LITTLER MENDELSON®
A PROFESSIONAL CORPORATION

ARIZONA
CALIFORNIA
COLORADO
DISTRICT OF COLUMBIA
FLORIDA
GEORGIA
ILLINOIS
MASSACHUSETTS
MINNESOTA
NEVADA
NEW JERSEY
NEW YORK
NORTH CAROLINA
OHIO
PENNSYLVANIA
TEXAS
WASHINGTON

March 7, 2005

Adam P. Forman
Direct: 617.378.6007
Direct Fax: 617.737.0052
aforman@littler.com

Mr. Feng K. An, Investigator
Equal Employment Opportunity Commission
Boston Area Office
John F. Kennedy Federal Building
Government Center, Room 475
Boston, MA 02203

Re: ***Seth Daniels v. American Power Conversion Corp.***
***EEOC Charge No. 161-2005-00257***

Dear Mr. An:

This letter constitutes the position statement of American Power Conversion Corporation ("APC" or "the Company") in response to the above-referenced charge of discrimination brought by Seth Daniels. For the reasons set forth in detail below, Daniels' claims of racial discrimination, retaliation and harassment are wholly without merit. APC terminated Daniels' employment because he persisted in conduct that violated the plain directives of the Company's travel manager, costing the Company thousands of dollars but resulting in valuable benefits for himself. The Commission therefore should issue a finding of no probable cause.

## I. Facts

### A. *Company Background*

APC is a global leader in power availability solutions for use in sensitive electronic, network, communications and industrial equipment of all sizes. Its back-up AC- and DC-based power products include surge-suppressors, uninterruptible power supplies, power conditioning equipment, power management software, and DC power systems. APC also manufactures precision cooling equipment and provides professional and consulting services for its end-users.

The Company employs approximately 1,800 persons in North America. Approximately 225 employees work in the East Providence, Rhode Island facility where Daniels worked. Daniels worked in APC's Global Services Group ("AGS").

Exhibit 1

APC is devoted to equal employment opportunity and to maintaining a harassment-free workplace. Copies of APC's current Equal Employment Opportunity and Anti-Harassment policies are attached hereto as Exhibits A and B.

B. *Daniels' Hire and Responsibilities*

Seth Daniels joined APC's Global Services group in September 2003 as the group's training and development manager. Daniels was interviewed by John Bonzani, Paul Kavanaugh, and Christine Hendrix. Once he was hired, Daniels was directly supervised by Bonzani, and Daniels' ultimate supervisor was Kavanaugh. Hendrix served as the human resources representative for the Company's East Providence facility where Daniels worked. In his offer letter, APC indicated that it would pay for Daniels' relocation expenses under the Company's relocation policy. Nonetheless, during his employment at APC, Daniels continued to reside in New Jersey, traveling to Rhode Island during the week and staying in hotels at the Company's expense. Daniels' salary was $75,000 and he was eligible for incentive bonuses. Daniels' offer letter is attached hereto as Exhibit C.[1]

As the training and development manager, Daniels' responsibilities included development and implementation of a training program for the Company's field service engineers ("FSEs") and for the Company's "high-powered partner" service organizations ("HPPs"). HPPs are firms that provide APC with service technicians who, like FSEs, travel to end-users' facilities to address any problems end-users encounter with APC's products. Daniels supervised a small team of two or three employees who helped him coordinate the training program.

As APC has clients nationwide, FSEs and HPPs are dispersed throughout the country. Training for FSEs and HPPs was normally held on-site at the East Providence facility, requiring the FSEs and HPPs to travel to Rhode Island and stay in hotels at the Company's expense.

C. *Daniels' Employment Has Auspicious Beginning*

Early on in his tenure at APC, Daniels ruffled feathers around the Company, especially in the Information Technology ("I.T.") and Finance Departments. For example, Daniels made unreasonable demands of the I.T. Department to provide technical solutions to his group that were not yet approved by the Company. He demanded that the I.T. Department provide his technicians with mobile e-mail devices called "Blackberries," when the Company had not yet decided whether to support such devices, and decided that FSEs were required to use a particular cell phone that was not supported by the Company's cell phone carrier at the time.

