IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

- - - - - - - - - - - - - - - x

SETH DANIELS,

Plaintiff

Civil Action

vs. No. 05-00459-ML-LDA

AMERICAN POWER
CONVERSION CORPORATION,

Defendant

- - - - - - - - - - - - - - - x

DEPOSITION of BRUCE E. GOUGH, a witness called on behalf of the Plaintiff, pursuant to the Federal Rules of Civil Procedure, before Patricia A. Conant, a Registered Professional Reporter and Notary Public within and for the State of Rhode Island, at the offices of Stephen Robinson, 155 south Main Street, Fourth Floor, Providence, Rhode Island 02903, on Thursday, November 9, 2006, commencing at 9:33 a.m.

**Exhibit 9**

Q. And other than this one complaint that came in over ethicspoint.com, were there any other complaints that came in over ethicspoint.com that you're aware of?
A. Yes.
Q. And about how many complaints are you aware that of that came in through ethicspoint.com?
A. We have received approximately 45 complaints through that tool.
Q. And how long has that tool been in place?
A. I believe it was activated in, in or around December of 2003.
Q. And what prompted it to be activated at that point?
A. Sarbanes-Oxley.
Q. You said there were 45 complaints that came over ethicspoint.com since it was instituted in 2003. Have you seen all of the complaints that come in over the ethicspoint.com?
A. Yes, I have seen all of the complaints that have come through ethicspoint.com.
Q. Okay. Are you aware of any complaints

that were made with regard to discrimination over ethicspoint.com?

A. Yes, I am.

Q. Okay. What about retaliation?

A. I am not aware of any relative to retaliation.

Q. Okay. How many discrimination complaints are you aware of that came through ethicspoint.com?

A. There are one or two complaints of discrimination internationally, none in the U.S.

Q. And those come in over ethicspoint.com?

A. Yes, they did.

Q. And what type of discrimination was complained about?

A. Without having the tool in front of me so that I could review the specifics of it, I will speak in generalities. There were claims of discrimination in India. However, the discrimination was not detailed to the point that you could determine why they used the phrase "discrimination," but there was nothing that indicated what they were being treated

differently as a result of.

Q. Okay. Other than the discrimination complaint that occurred in India -- you said there was one or two complaints about discrimination.

A. I don't recall the exact number. A few came in at the same time from India.

Q. Are you aware of any other discrimination complaints other than the ones in India?

A. No other complaints.

Q. That come over ethicspoint.com?

A. That's right.

Q. Are you aware of any other discrimination complaints that have came in to APC through any other means other than over ethicspoint.com?

A. Yes, I am aware of other discrimination claims that have came to the company.

Q. And how many?

A. The question is broad and it's not time-limited. I've been with the company for 13 years. Are you asking for that number across the 13-year period, or are you asking current or are you asking closed?

Q. The entire time. How many discrimination complaints were made while you've been employed at APC?

A. I cannot give you an exact number. I would say that it may be in the raining of 20 in the U.S.

Q. What about outside the U.S.?

A. Those -- I wouldn't be aware of all of those complaints because I haven't been in a global capacity for that long.

Q. How many are you aware of other than the ones in India?

A. Again, those are the ones I am aware of. I don't know of any others, specifically.

Q. You don't know of any others. Do you know whether or not there have been others, just not the specifics?

A. I don't know definitively whether there have been.

Q. Okay. The 20 or so in the United States, were any of those discrimination complaints based upon race, do you know, without reviewing any documents?

MR. KOSTAKOS: You mean beyond

this particular claim or including, I guess.
I guess it doesn't matter, does it? As long
as we're sure of that.
A. I'm aware of one other ethic origin
claim. And one other race claim.
Q. When you say "other," you're saying other
than Mr. Seth Daniel's complaint you are aware
of an additional race discrimination claim as
well as an ethnic origin claim, correct?
A. Correct.
Q. Do you know what race the individual was
who complained about race discrimination at
APC?
A. He was an African American male.
Q. And the ethnic origin claim, do you know
what ethnicity the individual was?
A. He was Danish.
Q. Do you recall when the race
discrimination complaint was made by the
African American?
A. I don't recall, no. I believe the year
was 1999.
Q. Okay.
A. That's my recollection at this point.

