IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| SETH DANIELS,<br><br>Plaintiff,<br><br>vs.<br><br>AMERICAN POWER CONVERSION CORPORATION,<br><br>Defendant. | Civil Action No. 05-00459-ML-LOA |

Deposition of CHRISTINE B. HENDRIX, taken pursuant to Fedeeral Rules of Civil Procedure, at the law offices of Stephen Robinson, 155 South Main Street, Providence, Rhode Island, before Sarah J. Miner, L.S.R., a Notary Public in and for the State of Connecticut, on October 18, 2006, at 9:00 a.m.

**Exhibit 10**

Do you recall the issues surrounding those individuals who were put on those plans who were terminated.

A. I remember one specifically.

Q. What was the issue of the one?

A. He would go to customer sites, and fall asleep on-the-job.

Q. And what was his name?

A. I don't recall his name.

Q. Do you recall his race?

A. I know what he looked like, yes, he was white. He was Caucasian.

Q. And how did you become aware of the problem with this white employee falling asleep on-the-job sites?

A. His supervisor brought it to my attention, if I recall.

Q. Do you recall who his supervisor was?

A. I don't. I don't.

Q. Did this individual work in the Providence area?

A. No. He worked in Pennsylvania.

Q. You had oversight of individuals outside of the Providence area?

A. Yes, my area was outside of Providence.

Q. You didn't have any job duties or responsibilities over employees in the Providence area?

A. I am sorry, I did, for the dispatch group, as well. But the field service group in general is all over the nation.

Q. So this individual was in the field service group who was falling asleep on the sites?

A. Yes.

Q. And had you general responsibilities over all the individuals in the field service group?

A. For human resources, yes.

Q. That is what I mean.

Do you recall what year this occurred in which you heard about this, this supervisor came to you with this issue that a white employee was falling asleep at the job site?

A. I don't.

Q. When he came to you, was the supervisor a man or woman; do you recall?

A. They were all men. He would have been a man.

Q. All the supervisors were men?

A. Yes.

Q. Do you recall the race of the supervisor?

the person's employee personnel file?

A. Yes.

Q. Would you also put that in the personnel file?

A. It is likely, yes.

Q. Other than notes, would there be any other documentation with regard to whether or not an individual met the requirements of the performance improvement plan?

A. Not that I recall.

Q. Did you ever E mail any individuals with regard to whether or not an individual was meeting all the expectations under the performance improvements plan?

A. Depending on the situation, perhaps.

Q. Do you recall anything about other individuals that were put on performance improvement plans in which you were involved?

A. I vaguely remember another employee in Florida who had negative interactions with a customer. I don't recall any more details at all about that.

Q. Do you recall the race of that individual?

A. I never met that individual, I don't recall.

Q. So you don't know if that individual was white?
A. I don't recall.
Q. And that individual got put on a performance improvement plan, correct?
A. As I recall, yes, he did.
Q. Do you recall how he learned about that issue?
A. Yes, from his supervisor.
Q. Do you recall who his supervisor was?
A. I do.
Q. Who was that?
A. David McDaniel.
Q. David McDaniel?
A. Yes.
Q. What is his race?
A. David is caucasian, white.
Q. What position does David McDaniel hold?
A. I think his title was supervisor, field service supervisor.
Q. Do you recall anything about what the negative interactions were?
A. I don't. I don't, I am sorry.
Q. Do you recall whether this individual met all the expectations in the performance

put someone on a performance improvement plan if nobody else supported your decision?
A. No.
Q. No?
A. No.
Q. How many individuals can you recall you felt should have been put on the performance improvement plans but were not.
A. I don't.
Q. Was it more than one.
A. Sure. There were a couple of people.
Q. Tell me what you remember about one of the individuals who you felt should have been put on the performance improvement plan who was not?
A. I remember a person in engineering, which was a group I didn't support. And he had an attendance issue that I thought should have been addressed, an attendance issue that turned into a productivity issue that I think should have been addressed.
Q. Do you recall who the supervisor was?
A. I don't.
Q. Who was the HR generalist handling that one; do you recall?
A. No. I don't know exactly who it was.

A. No.
Q. Do you recall instances where there were discussions about an individual's possibly being terminated for too much internet use?
A. Yes.
Q. What individuals do you recall?
A. One specifically, I don't recall his name. It was a manufacturing employee. His director had a concern that he was spending too much time on the internet. I am sorry. He is the manager.
Q. Do you recall the race of the employee?
A. Yes, he was Hispanic, likely Hispanic.
Q. Do you recall his name?
A. I don't recall.
Q. You are saying likely Hispanic.
A. I am not sure if he was Hispanic or Indian.
Q. And do you recall who the manager was?
A. J. Guimond.
Q. Do you know how to spell his last name?
A. G-U-I-M-O-N-D.
Q. What race was he?
A. White.
Q. And tell me about how you learned of this issue?
A. J. Guimond came into my office, and said, I

can't remember his name, we think he has been spending too much time on the internet. I have pulled the report, found it not to be true. That was the end of the situation.
Q. How much time had he been on the internet?
A. I don't recall specifically, not a huge amount.
Q. Like, did you look, when you pulled the report, does it tell you what they do, what they spend per day, per week, per month, per year?
A. I don't recall specifically the format of the report. I don't recall.
Q. Did you show the report to the manager?
A. No.
Q. Did you tell the results of the report to the manager?
A. Yes.
Q. What was the manager's response?
A. On, okay, good.
Q. When the manager came to you and said that the employee was spending too much time on the internet, did the manager actually recommend termination?
A. He said, is this something we should be terming for.

Q. Did you have any discussions with anyone other than requesting the internet report, and speaking with the manager about the issue?
A. Not that I recall.
Q. Do you recall any other individuals who for whom supervisors or managers or someone complaining they were using the internet too much?
A. No, that is what I remember off the top of my head.
Q. Do you remember any other individuals, manager, supervisor or anybody else that came to you and said there is an issue with an employee, and perhaps they should be terminated or disciplined or we need your advice on that issue?
A. Sure.
Q. Do you remember the circumstances surrounding any of those individuals?
A. Yes.
Q. What do you remember?
A. One when an engineer was in our group who people felt was not being productive, not sort of putting out a solid work product. And we considered what to do with him.
Q. In what way was that -- do you remember who that individual was, is?

A. Yes.
Q. What is the name of that individual?
A. Andy Cross, C-R-O-S-S.
Q. What race is he?
A. Caucasian, white.
Q. How did you learn that there were concerns about Andy Cross's work products?
A. His manager brought that to my attention.
Q. Who is his manager?
A. Paul Kavanagh.
Q. What specifically do you recall answering the problem about his work product?
A. I don't remember specifically what the concern was. I just remember they weren't happy with the product they were producing, I don't remember specifically.
Q. Do you recall anything about what Mr. Kavanagh told when you he told you there was an issue?
A. No, just that they weren't happy with what he was doing. And we talked about different ways to look into that situation and to remedy it in conversations.
Q. Did Mr. Kavanagh come to you and express any opinions as to whether or not he felt that

individuals should be disciplined or terminated or put on a performance improvement plan?

A. I don't recall him coming in a specific recommendation. I recall it just being conversation. I don't recall anything specific.

Q. Well, what was your understanding as to the reason he was coming to you?

A. To try to figure out what to do.

Q. In terms of should he be disciplined or should he be terminated or something else?

A. Just what should I do, I need to get this turned around.

Q. What were the various ways -- what did you talk about were the various options in dealing with Andy Cross's not being productive, and not having solid work product?

A. I don't recall specifically. What I recall talking to him about, having a conversation with him, outlining expectations. I don't recall whether we actually did go to performance with Andy. I don't believe we did.

