IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

ORIGINAL

\- - - - - - - - - - - - - - X

:

SETH DANIELS, :

:

Plaintiff, :

:

v. : Case No.: 1:05-cv-00459

:

AMERICAN POWER CONVERSION : Judge Mary M. Lisi

CORPORATION, : Magistrate Judge Lincoln D.

: Almond

:

Defendant. :

:

\- - - - - - - - - - - - - - X

Thursday, October 5, 2006

Washington, D.C.

Exhibit 13

the time.
Q. Did you ever stay at another hotel?
A. Twice during sales meetings, and I don't recall the name, one was in Newport and one was downtown I believe.
Q. The one that was downtown, do you recall the name of that one?
A. No, it was for a sales meeting. All of the arrangements were made companywide for all the sales people that came in.
Q. And when was that?
A. I don't recall the date. It would have been prior probably to Mr. McDaniels (sic).
Q. Mr. Daniels?
A. Mr. Daniels. I'm sorry.
Q. Do you recall if that was the Johnson & Wales?
A. It was not.
Q. Do you recall whether it was the Marriott?
A. I do not. It was an upscale sales meeting held there where all sales representatives for North America, U.S. and Canada, were brought in for

their sales meeting of the year, a two-day weekend type dog-and-pony show.

Q. Okay. You don't know one way or the other whether it was the Marriott? Is that what you said?

A. Correct.

Q. Okay. Are you aware of any hotels that any other employee stayed at while traveling to Providence?

A. Yes.

Q. Okay. What hotels do you recall APC employees staying at while traveling to Providence?

A. Johnson & Wales. There were two that were down the street from East Providence that the employees had started staying at recently, but I do not recall the name of them.

Q. You said "recently." You're saying "recently" as in when?

A. Within the last year of my employment.

Q. Okay. Comfort Suites?

A. It does not ring a bell.

Q. Okay. So you think it was something other than Comfort Suites?

MR. KOSTAKOS: Objection.
A. BY THE WITNESS: I don't know.
Q. You don't know. But there were two other in East Providence you said?
A. No, they would have been in Massachusetts.
Q. Oh.
A. It would have been across the line. East Providence, the line is right there.
Q. Okay. Are you aware of any other hotels other than the Johnson & Wales in Providence that employees stayed in while traveling for APC Providence?
A. The Sheraton would have been the only other one.
Q. You're not aware of any other hotels that APC employees stayed in while traveling to Providence?
A. I believe there was some time that they were spending at a different hotel, and I don't know the name of it.
Q. Was it the Marriott?
A. It was right next to Bugaboo, and I do not know the name of it.

Q. Okay.
A. I do know that Seth, Mr. Daniels, stayed there and that some employees had stayed there.
THE WITNESS: Can we take a break as long as you're thinking?
MS. KISCH: Sure. Would you like a five-minute break?
THE WITNESS: Please.
MS. KISCH: Okay.
(Recess.)
Q. BY MS. KISCH: Are you aware of any policies, written policies, that APC had with regard to an employee of APC being allowed to keep travel points related to travel for APC?
MR. KOSTAKOS: Objection.
A. BY THE WITNESS: No.
MR. KOSTAKOS: I'm sorry. Did you say "written"?
MS. KISCH: Yes.
Q. BY MS. KISCH: And then the next question is: are you aware of any policies that weren't written but any policies that APC had with regard to an

A. No. I have a guess; but not specifically, no.

Q. What's your guess?

MR. KOSTAKOS: Objection.

A. BY THE WITNESS: Black.

Q. Okay. And why would you guess black?

A. I believe it was a gentleman we have in St. Louis whose tools were stolen.

Q. And what's his name?

A. Dominic. I don't recall his last name. He was a field service engineer.

Q. Okay.

A. I do not know if he is employed there or not.

Q. I'm sorry? You don't know if he was employed where?

A. At this time I don't know if he is employed at APC.

Q. Oh, okay. You said it happened two or three times. Do you recall any of the other individuals whose computers or tools were either stolen or lost?

A. Anthony Corideo (phonetic).

A. I turned over everything I had at the time as far as passwords to my accounts, any account that I had that was awarded mileage on. I turned over, I believe, a couple of other documents. I want to say there was a review done. I'm not sure whether it was ever presented, but it should be on file.

Q. And, when you say "review," what are you referring to?

A. An annual review.

Q. There was an annual review done of Mr. Daniels?

A. At that time I believe we were in the process of working through them and one was in a draft.

Q. You handed that over to the lawyers?

A. No, that would have been on a PC file that they were informed that it existed, if my memory serves me correctly.

Q. Informed that the annual review existed?

A. Yes.

Q. When you say it was on a "PC file"--?

A. No, it would have been done on their

network. It would have resided on their network. Reviews are done in a formal program that resides on their server.

Q. Other than emails and this draft annual review, and you said you also gave over your account information for your mileage awards that you received?

A. Yes. I did not have hard copies.

Q. Is there anything else that you recall turning over?

A. Not to my knowledge. I believe that was it.

Q. Do you recall how many mileage awards you received while working for APC?

A. How many different accounts? How many total miles? Can you be a little more specific?

Q. Well, do you know how many total miles you've received?

A. No, I do not.

Q. When you say "miles," you're referring to airplane?

A. Airplane, hotel, car rental.

Q. Okay. Well, do you have any idea how many hotel reward points you received while working for

or procedure and who did not get terminated?

MR. KOSTAKOS: Objection.

A. BY THE WITNESS: No. I'm having trouble with the question for the fact of the corrective action plan versus you stating "policies and procedures." Just because they did something wrong who were put on a corrective action plan--? How it was interpreted, whether it was a policy or procedure, I don't understand that at all.

Q. Okay. Well, are you aware of any individuals who stayed in hotels other than what we've already talked about, stayed in a hotel that was not on APC's preferred hotel list?

A. Yes.

Q. Okay. Who?

A. Jim. I'm trying to remember the last name. He was a senior field service engineer. He is Canadian. Other than that, I can't remember his last name.

Q. Okay. What is his race?

A. White.

Q. Okay. Do you recall what hotel he stayed

stating that car is broke. If it's the employee that's paying it, the employee is going to get something in the mail that says "You owe us this kind of money," and they're not very nice about it.

Q. Did you have any suspicions about the truthfulness of Mr. Daniels' claim that his laptop was stolen?

A. No.

Q. Were you aware whether anybody else at APC had concerns about that?

A. Yes.

Q. And can you explain that? Who had concerns?

A. My conversations took place with Christine about the fact that --

Q. Christine Hendrix?

A. Christine Hendrix, I'm sorry, of HR about, you know, whether this truly happened and did it really take place and it's kind of suspicious. In my mind, I never even went there.

Q. You talked about a guy named Jim who was from Canada who stayed at a non-APC-preferred hotel right down the street from East Providence. Do you

recall that testimony?

A. Yes, I do. The last name was Biller, B-I-L-L-E-R.

Q. I believe you said he stayed there to see what the hotel was like. Was he told to do that?

A. No.

Q. Was he authorized to do that?

A. Yeah. Authorization, "Stay where you want for a hotel. Come into town." He was one of the instructors, one of the senior guys that traveled a lot in the field. You know, he was more independent than most of them.

Q. Why is it that he didn't have to stay at an APC-preferred hotel?

A. At the time he was doing that, again, "Stay at a hotel you want." He is not coming for training, and he is not a whole block of people -- again, unaware that we had negotiated rates with different hotels.

Q. Getting back to the stolen laptop issue, what was that the Bugaboo Creek Restaurant?

A. Correct.