***Document Electronically Filed***

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| SETH DANIELS,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN POWER CONVERSION CORPORATION,<br><br>Defendant. | Civil Action No: 05-00459-ML-LDA |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

On March 12, 2004, defendant American Power Conversion Corporation ("APC" or the "Company") discovered that plaintiff Seth Daniels had wrongfully received more than one hundred thousand travel rewards points from a hotel in exchange for booking almost 300 rooms for APC employees there, rather than at other hotels where the Company had negotiated lower rates. Although lucrative for Daniels, this scheme (which he tried to hide from APC) cost the Company thousands of dollars and threatened its business relationships with the other hotels. Upon discovering Daniels' self-dealing, APC immediately terminated his employment.

Daniels now claims that this decision (and virtually every other action taken by APC) was motivated by his race and/or his intra-Company complaints regarding various APC employees. The undisputed material facts, however, establish that APC terminated Daniels' employment because of his unethical self-dealing. Because Daniels can offer no evidence that the Company's actions were tainted by discriminatory or retaliatory animus, the Court should enter summary judgment for APC on each of Daniels' claims.

## I. UNDISPUTED MATERIAL FACTS

APC is a leading manufacturer and provider of back-up power products and services, including surge suppressors, uninterruptible power supplies, power conditioning equipment, power management software, precision cooling equipment, and related consulting services. (Statement of Undisputed Facts ("SUF") ¶ 1). The Company maintains facilities throughout the world and is headquartered in West Kingston, Rhode Island. (SUF ¶ 2).

### A. APC Hires Daniels

In 2003, Daniels, while working for a company called BBH Solutions, met John Bonzani, manager of APC's Global Services Group in North America. (SUF ¶ 3). Bonazani subsequently asked Daniels whether he was interested in working for APC. (SUF ¶ 4).

Daniels was interviewed by Bonzani, as well as Bonzani's supervisor, Paul Cavanaugh. (SUF ¶ 5). APC ultimately offered, and Daniels accepted, the position of Training Manager for the Global Services Group. (SUF ¶ 6). Daniels began working for the Company in September 2003. (SUF ¶ 7). He reported directly to Bonzani. (SUF ¶ 8). Daniels' office was in East Providence.[1] (SUF ¶ 9).

As Training Manager, Daniels' responsibilities included the development and implementation of training programs for the Company's field service engineers ("FSEs"). (SUF ¶ 11). Although the Company employs FSEs across the world, APC typically held the training sessions for which Daniels was responsible in Rhode Island. (SUF ¶12).

### B. Daniels' Troubled Tenure With APC

Daniels' brief time with APC was marred by numerous confrontations with his fellow employees. Indeed, many employees complained to members of the Company's human

[1] Daniels did not relocate to Rhode Island, but commuted from his home in New Jersey, staying in a hotel during the week. (SUF ¶ 10).

resources department, including Christine Hendrix and Brian Gough, about Daniels' behavior. (SUF ¶¶ 13-14). Among other things, employees complained that Daniels was "rude," "pushy," and generally behaved inappropriately. (SUF ¶ 14).

Daniels' behavior ruffled feathers from the very beginning of his employment at APC. At the commencement of his employment, Daniels, who only one month earlier had been employed by BBH Solutions and now made $75,000 in annual salary at APC, submitted a Form W-4 to the Company stating that he was completely exempt from federal income tax.[2] (SUF ¶ 15). In addition, Daniels' Form W-4 was incomplete: he had failed to indicate whether he was married or single. (SUF ¶ 19). After APC's finance department informed Daniels that he had filled out the Form W-4 incorrectly, Daniels spoke with Brian Kelly, APC's Director of Finance. (SUF ¶ 20). At that time, Daniels was unable or unwilling to affirmatively state that he actually qualified for a complete exemption from federal income tax.[3] (SUF ¶ 21). Accordingly, Kelly required Daniels to complete a new Form W-4. (SUF ¶ 22).

Shortly thereafter, Daniels had another difficult interaction with Kelly. In November 2003, someone broke into Daniels' rental car and stole his laptop computer bag, which contained his APC-provided computer and several weeks' worth of business-related receipts. (SUF ¶ 25). When Kelly learned that Daniels had left his laptop computer bag in plain sight in the back seat

---

[2] According to the Form W-4, an employee must satisfy two conditions to properly claim a complete exemption from federal income tax. (SUF ¶¶ 16-18). First, in the preceding year the employee must have had a right to a refund of <u>all</u> federal income tax withheld because he had no tax liability. (SUF ¶ 17). Second, in the current year, the employee must expect a refund of all federal income tax withheld because he expects to have no income tax liability. (SUF ¶ 18); <u>see also</u> 26 C.F.R. § 31.3402(n)-1. An employer's failure to withhold federal income tax from an employee's wages may result in liability: "every employer required to deduct and withhold" federal income tax "from the wages of an employee is liable for the payment of such tax whether or not it is collected from the employee by the employer," e.g., "if the employer fails to deduct any part of the tax, he is nevertheless liable for the correct amount of tax." 26 C.F.R. § 31.3403-1. Despite discovery requests from APC, Daniels failed to produce his tax returns for 2002, 2003, and 2004, or any underlying documentation regarding his income for those years. APC's motion to compel production of these materials currently is pending before the Court.

