*Document Electronically Filed*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

SETH DANIELS,

Plaintiff,

v.

AMERICAN POWER CONVERSION CORPORATION,

Defendant.

Civil Action No: 05-00459-ML-LDA

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

In accordance with Local Rule 56(a), defendant American Power Conversion Corporation ("APC" or the "Company") submits this concise statement, in consecutively numbered paragraphs, of the material facts as to which APC contends there is no genuine dispute or issue to be tried, with page, line, and/or paragraph references to supporting documents, which are submitted herewith.[1] The Affidavits of George P. Kostakos, Scott Barger, Christine Bollman, and Brian Gough, cited herein, were filed with the Court contemporaneously with APC's Motion for Summary Judgment.

**The Company**

1. APC manufacturers and provides back-up power products and services, including surge suppressors, uninterruptible power supplies, power conditioning equipment, power management software, precision cooling equipment, and related consulting services. (Affidavit of Brian Gough ("Gough Aff." ¶ 3).

2. The Company maintains facilities throughout the world and is headquartered in West Kingston, Rhode Island. (Gough Aff. ¶ 4).

[1] This Statement is based in part on the deposition testimony of plaintiff Seth Daniels. APC accepts Daniels' deposition testimony as true for purposes of its Motion for Summary Judgment only, and reserves the right to contest Daniels' testimony at trial.

## APC Hires Daniels

3. In 2003, Daniels, while working for a company called BBH Solutions, met John Bonzani, manager of APC's Global Services Group in North America. (Deposition of Seth Daniels ("Daniels Dep.") at pp. 131:4-133:18).[2]

4. Bonazani subsequently asked Daniels whether he was interested in working for APC. (Daniels Dep. at 132:18-132:22).

5. Daniels was interviewed by Bonzani, as well as Bonzani's supervisor, Paul Cavanaugh. (Daniels Dep. at 133:22-138:18).

6. APC ultimately offered, and Daniels accepted, the position of Training Manager for the Global Services Group. (Daniels Dep. at 134:8-135:8; Deposition of John Bonzani ("Bonzani Dep.") at 26:11-26:17, 30:4-33:22).[3]

7. Daniels began working for the Company in September 2003. (Daniels Dep. at 121:1-121:3).

8. He reported directly to Bonzani. (Daniels Dep. at 208:14-208:16).

9. Daniels' office was in East Providence. (Daniels Dep. at 225:14-225:15, 285:24-286:2).

10. Daniels did not relocate to Rhode Island, but commuted from his home in New Jersey, staying in a hotel during the week. (Daniels Dep. at 143:3-143:14).

11. As Training Manager, Daniels' responsibilities included the development and implementation of training programs for the Company's field service engineers ("FSEs"). (Daniels Dep. at 163:2-164:14).

12. Although the Company employs FSE's across the world, APC typically held the training sessions for which Daniels was responsible in Rhode Island. (Daniels Dep. at 279:23-281:19).

---

[2] The cited portions of the transcript of Daniels' deposition are attached as Exhibit A to the Affidavit of George P. Kostakos submitted herewith.

[3] The cited portions of the transcript of Bonzani's deposition are attached as Exhibit E to the Affidavit of George P. Kostakos submitted herewith.

**Daniels' Troubled Tenure With APC**

13. Many APC employees complained to members of the Company's human resources department, including Christine Hendrix and Brian Gough, about Daniels' behavior. (Deposition of Christine Hendrix ("Hendrix Dep.") at 111:2-121:22, 126:12-127:12, 135:1-136:6, 144:17-146:9, 157:5-158:18, 214:10-217:18; Deposition of Brian Gough ("Gough Dep.") at 249:7-250:19).[4]

14. Among other things, employees complained that Daniels was "rude," "pushy," and generally behaved inappropriately. (Hendrix Dep. at 111:9-16, 112:12, 114:21-22, 118:17-20, 126:14-19, 214:10-23, 216:2-217:23).

