IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

-----------------------------x

SETH DANIELS,

Plaintiff,

v. Civil Action No: 05-00459-ML-LDA

AMERICAN POWER CONVERSION CORPORATION,

Defendant.

-----------------------------x

Job No. 2713 Pages 1 - 307

COPY

DEPOSITION OF SETH DANIELS, a witness called by counsel for the Defendant, taken pursuant to the Federal Rules of Civil Procedure before Dena M. O'Brien, CSR, and Notary Public in and for the State of Rhode Island, at the law office Of Littler Mendelson, 10 Weybosset Street, Suite 404, Providence, Rhode Island, on September 14, 2006, commencing at 9:29 a.m.

Q. You can answer.

A. Yes, this document -- this document reflects jobs that I've had prior to joining APC with respect to titles and previous positions and type of work that I performed.

Q. So the answer to my question is "yes"?

A. I answered your question that this document -- was I a sales director at BBH? Yes. Was I --

Q. Let me ask you it again. Does it accurately reflect your education and work background and experience prior to starting your employment with APC? Does it or doesn't it?

A. Yes.

Q. Let's start with the BBH Solutions position. Does it accurately reflect the nature of your work there, that description?

MS. KISCH: I'm going to object to the extent it's been asked and answered.

MR. KOSTAKOS: That's fine.

BY MR. KOSTAKOS:

Q. It says 2002 to the present there. When did you actually leave the employment of BBH Solutions?

A. When I started with APC, I left my employment with BBH. That would be on or about one day in September of 2003.

Q. Okay. Did you leave -- what was the reason for your leaving?

A. I was pursuing what I perceived to be a better opportunity.

Q. How about with respect to Wireless Evangelist? It says you worked there from 2001 to 2002, correct? As I believe you testified earlier, you actually owned that business, correct?

A. Yes.

Q. And what was the reason for discontinuing working for Wireless Evangelist?

A. The market, lack of penetration into the market relative to the economic environment of 2001 post September 11th.

Q. So did that lead to the closure of the business?

A. This element of the business model was no longer economically viable.

Q. So did you close down the business?

A. Yes. I left Wireless Evangelist and became an employee for BBH.

installation services as an APC partner for -- BBH and APC were partners, and I believe APC had a set of work that needed to be completed, at which point I became the project manager for completing that work for BBH Solutions. And the work that had to be completed was installation of APC hardware, and during that installation process, it happened one time in Phoenix, Arizona, and another time in New York -- I don't remember the client -- I became -- I had multiple interactions with the APC Global Services personnel, and it was through that back and forth interaction that I became aware of APC Global. APC Global Services had positions available.

Q. And this is after you've already met with the regional salesperson regarding a sales manager job?

A. Yes.

Q. And did you then pursue a position after those contacts with the APC Global Services personnel?

A. Yes.

Q. Can you describe that sequence of events for me, please?

A. I believe what happened was in Phoenix there was an installation that was being done for Safeway. It's the largest installation of APC infrastructure, which are the black computer racks, that had been done to date. I was in Phoenix running a team of BBH contractors and/or personnel to deploy and deliver the job under the auspices of APC Global Services through the partner relationship that BBH had with APC.

There were a number of problems with that job, but I managed the project, successfully installed all of the racks, exceeded the client's expectation from my recollection of what transpired, and during that period of time, I guess I was noticed by APC as a person that had done a good job, and subsequent to that, there was a conversation with APC personnel that I had applied previously on the sales side. I was made aware that APC Global Services needed someone with my skill set, and I received a phone call from John Bonzani, at which point we ended up having dialogue about working for him and APC Global Services.

Q. So did you end up meeting with Mr. Bonzani?

A. Yes.

Q. After that phone conversation?
A. Yes.
Q. Okay. What was his position? Do you recall?
A. He was, as I recall, the national service manager responsible for APC Global Services in North America.
Q. You said you interviewed with him subsequent to the phone conversation. You met with him?
MS. KISCH: Objection, asked and answered.
BY MR. KOSTAKOS:
Q. All right. Where did you meet with him, Mr. Bonzani?
A. I believe I met him previously. During the iterations, he may have come to BBH's office one time, or I may have met him at a computer show. I don't remember the first place that I met him.
Q. I'm talking about in relation to your actually meeting with him about employment with APC. Where did that take place?
A. It didn't. My recollection is that John and I had an interview over the phone because John traveled throughout the country constantly. So it's

my understanding that because John had met me before, he knew that I had done good work for him before that. We went through questions that we would have had in a face-to-face meeting via the phone.

