because it was part of what I understood the policy to be.

Q. Okay. And at some point you were told you weren't to direct bill car rental expenses anymore, correct?

A. Yes.

Q. Did you attempt after that point to direct bill any car rental expenses?

A. In my answer previously and my answer now, is to my knowledge at this point in time I don't believe that I did.

Q. Did you ask for approval after it was suspended? Did you ask Christine Bollmann for reinstatement of that ability at any point?

A. Yes, I asked Christine Bollmann. She said no.

Q. How many times did you ask her?

A. More than once.

Q. And did that -- I believe your testimony is they suspended your direct billing rights with respect to rental cars only, not other travel expenses; is that correct?

A. I believe what my testimony was previously was that my direct -- my ability to direct bill a

rental car was suspended, and I remember that happening.

Q. And I'm trying to clarify for my purposes whether that suspension extended beyond rental cars to other forms of travel expenses?

A. If it extended beyond rental car to other travel expenses, when I talked to my manager and my manager told me subsequently to attempt to set up a relationship to minimize the expense, then I believe my manager's instructions, who I work for, would supersede Christine Bollmann's instructions.

Q. Okay. Was it Christine Bollmann's instruction that your ability to direct bill expenses extended beyond rental cars? Is that what you're testifying?

A. What I'm testifying is that it was my understanding that APC had the ability to have a direct bill relationship with multiple vendors.

Q. Okay. I understand that. I'm simply trying to ask you the question of what Ms. Bollmann said to you. What did she suspend? Did she suspend simply your car rental expenses or direct -- your ability to directly bill car expenses, or did she suspend your ability to direct bill other travel

Q. At which you may have distributed a document like this or substantially like this; is that --
A. That would have relevant information such as this does.
Q. And the topics going back 1 through 12 on the first page, are those the sorts of topics that were covered at the new hire training session, that we're talking about, typically?
A. Typically, yes.
Q. Including number 9, the travel and expense policy; is that correct?
A. Yes. That would be covered.
Q. Who was your supervisor, your direct supervisor?
A. John Bonzani.
Q. Did you report to anybody else?
A. No.
Q. So he remained your direct supervisor throughout your tenure at APC?
A. Yes. If I had a question, he told me I could talk to Shawn or Paul in his absence.
Q. Were Shawn and Paul -- Shawn King and Paul Cavanaugh, were they peers or colleagues of yours --

MR. KOSTAKOS: And then we'll come back and keep pushing until you have to leave.

MS. KISCH: Okay.

(Recess taken from 4:02 p.m. to 4:11 p.m.)

BY MR. KOSTAKOS:

Q. Mr. Daniels, I want to remind you that you are under oath. Did you complete a W-4 -- are you familiar with what a W-4 form is?

A. Yes.

Q. Did you complete one when you commenced your employment with APC?

A. Yes.

Q. And did you attempt to complete it as exempt from taxes?

A. Yes.

Q. Why? What was the basis for your reasoning then listing yourself as exempt?

A. I believe that that was an accurate way to complete the form.

Q. And why is that? What do you believe made you exempt from income taxes?

A. I don't believe I'm exempt from paying income taxes. I believe that that was the proper way to complete the form.

Q. Why is that? Let me hand you the form, so we're not talking in the dark.

(Defendant's Exhibit No. 8 was marked.)

BY MR. KOSTAKOS:

Q. This is a document marked Exhibit 8 that I'm handing you. I'm going to ask you if you recognize or can identify this document?

A. Yes.

Q. And what is it?

A. It appears to be a copy of the W-4 that I completed.

Q. And is this the document that you first -- that you listed yourself as exempt in item 7?

A. I'm sorry. Repeat the question.

Q. Is this a copy of the document in which you listed your -- which reflects your position that you were exempt from taxes for 2 -- strike that. In item 7, it says -- there's handwriting that says "exempt." Do you see that?

A. Yes.

Q. Did you -- I know this is a copy of the document, but is that your handwriting?

A. It appears to be my handwriting.

Q. Do you recall completing that item by

writing the word "exempt" in there?

A. Yes, I do.

Q. So, again, I'll ask the question because I don't think we finished. What was the basis for your belief that you were exempt from federal taxes for 2003?

A. For the items stated in number 7?

Q. Yes.

A. Yes, that's the basis.

Q. But what was your reasoning? I mean, is it that you didn't expect to pay any -- to have any tax liability for 2003? Strike that. Did you feel you met both of the conditions that were set forth in item 7 for claiming exempt status?

A. Yes.

Q. You had no tax liability in 2002; is that correct?

A. I completed the form the way I did because I felt that that was the appropriate way to complete the form.

Q. In 2002, did you have a right to refund of all of your federal tax income -- income tax withheld because you had no tax liability?

