IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

-----------------------------x

SETH DANIELS,

Plaintiff,

v. Civil Action No: 05-00459-ML-LDA

AMERICAN POWER CONVERSION CORPORATION,

Defendant.

-----------------------------x ORIGINAL

Job No. 2867 Pages 308 - 419

CONTINUATION DEPOSITION OF SETH DANIELS, a witness called by counsel for the Defendant, taken pursuant to the Federal Rules of Civil Procedure before Dena M. O'Brien, CSR, and Notary Public in and for the State of Rhode Island, at the law office of Littler Mendelson, 10 Weybosset Street, Suite 404, Providence, Rhode Island, on November 10, 2006, commencing at 9:00 a.m.

Q. Yes.
A. I believe her words were "Paul needs to speak to you right now. Come with me."
Q. Was that the extent of what she said to you?
A. At my desk, to the best of my recollection at this point in time.
Q. And did you respond to that to her at that point?
A. I got up and followed her.
Q. Okay. And where did you go?
A. To Paul's office.
Q. And what happened next?
A. We went into the office, closed the door. Paul said "You're going to be fired."
Q. Did he say anything else?
A. I said "For what?"
Q. You said "For what?"
A. Yes, to the best of my recollection.
Q. And what did Paul say, if anything, at that point?
A. "For kickbacks."
Q. Did he say anything else?
A. He said that I was taking kickbacks and

that -- he said that I was taking kickbacks, and I said what do you mean by that? He said you were getting points that should have gone to other field service engineers and that you were stealing the points, and he had to terminate me for that.

He went on to say that how could you do such a thing or -- he -- his words were that that is what I had done. I attempted to explain that I had not done anything wrong. I told him that I was a Marriott member before joining the company. Everything had been approved with John, and I did nothing wrong.

Q. When you say everything was approved, did John approve your receipt of points from the Marriott for those stays?

A. John had prior knowledge that I was an awards member. He said it's not a problem. He's a member of hotel rewards, too. He collects points, and he used one credit card is what John told me. He puts everything on one card, so he can get the points, as well.

Q. Do you know whether he was referring to points he received for his own travel or points he was receiving from meeting organizer type points that

Q. Where do you go immediately after the meeting?

A. To my desk.

Q. What did you do at your desk?

MR. KISCH: Objection to the extent it's been asked and answered.

THE WITNESS: Gave her APC assets in my possession.

BY MR. KOSTAKOS:

Q. Did you go from your desk at that point in to the conference room where you had the meeting?

A. From which point?

Q. You went from Mr. Cavanaugh's office to your desk, and at that point, did you go from your desk to the conference room for the meeting with your staff?

A. To the best of my recollection at this point in time.

Q. Where did you go after this meeting with your staff?

A. At some point prior to my departure, I saw John.

Q. Bonzani?

A. Bonzani.

Q. Do you know whether that was before or after your meeting with your staff?
A. I believe it was after, to the best of my recollection at this point in time, but it could have been before.
Q. And where did you see him?
A. I believe I saw him in his office.
Q. Did you go to his office to talk to him?
A. Yes.
Q. Why did you do that?
A. I wanted to hear from him why this was happening when he was aware and had approved everything.
Q. And did you ask him that question?
A. Yes.
Q. And what did he say?
A. To the best of my recollection at this time, he said he found out as I was being told and I accepted his answer because he had just flown in from out of town.
Q. Did you have any other discussions with him about that -- strike that. When you went in to his office, was there any other conversation between you?
A. I said -- to the best of my recollection,

it was a typical, you know, good-bye. Sorry that -- I think he said sorry it didn't work out or something like that, just typical hasty departure type of discussion. He indicated that Paul made the decision. Since Paul was his boss, there was not much he could do because Paul made the decision.

Q. Did he indicate whether he had spoken to Mr. Cavanaugh?

A. As I said, he said he found out from Paul when I was finding out.

Q. I'm sorry. I didn't know that he said he found out from Paul. Did he say anything about his conversation with Mr. Cavanaugh?

A. I'm sorry?

MR. KOSTAKOS: Can you read the question back?

The pending question was read by the reporter as follows:

("Q. I didn't know that he said he found out from Paul. Did he say anything about his conversation with Mr. Cavanaugh?")

BY MR. KOSTAKOS:

Q. Anything else about his conversation with Mr. Cavanaugh?

A. He repeated to me what Paul had said that I had done.

Q. And what did Mr. Bonzani say to you that Paul had said?

A. That I was taking kickbacks.

Q. Did you say anything in response to Mr. Bonzani?

A. I said that I had not done anything wrong, only -- everything that I had done was in accordance to what she wanted me to do.

Q. Did Mr. Bonzani want you to receive over 100,000 points for organizing meetings at the Marriott?

MR. KISCH: Objection, foundation and form.

MR. KOSTAKOS: You can answer.

