IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

- - - - - - - - - - - - - - - x

SETH DANIELS,

COPY

Plaintiff

Civil Action

vs. No. 05-00459-ML-LDA

AMERICAN POWER
CONVERSION CORPORATION,

Defendant

- - - - - - - - - - - - - - - x

DEPOSITION of BRUCE E. GOUGH, a witness called on behalf of the Plaintiff, pursuant to the Federal Rules of Civil Procedure, before Patricia A. Conant, a Registered Professional Reporter and Notary Public within and for the State of Rhode Island, at the offices of Stephen Robinson, 155 south Main Street, Fourth Floor, Providence, Rhode Island 02903, on Thursday, November 9, 2006, commencing at 9:33 a.m.

I N D E X

| Deposition of: | Direct | Cross |
|---|---|---|
| BRUCE E. GOUGH | | |
| By BY MS. KISCH: | 4 & 274 | |
| By Mr. Kostakos | | 272 |

E X H I B I T S

| No. | Description | Page |
|---|---|---|
| 1 | Letter of 7/11/03 | 129 |
| 2 | Travel Policy | 210 |
| 3 | Ethics Policy | 210 |
| 4 | Corrective Discipline Policy | 248 |
| 5 | Answers to Interrogatories | 255 |
| 6 | Agenda of 3/9/04 | 264 |
| 7 | EEO Opportunity Policy | 266 |
| 8 | Complaint Resolution Procedure | 268 |
| 9 | Documents | 269 |

BRIAN GOUGH,

having been satisfactorily identified by the production of his driver's license, and duly sworn by the notary public, was examined and testified as follows:

EXAMINATION

BY MS. KISCH:

Q. Good morning. Would you go ahead and just state your name for the record?

A. Brian Gough, G-O-U-G-H.

Q. What is your current address?

A. 47 April Lane, Tiverton, Rhode Island.

Q. And what is your phone number?

A. 401-816-0470.

Q. Do you have any plans of living out of area in the next few months?

A. Yes, I do.

Q. Where to you plan on living?

MR. KOSTAKOS: She didn't expect that answer.

MS. KISCH: Well, in this case it's not unusual.

A. St. Louis.

Q. When are you planning on moving?

Q. Do you know an individual named Seth Daniels?
A. Yes, I do.
Q. Was he terminated from APC?
A. Yes, he was.
Q. Why was he?
A. He was terminated for a violation of the ethics policy.
Q. Anything else? Was there any other reason he was terminated other than a violation of the ethics policy?
A. That was the cause of the termination.
Q. Was there any other reason?
A. Yes.
Q. What specifically did he violate with regard to the ethics policy?
A. He diverted business from one approved hotel to another hotel in order for him to gain reward points through Marriott for his own personal use.
Q. Anything else? Any other ways in which he violated the ethics policy?
A. Reason he was terminated was for diverting the business from one hotel to

another which caused APC additional money, and he did so in order to gain Marriott reward points in his own personal account.

Q. Anything else? Any other reasons? Are there any other ways in which Mr. Daniels violated the ethics policy?

MR. KOSTAKOS: Objection. Asked and answered.

A. Not that I recall.

Q. Was he terminated for violating any other policies?

MR. KOSTAKOS: Objection.

A. No, he was not.

Q. Were there any other reasons, other than what you just said, which caused APC to terminate Mr. Daniels?

MR. KOSTAKOS: Objection.

A. There were no other reasons for his termination.

Q. What specifically was the violation of the ethics policy with regard to Mr. Daniel's diverting business from one hotel that was approved to another?

MR. KOSTAKOS: Objection.

A. Mr. Daniels took actions not in APC's best interest to change the hotels that APC employees and other partners were to use in order to gain credit with the other hotel, Marriott, for his own personal benefit.
Q. When you say he -- the use of the Marriott was not in the APC's best interest, on what facts do you make that statement?
A. APC had agreements with other local hotels at a more favorable rate, more favorable business conditions.
Q. What do you mean by business conditions?
A. We may have received other benefits for having utilized those hotels that weren't directly rate related. I don't know the specifics on the deal, but our travel manager had indicated there were other hotels that were better business deal for APC to be utilizing.
Q. Which hotels provided APC a better business deal?
A. I don't know the ones at the time. I know they were non-Marriott related.
Q. Did you know at the time?

A. No, because I don't stay in the hotels. I live here.
Q. Did you inquire of the travel manager as to which hotels provided a better business condition?
A. I don't recall if -- I do recall something about a Johnson & Wales Hotel.
Q. Do you recall whether there were any others?
A. There may have been. I don't recall.
Q. Do you know what capacity hotel rooms, or for what purpose hotel rooms were reserved at Marriott?
A. My recollection of it was that they were for field service engineers coming in for training or what we would term high power partners, third-party individuals who were coming in for training as well.
Q. And do you know, in fact, if Johnson & Wales could accommodate the needs of those trainees?
A. I have no idea.
Q. Do you know whether any hotel other than Marriott at that time could have accommodated

all of the needs and requirement for individuals in need of hotel rooms?
A. I do not know that.
Q. Did you know that then?
A. I did not know that then.
Q. Did you ever ask Miss Bollman, the travel manager, whether or not any other hotel could provide all the necessary requirements for the trainees and individuals who needed hotel rooms?
A. I was assured that the hotels that we were under agreement with were satisfactory for our business needs.
Q. But for the particular hotel reservations that were made at the Marriott for those trainings, did you ever ask Miss Bollman whether the hotels for which she said Mr. Daniels should have booked at could accommodate all the needs of the individuals who needed hotel rooms?
MR. KOSTAKOS: Objection.
A. Again, I was assured by our travel manager that the hotels we had an agreement with met our business needs. If there were

