Q. Anything else?
A. She indicated to me at the time that the Marriott had a higher rate than we had negotiated with the other hotels, and that she had had a conversation with Seth Daniels prior to this, indicated he should book hotels that were approved, and had a deal negotiated.
Q. He should book hotels what?
A. Where a deal had been negotiated and was therefore approved by APC.
Q. And was that hotel where a deal had been negotiated by APC or by APC and somebody else?
A. I believe by APC but it could be in conjunction with our travel provider.
Q. Okay. And was it your understanding that the Marriott was not -- what did she tell you with regard to whether or not the Marriott was approved or not an approved hotel?
A. She had indicated we did not have an agreement with the Marriott.
Q. Is that APC didn't have an agreement or APC and the travel agency didn't have an agreement or didn't you know?
A. She indicated no agreement existed. I

specified travel agent or APC. She said no agreement in place; therefore, was not to be used.
Q. Was it then prohibited from being used according to APC policy, or was it just not preferred?
A. I would -- for group meetings such as that, it would have been not approved.
Q. What does that mean, "for group meetings"?
A. Individual travel coming in, one off type of things where approved hotels weren't available. They may have shifted to the Marriott, but in general, if you are going in and setting up a program, you would follow through with the hotels that we had preapproved. Here it was a direct bill relationship, and APC did not have a direct bill relationship with the Marriott.
Q. Okay. You said a number of things there. You said for an individual group. Are you saying that for group bookings or hotel reservations where there's going to be a good number of people who are reserving rooms, more

negotiated rate with a hotel, and therefore, a contract regarding the rate that's going to be applied for the group, is that, therefore, in compliance with the general practice for making group reservation at a hotel?

MR. KOSTAKOS: Objection.

A. Yes, that is consistent with general practice.

Q. Okay. Miss Bollman tells us there was no prenegotiated rate for the reservations that were made at the direction of Mr. Daniels?

A. I believe her -- my recollection is she indicated that the rate that we were paying was greater than our approved rate at the other hotels.

Q. Okay. Did she, I'm going to ask my question again. Did Miss Bollman ever tell you that there was no negotiated rate prior to the hotel reservations being made at the Marriott?

MR. KOSTAKOS: Objection.

A. I don't recall her making that statement to me.

Q. Okay. Do you, in fact, have any

knowledge whether or not there was such a
negotiated rate at the Marriott?
MR. KOSTAKOS: Objection.
A. I do not have direct knowledge of that.
Q. And did you at the time?
A. I don't recall at the time if I did or
did not.
Q. Okay. Is that an important fact?
MR. KOSTAKOS: Objection.
A. No.
Q. It's not?
A. It is not.
Q. Okay. Are all the hotels in the
Providence area, are the rates at all the
hotels the same?
A. No.
Q. Were there any hotels in the Providence
area that had equal or greater room rates than
the Marriott at that time?
A. I'm not aware of the rates in any of the
locations at that time.
Q. Would that be an important fact to know?
MR. KOSTAKOS: Objection.
A. No.

Q. Would it be an important fact to know whether or not any other hotel could accommodate the training needs of the individuals who had booked hotels at the Marriott?
A. No.
Q. It would not? Do you know whether any individuals who stayed at the Marriott Hotel, in fact, received reward or travel points from the Marriott at that time?
A. I'm not aware of that.
Q. You don't know one way or the other?
A. I don't know definitively one way or the other.
Q. Did you know at that time?
A. My understanding was that the points associated with the reservations went to Seth Daniels.
Q. Did you inquire whether or not any individuals also received reward points for their stay at the Marriott?
A. No, I did not at that time.
Q. Okay. And is that an important fact to know?

each and every day.
Q. And I'm talking specifically for the time at which Mr. Daniels was terminated for booking at the Marriott; do you understand that?
A. Yes.
Q. Same answer?
A. Same answer.
Q. Did you know that fact then at the time Mr. Daniels was terminated?
A. No, I did not.
Q. Did you ask Miss Bollman?
A. No, I did not.
Q. Is that an important fact?
A. No, it is not.
MR. KOSTAKOS: Objection to that.
THE WITNESS: Could we take a break?
MS. KISCH: We can take a break as long as you're not going to talk about the line of questioning.
(Recess taken.)
BY MS. KISCH:
Q. Mr. Gough, did you ask any questions of

Miss Bollman when she came to you and talked to you about the issue related to the hotel rooms being booked at the Marriott?

A. Yes, I did.

Q. What questions did you ask?

A. I asked her if she had verified the information from Marriott. I asked her for the specifics of the situation. Asked her if there was evidence to show what she was claiming.

I'm certain I asked her, and again I can't recall specific questions that I asked and answers received, but generalities related to the financial impact, general policy, how this action violated the policy from her perspective.

I believe I asked her to detail the communication she had had with Seth Daniels. My general recollection of the line of questioning I had with her.

