IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

- - - - - - - - - - - - - - - - - - - - - -

SETH DANIELS,

Plaintiff,

COPY

vs C.A. No. 05-00459-ML-LDA

AMERICAN POWER CONVERSION CORPORATION,

Defendant.

- - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF CHRISTINE BOLLMAN, called as a witness by counsel for the Plaintiff, pursuant to the provisions of Rhode Island Rules of Civil Procedure, before Victoria S. Reade, Professional Court Reporter and Notary Public, in and for the State of Rhode Island, taken at Law Offices of Stephen Robinson, 155 South Main Street, Providence, Rhode Island, on Thursday, October 12, 2006, commencing at 1:00 p.m.

travel manager in 1996?
A. No.
Q. Did APC pay for that certification training?
A. Yes, they did.
Q. When did you receive at that certificate?
A. I am thinking it was 1998.
Q. So you began that soon after you received the promotion?
A. Correct.
Q. Describe to me what your job duties responsibilities and duties have been as a corporate travel manger since 1996.
A. I administer the corporate card program, I negotiate all hotel, car and air flight contracts, I administer the corporate travel policy, our online booking and I think that's about it.
Q. Your first duty and job responsibilities is your administer the corporate what program?
A. Corporate card program, like a credit card.
Q. And tell me more specifically what your

Q. Okay.
A. I get involved.
Q. You get involved with the credit card company?
A. No. I get involved in the matter that they need obviously extra monies to travel, so the way we help them out is we know their profile, their travel profile to say that there is either no credit card or a limited credit card and if they want to ask, we can direct bill car and preferred hotels for them, rental cars.
Q. Are all individuals who's credit is either limited or they're declined on the credit card, are all such employees entitled to directly bill hotels and rental cars?
MR. KOSTAKOS: Objection.
A. Yes.
Q. Are there any other individuals who are entitled to directly bill other than those who actively applied for a credit card and the credit card company declines to give them a card?
MR. KOSTAKOS: Objection. You

can answer.
A. We direct bill hotel and car obviously for candidates who come for an interview, for employees that come for training that last longer than ten consecutive days and for customers.
Q. Are there any other individuals who are entitled to direct bill cars or hotels other than those you have just listed?
A. No.
Q. And is there a written policy that specifically outlines what you have just described as to who is allowed to directly bill rental cars and hotels?
A. Yes.
Q. And what was you role, if any, in creating that written policy?
A. Well, this obviously has always been an issue, direct billing a car and a hotel because if you direct bill a car and a hotel it is so much more that the employee does not have to put in their expense report.
In other words, if they just

have a hotel and a car, and we direct bill it they don't have to do an expense report, period. Can you go back to your question.

Q. My question was what role, if any, did you have in creating the written policy with regard to the direct billing that you just describe?

A. So as I mentioned, that is always an issue and we have to be very clear. We have many, many employees and we treat all employees the same and we notice that this became an issue that everybody wanted to have direct billing, we decided that we to need to put that in our travel policy.

Q. When you noticed that this became an issue and you noticed that everyone wanted to have direct billing, when was that?

A. That was in 2003 probably.

Q. And tell me a little bit more specifically who voiced, you said everyone wanted to have direct billing, which employees are you referring to?

A. Anybody that traveled.

Q. And how do you know everyone wanted to have direct willing?

A. Because our travel agents go requests for direct billing and direct billing is usually approved by me, so I would see an increase in trying to get approval for direct billing.

Q. Tell me about the approval process that you go through, walk me through the steps. Someone needs to rent a car, for example, walk me through the process of how the direct billing works.

A. If it is an employee and like he said, he applied for a credit card and was declined or has limited credit on their card, at the time they make the reservation with the travel agent they would ask to have their car direct billed.

And, as I mentioned before, it would be noted in their travel profile that they're allowed for direct bill, so they wouldn't even have to ask me for approval because it's already preapproved.

If there are others that ask for

direct billing, the agents would come to me and ask for approval.

Q. So if an individual doesn't have a credit card and they've applied for one and it's been declined or they have a credit limit on their card and, therefore, they can't afford to pay for the rental car themselves and go through the reimbursement process, the car rental agency would have a list of individuals that are allowed to directly bill; is that correct?

