Q. They wouldn't communicate that to you?
A. I would think not.
Q. What, if anything, did you do after you looked at the expense records for these ten or so individuals?
A. I contacted the general manager at the Marriott.
Q. Who was that?
A. Scott Barter.
Q. And did you contact him by phone or e-mail or in person?
A. I think by phone and by e-mail.
Q. And how soon after reviewing the expense reports did you contact the general manager at the Marriott?
A. I think right away.
Q. And do you recall whether it was by phone or e-mail first, which one was first?
A. I don't recall.
Q. Describe for me your phone conversation with Mr. Barger.
A. I told him that my understanding was that we were doing quite a bit of big business with them lately and I was wondering what

kind of room night we have been giving them.

I also inquired if Mr. Daniels was given points for his trainings and I was also inquiring how these room nights and meeting space I believe he had as well was being billed to APC.

Q. Anything else that you said?

A. No.

Q. And what was his response?

A. His response was that in January he had 180 or 160 room nights, in February he had 180 or 160, I don't remember the numbers maybe I get them mixed up.

He also replied that Mr. Daniels had received I think so far 100,000 points and he mentioned that he sends the invoice to east Providence, the APC office in east Providence.

Q. He told you this over the phone or in e-mail?

A. E-mail.

Q. Anything else that he told you?

A. No.

Q. And are you sure he told you that Mr. Daniels received 100,000 points so far in that e-mail?
A. Yes.
Q. Where is the finance department located?
A. In West Kingston.
Q. Did he tell you who the invoices were sent to in particular?
A. I can't recall.
Q. Who is Jean, do you know?
A. Jean is accounts payable in West Kingston.
Q. Did he also tell you that he sent the invoice to West Kingston?
A. I think he did in that e-mail.
Q. And what, if anything, did you do next?
A. I think by that time Brian Kelly was already aware of what had transpired and I spoke to him and he suggested that I put an e-mail together on this issue and send it to human resources.
Q. Let me just back up a moment. What made you inquire whether or not Mr. Daniels received any points?
A. Because it's generally known in the

industry that if you send large, if you send groups to a Marriott property that you can gain some nice points, a nice amount of points. You earn points by bringing groups to Marriott.

Q. You knew that?

A. I knew that, yes.

Q. And what is your knowledge based upon?

A. You can go to marriott.com and it's under group meeting planning, it says it right there.

Q. You knew that prior to your inquiry?

A. Yes.

Q. And how knowledgeable are you with regard to how that program works?

A. Besides that the meeting planner can earn those points, I don't have any knowledge.

Q. So you said that Brian Kelly suggested that you write and e-mail and send it to HR, tell me what happened next?

A. I think that was shortly before he was terminated.

Q. Did you, in fact, send an e-mail to HR?

A. Yes.

Q. Did HR contact you after you sent an e-mail?
A. No.
Q. Did you speak with anyone after you sent that e-mail?
A. No.
Q. With regard to Mr. Daniels?
A. No.
Q. You spoke to no one at all?
A. It could be that I had a conversation with my boss because I would speak to him at least on a weekly basis, not a daily basis, but not HR.
Q. And who was your boss?
A. Who was my boss?
Q. Yes.
A. Brian Kelly.
Q. Brian Kelly was your boss at the time?
A. Yes.
Q. Tell me about all the conversations that you had with Mr. Kelly with regard to Mr. Daniels and this incident that you're describing with regard to the travel points and the hotel bookings at the

A. No, then it would get approved through the iProcurment process.

Q. After you expressed your suspicions to Mr. Kelly and what you found out after receiving the e-mail from Mr. Barger, did you say anything to Mr. Kelly with regard to this issue with Mr. Daniels?

A. Yes, I expressed my dissatisfaction that we would lose points at Johnson and Wales that we generally use for our Christmas party gifts to an individual who receive points pretty much can take a nice vacation.

Q. Did you say anything else?

A. No.

Q. Was the Johnson and Wales the only other hotel on the preferred list in the Providence area, the APC preferred list?

A. In East Providence or the entire Providence area.

Q. The Providence area.

A. No.

Q. There we other hotels?

A. Right.

Q. And if hotel rooms were booked at other hotels, I assume you wouldn't receive points at the Johnson and Wales, correct?
A. Actually, at the time there was one other hotel where we received points.
Q. Okay, but you wouldn't receive points at the Johnson and Wales, correct?
A. Correct.
Q. And was there any written policy or requirements with regard to whether or not -- well, strike that.
Did you ever inquire with travel agents to see whether or not the Marriott Hotel in their book of hotels?
A. No.
Q. Do you know if anyone else inquired from APC about that issue?
A. I don't know.
Q. Did you say anything else to Mr. Kelly other than what you've already expressed?
A. No.
Q. And what was Mr. Kelly's response to you?
A. He felt that was not right.
Q. What was not right?

