conclusion from that because of what Brian had said he had given the documentation because without it he was very clear he would not be given the documentation.

Q. Who is Mike Cox's supervisor?

A. It was John Bonzani.

Q. Do you know who the employee was who had this issue with the receipts?

A. I don't recall.

Q. Do you remember if he was white?

A. I don't recall that I met him.

Q. David McDaniel, what was the nature of his complaints against Mr. Kelly?

A. Similar thing.

Q. He himself?

A. No, one of his techs didn't have receipts.

Q. It was a similar situation. Did you get involved?

A. I didn't. I took the complaints, and the tech was able to find the receipts. That null and voided that.

Q. In addition to the two supervisors who came to you, there were a few employees who complained about Mr. Kelly, as well?

A. I only remember one specific instance, and

it was a fellow generalist of mine. We just talked about Brian being difficult to work with. It wasn't a formalized complaint. Frankly, it was just griping, can you believe how tough this is, all these different situations.

Q. How tough is it to work with Brian Kelly?

A. Right. We also commiserated. We found a way to work with him. We were successful in working with him.

Q. Who was the other generalist?

A. Mary Rudy.

Q. Do you remember anything more specific about what she said that it was difficult to work with Mr. Kelly?

A. No, I just remember sitting in her office and kibitzing about it. It wasn't anything memorialized.

Q. What specifically do you recall of that conversation?

A. That is all. I remember us frankly saying thank God we have figured it out. A way to work with him.

Q. When you say thank God, why, what would have happened if you didn't figure it out?

A. It would you have been more difficult.

There wasn't anything more specific that would have happened.

Q. Going back to when Mr. Kelly was loud and what was this guy trying to pull, that was all related to him filling out the W-4 form, correct?

A. Yes. This is all within the first week of employment. There is a window they have to file those forms.

Q. Did you ever ask Mr. Daniels what the basis was for filling out the W-4 form in the way that he did?

A. I went back up to East Providence, and having sat down with Seth, and delivered the message, and said: I am not a payroll person. This is the message I am getting from Brian. You need to put something other than exempt. Seth got fairly belligerent with me. I remember being surprised. This was outside of the interview process my first interaction with him. So I was surprised. I didn't understand where had -- it doesn't seem like that big a deal to me.

Q. You didn't think it seemed that big of a deal as to whether or not on his tax form he was exempt or not exempt?

A. No, except or how many exemptions for the

amount of belligerence he was showing towards me, I was like we need to just clarify this issue, and move on. I didn't anticipate Seth's reaction what it came to.

Q. When you went to him did you tell him he needed to actually change what he had on his tax form?

A. I went with a new tax form. Because Brian had given me a new one to fill out. And said this is what I have been told unless you file in the past exempt, then there are subject other regulations that I don't necessarily know. And I said I don't know. This is what I have been told. Frankly I thought perhaps he had made a mistake. A number of people don't fill out those. Then it was clear to me in speaking with Seth, no, in fact, he didn't make a mistake, and he was adamant that that was the way it was going to be. And that is when I sort of had this -- then it sort of escalated from there very quickly. Seth was very belligerent about it. And had John was mad.

Q. When you say belligerent?

A. He back at me, it was his tone I am not changing that form. I am not doing it. I didn't anticipate that reaction.

Q. Other than saying I am not changing that form, what else did he say that you felt was belligerent?

A. It was, again, it was this fiduciary responsibility question. He said, because I said, well, Brian said he has fiduciary responsibility. He doesn't have fiduciary responsibility over me. But I said he has fiduciary responsibility for the company, and you work for the company. And I said does that make sense? And he kept saying to me, he doesn't have anything over me. I did not remember being surprised by that reaction.

At that point I let Brian Gough know. I don't know what is going on here, but I don't know what fiduciary responsibility is I am not a payroll person. I don't know what fiduciary responsibility Brian Kelly has in this situation. And I let him know.

Q. What if anything did Brian Gough say?

A. I recall he said he would go back to Brian Kelly. And find out about the situation. I was in East Providence, and Brian Gough was in West Kingston. It was easy to bop over. At that point their offices were next to each other. At some point Brian Kelly moved.

been stolen?

