IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

COPY

- - - - - - - - - - - - - - - X
:
SETH DANIELS, :
:
Plaintiff, :
:
v. : Case No.: 1:05-cv-00459
:
AMERICAN POWER CONVERSION : Judge Mary M. Lisi
CORPORATION, : Magistrate Judge Lincoln D.
: Almond
:
Defendant. :
:
- - - - - - - - - - - - - - - X

Thursday, October 5, 2006

Washington, D.C.

Deposition of:

JOHN J. BONZANI,

a witness was called for examination by Counsel for Plaintiff, Lori Kisch, attorney at law, pursuant to Notice at the offices of Wiggins, Childs, Quinn & Pantazis, 7 Dupont Circle, Northwest, Suite 200, Washington, D.C. 20036, commencing at 10:00 a.m., there being present on behalf of the respective parties:

A P P E A R A N C E S:

ON BEHALF OF PLAINTIFF:

WIGGINS, CHILDS, QUINN & PANTAZIS
BY: LORI KISCH, ATTORNEY-AT-LAW
7 Dupont Circle, N.W.
Suite 200
Washington, D.C. 20036
Telephone: 202.467.4123
Facsimile: 202.467.4489

Q. What were you job duties or role in that position?

A. I was responsible for the service operation of the three-phase UPS and air products in North America, the U.S. and Canada.

Q. Did you supervise any individuals?

A. Yes, approximately 130.

Q. Did you have authority to -- well, did you hire any of those individuals that you supervised?

A. Yes.

Q. Okay. Was Mr. Daniels one of those individuals who you hired?

A. Can you clarify "hire"? I made the recommendation. I don't or can't -- I just make the recommendations. I don't direct hire. It is approved by HR and senior management for an open position. They create the offer letters, send out the documents.

Q. Other than creating the offer letters and sending out the documents, what else does HR do? Do they have any other role other than sending out the offer letter and creating the documents?

A. They, you know, did the background checks,

A. No, I believe that there was more than one phone call to discuss the opening and whether he would be interested in what the opening was.

Q. Okay. Did you have that initial discussion with Mr. Daniels or with somebody else?

A. I believe it was me.

Q. Okay. So you had more than one phone conversation with Mr. Daniels with regard to hiring him?

A. I believe so.

Q. Okay. Is it your testimony that you don't believe anybody else was on those phone calls with you?

A. Not that I'm aware of, no.

Q. Okay. Other than Mr. Daniels of course?

A. If Mr. Daniels had somebody on the other end of the phone, I would not be aware of that.

Q. Right. Do you recall whether there were more than two phone call conversations with Mr. Daniels?

A. No, I do not.

Q. Okay. Do you believe there were just two?

A. I believe there was a number, more than one. I do not know the exact number, but I seem to recall somewhere in the neighborhood of at least two.

Q. Okay. After the second phone call in which you conducted an interview with Mr. Daniels, did you at that point have an opinion as to whether or not Mr. Daniels should be hired?

A. Yes.

Q. And what was that opinion?

A. That he should be hired. He had the qualifications, and, in fact, we were very interested in him. I personally was very interested in him in this role.

Q. Okay. Did you express to anybody the fact that you thought he should be hired after that phone call?

A. Not in that manner. The expression was to bring him in to go through the process of HR interviewing any other people, that he had the qualifications that I was interested in for that position.

Q. Who did you tell that you were, in fact,

interested in Mr. Daniels filling the open position?

A. Her name was Christine Hendrix, who was the HR representative for AGS, which is the division that I was in.

Q. Did you tell anybody else other than Christine Hendrix?

A. Pardon?

Q. Did you tell anyone else other than Christine Hendrix that you, in fact, wanted Mr. Daniels to fill this open position?

A. Yes.

Q. Who did you tell?

A. Paul Kavanagh.

Q. Anybody else?

A. There might have been passing conversations, but nobody that I recall.

Q. Okay. What, if anything, did Mr. Kavanagh say to you when you told him that you would like Mr. Daniels to fill this open position?

