IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

COPY

SETH DANIELS, Plaintiff,

vs.

AMERICAN POWER CONVERSION CORPORATION, Defendant.

Civil Action No. 05-00459-ML-LOA

Deposition of BRIAN J. KELLY, taken pursuant to Fedeeral Rules of Civil Procedure, at the law offices of Stephen Robinson, 155 South Main Street, Providence, Rhode Island, before Sarah J. Miner, L.S.R., a Notary Public in and for the State of Connecticut, on October 19, 2006, at 9:00 a.m.

Daniels allegations against APC?

MR. KOSTAKOS: Objection.

THE WITNESS: Still answer.

MR. KOSTAKOS: The only time you can't answer a question over my objection if it indicates the attorney-client privilege.

THE WITNESS: Not that I recall.

BY MS. KISCH:

Q. Is that something that you think you would recall?

A. Well, in my nine years at APC I signed many documents for many different reasons. Do I always remember the details of what I sign? I certainly am cognizant of what I am signing at the time I am signing and why I am signing it. Whether I signed the document nine years ago, and being asked 10 years later time whether I signed the document, and what it pertained to, no, I have been gone from APC for a year. The case that you are referring to with Seth Daniels took place, I think, probably a year or two prior to that. So I am going on recollection from two or three years ago. So to the best of my knowledge, I have not signed a document relative to Seth's case against APC or allegations.

Q. How much was the allowance?
A. It was not a set amount. It could have been $500 a month or $700 a month. It could vary based on the territory somebody had to cover geographically, or based upon where they are centrally located. Sometimes the allowance could be higher in New York City or Hoboken, Wisconsin or whatever.
Q. Are you aware of any individuals who -- let me ask this.
Would you be aware if individuals were directly billing car rentals related to their APC travel?
A. I would have -- I would be aware, yes, that people would be, not particularly who, but, yes, that employees would be.
Q. So you are assuming individuals, some individuals did directly bill their rental cars?
A. Yes.
Q. And under what circumstances -- for what reasons did those individuals directly bill the rental cars, do you know?
A. I believe the executives. I believe direct billed their cars. The executives also had corporate American Express cards which were billed

directly to the office.

Again, that wouldn't be a frequent occurrence, just by knowing that people were, as a rule, required to, if necessary, rent a car according to the policy, and seek reimbursement through their expenses.

Q. For the executives, what was the purpose or what was the reason why they were allowed to directly bill rental cars?

A. That would be standard practice in different companies, is that eliminates the need for executives to take care of minute paperwork, and focus on bigger issues within the company.

Q. And other than executives there were some other individuals who did on occasion directly bill rental cars?

A. I am sure there were, but I can't recall the particulars about it.

Q. Did APC have any policies with regard to individuals receiving travel points related to their APC travel?

A. Can't recall if it was in the policy, but the practice was that individuals who were traveling for business, for airline or hotel, even car rental, for their own travel arrangements, not

MR. KOSTAKOS: Objection.

THE WITNESS: Yes, there would have been other instances where I got involved, where people put on expense reports items which would not be normally covered under APC's policy.

BY MS. KISCH:

Q. Well, let me just stop you there. I am not talking about instances in which you answered questions or got involved. I am talking about instances in which you took over the review of the expense reports in the future.

MR. KOSTAKOS: Object.

THE WITNESS: None that I can think of.

BY MS. KISCH:

Q. Did you take over the role of reviewing Mr. Daniels expense reports, did you take that role away from Mary Tougas, and take that responsibility on for yourself?

A. Yes.

Q. What prompted that?

A. Because there was an issue surrounding Seth's expense reports, the completeness of the expense reports, and the past interaction with employees who worked for me in payroll, and Christine Bollman in travel. And when it came to

the expense reports I was not going to put Mary in that position, and my instructions to Mary was if expense reports came in for Seth until the issues were rectified, that those reports were to come to me.

Q. Was it the case that you reviewed all of his expense reports or only where an issue arrived?

A. From the point that an issue, that I became aware of an issue is at the point regardless of what the expense responsibility report was for I needed to see it because at the end of the day the checks that are issued or were issued at the time to reimburse expense reports had my signature on those checks, and I do not let anything go out under my signature unless I am comfortable in compliance with our policy. If I am made aware of a situation that is in violation of the company policy, which applied to everybody, then if it can be quickly rectified by Mary E mailing or saying Joe, they, this, and this. Yeah, just take it off my expense report. But when an issue gets escalated I owe it to the company, and the employee to exercise my prerogative and step in on that situation, and monitor it.

