IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

\- - - - - - - - - - - - - - - x

SETH DANIELS,

COPY

Plaintiff

Civil Action

vs.

No. 05-00459-ML-LDA

AMERICAN POWER CONVERSION CORPORATION,

Defendant

\- - - - - - - - - - - - - - - x

DEPOSITION of BRUCE E. GOUGH, a witness called on behalf of the Plaintiff, pursuant to the Federal Rules of Civil Procedure, before Patricia A. Conant, a Registered Professional Reporter and Notary Public within and for the State of Rhode Island, at the offices of Stephen Robinson, 155 south Main Street, Fourth Floor, Providence, Rhode Island 02903, on Thursday, November 9, 2006, commencing at 9:33 a.m.

BRIAN GOUGH,

having been satisfactorily identified by the production of his driver's license, and duly sworn by the notary public, was examined and testified as follows:

EXAMINATION

BY MS. KISCH:

Q. Good morning. Would you go ahead and just state your name for the record?

A. Brian Gough, G-O-U-G-H.

Q. What is your current address?

A. 47 April Lane, Tiverton, Rhode Island.

Q. And what is your phone number?

A. 401-816-0470.

Q. Do you have any plans of living out of area in the next few months?

A. Yes, I do.

Q. Where to you plan on living?

MR. KOSTAKOS: She didn't expect that answer.

MS. KISCH: Well, in this case it's not unusual.

A. St. Louis.

Q. When are you planning on moving?

BY MS. KISCH: Mark that, please.

(Gough Exhibit 1, marked for identification.)

BY MS. KISCH:

Q. I show you, Mr. Gough, what's been marked as Gough Exhibit 1?

A. Okay.

Q. Take a moment to look at the document. Let me just ask you a quick question. I'll give you a chance to read this fully, but does this refresh your recollection at all? Do you know Mr. Robert Graham.

A. Yes, I do.

Q. And were you involved at all in his termination from APC?

A. Yes, I was.

Q. Okay. I'm not going to ask you specific questions regarding this agreement, but wanted to refresh your recollection because you had said you didn't recall any terminations during the 2002, 2004 time frame. Now that your recollection has been refreshed, tell me what you can recall surrounding the issues of Robert Graham's termination?

MR. KOSTAKOS: What --

BY MS. KISCH: I'm not asking specifically about the document. I wanted to refresh his recollection about it.

A. Mr. Graham was responsible for managing our Latin American region. At the time of his termination, he had transferred to Europe and was in charge of the sales force for the European, Middle East and Africa region.

After that transfer it was brought to our attention that during his tenure in Latin America there was a gray marketing scheme that involved some of our distributors in Venezuela. An investigation was conducted by our general counsel and myself to determine to the best of our knowledge the facts of the case. It was our determination that the sales manager, Rainer Weigle, was, if not involved, complicit with the efforts of the distributor to purchase APC products in the Latin American region at a Latin American discount, and then forward those products back in to North America, realizing significant gains.

Mr. Weigle and Mr. Graham

benefited from this financially through their sales bonus program. Mr. Graham indicated he had no knowledge of the gray marketing scheme. Our investigation indicated that if he were not -- if he was not aware of it, he should have been as the leader of the organization, but the numbers were significant enough that he should have been given, have given it greater due diligence, and as a result, the company took action to terminate both Mr. Graham and Mr. Weigle.

