**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| SETH DANIELS, | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL NO: 05-00459-ML-LDA |
| | ) | Judge Lisi |
| AMERICAN POWER CONVERSION CORPORATION | ) | |
| Defendant. | ) | |

**<u>REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL</u>**

The Plaintiff, through his undersigned Counsel, hereby submits his Reply in Support of his Motion To Compel Defendant to answer discovery and produce documents in response to Plaintiff's discovery requests.

## I. INTRODUCTION

Defendant, American Power Conversion Corp. ("APC"), has misstated the facts in an effort to avoid having to produce relevant and responsive discovery. It has also misconstrued the scope of the discovery sought in an effort to exaggerate Plaintiff's reasonable requests. Most egregiously, it has taken the position that it should not have to produce documents unless APC itself decides, at some future time, that such documents are of use to APC, and then, and only then, will it produce the documents to Plaintiff. Equally egregious are APC's misstatements to Plaintiff that no documents existed in response to certain requests, only later to produce such responsive documents after Plaintiff filed his Motion to Compel.

APC seeks to hide four categories of documents. It seeks to withhold from Plaintiff, and ultimately from this Court and a jury, documents demonstrating that (1) it is not the general practice of APC employees to stay at APC-preferred hotels, (2) Daniels did not cost, but in fact, saved APC money by directing that the hotel rooms be booked at the Marriott, (3) other employees did receive reward points for use of the Marriott and for APC travel-related expenses of other employees, and (4) white individuals who committed more serious infractions than Daniels, and over whom Brian Gough had Human Resources responsibility, were treated more favorably than Daniels. APC's discovery tactics violate the Federal Rules of Civil Procedure and the law of this Circuit.

## II. FACTS

In its opposition memorandum, APC misstates and mischaracterizes many of the facts. In an effort to justify its reasons for terminating Daniels, APC mischaracterizes the instructions given to Daniels regarding the room reservations at the Marriott. Specifically, APC alleges that travel manager Bollman instructed Daniels to book the hotel rooms at issue at "one of the other Providence-area hotels where Bollman had negotiated a preferred rate on the Company's behalf." APC Mem. at 1-2. APC also alleges that Bollman "directed Daniels to utilize" the Johnson & Wales Hotel. *Id.* at 2. APC's recitation of the facts directly contradicts the sworn testimony of Bollman in which she admitted that she never gave such instructions to Daniels:

> Q. Did you ever specifically direct Mr. Daniels and tell him that he must insure [*sic*] that rooms are reserved at the Johnson and Wales Hotel?
> A. No, I did not.
> Q. Did you ever direct[] him that he was not permitted to allow rooms to be booked at the Providence Marriott?
> A. No, I did not.

Ex. 1, Bollman, Dep. at 157-58.

Further, Bollman testified that the hotels on the APC-preferred list are merely preferred vendors and employees are not required to use the vendors listed:

> Q. [W]hat is the policy when you have a certain airline, car rental or hotel that you contract with for services, do you require APC employees to use those specific vendors or are they merely preferred vendors?
> A. There are preferred vendors.
> Q. So you don't require that they use those vendors?
> A. Right.

*Id.*, Bollman Dep. at 37.

APC alleges that Daniels "lied" to Bollman about the *use* of the Providence Marriott. APC Mem. at 2. APC's false accusation against Daniels is remarkable because the evidence clearly shows that Daniels *never lied* to Bollman or anyone else at APC. Although APC alleges that Daniels denied "using the Providence Marriott," in APC's own statement of facts, it admits that Daniels made no such denial. Rather, when asked whether or not Daniels was holding training at the Marriott, Daniels simply responded "we are not doing training at the Marriott." Ex. 2. (APC 137-38). Bollman never asked Daniels whether hotel rooms were being booked at the Marriott. Bollman's failure to articulate clearly what she now says was meant to be an inquiry into whether or not hotel rooms had been reserved at the Marriott cannot be imputed to Daniels to prove an improper motive by Daniels. Further, Daniels never attempted to hide the fact that rooms were being used at the Marriott Hotel for employees traveling to Providence for training. In fact, Daniels notified Human Resources and his management prior to the time in which the employees actually stayed at the Marriott. Ex. 21, Daniels Dep. at 298-301.

APC also falsely alleges that Daniels' use of the Marriott Hotel for APC trainees cost APC "$8,000 in additional hotel costs during that period." APC Mem. at 2. This fact is quite

significant because APC has refused to produce documents which would reflect the cost per night at the hotels in the Providence area other than the Johnson & Wales Hotel. In fact, the preferred hotel list provided by APC identifies a number of other hotels in the Providence area in addition to the Johnson & Wales Hotel. The list includes the Radisson Airport Hotel, Sheraton Providence Airport Hotel, Fairfield Inn, and Extended Stay America. Ex. 3, APC 139-40. Because other hotels were on the preferred list, Daniels could have used them for the trainees without any argument from APC that bookings at such hotels would have been improper. Had any of these hotels had a higher rate than the negotiated rate obtained by Daniels at the Marriott, APC would have no argument that Daniels cost the company any money at all, and concomitantly, if any of these hotels had rates less aht the Johnson & Wales, any loss would have been less than $8,000.

Additionally, despite APC's suggestion to the contrary, numerous hotels in the Providence area have been used by APC employees which were not on the APC-preferred list produced by Defendant.[1] Several of the hotels which were not on the APC list had higher room rates than the Johnson & Wales[2] and several hotels cost more than the rate obtained by Daniels at

1 The following hotels in the Providence area were used by APC employees for work-related events and were not on the preferred hotel list provided by APC: Comfort Inn Warwick Airport, Courtyard Providence Downtown, Courtyard Providence Warwick, Courtyard Providence-Lincoln, Crowne Plaza Warwick, Days Hotel At Providence, Express North Attleboro, Express Suites Conference Center Woonsocket, Hampton Inn Providence Warwick Airport, Hampton Inn Seekonk, Hilton Garden Inn Providence, Holiday Inn Express & Suites Warwick-Providence, Holiday Inn Providence-Downtown, Homewood Suites Providence, Mainstay Suites, Marriott Providence, Motel 6 Providence - Seekonk, Park Inn Seekonk, Providence Biltmore Hotel, Providence Warwick Airport Hotel, Residence Inn Providence, SpringHill Suites Warwick, and The Westin Providence. Exs. 3, 15.

2 The following hotels at which APC employees stayed had higher average room rates than the rate at the Johnson & Wales Hotel: Comfort Inn Warwick Airport ($108), Courtyard Providence Downtown ($225), Courtyard Providence Warwick ($104), Courtyard Providence-Lincoln ($125, yr-2006), Crowne Plaza Warwick ($156.46), Days Hotel at Providence ($95.45, yr-2003, 2005, 2006 avg.), Hampton Inn Providence Warwick Airport ($118.41), Hampton Inn Seekonk ($97.81), Hilton Garden Inn Providence ($111.15, yr-2005, 2006 avg.), Holiday Inn Express & Suites Warwick-Providence ($104), Holiday Inn Providence-Downtown ($118.32), Homewood Suites Providence ($111.03, yr-2005, 2006 avg.), Mainstay Suites ($82.62), Marriott Providence ($189), Park Inn Seekonk ($75.99 - 2005), Providence

the Providence Marriott.[3] Further, APC's own travel manager, Bollman, testified that the Crown Plaza Hotel in Providence was on the APC-preferred hotel list in 2003, 2004, and 2005. Ex. 1, Bollman Dep. at 138-39. Bollman further testified that rooms at the Crown Plaza in 2003 cost $129 per night, $34 more per night than Daniels' negotiated rate of $95.00 per night at the Marriott. *Id.*

## III. ARGUMENT

### A. Daniels' Discovery Has Not Been Wide-Ranging and Instead Is Tailored and Limited To The Specific Issues of the Case

APC alleges that Daniels' discovery has been "wide-ranging." APC Mem. at 3. APC overstates the discovery that has been conducted in this case. Daniels initially served APC with eleven document requests and twenty interrogatories. Plaintiff's Motion to Compel, Ex. 16. APC refused to answer several of the interrogatories and document requests and gave only partial answers to almost every other request. See Plaintiff's Motion to Compel, Exs. 17 and 24. On October 3, 2006, after APC refused to respond to, and instead objected to, many of the requests, in part, because APC argued the discovery requests were overly broad, Plaintiffs served five additional interrogatories and nine additional document requests. Ex. 4, Plaintiff's Supplemental Interrogatories and Request for Production of Documents and Plaintiff's Motion to Compel, Ex.