---

[1] Brian Kelly, who Daniels mentions in his charge, is APC's Director of Finance. He is not a member of Daniels' group, AGS, nor did he supervise Daniels.

In his very first week at the Company, Daniels also raised the ire of APC's Finance Department when he claimed to be "exempt" in entirety from federal taxes on his form W-4. It is the policy of APC's Finance Department to verify with employees who claim to be exempt from federal taxes that they meet the criteria of the Internal Revenue Service for doing so. Daniels was reticent with the Company's payroll coordinator, Bonnie Smith, when she asked him for confirmation that he qualified as exempt, so her supervisor, Brian Kelly, the Company's Director of Finance, contacted Daniels by phone and electronic mail to verify Daniels' eligibility. In these communications, Daniels was once again cagey, refusing to verify that he qualified as exempt from federal taxes. Kelly later met with Daniels in person and explained that Daniels must submit a different W-4 form unless he provided evidence that he was exempt from federal taxes. Daniels eventually complied with Kelly's directives and did not file his form W-4 as "exempt." At no time did Kelly question Daniels' credentials, or why Daniels was hired by the Company.

Daniels also refused to comply with and repeatedly attempted to evade APC's travel policies. For example, APC's policy with respect to travel expenses is that employees should pay for transportation, hotel and rental car expenses by charging them to an APC corporate credit card, or by obtaining a floating travel advance from the Company. APC allows an employee to direct bill such travel expenses to the Company in exceptional circumstances only, such as where an employee is ineligible to obtain a corporate credit card or is only eligible for a corporate credit card with an insufficient credit limit to cover their travel costs. "Direct-billing" of expenses allows an employee to rent a hotel room or rental car without expending his or her own money. Instead, the hotel or rental car agency directly bills APC, who pays for any services rendered to the employee. APC's direct billing policy allows APC to understand and approve the expenses being charged by employees before paying for them.

Daniels initially billed his rental car expenses directly to the Company. After his rental car was burglarized at a Providence-area restaurant in November 2003,[2] however, and the Company learned he had been direct-billing it for car rentals, the Company suspended Daniels' ability to direct bill such expenses. Brian Kelly suggested to Daniels that he apply

[2] In this incident, Daniels' laptop computer bag, containing his computer and weeks' worth of receipts substantiating his many travel expenses, was stolen from the back seat of the rental car. When Kelly learned that Daniels had kept the computer bag in plain sight in the back seat of the car, Kelly told Daniels that he believed Daniels was partially to blame for the theft, as he did not take care to conceal the computer or put it in the trunk. Nonetheless, APC did not require Daniels to pay the costs of replacing his laptop. Moreover, even though many of Daniels' travel receipts were stolen along with the computer bag, Daniels was allowed to substitute a written explanation for his travel expenses, and the Company reimbursed him for reasonable expenses incurred even without the receipts. The Company does not know to what Daniels refers in his charge when he claims that the Company did not question the judgment of four white managers whose laptop computers were stolen during a business trip.

for an APC corporate credit card. Daniels balked at this suggestion, and repeatedly asked the travel department's manager, Christine Bollman, to direct bill his various travel expenses. When Bollman repeatedly denied his requests and again suggested that he apply for a corporate credit card, he continued his attempts to circumvent her directives (and APC's policy) by asking other travel department employees to direct bill his travel expenses.

D. *APC Terminates Daniels' Employment.*

Bollman's directives concerning the Company's travel policies did not stop Daniels. In his most egregious violation of corporate travel policies, Daniels directed the FSEs and HPPs, who were traveling to Providence for training programs (that he developed and arranged), to stay at the Marriott Hotel in downtown Providence rather than at the Johnson and Wales hotel in East Providence.