I'm not exactly sure, but I believe it was 1999.

Q. Okay. And what was the nature of the complaint, more specifically?

Actually, before I ask that question, do you recall the name of the individual who made the complaint?

A. Yes, I do.

Q. What was his name?

A. Junior Thomas.

Q. Junior Thomas?

A. Yes.

Q. Okay. Go ahead and describe the nature of the complaint for me as best as you can recall?

A. He claimed that he had received an offer of employment less salaried than other white males in similar circumstances.

Q. Okay. And what was his position that he was hired into?

A. He refused the offer for a promotion into a -- I believe it was a tech support engineer role.

Q. Well, was it, in fact, that he complained

that the promotion that he was offered was for a lower salary, or was it employment in the first instance?

A. He was working for us in a technician role on the manufacturing floor. He applied for a position with the customer service team as a tech support engineer.

Q. Okay. So he was an employee who applied for a promotion and he complained that the salary offered to him for that promotion on the customer service team was lower than that offered to white employees in that same position, is that correct?

A. That is correct.

Q. And who did he complain to?

A. He filed his complaint with the Rhode Island Commission.

Q. Okay. And prior to filing with the Rhode Island Commission, had he spoken to anyone at APC about his race discrimination complaint?

A. No, he had not.

Q. Okay. And what investigation, if any, did APC conduct after the complaint was filed with the Rhode Island Commission with regard

to his race discrimination complaint?
A. We reviewed all job offers made for individuals coming into a tech support role. We reviewed the salary offer provided. We looked for any variance based on race, sex or age, and we found nothing.
Q. Who conducted those reviews?
A. I did.
Q. Anybody else assist you?
A. The general counsel reviewed the materials, as well.
Q. Did you draft any memorandum at all with regard to your investigation or any of the steps you took or any of the findings you made with regard to that race discrimination complaint?
A. External counsel has been involved in drafting any responses regarding that complaint.
Q. Did you draft any memos at all in regard to any of the claims or your investigation?
A. I did not draft any.
Q. Did you take any notes at all with regard to your investigation?

A. I believe external counsel was involved it this matter and I allowed them to take any notes. I just provided them data.

Q. And did you maintain any of the data that was provided to counsel? Did you have a file with the investigation at home?

MR. KOSTAKOS: If you --

A. I can't speak definitively. I believe we do.

Q. Where would that be maintained?

A. In the human resources office.

Q. That would be your office that you oversee?

A. Yes.

Q. Okay. Did -- would that also contain the response from APC to the Rhode Island Commission regarding the complaint? Would the response be in that file as well?

A. I don't know definitively if it is in the file or not. It would have been a response that our general counsel would have maintained in their files because external counsel would have been involved in it.

Q. When you say external counsel, was it an

outside law firm that was involved, or was it the in-house attorneys?
A. External counsel would be someone from, at that point, more than likely, Testa Hurwitz in Boston. No longer in existence.
Q. Would in-house counsel have been involved, as well?
A. Yes, they would have.
Q. Okay. Do you -- did the employee ever file a lawsuit, do you recall, against APC?
A. My recollection is that he received a Right to Sue letter, and that he has filed in the State of Rhode Island. I am not aware of where we stand with that currently.
Q. So it's actually on-going litigation?
A. Yes, I believe so.
Q. Do you know who his attorney is?
A. No, I do not. If I recall correctly, he is representing himself.
Q. Have there been any offers of settlement in that case?
A. Not that I am aware of.
Q. Okay. Do you recall when that lawsuit was filed?