Q. After Mr. Kavanagh came to you, and told you that Mr. Cross's work product was not solid, and he was not being productive, you recommended that Mr. Kavanagh speak with the employee and

outline -- well, that he speak with the employee; is that correct?

A. I am not sure specifically what I recommended. But we discussed possible options. But I don't recall specifically what I recommended.

Q. And you don't remember what those options were, correct, that you discussed?

A. No, I don't remember specifically for Andy what the specific options were. I just remember there being an issue.

Q. Do you remember what APC ended up doing with regard to Mr. Cross?

A. While I was there?

Q. Yes.

A. I don't recall that we went -- I don't recall whether we went to performance action plan with while I was there, and no further action was taken.

Q. While you were there no further action was taken; is that what you said?

A. He wasn't terminated.

Q. You don't know whether or not he was put on a performance improvement plan, correct?

A. I don't recall that we did. I know it was a conversation.

Q. Any other responsibilities -- did you have any other responsibilities with regard to maintaining the personnel files for employees at APC?

A. No.

Q. Where are the actual personnel files kept, are they kept in somebody's office or a file room, where are they actually kept?

A. They were in a file room, I don't know where they are now.

Q. Other than that one individual that you just mentioned Andy Cross, are you aware of, and that one Hispanic or Indian individual who J. Guimond managed, are you aware of any other individuals whose work performance was at issue while you were at APC?

A. Yes.

Q. Who?

A. Cathy. I can't remember her last name reported to Paul.

Q. She reported to Paul Kavanagh?

A. Yes. I mean there were a number of people.

Q. What is the issue you recalled with regard to Cathy who reported to Paul Kavanagh?

A. She was responsible for the marketing

program for APC, and they weren't pleased with the marketing program that she put together.
Q. Why not, do you know what was wrong?
A. I don't. I don't recall.
Q. What was her race, or what is her race?
A. She is white.
Q. How did you learn that there was an issue with regard to her work performance?
A. Paul brought it to my attention.
Q. Do you recall what your conversations were with Mr. Kavanagh with regard to Cathy?
A. No, they would have been similar to conversations with Andy, what should we do, what should we do, where should we go?
Q. Do you recall what the outcome of those conversations were?
A. No.
Q. Do you recall whether or not she was terminated for her poor work performance?
A. She was not terminated while I was there.
Q. Do you recall when this occurred, when this issue arose regarding poor work performance?
A. Not specifically, no.
Q. Do you know whether she has been terminated since you left?

A. I don't know. I don't know. Cathy Green is her last name.

Q. Green. Okay. Was she put on a performance improvement plan while you were at APC as a result of the poor work performance that Mr. Kavanagh had brought to your attention?

A. I believe so.

Q. Did you ever have any meetings after she was put on a performance improvement plan with regard to Cathy Green's performance?

A. Yes.

Q. Who did you have those meetings or discussions with?

A. Cathy.

Q. Do you have any further conversations with Mr. Kavanagh after Cathy Green was put on the performance plan?

A. Yes.

Q. What did he tell you?

A. Updates on the new marketing plan.

Q. Did he tell you whether she was meeting the conditions of the performance improvement plan?

A. I don't recall specifically, but --

Q. But what?

A. But I don't recall specifically what he

said.

Q. Well, is it your understanding that she at the end of that 90 day period met the expectations of the 90 day performance improvement plan?

A. I don't recall. I believe it was towards the end of my employment. I don't recall whether I saw an end to that situation one way or another.

Q. Well, did her 90 days end prior to you leaving?

A. That is what I don't recall. That is why I am not sure.

Q. Well, while you were there, from your meetings with Mr. Kavanagh, and your meetings with Cathy Green, was it your understanding that it was looking like she was going to meet those expectations or not?

A. I believe it was looking like she was going to meet those expectations, yes.

Q. What other individuals do you recall?

A. There was a woman who reported directly to Cathy who we terminated her employment.

Q. What was her name, do you remember?

A. Julie, but I don't remember. I will think of it.

Q. What was her race?

situations.

Q. Is there any other parts of the termination process that you regularly undergo other than what we have already talked about?

A. There is a notification process that goes out to the IT, and things like that.

Q. What is that notification process?

A. It is an E mail that goes from I believe I am not sure directly from the HR system or from the assistant, by Brian's assistant, I don't know specifically. It just went out to IT to suspend services.

Q. Who is Brian Gough's assistant?

A. Charlotte Lee was at the time.

Q. Other than notifying IT when an individual is terminated, are any other individuals notified of the termination?

A. I am not sure who is on that notification E mail. It was a blind E mail so I wasn't, I can't see other people assigned to it.

Q. But you got that notification yourself?

A. I don't recall a notification. I recall setting in motion the notification to go out. Telling Charlotte this person was terminated, and she would do that.

Q. You don't know whether it went to anyone other than IT?
A. I don't recall. I don't remember.
Q. Is there any other sort of practice in notifying an individual that an individual is terminated?
A. It would have been through that E mail.
Q. That was the practice?
A. Right. There was no other practice.
Q. Are you aware of any individuals at APC who have been disciplined at any way other than through termination or through their performance improvement plan?
A. Coaching from their supervisor.
Q. And I think you told me about one such individual. Are you aware of any others, do you recall any others?
A. Numerous. There are numerous people who would have been coached.
Q. Do you recall any individuals under Paul Kavanagh's authority who were just spoken to by a supervisor rather than being put on a performance improvement plan or terminated other than what you have already told me?
A. Again, that would go under the I am sure

there were a number of people. I don't recall anyone specifically.

Q. Okay.

A. Not recalling specifically doesn't mean it didn't happen.

Q. Do you recall even if you don't recall the individual's names, do you recall the instances surrounding any of those individuals?

A. No.

Q. You mentioned earlier one of your job duties in general was intake of concerns I think we already talked about that?

A. Yes.

Q. You mentioned conflict resolution?

A. Yes.

Q. Is that something separate from what we have already discussed?

MR. KOSTAKOS: Objection.

THE WITNESS: No.

BY MS. KISCH:

Q. That would come into, that would fall into the intake of concerns or the termination process?

A. Right.

Q. You said that there are sometimes issues as part of the complaint process of an individual came

to you, and made a complaint about a leader you wouldn't necessarily go and speak to that leader about the issue. Do you remember that?

A. Yes.

Q. What would you do in the instance where an individual came to you, and complained about a leader when you use the term leader that is supervisor or manager?

A. Yes.

Q. What would you do in that instance?

A. It very much would depend on the situation. I may speak with that manager's director or I may speak with other pertinent parties. I mean, options are wide open depending on the nature of the concern.

Q. Are there instances in which someone made a complaint about a manager or supervisor in which you did not follow up in speaking to someone?

A. Yes.

Q. And what were those instances?

A. There was a, I don't remember specifically his title, there was an office manager who having sat next to me who people complained about fairly regularly. Just from a competency standpoint.

Q. And when individuals complain to you about

the office manager's competency, what if anything did you do?

A. His position was being eliminated, I would take notes of the -- I would talk to the person about how to handle the concern, knowing that there was this outcome anyway.

Q. Was this part of one of the layoffs?

A. I don't recall specifically.

Q. So you are saying you knew this individual was no longer with the company so you felt there was no need to address it; is that correct?

A. No, not specifically. I didn't -- I knew he wasn't able to fix the things that people were bringing to my attention, and I knew that his concern, he was leaving an appointment.