[3] Daniels, when asked at deposition why he listed himself as exempt from federal income tax, cryptically testified that "I completed the form the way I did because I felt that that was the appropriate way to complete the form." (SUF ¶ 23). Significantly, he also testified as follows: "I don't believe I'm exempt from paying income taxes." (SUF ¶ 24).

of the car, he told Daniels that he was partially responsible for the theft. (SUF ¶ 26). Despite the fact that Kelly was upset at Daniels' refusal to accept any responsibility for the theft, APC did not require Daniels to pay the cost of replacing his laptop.[4] (SUF ¶ 27). Moreover, although many of Daniels's business-related receipts were stolen along with his laptop, APC reimbursed him for such expenses. (SUF ¶ 29).

Around this same time, APC became aware that Daniels somehow had been "direct billing" his rental car expenses, contrary to Company policy.[5] (SUF ¶ 30). At the time, the only non-executive level APC employees who could direct bill travel expenses were those employees who either (a) spent more than ten consecutive days in Rhode Island on business, or (b) did not have a personal credit card and had applied for, but been denied, an APC corporate credit card. (SUF ¶ 33). Daniels did not fit into either of these two categories.[6] (SUF ¶¶ 34-35). Accordingly, Christine Bollman, APC's travel manager, told Daniels that he could not direct bill his rental cars. (SUF ¶ 37). Daniels was not happy about this situation, and repeatedly asked Bollman to reconsider. (SUF ¶ 38).

### C. The Company Uncovers Daniels' Kickback Scheme

In late 2003, Bollman received a telephone call from Carol Shibley, general manager of the Johnson and Wales Hotel. (SUF ¶ 40). Bollman previously had negotiated a rate of $68 per room, per night with the Johnson and Wales Hotel, which was located near APC's East

---

[4] Kelly was not the only one who was miffed by Daniels' response to the theft: the owner of the restaurant where Daniels' car was parked when it was burglarized complained to APC that Daniels was acting belligerently toward him and "being an asshole" about the situation. (SUF ¶ 28).

[5] Normally, APC employees incur business-related expenses and then seek reimbursement from the Company. (SUF ¶ 31). In contrast, where a "direct billing" arrangement is in place, the vendor (e.g., a hotel or rental car company) bills APC directly for the goods or services; as a result, the employee does not have to incur the cost first and then seek reimbursement. (SUF ¶ 32). To the extent Daniels asserts that Bonzani authorized him to direct bill, Bonzani himself testified that he did not have the authority to approve direct billing. (SUF ¶ 39).

[6] Daniels never applied for an APC corporate card. (SUF ¶ 35). When Bollman asked him why he would not do so, Daniels said "I just don't want to." (SUF ¶ 36).

Providence facility.[7] (SUF ¶ 41). Historically, the Company made significant use of this hotel. (SUF ¶ 45). Shibley, however, asked Bollman why there had been a "sudden drop" in the number of rooms booked by APC. (SUF ¶ 46). Surprised, Bollman said she would look into the matter. (SUF ¶ 47).

Bollman subsequently asked Daniels whether he knew why there had been a sudden drop in APC's use of the Johnson and Wales Hotel. (SUF ¶ 48). Bollman – APC's corporate travel manager – previously had advised Daniels that he should arrange for FSEs and other employees to stay at hotels on APC's list of preferred hotels when they were in Rhode Island for training sessions. (SUF ¶¶ 49, 67). Indeed, it was her understanding, based on conversations with Daniels, that he would arrange for such employees to stay at the Johnson and Wales Hotel. (SUF ¶ 50).

Initially, Daniels did not respond to Bollman's query regarding the drop in usage of the Johnson and Wales Hotel. (SUF ¶ 51). Based on conversations with other employees, Bollman became suspicious that Daniels was using the Marriott hotel on Orms Street in downtown Providence (the "Providence Marriott"), instead of the Johnson and Wales Hotel. (SUF ¶ 52). The Providence Marriott was not on APC's list of preferred hotels. (SUF ¶ 53). Following up on the matter, Bollman sent Daniels an email on February 6, 2004, in which she stated as follows: "I am trying to understand in what capacity you guys are using the Marriott in PVD [Providence] and which one." (SUF ¶ 54). Daniels simply replied that "we are not doing training at the Marriott."[8] (SUF ¶ 55).

Following up on her suspicion, Bollman reviewed a number of employee expense reports.

---

[7] Bollman, on behalf of APC, had negotiated rates with various hotels in Rhode Island and elsewhere. (SUF ¶ 42). These rates generally were re-negotiated on a yearly basis. (SUF ¶ 43). Bollman maintained a list of these preferred hotels and encouraged employees to stay at such hotels whenever possible. (SUF ¶ 44).

[8] Daniels knew that the Providence Marriot was not on APC's list of preferred hotels. (SUF ¶ 56).