15. At the commencement of his employment, Daniels, who only one month earlier had been employed by BBH Solutions and now made $75,000 in annual salary at APC, submitted a Form W-4 to the Company stating that he was completely exempt from federal income tax. (Daniels Dep. at 215:10-220:11; Gough Aff., Exhs. A-B; Deposition of Brian Kelly ("Kelly Dep.") at 69:6-78:18, 186:2-186:8).[5]

16. According to the Form W-4, an employee must satisfy two conditions to properly claim a complete exemption from federal income tax. (Gough Aff., Exh. B).

17. First, in the preceding year the employee must have had a right to a refund of all federal income tax withheld because he had no tax liability. (Gough Aff., Exh. B).

18. Second, in the current year, the employee must expect a refund of all federal income tax withheld because he expects to have no income tax liability. (Gough Aff., Exh. B).

19. Daniels' Form W-4 was incomplete because he had failed to indicate whether he was married or single. (Gough Aff., Ex. B; Kelly Dep. at 79:8-80:17, 186:11-188:4).

---

[4] The cited portions of the transcript of Hendrix's deposition are attached as Exhibit D to the Affidavit of George P. Kostakos submitted herewith. The cited portions of Gough's deposition transcript are attached as Exhibit B thereto. Due to a clerical error, the cover page of Gough's deposition transcript identifies his first name as "Bruce" instead of "Brian."

[5] The cited portions of the transcript of Kelly's deposition are attached as Exhibit F to the Affidavit of George P. Kostakos submitted herewith.

20. After APC's finance department informed Daniels that he had filled out the Form W-4 incorrectly, Daniels spoke with Brian Kelly, APC's Director of Finance. (Daniels Dep. at 221:10-222:18, 241:2-243:21; Kelly Dep. at 188:5-189:17).

21. At that time, Daniels was unable or unwilling to affirmatively state that he actually qualified for a complete exemption from federal income tax. (Kelly Dep. at 81:14-83:4, 93:2-94:3).

22. Kelly required Daniels to complete a new Form W-4. (Daniels Dep. at 220:20-221:2, 222:17-222:18).

23. Daniels, when asked at deposition why he listed himself as exempt from federal income tax, testified that "I completed the form the way I did because I felt that that was the appropriate way to complete the form." (Daniels Dep. at 217:18-218:20).

24. Daniels also testified as follows: "I don't believe I'm exempt from paying income taxes." (Daniels Dep. at 215:22-215:23).

25. In November 2003, someone broke into Daniels' rental car and stole his laptop computer bag, which contained his APC-provided computer and several weeks' worth of business-related receipts. (Daniels Dep. at 271:4-272:4, 277:21-278:2).

26. When Kelly learned that Daniels had left his laptop computer bag in plain sight in the back seat of the car, he told Daniels that he was partially responsible for the theft. (Daniels Dep. at 252:20-252:21; Kelly Dep. at 197:8-198:12; see also Hendrix Dep. at 175:20-176:4; Deposition of Christine Bollman ("Bollman Dep.") at 185:18-186:10).[6]

27. APC did not require Daniels to pay the cost of replacing his laptop. (Daniels Dep. at 278:17-279:2).

28. The owner of the restaurant where Daniels' car was parked when it was burglarized complained to APC that Daniels was acting belligerently toward him and "being an asshole" about the situation. (Hendrix Dep. at 176:24-178:10).

---

[6] The cited portions of the transcript of Bollman's deposition are attached as Exhibit C to the Affidavit of George P. Kostakos submitted herewith.

29. Although many of Daniels' business-related receipts were stolen along with his laptop, APC reimbursed him for such expenses. (Daniels Dep. at 277:21-278:16).

30. Around this same time, APC became aware that Daniels somehow had been "direct billing" his rental car expenses, contrary to Company policy. (Bollman Dep. at 204:4-206:5; Daniels Dep. at 174:22-175:6, 176:21-178:23).

31. Normally, APC employees incur business-related expenses and then seek reimbursement from the Company. (Daniels Dep. at 172:3-173:8; Bonzani Dep. at 49:15-50:1).

32. Where a "direct billing" arrangement is in place, the vendor (e.g., a hotel or rental car company) bills APC directly for the goods or services; as a result, the employee does not have to incur the cost first and then seek reimbursement. (Daniels Dep. at 173:24-174:4; Bollman Dep. at 15:16-18:2; Bonzani Dep. at 180:17-182:2).