Q. Was anybody else on that phone call? Was it one or a series of phone calls?

A. It was one phone call where he offered me the job. It was some back and forth as we negotiated salary and relocation.

Q. Was anybody else on the phone call when he offered you the job?

A. I don't recall. I don't believe so.

Q. Did you have any other phone calls with anybody else in relation to your application for employment with respect to the position you talked to Bonzani about?

A. I recall John offering me the position. I don't recall the order it happened. There was an offer of a position, and then he wanted me to come up and meet with his management or if he wanted me to meet with his management first and then there was an offer of the position.

I think it was he offered me the position,

and he said, before I can bring you on board, I have to have you meet with my managers.

Q. Let's step back for one second. What was the position in question?

A. As a training manager for APC Global Services.

Q. Is that the position you ultimately took?

A. Yes.

Q. In sitting here today, I want to make sure I understand your testimony. You can't recall whether you got on offer for that position from Bonzani first or whether you met with the management team before he gave you the offer? Is that a fair characterization of your testimony?

A. I don't remember which came first.

Q. That's what I thought. That's what I thought.

A. Right, but I did -- to be accurate for the record, we had a conversation. There was a meeting. I don't remember if the meeting where I met Paul Cavanaugh or Shawn King happened before or after. I do remember --

Q. Who's the second name you said? Shawn --

A. King.

Q. King. Sorry. Go ahead. You were going to say you do remember --

A. I do remember -- it may have happened -- the conversation may have happened first when he offered me the position, and I remember asking John if I had to interview with anyone else, and he said no, I make my own decisions. I run the service. If I say you're hired, you're hired. I just want you to meet Paul and -- I want you to meet Paul and Shawn.

Q. So did he -- he didn't condition the offer on your meeting Shawn and Paul?

A. I don't believe so.

Q. Did you meet with Shawn and Paul at some point?

A. I did meet with Shawn and Paul.

Q. And where was that?

A. In East Providence at the APC facility.

Q. And it was obviously -- it was after your phone call with Bonzani. What was Paul Cavanaugh's position?

A. Paul Cavanaugh, as I understand it, then was the person responsible for the business unit known as APC Global Services.

Q. Do you know what his title and position was?

A. I believe it was general manager or director.

Q. Did he report to Bonzani, or did Bonzani report to Cavanaugh?

A. Bonzani reported to Cavanaugh.

Q. What about Shawn King? What was his role?

A. Shawn and John were peers, I believe.

Q. Can you remember Shawn's title?

A. Shawn -- no, I don't.

Q. Was that all in one day that you met these folks, Paul and Shawn?

A. I believe so.

Q. Did you meet with anyone else that day in regards to the position you were considering? Let me strike that. I don't want to put words in your mouth. When Bonzani made the offer, did you accept it?

MS. KISCH: Object to the extent it calls for a legal conclusion. Go ahead.

THE WITNESS: Can you repeat the question?

BY MR. KOSTAKOS:

Q. When Bonzani made his offer of employment

over the phone to you, as I believe you testified, .
did you accept it during that conversation --
MS. KISCH: Same objection.
BY MR. KOSTAKOS:
Q. Or did you wait and accept it at a later point?
A. I accepted it at a later point.
Q. And when was that?
A. When I got the offer letter.
Q. When did the offer letter come, after your meeting in Rhode Island or before?
A. I don't recall if it came after or before.
Q. Getting back down to the other question, did you meet with anybody else at APC during your visit when you met with Paul Cavanaugh and Shawn King?
A. With respect to my employment, no.
Q. How about in any other respect?
A. I previously had been to the APC East Providence facility as a BBH employee for training.
Q. I want to know about your meeting after receiving the offer over the phone from Bonzani when you came up here and I believe you met with Cavanaugh

correct?