MS. KISCH: Objection, form and foundation.

BY MR. KOSTAKOS:

Q. Okay. In number 7, it says "I claim exception from withholding for 2003, and I certify that I meet both of the following conditions for exemption." The first bullet point says "Last year I had a right to a refund of all federal income tax withheld because I had no tax liability." Second bullet point, "This year I expect a refund of all federal income tax withheld because I expect to have no tax liability." Do you follow me so far?

A. Yes.

Q. It then says "If you meet both conditions, write exempt here," and there's a line over to that box where you testified you wrote the word "exempt." Do you follow me?

A. Yes.

Q. In writing that word "exempt," did you feel that you met both of the conditions for exemption that are listed in item 7?

MS. KISCH: Objection to the extent it's been asked and answered.

MR. KOSTAKOS: I don't think it has.

THE WITNESS: Yes.

BY MR. KOSTAKOS:

Q. Okay. Now, I'd like to ask you about your 2002 tax year. Did you have a right to the refund of all of your federal income tax withheld for that year because you had no tax liability?

A. I believe so. At the time that I completed the document, that was my belief.

Q. And you expected at the time of the document -- that you signed the document that you'd have no tax liability for 2003?

A. That was my belief at the time that I signed the document, yes.

Q. Okay. You were making $75,000 as an employee of APC starting in I believe it was September of that year; is that correct?

A. Yes.

Q. And what led you to believe -- what circumstances led you to believe you wouldn't have any tax liability for that amount, for the amount you earned as an APC employee?

A. Based upon the previous bullet.

Q. The first or the second of those bullets?

A. The first bullet.

Q. The first bullet relates to the previous tax year?

A. That's correct.

Q. The second bullet relates then to the current tax year 2003?

A. I'm trying to answer your question honestly and fully, and at the time I did this, I believed that I had a right to a refund from the previous year, and I believed that I'd have a right to a refund of federal taxes in the current year because of my financial circumstances, and that's why I completed the form this way. I wasn't doing anything other than answering the questions.

Q. Okay. And did that belief change? Did your belief that you were filling it out correctly change at any point? In other words, did you change the W-4 form?

MS. KISCH: Object to form. Go ahead.

BY MR. KOSTAKOS:

Q. Did you subsequently fill out and sign a different W-4 form?

A. Yes, I subsequently signed a separate W-4 form at the direction -- I was forced to do so by Brian Kelly.

Q. What do you mean you were forced to? How so?

A. He said I had to. He forced me to do so. He did not give me an option not to.

Q. Did you read the instructions for filling out this form before completing it?

A. I completed it based upon my knowledge of the form, yes.

Q. I asked you if you read the instructions before completing the form?

A. Yes, I read the instructions.

Q. What led -- were there any discussions that led to Brian Kelly telling you that you had to change the form?

A. Yes.

Q. And what was the substance -- who were you speaking to about your completion of this form?

A. I believe it was someone in payroll. I don't know if -- I don't remember if her name was Bonnie or if it was someone else. When I got my check, I noticed that my check had federal taxes withheld, inconsistent with the way the form was completed. I subsequently asked her about that. She referred me to Brian Kelly, at which point, Brian Kelly told me that he was rejecting this W-4. He would not use it and forced me to complete

another W-4.

Q. Did you say anything in response to Brian Kelly?

A. I disagreed with him.

Q. What did you say to him?

A. From the best of my recollection at this time, I told him that it wasn't his obligation to tell me how to complete the form and that the form being completed, that I completed the form that represented accurately what I believed my tax situation should be.

Q. And then what did he say?

A. To the best of my recollection at this point in time, he said that he rejected my explanation, told me that he would reject my W-4, and he would withhold the taxes that he felt were appropriate, even if I did not complete another form, and he told me to do so.

Q. Was there any further conversation about your completion of this form between you and Brian Kelly?

A. He alleged that I was completing it incorrectly, at which point we launched into a discussion about how I was hired at APC and who

A. I don't believe that I had.

Q. And what was your experience with him like after this conversation? How frequent was your interaction with him afterwards?

A. I would not -- I wouldn't term it -- he was very adversarial.

Q. I'm talking about the frequency of your contact with Brian Kelly after you had this exchange about the W-4 form? How frequent was your contact with him?

A. As infrequent as possible.

Q. Was is once a day, once a week, once a month?

A. No. Brian Kelly was in Kingstown, I was in East Providence, and my interaction with him may have been once a month or less than that, a handful of interactions with him. There was a time where I tried to at Christine Hendrix's suggestion, I believe it was, build a bridge was the terminology she used. I believe Paul Cavanaugh used that same terminology. I attempted to build a bridge to him.