THE WITNESS: As I stated previously, Mr. Bonzani said and he told me when I asked him about points and staying at Marriotts, he said it was not an issue. He collected points. He had his credit card limit increased to $50,000 because that's how much he would spend, and he collected points, and it was no issue.

With respect to this, these complaints that you made, is it your contention or your view that Mr. Cavanaugh treated you in the manner you described or differently than other employees were in a discriminatory manner?

MR. KISCH: Object to form. Go ahead.

THE WITNESS: Yes, and actually, I had mentioned to John and to Christine that Paul Cavanaugh said to me "Seth, why can't you be a good Irish lad like everyone else?" Paul was from Ireland, and he had logos or slogans on his desk that may have been acceptable in Ireland, but I found them to be not acceptable.

BY MR. KOSTAKOS:

Q. And what were those?

A. It was to the extent if you were Irish, you could do no wrong, a little Irish boy can do no wrong or something to that extent.

Q. So, in your view, was he discriminating against you because of your race?

A. Yes.

Q. How so?

A. Well, if we look on what his slogan said,

A. Well, the woman, as I understand, that got him to do it was Irish.

Q. And do you know if that's why he did it?

A. I don't know that's not why he didn't do it.

Q. And with respect to direct billing, do you know if he treated anybody else differently with respect to the issue of direct billing than he treated you?

A. I don't have direct knowledge of that.

Q. Is it your contention that because of the complaints that you raised with respect to Mr. Cavanaugh to Mr. Bonzani that you were ultimately terminated?

A. Yes.

Q. And how so? Strike that. What is the basis for that contention?

A. The basis for that contention is the ongoing -- the way that I was treated by Paul, the fact that I had complained, and here was his opportunity to punish me, and that's what he did. I did nothing wrong, and he immediately jumped to the conclusion that I had done some criminal act.

Q. When did you make these complaints about

Mr. Cavanaugh to Mr. Bonzani?
A. Prior to the termination.
Q. How long prior?
A. I don't remember specifically.
Q. Was it a day prior?
A. No.
Q. Was it a week?
A. A few weeks.
Q. A month?
A. A few.
Q. A few months?
A. It was within a couple of months' span of time.
Q. Okay. Between when you made the complaint about Mr. Cavanaugh and when you were terminated?
A. I made -- all of these complaints did not happen at the same time. So over the course of making the complaints was a few months.
Q. And did you tell Mr. Bonzani that you thought it was because of your race that Mr. Cavanaugh was treating you that way?
A. Yes.
Q. And what was Mr. Bonzani's response to that?

car when it was creating an undue financial hardship on me and my family because of the expenses that I was incurring on a daily basis with the company. He did nothing.

BY MR. KOSTAKOS:

Q. Anything else?

A. I told everybody in my chain of command. I didn't have another -- I told the most senior person in HR of the discriminatory actions and hostile work environment that I was in, and he did nothing.

Q. And how do you connect that to the termination?

A. After my complaining, I got fired for something that I did not do.

Q. Okay. Is there anything specific that you base your claim that your complaint to Mr. Gough was connected to the decision to terminate you?

MR. KISCH: I'm going to object to the extent it calls for a legal conclusion.

MR. KOSTAKOS: I'm asking for any facts he's aware of that he can establish that his complaints to Mr. Gough about discrimination were in some way related or

connected to the decision to terminate?

MR. KISCH: Same objection.

THE WITNESS: I was told by Mr. Gough and by Paul Cavanaugh to stay away from Brian Kelly. I was told by John Bonzani that Brian Kelly has a long memory and was vindictive.

BY MR. KOSTAKOS:

Q. By whom were you told that?

A. John Bonzani.

Q. Any other evidence to connect your complaints to Mr. Gough to a decision to terminate you?

A. I complained to Brian Gough about Christine Bollmann, about Brian Kelly, about the ongoing situations that I've had, and I complained to his direct subordinate.

Q. Okay. Other than the mere fact that you complained, do you have any additional evidence other than what you've told me or any additional bases to contend that your complaints to Mr. Gough about all of the people that you talked about or to anybody else were in some way connected to the decision to terminate you?

MR. KISCH: I'm going to object to the extent it's been asked and answered, and to the extent it calls for a legal conclusion.

MR. KOSTAKOS: Did you find where we talked about it before?

MR. KISCH: I stopped looking. Do you want me to go back?

MR. KOSTAKOS: If you want.

MR. KISCH: I mean I wasn't actually -- I know it's been discussed. I can tell you it's not one passage.

BY MR. KOSTAKOS:

Q. Is there any other evidence that you have, Mr. Daniels, to connect your complaints to Mr. Gough or to anybody else to the decision to terminate your employment by APC?

MR. KISCH: Same objections.

THE WITNESS: It seems to me to the best of my knowledge and recollection that I was fired after I complained about the individuals that, as I understand, had a direct hand in firing me.