other business needs related to this, I was not aware of it.
Q. Are the business needs of individuals always the same for all trips and all travel and all occasions in which hotels are booked, or do the business needs at times vary?
A. Again, it's a fairly broad question, but I would answer it in a broad manner. Yes, there could be specific needs for individual cases, but for central programs, training programs where the activity occurs on a regular basis, it should remain fairly consistent.
Q. Did you ever learn, in fact, there was no other hotel that could accommodate the needs of the individuals that were being trained at that time and that was the reason why Mr. Daniels had booked the Marriott?
MR. KOSTAKOS: Objection.
A. That's not my understanding of the situation based on the information as provided by the travel manager.
Q. If, in fact, there was no other hotel that could accommodate the needs, would you

change your position that, in fact, Mr. Daniels did not violate the ethics policies with regard to what was in the best interests of the company?

MR. KOSTAKOS: Objection. Calls for speculation.

BY MS. KISCH:

A. I would say, no, I would not.

Q. You would not change your position?

A. No.

Q. So if, in fact, the Johnson & Wales could not accommodate all of the requirements necessary for that training function, and Mr. Daniels went ahead and booked hotel rooms for all those individuals at the Johnson & Wales and there were severe problems, you would then say, in fact, booking at the Johnson & Wales was in the best interests of the company?

MR. KOSTAKOS: Objection. Speculation.

A. I don't understand your question.

Q. My question was, and I'll go back two questions because maybe you need to change your answer here. If, in fact, the Marriott

was the only hotel that could accommodate the needs of the individuals who were sent to Rhode Island to train, if the Marriott Hotel was the only facility, only hotel in the Providence area that could accommodate the needs of trainees with regard to their job functions for being in Rhode Island in the first place, would you still take your position that Mr. Daniels' direction that the hotels rooms be booked at the Marriott was not in the best interests of the company?

MR. KOSTAKOS: Objection. Calls for speculation.

A. My expectation is that Mr. Daniels would have cleared that with the travel manager because my understanding is he had a direct conversation with her about that issue.

Q. Oh, so you do have some knowledge of this issue?

A. I'm aware through the travel manager they had a conversation and she told him not to divert the business to a different hotel. That's the extent of my knowledge.

Q. And what do you believe she told him? Is

A. I book my travel through APC travel.
Q. What do you mean by that?
A. We have travel agents that are connected and they book at hotels we are to stay at.
Q. So you've never requested a specific hotel when you were traveling?
A. No.
Q. Is it your understanding or did Miss Bollman tell you that she had told Mr. Daniels to book the hotel at the hotels on the APC hotel list?
MR. KOSTAKOS: Objection.
A. Repeat the question.
Q. Did Miss Bollman -- let me ask you this question. Is all of your knowledge relating to the issue of Mr. Daniel's termination and the reasons for his termination in terms of violating any policies, does all of your knowledge come from Miss Bollman?
A. Yes.
Q. Okay. Doesn't come from any other source?
A. No.
Q. Did Miss Bollman specifically tell you

that she told Mr. Daniels to book the hotel rooms at an APC preferred hotel?

MR. KOSTAKOS: Objection.

A. That is my understanding or general understanding. She had informed him that the meetings he was setting up should be set up at APC, or hotels that APC had an agreement with.

Q. And that was a requirement she imposed upon him?

A. That's my understanding.

Q. It wasn't optional?

A. That is my understanding.

Q. And it wasn't a suggestion?

MR. KOSTAKOS: Objection.

A. That is my understanding.

Q. And if you came to learn that that wasn't true, that she had never actually given him that directive, would that impact your decision as to whether or not Mr. Daniels should have been terminated?

MR. KOSTAKOS: Objection.

A. I don't know. I'd have to look at the full circumstances at that point.

Q. Uh-huh. Well, how did you determine --

did you give your approval, actually, to Mr. Daniel's termination?

MR. KOSTAKOS: Objection.

A. Yes, I did.

Q. How did you determine that booking the hotels at the Marriott was not in the best interests of APC?

MR. KOSTAKOS: Objection to the extent -- objection, that's not the reason, sole reason.

MS. KISCH: Please don't make a speaking objection.

MR. KOSTAKOS: You shouldn't misrepresent --

MS. KISCH: I didn't misrepresent anything.

BY MS. KISCH:

Q. Go ahead.

A. Can you repeat the question?

MS. KISCH: Could you repeat the question.

(Last question read back by reporter.)

MR. KOSTAKOS: Objection.

A. That would be based on my conversations with Christine Bollman.

Q. Why don't you tell me everything Miss Bollman told you with regard to the issues surrounding Mr. Daniel's alleged violations of the policy and the reason for his termination?

A. Okay. I'll need to paraphrase because I don't recall exact words that were used. However, I would state that she indicated to me that she had learned through our vendors at approved hotels in the area that business had dropped off significantly and that did not necessarily make sense to her because our overall training programs and everything else were still moving forward.

In her investigation or research on it she found that hotel rooms were being booked at the Marriott and that in her conversations with the Marriott Hotel, she found out that Seth Daniels had booked those hotels and had indicated that the reward points should go to his personal account, so he was acting as a meeting planner and taking those points for his own personal use.