Q. How many conversations did you have with Miss Bollman relating to these issues?

A. More than one, less than 5.

Q. Over how long a period of time?

A. A few days.
Q. Okay. Did your knowledge of this whole issue come because Miss Bollman came and spoke to you?
A. Yes.
Q. Did it come from any other source as well or just Miss Bollman?
A. Just Miss Bollman.
Q. On the first occasion that she came to you, did you ask all the questions that you just outlined, or were some of them in later discussions?
A. The initial question would have been around the specifics of what she was claiming. I'm not sure which questions came at which meeting, but the majority of the questions were in the beginning with maybe a few follow-up calls after that.
Q. When Miss Bollman came to you, did she tell you that she felt that Mr. Daniels should be terminated?
A. No. She just indicated that something needed to be done regarding a violation.
Q. Did she ever make a recommendation that

she felt Mr. Daniels should be terminated?
A. No, she did not.
Q. Did anyone ever make such a recommendation to you?
A. No.
Q. So you're the one that came up with the position that he should be terminated?
A. I would say between his manager and myself made that determination.
Q. All right.
A. I misspoke there because I believe his manager at the time was John Bonsoni (phonetic). The director and general manager of that particular area, Paul Cavanaugh, and we were the ones to go over the situation and determine what to do.
Q. When you first had your conversation with Miss Bollman, did she have all the information at that point that you had asked for?
A. I don't recall. Again, I believe we had a couple of follow up conversations on additional minor issues that I needed to verify.
Q. Like what? What did you need to verify?

A. I can't remember the specifics.
Q. Okay. Do you actually remember asking what the financial impact was?
A. No, I don't remember asking specifically that question.
Q. Okay. And when you say the financial impact, are you saying it in terms of what the financial impact was to APC?
A. Yes, that would have my line of questioning.
Q. Okay. But you don't have any understanding today as to what the financial impact was to APC, correct?
A. No, I don't.
Q. You don't even know whether there was a financial impact, do you?
A. It's my understanding there was some, and that was the conversation we had at the time that there was a loss of some money to APC because of the difference in the hotel rates.
Q. Any other financial impact other than the differential and the hotel rates?
A. There may have been. I don't have the details on that.

Q. You don't remember one way or the other?
A. I don't -- I don't have any information on it.
Q. Okay. Was the financial impact on APC, did that contribute to the decision to terminate Mr. Daniels or not?
A. The decision to terminate was based on his directing the Marriott award points to go to his personal account. The additional cost to APC clearly didn't help his case, but the actual issue for termination and cause was diverting those points.
Q. When you say diverting those points, what do you mean?
A. He accepted points for, essentially, as a group planner to go to his personal accounts.
Q. When you say diverted, did he divert them from someone else?
A. From APC.
Q. He diverted them from APC?
A. Yes.
Q. So APC would be entitled to receive those points had Mr. Daniels not received them?
A. That's my understanding.

Q. What is that understanding based on?
A. General business.
Q. What do you mean, general business?
A. That Marriott would reward the points to someone, if not an individual then the corporation. We have similar agreements with other hotels where we get their type of points towards certificates for stays at their hotels that we can raffle off, etc.
Q. Well, do you know, in fact, whether or not the Marriott actually had a program that would enable APC to receive travel points as a company?
A. I'm not familiar with all the programs, so I can't say specifically that they do, but it's my understanding that, yes, they have some type of program. That is through my conversation with Miss Bollman.
Q. So Miss Bollman told you the Marriott had some sort of program that would allow APC to receive the points instead of Mr. Daniels?
A. Again, I can't recall the specific conversation and how it went, but that's my recollection of it, yes, that she led me to

believe that Marriott has a program that would allow the points in some fashion to come back to us as a corporation.

Q. Did you, in fact, ask her whether or not there was such a program?

A. I can't recall if I asked that question or not.

Q. Okay. Is that an important fact?

MR. KOSTAKOS: Objection.

A. The fact that I ask her?

Q. No, the fact of whether or not Marriott had a program that would enable it, APC as a company, to receive points for the hotel reservations for APC employees?

A. Yeah, that would be an important fact.

Q. So if no such program existed and Mr. Daniels did receive points, would there have been a violation of the policy?

A. Again, that would be --

Q. An APC policy?

MR. KOSTAKOS: Objection.

A. It would depend on the full circumstances surrounding that issue.

Q. Did you ever look into that?

Cavanaugh.
Q. It's your testimony that Christine Hendricks and Paul Cavanaugh were involved in questioning Mr. Daniels on the issues for which he was terminated?
A. They brought the issue to his attention. It's my understanding they brought the issue to his attention and allowed him to respond, and based on that response or based on a lack of any data to contrary to what we had found, in that meeting they terminated his employment.
Q. What is your understanding that Mr. Daniels told Mr. Cavanaugh and Miss Hendricks?
A. I don't recall the specifics, but my understanding was he didn't deny he had set up the meetings at the Marriott, he did not deny that he had received the points.
Q. Do you have knowledge that he set up any meetings at the Marriott?
A. Sorry, hotel rooms.
Q. Hotels were used by FSE?
A. Yes.
Q. Was this meeting held together, both with

Miss Hendricks and Mr. Cavanaugh at the same time, all present in the room?