A. No.

Q. Well, you said there is a profile and that you wouldn't even need to be notified for permission.

A. That's through the car rental company. That is through our designated travel agency.

Q. So the individual would contact the travel agency for a rental car and a travel agent would have a list of the individuals who are allowed to directly bill; is that correct?

A. Same.
Q. And when did the policy first state what you just described?
A. At the first draft.
Q. In 1996?
A. Yes.
Q. And it's your testimony the policy specifically said that the APC employees must use the APC hotels?
A. Yes.
Q. They're required to use those?
A. They're required to whenever possible.
Q. So they're not required to?
MR. KOSTAKOS: Objection.
A. Well, that would say to me they're required to when it's possible.
Q. Well, what are the circumstances that APC would consider as legitimate reasons why it might not be possible to an APC designated hotel?
A. There might not be none in that city that they're traveling to.
Q. Any other reasons?
A. No.

A. The agents work off that book.
Q. Have you ever seen that book?
A. No.
Q. Do you know what hotels are on that book?
A. No.
Q. Do you know what hotels book in the Providence area?
A. No, I don't.
Q. And do you know if the hotels in that book has changed overtime?
A. I do not know that.
Q. If an individual is not able to make hotel reservations at either one of the hotels on the APC preferred hotel list or that is in the book that is maintained by the travel agency, what, if any approval, do they need to go outside those?
A. They don't need any.
Q. Are there any other policies, APC policies relating to booking hotels other than what you have just described?
A. No.
Q. Are there written policies at APC with regard to an employee's receipt of reward

and travel points related APC-related travel?

A. There are two policies. One is it says APC employees are allowed to keep their travel points, but it cannot influence their decision on air carries, they have to use the preferred, in other words.

And then the other is an HR policy that APC employees cannot keep any sort of gifts that are given to them by any vendors.

Q. Anything else that you recall about either of those policies or is that is?

A. No, that's it.

Q. Let's just look at the first one that employees are allowed keep travel points, but it can't influence their decision on the air carriers, they have to use the preferred; is that a written policy?

A. Yes.

Q. And when did that written policy come into effect?

A. 1996, first draft.

Q. And did you write that?

preferred hotel list; is that correct?
A. That's correct.
Q. Did an APC preferred hotel list come into existence?
A. Say that again, sorry.
Q. Did an APC preferred hotel list come into existence at some point?
A. Yes, it did.
Q. When?
A. 2003.
Q. And who created that list?
A. I did.
Q. And in 2003 where was that list maintained?
A. On the APC Intranet.
Q. And when was it posted on the Internet?
A. Sometime early in 2003 when we actually had an Intranet for the first time.
Q. You thought that was in March perhaps?
A. Yes.
Q. So was the APC preferred hotel list put on the Internet at the same time that the APC travel policy was also posted?
A. About the same time.

Q. Other than actually listing hotels, was there any other policy other than what you've already testified about with regard to the use of hotels?

A. No.

Q. I don't remember if I already asked you this, you created that list?

A. Yes.

Q. Did anybody assist you in creating that list?

A. No.

Q. And what considerations did you take into account in creating that list?

MR. KOSTAKOS: Objection.

A. We put preferred hotels out to bid every year and that list was created on what worked for that time, preferred hotels.

Q. What considerations do you take in deciding whether a hotel can accommodate the needs of the APC employees?

A. Previous relationships with the property, employee feedback. Generally I go inspect these hotels myself, so my opinion weighs in a little bit and then ultimately it's

were you talking with Mr. Daniels at all about whether or not high-speed Internet access was required?

A. I believe that was after I got spoke to the general manager who asked me why there was a sudden drop in room night from APC.

Q. Why don't you start with who was the general manager that you spoke with?

A. Carol Shibley.

Q. And did you speak with her over the phone or in person?

A. Over the phone.

Q. Did she call you or did you call her?

A. No, she called me.

Q. And when was that?

A. Late 2003.

Q. And tell me everything you recall during that conversation.

A. I recall her asking me that they have been used to a certain volume of rooms nights from APC and why there was a sudden drop, if I knew anything, if anybody was not happy with the hotel or if there were any other circumstances that I am aware of.