Q. How many points would APC have obtained from the Johnson Wales had Mr. Daniels booked all of those rooms that were booked at the Marriott at the Johnson and Wales?

A. I couldn't tell that.

Q. Do you know how many points are generally received from the Johnson and Wales for a hotel stay?

A. You know what, I can't say exactly. I think it was one point per night.

Q. One point per night?

A. Yes.

Q. And how many points did you need in order to get a gift?

A. Well, the smallest one was $50 to Home Depot, Lowes.

Q. And how many points would you need in order to get a $50 -- was it a gift certificate?

A. Yes.

Q. How many points would you need in order to get a $50 gift certificate to Home Depot?

A. Fifty points.

Q. So points translated, it was $1 per point?

A. Yeah, I guess, yes, that would be correct.
Q. Is it your testimony that after you sent that e-mail to HR that you had no further discussions with anyone with regard to Mr. Daniels at all?
MR. KOSTAKOS: Objection.
A. Correct.
Q. How did you become aware that Mr. Daniels was terminated?
A. As the corporate card administrator I am cc'ed on hold terms.
Q. Did you ever make any recommendations that you thought that Mr. Daniels should be terminated?
A. No.
Q. Did you ever whether or not it was an official recommendation or not, did you ever express at all that you thought Mr. Daniels should be terminated?
A. I did not.
Q. Did you ever express to anyone that you thought what Mr. Daniels did was unethical?
A. Yes.

Q. Who did you express that to?
A. Brian Kelly and HR.
Q. And was this in writing or verbally?
A. I believe that was in that one e-mail.
Q. That one e-mail that you said Brian Kelly suggested that you write?
A. Right.
Q. And why did you think that what Mr. Daniels did was unethical?
A. I would have to go back to common sense that if we are not allowing employees to keep gifts whether it's, like I said, a purse, a leather purse or 100,000 points and taking those points away from other employees for the Christmas party that's just -- I guess you could argue whether it's unethical, but in my eyes it's unethical.
Q. If an individual is not booked at -- strike that.
Did you ever express to anyone that what Mr. Daniels did was fraud?
A. No.
Q. Did you give any other opinions as to what

you thought about the actions taken by Mr. Daniels?
A. No.
Q. If there are hotels in the book that travel agents have that are not on the APC preferred hotels list, will APC receive any points for stays at those hotels?
A. No.
Q. Did APC receive points for the stays at the Fairfield?
A. No.
Q. Is Comfort Suites on the APC preferred hotel list?
A. It must have been on the preferred list, yes.
Q. And did APC receive points for hotels rooms that were book up there?
A. No.
Q. Mr. Daniels could have booked hotel rooms at the Comfort Suites, correct, that would have been one of the APC preferred hotels?
A. Yes.
Q. And APC wouldn't have received points for their Christmas party for that?

A. No.

Q. Do you know whether or not Mr. Daniels actually inquired?

A. I don't know.

Q. Did you ever ask Mr. Daniels if he had inquired?

A. No, I did not.

Q. What did you say the price was at the Johnson and Wales at the time in late 2003, early 2004, what was the rate?

A. I think it was $65 or $69.

Q. Was that for all rooms?

A. I think there was a higher tier. I usually book the lower, the $65. I don't remember what the cost was of the higher one.

Q. Is there just two tiers or three tiers or four tiers?

A. I think there was two.

Q. Are you pretty sure about that?

A. Not 100 percent.

Q. Was there ever an issues with APC employees who booked a higher rate room at the Johnson and Wales?

that it really was a non-issue.

Q. Well, did you receive communications from anyone at the Comfort Suites that the Internet was necessary to do their homework?

A. From the Comfort Suites, no.

Q. Well, why did you contact the Comfort Suites or why did you intervene in any way to make sure that the Internet access was up and running at the Comfort Suites?