A. Yes.

Q. Why?

A. For a couple of reasons. I felt by the time the laptop had been stolen there had been several other situations where I felt like Seth had not been forthcoming. And there were questions about the way he was handling situations. Additionally, I was aware he had not produced a police report about the issue, which I know had been asked of him. And I think I didn't understand if someone had had something stolen, sort of his reaction didn't compute to me when someone had had something stolen. It just didn't feel right. There was something funny about it, but that was my feeling.

Q. Well, describe to me what his reaction was that led you to feel that there was something that wasn't right?

A. I think that sort of -- the laptop was in the back, as I understand it, the laptop was in the back of the car in full view, and he didn't take ownership there was a better way to handle that. There had been questions about his expenses. And the receipts were in this stolen laptop. Then the

fact that he got a laptop back from us, and he also continued to seek reimbursement from the restaurant didn't seem to me to be ethical. So I questioned whether he was being ethical.
Q. Did you question that with someone in particular or just in your own mind?
A. In my own mind, and with Brian Gough.
Q. When he was seeking reimbursement from the restaurant is that something he disclosed to APC?
A. I am not sure. I don't know.
Q. Do you know whether he ever got reimbursement from the restaurant?
A. I do not.
Q. If he could get reimbursement from the restaurant for the stolen laptop, and then give that reimbursement to APC, wouldn't that have been in APC's best interest?
A. It wasn't Seth's responsibility to seek that reimbursement, it would have been the responsibility of the IT Department, and, frankly, perhaps Brian Kelly to do that. So, again, in the way that he went about it just seemed not up and up to me.
Q. If Mr. Daniels felt in any way, if he felt upset that his laptop was stolen, and his rental

car was broken into outside of a restaurant, and he took initiative to get reimbursement for the company that actually should be commended for doing?

MR. KOSTAKOS: Objection.

THE WITNESS: Not in the way he handled it. How he handled it resulted in the restaurant owner calling into APC, and complaining.

BY MS. KISCH:

Q. What did the restaurant owner say?

A. That he was belligerent.

I did not speak to the restaurant owner.

Q. Which restaurant owner told you that?

A. Gough.

Q. What did he specifically tell you other than what you already said?

A. Frankly he said that Seth was being an asshole.

Q. Did he say the restaurant owner said that?

A. What I recall is him saying, Brian Gough being frustrated and saying to me: This restaurant owner guy called. He said, Seth is being an asshole. I didn't believe we are going through this. When is this guy going to get it through his head: Honest to God, had the same conversation

with the same people over and over again his entire employment. It was just like, okay, I said, let me know what you need me to do. And he said: I will let you know. And he vented some more. And I said: Okay.

Several weeks later time, as I recall it, I was sent down to the police station to obtain a police report. It was my understanding at that point that Seth had not yet provided the police report.

Q. When you went down to the police station was there in fact a police report regarding the stolen laptop, and the breaking of Mr. Daniels rental car?

A. There was a police report. I didn't read it. So I don't know what the police report said.

Q. But it was regarding this particular incident?

A. Yes.

Q. Which resulted in what Mr. Daniels his laptop had been stolen?

A. That is what he said, yes.

Q. That is what this police report was regarding?

A. Yes.

Q. Are you aware of any other individuals who violated the travel policy?

A. What I don't specifically remember if reimbursements was part of the travel policy or not. I am unable to answer that question.

Q. Are you aware of any individual who violated the policies with regard to reimbursements, other than that individual we just spoke about, I can't think of the name?

MR. KOSTAKOS: Julie Kelly.

THE WITNESS: Julie Kelly. Yes.

BY MS. KISCH:

Q. Who violated the policy with regard to reimbursements?

A. Seth was terminated for receiving kickbacks and so that was in violation of the policy around gifts, and I believe the travel policy spoke to credit use or how to use your credit card, and things like that, that I recall correctly. And so my answer to the question would be Seth.

Q. Are you aware of any other individuals who you believe violated the policy on reimbursements?

A. No, not that I can think of off the top of my head.

Q. What information, if any, tell me what

information you know about Seth allegedly receiving kickbacks?

A. I don't know a lot. What i do know is that Seth's employment was terminated for receiving --

Could you ask me the question again?