A. I don't recall quite exactly what was said. But, if the process moved along, he okayed it.

Q. He okayed it at that time when you told him?

A. To bring him in for an interview, that he had met the qualifications. If I was interested, get the process started.

Q. Okay. Describe for me the particular steps in the process that occurred next.

A. I can tell you what the process is; I don't know the particular steps in that case. I'm out of the loop when it comes to that.

Q. Okay. Well, is it anything other than what you already described to me earlier?

A. No.

Q. Okay. Is it your understanding that Mr. Daniels, in fact, went to meet in person with Christine Hendrix after you had recommended that he fill the position?

A. I believe so.

Q. Okay. What, if anything, did you hear next?

A. The next was what the offer would be, and it was okay to push through.

Q. Did you talk to Mr. Daniels on the phone when you interviewed him about an offer?

A. Yes.

travel?

A. APC tickets were all done direct bill. Normally, the cars, the rental cars, and the hotel rooms were picked up by the field service engineers in our division. As for the rest of the sales department, I don't know.

Q. Do you know with regard to Mr. Daniels whether or not APC's policies on direct billing would have allowed for him to directly bill rental cars and hotels when he was traveling for APC?

A. Not under normal circumstances.

Q. Is there a particular written policy that would explain that?

A. (Smiling) A written policy, no.

Q. Why did you respond in that manner, that that question was a little bit humorous?

MR. KOSTAKOS: Objection.

A. BY THE WITNESS: Written policies are not the norm at APC.

Q. Okay. How did APC communicate that? If it didn't have written policies, how did it communicate its policies to the employees?

three-and-a-half-year period. I'm wondering if you had communicated that at any other point?

A. I would imagine it came up in conversation prior to me taking the job at some point or another.

Q. Okay. Any other verbal communications with regard to discrimination or harassment that you can recall, specifically with regard to APC's policies?

A. No.

Q. Okay. Were you aware at all of Mr. Daniels' concerns about having to pay for his travel-related expenses through his own credit card versus the direct billing?

MR. KOSTAKOS: Objection.

A. BY THE WITNESS: Can you say that again?

Q. Yeah. Were you aware of Mr. Daniels' concerns about having to pay for his travel-related expenses out of his own credit card versus the direct billing of APC?

MR. KOSTAKOS: Objection.

A. BY THE WITNESS: The normal policy is that people were reimbursed when they turned in their expense reports. The normal policy did not have

direct bill for employees.

Q. Okay. That wasn't my question, though. Were you aware of Mr. Daniels' concerns about having to pay for all of his travel-related expenses on his own and then get reimbursed versus direct billing?

MR. KOSTAKOS: Objection.

A. BY THE WITNESS: Yes.

Q. Okay. And how did you become aware of those concerns?

A. It was brought to me that he was having issues with the amount of money that it was taking.

Q. Do you recall when he came to you about that?

A. The only thing that I do recall is that he had come to me and stated that he had direct billed a rent-a-car because he was having trouble with the paying for it and getting reimbursed.

Q. What, if anything, did you do in response to his stated concerns?

A. At that time to me he had gone to direct bill and it had been okayed. It was my understanding that it was taken care of.

Q. It was your understanding that APC would allow him to direct bill his rental cars; is that what you said?

A. At that time he had already had a rent-a-car when he came to me that had been directed billed; so, yes, it had been direct billed and APC had okayed the fact that he could direct bill. It had to be okayed by somebody other than me. I did not have the ability to say direct bill or not.

Q. Okay. Well, if Mr. Daniels -- I'm not quite sure I understand your answer -- had direct billed a rental car, then why was he coming to you with any concerns?

A. That it had been raised that there were issues with him trying to direct bill and that was not normal company policy for individuals to direct bill on a regular basis.

Q. Do you know whether there were any exceptions to the normal policy? You said it was not the normal policy for employees to directly bill; correct?