Q. You said there were three months to look

over the review in dealing with all of Mr. Daniels' expense reports, completeness of expense reports, and his past experience with Bollman in. When did you first come to the knowledge that there was a problem with regard to Mr. Daniels completeness of his expense reports?

A. Let's see. I believe there was a situation with Mr. Daniels, if I am correct, he was, his vehicle was parked at Bugaboo Creek. And he reported that his car had been broken into, his laptop had been stolen, and his backpack containing his receipts, and expense reports. The reports that he submitted to cover that period, even though they were late, did not include receipts to substantiate the expenses. So contact was made with Seth where there were no receipts. And he said his laptop had been stolen.

That is fine. But still there would be receipts from the date forward when your laptop bag is stolen. Now, if I felt -- and there have been other people in the company who have had similar situations when where their laptops were stolen, or people legitimately send the expense reports in, and they get lost in the mail. He said he filed a police report. I believe his windshield was

damaged, which was, I don't know if it was a rental car at the time, I am not sure what he was driving. I think it was a rental car.

But the expectation is when you do an expense report, you may have a reason why there are receipts missing from that day back. Not from this day forward. You can't use from this day forward as -- you can't use your car being broken into for receipts not being there, because when those receipts you haven't even incurred those receipts. So those reports were kicked back. One I reviewed them to make sure that they were accurate, and standard for an expense amount for somebody who might be traveling. Compared to other expense reports, and say, all right, what is a per diem you would normally allow somebody to travel in Rhode Island, or whatever. You do a test in your mind whether it is possible. Certainly from the day, from the points that the car was broken into I would expect that the receipts would be attached to the report in accordance with our policy.

Q. How soon after the car was broken into did Mr. Daniels submit his expense report?

A. I don't recall.

Q. Is it your testimony that the first expense

Q. We were talking about what issues you felt there were with regard to the lack of completeness to Mr. Daniels expense reports and we talked about one such issue. Were there any other issues that came to your attention that raised concern with you with regard to the completeness or lack of completeness of Mr. Daniels expense reports?

A. I can't think off the top of my head whether there were issues or not.

Q. You don't recall anything else at this time?

A. No, not right now.

Q. You mentioned the second reason you mentioned for the reason for taking over the role that Mary Tougas had in reviewing expense reports. When you took over that role with regard to Mr. Daniels' expenses, you mentioned another reason was because of the past interaction with the employees, and payroll. What did you mean by that?

A. My senior payroll person down in payroll had a difficult time getting a completed, signed W-4 form from Seth.

Q. Who was that person?

A. Bonnie Smith.

Q. She wasn't able to get a completed and

signed W-4 form from Mr. Daniels; is that correct?
A. We are required by the IRS to have on file a completed and signed W-4 forms for our employees.
Q. Well, was it that he hadn't completed it or he had not signed the W-4 form?
A. Well, that is one and the same. I can't recall whether he had submitted something that wasn't signed or I can't remember the particulars, the issues surrounding the W-4, I know that Bonnie, who is a very patient person, had extreme difficulty dealing with Seth on the issue.
Q. Did she ever obtain a completed and signed W-4 form from Mr. Daniels?
A. I believe ultimately she did. I am not absolutely sure, but I believe she did after some period of time.
Q. How long was that period of time?
A. I don't know. This was an issue that went on for, maybe weeks.
Q. Are you are you required to receive a W-4 form before issuing a check to an employee?
A. I am not specifically sure what the IRS requirement is in relation to having one on file, and being able to pay an employee, because proof of employability is different from requirement for a

W-4. So I am not -- I don't recall whether we necessarily have to have a W-4 on file to pay an employee, but we certainly have to have one on file, and when we make the effort to get one, and it is not done, you know, then we have to follow-up with the employee to get it. And I don't think in Seth's situation that we ever did not not pay him because of the W-4 situation. One of the issues was his taxes of where he was required to pay taxes, whether it be in Rhode Island or whether it be in New Jersey which I believe his family was living at the time he was working for APC here. What taxes were to be withheld in what state, that type of information. But he was never not paid.

Q. Well, do you know whether the issue of the W-4 form was resolved prior to him -- prior to APC issuing his first paycheck?