Q. How do you spell Mr. Weigle?

A. Weigle?

Q. Yeah, Mr. Weigle.

A. Rainer, R-A-I-N-E-R; Weigle, W-E-I-G-L-E.

Q. And is Rainer, R-E-I-N-E-R?

A. R-A-I-N-E-R.

Q. Okay. How did you first learn about this issue?

A. The issue was brought to my attention by our general counsel.

Q. And when you first learned of this information, what documents do you have in your possession that you reviewed prior to

starting a full-scale investigation?
MR. KOSTAKOS: I'm going to object to the extent any of those documents are protected by attorney/client privilege or work product. I instruct the witness not to discuss those items.
A. My recollection is we had sales figures as well as documents from our distributors.
Q. And what kind of documents from distributors?
A. Those would include sales numbers.
Q. Okay.
A. Specific invoice data.
Q. Okay. And what, in your full-scale investigation that you undertook, who did you speak with?
A. We spoke with Rainer Weigle, and we spoke with his fiancee who was also an APC employee, Patricia -- I can't remember Patricia's last name. We spoke with Fernando Garcia who was the general manager of Latin America post Mr. Graham.
Q. I'm sorry. Can I just interrupt. What was his title prior to taking over as GM of

Latin America?
A. Mr. Garcia?
Q. Yes.
A. Country manager of Spain.
Q. When you spoke to him at that point he was country manager, correct?
A. No, when we spoke to him he was general manager of Latin America. Mr. Graham had moved to Europe at that point.
Q. Okay, go ahead.
A. We spoke with the finance manager for Latin America, Aidan Mitchell, A-I-D-A-N.
Who else did we talk to? I may be missing one marketing person that we spoke with, but I can't recall. It's been a few years.
Q. Okay. Okay. And did you speak with Mr. Graham at all during your investigation?
A. At that point in the investigation, no, we did not.
Q. At some point in the investigation prior to his termination did you speak with Mr. Graham?
A. Yes. I believe that conversation was

held just by the general counsel. I don't recall I was involved in that conversation.

Q. Okay. Okay. And other than you and the general counsel, was there anybody else involved in the investigation, other than, obviously, the people you spoke to during the investigation that you just described?

A. One individual from our systems group was requested to come with us to Florida, and we took the hard drives off the computers of those individuals, and he wasn't aware of circumstances surrounding it. He was just instructed what to do.

Q. When you say the hard drives of the individuals, do you mean individuals you spoke with?

A. Specifically, Mr. Weigle and Patricia and Aidan, was three.

Q. Aidan, also?

A. Yes.

Q. Who was Aidan?

A. Aidan Mitchell, finance manager.

Q. Okay. Was he in any way implicated in the gray marketing schemes?

A. No.
Q. Did you think that he might be?
A. Going into the investigation we weren't certain whether he was involved or not. There was no evidence to indicate he was aware of what was taking place.
Q. Okay. Going into the investigation was it your understanding that both Mr. Graham and Mr. Weigle were involved in the gray marketing scheme?
A. Could you repeat that question?
Q. Going into the investigation was it your understanding that both Mr. Weigle and Mr. Graham were involved in the gray marketing scheme?
A. We knew that there was evidence of gray marketing. We did not know definitively who might be involved.
Q. Okay. And what prompted you then to speak to Mr. Graham's fiancee?
A. Wasn't Mr. Graham's, it was Mr. Weigle's.
Q. I'm sorry, Mr. Weigle's.
A. She was actually in charge of the marketing area and had specific interaction

with the distributors, so she had knowledge of the overall business in Latin America, so it was not specifically because they had a relationship that we were speaking with her.

Q. Okay. Did you speak with Mr. Graham before or after you had a belief that he was involved in the gray marketing scheme?

When I mean you spoke, or the general counsel. You said the general counsel, you believe, spoke?

A. I believe the general counsel spoke with him after our visit to Florida where we gathered additional data. Clearly, at that point we had, we had determined that there was significant evidence to show that the management in Latin America knew or should have known about the situation.

Q. Did you speak with Mr. Weigle before or after you had acquired evidence suggesting he either knew or should have known of the gray marketing scheme?

A. We spoke with him at the initial part of the investigation, so that day we didn't have significant data to form any opinion.