Biltmore Hotel ($139), Providence Warwick Airport Hotel ($98.10), Residence Inn Providence, ($114.58, yr-2005-2006 avg.), SpringHill Suites Warwick ($102.14), and The Westin Providence ($126.19, yr-2003, 2005, 2006 avg.). *Id.*

3 The following hotels at which APC employees stayed had higher average room rates than the $95.00 rate obtained by Daniels at the Marriott: Comfort Inn Warwick Airport ($108), Courtyard Providence Downtown ($225), Courtyard Providence Warwick ($104), Courtyard Providence-Lincoln ($125, yr-2006), Crowne Plaza Warwick ($156.46), Days Hotel at Providence ($95.45-2003, 2005, 2006 avg), Hampton Inn Providence Warwick Airport ($118.41), Hampton Inn Seekonk( $97.81), Hilton Garden Inn Providence ($111.15, yr-2005, 2006 avg.), Holiday Inn Express & Suites Warwick-Providence ($104), Holiday Inn Providence-Downtown ($118.32), Homewood Suites Providence ($111.03, yr-2005, 2006 avg.), Marriott Providence ($189), Providence Biltmore Hotel ($139), Providence Warwick Airport Hotel ($98.10), Residence Inn Providence, ($114.58, yr-2005-2006 avg.), SpringHill Suites Warwick ($102.14), and The Westin Providence ($126.19, yr-2003, 2005, 2006 avg.). *Id.*

22, Second Supplemental Request for Production of Documents. However, many of the documents requested in these supplemental discovery requests were in fact responsive to Plaintiffs' first requests, and were merely re-served in an effort to be more specific. Plaintiffs then took the depositions of six current and/or former employees of APC who possessed knowledge regarding Daniels and/or who were specifically involved in his termination. Plaintiff's attorney took the depositions of John Bonzani, Christine Bollman, Doug Radamacher, Chrstine Hendrix, Brian Kelley, and Brian Gough. Ex. 5. APC had specifically identified each of these individuals in its initial disclosures. (In fact, APC also identified additional individuals whose depositions Plaintiff did not take.) Plaintiff undertook to take the depositions only of those individuals who were considered necessary to litigate the case. After taking most of the depositions, Plaintiff then served eighteen additional document requests specifically for documents revealed during the depositions which had not yet been produced, but which were responsive to Plaintiff's previous discovery requests. Plaintiff served the more specific requests to ensure that the specific documents identified by the deponents were produced. Finally, Plaintiff took the deposition of three third party witnesses which lasted a total of fifty-three minutes. Ex. 6, Colucci Dep. (15 min.); Ex. 7, Hayek Dep. (18 min.); Ex. 8, Laurence Dep. (20 min.).

APC also alleges that Daniels "now seeks to compel *additional* responses to thirteen requests for production of documents and five interrogatories." APC Mem. at 3 (Emphasis added). The fact that there are eighteen discovery requests to which APC failed to respond fully is not a reflection of "wide-ranging" discovery on Plaintiff's part, but instead, APC's

unwillingness to fulfill its discovery obligations under the Federal Rules and the law of this Circuit.

The types of documents which Plaintiff seeks to discover are limited and narrowly tailored. With regard to comparator information, Plaintiff has, for the most part, limited its requests for discovery to those individuals who worked under the supervision of John Bonzani and Paul Kavanaugh, Daniels' supervisors, as well as those individuals over whom Brian Gough had human resources responsibility. Thus, Plaintiff limits the discovery of potential comparators to those employees who worked under the three managers who APC alleges identified as the decision makers for Daniels' termination. Courts generally recognize that evidence relating to individuals under the decision makers is properly discoverable. *See, e.g., Jacobson v. Starbucks Coffee Co.*, No. 05-1338, 2006 WL 3146349 (D. Kan. Oct. 31, 2006). In *Jacobson*, the court granted a motion to compel ordering the defendant to produce the employee records for those individuals who were terminated by the same decision makers as plaintiff. *Id.* at 5. Plaintiff here also, for the most part, limited the discovery sought relating to hotel stays and costs to hotels in Rhode Island even though evidence beyond Rhode Island would also demonstrate that employees regularly stayed at hotels that were not listed on the APC-preferred list.

**B. APC Argues that Daniels Is Not Entitled to Much of the Discovery He has Requested Until He Can Prove Which Individuals Are Similarly-Situated To Him**

Most importantly, APC seeks to withhold discovery and to determine unilaterally which comparators it believes are similarly situated. Not surprisingly, APC takes the position that there are no comparators and, therefore, it need not produce any documents related to comparators. APC's refusal or produce evidence relating to potential comparators violates the Federal Rules

which permit a party to withhold responsive documents reasonably calculated to lead to the discovery of admissible evidence only where the documents are protected by privilege or a protective order, neither of which is the case here. Fed. R. Civ. P. 26(b).

APC argues that Plaintiff must first identify the individuals believed to be comparators and demonstrate how the evidence relating to such individuals meets the similarly-situated test before Plaintiff is entitled to receive the discovery regarding such individuals. Ex. 9, Letter from Kostakos to Kisch dated Dec. 1, 2006. APC argues that "to obtain discovery Daniels still must demonstrate that the employees who allegedly complained are similarly-situated to him in all material respects." APC Mem at 8-9. It also alleges that "to be entitled to the personnel files of other employees, Daniels must make a particularized showing that such employees are similarly situated to him" and that a protective order may not be sufficient to protect the employees' privacy interests. *Id.* at 11.

### 1. A Protective Order Is Sufficient To Protect The Privacy Concerns of the Employees

Contrary to Defendant's assertion, courts routinely allow the production of non-parties' personnel files relevant to plaintiff's claims, particularly where a confidentiality agreement has been reached. Defendant's assertion that a protective order would not adequately protect the employees' privacy interests is without merit. As courts have routinely held, privacy interests are not absolute, and cannot be baldly asserted without consideration of the competing interests and the means by which any alleged invasion of privacy may be curtailed. *See, e.g., Burka v. New York City Transit Authority*, 110 F.R.D. 660, 664 (S.D.N.Y. 1986). "If an individual's privacy is at stake, courts balance "the need for the information sought against the privacy right asserted."

*Soto v. City of Concord,* 162 F.R.D. 603, 616 (N.D.Ca. 1995).

Here, the personnel files requested are essential to proving Mr. Daniels' case. The information will help Daniels establish that similarly-situated white employees were treated more favorably and that APC's proffered reason for his termination was pretext. "[W]here the files sought are those of employees whose action or inaction has a direct bearing on the Plaintiff's claims or Defendant's affirmative defenses and especially where, as here, the court has issued an appropriate confidentiality order, personnel files are subject to discovery." *Cason v. Builders FirstSource-Southeast Group, Inc*. 159 F. Supp. 2d 242, 247-48 (W.D.N.C. 2001); *see also Knoll v. American Tel. & Tel. Co*., 176 F.3d 359, 365 (6th Cir. 1999) ("Such protective orders are commonly granted, however, as a means of protecting the privacy interests of nonparties while yet serving the needs of litigation."); *Coughlin v. Lee,* 946 F.2d 1152, 1158-59 (5th Cir. 1991) (holding plaintiff was entitled to comparators' personnel files because relevant to question of pretext, and stating **"**In Title VII litigation, in which plaintiffs are similarly required to demonstrate pretext, courts have customarily allowed a wide discovery of personnel files. All or some parts of these personnel files could be central to the plaintiffs' effort to prove pretext.") (collecting cases); *Johnson v. Morris,* 903 F.2d 996, 998 (4th Cir.1990) (pursuant to a protective order, defendant's investigative file and the personnel files of all employees who supplied information during the investigation of plaintiff's alleged misconduct, were produced.); *Mitchell v. Fishbein* 227 F.R.D. 239, 253 (S.D.N.Y. 2005) (requiring personnel files be produced in an employment discrimination suit, despite asserted privacy concerns, where there was a confidentiality agreement and "there is simply no reason to believe that plaintiff would not comply with a court order precluding her from disclosing the contents of the personnel files

except for the limited purpose of this litigation."); *Barfoot v. Boeing Co*., 184 F.R.D. 42, 644 (N.D. Ala.1999) (permitting discovery of personnel files in that information within them might relevant for establishing pretext or a *prima facie* case); *Blount v. Wake Elec. Membership Corp*., 162 F.R.D. 102, 105-06 (E.D.N.C. 1993) (ordering production of personnel files of employees directly implicated by plaintiff because the files contained information which was "clearly relevant" and not otherwise readily available).