The Johnson and Wales hotel was an APC-preferred hotel, with which Bollman had negotiated a rate of $68 per room, per night.[3] (See Exhibit D, attached hereto, outlining the rates available to APC employees at the Johnson and Wales hotel). As part of his deal with the Marriott, Daniels negotiated a rate of approximately $95 per room, per night, which is $27 more per night than the APC rate for rooms at the Johnson and Wales hotel. (See Exhibit E, attached hereto, which is a sampling of invoices from the Marriott revealing the $95 per room, per night rate). Daniels also moved the training sessions themselves from the APC facility in East Providence to the Marriott in downtown Providence.

For January and February 2004 alone, APC was charged approximately $8,000[4] more in hotel expenses in conjunction with training programs because of Daniels' scheme. (See Exhibits D, E and F, attached hereto. Exhibit F is an e-mail from the Marriott's Director of Sales and Marketing which explains that Daniels rented a large number of rooms for APC training at the Marriott in January and February 2004).

To make matters worse, Daniels personally profited from moving the Company's business from the Johnson and Wales hotel to the Marriott hotel. He devised a direct billing relationship with the Marriott, in direct violation of APC's practices, whereby the Marriott sent the bills to him at his office at APC in East Providence. The Marriott allowed Daniels to

---

[3] Bollman also negotiated rates of $78 and $88 per room, per night for the use of certain more expensive rooms at the Johnson and Wales hotel. However, the practice at APC was for employees to stay in the cheapest rooms available to them at the hotel. Unless no other rooms were available, or unless an employee had special circumstances, it was expected that they stay in the cheapest room.

[4] According to the Marriott, Daniels rented 116 rooms in January 2004 and 180 rooms in February 2004 for APC training events (totaling 296 room nights). (See Exhibit F, attached hereto). At the rate of $95 per room, per night, APC paid $27 more per room, per night for rooms at the Marriott than it would have had the employees stayed at the Johnson and Wales hotel where the room rate was $68 per room, per night. Thus, the math reveals that 296 room nights multiplied by $27 equals $7,992. (See Exhibits D, E and F).

accrue over 100,000 Marriott Rewards points for his personal account based upon the stays of other APC employees for APC training activities.[5] (See Exhibit F).[6]

Bollman only uncovered Daniels' scheme when the Johnson and Wales hotel called her to inquire as to whether there was a problem with the hotel's service because the business it received from APC had dropped so precipitously. This aroused Bollman's suspicions, and on February 6, 2004, she asked Daniels whether or not he was using the Marriott for training. Attempting to hide his self-serving and unethical conduct, Daniels lied, stating in an e-mail "we are not doing training at the Marriott." (See Exhibit G, attached hereto).

After some investigation, however, Bollman discovered the extent of Daniels' deception. On March 12, 2004, she received an electronic mail from the Marriott's Director of Sales and Marketing explaining that Daniels had rented a large number of rooms at the Marriott in January and February 2004 for APC events, and that he was awarded over 100,000 points to his personal Marriott Rewards account as a result. (See Exhibit F). Bollman immediately informed Brian Kelly, and later Brian Gough, then the Company's Director of Human Resources, what she learned from the Marriott. That same day, Gough informed Daniels' ultimate supervisor, Paul Kavanaugh, about Daniels' conduct. On that very day, March 12, 2004, Kavanaugh terminated Daniels' employment with the Company.

## III. At No Time Did APC Treat Daniels Differently Because of His Race.

In terminating Daniels' employment with the Company, APC was well within its rights. APC is entitled to require its employees to follow its corporate policies and practices. APC is equally entitled to insist that employees do not engage in conduct that amounts to self-dealing. Daniels, however, neither followed APC's rules, nor acted in APC's best interests. From the onset of his employment with the Company, Daniels established that he believed he was not subject to the Company's rules. When his violations of Company policy became particularly egregious, and ventured into the realm of self-dealing, APC terminated his employment.