A. Somewhere in the range of 1999 to 2000.
Q. Okay. The ethic origin claim, do you recall the name of the individual who made that claim?
A. His last name is Olson. I cannot recall his first name.
Q. How did you become aware of that claim?
A. He sent a letter to our in-house counsel.
Q. What role, if any, do you have with regard to his complaint of ethic origin discrimination?
A. I provided data to the general counsel as to reasons for termination.
Q. So it was actually a termination case?
A. Yes.
Q. And when was that termination?
A. A few years ago. Say two to three years.
Q. And describe for me, other than providing documentation to in-house counsel, did you conduct any other investigation at all with regard to Mr. Olson's claims regarding his termination based on what he believed to be his ethic origin?
A. No, I did not.

Q. Okay. What position did Mr. Olson hold at the time he was terminated?
A. Product manager, I believe, was his title.
Q. And where did he work? Where did he work out of?
A. He worked out of West Kingston, Rhode Island.
Q. Do you know if he filed a charge with the Rhode Island Commission or the EOC?
A. No, he did not.
Q. Did the company enter into a settlement agreement with him regarding his claim?
A. It is my understanding that, yes, we did.
Q. And what was the settlement agreement as you can recall?
A. Minor, a few thousand dollars, is best I can recall at this stage.
Q. Okay. Was there an executed settlement agreement in that instance?
A. It is my understanding there was.
Q. Okay. And where would that settlement agreement be maintained? Would APC have a copy of that?

A. Our general counsel would have that in his files.

Q. Okay. Did APC find that, in fact, he had been terminated -- that his ethic origin was a factor in his termination.

MR. KOSTAKOS: Objection.

A. We found it was not a factor in his termination at all.

Q. And on what basis do you make that statement?

A. Based on the circumstances surrounding his termination. It was performance based. That was the reason for his termination. That is APC's position on that.

Q. Well, do you have specific knowledge with regard to how that position was reached, the facts of the case? The facts of the complaint?

A. No, I don't.

Q. You just know the position that APC has taken, is that correct?

A. That's correct.

Q. Other than general counsel, would anybody else have knowledge regarding the facts

surrounding the decision to terminate Mr. Olson?
A. His manager would have knowledge of that.
Q. Well, was HR involved at all with regard to his termination?
A. Yes, we were.
Q. Okay. And who at HR was involved?
A. One of the human resource generalists.
Q. Who was that?
A. Joan Hutchinson.
Q. Is that somebody under your direction?
A. Yes, it is.
Q. Do you have any conversations with Joan Hutchinson regarding Mr. Olson's termination prior to his termination?
A. Yes, I did.
Q. Okay. And tell me about those conversations.
A. I informed Joan that there were continuing performance concerns at the highest level regarding this particular employee, and that the manager was looking to move to terminate, instructed her to administer that as necessary.

Q. How did you become aware that there were performance concerns at the highest level with regard to Mr. Olson?
A. I was informed by the vice president in charge of that area.
Q. The vice president of what? That area?
A. The area.
Q. What area was that?
A. Was the large systems area?
Q. And who is the vice president?
A. Dwight Sperry, S-P-E-R-R-Y.
Q. And who has final authority, final decision-making authority to terminate an employee? Is it the manager or is it HR?
A. Human resources authorized the termination.
Q. And do you have a file with regard to Mr. Olson's termination?
A. I don't have a specific file on him.
Q. Would his personnel file include documents related to his performance-related issues?
A. I can't speak to what's in his file at this point. I don't know.

Q. Well, you say at this point. Do you know whether or not his termination-related documents and his performance-related issues were ever in his file?
A. I can't speak specifically to that. I do not know if they were ever in the file or not.
Q. Okay. When the vice president came to you and spoke to you about the performance-related issues, what if any documents did you review with regard to Mr. Olson's performance?
A. I can't recall any specific documents I reviewed at that time.
Q. Did you review any?
A. I don't recall reviewing any at this stage.
Q. Was it that you don't remember whether you did or not, or you believe you don't -- you didn't?
A. I don't remember if I did or not.
Q. Okay. Do you recall whether the vice president contacted you verbally or in writing through an e-mail or letter or how did he contact you about Mr. Olson's

performance-related issues?

A. I don't remember that.

Q. Okay. Did you provide any documents to counsel referring to either Mr. Olson or Mr. Junior Thomas in relation to the claims in Mr. Daniel's case?