Q. When you say he wasn't able to fix the concerns, what were the concerns?

A. They are just related to his computer skills, and things like that.

Q. Other than the office manager, are there any other individuals who -- any others supervisors or managers who employees complained about you did not follow up and have a conversation with another individual?

A. I can't think of one.

Q. It would have been your general practice to follow-up with somebody about the complaint, correct?
A. Generally, yes.
Q. Do you recall receiving any complaints from anyone that they felt that a supervisor or manager was not treating them fairly?
A. Yes.
Q. Who do you recall those complaints coming from?
A. A field person in North Carolina. I don't know his name.
Q. Anybody else?
A. Yes. I received a complaint from Andy Cross about John Bonzani. I received numerous complaints about Seth.
Q. About Seth or from Seth?
A. About Seth. There were a number I received.
Q. Who else?
A. J. Guimond, Ron Templeton.
Q. You received complaints about J. Guimond or from J. Guimond?
A. About J. Guimond.
Q. You received complaints about Ron

Templeton?

A. Yes. And from Ron Templeton, and about, and from John Bonzani.

Q. Who did Ron Templeton complain about?

A. His co-supervisor he didn't feel was pulling his weight.

Q. Who did you receive complaints of when J. Guimond complained? Did he complain about anything else?

A. He complained about the individuals I quoted earlier.

Q. Who was that?

A. That was the internet person.

Q. Okay. But the internet person wasn't his supervisor manager, was he?

A. No. J. Guimond was the head of the whole thing.

Q. The field person in North Carolina you received a complaint from him or about him?

A. From him.

Q. About who?

A. About his supervisor.

Q. Who is who?

A. I don't recall if it was Tom Saleki.

Q. What was the nature of that complaint?

A. He felt that he was, I believe his word was riding him too hard to get his work done.

Q. What if anything did you do in response to that complaint?

A. I believe I spoke with Tom to understand the concerns with the employees' work product. And then I spoke with John Bonzani as Tom's supervisor at the time to understand any concerns with Tom.

Q. And what, if anything, did you find out from John Bonzani?

A. That he hadn't heard anything additional about Tom in the field having these types of complaints or concerns.

Q. And what did you learn from Tom when you spoke to him?

A. That he outlined for me the concerns that the tech was having, the concerns he had about the tech's performance.

Q. Did he have concerns about the tech's performance?

A. He did.

Q. Was the tech put on a peformance improvement plan?

A. I don't recall that he was. I don't recall specifically, though.

Q. Did you speak to anyone else other than Tom or John Bonzani about the concerns raised by the tech in North Carolina?
A. I don't recall speaking to anyone else.
Q. Did you speak with Brian Gough?
A. I don't recall I did.
Q. Did the tech, field person in North Carolina ever express to you whether he was satisfied about the issue?
A. Yes. He was not involved.
Q. He was not involved. What if anything did he want done?
A. He wanted -- he had grandiose -- he wanted Tom fired. He wanted John fired. Probably me fired. He didn't say that to me, though.
Q. Did that field person or tech in North Carolina continue to work for APC after the complaints were made?
A. Yes, that I recall.
Q. Was he ever disciplined in any way that you recall?
A. I don't recall that he was disciplined. I recall it being a communication problem between Tom the tech.
Q. Do you know whether that was ever resolved?

A. I felt it was resolved.
Q. What was the race of that field person in North Carolina?
A. I don't know.
Q. What was the nature Cross's complaints about John Bonzani.
A. Just thought he was mean.
Q. Did he give you anymore specifics other than coming to you and saying John Bonzani is mean?
A. No. Just that he was difficult to get along with in meetings.
Q. Anything else?
A. That is what I remember.
Q. What if anything did you do to follow up after Dean Cross made those complaints about John Bonzani.
A. Spoke to Kavanagh.
Q. What do you recall about your conversation with Paul Kavanagh about Andy Cross's complaint about John Bonzani?
A. Paul had concerns about Andy.
So we spoke about those. We talked about John being -- we talked about him speaking with John to try to help smooth his rough edges?
Q. Do you recall whether Mr. Kavanagh ever had

that conversation with John about smoothing his rough edges?

A. I do know he had a conversation, yes.

Q. How do you know that?

A. He told me.

Q. Did he tell you about the conversation?

A. Yes, this was an ongoing conversation with John.

Q. In response to Andy Cross's complaints or were there other complaints?

A. I remember specifically Andy.

Q. Do you recall whether or not there were other complaints even if you don't recall everything that went on connected to these complaints?

A. I don't recall specifically any other complaints.

Q. What if anything did Mr. Kavanagh tell you about the conversation with John Bonzani?

A. Just that he requested that he be nicer. I am paraphrasing.

Q. Do you remember anything more specific?

A. No.

Q. And did you have any conversations with Mr. Cross to see whether he was satisfied?

A. I did.
Q. Was he satisfied?
A. Yes. I believe so.
Q. Was Mr. Bonzani ever given any discipline after any complaints about him?
A. He was eventually removed from his position.
Q. Okay.
A. As a direct result of Andy's complaint, I can't say that.
Q. Were there any other complaints that you know of with regard to Mr. Bonzani?
A. Not that I received or was aware of.
Q. Do you know why Mr. Bonzani was removed from his position?
A. I don't know specifically. That was a decision made above my head.
Q. You didn't have any conversations or have any role with regard to Mr. Bonzani's removal from APC?
A. I am not speaking about him being removed from APC. He was removed into a different role within APC.
Q. What position was he moved into?
A. I don't remember the title of it.

Q. Do you remember when?
A. No.
Q. And you don't know whether or not his movement to a new position was a result of complaints; is that correct?
A. No. I don't know what the reason was that he was moved.
Q. Do you know whether or not that removal to a new position was a promotion?
A. He was asked to take on special projects, that is what was communicated.
Q. Do you know whether or not one way or another whether or not that change in his position was actually a promotion?
A. I do not know.
Q. Are you aware of any other complaints other than the complaints by Andy Cross made about Mr. Bonzani, even if they didn't come to you directly?
MR. KOSTAKOS: Objection. Go ahead.
THE WITNESS: I can't think of anything specific.
BY MS. KISCH:
Q. Do you know whether Mr. Bonzani is currently with the company or with APC?
A. I understand he is not.

Q. What is your understanding based on?
A. I just know he is not with the company anymore.
Q. Do you know when he left the company?
A. I don't actually.
Q. You don't know anything surrounding the circumstances of him leaving APC?
A. No, because he left after I left.
MS. KISCH: We can take a lunch break.
(Recess taken.)
BY MS. KISCH:
Q. Ms. Hendrix, before we left on the lunch break we were talking about some of the complaints made by employees of supervisors and/or managers, and you had stated that there were some complaints made about Jake Guimond, did I pronounce his name correctly?
A. Yes.
Q. What were the nature of the complaints made about Mr. Guimond?
A. I just recall that he was unavailable when supervisors were trying to reach him.
Q. Is Mr. Guimond a supervisor or manager?
A. He is a manager or director. I don't recall. He was the top person over manufacturing

in the East Providence facility.

Q. And there were complaints that he was generally unavailable when supervisors or managers were trying to reach him?

A. Yes.

Q. What if anything did you do to address those complaints?

A. I believe I looped in with J. Guimond, and said: Look, people are trying to get ahold of you, you are not available. Is there something going on? Is there something I can assist with? Is there something in your personal life that is preventing you from being available at work? And he made more of an effort to fix it. That is what I remember.