(SUF ¶ 57). As a result of this review, Bollman learned that APC in fact had booked a large number of rooms at the Providence Marriott. (SUF ¶ 58). In addition, on March 11, 2004, Bollman received an email from an FSE complaining about his stay at the Providence Marriott. (SUF ¶ 59). Bollman forwarded this email to Daniels, reminding him that she had "been trying to find out what kind of events are taking place at the Marriott," but her "emails were ignored." (SUF ¶ 60). Daniels again failed to respond to her email. (SUF ¶ 61).

Bollman then contacted Scott Barger, Director of Sales and Marketing for the Providence Marriott. (SUF ¶ 62). On March 12, 2004, Barger sent her an email explaining that Daniels had rented 116 hotel rooms at the Providence Marriott in January 2004 and another 180 rooms that February. (SUF ¶ 63). Moreover, Barger informed Bollman that the Providence Marriott had awarded Daniels over 100,000 points to his personal Marriott Rewards account as a result of these bookings. (SUF ¶ 64).

**1. Daniels' scheme was lucrative for him but detrimental to APC.**

Bollman viewed Daniels' behavior as unethical for a number of reasons. (SUF ¶ 65). First, contrary to Bollman's instructions, Daniels booked rooms at the Providence Marriott, instead of the Johnson and Wales Hotel, thereby resulting in increased cost to the Company. (SUF ¶ 66). Unbeknownst to Bollman (the Company's corporate travel manager and the person responsible for negotiating all hotel contracts), Daniels negotiated a rate of $95 per room, per night with the Providence Marriott. (SUF ¶ 67). This was $27 more per night than the APC rate for standard rooms at the Johnson and Wales Hotel. (SUF ¶ 68). As a result, APC paid approximately $8,000 more for these hotel rooms during January and February 2004 than it would have if Daniels had booked rooms at the Johnson and Wales Hotel. (SUF ¶ 69).

Moreover, under the arrangement between APC and the Johnson and Wales Hotel, APC

received one "Corporate Inn-Incentive" point from Johnson and Wales for each guest room used by an APC employee. (SUF ¶ 70). If APC accumulated a sufficient number of points, it would receive awards from Johnson and Wales, often in the form of retail gift certificates; APC generally distributed these gift certificates to employees as gifts or prizes at the Company's annual holiday party. (SUF ¶ 71). By diverting almost 300 rooms from the Johnson and Wales Hotel to the Providence Marriott, Daniels reduced the number of points received by APC, thereby reducing the number of gift certificates and other awards it could receive and distribute to other employees. (SUF ¶¶ 71-73).[9]

Second, when Bollman asked Daniels on February 6, 2004 whether he was using the Marriott, he denied doing so. (SUF ¶ 75). In fact, Daniels had negotiated his arrangement with the Providence Marriott on January 9, 2004, one month before his email to Bollman. (SUF ¶ 76). Indeed, Barger had sent a letter to Daniels on January 9th confirming the details of the arrangement they had reached earlier that day and stating that the Providence Marriott was "excited about the opportunity to host your trainees." (SUF ¶ 77).

Third, and most significantly, although Daniels' arrangement with the Providence Marriott cost APC money, Daniels himself *benefited* financially from it. Specifically, Barger informed Bollman that Daniels had received over 100,000 Marriott Rewards points for his personal account based upon the stays of other APC employees for APC training activities. (SUF ¶¶ 78-82). This was only the beginning: Daniels' agreement with the Providence Marriott states that he would receive a total of 225,000 Marriott Rewards points over a nine-week period. (SUF ¶ 79).

---

[9] Daniels' dealings with the Providence Marriott potentially were costly to APC in another way as well. Bollman negotiated a preferred rate with the Johnson and Wales Hotel based on, among other factors, the number of nights APC employees stayed there. (SUF ¶ 74). Thus, by booking 296 hotel stays with the Providence Marriott, instead of the Johnson and Wales Hotel, Daniels hampered Bollman's ability to negotiate the best possible rate with the Johnson and Wales Hotel. See id.

These points are valuable, as they can be redeemed for, among other things, free hotel stays, cruises, vacation packages, and other rewards. (SUF ¶ 80). As Barger (who no longer is employed by Marriott) testifies in the Affidavit submitted herewith, Daniels' receipt of points was "a very important part of the agreement" with the Providence Marriott; Daniels "made multiple calls to [Barger] regarding the timing of the award of points to his Marriott Rewards account." (SUF ¶¶ 81-82).

Daniels' receipt of Marriott Rewards points violated APC's Code of Ethics and Business Conduct (the "Code of Ethics"), which prohibits an employee from accepting "[c]ash or cash-equivalent gifts" or any form of kickback. (SUF ¶¶ 83-84).[10] In addition, Daniels' receipt of Marriott Rewards points was detrimental to the financial interests of his fellow employees because, under the terms of Marriott's Reward Points plan, only those individuals who pay for their own rooms may receive points for a hotel stay. [11] (SUF ¶ 87). Thus, because Daniels received points for organizing hotel stays at the Providence Marriott, and had the hotel bill APC directly for those stays, the APC employees who actually stayed there, and whose rooms were directly billed to APC, could not receive any points. (SUF ¶¶ 88-91).