33. At the time, the only non-executive level APC employees who could direct bill travel expenses were those employees who either (a) spent more than ten consecutive days in Rhode Island on business, or (b) did not have a personal credit card and had applied for, but been denied, an APC corporate credit card. (Bollman Dep. at 14:5-15:10; Kelly Dep. at 38:23-39:6).

34. Daniels did not fit into either of these two categories. (Bollman Dep. at 204:05-205:19; Bonzani Dep. at 40:7-40:11; Daniels Dep. at 180:2-181:12).

35. Daniels never applied for an APC corporate card. (Daniels Dep. at 180:2-181:12).

36. When Christine Bollman asked him why he would not do so, Daniels said "I just don't want to." (Bollman Dep. at 204:14-205:13).

37. Bollman told Daniels that he could not direct bill his rental cars. (Daniels Dep. at 176:24-177:23, 183:8-185:18).

38. Daniels was not happy about this situation, and repeatedly asked Bollman to reconsider. (Daniels Dep. at 193:12-193:18, 268:2-268:11; Bollman Dep. at 209:8-209:23).

39. Bonzani did not have the authority to approve direct billing. (Bonzani Dep. at 51:1-51:9; Kelly Dep. at 205:18-205:20).

**The Company Uncovers Daniels' Kickback Scheme**

40. In late 2003, Bollman received a telephone call from Carol Shibley, general manager of the Johnson and Wales Hotel. (Bollman Dep. at 87:4-87:24).

41. Bollman previously had negotiated a rate of $68 per room, per night with the Johnson and Wales Hotel, which was located near APC's East Providence facility. (Affidavit of Christine Bollman ("Bollman Aff."), Exh. B).

42. Bollman, on behalf of APC, had negotiated rates with various hotels in Rhode Island and elsewhere. (Bollman Dep. at 12:11-12:18, 75:3-76:17; Bollman Aff. ¶3).

43. These rates generally were re-negotiated on a yearly basis. (Bollman Dep. at 76:15-76:17; Bollman Aff. ¶3).

44. Bollman maintained a list of these preferred hotels and encouraged employees to stay at such hotels whenever possible. (Bollman Dep. at 43:7-43:24, 75:3-76:17).

45. Historically, the Company made significant use of the Johnson and Wales Hotel. (Bollman Aff. ¶5).

46. Shibley asked Bollman why there had been a "sudden drop" in the number of rooms booked by APC. (Bollman Dep. at 87:4-87:24).

47. Bollman said she would look into the matter. (Bollman Dep. at 87:17-88:3).

48. Bollman subsequently asked Daniels whether he knew why there had been a sudden drop in APC's use of the Johnson and Wales Hotel. (Bollman Dep. at 90:10-92:23).

49. Bollman previously had advised Daniels that he should arrange for FSEs and other employees to stay at hotels on APC's list of preferred hotels when they were in Rhode Island for training sessions. (Daniels Dep. at 286:7-286:19).

50. It was Bollman's understanding, based on conversations with Daniels, that he would arrange for such employees to stay at the Johnson and Wales Hotel. (Bollman Dep. at 96:18-97:21).

51. Initially, Daniels did not respond to Bollman's query regarding the drop in usage of the Johnson and Wales Hotel. (Bollman Dep. at 91:17-92:7).

52. Based on conversations with other employees, Bollman became suspicious that Daniels was using the Marriott hotel on Orms Street in downtown Providence (the "Providence Marriott"), instead of the Johnson and Wales Hotel. (Bollman Dep. at 99:11-104:3).

53. The Providence Marriott was not on APC's list of preferred hotels. (Bollman Aff., Exh. C at APC 139-APC141; Daniels Dep. at 287:19-287:23).

54. Bollman sent Daniels an email on February 6, 2004, in which she stated as follows: "I am trying to understand in what capacity you guys are using the Marriott in PVD [Providence] and which one." (Bollman Aff. ¶8, Exh. C at APC 137).

55. Daniels replied that "we are not doing training at the Marriott." (Bollman Aff. ¶8, Exh. C at APC 137).

56. Daniels knew that the Providence Marriot was not on APC's list of preferred hotels. (Daniels Dep. at 286:7-288:3).

57. Following up on her suspicion, Bollman reviewed a number of employee expense reports. (Bollman Dep. at 99:11-104:17).