A. That is correct. I negotiated it.

Q. What was the terms of that relocation expense and timeline?

A. It was expressly understood that I would have to relocate Providence -- to the Rhode Island area. I had a year to do it because I accepted the position in September. I had three children that were -- three children of which two were in school at that time, and I'd have to relocate my family. So I could not do it in a short period of time. So they gave me a year, and during that period of time, Paul and John told me that I could commute back and forth at the company's expense.

Q. Who told you that?

A. John Bonzani and Paul Cavanaugh. Paul said he understood it because he had to commute for a period of time from Ireland as he was trying to get his family over here. So he had no problem with it. And John said hell, I live in Oregon, and I commute to and from Rhode Island. So I have no problem with it either.

Q. Did you get that -- well, okay. Any other terms that were part of the location expense aspect

A. Yes.

Q. Your active employment?

A. As an APC employee, yes.

Q. That training session, did you end up going to it that you referred to?

A. Yes.

Q. And was that after you began your active employment with APC?

A. Yes.

Q. Okay. So before that time, is it fair to say based on your testimony that you didn't see the corporate guidelines before executing and returning the offer letter and commencing your employment?

MS. KISCH: Objection to the extent it mischaracterizes his prior testimony.

MR. KOSTAKOS: To the extent it does, objection noted.

THE WITNESS: I don't recall receiving a copy of APC's corporate policies or a handbook until after I was an employee of the company.

BY MR. KOSTAKOS:

Q. Okay. And did you ask for an explanation of what those corporate guidelines related to

responsibilities as the training manager?

A. As I understood them from John Bonzani and Paul Cavanaugh, I had multiple duties and tasks that I was discharged with, providing training for all APC Global Services personnel, not only locally and/or nationally in North America but globally, as well.

Q. What sort of training?

A. I was responsible for ensuring that all APC personnel existing and new hires received training on APC Global Services' products and services and policies, as well as safety classes, Red Cross classes and other tasks and duties that John and/or Paul needed to further the organization.

Q. And when you referred to policies, are you talking about internal corporate policies, APC corporate policies, or employee policies?

A. I'm referring to APC Global policies that John and/or Paul wanted to create or make APC Global Services employees aware of.

Q. And did those include policies relating to employee conduct and benefits and other items in the employee manual?

A. No, the policies would be best characterized as APC Global or departmental policies.

Q. What was the substance of these policies? What did they relate to? I mean, did they relate to employee conduct? Did the they relate to sales techniques? Did they relate to sales and employee interaction with customers? I'm trying to find out what the nature of the policies was.

A. They related to training. All FSE's would learn how to use Siebel, which is the customer relationship management software, correctly. I was responsible for that, policies on tools and parts and things of that nature.

Q. Did you, for instance, discuss with -- were these all new employees or existing employees or both?

A. New and existing. The best way would be to draw a line in the sand. There were people that were already in APC Global Services as an employee of APC corporate, but I think it's important to understand that it was widely known by AGS or APC Global Services employees that the policies in corporate did not always apply to APC Global

Q. Strike that. I'm sorry. Under what circumstances -- what's your understanding of when -- let me start over. You testified that you were required to pay for your expenses yourself and then seek reimbursement; is that correct?

A. Yes.

Q. After the 2,000 was exhausted?

A. Yes.

Q. Is that your understanding of what all Global Services employees were required to do with respect to business travel and expenses?

A. I would say that all Global Services employees did not get the $2,000 stipend, but ones that were likely to incur ongoing expenses did.

Q. But aside from the $2,000 stipend, assuming that people have either not gotten it or exhausted it, would they also -- other Global Services employees required to pay for expenses themselves and then seek reimbursement? Let me strike -- was that the corporate policy?

A. If you incurred a business expense, the company would reimburse you.

Q. But you were required to pay for them in the first instance yourself and then seek

reimbursement as a Global Services employee; is that correct?

A. I don't know if the policy said that you had to pay for it first using your personal expenses or if the policy allowed for a corporate credit card, but I do know that business expenses, as I understood corporate policy, would be reimbursed to the employee.