Q. So prior to the meeting in which -- you met in person when he talked to you in a way that you felt was disrespectful; is that correct?

BY MR. KOSTAKOS:

Q. Okay. Have you talked to Bonnie Smith about the W-4 issue?

A. Yes. I didn't recall her name being Smith, but I do recall talking to a Bonnie.

Q. And when did you talk to her, before or after you talked to Brian Kelly?

A. I believe I spoke to her before.

Q. And what did she say to you?

A. She said it was filled out incorrectly. So she on her own accord, from the best of my recollection, withheld taxes.

Q. Did she contact you or did you contact her?

A. I believe I contacted her.

Q. Okay. And did you meet with her, or did you call her, or did you e-mail her or any of the above?

A. I believe over the course of my employment there all three were done.

Q. I mean related to the W-4 issue.

A. Again, I believe -- specifically to the W-4 issue, I believe I called her, I may have sent her an e-mail, and I do remember meeting with her.

Q. All three?

A. Yes.

Q. Did you meet with her with anybody else in the room, or was it just her?

A. I think I met with her. She has a sliding window. So I don't know who else was in her area.

Q. And what did she say to you?

A. Again, she said that the way the form was filled out, it was incorrect and that she withheld the taxes, and she said she checked with her boss, that being Brian Kelly, to talk to him, at which point I spoke to him.

Q. And did you say anything else to her, or did you say anything to her? I'm sorry, not anything else, anything?

A. I think we spoke specifically about this issue.

Q. The exception issue, the W-4 issue?

A. Specifically about the W-4 issue in my recollection of my initial conversation with respect to the tax, the W-4's.

Q. Did she say it was incorrectly filled out?

MS. KISCH: Objection to the extent it's been asked and answered. Go ahead.

BY MR. KOSTAKOS:
Q. Did she say it was incorrectly filled out?
A. She said, from the best of my recollection, that she thought it was filled out incorrectly.
Q. And then she told you to go talk to Brian Kelly. Did you say anything else related to your W-4?
A. She may have tried to explain to me how to complete it.
Q. Do you recall what she said?
A. I don't remember specifically what she said other than -- I remember that I didn't make -- I remember that it wasn't resolved. She told me to talk to Brian Kelly. So I spoke to Brian Kelly.
Q. So she said it was incorrectly filled out. Do you feel she said that to you because of your race?
A. I don't know that she knew I was black at the time because it would have been on the phone or via e-mail.
Q. I apologize. I thought we were talking about the in-person meeting when she was behind the sliding -- behind the glass window. What did you

handful, a few.

Q. Do you remember any specifics from any of those conversations or interactions?

A. I remember a conversation that I had once telling John Bonzani about the conversation that I had with Brian Kelly, how --

Q. I'm talking about your interactions with Brian Kelly, not with John Bonzani. I want to know what subsequent interactions you had with him that support your contention that you were exposed or experienced a hostile work environment created by Brian Kelly. I'm talking about your interactions with Kelly that form the basis of that contention, again, subsequent to the W-4 form interaction.

A. I believe that one interaction, which we have talked about, was the direct bill situation on the rental car. Another interaction was when a rental car was broken into and items were stolen. He inferred -- he inferred that I participated and accused and blamed me for the theft of APC equipment.

Q. Any other times?

A. There was a time where he interrogated me about why I did not apply for the corporate credit

A. Overall her demeanor.
Q. What about her demeanor?
A. It was just hostile. I mean it's consistent with what we've been talking about.
Q. Well, I want to know specifically about hers. We talked specifically about Mr. Kelly's demeanor. Is there anything about hers that created this environment?
A. Her demeanor was very smug. I control the travel. You're going to do what I do -- you're going to do what I tell you to do.
Q. Anything else?
A. That's all I can remember at this time.
Q. Is it your contention that she also treated you differently than she treated other employees?
A. Yes.
Q. How so?
A. She didn't -- my recollection of her interaction with other field service engineers and other people was, you know, that she was cordial with them.
Q. But she was not with you?
A. She was not with me, no.
Q. And how often or frequent was your

be?

(Discussion off the record.)