BY MR. KOSTAKOS:

Q. Why does it seem to you?

A. John Bonzani wasn't made aware of it, but he knew that I had complained to him about the treatment of his subordinate and other senior members in the company, and it seems to me that they got together and got back at me for my complaints.

Q. Why does that seem to you that they got back at you? That's what I'm driving at. What is it -- other than your conclusion from what happened, why does it seem to you that they got back at you?

A. I was meeting all of my deliverables from my supervisor. I was making a positive impact in APC in their service department not just nationally but globally. I was doing a good job, and there was not a performance issue, there was not a deliverable issue. I had no issues as I'm aware. I was doing a good job for my boss, and I was doing a good job for the company, and I was doing a good job for the customers of the company by training their people and getting them information that they needed in a timely manner, and differently than had been done before.

I had taken a very disorganized process where field service engineers had been hired by the company and had been at training and gone back to

their home office and did not have computer equipment or the tools to do their job for months after they had been employed by the company costing the company thousands of dollars for a nonproductive employee. I turned that around. Within the period of time that a person got hired while they were there in Rhode Island for training, they got their laptop, they got all of their tools, they got their $2,000 disbursement voucher, which they're able to cash, so they could be immediately productive.

So I made a very positive impact to the company, but the reason that I was terminated had nothing to do with that in my mind, and I haven't -- no one complained about what I was doing. It was all because I complained about my superiors and the other white managers in corporate that did not like the fact that I complained about them, and then the manager that had direct responsibility for me that knew that I was doing a good job wasn't included in the loop, and they cut him out and I was terminated. How else can it be interpreted? That's the fact.

Q. And do you have any evidence to support that fact other than your own conclusions?

MR. KISCH: Object to the extent it's been

asked and answered.

THE WITNESS: Do I have evidence to support what I just said?

BY MR. KOSTAKOS:

Q. Evidence that it had to be that, it had to be because you complained?

MR. KISCH: Object to the form and to the extent it's been asked and answered.

MR. KOSTAKOS: You can just object.

MR. KISCH: No, it's proper to say what your objections are.

MR. KOSTAKOS: It's obviously as to form.

MR. KISCH: And to the extent it's been asked and answered.

MR. KOSTAKOS: That's form.

BY MR. KOSTAKOS:

Q. So is it your conclusion that because you were a good employee and there were no performance issues, that it had to be -- that your termination had to be the result of your complaint?

MR. KISCH: Objection. It mischaracterizes previous testimony and to the extent it's been asked and answered.

BY MR. KOSTAKOS:

Q. Is that your conclusion?

A. I just previously gave you my conclusion.

Q. Is there anything else that connects your complaints to the termination of your employment?

A. My answer to that question is the company had a shortage of field service engineers. Customers were complaining they weren't getting service soon enough. The company did not have enough service partners, and where there was not a field service engineer, the service department would step in and help out with their people. That was a deficiency that the company had.

The company tried to overcome that deficiency by hiring new service engineers. An impediment to that was that when they hired them, there were a number of them that came up, got training, but the training was ineffectual because they did not have the tools and did not have their laptop and, in a number of instances, went back to the field without having expenses to do their job prior to my coming there.

Upon my arrival at the company, I had a positive impact on that. Every field service

engineer left Providence with a laptop that was typically issued within two days, if not the same day that they started. The same day that they started. Where it used to take them weeks to get their $2,000 advance voucher, they were getting it the same day that they came in.

I was training all field service engineers. I was training the APC partners in a very effective manner. So I was meeting the deliverable there. Training people faster, better, and allowing people to go back out into the field prepared to do their job.

At the same time, as a direct result of that, I was saving the company money, and I had a positive impact on the moral of the field service engineers that was suffering. In addition to that, I was meeting the deliverables that Paul Cavanaugh had where he was getting heat because field service engineers were not able to do Siebel, which was the software that he was catching a lot of flack for that we talked about before.

So I was meeting his deliverable, which was ultimately John's deliverable, and then apart from that, saving the company money. There was no

performance issue. So all of the business strategies were there, but --

Q. Have you been employed since leaving APC?

MR. KISCH: You don't want him to finish his answer?

MR. KOSTAKOS: Oh, I thought he was done. I'm sorry.

THE WITNESS: I said but, and you asked a question.

MR. KOSTAKOS: I apologize. Are you nearly done with your answer because I'd like to move on to the next topic?

MS. KISCH: If you don't want him to finish his answer, just say so.

MR. KOSTAKOS: I'm just asking are you nearly done?

THE WITNESS: I'm willing to finish, if you --

MR. KOSTAKOS: Go ahead, finish.

THE WITNESS: So the business drivers were there to allow me to continue to grow and flourish. It was an economic reason. It was because the people that I complained about did not like me and did not like the