A. That's my understanding.

Q. Was that the same meeting in which Mr. Daniels was terminated?

A. Yes, it was.

Q. Okay. Had a decision been made to terminate by then?

A. As I recall correctly the conversation between Paul Cavanaugh and myself, if the facts of the matter are as had been noted, the termination would be taken.

Q. But you left it up to the discretion of Christine Hendricks and Paul Cavanaugh to make that final determination?

A. I informed Christine of the circumstances and indicated if there was something significantly different than what we had heard in the facts then they were to proceed in the termination.

Q. Sorry if there was something significantly different proceed or don't terminate?

A. Unless there was something significant

brought to her attention, then they needed to go forward with the termination.

Q. So you left it up to their determination to determine whether there was something significant enough to proceed with the terminate nation?

A. Yes.

Q. Had you ever done that before?

A. Yes.

Q. In what instance?

A. Most terminations result in the employee providing some data in that meeting. The human resource professional is required to listen to that information and make a judgment as to whether it's valid or thought, and then move forward or hold back on the termination as necessary.

Q. Was it your understanding that there was to be a substantive conversation prior to termination to determine whether or not Mr. Daniels had an explanation to the accusations?

MR. KOSTAKOS: Objection.

A. The facts of the situation didn't necessarily call for a lengthy investigation.

issues involving Mr. Daniels?
A. I can't recall at this point.
Q. Do you recall any other complaints raised by Mr. Daniels other than what we already talked about?
A. Not that I can recall at this time.
Q. Do you recall speaking with anybody else at all about any issues relating to Mr. Daniels other than what we've talked about?
A. I do recall having a conversation that concerned by the systems department relative to Mr. Daniels, and having that conversation with -- or following that conversation with Mr. Cavanaugh explaining the concern.
Q. And what specific complaint was that?
A. Complaint about Mr. Daniels' treatment of the help desk support personnel.
Q. Who specifically -- did somebody actually make a complaint?
A. Somebody came to me with a concern.
Q. Who was that?
A. Director of end user operations.
Q. Who is that?
A. Terry Ward.

Q. Is that a man or women?
A. Women.
Q. What did she say?
A. She indicated that Seth was very rude to the employees on the other end of the line. He was very aggressive in attempting to get some things done, and that specifically he was pushing on a purchase of or support for blackberry devises which at this time were not a supported platform at APC.
Q. Okay. And what if anything else -- what did you do after you had that concern raised to you?
A. I followed up with a conversation with Christine in order for her to speak with John. I believe I had a conversation with Paul Cavanaugh on it, as well, alerting him to the fact that Seth was essentially creating tension within other departments.
Q. Okay. Anything else?
A. No.
Q. Did you ever speak with Mr. Daniels about that?
A. I believe I did have a brief conversation

indicating that the system's group was a little concerned. Again, I don't recall the specifics of the conversation.

Q. Okay.

A. I think I did.

Q. And were you satisfied after your conversation with Mr. Daniels --

MR. KOSTAKOS: Objection.

BY MS. KISCH:

Q. -- that everything that needed to be done at that point was done with regard to the concern that was raised to you?

A. I didn't feel like we needed to go any further.

Q. Okay. Any other concerns raised by anybody with regard to Mr. Daniels?

A. Not that I can recall.

Q. Did anybody raise any concerns with you about Mr. Daniels about Mr. Kelly?

A. Rephrase that, please?

Q. Did anybody ever raise any complaint to you about Mr. Kelly other than Mr. Daniels?

A. Other people who worked with Mr. Kelly didn't particularly care for him.

Q. Okay. Who?
A. Variety of individuals over the years. I can't speak to specific names. People in the HR department didn't particularly care for him.
Q. What was the nature of the complaints about Mr. Kelly?
A. That he was very rule oriented, black and white relative to interpretation of policy, rules, whatever it may be, and very direct in trying to address those.
Q. And did you follow up on any of those issues and concerns?
A. The ones that needed to be followed up on. That is who Brian Kelly is. He's very rule based.
Q. Were you aware that Mr. Kelly used profanity when referring to Mr. Daniels?
MR. KOSTAKOS: Objection.
A. I'm not aware of that at all.
Q. Is that something that APC -- had you become aware of that? Is that something that's permitted at APC?
MR. KOSTAKOS: Objection.

MS. KISCH: Objection.
BY MS. KISCH:
Q. You can answer. Let me rephrase it.
A. Yes.
Q. With respect to the decision to terminate Mr. Daniels, does it matter whether or not he diverted those points from APC?
MS. KISCH: Objection.
BY MS. KISCH:
Q. You can answer.
A. No, it doesn't.
Q. Why not?
A. The -- by accepting the points, it gives the appearance of influencing his decision to do business that that particular vendor which is a direct violation of our ethics policy.
Q. It's the ethics policy that's been marked as Exhibit 3, is that correct?
A. That's correct.
MR. KOSTAKOS: No further questions.
MS. KISCH: I have a further question.