Q. Did you say anything in response to her?
A. No, I did not. I said I would try and check into it.
Q. Did she tell you what the actual drop was, how many rooms were normally used versus what was occurring at that point?
A. No.
Q. Did you inquire with her about that?
A. No.
Q. So you have no idea how far it dropped?
A. No.
Q. Did you ever look to see how many rooms were actually used in 2003 at the Johnson Wales Hotel?
A. We look at that on an annual basis.
Q. And do you recall how many rooms were rented at the Johnson and Wales Hotel in 2003?
A. No.
Q. Do you have any idea?
A. No.
Q. Do you have any idea whether it was more than ten?
A. Oh, yeah.

A. Probably.
Q. More that 750?
A. Right around that I would think, yes.
Q. You believe that in 2004 that APC used about 750 rooms at the Johnson and Wales Hotel?
A. That's a guesstimate.
Q. Do you know how many rooms were used during -- strike that.
After you got off the phone with Miss Shibley what, if anything, did you do next with regard to the issue of the drop of rooms at the Johnson and Wales Hotel?
A. I believe I contacted Seth to inquire if they had anything to do with the shift of, at that time I didn't know shift, but with the sudden lack of room nights that we were giving to the Johnson and Wales.
Q. Was Mr. Daniels the only individual at APC who was in charge of organizing rooms in the Providence area at hotels?
A. No.
Q. Who else?
A. Kim Distafano I believe I recall that

name.
Q. Did she work for Mr. Daniels?
A. Yes.
Q. Anybody else who was also in charge of organizing hotel rooms for APC employees in the Providence area?
A. Not that I am aware of.
Q. Did you call Kim DeStephano as well?
A. Yes.
Q. Did you call anyone else to inquire?
A. Not that I recall.
Q. Did you call the travel agent?
A. No.
Q. Why not?
A. I don't understand what information the travel agent would be able to give me.
Q. When you called Seth what did you ask him or what did you say to him?
A. I asked him if they are holding any kind of trainings anywhere that we're not aware of.
Q. That was a verbal conversation that you had with him?
A. I think there were several e-mails that I

asked him that question.
Q. How many e-mails?
A. At least three.
Q. And what did he say in response?
A. I got no response most of the time.
Q. Did you ever get a response?
A. Yes, ultimately I did.
Q. And what was the response?
A. The response was, no, we're not holding any trainings anywhere.
Q. Might you be misremembering what his response was?
A. Yes.
Q. You're sure?
A. I am sure.
Q. And he said they're not holding any trainings anywhere?
A. Correct.
Q. Any other responses other than that one that he gave you?
A. No.
Q. Are you sure of that?
A. Yes.
Q. And what did you ask Miss DeStephano, was

Q. Did you have any written correspondence with Mr. Daniels with regard to whether or not five rooms would be sufficient for the training needs of the individuals who were being trained in the Providence area?
A. I don't recall that there were any written conversations.
Q. Did you speak with anyone else other than Mr. Daniels with regard to the training needs for the individuals other than what you have already testified about?
A. No.
Q. Did Mr. Daniels tell you anything else other than what you've already testified to with regard the training needs of the individuals?
A. No.
Q. And were you satisfied at that point after speaking with Mr. Daniels with regard to the travel arrangement that were made for the individuals that were traveling to the Providence area for training?
A. I was under the understanding that those would go to the Johnson and Wales Hotel.

Q. Which ones would go to the Johnson and Wales?
A. Any kind of training that he possibly did if he was going to hold trainings in the future that they we would go to the Johnson and Wales.
Q. What was your specific understanding as to what would go to the Johnson and Wales?
A. Hotel room nights.
Q. Are you saying for all individuals who are traveling for APC and Mr. Daniels was organizing, that all hotel rooms would be reserved at the Johnson and Wales from that point on after that conversation?
A. No.
Q. Well, what was to go to the Johnson and Wales?
A. The portion that has gone to the Johnson and Wales in the past.
Q. What portion is that?
A. A large portion.
Q. Did you ever quantify that for Mr. Daniels?
A. No.

were?

A. I am not sure I understand the question.

Q. Did you ever inquire with anybody whether or not any rooms that were reserved for which Mr. Daniels had organizational responsibility for reserving, did you ever inquire with anyone whether any rooms were reserved at the Johnson and Wales?