A. Because I am getting an e-mail from Kim telling me that is an issue.

Q. I thought you said you heard from Kim and another individual, that's not true?

A. No, I misunderstood.

Q. You only heard it from Kim?

A. Right.

Q. Are you aware that Mr. Daniels' car was broken into at some point?

A. Yes.

Q. And what's your knowledge with regard to that?

A. I remember he called me that that's what happened.

Q. Mr. Daniels called you and told you?
A. Yes, I believe he did.
Q. And do you remember what he said during that conversation?
A. That he was at Bugaboo Creek Resturaunt and that his laptop was stolen and I asked him right away that how this would happen and he said that he left his computer either on the front seat or on the back seat or in obvious sight in the car.
Q. And did you say anything else?
A. I said that was pretty stupid, wasn't it.
Q. And what did he say?
A. I remember he got pretty upset with me and he was inquiring as to why we did not have theft insurance included in our corporate rate with Avis and I think that was about it.
Q. And did you ask them anything else during that phone conversation?
A. I don't recall anything else on the phone conversation.
Q. Nothing else significant that you can recall?

broken into?
A. No.
Q. What else did Mr. Kelly tell you?
A. That's it.
Q. What else did you say in response to that?
A. Nothing really.
Q. Well, did you say anything in response to that or you just said nothing?
A. No, I didn't say anything. There is nothing for me to say.
Q. Do you even know why Mr. Kelly was telling you this?
A. Well I think because he was my boss and we have both had issues with this individual and so it came up as a conversation, in a conversation.
Q. What issues have you had with Mr. Daniels up to this point?
A. Well, the direct billing I had with the rental cars, the Marriott, again, I can't recall exactly when I had this conversation about his expense reports took place, before or after.
Q. Did Brian Kelly tell you what, if

anything, he found after looking into
Mr. Daniels's expenses?
A. No, he did not.
Q. What was the issue with regard to the
direct billing of the rental car?
A. He felt like it should be direct billed on
a rental car every time he came to Rhode
Island.
Q. Did he specifically talk to you about
that?
A. Yes, he did.
Q. Tell me specifically what you recall him
telling you.
A. He wanted to have, as I said, his car
direct billed. I asked him to as to what
the reason was and he said that he just
wanted the car direct billed.
I told him that our policy was
that if you cannot get a corporate card,
if you have a limit on your corporate card
or if you stay for more than ten
continuous days for training that we could
direct bill the car or if he was --
obviously at the time he was not a

candidate and he was not a customer.
He responsed to me that he did not want to apply for an American Express corporate card.
Q. And did he tell you why?
A. No.
Q. Did you ask him why?
A. I did.
Q. You did ask him?
A. Yes.
Q. And what was his response?
A. He said I just don't want to apply for an American Express corporate card.
Q. Do you have any knowledge whether or not Mr. Daniels was having financial issues?
A. No.
Q. And did you approve or not approve the direct billing of rental cars?
A. I did not approve it.
Q. Did Mr. Daniels ever directly bill rental cars?
A. He could have. There is always that one time when an agent doesn't ask the individual why or come to me and ask for

approval or he could have done it through the after hours service which would have not really had all the details about a policy, there is always that chance that he could have.

Q. What's the after-hours service?

A. That's our emergency service travel -- if you travel after hours, an emergency service.

Q. And how does that process differ?

A. Well, it's a call center in St. Louis that just picks up calls from customers really anywhere in the United States.

Q. Do they have a list of the profiles that you were talking about earlier?

A. Yes, but once in a while they don't go and look in those profiles.

Q. And I assume you're not available after hours for approval if someone has to direct bill and they're not in the profile?

A. I do once in a while get calls, yes.

Q. Did any other employees approach you and ask that they be able to direct bill any

which individuals inquired about directly billing?

A. Probably not.

Q. About how many of them did you discuss with Mr. Kelly?

A. I don't recall discussing any with them really.

Q. Any other conversations with Mr. Kelly other than that one that you had with regard to Mr. Daniels requesting to directly bill rental cars?

A. Well, he requested it on a number of occasions, so I don't recall if I had a second or third conversation with Brian.

Q. Do you remember any other details of any other conversations you had with Mr. Kelly with regard to the issue of direct billing for Mr. Daniels?

A. No, I don't.

Q. Did you speak to anyone else other than Mr. Kelly with regard to this issue?

A. One of the agents probably who was asked to direct bill and came to me.

Q. And they came to you asking whether or not