Q. Tell me what you know about Seth's termination, I will change the question.

A. That is easier. Brian Gough called me, and requested that I to go Paul Kavanagh's office late on a Friday afternoon. It was after 4:00. Frankly, I remember I had dinner reservations that evening and I was concerned about making them. And Brian called me, and said: I need you to go over to Paul Kavanagh's office to sit with Paul. We are going to terminate Seth's employment. I said: Okay.

Q. Did he tell you anything about the reasons why they were going to terminate him at that time?

A. He told me that Paul knew what he needed to say, and that it was for, frankly, I think he said something about this craziness with the Marriott. I was not completely aware of what was going on with the Marriott. His tone was urgent, and I knew not to ask too many questions, so I just went over there.

Q. Why do you say you knew not to ask too many questions?
A. Just because of the urgency that was in his voice.
Q. Did he say anything else to you about why he was being terminated at that point?
A. Not at that point, no.
Q. And did you speak to anyone after you spoke to Brian Gough?
A. No. I hightailed it to Paul Kavanagh's office.
Q. Did you get to Paul Kavanagh's office before Seth's Daniels came?
A. Yes.
Q. Did you speak with Paul Kavanagh about the issue of the termination?
A. Briefly.
Q. What did he tell you?
A. He told me we have to get Seth in here. There was some urgency, because I believe Seth was going home that evening on the train. And there was some concern we would miss him when he got on the train. We outlined what Paul was going to say, what I was going to say, and we brought Seth into the room.

Q. What was Paul's demeanor?
A. I would call him excited but not like happy excited. I would call him nervous excited, agitated I would say.
Q. Did he express anything to you why it was so urgent you terminate him before he went home for the evening?
A. It was related I understood to the train ticket, and we didn't want to buy another train ticket coming back up on Monday.
Q. What did you discuss -- well, you said you went over what he would say, and what you would say?
A. Yes.
Q. Did you discuss anything other than what you actually said?
A. No, I remember asking him if he was okay, because Paul was pretty agitated.
Q. What did he say, his response?
A. He said: I can't fucking believe this. I can't believe this fucking guy did this. At that point I sense going through it with him was going to aggravate him more. So I went into, it is going to be fine. We will handle this. It will be okay. I just went into soothing mode.

Q. Did he say anything else to you at that point?

A. No.

Q. Did you say anything else to him?

A. No.

Q. How soon after you got there did Seth come?

A. Very soon, minutes.

Q. Tell me what happened upon Seth's arrival, Mr. Daniels arrival?

A. Paul went out to get Seth, Seth came in. Paul said basically two sentences. And then Seth looked surprised. And then I went into my speech about HR benefits. And then asked if he could go to his desk, and get his things. Paul said, yes, which was not our normal practice. Seth got up, and went outside very quickly, out of Paul's office, and beelined into his desk, Seth's desk, I shot out after him very quickly. Frankly I was running because Seth was moving quickly, and his legs are somewhat longer than mine. It was a little bit Keystone cops. And we got to his desk, and he started taking all kinds of stuff off of his desk. I asked him not to do that. I told him he could take his personal effects. He was moving fairly frantically. And then he said: I want to

talk to my team. And I said: No. You can't talk to your team. And he stood up, and gathered all of the people in his team who sat around him, and said: I want to meet with you in the conference room right now. He gathered everybody in, following me again. And he got in there and said, that he had been fired, and he didn't get much farther than that, at which point for the first time in my career I yelled at him, and said: You need to stop immediately. And told him that that was it, he was done. And he needed to get up, and he left with me back to his desk where Paul was standing, and then Paul walked him back out. I went back into the training room where he had gathered his staff, and said: You guys okay? How is everybody doing? And Paul walked him out.

Q. Who in his staff was he addressing?

A. I don't recall specifically who was in the room.

Q. How many people?

A. Five probably. Julie was there. Julie Sapola was there. Ed Maligaya, M-A-L-I-G-A-Y-A.

Q. Did anybody in there say anything to you at that point?

A. Afterwards?

Q. Yeah, when you said: Is everyone okay? Did anyone respond?

A. People were shocked, and just said: What just happened? And then we made plans to meet the next day, which was a Saturday, to discuss what was going to happen with training, because we had just terminated the manager.