A. Correct.

A. I don't understand.
Q. Well, did you like Mr. Kelly?
A. He was a personal man who did the job he was supposed to do. The way he went about the job wasn't always the right way to do things in my opinion. He was a numbers guy, straight numbers, yeses and nos. If the numbers worked and things were right and you could explain things, you were okay.
Q. Well, you said there was a way in which he went about his job which you didn't agree. What did you disagree with?
A. I don't agree that there is always a yes and a no, but I'm not an accountant, either.
Q. Can you give me an example of when this arose?
A. I have no dealings with him at any level shape or form as long as firsthand knowledge, but I do know that when expense reports didn't go in correctly or you were trying to get a piece of equipment, that if you did not have everything lined up and explained correctly and everything put in the right place, it would come back down through the chain as "This needs

to be fixed" or, you know, "This has to be done" in order to make it happen.

Q. Okay. So you obviously has no knowledge about Mr. Kelly's departure from the company, since you didn't know he had departed; right?

A. No. But I do know his boss left shortly before he did, so I would imagine the two were king of tied together at some point.

Q. And who was his boss?

A. I don't remember his name, but he was the chief financial officer.

Q. Christine Hendrix, and I don't know if you already told me this but I don't recall, but do you know when she left?

A. I believe just shortly after I did.

Q. Shortly after you did?

A. Not too long after I did.

Q. Okay. How did you learn that she had left?

A. I was informed by somebody. At that point I was still talking to a couple or three or four different people inside the company.

Q. Okay. What were you told were the

some length about direct-billing policies at APC. Can you explain for me, you may have done this but I'm not sure you have, what does it actually mean? What does "direct billing" mean to you as it existed at APC during your tenture?

A. Direct billing was that the bill was given directly to corporate headquarters to be paid directly out of our finance company rather than the employee taking the receipt and submitting it through the approval process.

Q. So, in a direct billing scenario, the employee never charged it with their own credit card --

A. Correct.

Q. -- typically; is that correct?

A. That is correct.

Q. When, in what circumstances, was direct billing sort of acceptable and understood to be okay?

A. I seem to recall stating that it was mostly used for interviewing and for the hiring process or bringing in a consultant, people like that. It was used in a couple of incidents where the field people

were unable to do their work due to a lack of funds that were an emergency, one-time type of deal. It was used in a couple or three different cases.

Q. Okay. What was your understanding about what the issues were with regard to Seth Daniels? Was he having -- let me start over. Did anybody at APC ever suspend, to your knowledge, Seth Daniels' ability to direct bill expenses at any time?

A. I never knew he had it, but, no.

Q. So you're telling me you never even knew he had it in the first instance, the direct billing ability?

A. Correct.

Q. Okay. Why wouldn't he?

A. I didn't believe I possessed it.

Q. When would somebody have the ability? Now, are you talking about with regard to your own expenses, not expenses you might -- well, strike that.

When would somebody have that direct-billing authority?

A. That would be above me. Direct billing goes through HR and the Finance people to say, "Yeah, this

is agreed upon, and this is the reasons why we're going it."

Q. There were some issues as you understand it, though, with respect to people in Finance or Human Resources who had some issues with regard to Seth Daniels and direct billing; is that correct?

A. I did not understand them to be the direct billing issues.

Q. Well, what expense-related issues did they have?

A. Expense receipts and documentation of what was provided to them was my understanding.

Q. Was he not following proper procedures and policies with regard to expense reimbursements?

A. I believe so.

Q. Is it possible that he was also having some issues with respect to -- let me start over. Do you know whether he requested the ability to direct bill his expenses of anybody in Finance at any time?

A. Apparently, from my conversation today, somebody had given him and set up a deal with him, from the emails I see, with the proper authority to

start with these kinds of tasks: number one, a new trainee hire, get computers to people in a timely manner, start going through the classes and cleaning up the documentation." Again, another task is "Find us another hotel that has Internet access where you put people in."

Q. So this was a directive in a sense that you gave him at or near the time of his commencing his employment with APC; is that correct?

A. It existed on a list of things that needed to get done when he was hired, and when I presented it to him was in the first couple of months sometime or another.

Q. Okay. Did Seth Daniels ever present to you an arrangement whereby he planned to make reservations for APC employees at the Providence Marriott?