A. No, I don't think it was, because of the amount time it took to get the W-4 completed, he was there, he was certainly there longer than two weeks, which would have more than covered his first payroll period, so like I said he was never not paid while the issue of the W-4 was being worked on.

Q. You said there was an issue with regard to

where the tax, what state the taxes, the State taxes would be withheld?

A. Well, there are different laws. He did not reside in Rhode Island. He was housed in a hotel in East Providence I believe. His family was in New Jersey. Now, I can't remember, customarily, I thought his, my recollection was I thought his position was housed in Rhode Island, and that he was supposed to be moving to Rhode Island. And the only reason he hadn't moved to Rhode Island at the time, was that he did not want to pull his children out of school in mid year, and that is why his family remained in New Jersey.

And given that he wasn't a resident, he wasn't a resident of Rhode Island, the issue about where his taxability is raised because his domain is in New Jersey.

Q. But is that something that Mr. -- was that an issue that you were waiting for information from Mr. Daniels or is that an issue that APC had to figure out on its own aside from getting information from Mr. Daniels?

A. The W-4 wasn't necessarily tied to it. That was an issue. The W-4 certainly determines what we have to withhold in federal taxes, the

number of exemptions that you claim, and because of the Rhode Island, you would have to determine how many exemptions you are going to claim in Rhode Island. So it does determine what has to be withheld in taxes. But the company has a responsibility under the IRS to make the effort to follow up with the employee to get the completed W-4 form. When all else fails, I believe the form itself says that the employee will be defaulted to single zero exceptions or something like that. I mean, that is on the form. And ultimately, what we did, is we put him to the default exemption, whatever its called for on the form. And I believe that even raised an issue with Seth as to why that was done.

Q. Going back to the issue of you said that Mr., Bonnie Smith had a difficult time getting a completed and signed W-4 form from Seth. You don't recall at this point what was incomplete about the W-4 form; is that correct?

A. It was incomplete. I don't believe it wasn't signed. Marital status exemptions, whatever, nothing in there to indicate the information that payroll should use to properly process the payroll.

Q. The issue of -- all right. You mentioned something about other than -- strike that.

Other than the length of time you say it took for Mr. Daniels to completely fill out and sign the form, were there any other issues with regard to W-4 form?

A. Regarding payroll.

Q. Any other issues that you felt, you know, were out of the ordinary or you had questions about with regard to the W-4 form?

A. No, it had to do with the W-4 form, and his approach to Bonnie.

Q. Well, what about his approach with Bonnie caused concern to you?

A. Bonnie stated to me that she felt very uncomfortable with the way he approached her, and felt that he was, you know, I don't know, demonstrated high level of frustration. She was not comfortable. You would have to know Bonnie. Bonnie is very easy to work with. She is very customer friendly, very customer oriented. She did not feel comfortable with Seth and the way he approached her on this issue.

Q. What if anything did she tell you made her uncomfortable in the way he approached her?

A. His manner of speak. His tone.
Q. She told you that there was a problem with regard to his tone?
A. Bonnie is not one that would normally come to me to complain about her interaction with employees. She is very independent. She can deal with employees, and she is very customer oriented. She did not feel comfortable with the way that Seth approached her on this issue. She was doing her job trying to get a completed W-4 she was not comfortable with the response and I believe there was one instance where he traveled to the West Kingston office, and was standing outside the payroll window, and I believe that he and Bonnie had some discussion about the W-4.
Q. Is Bonnie in the West Kingston office?
A. Yes.
Q. And what specifically did Bonnie tell you about that meeting when he was at the office speaking to her?
A. I don't remember the particulars. All I know is what her, you know, she expressed that she was not comfortable with the way that he was dealing with her.
Q. Well, did you ask any questions as to what

she meant by she was uncomfortable with the way she was dealing with it?

A. I probably did. I don't recall the particulars of he said this or did this or whatever, knowing Bonnie, Bonnie has worked for me off and on for the nine years that I was at APC, and I know Bonnie, and how she interacts with people. And for Bonnie to say she is not comfortable speaking or dealing with an individual there has to be some concern.

Q. Did she use those particular words?

A. She did not say she did not feel comfortable I sensed that from her because she came to me on the issue. And given that she came to me on an issue that she would not normally come to me on, she was not, she said she was not comfortable with the way that he was interacting.

Q. She did say, she did use those words she was not comfortable with the way Mr. Daniels was interacting with her?

You recall that specifically?

A. Yes.

Q. What was the issue that led her to come to you, was there a particular issue with the W-4 for form or some other form?