Q. Okay. And did you believe, though, at that point that he might have been involved?
A. There were indications, based on the numbers, that led us to be skeptical and have concern about his involvement.
Q. And were those the numbers that you initially reviewed, the data that you described, the sales figures and documents from the distributors and the invoice data?
A. Yes.
Q. Okay. Did those sales documents raise concerns that you believe Mr. Graham should have known about the gray marketing scheme?
A. We became aware of Mr. Graham's involvement with the distributor after our conversation with Mr. Weigle.
Q. Okay. And you did speak with Mr. Weigle prior to the general counsel's conversations with Mr. Graham, is that correct?
A. Yes.
Q. Okay. Did either Mr. -- well, was Mr. Weigle terminated or was he asked to resign?
A. I think both of those is the same, but I believe Mr. Weigle was terminated. However,

he was a German employee so there were other obstacles or hoops we needed to go through for the German contractor.
Q. Do you have any knowledge whether Mr. Graham was asked to resign versus actually terminating him?
A. We indicated that we were terminating his employment.
Q. So you are not aware that he was actually asked to resign?
A. No.
Q. You see on Gough Exhibit 1, the first line it states, "As you know, I represent the above named Robert Graham relative to your request for his resignation from American Power Conversion, Corp."
A. Yes.
Q. Does that refresh your recollection as to whether or not APC asked Mr. Graham to resign after conducting his investigation?
A. Yeah, that's not my recollection of the conversation. We met with Mr. Graham and indicated his employment with APC was ending. The subsequent negotiations on an agreement, I

see that those indicate that it was a resignation date.

Q. Okay.

A. I'm not familiar with how it became a resignation.

Q. Did you have any role in the negotiations with Mr. Graham's attorney?

A. No, I did not.

Q. Are you aware that APC paid him a significant amount of money associated with his resignation from APC?

MR. KOSTAKOS: Objection.

A. I'm not aware of the specifics. I see what's in here but --

Q. You had no knowledge, separate from reading this document, as to the significant amount of money that APC paid Mr. Graham to resign?

MR. KOSTAKOS: Objection.

A. I knew that we had settled. I did not know the amount.

Q. Does it surprise you that APC paid, I believe it was about $80,000, to Mr. Graham for his resignation?

MR. KOSTAKOS: Objection.
A. No, it does not surprise me.
Q. Why doesn't it surprise you?
A. Because I'm familiar with the legal system, and Mr. Graham had been with the organization for 12 or more years at that stage, and it was in the interests of the company to remove him from his role.
Q. Well, had the company actually removed him already?
A. We had indicated that his employment with APC was ending.
Q. Well, did you actually terminate him or did you tell him it would end?
A. My recollection of the events is I terminated his employment. I took his laptop and his badge.
Q. Okay. And was he told that he was no -- and did his job duties at that point end for APC?
A. Yes, they did.
Q. Was he allowed to come back to work after that point?
A. No, he was not.

Q. Okay. Did Mr. Graham ever file a lawsuit against APC?
A. No, he did not.
Q. Did he ever file a charge of discrimination against APC?
A. No, he did not.
Q. How much money did Mr. Graham make from the gray marketing scheme?
MR. KOSTAKOS: Objection.
A. I don't know that amount.
Q. Would it be indicated in any of the files relating to Mr. Graham?
A. My understanding it would be difficult to ascertain that, to determine exactly how much the gray market scheme was worth to him.
Q. Did you attempt to determine that during the investigation? Did you and/or anybody else attempt to determine the amount of money that Mr. Graham received from the gray marketing scheme?
A. I don't recall if we did an exact calculation on that.
Q. But did you try to calculate and come up with a general understanding of the amount of

money he made from the gray marketing scheme?
A. I don't know if we did that or not.
Q. Do you have any understanding generally as to the amount of money that he made at all from the gray marketing scheme?
MR. KOSTAKOS: Objection.
A. I don't recall.
Q. Did you ever learn what his bonuses were during that time?
A. Again, I don't recall specifics. I'm assuming that we had the data on what his bonuses were.
Q. Okay. Was that the hundreds, the thousands, the ten thousands, or hundreds of thousands, or millions?
A. Based on my general knowledge, it would be in the tens of thousands.
Q. And do you recall whether it was low tens of thousands or high tens of thousands?
MR. KOSTAKOS: Objection.
A. I don't recall.
Q. How long did this gray marketing scheme go on for? What did your investigation reveal?