Further, in a Title VII retaliation case, the court in *Williams v. The Art Institute of Atlanta,* No. 1:06-CV-0285-CC/AJB, 2006 WL 3694649, *6 (N.D. Ga. Sept. 1, 2006) held that personnel files must be produced and that:

> [a]s far as the privacy concerns, the Court's protective order remedies these concerns . . . personnel files are generally permitted to be disclosed in discovery, where there is a protective order or confidentiality order, for: (1) those employees whose action or inaction has a direct bearing on the Plaintiff's claims or Defendant's affirmative defense; or (2) those employees whom a plaintiff believes were treated differently from her.
>
> As the Eighth Circuit stated in *In re Motion to Unseal Electronic Surveillance Evidence:*
>
> Much of the discovery done in civil suits implicates confidentiality and privacy interests, and courts are often asked to carefully balance these interests with the compelling need for discovery. In general, parties may obtain discovery "regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." Fed. R. Civ. P. 26(b)(1). . . . Thus the rules of discovery allow intrusions into the private affairs of parties to litigation as well as third parties. Courts often guard the confidentiality and privacy interests implicated in discovery by limiting discovery or issuing protective orders.

965 F.2d 637, 641 (8th Cir. 1992) (citing *Pagano v. Hadley,* 100 F.R.D. 758 (D. Del. 1984). There is no reason why any privacy interests in this case cannot adequately be protected through a protective order.

### 2. Plaintiff Need Not First Demonstrate That Comparator Information Meets the Similarly-Situated Test Before Receiving the Discovery

APC states, "Plaintiff has failed to identify any . . . individual similarly situated to him in all relevant respects, who engaged in the same or similar conduct . . . that was treated differently tha[n] Plantiff." Ex. 9, Letter from Kostakos to Kisch dated Dec. 1, 2006, pg. 3. Further, APC argues:

> [w]ith respect to your specific request for information regarding claims of discrimination by Kevin Brown and Kathleen Green based upon testimony by Doug Radamacher, APC maintains that Plaintiff failed to meet his burden. . . . [W]ith respect to both individuals, Mr. Radamacher testified that he did not have first-hand knowledge of discrimination claims asserted by these individuals. . . . APC will not further respond to this request.

*Id*.

APC has not cited any case law in support of its extreme position. Rather, APC cites several cases[4] in which the courts discussed the standard for determining whether an individual is similarly situated in the context of summary judgment. Numerous courts who have rejected the practice suggested by APC, namely, that a defendant may withhold documents during discovery until a plaintiff proves that the comparator meets the similarly situated test. In so doing, courts have held that it is improper to deny a motion to compel with regard to discovery that might uncover comparator information and subsequently to grant summary judgment to the defendant based upon the lack of such evidence or for failing to establish pretext. For example, the court in *Hollander v. American Cyanamid*, 895 F.2d 80 (2nd Cir. 1990) reversed summary judgment where the district court had failed to grant a motion to compel seeking discovery of individuals who may have been similarly situated. Specifically, the plaintiff, who had been terminated by his

4 The cases cited by APC for this proposition included, *Smith v. Stratus Computer, Inc*., 40 F.3d 11 (1st Cir. 1994);

employer, had requested that defendant "[i]dentify each management level employee who has terminated employment with you . . . who at the time of the termination of his employment was over the age of 40, stating as to each the reason or reasons for the termination of employment." *Id*. at 84. The defendant objected, arguing that the request was overly broad and vague and beyond the geographic areas in which the plaintiff worked. The district court held that the discovery would be burdensome and was irrelevant. *Id.* The Second Circuit held that the "restriction upon [] the plaintiff's discovery unduly limited his ability to establish his argument that [] [the defendant's] discharge of him was pretextual." *Id.* The Second Circuit further held:

> [e]vidence relating to company-wide practices may reveal patterns of discrimination against a group of employees, increasing the likelihood that an employer's decision regarding a particular individual masks a discriminatory motive. . . . It is possible that [] [plaintiff's] discovery request might uncover a pattern of older management employees leaving [] [defendant] under unexplained circumstances, which might help prove his claim that [] [defendant's] explanation for his discharge was pretextual.
>
> Because employers rarely leave a paper trail-or "smoking gun"-attesting to a discriminatory intent, . . . disparate treatment plaintiffs often must build their cases from pieces of circumstantial evidence which cumulatively undercut the credibility of the various explanations offered by the employer. Such determinations are, generally speaking, most competently and appropriately made by the trier of fact. So long as the plaintiff can present "solid circumstantial evidence" supporting his case, . . . he should have the opportunity to prove his case at trial.

*Id.* at 84-85; *Kraiman v. Georgia-Pacific Corp.*, No. 90-4299, 1991 WL 175428 (E.D. Pa. Sept. 5, 1991) (same).

The D.C. Circuit has also ruled that the denial of possible comparator evidence warrants a reversal of summary judgment. *Paquin v. Federal National Mortgage Association*, 119 F.3d 23 (D.C. Cir. 1997). The court held that evidence of potential comparators is necessary prior to a

---

*Roasado v. Radio Shack, Inc*., 312 F.3d 532 (1st Cir. 2002); *Cruse v. G& J USA Publishing*, 96 F. Supp. 2d 320 (S.D.N.Y. 2000); and *Williams v. Frank*, 757 F. Supp. 112 (D. Mass. 1991).

ruling on summary judgment because such evidence may assist the plaintiff in proving pretext. *Id.* at 229.

APC's argument for its refusal to produce responsive evidence are almost identical to those rejected in *Mitchell v. Fishbein*, 227 F.R.D. 239 (S.D.N.Y. 2005). In *Mitchell*, the plaintiff, an African-American attorney who was formerly certified to serve on the state's panel to provide legal services to indigent criminal defendants, alleged race discrimination when his recertification was denied. Plaintiff filed a motion to compel after the defendant refused to produce possible comparator evidence. The court held:

> To the extent that [] [defendants] are arguing that [] [plaintiff] must provide the Court with proof of discrimination before he is entitled to seek discovery relating to his claim of discrimination, that argument turns the purpose of discovery on its head and is rejected as frivolous. To the extent that defendants are arguing there is no possibility that [] [plaintiff] could ever demonstrate discrimination simply because he is the only African-American attorney who was not recertified to the Panel, that argument too is frivolous. As should be obvious, if [] [plaintiff] uncovered evidence that similarly-situated non-African-American applicants were in fact recertified to the Panel, such evidence plainly would be relevant to his claim of discrimination.

*Id.* at 249.

Numerous other courts have also ordered defendants to produce documents where they, like APC, have withheld evidence which might have aided plaintiffs to prove their case. For example, in *Jacobson v. Starbucks Coffee Co.*, No. 05-1338, 2006 WL 3146349 (D. Kan. Oct. 31, 2006), the court rejected the defendant's argument that, before it should have to turn over certain employee files, the plaintiff must first identify the individuals whose files would contain relevant information. In *Jackson v. Montgomery Ward*, 173 F.R.D. 524 (D. Nev. 1997), the court also held that a plaintiff had a right to access documents which might be helpful to his race

discrimination and harassment claim, and ordered defendant to produce the documents. The court further noted that "defendants of even minimal sophistication will neither admit discriminatory animus nor leave a paper trail demonstrating it," thus justifying the need for the requested documents. *Id.* at 527. In *Lyoch v. Anheuser-Busch Co., Inc.*, 164 F.R.D. 62, 67 (E.D. Mo. 1995), the court ordered defendant to comply with a discovery request over the defendant's argument that an individual plaintiff was "engaging in a 'fishing expedition'" when he asked the defendant to identify individuals who received promotions so that he could determine whether or not they were potential comparators,

Both the Seventh and Ninth Circuits have also ruled that summary judgment is improper in a disparate treatment case when a district court restricts a plaintiff's ability to discover evidence that may be useful for establishing a *prima facie* case or the employer's motivation for taking the employment action. *See Diaz v. American Telephone & Telegraph*, 752, F.2d 1356 (9th Cir. 1985), and *Cedillo v. International Ass'n of Bridge and Structural Iron Workers, Local Union No. 1*, 603 F.2d 7, (7th Cir. 1979).