APC terminated Daniels when it learned that he had been flagrantly violating the Company's travel policies and engaging in self-dealing. It discovered that Daniels had arranged to divert FSEs traveling to Providence for training sessions from the Johnson and Wales hotel, where the Company had negotiated a favorable room rate, to the Marriott hotel in downtown

---

[5] APC allows employees who travel on Company business to collect travel points for their own personal travel. Thus, if Daniels had followed Company practice, each individual renting a room at the Marriott would have collected travel points.

[6] At the time his employment terminated in March 2004, Daniels had not submitted bills from the Marriott for APC training activities to the Company for payment, nor had the Marriott been paid. Daniels' delay in processing these expenses is further evidence that he was attempting to hide the scheme he developed at the Marriott.

Providence. At the Marriott, Daniels had negotiated a deal that was favorable to <u>him</u>. Daniels made this arrangement after the Company's travel manager, Christine Bollman, expressly told him that FSEs should stay at the Johnson and Wales hotel where the Company had a preferred rate. Daniels also moved all of the training programs from APC's East Providence facility to the Marriott.

APC also learned that Daniels had arranged to receive Marriott reward points on his personal account for charges incurred as part of the FSEs' training programs at the Marriott. Finally, APC learned that Daniels had arranged a direct-billing relationship between the Company and the Marriott – which Bollman repeatedly explained was not allowed – whereby the Marriott sent Daniels the bills directly at his office at APC in East Providence. In what appears to be an effort to hide his arrangement with the Marriott, in the two-plus month period of this arrangement, Daniels never submitted any of the bills from the Marriott to APC's Finance Department for payment.

APC was not looking for a reason to terminate Daniels. It had hired him into a new and important position at the Company only six months earlier. But when the Johnson and Wales hotel contacted Bollman to determine if APC was displeased with its service because APC employees had abruptly stopped renting rooms at the hotel, APC was alerted to Daniels' scheme and had to act. Daniels' conduct during this two-month time period cost the Company approximately $8,000, and possibly more. To make matters worse, through his deal with the Marriott, Daniels misappropriated over 100,000 travel points for his personal use.

It is Daniels' ultimate burden to show that the termination of his employment was the result of intentional race discrimination. However, Daniels advances no credible evidence that he was treated differently because of his race or that APC's legitimate business reason for terminating him was because of his race. Each piece of evidence he cites falls down.

For example, Daniels' claim that APC does not employ many African-Americans in management or supervisory positions is belied by the fact that APC hired Daniels, who is African-American, into a position of management and supervision. Daniels also claims that he was held responsible for the theft of his laptop computer when other white employees whose laptops were stolen were not. But Daniels was not "held responsible" for the stolen laptop as he was not required to pay for the costs of replacing it. Daniels complains that the Company allowed other employees to accrue travel points when traveling on Company business. This is true – APC allows its employees to earn travel points for their <u>own</u> travel on behalf of the Company. Certainly, however, this policy does not entitle an employee to concoct a scheme to move Company travel (and corporate training sessions) for numerous

other employees in a given department to a hotel so that the employee can collect points in his own account, and at the expense of the other employees.[7]

## IV. Conclusion

It is plain from the above that Daniels' charge is entirely without merit. He has advanced no evidence supporting his claims that he was discriminated against, harassed, or retaliated against because of his race. For the foregoing reasons, APC requests that the Commission dismiss his charge and issue a finding of lack of probable cause. Please feel free to contact me should you have any questions.

Very truly yours,

Adam P. Forman

Boston:6596.3 049233.1002
3/3/05

[7] It is unclear to what Daniels refers in the allegation that he was discriminated against on the basis of his race after his termination because "the company deducted almost $1,000 from [his] final paycheck, for expenses for which [he] was either entitled for [sic] reimbursement, or had never taken from the company." Moreover, it is unclear how this possibly can constitute discrimination. APC maintains that it paid Daniels all wages to which he was entitled upon his separation from the Company in accordance with federal and state law.