A. I don't believe I did.

Q. Is it your understanding that such information was requested by plaintiffs --

MR. KOSTAKOS: Objection.

BY MS. KISCH:

Q. -- for Mr. Daniels?

A. I don't recall any request of that nature.

Q. Did you provide information to the attorneys generally, even if it wasn't documents, about either of those two individuals in relation to Mr. Daniel's litigation?

A. I don't recall having any conversations relative to those two cases in relation to this particular case.

Q. Are you aware whether or not that information was requested?

commission?
A. General business practices I would not maintain those files. I would allow our general counsel to maintain those.
Q. Okay. Were there any other termination-based complaints for those individuals who filed complaints with the Rhode Island Commission, EOC or other state commission?
A. I can't recall any other specific filings with any of the varying commissions.
Q. You'd have to look at the files themselves?
A. Yes, I would.
Q. If there were any others, would the investigation with regard to performance-related issues or the termination itself, would the personnel files for those individuals include documentation with regard to the performance-related issues or the reasons for their terminations?
A. Files maintained by the general counsel would have notations on the investigation relative to the claims. My expectation is

they would have some of those items.

Q. I assume there's a personnel file maintained separate from the general counsel files, correct?

A. There is a personnel file maintained in human resources office.

Q. And in those personnel files, would it contain the e-mails or the correspondence or any other notes related to the decision leading up to the terminations?

MR. KOSTAKOS: Objection.

A. As a general practice, those items would be maintained in an employee relations file as opposed to the personnel file.

Q. Okay. And who maintains the employee relations file?

A. Human resources department has a filing system for that.

Q. And tell me, does an employee relation file exist for every employee or certain employees?

A. Only where cases or issues brought to our attention and we need to maintain a file.

Q. So is it the case that an employee or

manager complains about an issue and brings HR into the process then an employee relation files are created for the employee about which the issue has arisen?

A. It would depend on the severity of the situation. If the HR individual taking the intake of that felt that there was a need to document anything, they would then create a file for that.

Q. What if the HR individual keeps notes about the complaint. Would an employee relation file be created?

A. No, it would not.

Q. If an actual full-scale investigation is conducted, would that give rise to a file being created?

A. Typically, yes.

Q. If an individual is going to be terminated or there's complaints that are leading up to a termination, would that cause an employee relations file to be created?

A. Again, it would depend on the circumstances surrounding it. It is possible that an employee relations file would be

created in that situation.

Q. Well, is there ever an instance in which an employee is being terminated in which there is not a full-scale investigation conducted?

MR. KOSTAKOS: Objection.

A. I guess my response would be there could be circumstances where a full-scale investigation would not necessarily need to be done, and depends on your definition of full-scale investigation. If there is irrefutable evidence of a violation of policy, then a full-scale investigation may not necessarily need to be done.

Q. Okay. Well, how many instances do you recall in which an employee was terminated in which a full-scale investigation was not done, and when I mean a full-scale investigation, I'm referring to the investigation process you described earlier, the best practices investigation?

MR. KOSTAKOS: Objection.

A. We do a number of terminations relative to reduction in force or realignment of the work force. We do -- have done terminations

for -- sorry. Strike that.

I cannot put a number on it, but we have not done terminations where the manager has brought forward evidence of a performance concern. Sometimes that's in the form of numbers, sometimes it's other formats of interactions, notations for customers, concern with an employee, etc.

Q. And are you saying that there are instances in which the manager may bring forward evidence of a performance concern of an employee and the best practice is investigation that you described earlier is not conducted?

A. Yes.

Q. Okay. Tell me those instances in which you can recall where an individual was terminated after a manager brought forward concerns about an individual in which the employee was terminated, but no best practices investigation was conducted?

MR. KOSTAKOS: Objection.