Q. Did he respond at all what the reasons were why he was unavailable when supervisors or managers tried to reach him?

A. He didn't, not that I recall.

Q. What is Mr. Guimond's race?

A. Caucasian.

Q. Was he disciplined in any manner?

A. No.

Q. After you spoke with Mr. Guimond did you receive any other complaints about him?

A. Not that I recall.
Q. Ron Templeton, what complaints do you recall receiving about Mr. Templeton?
A. Ron his employees just thought he was tough to work for.
Q. Did they express anything more specific other than he was tough?
A. No, just that his expectations were high.
Q. Did you receive more than one complaint about him?
A. I recall two.
Q. What if anything did you do when you received those complaints?
A. Spoke with Ron about what his expectations were, and, again, what was being communicated, which was the root of the issue.
Q. What did you mean it was the root of the issue?
A. His expectations were not actually what the employees thought that they were. He was communicating something different than what his expectations were. He wasn't being clear to the employees.
Q. After you spoke to Mr. Templeton, do you know whether the employees were satisfied with the

outcome?
A. Yes.
Q. They were?
A. Yes.
Q. And was Mr. Templeton in any way disciplined with regard to the complaints about him?
A. Not that I am aware of.
Q. What is his race?
A. White, caucasian.
Q. And did you say that Mr. Guimond had raised complaints about somebody else?
A. That was the internet individual that we spoke about.
Q. What about Mr. Templeton, did he. Raise complaints about somebody else?
A. About J. Guimond, that was the Ron reported to J. He said J. Guimond was not available.
Q. It was Ron Templeton who made that complaint?
A. Right.
Q. Other than Mr. Daniels, and other than what we have already talked about, do you recall any other complaints made about any supervisors or managers?

A. Not off the top of my head, no.
Q. What complaints do you recall being made about Mr. Daniels?
A. A number, several.
Q. How many?
A. I am not sure. Let me enumerate them, and that will tell us the number, I guess. Julie Sapola, who was one of his direct reports complained about him. She felt that he was rude, difficult to work with, didn't listen.
That complaints from her. I received a number of complaints from the IT department, around, again, his rudeness, just pushing too hard to get things done, sort of running over people, what I would term running over people in order to get his goal met.
Brian Kelly talked to me on numerous occasions about Seth, maybe more. That is what I can think of.
Q. Who in the IT department do you recall complaining about Seth Daniels?
A. I remember specifically Danielle Vincent.
Q. Daniel?
A. Danielle.
Q. What did she say?

A. She was the telephone coordinator. And her specific words, and this was consistent with what I generally would hear about Seth, which was, excuse me: But who the hell is this guy? She was offended by his tone, and sort of relentless with her.

Q. Did she tell you specifically what he said to her that offended her?

A. Not specifically. She spoke about him in regards to Blackberrys, phones, she handled both requests. She called off the cuff, vented, he had just spoken to her, and she felt that he was rude, and had pushed her beyond what was appropriate. So that was that.

Also Michelle Vollaro, who was the supervisor of the help desk at the time. I am not sure what she is doing now, called me because Seth had called into help desk.

Q. Can we hold off on this. I want to finish one Danielle Vincent.

When she called you to vent.

A. Yes.

Q. How long did that conversation last?

A. I don't remember specifically. I spoke with Danielle quite frequently, so I don't remember

specifically.
Q. Why did you speak with her on a frequent basis?
A. For a number of reasons. The way her phone system was set up, there was a closet in the facility, and that needed to be accessed. And the access was through this door that I had access to. She had to make sure there was access. She would talk about this access for this closet that her telephone wiring was in. She would call me about that.
Q. I don't understand what she was talking about to you about.
A. She was the telephone person, the office manager that I spoke about that was let go, he would have handled telephone access to this, there was a closet on our facility property that had the wiring for all of the phones for the building. Danielle was in charge of that. But she having sat at the West Kingston facility. So there would be times she would send up a third party check like Spring or somebody, and they needed access to that closet, and I would be able to get them access to that. I had universal access to the building. It was around occasions like that. That happened

quite frequently any time anyone moved or any time any phone came up I probably spoke to her several times a week or E mailed.

Q. Do you recall when she called to vent about her phone call with Seth Daniels?

A. I don't recall specifically.

Q. Was it toward the end of your employment there, mid, beginning?

A. I don't recall.

Q. Had other than the fact that her one statement said who the who the hell was this guy what else did she say in that conversation?

A. She called to complain that he had ordered, again, I don't remember what it was, it would have been something in the phone genre, cell phones or Blackberrys or something, and he was rude to her. And she felt that was not appropriate, and not generally how things were handled.

Q. Did she describe why, in what way she felt he was rude?

A. I don't recall. I just remember her saying he was being pushy.

Q. Being pushy. Did she use the word rude or pushy?

A. She used both words.

Q. She felt that his pushiness was rude?
A. Yes.
Q. That is a yes?
A. Yes.
Q. When he called to order whatever he ordered had she originally said, no, he couldn't have it?
A. I don't know.
Q. Did you inquire as to what the facts were as to what she was telling you?
A. I didn't inquire -- I inquired around the conversation, I didn't inquire around what the mechanics of the order were, I don't know what the mechanics were.
Q. When you say you inquired about the conversation, what did you inquire about?
A. What happened is what I said to you.
Q. What did he say?
A. I don't remember specifically, I am sorry.
Q. Do you remember any facts at all to support her statement that she felt he was pushy or rude?
A. No.
Q. After she talked to you and made that complaint, what if anything did you do?
A. I talked to her about strategies for dealing with different types of personalities, and

different people. And I don't recall what else I did after that.

Q. What kind of strategies did you talk to her about?

A. I just talked to her about being patient and flexible. I recall that, because she sort of laughed.

Q. Did you have an understanding as to why she was laughing at your advice how to deal with various types of people?

A. She said this is beyond that. That is not going to work with this guy. That is what she said.

Q. Did you ask her why not?

A. Frankly, I didn't.

Q. Why didn't you ask her?

A. Because at that point I had seen numerous occasions where Seth had been difficult with other people, and I understood him to be a difficult person by the time she and I had that conversation.

Q. What else if anything did you do after she called you to vent about Mr. Daniels?

A. I don't recall anything additional that I did.

Q. Did you ever speak with Mr. Daniels

at that point?
A. I spoke with Seth on several occasions. I don't recall if it was specifically related to that incident, but I did speak with him on several occasions.
Q. Do you recall speaking to anybody, and we will get to your conversation with Seth in a moment, do you recall speaking with anybody else after Daniel Vincent called you to vent about your conversation with Mr. Daniels?
A. It is Danielle.
Q. Danielle?
A. It is a woman. No, I don't recall speaking with anyone specifically.
Q. Do you recall whether you spoke with Mr. Brian Gough at that point?
A. I don't recall specifically.
Q. So did Danielle Vincent ever call you to complain about any other individuals?
A. Not that I specifically recall.
Q. Who else in the ID department, if anyone, contacted you about Mr. Daniels?
A. Michelle Hilaro, H-I-L-A-R-O.
Q. What race was Danielle Vincent?
A. Danielle is white.