### 2. Bollman informs human resources of Daniels' scheme.

When Bollman informed Kelly, her supervisor, of Daniels' behavior, he suggested that she write an email to the Company's human resources department explaining her findings. (SUF ¶ 92). Accordingly, on March 12, 2004, Bollman sent an email to Gough, then the Company's Director of Human Resources, stating in relevant part as follows:

---

[10] The Code of Ethics, adopted in 2003, was available to all APC employees on the Company's intranet. (SUF ¶ 85). The Code of Ethics states that a violation of any of its provisions may result in disciplinary action "up to and including termination of employment, without additional warning." (SUF ¶ 86).

[11] APC permits employees to receive rewards points from hotels, rental car companies, and airlines for their own business-related usage. (SUF ¶ 88). In contrast, Daniels received points because he arranged for *other* employees to stay at the Providence Marriott. (SUF ¶ 89).

> I recently became aware that a considerable amount of hotel rooms are going [to] the Providence Marriott, a hotel that is not on our preferred list for 2004 . . . Short term consequences are that we probably spend more than we should on hotel stays. Long term consequences are that we will spend a lot more and stand to ruin long term relationships with other properties that benefit APC in value and service. I have asked Seth Daniels if he was using the Marriott for training and he said no. 116 room nights in January and 180 in February indicate to me otherwise. To date Seth has earned a little over 100,000 Marriott rewards points from bringing his groups to the Marriott. This business in the past has gone to the Johnson&Wales which is awarding APC points that we then use for the Xmas party to benefit all employees . . . One could argue if Seth['s] behavior is unethical at the least it is not in the best interest of APC.

(SUF ¶ 93).

### D. APC Terminates Daniels' Employment

That same day, Gough relayed the information contained in Bollman's email to Cavanaugh, Daniels' ultimate supervisor. (SUF ¶ 94). Gough and Cavanaugh (who had interviewed Daniels just a few months before) then decided to terminate Daniels' employment. (SUF ¶¶ 5, 95). That afternoon, Cavanaugh and Hendrix informed Daniels of APC's decision to terminate his employment for receiving kickbacks from the Providence Marriott. (SUF ¶ 96). Neither Bollman nor Kelly were involved in this decision. (SUF ¶ 97).

Daniels now asserts claims of racial harassment, race discrimination, and retaliation against APC.

## II. ARGUMENT

Summary judgment is appropriate where, as here, "the pleadings, depositions, answers to interrogatories, and . . . the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As discussed in detail below, summary judgment is appropriate with regard to all of Daniels' claims because he cannot offer any evidence to support his conclusory assertions that he was

harassed because of his race and that APC's decision to terminate his employment was motivated by discriminatory or retaliatory animus. See LeBlanc v. Great American Ins. Co., 6 F.3d 836, 842 (1st Cir. 1993) ("the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party"); Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (the nonmoving party must rely on more than "conclusory allegations, improbable inferences, and unsupported speculation" to defeat a summary judgment motion).

### A. Daniels Cannot State A Hostile Work Environment Claim[12]

Daniels claims that he was subjected to a hostile work environment on account of his race. Specifically, Daniels alleges that Kelly "interrogated" him regarding the W-4 issue, questioned his job qualifications, blamed him for the fact that his laptop had been stolen, denied his requests to direct bill his rental cars, and generally was rude to him. See Complaint ¶¶ 12-15. Daniels also alleges that Hendrix asked him to accompany her to the train station "to inform an individual that his job offer was rescinded" because he had failed a drug test; and that Hendrix asked him to do this because Daniels would "scare the shit out of him." See id. ¶ 16.

To prevail on this claim, Daniels must establish that: (1) he is a member of a protected class; (2) he was subjected to "unwelcome" racial harassment; (3) the harassment was "based upon" race; (4) "the harassment was sufficiently severe or pervasive so as to alter the conditions of [his] employment and create an abusive work environment;" (5) the racially objectionable conduct "was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and [he] in fact did perceive it to be so;" and (6) there is a basis for

---

[12] Daniels asserts his harassment, discrimination, and retaliation claims under 42 U.S.C. § 2000e *et seq.* ("Title VII"), 42 U.S.C. § 1981, and the Rhode Island Civil Rights Act of 1990 ("RICRA"), R.I. Gen. Laws § 42-112-1 *et seq*. Because courts analyze claims under the latter two statutes by employing the well-established body of Title VII case law, APC does the same herein. See Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 33 (1st Cir. 2001) (analyzing Title VII and Section 1981 claims under the same standard); DeCamp v. Dollar Tree Stores, Inc., 875 A.2d 13, 21 (R.I. 2005) (analyzing RICRA claims by applying Title VII precedent).

holding APC liable. Crowley v. L.L. Bean, Inc., 303 F.3d 387, 395 (1st Cir. 2002) (citing O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001)). Daniels cannot satisfy this test for at least three reasons.