58. As a result of this review, Bollman learned that APC in fact had booked a large number of rooms at the Providence Marriott. (Bollman Dep. at 99:11-100:3).

59. On March 11, 2004, Bollman received an email from an FSE complaining about his stay at the Providence Marriott. (Bollman Aff. ¶9, Exh. D at APC 424-APC 425).

60. Bollman forwarded this email to Daniels, reminding him that she had "been trying to find out what kind of events are taking place at the Marriott," but her "emails were ignored." (Bollman Aff., Exh. D at APC 424).

61. Daniels did not respond to her email. (Bollman Aff. ¶9).

62. Bollman then contacted Scott Barger, Director of Sales and Marketing for the Providence Marriott. (Bollman Dep. at 109:3-110:19).

63. On March 12, 2004, Barger sent Bollman an email explaining that Daniels had rented 116 hotel rooms at the Providence Marriott in January 2004 and another 180 rooms that

February. (Bollman Dep. at 109:3-111:4; Bollman Aff. ¶10, Exh. E; Affidavit of Scott Barger ("Barger Aff."), Exh. C).

64. Moreover, Barger informed Bollman that the Providence Marriott had awarded Daniels over 100,000 points to his personal Marriott Rewards account as a result of these bookings. (Bollman Dep. at 109:6-111:4; Bollman Aff. ¶10, Exh. E at APC 374; Barger Aff., Exh. E).

**<u>Daniels' Scheme Was Lucrative For Him But Detrimental To APC</u>**

65. Bollman viewed Daniels' behavior as unethical for a number of reasons. (Bollman Dep. at 130:21-131:18; Bollman Aff., Exh. F).

66. First, contrary to Bollman's instructions, Daniels booked rooms at the Providence Marriott, instead of the Johnson and Wales Hotel, thereby resulting in increased cost to the Company. (Bollman Aff. ¶12, Exh. B; Bollman Dep. at 96:18-97:21).

67. Unbeknownst to Bollman (the Company's corporate travel manager and the person responsible for negotiating all hotel contracts), Daniels negotiated a rate of $95 per room, per night with the Providence Marriott. (Bollman Dep. at 12:11-12:18, 99:16-100:3; Barger Aff. ¶10, Exh. B; Bollman Aff., Exh. F).

68. This was $27 more per night than the APC rate for standard rooms at the Johnson and Wales Hotel. (Bollman Dep. at 160:8-160:16; Bollman Aff. ¶ 12, Exh. B).

69. As a result, APC paid approximately $8,000 more for these hotel rooms during January and February 2004 than it would have if Daniels had booked rooms at the Johnson and Wales Hotel. (Bollman Aff.¶12).

70. Under the arrangement between APC and the Johnson and Wales Hotel, APC received one "Corporate Inn-Incentive" point from Johnson and Wales for each guest room used by an APC employee. (Bollman Dep. at 129:1-130:1; Bollman Aff., Exhs. A, B).

71. If APC accumulated a sufficient number of points, it would receive awards from Johnson and Wales, often in the form of retail gift certificates. (Bollman Aff., Exh. B; Bollman Dep. at 119:8-119:13).

72. APC generally distributed these gift certificates to employees as gifts or prizes at the Company's annual holiday party. (Bollman Aff., Exh. F; Bollman Dep. 119:8-119:13, 131:10-131:18; Kelly Dep. at 42:23-45:25).

73. By diverting almost 300 rooms from the Johnson and Wales Hotel to the Providence Marriott, Daniels reduced the number of points received by APC, thereby reducing the number of gift cards it could receive and distribute to other employees. (Bollman Dep. at 119:3-120:8).

74. Bollman negotiated a preferred rate with the Johnson and Wales Hotel based on, among other factors, the number of nights APC employees stayed there. (Bollman Aff. ¶3).

75. When Bollman asked Daniels on February 6, 2004 whether he was using the Marriott, he denied doing so. (Bollman Aff. ¶8, Exh. C at APC 137).