Q. You said you understood what direct billing was. Do you understand under what circumstances direct billing was allowed by -- strike that. Do you understand in what circumstances APC allowed direct billing of business expenses?

A. At what point in time?

Q. During any time during your tenure?

A. I first became aware of some sort of direct bill arrangement by APC prior to my employment there.

Q. I'm talking about during your employment. I didn't ask about before. I want to know during your tenure, what was your understanding about what circumstances employees were allowed to directly bill their business expenses?

A. From the best of my recollection at this

point in time, it's my understanding that direct bill was an option where the company would make a payment to a provider of the good or service directly as opposed to an employee incurring that expense if it would create an undue hardship on an employee or if it was an ongoing expense that would be incurred by the employee.

Q. Did your understanding of that, what circumstances that was allowed in, ever change during your tenure?

A. Yes.

Q. How did that change? How did your understanding change?

A. When I attempted to -- when I had exhausted all of my personal funds creating an undue hardship for myself and my family back in New Jersey, I was unable to rent a car. I was unable to rent a car at the car rental agency, and I asked that it be direct billed, and it was not.

Q. It was not direct billed?

A. No.

Q. Was any business expense that you incurred ever the subject of a direct billing relationship?

A. Yes.

Q. Okay. Which one?
A. There was a direct bill for Avis, I believe. There may have been a direct bill for another car rental company. I believe at some point there were direct bills sent to APC by the Marriott.
Q. Any others that you're aware of for your business expenses?
A. Expenses in the course of doing my job for APC?
Q. Business expenses?
A. The Red Cross, I believe, was a direct bill.
Q. What did you do for the Red Cross?
A. They came in -- they were a contractor that provided services, training services.
Q. Any other direct billing relationships related to your -- to the expenses you incurred?
A. In performing my job?
Q. Yes, or in incidental expenses -- expenses incidental to travel, meals, that sort of thing?
A. Yes, there were -- we attempted and I don't know if we did get the relationship with a provider of food to direct bill for food for the

training classes.

Q. Any other direct billings that you --

A. At this time, that's all I can remember.

Q. The rental car situation, how frequently did you have that directly billed?

A. It happened a few times, and then it was no longer an option.

Q. Did you obtain prior okay to do it, to directly bill the rental car companies?

A. I never directly billed a rental car company.

Q. Okay.

A. A rental --

Q. Go ahead. Let me strike the question. Did you ever -- how frequently did you arrange direct billing relationships between APC and car rental companies related to your rental of a car for business purposes?

A. I never arranged or created a relationship.

Q. How often did you have the expense directly billed to APC for your rental car?

A. A few times.

Q. Okay. And were you told not to do that?

A. Yes.

Q. By whom?

A. I believe it was Christine Bollmann.

Q. And who is she?

A. The travel manager or travel -- I think her title was travel manager.

Q. And after she told you that, did you incur any expense after that that was directly billed?

MS. KISCH: Object to the form.

THE WITNESS: Can you repeat the question?

BY MR. KOSTAKOS:

Q. After Ms. Bollmann -- well, strike that. What did Ms. Bollmann tell you about direct billing?

A. That I could not -- she was not going to authorize a direct bill of the rental car.

Q. Did she reimburse -- strike that. When -- do you recall when she did this, when she told you that?

A. I don't remember the exact month or -- I don't remember the month that it occurred.

Q. What's your best recollection? How soon after you started did she tell you this?

A. Within 90 days I would estimate.

Q. Did you rent any cars after being told by

Ms. Bollmann that she wouldn't authorize that expense that was directly billed by the car rental agency or company to APC?

A. After I could no longer direct bill?

Q. After your conversation with Christine Bollmann?

A. I don't believe that I could direct bill any longer, and I believe that I had to use a credit card subsequent to that last time when she prevented me from --

Q. So your answer is no?

A. My answer is I don't remember exactly how many times I direct billed a car and when was the last time a car was direct billed.

Q. Is it your understanding that APC allows an employee to direct bill travel expenses to the company in exceptional circumstances only?