BY MR. KOSTAKOS:

Q. So you said you had a laptop stolen out of your car; is that correct?

A. I had a laptop stolen out of the rental car, yes.

Q. Was it issued by APC?

A. Yes, it was.

Q. And what kind was it?

A. An IBM ThinkPad.

Q. Did you pay for it or did the company pay for it?

A. The company paid for it.

Q. When was it stolen; do you recall?

A. I don't remember the date.

Q. Was there anything else stolen?

A. There were other items stolen.

Q. What were they?

A. I don't remember everything that was in the bag they took.

Q. Was it just the bag stolen -- that was stolen?

A. In the laptop bag, there was a laptop and

my personal effects, an iPAQ, electronic devices, things like that.

Q. Were the items ever recovered?

A. Not to my knowledge.

Q. And did you report it to APC, the theft?

A. Yes.

Q. And who did you report it to?

A. I reported it to John Bonzani, Christine Hendrix, Brian Kelly. I reported it to my management.

Q. What was the response? What was Bonzani's response?

A. I think his words were "shit happens. Where were you parked?"

Q. Any other response?

A. I think his question was what was on -- what work did you lose?

Q. Go back a second to your reporting of the harassment. You said reported it to Gough, Bonzani, and to Hendrix, correct?

A. Bonzani, Gough, Hendrix, and Gough.

Q. Right, three people. What did you say to Bonzani?

A. I told him about the problems I was having

told him that I felt there was racial bias.

Q. Did you at any subsequent time to Bonzani?

A. To Bonzani, no.

Q. Okay. How about to Hendrix? What did you say to her and when?

A. I told Christine Hendrix about the problem I had had with Brian Kelly. I told her that I had told Brian Gough. She told me she'd build a bridge, keep your nose clean, and there's not too much she can do since Brian Gough is her boss.

Q. Did you ask her to do anything?

A. Yes.

Q. What did you ask her to do?

A. To help me out. This was very uncomfortable.

Q. Did you tell her it was uncomfortable from a racial bias perspective?

A. At that point in time -- at that point in time, there were individual incidents that had not yet formed a pattern that I perceived to be racially motivated.

MR. KOSTAKOS: Can you read that back?

BY MR. KOSTAKOS:

Q. I'm sorry. Were you done with your answer?

A. Yes.

The answer was read by the reporter as follows:

("A. At that point in time, there were individual incidents that had not yet formed a pattern that I perceived to be racially motivated.")

BY MR. KOSTAKOS:

Q. Okay. When did that -- when did they form a pattern to be racially motivated, in your mind?

A. When I was terminated for something that I did not do.

Q. Okay. And when was that?

A. I don't remember the last day that I was -- I don't remember the date specifically that I was terminated.

Q. Well, how much time passed between your conversation with Hendrix and your termination?

A. I don't remember.

Q. Was it a week? I'm trying to figure out when you made this complaint to Ms. Hendrix.

A. Referring back to Exhibit 6, e-mail from Christine Bollmann dated October 7, 2003, I don't remember if this e-mail, as I said before, was sent

Brian Kelly.

Q. When were you terminated?

A. It was in '04 in March, I believe, which is why I said the individual instances had yet to form a pattern that I perceived to be racially motivated.

Q. You said that was when you had the conversation with Hendrix, as I recall.

A. Right, and I'm saying I believe that conversation with Hendrix happened between October and December of 2003, on or about. I'm approximating --

Q. And, as I understand it, that conversation came in third in the race of conversations, if you will. Let me say it a different way. You spoke to her after you spoke to Bonzani and after you spoke to Gough?

A. That is correct --

Q. You spoke to --

A. -- from my recollection.

Q. Getting back to the laptop issue, some receipts were stolen -- were some receipts stolen with that laptop?

A. Yes.

Q. Were they business-related receipts?
A. Yes.
Q. And did you obtain reimbursement for those expenses that were represented by those receipts nonetheless.
A. Yes. To the best of my recollection, I had to reconstruct what was -- I had receipts for. So --
Q. And you were able to do that how?
A. It was using a credit card for a majority or a bank card. So I had records.
Q. Got it. You were able to go back to your credit card or bank card records and reconstruct your expenses?
A. Yes, and I was using a personal computer program, too.
Q. Did the company provide you with a replacement laptop?
A. Yes.
Q. And did they require that you pay for the replacement?
A. No.
Q. How about for the lost laptop or stolen laptop? Did they require that you pay for it?

A. No, not to my recollection at this point in time.
Q. You never completed the relocation to Rhode Island, did you?
A. No, I did not.
Q. Is that because you were terminated before the year was up?
A. Yes.
Q. Did you have a plan in place to relocate?
A. Yes.
Q. And what was that?
A. I had to find suitable housing.
Q. Were you looking?
A. Yes.
Q. When were you looking?
A. From the time I got up here. My wife would come up, and we'd look.
Q. Were you obtaining reimbursement for expenses -- and I just want to make sure I understand that it's related to your travel to and from -- your commute to and from New Jersey, as well?
A. Yes.
Q. Were you responsible for selecting the locations for APC training sessions that you were

responsible for holding?