MR. KOSTAKOS: Objection.

A. No.

Q. Do you know whether any rooms were ever reserved at any other hotels other than Johnson and Wales over which Mr. Daniels had organizational responsibility?

A. I know that now.

Q. And where were those rooms reserved?

A. At the Marriott.

Q. And when did you learn that?

A. I believe it was early March or February of '04.

Q. And how did you learn that?

A. I had a suspicion, so as the travel manager of American Power Conversion I reviewed some expense reports and it

quickly became clear to me that there was quite a bit of business going to the Providence Marriott.

Q. And you testified that as travel manager you reviewed some expense reports; what expense reports did you review?

A. Some individuals' expense reports that I suspected were here for a specified date that I thought some trainings were being held.

Q. And you said you had a suspicion, what was that suspicion based upon?

A. The sudden drop in the room nights at the Johnson and Wales and some day to day conversations.

Q. What day-to-day conversations?

A. Office conversations.

Q. With who?

A. With various people.

Q. Who?

A. I cannot tell you exactly who it was.

Q. What was the conversation?

A. I don't know. I don't know exactly what the conversations were.

Q. Well, do you remember anything about the conversations?
A. No.
Q. And you don't remember any of the individuals with whom you had these conversations?
A. No.
Q. Do you normally have access to expense reports for individuals in your role as the travel manager?
A. If I chose to, yes.
Q. Have there been other instances where you've reviewed expense reports for individuals other than this instance?
A. There has been, yes.
Q. Okay, when?
A. A long time ago and I don't remember the actual reason why I went through some expense reports.
Q. These were expense reports for individuals other than yourself?
A. Right.
Q. And about what year?
A. I don't recall.

Q. Were you travel manager at the time?
A. Yes.
Q. Was it prior to or after 2003?
A. Prior.
Q. And that was one instance?
A. It must have been a couple.
Q. And do you remember anything about those circumstances?
A. No, I don't.
Q. And you remember the individuals whose expenses reports you reviewed when it was prior to 2003?
A. No, I don't.
Q. Do you remember the outcome after you reviewed those expense reports?
A. No, I don't.
Q. In this instance in which you had a suspicion that the Marriott was being used, how did you gain access to the expense reports?
A. I went to accounting and asked them if I could look at the last week's pile of expense records.
Q. Who in accounting did you speak too?

A. I believe it was Mary Tipus. I also must have mentioned it to Brian Kelly.
Q. Did you tell them why you wanted to see those expense reports?
A. Yes.
Q. What did you tell them?
A. That I thought we were losing a large amount of room nights to another hotel.
Q. Did you say anything else?
A. No.
Q. And what was the purpose of looking at those expense reports?
A. To verify my suspicion.
Q. Were you trying to find out what hotel was being used?
A. Yes.
Q. How many expense reports did you look at; do you recall?
A. Probably around ten.
Q. Did you anyone else look at those with you?
A. No.
Q. And what hotels were the ten individuals staying at?

A. Marriott Providence.
Q. All ten?
A. Yes.
Q. Were you given copies of those expense reports, or did you look them at the finance department?
A. At the finance department.
Q. And you don't remember any of the individuals whose expense records you looked at?
A. No.
Q. Were those hotel rooms paid by the individuals staying at the hotel or was it a direct bill to APC?
A. Some were paid by the individual and then others had just other expenses, meals and such at the Marriott Providence.
Q. Did you have any knowledge one way or another whether all the individuals paid for their own hotel and then got reimbursed or whether or not anyone directly billed the hotel changes?
A. Well, after receiving all the unpaid invoices after Seth's departure it became

Q. And you have no knowledge one way or the other which way it occurred in the instance?

A. In this instance I know it wasn't through the travel agency because I would have known.

Q. And why would you have known?

A. Because they know what our preferred hotels are and if they would have been asked to book room nights a non-preferred hotel, they would have let me know.

Q. So you're sure that the travel agents that work near you did not book any of the hotels rooms at the Marriott at the time that we're talking about?

A. Correct.

Q. Did you ever ask them if they did?

A. No.

Q. How can you be sure then?

A. I guess I can never be 100 percent sure.

Q. If HR had known that rooms were being booked at the Marriott, would have been told or would you have known?

A. Probably not.