Q. Did you ever explain to them the reason why he was terminated?

A. No. No one asked either.

Q. When you started out you said Paul said sentences. What were those two sentences?

A. I remember him saying -- the only two that I remember him saying were I can't believe you did this, but we are firing you for receiving kickbacks from the Marriott. That is what I remember him saying.

Q. And did Seth say anything in response?

A. I don't remember Seth saying anything. I just remember him leaning over, and looking shocked. That is what I remember. Then I remember him saying, and shooting out the door, and that whole other thing started. That is what was remarkable about it to me.

Q. Did you ever learn the factual basis for

A. With me it was her favorite topic of conversation. It was one of the few issues we had in common that we worked on. I did not see her that frequently. She was the exempt, and exemptions conversation, because she had to file the W-4 so she knew about that.
Q. Do you know if she had knowledge about any other issues with regard to Mr. Daniels other than that one issue?
A. I know that Seth had been in communication Bonnie with several different times about payroll related issues. And she thought he was rude.
Q. Did she ever express in what way she thought he was rude?
A. She called him an ass, but I don't remember specifically. She just called him an ass.
Q. Did she call anyone else an ass?
A. I don't recall, again, our interaction was fairly limited, and every time I saw her for a period of time, that is what she talked about, so I don't recall her speaking about anyone else frankly her name was Bonnie Smith. I believe she is retired.
Q. You have mentioned throughout this deposition a lot of references to Mr. Daniels

as being an ass and a lot of profanity that was used in reference to him?

A. Yes.

Q. The use of profanity at APC something that is normal or something that regularly occurs?

MR. KOSTAKOS: Objection.

THE WITNESS: Is the use of profanity, I wouldn't say it was normal, it is not unusual, but it is not the norm. It is not shocking, let's me say that.

BY MS. KISCH:

Q. Is it unusual for so many individuals to be referring about an employee with the use of profanity?

MR. KOSTAKOS: Objection.

THE WITNESS: People's feelings about Seth were unusual I would say.

BY MS. KISCH:

Q. Did you have a sense of why there were such strong feelings against Seth at APC?

A. Do I have a sense of that?

Q. Yes.

A. I have my, you know, I can speak to what I know.

MR. KOSTAKOS: Object to the question. Go

ahead.

THE WITNESS: Seth was not a nice person. He frequently pushed too far. He frequently sort of ran over people. He wasn't a good listener. He was unable to take personal responsibility for situations that he was in, and therefore sort of behaved in a different way. He is a very difficult person to work with.

BY MR. KISCH:

Q. Is Mr. Kelly a nice person?

MR. KOSTAKOS: Objection.

THE WITNESS: I think Brian was nice to me. He was.

BY MS. KISCH:

Q. Do you think he was a nice person in general in the way he treats people?

MR. KOSTAKOS: Objection.

THE WITNESS: I think he has a soft side. I think he comes on strong and soft underneath. I don't think that about Seth. Brian would given the facts of the situation, and some time, respond rationally, and appropriately. I can not say the same thing about Seth.

BY MR. KISCH:

Q. In which situation did Seth not respond

rationally?

A. He just would not, he just didn't let things go. He just wouldn't give up. When people would say it was this way, he wouldn't accept it, and he would push and push and push. He didn't understand social boundaries, meaning social grace boundaries. He didn't understand that.

Q. Can you give me some specific examples of what he wouldn't let go where he pushed and pushed and pushed?

A. The payroll issue is one of them.

Q. What do you mean the payroll issue?

A. The exempt, nonexempt issue, Blackberrys issue, or the cell phone issue. From what I understand from the restaurant owner he pushed, from what Brian told me about the restaurant owner he pushed and pushed and pushed there so much so we had a complaint made.

Q. What did he tell you about how Mr. Daniels pushed, what do you know?

A. Just that he was rude, and, I don't remember, I just remember that he was rude, and wouldn't let things go.

Q. Do you know any specific facts or specific conversation between Mr. Daniels, and the

Q. You don't have any memory at all about sending Mr. Kavanagh an E mail talking about the Brian Kelly issue?

A. I don't remember specifically what part of this, or what instance this was. This was an ongoing theme through his entire employment, so it is not a specific situation.