A. No.

Q. Did you at some point become aware that he made arrangements for employees to stay at the Providence Marriott?

A. A hotel. I still don't agree with the name. But, if you guys say it's the Marriott, fine.

Q. Do you know where in Providence that hotel is, the one I'm referring to, the hotel, the Providence hotel, the Marriott?

A. The Marriott? I don't know where it is, I don't.

Q. Why don't you take a look at Exhibit 6? Do you know where that hotel, the Providence Marriott on Orms Street, is in Providence?

A. (Perusing) No, I do not. I was just looking to see if it really said Providence. Sometimes the hotels on the outskirts --

Q. They all want to say Providence?

A. -- they all say Providence for marketing.

Q. That's right. Did you approve an arrangement by Mr. Daniels with any hotel whereby he could get points simply for organizing the accommodations for out-of-town FSEs for APC?

A. No.

Q. You may have said this earlier, and I apologize, but when did you first become aware that Seth Daniels was making arrangements for employees that were staying in hotels that were not on some

A. That is correct.
Q. Have you ever heard the name Scott Barger, B-A-R-G-E-R?
A. No.
Q. You don't know him to be the manager at that time in question at the Providence Marriott, do you?
A. (Chuckling) No.
Q. Are you aware of what the nature of the billing relationship between the Providence Marriott and APC was?
A. I am now, but not at that time, no.
Q. You are now based on what?
A. What you guys have been telling me all day, that it was a direct bill that had been arranged.
Q. Has somebody told that it was a billing relationship?
A. I believe that's what has been going on and told to me all day, or implied anyway. This appears to be, the Exhibit you have in your hand --
Q. Exhibit 6?
A. Yeah. It seems to be a bill sent directly to APC okayed by Julie Cipolla in the training

the upper, right-hand side?

A. (Examining) It looks like Julie's.

Q. Okay. Let me make sure I understand something. If, in fact, Mr. Daniels was receiving points from the Providence Marriott or any hotel for being the arranger of a meeting, it was your view that it was in fact okay to terminate his employment as it was terminated; is that correct?

MS. KISCH: Objection, that mischaracterizes previous testimony.

MS. KOSTAKOS: I'm trying to find that out.

A. BY THE WITNESS: I believe I stated earlier that, yes, I agreed with the decision that he should be let go if, in fact, that's what he did.

Q. I want to direct your attention to Bonzani's 5, if I could. This is a series of, I believe, emails from Christine Bollmann and Steve Grunin at Cendant Car Rental. You reviewed it earlier and I believe you testified, if I'm not mistaken, that you felt that this inquiry by Ms. Bollmann of Mr. Grunin was "out of the ordinary." Is that the proper characterization of your earlier

Q. I keep saying the last name because we've got two of them.
A. I'm sorry.
Q. That's okay. What did she say?
A. That him and Brian were not getting along, Brian Gough, that things were not going well on that front.
Q. Did you ever hear anybody else complain about Mr. Kelly?
A. Mr. Kelly was a well-known "hard-ass" I guess is the word to use. Excuse my language.
Q. Was he a hard-ass with everybody?
A. Yes.
Q. How do you know that?
A. My expense reports have been bounced back, my approvals bounced back. You answer the questions correctly and put in your justifications, you get what you want back. If you don't, you hear about it.
Q. Would you characterize him as a hard-ass across the board or an equal opportunity hard-ass?
A. He was an equal opportunity offender, yes, he was. He treated everybody the same way. Numbers

are numbers, yes, and no.

Q. Did you ever see anybody at APC harass or discriminate against Mr. Daniels because of his race?

A. No.

Q. Did you ever see Mr. Gough or Mr. Kelly discriminate or harass anybody because of their race?

A. No.

Q. What was Mr. Daniels' performance like?

A. Average, needed improvement.

Q. I think you talked about his ability to act with others. Was that a problem for him in terms of performing his job, his brashness?

A. I wouldn't term it as a problem, but some saw it as a problem, yes.

Q. You didn't determine or see it as a problem because it was helping him to get his job done; is that correct?

A. It was helping me, yes.

Q. Helping you to get your job done. But was it fair to say that he was offending people in the workplace because of his demeanor or attitude?

A. Yes.