A. It was the W-4 form. It was the main issue around payroll.

Q. What was the problem with the W-4 form that led her to come to you?

A. The W-4 form was incomplete. She had made more than one attempt with Seth to get a completed W-4 form, and still could not obtain it.

Q. And you don't remember what specifically was incomplete, right?

A. I can't recall if it wasn't signed. I believe that there wasn't, you know, he didn't indicate on under whether he was filing single, married, some of exemptions, whatever.

Q. Did Bonnie come to you at any other point other than telling you that he was unable to get a completed W-4 form with regard to Mr. Daniels' W-4 form?

A. No, the only issue I dealt with Bonnie relative to Seth and payroll was a W-4 form.

Q. Did you have any discussions with Mr. Daniels at all with regard to the W-4 form?

A. Yes.

Q. What were your discussions -- let me start out with this. How many times did you talk to him?

A. At least once. I don't know exactly how

many, at least once.

Q. Was that over the phone or in person?

A. I had more than one meeting with him on different issues and over the phone, and E mails. I am not sure if the one in person he may have come up to my office on this issue, I am not sure how we communicated on it.

Q. It may have been that you met in person?

A. It might have been. And as a matter of fact if it is, it is the first time I ever met him.

Q. What was the nature of your conversation when he came to your office, and spoke to you in person?

A. Simply that he was required to fill out the W-4.

Q. You told him he was required to fill out the W-4?

A. Yes.

Q. Did you ask him to come to your office or did he come to speak with you on his own?

A. I can't recall if he went down to payroll, and I advised Bonnie to just have him stop up and discuss this issue with me. I am not sure how it came about, but he didn't stop up at my office at his own urging. There was some prompting on my

part, either directly to him, or through Bonnie or whatever, that I needed to talk to him about the W-4.

Q. And tell me what you recall telling him?

A. Simply that he needed to complete the W-4 form, and that it was not an APC requirement, it is an IRS requirement.

Q. It is your testimony that at that meeting he had not yet completed a W-4 form?

A. He had not submitted a properly completed W-4 form.

Q. What do you mean properly completed, was there an issue with what he filed under or was it that it was incomplete?

A. For the third time, he did not fill in his marital status, what he was claiming four exceptions, married, single, number of exemptions. He had not completed that information, which makes it impossible for payroll to have proper records on their premises as required by the IRS. Now, what he ultimately submitted that may have been on record is not what was initially submitted.

Q. So did he initially submit a complete W-4 form?

A. No, he initially submitted an incomplete

W-4 form which raised the issue with Bonnie. He did not indicate marital, single, number of exemptions which is information Bonnie needed to put in the payroll system to properly process his payroll.

Q. He had given, is it your testimony, then, he had given back to Bonnie a W-4 form which was missing some information?

A. He initially submitted a W-4 form that was incomplete.

Q. Is it your testimony that he submitted a W-4 form to Bonnie that was missing some information?

MR. KOSTAKOS: Objection.

THE WITNESS: Missing, incomplete if you want to say missing equals incomplete, yes, it was missing information.

BY MS. KISCH:

Q. Was that form given back to Mr. Daniels to fill in the missing information?

A. I am not sure a finance form was given back to him. I am not sure if he was given a new form to complete. I know at one point of the interaction with Seth one of the original W-4's that he completed was retained, and then he

ultimately submitted a W-4 form, which I believe was then considered complete.

Q. How many different W-4 forms did Mr. Daniels fill out?

A. At least two.

Q. Do you know whether there were more?

A. I don't know if there were more. I know there were at least two, one that prompted this discussion with Mr. Daniels, and the second one ultimately, you know, it could have, ultimately have been the one that was, became, the W-4 of record, would have satisfied the requirement of payroll, and the IRS.

Q. Did you ever have any discussions with Mr. Daniels with regard to whether or not he could be considered exempt or non exempt on the W-4 form?

A. Yes.

Q. What were the nature of those discussions?

A. Well, his, my recollection is his response to me was on the, he was acting on the advice of his advisors that he was exempt, which may be good enough in his mind, but there is, I am sure you have a copy of the W-4, if you read the language on the W-4 there is an area on the W-4 where under only certain conditions that somebody is exempt

from withholding, and he was even refusing to, you know, acknowledge that. And I can't recall definitively, but I think it has to do with something about the prior years taxes where they had no tax liability, and received a full refund of any taxes they had paid. Even during my discussion with Seth, he would not attest to the fact that he met the requirement for exception under the IRS document. That is not an APC document, that is an IRS document.