A. I believe it was over the course of one year. It may be longer.
Q. And what about Mr. Weigle's bonuses? Were those also in the tense of thousands?
A. Yes.
Q. And were they more than the tens of thousands?
A. No.
Q. Did Mr. Weigle ever file a lawsuit against APC?
A. Not to my knowledge.
Q. Did Mr. Weigle ever file a charge of discrimination with the Rhode Island Commission or any other commission against APC?
A. Not to my knowledge.
Q. Did APC also pay Mr. Weigle a significant amount of money after he profited in the tens of thousands of dollars from the gray marketing scheme?
A. I'm not familiar with the final disposition of his German contract.
Q. Are you aware that APC paid him any amount of money in relation to his termination

and/or resignation after he profited in the tens or thousands of dollars from the gray marketing scheme with APC?
A. I'm not familiar with the provision of his contract.
Q. You don't know whether APC paid him any money at all in relation to the termination or resignation?
A. I don't recall anything.
Q. Okay. Did the board of directors have to approve, do you know, the payment to Mr. Graham in relation to his resignation?
A. I can -- the only thing I can answer to that is if the board approved it there would have been an 8-K filed.
Q. A what filed?
A. 8-K.
Q. What's that?
A. That's a document that would have been filed with the Securities and Exchange Commission and it would detail an agreement made by the company with an officer of the company. I don't recall if Mr. Graham was considered an officer of the company at the

A. I book my travel through APC travel.
Q. What do you mean by that?
A. We have travel agents that are connected and they book at hotels we are to stay at.
Q. So you've never requested a specific hotel when you were traveling?
A. No.
Q. Is it your understanding or did Miss Bollman tell you that she had told Mr. Daniels to book the hotel at the hotels on the APC hotel list?
MR. KOSTAKOS: Objection.
A. Repeat the question.
Q. Did Miss Bollman -- let me ask you this question. Is all of your knowledge relating to the issue of Mr. Daniel's termination and the reasons for his termination in terms of violating any policies, does all of your knowledge come from Miss Bollman?
A. Yes.
Q. Okay. Doesn't come from any other source?
A. No.
Q. Did Miss Bollman specifically tell you

Q. Would it be an important fact to know whether or not any other hotel could accommodate the training needs of the individuals who had booked hotels at the Marriott?
A. No.
Q. It would not? Do you know whether any individuals who stayed at the Marriott Hotel, in fact, received reward or travel points from the Marriott at that time?
A. I'm not aware of that.
Q. You don't know one way or the other?
A. I don't know definitively one way or the other.
Q. Did you know at that time?
A. My understanding was that the points associated with the reservations went to Seth Daniels.
Q. Did you inquire whether or not any individuals also received reward points for their stay at the Marriott?
A. No, I did not at that time.
Q. Okay. And is that an important fact to know?

A. The fact that they received Marriott point rewards for the stay? No, I do not see that as relevant.
Q. Did Mr. Daniels, in fact, ever inquire -- let me ask you this: You already testified you didn't speak with anyone with regard to these issues other than Miss Bollman, is that correct?
A. That's correct.
Q. Okay. Other than speaking with Miss Bollman, did you look at any documents?
A. Not that I recall.
Q. Okay. Did you conduct any investigation at all?
A. Yes, I did.
Q. What did you do?
A. I discussed the issue fully with Miss Bollman.
Q. What else did you do?
A. That's the extent of my investigation.
Q. Did Mr. Daniels get approval to book the hotel rooms at the Marriott from anybody?
MR. KOSTAKOS: Objection.
A. My only knowledge is that Miss Bollman