Additionally, the Ninth Circuit has held that it is inappropriate to make determinations regarding comparator analysis without first allowing a plaintiff to obtain the related discovery. For example, in *Garrett v. City and County of San Francisco*, 818 F.2d 1515, 1519 (9th Cir. 1987), the court reversed summary judgment where the district court failed first to address the plaintiff's request for comparator evidence relating to other employees who may have engaged in similar acts of wrongdoing, but were nevertheless not fired. The Ninth Circuit explained that "this case presents the circumstance where 'a party's access to material is of crucial importance where the information is likely to be in the sole possession of the opposing party." *Id.*

Based upon all of these precedents, APC's arguments that Plaintiff must first prove that the evidence, of which he had not yet even discovered, meets the similarly situated test, is plainly at odds with the entire fabric of the discovery provisions of the Federal Rules.

Even if this Court holds that, in order to obtain discovery relating to individuals who are similarly-situated, the test as articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 784 (1973), warrants disclosure of the requested documents. The Supreme Court held:

> [R]espondent must be afforded a fair opportunity to show that petitioner's stated reason for respondent's rejection was in fact pretext. Especially relevant to such a showing would be evidence that white employees involved in acts against petitioner of comparable seriousness were nevertheless retained or rehired.

*Id.* at 84.

The Supreme Court subsequently explained further that:

> precise equivalence in culpability between employees is not the ultimate question: as we indicated in *McDonnell Douglas,* an allegation that other employees involved in acts against [the employer] of *comparable seriousness* were nevertheless retained is adequate to plead an inferential case that the employer's reliance on his discharged employee's misconduct as grounds for terminating him was merely a pretext.

*McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 283 n. 11 (1976).

Certainly, individuals who were alleged to have committed any of the following actions are proper comparators to Daniels: (1) violation of the ethics policy, (2) unethical actions, (3) costing APC money through violation of a policy or directive, (4) disregarding a directive of an APC manager, or (5) taking actions in the course of the job which violated a policy and attempting to hide same from the employer. These are all acts of "comparable seriousness" as described *McDonald* and, therefore, warrant discovery.

### C. The Documents Requested by Daniels are Reasonably Calculated to Lead to the Discovery of Admissible Evidence and APC has Raised No Valid Objections To the Requested Production

#### 1. Request No. 4 seeks documents reasonably calculated to lead to the discovery of admissible evidence

In Request No. 4, Plaintiff seeks documents relating to complaints of race discrimination, harassment, and/or retaliation. APC argues that only those complaints made against Kavanaugh, Gough, or Kelly are relevant to this case.[5] APC Mem. at 7. But what APC fails to address is that discovery is also proper for those complaining individuals over whom Kavanagh and/or Bonzani had supervisory responsibility, or over whom Gough had human resources responsibility, and which one of supervisors were involved in, acted upon, and/or made a decision regarding such complaints. For example, if an individual, over whom Kavanaugh had supervisory responsibility and Gough had Human Resources responsibility, complained of race-based harassment by travel manager Bollman, and his personnel file or other file included a memo from Gough stating that, although he realizes that there have been several complaints about how Bollman has treated African-Americans and other minorities, he would not discipline her and would simply notify the complainant and/or EEOC that the allegations were unfounded. Certainly such a document would be relevant to establishing pretext in Daniels' case and would not have been limited to complaints against Kavanagh, Kelly, or Gough.

APC also alleges that complaints related to harassment or discrimination, other than those relating to race, are irrelevant. APC Mem. At 8. However, APC's position is counter to case law on this very issue. In *Roberson v. Allied Signal*, No. 95-CV-0616, 1997 WL 222359, (N.D.N.Y. March 21, 1997), the court held that discrimination of a type not alleged in the case may "lead to

5 Inexplicably APC takes the position that complaints against Bonzani, Daniels' direct supervisor, are not

relevant information, particularly with respect to the plaintiff's claim that the defendants' reason for termination was a mere pretext for discrimination." *Id.* at 3. As in the example above, a complaint against Bollman sounding in age discrimination would be material if Gough wrote a memo stating that, although there seems to be a pattern of discrimination and harassment complaints against Bollman, he would not discipline or speak to Bollman regarding the issues and instead would simply inform the complainant and/or EEOC that the allegations are unfounded. Even though the discrimination and/or harassment may not have been race-based, this type of evidence would be material to prove pretext in Daniels' case.

APC argues that Daniels must first prove the individuals are similarly-situated to Daniels in order to receive the complaint files. As set forth in pages 11-16 above, Daniels need not first prove that the discovery meets the similarly-situated test. Further, Daniels could not possibly make such a demonstration without first knowing anything about the individuals who complained.

Finally, APC point out that Daniels has already "received responses to over 60 interrogatories and document requests." APC Mem. at 9, to argue that Daniels has had a full opportunity to conduct discovery to make the similarly-situated showing. But, as APC is full aware, Daniels did not receive full responses and it is these responses that Daniels seeks to compel in this motion. Further, APC argues that Daniels took the deposition of Christine Hendrix who testified "regarding numerous employee relations issues." APC Mem. at 9, n. 9. Yet it was the testimony of Christine Hendrix, in part, which alerted Plaintiff to the fact that there were several complaints of discrimination and/or harassment that had been withheld by APC. Hendrix herself could not recall many of the details regarding the complaints and it is because

---

discoverable.

APC refused to produce the files pertaining to such complaints that Daniels filed this motion to compel. APC alleges, over and over again, that conclusory and/or bald assertions do not entitle Plaintiff to discovery. Moreover, it is not, of course, bold assertions that entitle Plaintiff to the discovery but rather the allegations of the Complaint and the provisions of the Federal Rules of Civil Procedure. Daniels has been very specific regarding the need for the discovery and has specifically provided information regarding how the documents relate to the case. Nevertheless, APC chooses to ignore such explanations and, instead, hopes the potentially hurtful evidence remains hidden from view.

**2. Request No. 5**

APC argues that the documents identified in Plaintiff's Motion to Compel relating to Request No. 5 are not responsive to the request. APC Mem. at 10. The documents at issue relate to comparators. APC's position is odd because APC itself responded in its supplemental response to this request that it had produced all responsive, non privileged documents . . . however, that no documents exist to support Plaintiff's contentions that he should not have been terminated, or that suggest he was treated differently than other employees. See Plaintiff's Mem. at 11. However, even if this Court were to find that the documents identified in Plaintiff's Motion to Compel on pages 11-13 are not responsive to Request No. 5, they are also responsive to other requests. The expense and reimbursement files for Kavanagh and Bonzani are responsive to Request Nos. 8, 12, 15, and 17; the documents reflecting that APC employees did not stay in APC Preferred hotels are responsive to Request No. 6 as it relates to Interrogatory No. 14, and to Request Nos. 8, 10, 12, 15, and 17.

Next APC suggests that unless "Gough or Kavanagh reviewed or considered any of the requested documents when they made the decision to terminate [Plaintiff's] employment," the documents are not discoverable. APC Mem. at 10. APC cites no case law to support this novel argument. Daniels is not limited to discover only those documents which Gough and Kavanaugh may have reviewed. Secondly, APC has not produced any evidence that Kavanaugh did not review documents prior to participating in the decision to terminate Daniels. If Bonzani and or Kavanaugh paid for the hotel rooms of other individuals or paid for any expenses related to APC travel other than their own personal travel, and they received reward points for such payments, then their actions would have been no different than those taken by Daniels. Such evidence will help to establish pretext regardless of whether or not APC reviewed the expense and reimbursement files for Bonzani and/or Kavanugh at the time that the decision to terminate Daniels was made. Further, although APC continually attempts to distance itself from its initial accusations that Daniels was terminated for booking the hotel rooms at a non-preferred hotel and costing the company additional money, the fact remains that APC made this argument and it cannot now avoid the discovery simply because the evidence is hurtful to its initial position.

Additionally, Gough testified that APC terminated "hundreds of employees every year." Ex. 10, Gough Dep. at 128. He further testified that he could not recall the circumstances related to the terminations. *Id.* Gough testified that several individuals who violated APC policies were not terminated. *Id.*, Gough Dep. at 150-51. He also testified that Human Resources was involved in these cases. *Id.* He further testified that the employee relations files would reveal many of these cases. *Id.* at 151-52.