A. Again, I've been an HR capacity for eight years. I've dealt with hundreds of

of individuals being terminated for cause?
A. I don't recall any circumstances.
Q. Do you recall any individuals?
A. No.
Q. Do you recall whether, in fact, there were individuals terminated for cause during that time frame?
A. I can't speculate. I don't recall.
Q. Okay. If there were any such individuals between 2000 and the present, would their personnel files reflect the circumstances surrounding their terminations -- excuse me, would the employee relation file reflect the circumstances surrounding their terminations?
A. In general, yes.
Q. Okay. Do you know whether there were employee relations files maintained in for each of the individuals terminated for cause between 2002 and 2004?
A. Again, since I don't have the names, I can't verify that.
Q. You don't recall the names?
A. And it's a set of files that I don't know everything that's in there.

Q. Is it in a file cabinet, the employee relations file?
A. Yes, it is.
Q. And how many drawers does the employee relations file fill in the file cabinet?
A. One or two.
Q. One or two?
A. Yes.
Q. Okay. Is it a -- is this like a standard, large file cabinet or is it, you know, with horizontal files?
A. Standard, fireproof, three drawer or four drawer.
Q. Four drawer. And lengthwise, how many feet across would you say the file is?
A. Not horizontal, normal size.
Q. How many feet of files would you say is encompassed in these employee relations file, or inches. Are we talking a few inches or several feet?
A. Talking two drawers at most.
Q. I know, I'm just trying to understand the size of the drawers?
A. Regular fireproof file cabinet. I don't

know what the -- what's that? 36 inches?
Q. Each?
A. For each drawer.
Q. Okay. Was an investigation conducted for the employees who were terminated who manipulated the phone system? Best practices investigation?
MR. KOSTAKOS: Objection.
A. My recollection of it is that the manager brought forward the evidence and we took action.
Q. Were you involved in approving those terminations?
MR. KOSTAKOS: Objection.
A. I can't recall the specifics of whether I approved verbally in writing or otherwise. I was the director at the time so I would have had accountability for the terminations so I'm certain I was briefed on them.
Q. Okay. Do you recall any specifics about the conversations you had with the manager?
A. No, I don't.
Q. Do you recall who the manager was?
A. No, I don't.

Q. Do you recall -- you don't recall who the manager was?

A. No, I'm not sure. They have team leaders managers. The director would have been Brent Cogswell.

Q. And he was the director of what?

A. Customer service team.

Q. And where were those individuals who were terminated located? What office?

A. West Kingston, Rhode Island.

Q. Did any of those individuals file complaints that they were terminated for illegal reasons?

MR. KOSTAKOS: Objection.

A. No. There were no complaints from that termination.

Q. Okay. And when you say there were no complaints, there were no complaints filed with the commission or a lawsuit filed, is that what you mean?

A. There were no complaints filed with a commission or any court.

Q. Did any of the individuals who were terminated actually raise a complaint

did you give your approval, actually, to Mr. Daniel's termination?

MR. KOSTAKOS: Objection.

A. Yes, I did.

Q. How did you determine that booking the hotels at the Marriott was not in the best interests of APC?

MR. KOSTAKOS: Objection to the extent -- objection, that's not the reason, sole reason.

MS. KISCH: Please don't make a speaking objection.

MR. KOSTAKOS: You shouldn't misrepresent --

MS. KISCH: I didn't misrepresent anything.

BY MS. KISCH:

Q. Go ahead.

A. Can you repeat the question?

MS. KISCH: Could you repeat the question.

(Last question read back by reporter.)

MR. KOSTAKOS: Objection.

she felt Mr. Daniels should be terminated?
A. No, she did not.
Q. Did anyone ever make such a recommendation to you?
A. No.
Q. So you're the one that came up with the position that he should be terminated?
A. I would say between his manager and myself made that determination.
Q. All right.
A. I misspoke there because I believe his manager at the time was John Bonsoni (phonetic). The director and general manager of that particular area, Paul Cavanaugh, and we were the ones to go over the situation and determine what to do.
Q. When you first had your conversation with Miss Bollman, did she have all the information at that point that you had asked for?
A. I don't recall. Again, I believe we had a couple of follow up conversations on additional minor issues that I needed to verify.
Q. Like what? What did you need to verify?