Q. What about Michelle Hilaro what race is she?
A. Polynesian. I don't know what that is.
Q. Michelle Hilaro, you said she works for the help desk?
A. She is the manager of the help desk.
Q. In the IT department?
A. Yes.
Q. And what was the nature of her call to you or complaint to you?
A. It was very similar, who is this guy? Apparently Seth had called into the help desk, and she felt had been rude to her help desk support staff I don't remember specifically who on her staff.
Q. How was he rude? What did she tell you?
A. I don't recall. I just recall her saying he was rude. Again, it was who is this guy. It was not too far into his employment, because she didn't know who he was, and was frustrated.
Q. Do you know the nature of his inquiries to the support desk help staff that Mr. Daniels made?
A. I don't. Seth was responsible for new hire computers. So perhaps something around that.
Q. Did you inquire with her what the nature of

his call was about?
A. I don't recall if she told me, and I inquired. I don't recall.
Q. Do you know what the nature his call was about?
A. I don't.
Q. Do you know how she learned or on what basis she felt he was rude to the support desk help staff?
A. No.
Q. Do you know if any of his support staff help desk complained about the call to Mr. Daniels?
A. Yes.
Q. They did?
A. They told her about it and she called me. They are in a back room. She wouldn't have, her office is in a different area.
Q. Who went to her?
A. The help desk employees who took the incoming calls. They take the incoming calls for any computer related help issues.
Q. Was there more than one incident in which the support desk support staff went to Ms. Hilaro to complain about Mr. Daniels?
A. I understand there to be two.

Q. When she came to you had there been two such complaints or just one?

A. There had been two when she came to me.

Q. Were there two different employees or two complaints from the same employee?

A. If I recall it was two different employees.

Q. How many employees were there?

A. At the time six or eight perhaps.

Q. What was the nature of their complaints about Mr. Daniels?

A. Again, that he was rude.

Q. Do you know anything more specific than that?

A. I don't recall anything more specific than that.

Q. Do you know whether you inquired at the time?

A. I may have inquired at the time, I don't recall now.

Q. You don't know one way or the other?

A. I don't know.

Q. What if anything did you do when you got the call from Mrs. Hilaro about Mr. Daniels?

A. I let her vent, again, and I was involved in a process had conversations about how to get new

hire computers to new hire individuals, the theory being if you improve the process, then we won't have these complaints.

Q. What was the problem with the process at that time or problems?

A. There wasn't a problem. And then Seth felt there was a problem. So then he formed a task group that there was if, they were trying to move more quickly to get the computers through, if I recall.

Q. Well, what was the problem that Mr. Daniels expressed to you?

A. That they weren't moving as quickly. They were getting their computers several days into training as opposed to on the first day, if I remember correctly.

Q. Was it the fact that Mr. Daniels expressed that computers needed to get to the employees on the first day of training that led to the complaints about the support help desk support staff?

A. That I don't know.

Q. Did Ms. Hilaro ever raise any other complaints about Mr. Daniels or anybody else?

A. Not specifically to me.

Q. To anybody else?

A. Not that I am aware of, no.

Q. You said you worked to help to improve the process of getting the computers to the employees more quickly?

A. I was involved with the group that was working on that. Specifically did not. I actually never attended meetings or anything of that nature around this.

Q. In what way were you involved with the group that was working?

A. People would ask me sort of how it had been done in the past. They would come back and ask me different questions. And I was aware it was going on, and I was saying, you know, we should go through with this, try to work it out. Different people who were involved in it worked in my area of sort of influence, so to speak.

Q. Who was working on that task force?

A. I know Seth, and then from there I don't know. Some IT people, but I don't remember specifically. But I believe Julie Sapola also was working on that task force.

Q. After the task force met, and worked on the process, in fact, was the process improved?

A. I don't believe so.

Q. The computers still didn't get to the employees by the first day of training?

A. Right.

Q. And why didn't it?

A. It was a purchasing issue. APC didn't keep laptops, they didn't just keep lap tops around in the event there were hires. So every time a new hire came in, they had to order a laptop, and that took sign-off, and time. It was procurement issue as opposed to an IT issue. Does that make sense?

Q. Yes.

A. I understood it was not resolved at the end.

Q. It was or was not?

A. Not.

Q. At the time you left it was not resolved?

A. Yes.

Q. Is it something that APC was still trying to solve?

A. I am not sure APC identified it as a problem.

Q. Was anyone at APC still working on the process?

A. I was not aware of anyone working on it.

It was sort of the way procurement happened at APC. I am not sure that APC saw it as a problem.

Q. There was a task force formed?

A. Yes, Seth formed it.

Q. The task force was not able to fix the problem. Did basically the issue get dropped, and everybody just sort of agreed there was no way to fix the problem?

A. It was unfixable by the group of people that were there.

Q. And nobody else was able to fix it, correct?

A. No one else felt it was a problem.

Q. Was anyone else able to fix the problem on the first day of problem?

A. If no one else sees it as a problem they are not going to work on fixing it.

Q. My question is, was anyone else able to fix the problem of not getting computers to employees on the first day of training?

A. Not that I am aware of.

Q. Employees, do you know whether the employees who are at training, whether they had to do homework during the training?

A. I don't know.

Q. Do you know why the computers were necessary beginning on the first day of the employees' training?

A. It was my understanding they weren't necessary.

Q. That they were or were not?

A. Were not.

Q. Where did that understanding come from?

A. Knowledge of orientation process that the first few days were hands-on learning that did not need the computers.

Q. Well, when you say hands-on learning, what do you mean?

A. APC does electrical, I don't know, it does electrical back-up systems. We run large, three-phase units, and it was hands-on learning within the units. That is what I understood it to mean.

Q. Were you aware that -- you don't know one way or the other whether the trainees had to do homework, correct?

A. I do not.

Q. You wouldn't know one way or another whether they needed the computer to do that homework?

A. I wouldn't know.
Q. Was there anyone else within the IT department that expressed any complaints about Mr. Daniels to you?
A. Not that I can recall, no.
Q. Are you aware of anyone else in the IT department complaining about Mr. Daniels to anyone else other than you?
A. I am not aware of anyone, no.
Q. Going back to Julie Sapola?
A. Sapola.
Q. Yes. Tell me about all of the complaints made by her about Mr. Daniels?
A. She came into my office, and asked to apply for a different position. And I asked her why she was applying for a different position. And she said: I simply can't work for Seth. And I said: Okay. Why can't you work for Seth? She felt that he was rude and mean, and she started crying.
Q. Did you inquire as to how he was rude or mean to her?
A. I don't specifically remember, what I remember about it was that she was crying.
Q. Do you know whether or not, in fact, you inquired whether he was mean or rude?

A. I don't know.

Q. You were going to say something else?

A. She was also concerned because Julie had been an employee of APC for quite a long time, and knew a lot of the people around, knew a lot of the people at APC, and felt that a lot of people thought that Seth was rude, and that it was affecting her credibility, and her ability to do her job, and that is why she wanted to apply for this outside position, which was really not related. It wasn't related to what she was currently doing.

Q. Why did she feel that if individuals thought that -- why did she feel that if other individuals at APC felt Daniels was rude that that would in any way be a reflection on her?

MR. KOSTAKOS: Objection.

BY MS. KISCH:

Q. Did she express any of her reasons to you?

A. That he reported to him.

Q. That was the only reason?

A. And he was representing the entire -- he was representing the training department, so when he was out in the rest of the organization, she felt that he wasn't frankly being nice.

Q. How long had she worked in the training department?

A. A number of years, perhaps five.

Q. At that time?

A. Yes.

Q. Do you remember when she came to with you this complaint?

A. I don't, not specifically.

Q. Who did she tell you thought Daniels was rude?

A. I only specifically remember her saying the corporate training group. So there was the AGS training group, of which Set was the leader, and there was a corporate training group, and I remember her saying that the guys in the field did not respect him, did not respect him related to apparently on their off hours, on their off time they were going to some of the local strip clubs, and that Seth was leading the charge to go to the local strip clubs.

Q. The guys in the field didn't respect him in part because they were going to strip clubs with Mr. Daniels?

A. Because Seth was taking them to strip clubs.

Q. But they went voluntarily to these strip clubs or were they required to go to the strip clubs?

A. I don't know anything about that. It was off hours off time, so I didn't get involved in the strip club issue.

Q. But it was your understanding that there were other employees that went to the strip clubs other than Mr. Daniels?

A. I am not sure I can say that.

Q. Did you ever inquire at all after she told you about -- do you know whether or not any employees went to a strip club on more than one occasion?