### 1. Daniels cannot show that the alleged conduct was race-based.

First, Daniels cannot show that he endured any offensive race-based conduct. See, e.g., Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 258 (1st Cir. 1999) (holding that where a plaintiff "toiled in a wretchedly hostile environment," but failed to show that he was harassed because of sex, the court properly granted summary judgment for the defendant on plaintiff's sexual harassment claim). Daniels offers nothing other than his own conclusory statements to support his assertion that the conduct of Kelly, Hendrix, or any other APC employee was motivated by his race. See id.; Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2002) (noting that it is "important in hostile work environment cases to exclude from consideration decisions that lack a linkage or correlation to the claimed ground of discrimination . . . [because] [o]therwise . . . courts will become a court of personnel appeals").

Indeed, the bulk of Daniels' harassment claims concern allegations regarding Kelly, who was widely regarded by APC employees of all colors as having a difficult personality.[13] (SUF ¶¶ 98-100). Because Daniels cannot show that Kelly's actions (or those of any other APC employee) were motivated by Daniels' race, he cannot state a harassment claim.[14] See Higgins, 194 F.3d at 258; Morrison v. Carleton Woolen Mills, Inc., 108 F.3d 429, 441 (1st Cir. 1997) ("Merely because a supervisor is overbearing or fellow employees unsociable and hard to get along with, does not suffice unless underlying motives of a sexual or gender discriminatory

[13] Bonzani, who is white, testified that Kelly was a "well-known hard ass." (SUF ¶ 98). According to Bonzani, Kelly was an "equal opportunity offender" who "treated everybody the same way." (SUF ¶¶ 98-99). Gough and Hendrix also testified that employees of all races complained about Kelly. (SUF ¶¶ 99-100).

[14] As for Daniels' allegation regarding Hendrix, she testified that Daniels volunteered to go to the train station with her and that, in any event, neither of them wound up going because the employee whom they had intended to meet missed his train. (SUF ¶ 101).

nature are implicated."); see also, e.g., Hesse v. Avis Rent A Car Sys., Inc., 02-CV-3653 (JMR/FLN), 2004 U.S. Dist. LEXIS 4553, at *12 (D. Minn. Mar. 18, 2004) (Rosenbaum, J.) ("Abusive behavior is not "based on sex" if the harasser subjects both men and women to similar abuse.").

**2. The alleged conduct did not create a hostile work environment.**

To prevail on his harassment claims, Daniels must establish that the alleged harassment was sufficiently severe or pervasive so as to alter the conditions of his employment and create an abusive work environment. See Carmona-Rivera v. Puerto Rico, 464 F.3d 14, 19 (1st Cir. 2006); Crowley, 303 F.3d at 395. Because he cannot do so, his claims should be dismissed.

Daniels' allegations that Kelly unfairly scrutinized him by questioning the fact that he claimed to be exempt from federal income tax on his Form W-4 or that Kelly and others were rude to him, see Complaint ¶¶ 12-15, simply do not give rise to a claim of racial harassment. See, e.g., Carmona-Rivera, 464 F.3d at 19 (holding that plaintiff's allegations that defendants were "rude and indifferent in their treatment of her" did not give rise to a harassment claim).

Daniels offers no evidence that he experienced "any physically threatening or humiliating conduct" or that the alleged incidents of harassment were so frequent or severe as to unreasonably interfere with his performance. See id. (identifying circumstances courts may consider in evaluating harassment claims). Indeed, Daniels himself testified that as of the time of his termination, he was (in his opinion) "meeting all of [his] deliverables from [his] supervisor" and "making a positive impact in APC in their service department not just nationally but globally." (SUF ¶ 102). In light of his testimony, Daniels simply cannot assert that the perceived slights about which he now complains rose to the level of actionable harassment. See Carmona-Rivera, 464 F.3d at 19.

**3. The alleged conduct was not objectively or subjectively offensive.**

Daniels also must show that the alleged harassment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that [he] in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998). He cannot satisfy either the objective or subjective component of this test.

First, no reasonable person, when looking at the petty slights and bureaucratic difficulties that form the foundation of Daniels' hostile work environment claim, could conclude that such behavior was so hostile or abusive as to rise to the level of actionable harassment. See id. To the contrary, such matters merely constitute the "ordinary tribulations of the workplace." Id. at 787-88. Indeed, it simply cannot be considered "hostile" or "abusive" for Kelly to require Daniels to properly complete expense reimbursement requests or to follow other Company policies.

Second, Daniels' own deposition testimony establishes that he did not perceive his working conditions as being subjectively offensive on account of race. Specifically, Daniels testified that he complained to Hendrix regarding Kelly and that he felt uncomfortable having done so. (SUF ¶ 103). He then testified as follows:

> Q: Did you tell her it was uncomfortable from a racial bias perspective?
>
> A: At that point in time – at that point in time, there were individual incidents that had not yet formed a pattern that I perceived to be racially motivated.
>
> . . .
>
> Q: When did that – when did they form a pattern to be racially motivated, in your mind?
>
> A: When I was terminated for something that I did not do.

(SUF ¶ 104).