76. Daniels had negotiated his arrangement with the Providence Marriott on January 9, 2004, one month before his email to Bollman. (Barger Aff. ¶10, Exh. B).

77. Barger sent a letter to Daniels on January 9th confirming the details of the arrangement they had reached earlier that day and stating that the Providence Marriott was "excited about the opportunity to host your trainees." (Barger Aff., Exh. B at MAR 003).

78. Barger informed Bollman that Daniels had received over 100,000 Marriott Rewards points for his personal account based upon the stays of other APC employees for APC training activities. (Barger Aff., ¶12, Exh. C; Bollman Aff., Exh. E).

79. Daniels' agreement with the Providence Marriott states that he would receive a total of 225,000 Marriott Rewards points over a nine-week period. (Barger Aff., Exh. B at MAR 003).

80. Marriott Rewards points can be redeemed for, among other things, free hotel stays, cruises, vacation packages, and other rewards. (Barger Aff. ¶8, Exh. A).

81. Barger (who no longer is employed by Marriott) testifies in his Affidavit that Daniels' receipt of points was "a very important part of the agreement" with the Providence Marriott. (Barger Aff. ¶¶2-4, 14).

82. Daniels made multiple calls to Barger regarding the timing of the award of points to his Marriott Rewards account. (Barger Aff. ¶14).

83. Daniels' receipt of Marriott Rewards points violated APC's Code of Ethics and Business Conduct (the "Code of Ethics"). (Gough Dep. at 164:15-166:11, 273:13-273:19; Bollman Dep. at 45:23-46:20).

84. The Code of Ethics prohibits an employee from accepting "[c]ash or cash-equivalent gifts" or any form of kickback. (Gough Aff., Exh. C at APC 327-APC 328).

85. The Code of Ethics, adopted in 2003, was available to all APC employees on the Company's intranet. (Gough Aff. ¶¶9-10, Exh. C).

86. The Code of Ethics states that a violation of any of its provisions may result in disciplinary action "up to and including termination of employment, without additional warning." (Gough Aff., Exh. C at APC 332).

87. Under the terms of Marriott's Reward Points plan, only those individuals who pay for their own rooms may receive points for a hotel stay. (Barger Aff. ¶13, Exh. D at SD 0126).

88. APC permits employees to receive rewards points from hotels, rental car companies, and airlines for their own business-related usage. (Bollman Dep. at 45:23-46:11).

89. Daniels received points because he arranged for other employees to stay at the Providence Marriott. (Barger Aff. ¶¶9-14).

90. Daniels had the Providence Marriott directly bill APC. (Barger Aff. ¶13).

91. The APC employees who stayed at the Providence Marriott, and whose rooms were billed directly to APC, could not receive any Marriott Rewards points. (Barger Aff. ¶13, Exh. D at SD 0126).

**Bollman Informs Human Resources Of Daniels' Scheme.**

92. When Bollman informed Kelly, her supervisor, of Daniels' behavior, he suggested that she write an email to the Company's human resources department explaining her findings. (Bollman Dep. at 111:15-112:24).

93. On March 12, 2004, Bollman sent an email to Gough, then the Company's Director of Human Resources, stating in relevant part as follows:

> I recently became aware that a considerable amount of hotel rooms are going [to] the Providence Marriott, a hotel that is not on our preferred list for 2004 . . . Short term consequences are that we probably spend more than we should on hotel stays. Long term consequences are that we will spend a lot more and stand to ruin long term relationships with other properties that benefit APC in value and service. I have asked Seth Daniels if he was using the Marriott for training and he said no. 116 room nights in January and 180 in February indicate to me otherwise. To date Seth has earned a little over 100,000 Marriott rewards points from bringing his groups to the Marriott. This business in the past has gone to the Johnson&Wales which is awarding APC points that we then use for the Xmas party to benefit all employees . . . One could argue if Seth['s] behavior is unethical at the least it is not in the best interest of APC.

(Bollman Dep. ¶11, Exh. F).

**APC Terminates Daniels' Employment**

94. On March 12, 2004, Gough relayed the information contained in Bollman's email to Cavanaugh, Daniels' ultimate supervisor. (Gough Dep. at 173:14-178:3, 185:12-187:18, 194:5-200:3, 218:7-218:12).