A. No.

Q. Okay.

A. Unless you consider undue hardship an exceptional circumstance or what is an exceptional circumstance?

Q. Is it your understanding that direct billing by an APC employee is acceptable only in

undue financial burden on their family.

Q. Did you ever apply for a corporate credit card while an employee of APC?

A. No.

Q. Were you ever told to?

A. Told to apply?

Q. Was it ever suggested to you by anybody at APC that you should consider applying for a corporate credit card?

A. Yes.

Q. And who made that suggestion?

A. Christine Bollmann.

Q. And do you know why she made that suggestion?

A. To make me aware of it as an option.

Q. Okay. In what context? Was it in the context of discussing direct billing with her?

A. I don't think so. I don't know.

Q. Do you recall what context it came up in discussion?

A. It could have been doing one of the new hire sessions that I organized when I took new hire employees to Christine Bollmann to her office showing them where the travel office was, and during

one of those sessions, she could have had discussion about it. I don't know specifically when or in what context the discussion was with Christine Bollmann about the corporate credit card.

Q. Did you ever have a discussion with Brian Kelly about applying for a corporate credit card?

A. Yes.

Q. And what did Brian suggest to you?

A. That APC had a corporate credit card that I could apply for if I chose to.

Q. And you didn't choose to do that, did you?

A. No.

Q. Why not?

A. I was preparing to relocate my family. I knew that I had to get a mortgage.

Q. Okay. Why didn't you apply for the credit card?

A. Because inquiries as you're applying for a mortgage process has never been recommended.

Q. I'm not sure I understand what you mean.

A. Everything I've read and everything I know highly suggests that you not have inquiries on your credit report when you're applying for the mortgage.

Q. Was your right -- strike that. Was your ability to direct bill business-related expenses ever suspended by the company, specifically suspended?

A. Can you repeat the question?

Q. Was your ability to direct bill business-related expenses at any time suspended by the company while you were employed?

A. My ability to direct bill a rental car was suspended by the company.

Q. Okay. Did you attempt after that to either -- did you attempt after that to direct bill any car rental expenses or any other travel expenses?

MS. KISCH: Object to form.

THE WITNESS: You said car rental or travel expenses?

MR. KOSTAKOS: Yes.

THE WITNESS: That's two questions.

BY MR. KOSTAKOS:

Q. Okay. I'll break it down for you. After your ability to direct bill business-related expenses was suspended by the company, did you attempt to direct bill any business-related expenses?

MS. KISCH: Object to the form. It

mischaracterizes his previous testimony.

MR. KOSTAKOS: I'm not trying to characterize his testimony.

MS. KISCH: He never testified that -- do you want me to explain my objection?

MR. KOSTAKOS: Yes. I'm curious about your objection because I'm asking -- I never asked him before a few seconds ago whether or not his license was suspended specifically, and I never asked him before whether or not he attempted to direct bill after his right to direct bill or his ability to direct bill was specifically suspended. So I don't understand where the objection comes from, but go ahead.

MS. KISCH: Okay. The objection is because Mr. Daniels testified that his right to directly bill rental cars was suspended, and in your question, you asked whether his right to directly bill business expenses was suspended, and that's the basis for my objection.

BY MR. KOSTAKOS:

Q. Okay. Was your right to otherwise bill

business expenses other than -- strike that. Was your right to directly bill other business expenses -- strike that -- travel expenses suspended in addition to your right or ability to direct bill car rental expenses?

A. My rights are God given and what rights are not God given are given to me in the Constitution. I do not believe that APC gave me any rights. However --

Q. Why don't I ask the question a different way. After APC suspended your ability to directly bill APC for rental car expenses, did you attempt to directly bill rental car expenses?

A. To the best of my recollection, when my ability to rent a car was last interrupted by Christine Bollmann, I do not remember at this point in time if I attempted to rent a car again. I do not believe that I did.

Q. Let me make sure I understand something you said. You said your ability to rent a car was interrupted. That's not what I asked. I asked about your ability to directly bill a rental car expense. My understanding is that after that you could continue to rent cars. It just had to be in a