A. Yes.

Q. How many employees would typically attend the training sessions?

A. It could be as few as two to many more. It depends upon the class.

Q. How frequently were you holding training sessions?

A. Normally daily.

Q. And that could range from two to a number of employees on a daily basis?

A. Yes.

Q. Were you responsible for selecting the hotels for trainees to stay in while they were -- let me start over. Would trainees come in from other states and cities across the country for these training sessions?

A. Yes, and from around the world.

Q. And were you responsible for selecting hotels for them to stay in while they were in Rhode Island?

A. For the field service engineers, yes.

Q. Okay. What was your understanding -- were you aware that the company had preferred

relationships with certain Rhode Island hotels?

A. Yes.

Q. What was your understanding about what hotels did they have preferred relationships with?

A. One was Johnson & Wales.

Q. Was there another?

A. Yes.

Q. Okay. And what was that?

A. There was a list. I remember specifically Johnson & Wales. I don't remember all of the hotels that were on that list at this time. At the time when I was made aware of the list, I did have knowledge of each hotel.

Q. Did the list include only hotels in Rhode Island? I mean, would you do training elsewhere that you were responsible for accommodating employees?

A. Typically it was just Rhode Island, people coming to Providence or East Providence.

Q. Okay. So the Johnson & Wales Hotel is one of the company's preferred hotel providers; is that accurate?

A. I would say yes; they're on that list, yes.

A. Absolutely.

Q. And how often did -- is this a one-time event, or did you have people stay there more frequently?

A. No. It was an ongoing -- referring back to a previous question with respect to John Bonzani and being focused, he wanted me to provide a scope of training for everybody in North America, and he gave me a list of criteria, and after providing him with options of additional hotels, I was told it was okay to use that hotel, and I was directed to do so.

Q. By John Bonzani?

A. Yes.

Q. Did anybody else direct you to do that?

A. No. And Paul Cavanaugh was aware of it, as well, and Paul's boss.

Q. Did you devise a direct billing relationship between the Marriott and APC related to those expenses that you contend Bonzani approved?

A. I did not create a direct billing relationship with the Marriott. A direct bill relationship existed prior to my hire, as I understand it.

Q. Did they ever send bills to you at your

office in East Providence?
A. Yes.
Q. Okay. Why did they do that?
A. We were being billed for the services that I was authorized to procure from the Providence Marriott by John Bonzani.
Q. Were you ever told -- did anybody at APC tell you that you should use preferred hotels for these purposes?
A. Yes.
Q. Who told you that?
A. Christine Bollmann.
Q. And when did she tell you that?
A. At sometime prior to -- at some time during my tenure at APC.
Q. Did she tell you that before you began using the Marriott for these services?
A. She told me that there was a list of preferred hotels that I should use, and I reviewed that with John Bonzani, and he told me I work for him, and he told me that as long as the hotel meets his requirements and the FSEs are happy, then to do -- to execute on the plan that he authorized me to do so.

Q. So when you made the accommodation reservations at the Marriott, you were aware that they were not preferred and that it was not consistent with APC policy that you use preferred hotel providers; is that correct?

MS. KISCH: Objection to the extent it mischaracterizes his testimony, and objection to form.

MR. KOSTAKOS: Okay.

MS. KISCH: And foundation.

MR. KOSTAKOS: You can reserve the foundation objections. It's to the form of the question and responsiveness of the answer.

THE WITNESS: I feel that I was acting within APC policy because I was following the directions of my management.

BY MR. KOSTAKOS:

Q. Okay. Let me break it down. When you made the reservations, were you aware that -- at the Marriott, were you aware that it was not on the list of preferred hotel providers for APC?

A. Yes.

Q. Okay. And you went ahead and made those

reservations under the direction of Bonzani; is that correct?

A. Yes.

Q. Were you receiving Marriott reward points for these reservations?

A. I've been a Marriott awards member for many years prior to my employment with APC.

Q. I'm very happy to learn that, but I really want to know whether or not you were receiving reward points for the accommodations and reservations that you were making at the Marriott for other people?

A. The Marriott awards program has a policy that meeting makers are eligible to receive points if they've organized a meeting.

Q. Okay. Can you answer my question? Were you receiving Marriott reward points for the reservations and accommodations you were reserving for training sessions and/or accommodations -- strike that. Were you receiving reward points related to accommodations that were reserved and used by other APC employees at the Marriott that we're talking about?

A. I received points from the Marriott consistent with the Marriott rewards program