Q. Do you recall if there was -- let me ask you this, you mentioned that drug tests are given to individuals, correct?

A. Yes.

Q. And they required to pass those drug tests in order to be employed by APC?

A. Yes.

Q. Do you recall an instance where an individual had been offered employment, was on the train on the way to APC, and then you got the results of the drug test, and the individual failed?

A. Not specifically. I remember an instance where an individual was supposed to get on the train, and he did not get on the train, and he failed the drug test.

Q. You don't recall an instance of going to the train station with an individual that had

failed the drug test?
A. No, I recall an instance where there was discussion about going to the train station. We did not go to the train station because the individual never got on the train.
Q. That discussion, was that with Mr. Daniels?
A. Seth was in the room when the conversation happened.
Q. Okay. Who else was in the room?
A. I remember it being the supervisor, the field service supervisors were there. And Seth was in the room, it was a Conference Room 4, and I walked in.
Q. Do you remember who else was there, who specifically in the field service supervisors were there?
A. I specifically remember Mike Cox was there.
Q. Anybody else?
A. No.
Q. But there were other individuals, as well?
A. Yes. I don't remember specifically other than Mike.
Q. What specifically do you recall being said?
A. I walked in and said: I need somebody to go with me to the train station. I have this tech

coming up. And relaying the situation that he had failed the drug test. I understand him at that point to be coming north. I learned shortly after that he wasn't. I needed someone to go with me to the train station.

Q. Do you recall requesting that Seth come with you?

MR. KOSTAKOS: I don't recall.

THE WITNESS: I don't recall specifically requesting anybody come with me. I just said I needed somebody to go with me. I wasn't comfortable going alone.

BY MR. KISCH:

Q. When you say you don't remember or you remember that you didn't specifically ask Mr. Daniels to come with you?

A. I didn't specifically ask any one person. I asked someone to come with me to the train station. That is why I know it was a management meeting because I made it a blanket statement. I was nervous about going alone.

Q. Did, in fact, you understood that someone would accompany you?

A. Seth offered to go.

Q. You don't recall saying to Seth that you

would like him to come because he would scare the shit out of a person?

MR. KOSTAKOS: Object.

THE WITNESS: No, I don't recall saying that.

BY MS. KISCH:

Q. Are you aware whether or not Brian Kelly was looking at Mr. Daniels' expense reports, and cross referencing his reports with other individual's reports?

MR. KOSTAKOS: Objection.

THE WITNESS: I don't remember cross referencing his reports, I don't know.

BY MS. KISCH:

Q. Are you aware whether Mr. Brian Kelly was trying to find problems in Mr. Daniels' expense reports?

MR. KOSTAKOS: Objection.

THE WITNESS: I am not aware that he was trying to find problems.

BY MS. KISCH:

Q. You are not aware one way or the other?

A. No, I wasn't aware that he was trying to find problems.

Q. Did Brian Kelly discuss with you what he

had you some doubts about whether or not the laptop that he was given was stolen?

A. Okay.

Q. Did the fact that he sought reimbursement for lunch for four people when three of them gave money for that lunch, also figure into your conclusion about his credibility as to the stolen laptop?

A. Yes.

Q. Did Seth Daniels ever come to you and say that anyone was harassing him or discriminating against him because of his race?

A. No.

Q. Did he say anything to you in his tenure there that would have led to you conclude that he had been harassed or discriminated against because of his race?

MS. KISCH: Objection.

MR. KOSTAKOS: You can answer.

THE WITNESS: No.

BY MR. KOSTAKOS:

Q. Did you ever observe anybody -- strike that.

Did you ever observe anybody engaging in any conduct that you would have concluded to have

been harassing or discriminatory toward Seth Daniels?

MS. KISCH: Objection, calls for legal conclusion.

BY MR. KOSTAKOS:

Q. You can answer.

A. No.

Q. Are you aware of any complaints regarding harassment or discrimination made by Seth Daniels to anyone at APC?

A. I am not.

MR. KOSTAKOS: No further questions.

EXAMINATION

BY MS. KISCH:

Q. I have one question.

A. Sure.

Q. And that is we had served a subpoena on you.

A. Yes.

Q. And it had asked for, there was an attachment with regard to documents?

A. Yes.

Q. Did you have any documents that you brought with you today?

A. No.