Q. When you say he didn't attest, did he fill out the document saying he had met those conditions?

A. No, he wouldn't. Not initially he didn't.

Q. And what is required in order to attest to that on the tax form?

A. If you give me a copy of the form I can read it. There are a couple questions in there. My recollection is it has to do something with prior years taxes. They didn't have a tax liability, whatever, and they have to attest to it, because that document becomes the basis on which we withhold, we process his payroll.

Q. Okay. Was it on that basis that you felt you needed to inquire as to whether or not he

should be exempt or non-exempt?

A. The initial form that he completed did not attest to the fact that he felt that he was exempted.

Q. Okay.

A. APC has had other employees in the past who for whatever reason have been exempted for taxes, mainly students, who can attest to the facts that he didn't have prior year tax liability, you know, they received a full refund. If they attest to that on the W-4 form. APC would go forward, as any employer would go forward and process the payroll. If the IRS came to APC, and said, why didn't you withhold taxes? Well, this person attested on your documents that they are exempt from withholding federal tax.

Q. So you see it as your role to make sure that they have filled out the form to answer the questions on the form with regard to this issue?

A. It is my role to make sure that all of my functional areas ensure that employees comply not only with our policies, but laws that APC has complied with. And the reason we do that is that example, if we had people from the IRS in, reviewing our documentation of I-9's for people,

those questions.
Q. Did you have, ever have a conversation with Mr. Daniels about whether or not he was exempt from paying taxes?
A. Yes.
Q. Did Mr. Daniels tell you he believed he was exempt?
A. He said, again, based upon advice of people whoever was advising him, you know, but, again that doesn't negate the requirement to complete a W-4 form, and indicate and attest by signature that you have met the criteria as to prior year taxes, and you expect the same to take place.
Q. Did you ever tell him that APC would not pay him -- did you ever tell Mr. Daniels that you would not allow him to claim that he was exempt from taxes?
A. I don't recall telling him that he couldn't claim it. I didn't write the IRS form. I mean, he would have signed something under penalty of perjury if he claimed exempt, and he ends up having a problem with IRS, APC has meet their obligation by having a completed W-4 form.
Q. Any other issues you recall with regard to Mr. Daniels fill go out his W-4 form or the way in

which he filled out his W-4 form?

A. No, just simply that he needed to complete a W-4 form.

Q. Did you have any conversations with anyone other than Mr. Daniels or Bonnie about this issue?

A. I may have had a conversation with the HR representative in East Providence.

Q. Who was that?

A. Christine Hendrix.

Q. What did you tell her?

A. Basically that there were, that, that we may have had been having an issue with W-4. She would have been the only person that I would have spoken with on that issue. She and the payroll manager who would have been made aware of the situation.

Q. Who is the payroll manager?

A. Reshma Gada.

Q. What do you recall speaking to Reshma Gada about?

A. Just apprising her of the situation, and the requirement he needed to fill out the W-4 form.

Q. Other than telling Reshma that Mr. Daniels needed to fill out a W-4 form, did you tell her anything else at all with regard to Mr. Daniels,

documentation.
Q. What prompted to you speak with Mr. Bonzani?
A. I believe he was Seth's immediate supervisor.
Q. What did you speak to him about specifically?
A. Well, I think that because John had approved the expense reports, and in making him aware of the fact that there were receipts missing on a report that he had approved, and these are receipts that were unrelated to any receipts that would have been stolen in the break-in to the car. And, again, asking John's assistance to work with Seth to obtain either the original receipts or copies of the receipts or certain documentation for certain expenses.
Q. Do you recall anything else you said to John at that time?
A. No, not offhand.
Q. What was John's response?
A. He was willing to address the issue with Seth.
Q. And did he?
A. As far as I know he did.

Q. Was there a requirement that employees submit original receipts in order to be reimbursed for expenses or could they attach copies of receipts?

A. The policy is that they submit the originals. And the reason we require them to submit the originals is so that somebody doesn't unintentionally or inadvertently resubmit the original thinking they had already submitted it.

Q. Is there any exception to an employee gaining reimbursement for an expense other than for providing an original receipt?

A. Yes, as if I said earlier this morning, if someone's expense reports was put in the mail, and lost, if the employee retains a copy of the report, and backup, then we would accept the copies as documentation for the report. But, again, that wouldn't be a pattern, that would be the exception.