Daniels requests that their personnel and employee relations files be produced because the documents are reasonably calculated to lead to the discovery of admissible evidence. Information within the files may reveal their races, dates of employment, employment history, the supervisors to whom they reported, the human resources representatives to whom they reported, the terms of their separation from the company, whether they were reimbursed for all their APC-related expenses upon separation from the company, the investigation notes, and other documents of which Daniels would not have any knowledge, but which may be relevant.

3. **Request Nos. 6, 13, and 14**

**a. APC's stated purpose to withhold documents until it decides whether it will rely on such documents at trial is astonishing**

APC's denial of Plaintiff's entitlement to the personnel files and documents related to the individuals involved in the "grey marketing scheme" and the sales employees who allegedly manipulated the phone system is nothing short of astonishing. APC states:

> [I]f APC ultimately decides to raise these issues as part of its defense at trial, the Company will amend its initial disclosures appropriately and provide additional documents and information to Daniels, such that he has adequate time to prepare a response to, and, if necessary, request additional discovery regarding same.

APC Mem. at 13, n. 14.

Because APC itself admits that it may raise these issues at trial, the documents are clearly discoverable. APC cannot unilaterally decide whether and when Daniels is entitled to the evidence, and Daniels is not limited to discover only those documents which APC intends to use at trial. Nor is Daniels limited to discovery of only those documents which may be helpful to APC. Daniels is entitled to all evidence that is

reasonably calculated to lead to the discovery of admissible evidence. Nor is APC entitled to craft its own rules of procedure, in particularly, a scheme which would- during the middle of trial- force the Plaintiff back into discovery mode.

APC's efforts to hide these documents are transparent. APC does not want Daniels to have access to the documents to oppose summary judgment.[6] APC's argument that Plaintiff is not entitled to these documents because APC itself did not rely upon the documents in its motion for summary judgment further illustrates this point. APC Mem. at 13. The relevancy of these documents is clear. APC originally relied upon these documents and represented to the EEOC that they supported its termination of Daniels. However, after Plaintiff's counsel revealed the potential benefit that these documents posed for Daniels, APC changed its position, arguing that, suddenly they are irrelevant.

The "grey marketing" scheme cost APC hundreds of thousands of dollars. Ex. 10, Gough Dep. at 149-50. Yet, APC allowed one of the executives who was involved in the scheme, Mr. Graham, to resign and it wrote him a letter of reference. Further, APC paid this executive $80,000 and gave him other benefits upon his resignation. *Id.*, Gough Dep. at 139-40.[7] Unlike APC's treatment of the white executive, APC terminated Daniels and refused to reimburse him for legitimate APC-related expenses. APC allegedly did this because Daniels directed that hotel rooms be booked at the Marriott for $95.00 rather

6 Like the grey marketing scheme and sales employees' documents, it has been APC's practice throughout the litigation to withhold relevant and responsive evidence for as long as possible. For example, APC produced hotel information only after it had filed a Motion for Summary Judgment and after the motion to compel was filed.
7 The other executive involved in the scheme was Mr. Weigle. Despite questions to Human Resources Director Gough regarding the amount paid to Mr. Weigle, Gough was unable to recall the facts. Ex. 10, Gough Dep. at 143. Gough's lack of recall is yet another reason why the documents are so important.

than at a preferred hotel, which ultimately enabled the success of the training and saved APC money, despite the company's knowledge at the time.

Next, APC argues that it should be allowed to determine which documents from the files of these individuals it should have to produce. APC has not provided any reason, other than privilege, as to why it should be allowed to withhold documents from their files. APC's failure to produce Graham's and Weigle's personnel and employee relations files, as well as any other files pertaining to the individuals and their alleged grey marketing scheme, is indefensible.

APC did, for the first time in its opposition motion, argue that it could withhold certain documents regarding the "grey marketing scheme" because the documents are "unreasonably cumulative, duplicative, or … obtainable from some other source that is more convenient, less burdensome or less expensive." APC Mem. at 18. APC never raised this objection in its response to Plaintiff's requests. See Motion to Compel, Ex. 22. Further, APC has not explained how the production of these documents would be burdensome or expensive. Further, the information is not duplicative because, although Plaintiff's counsel questioned Gough regarding the "grey marketing scheme," there was much that Gough was unable to answer. The following examples are illustrative:

> Q. Are you aware that APC paid [] [Graham] a significant amount of money associated with his resignation from APC?
> A. I'm not aware of the specifics. . . . I knew that we had settled. I did not know the amount. . . .
> Q. How much money did Mr. Graham make from the gray marketing scheme?
> A. I don't know that amount.
> Q. Did you attempt to determine that during the investigation? Did you and/or anybody else attempt to determine the amount of money that Mr. Graham received from the gray marketing scheme?
> A. I don't recall if we did an exact calculation on that.
> Q. But did you try to calculate and come up with a general understanding of the amount of money he made from the gray marketing scheme?

A. I don't know if we did that or not.
Q. Do you have any understanding generally as to the amount of money that he made at all from the gray marketing scheme?
A. I don't recall.
Q. Did you ever learn what his bonuses were during that time?
A. Again, I don't' recall specifics. I'm assuming we had the data on what his bonuses were.
Q. And do you recall whether it was low tens of thousands or high tens of thousands? . . . .
A. I don't recall. . . .
Q. Did APC also pay Mr. Weigle a significant amount of money after he profited in the tens of thousands of dollars from the gray marketing scheme?
A. I'm not familiar with the final disposition of his German contract.
Q. Are you aware that APC paid him any amount of money in relation to his termination and/or resignation after he profited in the tens of thousands of dollars from the gray marketing scheme with APC?
A. I'm not familiar with the provision of this contract.
Q. You don't know whether APC paid him any money at all in relation to the termination or resignation?
A. I don't recall anything.

Ex. 10, Gough Dep. at 139-44.

b. **APC's arguments for privilege and protection under the work product doctrine are fatally flawed**

APC's withholding of documents on the basis of privilege is unfounded as well. APC belatedly provided a privilege log on December 18, 2006, identifying certain documents it had withheld based upon privilege relating to the "grey-marketing scheme" after Plaintiff filed his Motion to Compel. On the privilege log, which is attached as Ex. 11, APC indicated it withheld numerous documents based upon the attorney-client privilege and work product doctrine. On January 11, 2007, Plaintiff's counsel sent APC a letter requesting that the documents identified on the privilege log be produced. Ex. 12. APC responded on January 16, 2007 refusing to do so. Ex. 18. The two individuals involved in the "grey marketing scheme" were Mr. Graham and

Mr. Weigle, but neither filed a lawsuit against APC. Gough Dep. at 139-143. The investigative notes and documents related to Mr. Graham and Mr. Weigle are discoverable.

To withhold documents based on work product, APC bears the burden to demonstrate that the documents were prepared by, or at the direction of, an attorney and in anticipation of litigation. *See* Fed. R. Civ. P. 26(b)(3); *see also Hickman v. Taylor*, 329 U.S. 495 (1947). "At its core, the work product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *U.S. v. Nobles*, 422 U.S. at 238; *see also Hickman v. Taylor*, 329 U.S. at 510-11. Even if the documents APC seeks to withhold were prepared by, or at the direction of, an attorney, they are not automatically protected under the work product doctrine. The documents must also have been prepared "in anticipation of litigation" for the protection to apply. Fed. R. Civ. P. 26(b)(3). "In determining what scope to give the work product doctrine, whether in the civil discovery context or elsewhere, courts must be careful to give no more protection than is necessary to preserve the values articulated in *Hickman*." *In Re: Grand Jury Subpoena*, 220 F.R.D. 130, 143 (D. Mass 2004).

Documents are not protected if they are prepared in the ordinary course of business or would have been created in essentially similar form irrespective of the litigation, and this is true even if the documents aid in the preparation of litigation. *See, e.g., State of Maine v. U.S. Dept. of Interior*, 298 F.3d 60 (1st Cir. 2002). Also, the fact that litigation ultimately occurred is not dispositive of the question of whether a party reasonably anticipated that litigation would occur. *Binks Manufacturing v. National Presto Industries,* 709 F.2d 1118 (7th Cir. 1983).