A. I don't know.

Q. Do you know if anyone actually did, in fact, go to any strip clubs?

A. I do not.

Q. You never made any inquiry about that?

A. Again, it was off time, off work hours, and that is what I counseled Julie. She felt it spoke to a larger credibility issue. I talked to her again about that it was off work time, off work hours.

Q. Was she upset that the guys in the field

were going to strip clubs?

A. Again, I am not sure that she told me. I don't recall speifically that she said the guys were going. I know she said specifically that Seth was going.

Q. Well, what reasons did she give you that she felt that the guys in the field did not respect Mr. Daniels?

A. The strip club issue. That is where she spoke about the guys in the field respecting him.

Q. Just the strip club?

A. That is what I said.

Q. Did you inquire with her was there any other reason that the guys in the field didn't respect Mr. Daniels?

A. I remember the conversation being around the strip club issue. I don't remember additional parts of that.

Q. What other reasons if any did she give to you as to reasons why individuals did not respect Mr. Daniels, anyone?

MR. KOSTAKOS: Objection.

THE WITNESS: What other reasons did she give me why people did not respect --

BY MS. KISCH:

Q. Anyone, not just guys in the field, but anyone? Let me just explain because you had said she was concerned about her own reputation because of what people thought about Mr. Daniels?

A. Yes.

Q. I want to know all you know about what she told you about how, why other people didn't respect him.

A. I understand now.

She thought that he was rude. It went back to the rude. He was rude with other people. He pushed too hard. He wasn't building relationships with people, he was steam rolling people. That was, again, sort of saying this is the way the training group in general operates and this is what she felt, that that was representative.

Q. And did she tell you who any of these other people were?

A. She spoke about Timothy, his last name I can't remember, and John Pyle.

Q. What position does Timothy hold?

A. Timothy was the training consultant or something like that and John Pyle was the director -- I am not sure, Director of Corporate Training at the time, I believe was his title. I

do not believe John is there any longer. I don't know.

Q. Were both of these individuals white?

A. Yes.

Q. Were they underneath Mr. Bonzani?

A. No, entirely separate they were in the sales organization.

Q. They were in sales?

A. They were in sales.

Q. So they weren't underneath Mr. Kavanagh either?

A. No.

Q. Who was their supervisors?

A. I am not sure. John might have reported at the time to the vice president of sales. I am not positive.

Q. Who is that or who was that at the time?

A. It would have been Edmund Bennarick, B-E-N-N-A-R-I-C-K.

Q. Any other individuals that Julie Sapola had complained about Mr. Daniels?

A. No, I mean, she herself felt that he was being rude to her.

Q. No, I understand that.

A. No, additional people beyond that.

Q. Did John Pyle and Timothy actually complain to Julie Sapola about Mr. Daniels?
A. I am not aware of the conversation between John, I don't know.
Q. You don't know how Julie Sapola learned that Mr. Pyle, and Timothy, had any complaints at all about Mr. Daniels?
A. I don't know.
Q. Did you ever speak to Mr. Pyle or Timothy about Mr. Daniels?
A. I don't recall speaking with either one.
Q. So anything else that Ms. Sapola told you when she came in and she was upset?
A. No, that I recall.
Q. Did you have other conversations with her about Mr. Daniels other than that one time when she was crying?
A. She would come back periodically, and just say: I don't know how long I can take this, that kind of thing.
Q. After that first, that initial meeting in which she was crying, what if anything did you do to follow-up about her concerns?
A. A number of things. I talked to John about it. Because Julie was a valued employee, and I was

concerned about Julie leaving.

Q. When you say John are you saying John Bonzani?

A. I am.

And so I spoke with John about it. I spoke to John about it.

Q. What did you tell him?

A. I shared with him some of what Julie shared with me.

Q. What did you tell him?

A. I told him that she was concerned. I don't believe I told him anything about the strip clubs. I just -- I told him that she was looking to apply other places, and that she was very upset, and felt that Seth was being rude. And not representing the training department well. That is what I shared with John.

Q. Was this an in person meeting or over the phone?

A. In person.

Q. Was anyone else present?

A. No, I was in my office.

Q. What if anything did he say in response?

A. He was adamant and used a number of expletives. He was frustrated.

Q. What did he say, when you said he was adamant, adamant about what?
A. He got mad, and I believe he said, I am sorry, he said: What the fuck. And why do I keep hearing this stuff?
He was just generally frustrated.
Q. Who was he frustrated with?
A. Seth.
Q. He said he was frustrated with Seth?
A. Yes.
Q. What else did he say?
A. He said he wanted to talk to Julie. He said: I will talk to Julie, I will talk to Julie. I will take care of it. He and Julie had worked together for quite a long time. He respected Julie's opinion, and he wanted to speak with Julie directly. I looped in with Julie, and said: John really wants to speak with you. Are you okay with that? And she said, yes, and they spoke.
Q. Were you present at that meeting?
A. I was not.
Q. Did anybody report to you what was said at that meeting?
A. I don't remember anything being reported but I remember John saying: I will take care of

it, I will take care of it.

Q. Do you remember any other complaints from Julie about Seth?

A. She would continually come into my office, and say: I don't know how much longer I can take this.

Q. You don't know what in anything was said in the meeting?

A. I don't know what was said in the meeting.

Q. Other than Mr. Bonzani telling you he would speak with Julie, what if anything else did the two of you discuss to address Julie's complaints?

A. The two of us being John and I?

Q. Yes.

A. Nothing that I recall.

Q. Did you speak with any other individuals -- did you just remember something?

A. No.

Q. Did you speak with any other individuals others than Mr. Bonzani about Julie's complaints?

A. I believe I had told Brian Gough.

Q. What did you tell him?

A. I told him that Julie was upset. She was looking to apply for another position, because she was frustrated from working with Seth, and I

outlined the same thing that I outlined to you here today.

Q. Did you memorialize in writing any of these meetings?

A. I don't recall.

Q. Did you take notes when Julie came in?

A. I don't recall.

Q. If you did, would you have kept those in Seth's personnel file or Julie's or both?

A. I don't know. It would have depended.

Q. But if you took notes you would expect to see them in either Seth's or Julie's or both; is that correct?

MR. KOSTAKOS: Objection.

THE WITNESS: I am not sure.

BY MS. KISCH:

Q. If you took notes, would you hve put them into at least one of their files?

A. I think so. I am not sure. I just want to be perfectly accurate.

Q. That is good. When Julie told you she wanted to apply for another position, was there a specific position she wanted to apply for?

A. Yes.

Q. Do you recall what position it was?

A. I don't.
Q. Did she, in fact, apply for that position?
A. I don't recall.
Q. Did you supply her whatever resources she needed to apply for that position?
A. I don't recall providing her specific resources. That would have been available to her through the web, and through her conversations with other people.
Q. Did you discourage or encourage her in any way from applying or not applying for that position?
A. I don't recall making any recommendations one way or another.
Q. You don't know whether she in fact applied?
A. I don't remember I know she had applied for a specific position I don't know whether she went through the process.
Q. Do you know whether that position was filled while you were still employed by APC?
A. I don't know.
Q. Did Julie ever change positions while you were at APC?
A. I think so.
Q. Okay. Do you recall when?

A. No. I think she was moved -- yes, I do. She was training coordinator. The titles might be off. The title might be right. She was an admin person under the training group before Seth arrived. After Seth arrived she took on more of a coordinator role, if I recall accurately. She also was the lead for the group while Seth's position was open previous to Seth being employed at APC.