Because Daniels, prior to his termination, did not perceive any of the actions underlying

his harassment claim to be racially motivated, he cannot now assert that he felt his working environment was "permeated with discriminatory intimidation, ridicule, and insult," so as to rise to the level of being hostile or abusive. Kosereis v. Rhode Island, 331 F.3d 207, 212-13 (1st Cir. 2003) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). Therefore, Daniels' race harassment claims should be dismissed.

**B. Daniels' Race Discrimination Claim Fails**

Daniels next alleges that he was terminated because of his race. Summary judgment is appropriate for this claim because Daniels is unable to offer evidence sufficient to establish a prima facie case of race discrimination or to create a genuine issue as to whether APC's stated reasons for its decision to terminate his employment were pretextual.

**1. Daniels Cannot Establish a Prima Facie Case of Race Discrimination.**

To establish a *prima facie* case of race discrimination, Daniels must establish, among other elements, that "he was performing his job duties at a level that rules out the possibility that he was fired for job performance."[15] Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003). He cannot do so.

As discussed above, Daniels received over 100,000 Marriott Rewards points in exchange for booking rooms at the Providence Marriott instead of one of the hotels with which the Company had negotiated a preferred rate. (E.g., SUF ¶¶ 56-64). Daniels' receipt of these points violated APC's Code of Ethics, which prohibits an employee from accepting cash or cash-equivalent gifts or any other form of kickback. (E.g., SUF ¶¶ 83-86). Daniels' focus on his own self-interest is best highlighted by his willingness to book rooms at the Providence Marriott

[15] APC assumes, for purposes of this motion only, that Daniels can establish the other elements of his prima facie case regarding his termination claim. See Benoit, 331 F.3d at 173 ("To establish a prima facie case of racial discrimination, [plaintiff] must show that (1) he belonged to a protected class, a racial minority . . . (3) he suffered an adverse job action by his employer; and (4) his employer sought a replacement for him with roughly equivalent qualifications.").

instead of the Johnson and Wales Hotel at an increased cost to the Company of over $8,000 in unnecessary hotel fees. (SUF ¶¶ 67-69). In addition, Daniels lied to Bollman when she asked him whether he was using the Providence Marriott. (SUF ¶¶ 50, 55-60).

In short, he created, and attempted to hide, a kickback scheme that was beneficial to himself and detrimental to the best interests of the Company (and his fellow employees, who were unable to receive Marriott Rewards points for reservations made by Daniels and billed directly to APC). (E.g., SUF ¶¶ 83-86, 95-96). In light of these facts, Daniels cannot establish that he was adequately performing his job duties. His race discrimination claim therefore should be dismissed. See, e.g., Bramble v. American Postal Workers Union, 135 F.3d 21, 25 (1st Cir. 1998) (affirming grant of summary judgment where employer offered uncontroverted evidence that plaintiff's job performance did not satisfy the employer's legitimate expectations).

**2. APC Acted for Legitimate Nondiscriminatory Reasons.**

Even assuming, *arguendo*, that Daniels could establish a *prima facie* case, the evidence demonstrates that APC terminated his employment for a legitimate, nondiscriminatory reason, namely, his wrongful receipt of over 100,000 Marriott Rewards points from the Providence Marriott and his attempts to hide this scheme by lying to Bollman. (E.g., SUF ¶¶ 65-91). Daniels' self-dealing violated the Company's Code of Ethics, cost APC thousands of dollars, and was detrimental to the best interests of APC and its employees. (E.g., SUF ¶¶ 69, 73, 83-84, 91).

**3. Daniels Cannot Establish Pretext.**

Because APC had a legitimate, nondiscriminatory reason for terminating Daniels' employment, he must show that APC's reason is pretextual, a cover-up for unlawful discrimination. See Kosereis, 331 F.3d at 212-13; Feliciano De La Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 6 (1st Cir. 2000).

Daniels, however, has not come forward with any evidence suggesting that Gough or

Cavanaugh, who made the decision to terminate his employment, were motivated by racial bias.[16] See Straughn, 250 F.3d at 41 (holding that, in assessing pretext, the "focus must be on the perception of the decisonmaker"). Indeed, just a few months earlier, Cavanaugh had interviewed Daniels and approved the decision to hire him. (SUF ¶ 5). It defies logic for Daniels to suggest that Cavanaugh suddenly developed an aversion to African Americans in the intervening months.[17] See LeBlanc, 6 F.3d at 847 (quoting Proud v. Stone, 945 F.2d 796, 797 (4th Cir. 1991) ("[I]n cases where the hirer and firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer.")).

To the extent Daniels may assert that Bonzani approved his decision to use the Providence Marriott, any such claim is irrelevant to the issue of pretext for two reasons. First, the fact is that Bonzani did not know that Daniels was receiving Marriott Rewards points for coordinating the stay of other APC employees at the Providence Marriott. (SUF ¶ 106). Second, and perhaps more significantly, even if Daniels' arrangement with the Providence Marriott had been acceptable to Bonzani, it plainly was unacceptable to Gough and Cavanaugh; and the fact that they may have had different standards than Bonzani does not support a finding of pretext. See Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 20 (1st Cir. 1999) ("The fact that Cahill may have had different expectations for [plaintiff], even if those expectations were

---

[16] As discussed above, although Daniels alleges that Kelly harassed him, there is no basis for concluding that any of Kelly's actions were motivated by racial animus. See Section II.A, supra. In any event, it is undisputed that Kelly did not make, or participate in, the decision to terminate Daniels' employment. (SUF ¶ 97).