95. Gough and Cavanaugh then decided to terminate Daniels' employment. (Gough Dep. at 164:7-171:17, 196:6-196:16, 218:9-218:12).

96. That afternoon, Cavanaugh and Hendrix informed Daniels of APC's decision to terminate his employment for receiving kickbacks from the Providence Marriott. (Hendrix Dep.

at 197:15-203:24; Daniels Dep. at 348:14-349:5, 355:4-356:5; 353-56; Gough Dep. at 217:2-219:2).

97. Neither Bollman nor Kelly were involved in this decision. (Bollman Dep. at 130:2-130:20; Kelly Dep. at 210:9-210:14; Gough Dep. at 195:19-196:16).

**Additional Relevant Facts And Testimony**

98. According to Bonzani, who is white, Kelly was a "well-known hard ass" and an "equal opportunity offender" who "treated everybody the same way." (Bonzani Dep. at 152:2-153:2, 207:10-208:1).

99. Kelly often got loud and upset with employees. (Hendrix Dep. at 148:11-148:24).

100. Employees of all races complained about Kelly's behavior. (Hendrix Dep. at 150:15-155:11, 277:10-278:7; Gough Dep. at 251:23-252:16).

101. According to Hendrix, Daniels volunteered to go to the train station with her but, neither of them wound up going because the employee whom they had intended to meet missed his train. (Hendrix Dep. at 243:20-246:5).

102. In Daniels' opinion, as of the time of his termination, he was "meeting all of [his] deliverables from [his] supervisor" and "making a positive impact in APC in their service department not just nationally but globally." (Daniels Dep. at 398:10-402:24).

103. Daniels testified that he complained to Hendrix regarding Kelly and that he felt uncomfortable having done so. (Daniels Dep. at 274:6-274:10).

104. Daniels testified as follows:

> Q: Did you tell her it was uncomfortable from a racial bias perspective?
>
> A: At that point in time – at that point in time, there were individual incidents that had not yet formed a pattern that I perceived to be racially motivated.

. . .

Q: When did that – when did they form a pattern to be racially motivated, in your mind?

A: When I was terminated for something that I did not do.

(Daniels Dep. at 274:16-275.12).

105. At deposition, Daniels testified that a few months or weeks prior to his termination Cavanaugh asked him "why can't you be a good Irish lad like everyone else?" (Daniels Dep. at 387:7-14, 389:6-390:13).

106. Bonzani did not know that Daniels was receiving Marriott Rewards points for coordinating the stay of other APC employees at the Providence Marriott. (Bonzani Dep. at 190:14-191:18, 197:8-197:11, 200:3-200:14).

107. Daniels testified as follows regarding the alleged connection between his alleged complaints and his termination:

Q: And how do you connect that to the termination?

A. After my complaining, I got fired for something that I did not do.

(Daniels Dep. at 395:12-395:15, 395:16-401:3).

108. APC processed all of Daniels' requests for reimbursement in accordance with Company policy and never made any improper deductions from his pay. (Kelly Dep. at 47:5-48:19, 61:15-64:21, 99:8-99:17, 152:20-153:4, 158:1-160:15, 174:16-174:22).

Respectfully submitted,

AMERICAN POWER CONVERSION CORPORATION,

By its attorneys,

/s/ George P. Kostakos

George P. Kostakos (6971)
Christopher B. Kaczmarek (*pro hac vice* motion pending)
Littler Mendelson, P.C.
10 Weybosset Street, Suite 404
Providence, RI 02903
(401) 454-2903 (tel.)
(401) 454-2969 (fax)
gkostakos@littler.com
ckaczmarek@littler.com

Dated: December 15, 2006

**CERTIFICATE OF SERVICE**

I, George P. Kostakos, hereby certify that on this 15th day of December 2006 the foregoing Statement of Undisputed Facts in Support of Defendant's Motion For Summary Judgment was filed electronically through the ECF system, is available for viewing and downloading from the ECF system, and will be sent electronically to counsel of record as registered participants identified on the Notice of Electronic Filing and via first class mail to all non-registered participants identified on the Notice of Electronic Filing.

/s/ George P. Kostakos
George P. Kostakos