BY MS. KISCH:

Q. Are there any other exceptions other than if an individual's expense reimbursement request was lost in the mail, are there any other exceptions where an employee is allowed to be reimbursed without supplying receipts?

A. No, policy in place for a reason.

Q. That was part of the written policy when you were at APC?

A. Yes.

Q. Was that the policy up until the time you left?

A. I didn't change the policy, so as far as I know it was.

Q. Okay. Well, if that policy had changed, could it have been changed by anyone other than yourself?

A. No.

Q. So when you left APC, that was the policy at the time, correct?

A. Right.

( Kelly Exhibit No. 3 marked for identification.)

BY MS. KISCH:

Q. Mr. Kelly, showing you what has been marked as Kelly Exhibit 3. Take a quick look at this.

This appears to be an E mail sent by you to Mr. Daniels, correct?

A. Correct.

Q. Why did you have this question?

A. Not having the report in front of me, the question may have been related to the period of

time that the expense report covered in relation to when the break-in of the car took place. So without having the report in front of me, that may have been why the question was asked. And also there are employees who may have receipts that they carry with them, because they are incurring those expenses on the road, and have a file with them on the road. And there may be -- and they may have a file at home for receipts or expenses that they occur on their way home. There is always the possibility, just because what is on that report, and may be on or before the date of the break in, and the theft of the laptop bag, doesn't necessarily mean that the laptop bag contained all of the receipts that were on the report.

Q. Do you recall today what prompted you to send this E mail?

A. I believe because I was reviewing reports.

Q. Anything other than that, anything more specific?

A. No.

Q. When an individual submitted an expense report, is that expense report, request for reimbursement saved by APC?

A. Under the IRS guidelines, yes, it is

the IRS.

Q. But hold originals?

A. Hold the originals.

Q. And then it says copy mailed to employee. That's a standard practice that you mail copies to employees?

A. No, I think that copy was mailed to the employee because he had to get the original back, so if he wanted a copy for his record I asked Bonnie to send him a copy of the original documents.

Q. Do you know when he asked for the original back?

A. No.

Q. Do you know why?

A. No idea.

Q. Now, at the bottom of the first page, there is a signature in the line that says, "employee signature." Do you see that?

A. Yes.

Q. Do you know if that is Seth Daniels' signature or not?

A. Could be I have nothing to compare it to.

Q. In looking at, in box number seven, at the end of line seven?

A. Correct.
Q. There is the handwriting "exempt." Do you see that?
A. Correct.
Q. What do you understand that to mean?
A. Well, it states that the employee is saying that he is, he is saying that he is exempt from all federal tax withholdings.
Q. Direct your attention to box three?
A. Correct.
Q. Where apparently it asks for the employee to check a box whether they are single, married or married but withholding at the higher single rate. Do you see that?
A. Correct.
Q. In this instance it does not appear that this the person who filled out this W-4 completed that; is that correct?
A. Correct.
Q. In looking at this, do you feel -- strike that.
In sitting here today, is this in your view a completed W-4?
A. No.
Q. Why is that?

A. Well, this form here dictates what withholdings are done on the federal tax level, but there is also information that is needed at the state level to determine signing here saying you are exempt only pertains to federal taxes. There is no form that this does not deal with his tax obligation to Rhode Island and/or New Jersey for tax purposes. He would still have to have some indication for tax witholdings.

Q. Is it completed from a federal tax perspective?

A. No.

Q. Why is that?

A. Because box three, box three doesn't necessarily -- item seven doesn't necessarily exclude you from having to conclude box three.

Q. In fact, let me direct your attention to the upper left-hand corner. Do you see the portion about five or six lines down that says exemption from withholding?

A. Yes.

Q. And it follows if you are exempt complete only lines one, two, three, four and seven. Sign the form and validate it. Do you see that?

A. Yes.

Q. So reading that, does that?
A. He is required to fill out line three, whether or not you are claiming exemption you are still required to fill out line three.
Q. When Ms. Smith elevated this issue and brought the W-4 to your attention, had you ever met Seth Daniels?
A. No.
Q. Had you ever spoken to him?
A. I am not sure I had even spoken to him at that time. I can't recall the time line when I spoke to him. I had certainly not met him in person.
Q. Did you at some point yourself interact with or question him about his completion of this W-4 or a W-4 form?
MS. KISCH: Objection to the extent it has been asked and answered.
MR. KOSTAKOS: You can answer.
THE WITNESS: Yes, I had conversations about this form.
BY MS. KOSTAKOS:
Q. And do you know if those conversations, if your initial conversation with him was in person or over the phone -- strike that.