The documents at issue here were not created in anticipation of litigation, but instead

were created after APC learned of a possible "grey marketing scheme." As APC's counsel points out, "[w]hen the possible existence of this scheme came to light, its precise nature was unknown . . . . Accordingly, APC asked its in-house counsel, Attorney Giguere, to investigate the underlying facts and . . . provide services to the company regarding the situation." Ex. 18, email of Jan. 16. Thus, Attorney Giguere was not acting as an attorney, but as an investigator for the company. *Id.* APC has not presented any evidence that, at the time the investigation was undertaken, litigation was imminent. In fact, the evidence suggests that the investigation was undertaken for business reasons prior to the termination of Weigle and Graham, further supporting that litigation was not viewed as imminent. Ex. 10, Gough Dep. at 129-38. When the investigation began, APC did not even know if Graham and Weigle were involved. Ex. 10. Gough Dep. at 135.

Even if APC were able to meet the initial burden of demonstrating work product, Daniels is still entitled to the documents to the extent that the documents contain facts because it would be an undue hardship for him to obtain the information by other means.

> [A]n inquiring party may obtain discovery of documents and tangible things prepared in anticipation of litigation providing he shows a "substantial need" for the materials and "is unable without undue hardship to obtain the substantial equivalent of the materials by other means. . . . One such substantial need, for example may be for statements taken from parties or witnesses at the time of an incident. *See Tiernan v. Westext Transp., Inc.*, 46 F.R.D. 3, 3-4 (D.R.I. 1969).

*City of Springfield v. Rexnord Corp.*, 196 F.R.D. 7, 10 (D. Mass. 2000).

Plaintiff is in substantial need of the documents because they will demonstrate the level of investigation conducted for the white comparators as opposed to the lack of investigation conducted for Daniels. Further, the documents would tend to demonstrate the costs to the

company of the grey marketing scheme as well as the amount of money made by the individual white comparators. It is nearly impossible for Plaintiff to obtain this information from any other source because the documents, with perhaps a few exceptions, presumably exist nowhere but at APC. Thus, the transcripts, investigation notes, settlement agreements (whether in draft or final form), and emails with factual information are neither privileged nor protected under the work product doctrine and must be produced.

Further, "at a minimum, a [] [party] seeking to withhold a document . . . must identify the litigation for which the document was created (either by name or through factual description) and explain why the work-product privilege applies to all portions of the document." *State of Maine v. U.S. Dept. of Interior*, 298 F.3d 60, 69-70 (1st Cir. 2002). APC has not provided the detailed explanation that is required, as articulated by the First Circuit in the *State of Maine*. Its failure to do so is fatal to its assertion of protection.

Additionally, courts have ruled that, even if certain documents are considered privileged or protected under the work product doctrine, such privilege and/or protection does not extend to other unrelated litigation. *See e.g., Untied States v. International Bus. Mach. Corp.*, 66 F.R.D. 154 (S.D.N.Y 1974), and *Honeywell, Inc. v. Piper Aircraft Corp.*, 50 F.R.D. 117 (M.D. Pa. 1970).

APC argues that many of the documents, including transcripts of conversations with third parties, are protected by the attorney-client privilege. *See* APC's privilege log, attached as Ex. 11. "For the attorney-client privilege to attach to a communication, it must have been made in confidence and for the purpose of securing legal advice." *In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.)*, 348 F.3d 16, 22-23 (1st Cir. 2003).

> [T]he privilege is not limitless, and courts must take care to apply it only to the extent necessary to achieve its underlying goals. . . . In other words, the attorney-client privilege must be narrowly construed because it comes with substantial cost and stands as an obstacle of sorts to the search for truth. . . . For the attorney-client privilege to attach to a communication, it must have been made in confidence and for the purpose of securing or conveying legal advice. . . . The privilege evaporates the moment that confidentiality ceases to exist. . . . [T]he presence of third parties is sufficient to undermine the needed confidentiality.

*Id.*

Further, where an attorney functions in another capacity, his communications are not privileged. *Texaco Puerto Rico, Inc. v. Department of Consumer Affairs*, 60 F.3d 867, 884 (1st Cir. 1995). Giguere was not functioning as an attorney giving legal advice, but was acting as an investigator for the company. Further, "the protection of privilege extends only to communications and not to facts. A fact is one thing and a communication concerning that fact is an entirely different thing. . . . [T]he courts have noted that a party cannot conceal a fact merely by revealing it to his lawyer." *Upjohn Co. v. U.S.*, 449 U.S. 383, 395-96 (1981).

APC cannot credibly argue that transcripts of interviews are protected by the attorney-client privilege. The transcripts involved third party witnesses. Further, the individuals providing the information to Giguere through the interviews could not possibly have sought his legal advice. This is particularly evident because one of the transcripts was of a conversation with Graham himself who APC later terminated or allowed to resign.

It is unclear whether any of the documents listed on the privilege log relate to the sales employees who were terminated for the telephone manipulation scheme. But it is clear that only a few documents related to the sales employees have been produced. For the same reasons as stated above regarding the investigative notes and documents related to Mr. Graham and Mr. Weigle, all such documents related to the sales employees should be produced.

APC should have also produced the personnel and employee relations files related to Lisa Sipe who was apparently terminated for violating the ethics policy. Ex. 10, Gough Dep. at 145. Although Gough recalled that she was paid tens of thousands of dollars upon her termination from the company, he did not recall the specific amount. *Id.* at 148.

**c. Personnel Files Including Expense and Reimbursement Files for Individuals Who Stayed at the Marriott Are Reasonably Calculated to Lead to the Discovery of Admissible Evidence**

Document Request No. 6 and Interrogatory No. 14 request information related to the individuals from whom Daniels allegedly stole rewards points and whose hotel stays Daniels allegedly sought to hide from APC. The personnel files, including the expense and reimbursement files, for those individuals who stayed at the Marriott Hotel at Daniels' direction are reasonably calculated to lead to the discovery of admissible evidence. APC argues that, because Daniels arranged for the rooms to be billed directly, there will be no evidence in the files that the employees paid for their own rooms. APC Mem. at 15. APC's reasoning is circular. The evidence itself will demonstrate whether or not any of the employees paid for their own rooms. APC cannot rely on its own arguments and conclusions to justify hiding the evidence that could demonstrate otherwise. APC also argues that the files should not be produced because it is "highly unlikely" that the documents would contain information regarding whether the individual received reward points. APC Mem. at 15. But even APC itself does not represent that such information would not be included in the files. Further, APC is well aware that any individuals who paid for their own stays at the Marriott hotel were eligible to receive their own travel points if the individual signed up for the rewards program.

Since discovering that its argument for terminating Daniels for stealing reward points from other individuals was fatally flawed, APC has been trying to change its position. But its statements to the EEOC, as outlined in Plaintiff's Memorandum in Support of His Motion to Compel, see pg. 2, evidence its initial position, and APC 's efforts to distance itself therefrom can only be seen as a desperate attempt to avoid damaging evidence. APC cannot credibly dispute its own words. APC argues that Gough testified that he would have terminated Daniels even if "no employees had lost Marriott Rewards points as a result of his scheme." APC Mem. at 14.[8] APC apparently makes this argument because it is trying to change its stated reason for terminating Daniels. But Gough's testimony, cited by APC, does not support its statement that Daniels would have been terminated anyway. Rather, Gough simply states that the issue of whether or not other APC employees received reward points is irrelevant, which does not mean that Gough would have terminated Daniels regardless of whether or not other employees would have received reward points. It quite simply doesn't answer the question. This is further evidenced by Gough's other answers regarding whether or not certain facts were relevant. Gough testified that the issue of whether or not APC lost money from the hotel bookings at the Marriott is irrelevant, as is whether Daniels attempted to reserve rooms at the Johnson & Wales Hotel prior to having rooms booked at the Marriott. Ex. 10, Gough Dep. at 191-92. Further, Gough testified that the fact of whether or not the Johnson & Wales had enough rooms to accommodate the APC employees at the time the rooms were reserved at the Marriott is irrelevant. *Id.* at 192-93. Gough's testimony regarding the relevancy of certain facts is quite perplexing.

---

[8] Daniels agrees that he would have been terminated anyway because he has always alleged that he was terminated based upon his race and for complaining of discrimination and harassment.