Q. So she prior to Seth coming in, she temporarily held his position?

A. No. She didn't hold the acting position, she was the liaison so to speak or the contact. But she didn't have managerial over the rules.

Q. Was there a period of time no one held Seth's position?

A. Yes.

Q. That was the period of time that she took over many of the duties that Seth took on?

A. No. She would have taken orders and done coordination. She didn't do any leadership or management responsibilities while there was an open position.

Q. Did she take on some of the responsibilities that Seth had once he came on, liaison responsibilities, did those stay with Julie

or did they go to Seth once he was hired?

A. Had they stayed with Julie.

Q. So what relevance -- strike that. You said that while Seth, prior to Seth being hired when there was a vacant position she took on certain roles. Is it the case that she had those roles before and after, and the fact there was a vacant position had nothing to do with her taking on those responsibilities?

MR. KOSTAKOS: Objection.

THE WITNESS: Not necessarily because, let me call it the training manager role for sake of conversation. The training manager role was held by an individual who left the role. I don't know the circumstances under which he left. He was still employed with the company. That happened before I arrived. The training manager role definition changed dramatically between the time that individual held the role, and Seth was hired for the position. Does that make sense?

BY MS. KISCH:

Q. So the training manager who changed positions prior to Seth coming on board had certain responsibilities that went to Julie prior to Seth coming on board?

A. Right. But they were not ultimately part of what ended up being the training manager role.

Q. So Seth, so that Seth did not then take those responsibilities from Julie, Julie kept those?

A. Exactly.

Q. Basically during the interim period Julie obtained additional responsibilities that she didn't have previously, correct?

A. Yes, as did a number of other people.

Q. She wasn't just an admin person at that point?

A. No. Again, once Seth moved in, she was moved in, again, titles I don't recall, but a coordinator type of role.

Q. When Seth was hired, she had certain, responsibilities, but once Seth came in and took over as the manager in the training department, Julie then was given even additional roles; is that correct?

A. Yes.

Q. Additional responsibilities?

A. Yes.

Q. Did Julie, was that something do you know that Julie welcomed, and was happy about getting

these additional responsibilities?
A. Sure, yes, because that was arranged before Seth's arrival, that once the new manager was in place, this was the role she was going to move into. So she was excited about it.
Q. But did she get even more responsibilities once Seth started that hadn't specifically been prescribed to her prior to Seth's arrival?
A. I don't recall specific responsibilities.
Q. We talked earlier about whether or not she moved into a new position after she made these complaints. And you said you thought she did change positions after she made the complaints to you?
A. No, not after she made the complaints. The move was right before Seth came.
Q. So after the complaints her job at APC, her position and job duties did not change at all up until the time you left, correct?
A. That I recall.
Q. You don't know what if any of her job responsibilities were after you left, correct?
A. I would have no way of knowing that, no.
Q. When Julie came to you on these other few occasions to say she doesn't know how much longer

she can take it what if anything did you do in response to those comments?

A. I listened. Again, I did the sort of, what would you like me to do, what can I, and we talked about, again, strategies for dealing with people who have different opinions than you do. And, again, she was talking about different options within the company. And I just sort of, I did a lot of listening.

Q. Did you speak to Mr. Bonzani again?

A. No. Julie was in contact with Mr. Bonzani, with John.

Q. After she made these additional comments to you or complaints to you, did you speak to Mr. Bonzani again about Mr. Daniels?

A. No. Because they were in the same vein as what I spoke to John about.

Q. Did you speak to anybody else at all other than Julie after she made the additional complaints or comments to you?

A. I don't recall speaking to anyone additionally.

Q. Whether you told Brian Gough after Julie initially went to you, and was upset, and told him that she was looking to apply for another position,

what if anything did Brian Gough tell you?
A. I don't remember specifically what he said to me. I remember him -- I remember the conversation because she was talking about how long Julie had been there, and that is what I remember about the conversation.
Q. You don't remember anything else about what Mr. Gough had said to you?
A. I don't.
Q. Any other complaints at all made by Julie about Mr. Daniels?
A. Not that I recall right now.
Q. Did you ever speak with Mr. Daniels about any of the complaints that Julie made to him?
A. I don't remember specifically talking to him about Julie.
Q. You said that Brian Kelly made numerous complaints?
A. Yes.
Q. About Mr. Daniels. What did he tell you?
A. Okay. On several different occasions things happened. The very first was I, again, in my role I would shuttle papers sometimes back and forth for new hire orientation. There was -- your deductions form says how much is supposed to be

taken out of your paycheck. I shuttled Seth's back to the corporate office. And Brian came down several days later time to talk about it. And said: You need to take this back, and he needs to refill out this form, because Seth had written exempt on his tax form. And Brian said that unless he filed, I don't remember all logistics, unless he had filed exempt the year before he wasn't exempt. Did he know he filed exempt the year before? And I said I didn't know. I didn't know he filed exempt. He set me up with a new tax form for Seth. At that time he said: I have never seen anyone try to do this. Frankly, he said, what is this guy trying to pull?

A. I said, again, I don't know. I will take the form up. I took the form up to Seth. I said: You need to fill this form out again. You can't be exempt. I said: I am not. I said: I am exempt. I said: I am not a payroll person. This is the information I have gotten. And monkey in the middle. And then started this whole thing where Brian Kelly and Seth were in a disagreement about his filing status. I quickly removed myself from that. I believe they spoke directly. I know Brian Gough also got involved. And Brian Kelly would

periodically come to me, and say: Lose this guy, he is so rude, what is he trying to pull? That kind of thing.

I remember specifically what situation where Brian Kelly was in my office with the door shut certainly after Seth began his employment, and was very loudly upset. He was screaming about what is this guy trying to pull. Who does he think he is?

Q. This is relating to the tax form or something else?

A. The tax form. This was like, I mean, really a week into his appointment, Seth's employment.

Q. At this point had he met with Seth to discuss it?

A. No. I don't know that they ever met face to face.

Q. I thought you said they did talk?

A. They talked on the phone. Seth was at the East Providence facility. And corporate was based out of West Kingston. So Brian was at West Kingston. Seth was in Providence. Hence I was shuttling the paperwork back and forth. I don't remember them having a face-to-face meeting.

Q. That is in your office near Brian Kelly's?
A. Mine? Yes, actually it was it was down the hall. Then he moved.
Q. Would you necessarily know if Seth came in and spoke with Mr. Kelley?
A. I wouldn't.
Q. You don't know one way or another whether they met in person?
A. No. I remember when they did all the yelling I know they had not met at that time.
Q. How do you know that?
A. He was asking who is this guy, trying to get more information about the guy.
Q. He was screaming and yelling at this point?
MR. KOSTAKOS: Objection.
THE WITNESS: He was angry.
BY MS. KISCH:
Q. Was he yelling and screaming at this point?
A. No, he was loud and frustrated. I wouldn't characterize it as screaming.
Q. Would you characterize it as yelling?
A. No, just loud tone.
Q. What was your impression as to why he was so frustrated with the way that Mr. Daniels had filled out his W-4 form?

A. What Brian related to me at the time he felt he had a fiduciary responsibility that those forms are accurate. I remember him specifically saying fiduciary duty. I remember thinking it is something I had not heard before.

Again, he was trying to pull something over.

Q. Was this before or after you went to Mr. Daniels, and said you need to change your tax form?

A. I don't know. It was all within two days.

Q. Well, have you seen Mr. Kelly get this upset that he was visibly loud, and referring to how somebody filled out their tax forms for some other reason?