[17] At deposition, Daniels testified that a few months or weeks prior to his termination Cavanaugh asked him "why can't you be a good Irish lad like everyone else?" See SUF ¶105. Even if Cavanaugh made this remark, it is not probative of bias, and, in any event, was remote in time from, and wholly unrelated to, the decision to terminate Daniels' employment, and, therefore, insufficient to establish pretext. See Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002) ("stray workplace remarks . . . normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus"); Straughn, 250 F.3d at 36 ("mere generalized "stray remarks," arguably probative of bias against a protected class, normally are not probative of pretext absent some discernible evidentiary basis for assessing their temporal and contextual relevance").

contrary to those of [plaintiff]'s prior supervisors, does not support a finding of pretext.").

Although Daniels may believe that APC's termination decision was unfair, or its investigation or decision making processes were flawed, "[c]ourts may not sit as super personnel departments, assessing the merits - or even the rationality - of employers' nondiscriminatory business decisions." Mesnick v. General Electric Co., 950 F.2d 816, 825 (1st Cir. 1991). Said differently, the Court's "task is not to evaluate the soundness of [APC's] decision making but to make sure that it does not mask discriminatory animus." Id.; see Rodriguez-Cuervos, 181 F.3d at 22 ("Title VII does not stop a company from demoting an employee for any reason – fair or unfair – so long as the decision to demote does not stem from a protected characteristic, here, race."); LeBlanc, 6 F.3d at 846 ("It is not a court's role to second-guess the business decisions of an employer.").

Because Daniels offers nothing more than his own conclusory assertions of discrimination to establish pretext, he cannot withstand summary judgment. See Pilgrim v. Trustees of Tufts College, 118 F.3d 864, 871 (1st Cir. 1997) ("although . . . Fischer's behavior left Pilgrim with the perception he had been discriminated against, Pilgrim's perception is not enough to withstand summary judgment"); Medina-Munoz, 896 F.2d at 8. Accordingly, the Court should dismiss Daniels' race discrimination claims.

### C. Daniels Cannot Establish Unlawful Retaliation

Lastly, Daniels alleges that, in December 2003, he complained to Bonzani and APC's human resources department "regarding the racially discriminatory and harassing treatment that [he] had experienced, particularly about Kelly's conduct." See Complaint ¶ 17. Daniels asserts that Cavanaugh and Gough terminated him in retaliation for these alleged complaints. Because Daniels cannot offer evidence sufficient to establish a prima facie case of retaliation, or to create a genuine issue as to whether APC's stated reasons for its decision to terminate his employment

were pretextual, summary judgment is appropriate.

**1. Daniels cannot establish a prima facie case of retaliation because he did not engage in protected activity.**

To prevail on his retaliation claims, Daniels first must establish a *prima facie* case by showing that: (1) he engaged in protected activity; (2) he suffered a material adverse employment action; and (3) a causal connection existed between the two. See Carmona-Rivera, 464 F.3d at 19. Because Daniels did not engage in protected activity, his retaliation claims fail.[18]

General complaints of unfair treatment do not constitute "protected activity." See e.g., Slagle v. County of Clarion, 435 F.3d 262, 265-68 (3d Cir. 2006); Benoit, 331 F.3d at 174-75. If the rule were otherwise, the courts would be flooded with retaliation claims based on routine workplace interactions. To rise to the level of "protected activity," an internal complaint either must be based on (a) events that constitute a violation of Title VII or some other antidiscrimination statute, or (b) the employee's "good faith, reasonable belief" that the underlying conduct violated the law. See Benoit, 331 F.3d at 174-75. Daniels cannot satisfy either of these standards.

First, even if Daniels complained to APC regarding all of the alleged incidents of harassment set forth in his Complaint, it is clear, for the reasons discussed above, that such conduct did not give rise to a cause of action for racial harassment or discrimination. See Sections II.A-B, supra. Thus, he cannot satisfy the first definition of protected activity.

Second, Daniels' own testimony precludes his reliance on the "good faith, reasonable belief" standard. As discussed above, Daniels testified that he did not come to believe the actions of Kelly were motivated by race until after he was terminated. (SUF ¶ 104). Thus, his

---

[18] To the extent Daniels may base his retaliation claim on other alleged actions (e.g., APC's decision not to create an exception from its policy regarding direct billing of rental cars), any such claim fails because these actions do not constitute adverse employment actions. See Carmona-Rivera, 464 F.3d at 19-20 ("The alleged retaliatory action must be material, producing a significant, not trivial harm.").

prior internal complaints regarding Kelly were the sort of garden-variety gripes regarding working conditions that do not constitute protected activity and cannot support a claim of retaliation. See Slagle, 435 F.3d at 265-68. Therefore, his retaliation claim should be dismissed.