Was your initial communication with him about this do you recall by phone, by E mail, in person?

MS. KISCH: Objection, asked and answered.

THE WITNESS: I don't recall the means by which I first had contact with him on this issue.

BY MR. KOSTAKOS:

Q. Did you have any knowledge before -- strike that.

At the time you spoke to Ms. Smith initially about this issue, do you have any knowledge whether or not Mr. Daniels was African American?

A. No.

Q. Did Bonnie Smith tell you that in your conversations about the W-4?

A. Not that I recall.

Q. Then getting back to the expense reimbursement issues, and your testimony regarding Mr. Daniels' loss of receipts related to the laptop theft, I believe you testified that you couldn't recall whether there were any others instances where he failed to submit receipts, is that correct, as part of an expense reimbursement?

MS. KISCH: Object to the extent it has

Q. Would you have a role in that claim submission if it were to take place?

A. No.

Q. Do you know who would?

A. Probably somebody within the IT department in conjunction with somebody in HR, and, somebody in security.

Q. This may have been asked before, I apologize, did you have conversations with Mr. Daniels about the laptop theft?

MS. KISCH: Objection. Asked and answered, go ahead.

BY MR. KOSTAKOS:

Q. I am just trying to figure out.

A. I did have a conversation with him regarding the theft as to the vandalism on the car and house. Somebody got into the car, and the carelessness -- because the trunk was not Jimmied open or damaged, the laptop apparently was left out and open in plain view in the back seat. So my question to him was basically: Why wouldn't you have locked that in the trunk and would you have taken that same care if it was your own personal laptop?

Q. What was his response?

A. I don't recall what his response was. I know that was my question to him.
Q. Maybe you don't recall -- let me ask you, do you not recall the specifics of his response or do you not recall anything about his response?
A. I don't remember the specifics.
Q. Do you remember generally what his response was?
A. He didn't, it didn't seem to phase him for the fact that part of the theft -- part of the responsibilities of the theft of the laptop resided by him by leaving it in plain sight.
Q. Did you have any reason to doubt that the laptop was stolen?
A. No, ultimately a police report was filed. I believe that the manager at Bugaboo Creek, I don't know if he went out and viewed the damage, but I had no reason to believe it wasn't stolen.
Q. Do you know whether Bugaboo Creek agreed to reimburse APC or Mr. Daniels for any expenses related to the laptop theft?
A. I don't have any knowledge of that.
Q. Do you know whether Mr. Daniels tried to obtain reimbursement from the restaurant or Bugaboo Creek regarding that, regarding the loss?

Q. Based on your review of Mr. Daniels' expense reimbursement request, did you feel at any point that he was taking liberties with respect to the agreement or what your understanding of the agreements was?

A. One of the issues I had was the exec expensing of the lunches, because that would be expenses if he was living here would normally be paid for on his own during the day.

Q. In other words, he would have those expenses whether he lived here or not?

A. I --

Q. Or whether he was commuting or not?

A. Correct.

Q. That was yes?

A. Yes.

Q. Did you have suspend -- strike that.

Did Mr. Daniels ever have the authority to direct bill any expenses to your knowledge?

A. Not to my knowledge.

Q. Did you ever suspend any right or authority that he might have had to direct bill expenses, travel or otherwise?

A. I specifically didn't, I don't have knowledge of it, I wouldn't have taken any action.

towards you rather than the company, similar as to when other employees may be out trying to make a sale to somebody, like I did, trying to, who might want to buy a software package, receiving a gift from Vendor A, versus Vendor B, who may tend to have them go, tilt their decision towards Vendor A, even though Vendor B may be in the best interests of the company.

Q. Did you participate in the decision to terminate Seth's Daniels?

A. No.

Q. Do you know who handled the meeting with Seth Daniels regarding his termination?

A. No.

Q. Are you aware whether or not Seth Daniels ever complained to anybody at APC that you harassed him or discriminated against him because of his race?

A. No.

MR. KOSTAKOS: That is.

EXAMINATION

BY MS. KISCH:

Q. I have one. You testified earlier that you didn't know what directives or requirements Mr. Daniels was given when he was instructed to book