APC also argues that because Daniels received some documents from the Marriott Hotel, it is not entitled to documents from APC. APC specifically alleges that "the invoices produced by Providence Marriott in response to Daniels' subpoena duces tecum contain the names of some, *if not all*, of the employees who stayed at the Providence Marriott at Daniels' direction." APC Mem. at 22 (emphasis added). Actually, APC is well aware that the documents did not contain all of the names of such employees, and its suggestion that they may have done so is a material misrepresentation of the facts. Plaintiff served a *subpoena duces tecum* upon the Marriott and requested the following documents: "All documents reflecting reservations made and/or hotel rooms used by an employee of American Power Conversion Corporation ("APC") at the Providence Marriott at any time from 2000 to the present." Ex. 13. During the deposition of Susan Colucci, Controller for Marriott, Colucci testified that she did not have documents responsive to this request. Ex. 6, Colucci Dep. at 6. Specifically, Colucci explained that the Marriott does not maintain its computer records dating back to 2003 or 2004. *Id.* at 10-11. She further testified that she did not have any documentation for individuals who booked their own hotel rooms. *Id.* at 7-8. Further, unless she is provided with a particular name of an individual, she is unable to search for documents related to that specific individual. *Id.* at 9.

**d. Documents relating to stolen or lost company equipment are reasonably calculated to lead to the discovery of admissible evidence**

Document request No. 6 requests files of individuals who have reported lost or stolen equipment, as identified in response to Interrogatory No. 15. APC states that Daniels has not provided any temporal limitation to this request. APC Mem. at 15. That is simply not true. In Plaintiff's letter of September 29, 2006, Plaintiff specifically agreed to limit its request to

incidents dating back to 1990. See Plaintiff's Motion to Compel, Ex. 18, pg. 6. However, if this Court were to find that 1990 relates too far back, Plaintiff would further limit the temporal scope to those incidents dating back to 1998.

Further, APC argues that Daniels has not limited the request to only those instance in which Kelly responded to the reports of stolen equipment. APC Mem. at 15-16. Brian Kelly served as the Director of Finance and Administration for North America beginning in 2000 or 2001 and remained in that position until 2005. Ex. 14, Kelly Dep. at 20-21. In that position, Kelly's job duties included "global process ownership for accounts payable, for payroll, and for travel." *Id.* at 22. In this position, Kelly had access to, and communicated, with all of APC's North American employees. Id. at 27. Prior to holding that position, Kelly was the Finance Manager for APC, from around 1998 until 2000 or 2001. *Id.*at 20-21. Kelly testified that, although he does get involved with some incidents in which reports are filed that a laptop has been lost or stolen, he does not get involved in all such incidents. Ex. 14, Kelly Dep. at 156-57. Kelly is aware of his involvement with some such individuals in addition to Daniels. *Id.* Because Kelly had responsibility over employees in North America, Daniels limits his request to individuals employed in North America. Even if this Court rules that Daniels is not entitled to the files pertaining to individuals who reported a theft for which Kelly did not become involved, at the very least, Daniels is entitled to the files in which Kelly did get involved relating to those individuals who reported that company equipment was lost or stolen.

Finally, APC argues that this request is unduly burdensome because it would require APC to canvass its records and interview all of its supervisors throughout the company. APC Mem. at 16. However, there are less burdensome means to find the information. For example, APC

could send an email to all employees in North America inquiring whether they, or anyone they knew, had previously had any APC company equipment that was lost or stolen. Such an email would not be burdensome and would allow APC quickly and easily to identify all or most of the individuals for whom files should be produced.

**4. Request No. 7**

APC argues that Daniels is not entitled to discipline-related documents for individuals working under the supervision of Bonzani or Kavanagh, or over whom Gough has had human resources responsibility. APC Mem. at 16. APC argues that Daniels must first demonstrate which individuals are similarly-situated to obtain such discovery. As set forth fully in pages 11-16, *supra*, discovery is not properly withheld on this basis. APC argues that documents related to Jim Biller's stay at a non-preferred APC hotel is not discoverable and further that, because Plaintiff has not identified any evidence that Biller was indeed disciplined, Daniels is not entitled to the discovery. APC Mem. at 17. Yet it is impossible for Daniels to know whether or not Biller received discipline without first receiving the discovery. If Biller did receive discipline, then the documents are clearly responsive to this request. If he did not receive discipline, then the documents related to his hotel stay are responsive to Request Nos. 15 and 17. APC also suggests that documents related to individuals over whom Gough had human resources responsibility are not discoverable. APC Mem. at 17. For example, APC argues that an employee in the engineering department who had attendance and productivity problems did not report directly to Gough and, therefore, the documents related to him are not discoverable. This argument is quite nonsensical because Daniels did not report directly to Gough either. Despite this fact, Gough made the determination to terminate Daniels. As such, other individuals over

whom Gough had human resources responsibility and over whom Gough made or could have made decisions regarding termination and/or discipline are discoverable.

**5. Request No. 15**

APC has misstated Daniels' request for documents relating to individuals who have violated APC policies who were not terminated. APC appears to have misread Plaintiff's Memorandum in Support of His Motion to Compel. Plaintiff seeks all such documents which are contained in the two-drawer employee relations files. In addition, Plaintiff seeks copies of documents responsive to this request for those individuals who worked under the supervision of Bonzani or Kavanaugh, and/or over whom Gough had human resources responsibility. Plaintiff's Mem. at 22. APC's sole objection to producing these documents again relates back to its argument that Daniels must first prove that the individuals (of whom he has no knowledge) are similarly situated to Daniels. As set forth in pages 11-16, *supra*, such a condition is not required.

**6. Request No. 18**

Daniels requested the expense and reimbursement files for Laurie Gaspar because he understood that Gaspar did, in fact, submit expenses and get reimbursed for social events at her home. APC alleges that, because Gaspar was not disciplined for this action, she is not a proper comparator. APC Mem. at 19. However, assuming that this is true, the fact that Gaspar was not disciplined does not exclude her from being a comparator; however, it may make her a comparator. Indeed, it is the evidence of lack of discipline that Daniels would use to demonstrate that white employees are treated differently than black employees accused of stealing from the company.

Second, APC argues that Gaspar's expense and reimbursement files are stored at an off-site storage facility and are not indexed and thus would be unduly burdensome to produce. However, APC has not provided an affidavit to support these assertions. On the other hand, Plaintiff has provided sworn testimony from Kelly (Ex. 14, Kelly Dep. at 162-66) that the expense and reimbursement files are organized by employee and are not difficult to obtain. Further, APC produced Daniels' expense and reimbursement files without any apparent difficulty. Finally, APC argues that it would have to review the expense and reimbursement files prior to producing them to determine whether or not there were any references to the events held at her house. Plaintiff has not requested that APC review the documents prior to production, but instead has requested that the entire expense and reimbursement files be produced. Thus, the burden to which APC refers is nonexistent.

**7. Interrogatory No. 5:**

APC argues that it has not waived its objections to Plaintiff's interrogatories because it notified Plaintiff ten days after the agreed extension for its responses that it was unable to obtain a signature from the client. APC Mem. at 20. APC argues that, because Plaintiff did not object to this delay of the signature at the time, APC cannot be held to have waived its objections. APC Mem. at 21. But Plaintiff did not argue that the further delay of the signature beyond the already delayed ten days was the reason for the waiver. Additionally, an objection by Plaintiff on September 11, 2006, regarding the belated signature would have accomplished nothing. APC was already ten days late on the responses themselves and represented that Gough was still unable to sign. Then APC did not inform Plaintiff that it needed the additional ten days to

respond to the Interrogatories prior to the deadline, nor did APC inform Plaintiff that it needed additional time for the signature prior to the service of the belated answers.

Additionally, APC alleges that it granted Plaintiff an extension and, therefore, Plaintiff's arguments regarding waiver are "galling." APC Mem. at 21. While Plaintiff requested only one short extension after receiving the requests, [9] Plaintiff agreed to several extensions for APC. Ex. 19.

APC also argues that, with respect to Interrogatory No. 5, it should not have to answer the Interrogatory because it is overly broad and is not limited in time. APC Mem. at 21. However, as discussed in Plaintiff's Memorandum in Support of His Motion to Compel, Plaintiff specifically agreed to a temporal limitation dating back to 1995. Plaintiff's Mem. at 25; Plaintiff's Motion to Compel, Ex. 18, pg. 3. However, if this Court determines that 1995 is not a sufficient temporal limitation, Plaintiff would agree to a temporal limitation dating back to 1998.

APC also refuses to respond to supplement its Answer to Interrogatory No. 5 to provide a full description of the "circumstances leading to and the reasons for such terminations." Plaintiff's Motion to Compel, Ex. 17, pgs. 5-6. APC gives no explanation as to why it should not have to provide this information.