A. Yes.

Q. Had you seen him act like this before?

A. Brian Kelly?

Q. Yes.

A. Yes.

Q. This was not out of character for Mr. Kelley to get loud and upset with employees?

A. Entirely in character.

Q. Entirely in character.

A. It was.

MR. KOSTAKOS: That is fine.

BY MS. KISCH:

Q. What was your reaction or how did you feel when Mr. Kelly was very loud when it came to his reaction in the way that Mr. Daniels filled out his W-4 form?

A. How did I feel?

Q. Right.

A. I mean, I don't think I felt sort of anything. I think it was just, I just sort of felt like, well, okay. We would have to fix this situation. That was my feeling.

Q. Well, if another employee had been speaking in the way that Mr. Kelly had been speaking in a loud voice, and expressing himself in a way that he had, would you have felt that it was an inappropriate way to act professionally?

MR. KOSTAKOS: Objection.

THE WITNESS: It isn't the way I would have acted.

BY MS. KISCH:

Q. Did you feel it was inappropriate the way that Mr. Kelly was reacting?

MR. KOSTAKOS: Objection.

THE WITNESS: No, I was okay with the way he acted, in that environment. It is what it was.

BY MS. KISCH:

Q. When you say in that environment, what are you referring to?

A. Where the doorways closed, it wasn't a large group of people. He was frustrated. Lots of people in my role vent lots of frustrations to me. So that doesn't necessarily sort of -- if I got upset every time I would be a mess.

Q. Well, did you think he was coming to you to vent in the same way that Julie Sapola came to you and vented as an HR rep?

MR. KOSTAKOS: Objection.

THE WITNESS: No. I do not.

BY MS. KISCH:

Q. And did you ever witness Mr. Kelly being loud or yelling expressing himself in this manner with other individuals?

A. Yes.

Q. Did you think that was appropriate?

A. It was Brian that is just how he was.

Q. Well, what do you mean by that?

A. That was his sort of interpersonal interaction style.

Q. His style was often to yell at individuals?

A. Again, be loud, and agressive in his tone.

It wasn't all the way yelling, he wasn't hollering at people. He would get frustrated and that was his sort of MO, I would say.

Q. Was that appropriate or inappropriate as a professional employee manager at APC?

A. At APC it was appropriate.

Q. Did anyone complain about Mr. Kelly's manner in the way that he spoke to people being loud, and expressng his frustration loudly, and --

A. Yes.

Q. Who complained about him?

A. In my group the field service group the two different supervisors did. And a few employees, as well.

Q. Who were the two supervisors who complained about Mr. Kelly?

A. If I remember it was Mike cox, and David McDaniel.

Q. What was Mike's last name?

A. Cox, C-O-X.

Q. The other individual was who?

A. David McDaniel.

Q. What were Mike Cox's comments about his complaints about Brian Kelly?

A. It wasn't actually him. It was his

employee, the employee was, he was a tech, and they flew for a living, and they were responsible for their expenses. And the employee had lost his receipts. And did Brian follow, you know, follow the reimbursement policies without receipts they didn't reimburse expenses. So I remember Mike imploring me to intervene because this tech was going to be out I remember it to be $8,000.

Q. How many?

A. $8,000, because he didn't have his receipts. And this was an employee that was making approximately $50,000 a year. And it was expenses on behalf of the company.

Q. Nobody was disputing that he had, in fact, $8,000 for the company?

A. No.

Q. Brian Kelly didn't dispute that he actually did spend that amount?

A. I don't recall whether he disputed it. He said: I don't have any way to prove it. Without the receipts we didn't do reimbursements. Anyway. But people felt like, Mike was complaining to me he felt that was particularly harsh, and again because of the $8,000, and an employee was making 50,000 a year.

Q. After Mike Cox asked you to please get involved.

A. I did.

Q. What did you do?

A. I got on a phone call with -- I spoke with Brian Kelly about the situation. I listened to his concerns. I told him I heard him, but, again, put into perspective the $8,000 for $50,000 a year employee. And he, Brian Kelly agreed to listen to the employees concerns, and I facilitated the phone call between the employee, it was dramatic, the employee, Brian Kelly, me, and the supervisor were on the call, where Brian Kelly outlined the terms under which he would reimburse. He had to get several kinds of documentation. I don't recall what it was. He had something he had to find documentation for.

Q. Do you know whether he was able to get that documentation?

A. He was reimbursed.

Q. Do you know whether he got the documentation that Brian Kelly asked him to get?

A. I don't know specifically.

Q. You know he was reimbursed?

A. I know he was reimbursed. My logical

conclusion from that because of what Brian had said he had given the documentation because without it he was very clear he would not be given the documentation.

Q. Who is Mike Cox's supervisor?

A. It was John Bonzani.

Q. Do you know who the employee was who had this issue with the receipts?

A. I don't recall.

Q. Do you remember if he was white?

A. I don't recall that I met him.

Q. David McDaniel, what was the nature of his complaints against Mr. Kelly?

A. Similar thing.

Q. He himself?

A. No, one of his techs didn't have receipts.

Q. It was a similar situation. Did you get involved?

A. I didn't. I took the complaints, and the tech was able to find the receipts. That null and voided that.

Q. In addition to the two supervisors who came to you, there were a few employees who complained about Mr. Kelly, as well?

A. I only remember one specific instance, and

by an APC employee?
A. I am aware that one of the techs lost luggage on an airline that included a P.C. meter, and things like that.
Q. What tech was that; do you recall?
A. I don't.
Q. Do you recall the race of the individuals, was he or she white?
A. I don't know the tech, so I don't recall. I did not meet a number of the techs to know their race.
Q. Do you remember any other APC equipment that was lost by any APC employee?
A. I can't think of any right now.
Q. This one employee whose luggage was lost, was it lost by the airline?
A. Yes.
Q. Were you involved when this luggage was lost?
A. No. I was aware of it. I was not involved.
Q. Was anyone in HR involved?
A. Not that I recall.
Q. Do you know what if anything happened after the employee reported that his luggage was lost,

on-line, pulled it up, and printed it then.
Q. You were not aware whether or not there were any changes to the travel policy while you were employed by APC?
A. I don't remember any changes.
Q. Are you aware there were no or you don't remember?
A. I don't remember any. It doesn't mean they didn't have any, it means I don't remember.
Q. Do you recall how long the travel policy was when you were there, how many pages?
A. No, I recall it to be quite a long document, but I don't recall specifically how long.
Q. Are you aware of any individuals who violated the APC travel policy?
MR. KOSTAKOS: Objection.
THE WITNESS: We spoke about Julie Kelly earlier, yes.
BY MS. KISCH:
Q. That was with regard to seeking reimbursement for a personal trip.
A. Yes.
Q. That would be considered a violation of travel policy?
A. Yes.

Q. Are you aware of any other individuals who violated the travel policy?

A. What I don't specifically remember if reimbursements was part of the travel policy or not. I am unable to answer that question.

Q. Are you aware of any individual who violated the policies with regard to reimbursements, other than that individual we just spoke about, I can't think of the name?

MR. KOSTAKOS: Julie Kelly.

THE WITNESS: Julie Kelly. Yes.

BY MS. KISCH:

Q. Who violated the policy with regard to reimbursements?

A. Seth was terminated for receiving kickbacks and so that was in violation of the policy around gifts, and I believe the travel policy spoke to credit use or how to use your credit card, and things like that, that I recall correctly. And so my answer to the question would be Seth.

Q. Are you aware of any other individuals who you believe violated the policy on reimbursements?

A. No, not that I can think of off the top of my head.

Q. What information, if any, tell me what