**2. APC Acted for Legitimate, Nonretaliatory Reasons.**

Even assuming, *arguendo*, that Daniels could establish a *prima facie* case, the evidence demonstrates that APC terminated his employment for a legitimate, nonretaliatory reason, namely, his wrongful receipt of over 100,000 Marriott Rewards points from the Providence Marriott and his attempts to hide this scheme by lying to Bollman. (E.g., SUF ¶¶ 65-91). Daniels' self-dealing violated the Company's Code of Ethics, cost APC thousands of dollars, and was detrimental to the best interests of APC and its employees. (E.g., SUF ¶¶ 69, 73, 83-84, 91).

**3. Daniels Cannot Establish Pretext.**

Because APC had a legitimate, nonretaliatory reason for terminating Daniels' employment, "[t]o defeat summary judgment, [Daniels] must point to some evidence of retaliation by a pertinent decisionmaker." Randlett v. Shalala, 118 F.3d 857, 862 (1st Cir. 1997); see Carmona-Rivera, 464 F.3d at 20. Daniels, however, cannot offer any evidence suggesting that Gough and Cavanaugh terminated him because of his alleged complaints.[19] See Carmona-Rivera, 464 F.3d at 20; Straughn, 250 F.3d at 41 (holding that, in assessing pretext, the "focus must be on the perception of the decisionmaker").

Indeed, at deposition, Daniels, after describing his alleged complaints, offered only speculation that such complaints were connected to APC's decision to terminate his employment:

Q: And how do you connect that to the termination?

[19] As discussed above, the bulk of Daniels' complaints concerned Kelly, who did not make, or participate in, the decision to terminate Daniels' employment. (SUF ¶ 97).

> A: After my complaining, I got fired for something that I did not do.

(SUF ¶ 107).

Thus, Daniels' retaliation claim ultimately rests on the fact that he was terminated a few months after his internal complaints. This is not enough. The First Circuit has explained that the mere fact that an employer knows of protected activity and thereafter takes some adverse action against the complaining employee does not, by itself, establish causation:

> [T]hat kind of knowledge on an employer's part, without more, cannot itself be sufficient to take a retaliation case to the jury. Were the rule otherwise, then a disgruntled employee, no matter how poor his performance or how contemptuous his attitude toward his supervisors, could effectively inhibit a well-deserved discharge by merely filing, or threatening to file, a discrimination complaint. We agree with the Eighth Circuit that, while statutes such as the ADEA bar retaliation for exercising rights guaranteed by law, they do "not clothe the complainant with immunity for past and present inadequacies, unsatisfactory performance, and uncivil conduct in dealing with subordinates and with his peers."

Mesnick, 950 F.2d at 827-28; see Kosereis, 331 F.3d at 217.

Because Daniels cannot offer evidence sufficient to show that defendant took disciplinary action against him because of his complaint, his retaliation claim must be dismissed.[20] See Carmona-Rivera, 464 F.3d at 20; Randlett, 118 F.3d at 862; Gilbert v. Amerifee, L.L.C., 345 F. Supp. 2d 70, 73 (D. Mass. 2004) (granting summary judgment on retaliation claim where the only evidence of causation was the fact that the termination occurred four months after plaintiff engaged in protected activity); see generally Medina-Munoz, 896 F.2d at 8.

---

[20] In his Complaint, Daniels briefly alleges, in conclusory fashion, that APC improperly deducted money from his final paycheck and failed to reimburse him for unspecified work-related expenses after his termination. APC processed all of Daniels' requests for reimbursement in accordance with Company policy and never made any improper deductions from his pay. See SUF ¶ 108. Daniels has not produced any evidence to substantiate his assertion that these alleged actions were motivated by retaliatory or discriminatory animus. Thus, to the extent Daniels purports to base his retaliation or discrimination claims on these alleged actions, any such claim fails.

## III. CONCLUSION

For the foregoing reasons, APC respectfully requests that the Court enter summary judgment on each of Daniels' claims against it.

Respectfully submitted,

AMERICAN POWER CONVERSION CORPORATION,

By its attorneys,

/s/ George P. Kostakos

George P. Kostakos (6971)
Christopher B. Kaczmarek (motion to appear *pro hac vice* pending)
Littler Mendelson, P.C.
10 Weybosset Street, Suite 404
Providence, RI 02903
(401) 454-2903 (tel.)
(401) 454-2969 (fax)
gkostakos@littler.com

Dated: December 15, 2006

**CERTIFICATE OF SERVICE**

I, George P. Kostakos, hereby certify that on this 15th day of December 2006 the foregoing Memorandum of Law in Support of Defendant's Motion for Summary Judgment was filed electronically through the ECF system, is available for viewing and downloading from the ECF system, and will be sent electronically to counsel of record as registered participants identified on the Notice of Electronic Filing and via first class mail to all non-registered participants identified on the Notice of Electronic Filing.

/s/ George P. Kostakos
George P. Kostakos