---

[9] APC references the fact that Plaintiff's counsel and local counsel informed APC that neither had received the discovery requests when APC allegedly stated it had served them. APC Mem. at 21. In fact, it is true that neither Wiggins, Childs, Quinn, & Pantazis, PLLC, nor the Law Office of Noelle Clapham received the requests when APC alleged to have served them. Ex. 15, Kisch Aff. While it is unlikely that the mail sent to Ms. Clapham in Rhode Island, and Ms. Kisch in Washington, D.C. would both be lost, it is more probable that the requests were never sent at all.

### 8. Documents Related To Hotel Use Are Reasonably Calculated To Lead To The Discovery Of Admissible Evidence

APC refuses to produce hotel-related documents including the evidence which would reveal the hotels used by APC employees and the rates paid by such employees. APC's arguments that such documents are not relevant are unavailing. Its arguments to the contrary to the EEOC and its stated reasons for terminating Daniels -- that he directed that rooms be booked at a non-preferred hotel which cost the company money, jeopardized APC's contract with the Johnson & Wales in the future, and prevented other employees and/or the company from receiving reward points – warrants production of the documents. Daniels must be permitted to discover the evidence to rebut APC's stated positions even though APC has attempted to distance itself from its originally articulated position.

#### a. Request No. 8:

In its supplemental response to Request No. 8, which asked for all documents "reflecting and/or referring or relating to the Marriot Hotel in Providence and/or the Johnson & Wales hotel," APC stated that "no documents responsive to this request exist in APC's files other than those already produced by Plaintiff." See Plaintiff's Motion to Compel, Ex. 21 (letter of November 13, 2006), pg. 3. However, on December 18, 2006, after Plaintiff filed his Motion to Compel, Defendant belatedly produced documents which identified the number of rooms used by APC employees at various hotels, including the Marriott and the Johnson & Wales, and the average rates charged for the rooms. Ex. 15. These documents were clearly responsive to this request and clearly existed when APC represented otherwise.

APC argues that, because it provided this belated discovery regarding the hotel use to Plaintiff, no further discovery is necessary. APC Mem. at 23-24. But additional discovery is necessary for several reasons. First, the charts produced do not indicate the actual rates paid at the hotels, but instead merely list the average rates. Unless APC is precluded from arguing that Plaintiff cannot compare the average rates provided in the charts to the actual rates paid by the trainees at the Marriott, APC must produce the documents revealing the actual rates. Additionally, when producing the hotel charts for the years 2005 and 2006, APC stated that it "reserved the right to object to the competency . . . " of the documents. Ex. 16, email of January 5, 2007. While Plaintiff finds it perplexing that APC would object to its own document in this manner, such a potential objection requires that APC produce the documents from which the charts were compiled.

Still other unproduced documents that are responsive to this request and are reasonably calculated to lead to the discovery of admissible evidence relate to employee complaints about the Johnson & Wales Hotel. Other such documents include all of the expense reimbursement requests and approvals for the hotel stays at the Marriott, and in particular, the hotel stays for the large sales meeting. Further, all documents related to the hotel stays at the Marriott for the large sales meeting, including documents indicating who organized and approved the hotel stays at the Marriott after Daniels was terminated, are responsive and relevant. These documents would demonstrate that, despite APC's arguments that Daniels was terminated, in part, for arranging hotel rooms at the Marriott which cost the company money and which threatened APC's relationship with the Johnson & Wales, the very same reservations were again made for the large

sales meeting and yet no one was disciplined, let alone terminated, for making such hotel reservations.

While APC does not specifically allege that it would be burdensome to produce the documents responsive to this request, it cites *Archer Daniels Midland Co., v. Aon Risk Services, Inc.*, 187 F.R.D. 578 (D. Minn. 1999), for the proposition that discovery may be limited where the benefits to obtain the documents are outweighed by the burdens and expenses involved. APC Mem. at 24. However, the Fifth Circuit has held that discovery should be produced despite a burden where the burden does not outweigh the relevance of the information and utility to the plaintiff. *Burns v. Thiokos Chem. Corp.*, 483 F.2d 300 (5th Cir. 1973). See also, *Clarke v. Mellon Bank*, No. 92-CV-4823, 1993 WL 54435 (E.D. Pa. 1993) in which the court held that even though document requests were likely to call for the production of thousands of personnel files and would cause burden, "unless Defendant demonstrated undue burden, the documents must be produced because they may provide "circumstantial evidence supporting [] [the plaintiff's] argument of pretext." *Id.* at 2. Further, APC does not explain how production of documents responsive to this request is burdensome or expensive. In fact, such an argument would be difficult to make because APC must have reviewed such documents in order to create the belatedly produced charts included in Ex. 15.

**b. Request No. 10:**

See Plaintiff's response to Request No. 6 above.

**c. Requests Nos. 12, 16, and 17**

APC argues that documents relating to hotel reimbursement expenses, documents sent to and/or received from the Marriott, and documents relating to the use of non-preferred hotels are

not discoverable. APC Mem. at 25. In addition to the reasons for production as described above, additional reasons for the documents' production are evident. First, APC argues that deposition testimony "establishing that APC employees *occasionally* stayed at non-preferred hotels" is sufficient and no further discovery is necessary. APC Mem. at 25 (emphasis added). However, to the extent that the deposition testimony states that employees *only* occasionally stayed at non-preferred hotels, such deposition testimony is not credible. As is evident from the summary charts of hotel use, there were an extraordinarily high number of stays at non-preferred hotels. Ex. 15 and fns. 1, 2, and 3.

Further, APC's allegations that it would take a "Herculean" effort to respond to the discovery is not credible. First, APC has not provided an affidavit stating the nature or extent of the burden or expense that would be incurred responding to such requests. Further, APC could send an email to employees asking them if they stayed at hotels other than those on the preferred list. APC could then make available to Plaintiff the personnel and expense and reimbursement files for those individuals. Finally, APC states that there is "no readily-available master record of all hotels in Rhode Island at which APC employees stayed since 2000." APC Mem. at 26. This ignores the fact that records must have been available to the individual or individuals who created the charts which were sent to Bollman and which have been attached hereto as Ex. 15.

**d. Request No. 18**

APC argues that the only complaints about the Johnson & Wales Hotel which Daniels is entitled to receive are those of which he was aware and/or which were made during his employment by APC. APC's argument is nonsensical. To the extent that numerous complaints were made prior to Daniels' employment at APC, and of which Bollman, Gough, Kelly,

Kavanaugh, and/or Bonzani were aware, such evidence would tend to establish pretext. For example, to the extent that there were complaints made by trainees that the Johnson & Wales did not and could not accommodate their training needs, because, for example, no high speed internet access was available at the hotel, such evidence would support Daniels' reason for booking the rooms at the Marriott. Further, to the extent that any of the individuals above had knowledge of that fact, which may be evident from the file materials, such evidence would impeach their deposition testimony and would establish that they had knowledge of facts which countered their stated reasons for terminating Daniels.

Further, APC states that "[b]ecause APC produced all such responsive information, . . . *and other complaints, if any*, are not even remotely relevant to this case, Daniels' motion should be denied." APC Mem. at 27 (emphasis added). This type of response is emblematic of APC's discovery tactics throughout this litigation. On the one hand, the above sentence suggests that all discovery was produced. However, it also suggests the opposite, that not all documents have been produced, but that APC refuses to produce them on grounds of lack of relevancy. APC's repeated attempts to mischaracterize the evidence and the discovery production that has occurred in this case are inexcusable. APC's intransigence in the face of the standard imposed by the Federal Rules must be rebuked, and the discovery to which the Plaintiff is entitled must be compelled.

## III. CONCLUSION

For the forgoing reasons, Plaintiff respectfully requests that his Motion to Compel be granted.

Dated: January 16, 2007

Respectfully submitted,

/s/ Noelle Clapham____________________
Noelle K. Clapham (R.I. Bar #5338)
Law Office of Noelle Clapham
24 Salt Pond Road
Suite A-8
South Kingston, RI 02879
claphamlaw@verizon.net
(401) 783-3600

Lori B. Kisch (MD Fed Bar # 25781)
Wiggins, Childs, Quinn & Pantazis PLLC
2031 Florida Ave., NW, Suite 300
Washington, DC 20009
lkisch@wcqp.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing Reply Memorandum in Support of Plaintiff's Motion to Compel and exhibits will be served upon all counsel of record via the court's electronic filing system.

__________/s/ Noelle Clapham ____