IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

- - - - - - - - - - - - - - - - - - - - - - -

SETH DANIELS,

Plaintiff,

vs C.A. No. 05-00459-ML-LDA

AMERICAN POWER CONVERSION CORPORATION,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF CHRISTINE BOLLMAN, called as a witness by counsel for the Plaintiff, pursuant to the provisions of Rhode Island Rules of Civil Procedure, before Victoria S. Reade, Professional Court Reporter and Notary Public, in and for the State of Rhode Island, taken at Law Offices of Stephen Robinson, 155 South Main Street, Providence, Rhode Island, on Thursday, October 12, 2006, commencing at 1:00 p.m.

**Exhibit 1**

APPEARANCES:
WIGGINS, CHILDS, QUINN, PANTAZIS
BY: Ms. Lori Kirsch, Esq.
7 Dupont Circle NW, Suite 200
Washington, DC 20036
202-467-4123
Counsel for the Plaintiff

LITTLER MENDELSON
BY: Mr. George P. Kostakos, Esq.
10 Weybosset Street, Suite 404
Providence, Rhode Island 02903
401-454-2903
Counsel for the Defendant



INDEX


| Testimony of: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Christine Bollman | | | | |
| by Ms. Kirsch | 4 | | | |


EXHIBITS


| Exhibit No. | | Page |
|---|---|---|
| 1 | Invoice from Providence Marriott | 170 |
| 2 | E-Mail | 180 |
| 3 | E-Mail | 182 |


EXHIBITS ATTACHED TO ORIGINAL TRANSCRIPT



PROCEEDINGS

CHRISTINE BOLLMAN, having first been satisfactorily identified by the production of her driver's license and duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION BY MS. KISCH:

Q. Could you go ahead and please state your name for the record.
A. Christine Bollman.
Q. What is your current address?
A. 99 Mill Pond Road in Exeter, Rhode Island 02822.
Q. And what is your phone number?
A. 401-295-5948.
Q. Good afternoon. My name is Lori Kirsh. We met earlier and I represent Mr. Daniels in a lawsuit that he's filed against American Power Conversion Corporation or APC; I'll probably refer to it as APC as we go through this deposition.
I am here to take your deposition today; have you ever had your deposition taken before?



A. No.
Q. Let me talk a little bit about how we're going to proceed today. As you can see, there is a court reporter who is going to be transcribing my questions and your answers.
I am going to try not to interrupt you when you're answering, but if I do, please let me know because I do want you to fully answer the question and I'd just ask for the same courtesy that you wait until I finish asking my question before you answer even if you think you know where I am going with the question because it's very difficult for the court reporter to transcribe two people talking at once.
It's very important to answer verbally rather than a nod of the head or a shrug of the shoulders or uh, huh, or uh, uh because those are difficult to transcribe as well.
If you need a break at some time, let me know and certainly we can

this 25-page travel policy?
A. Yes, I did.
Q. And when did you draft that? Actually, let me back up. What was you role in drafting or creating the policy?
A. I drafted the policy.
Q. The initial policy?
A. Yes.
Q. You did the first draft?
A. Yes.
Q. When did you do that?
A. Right after I became travel manager, so that was late 1996.
Q. And when you drafted it, was it originally 25 pages?
A. No.
Q. How many pages was it originally when you drafted it?
A. Fifty pages.
Q. Fifty pages?
A. Yes.
Q. Was it also on the Internet back then?
A. No.
Q. When was it first put on the Internet?



A. Early 2003.
Q. And you said that it's continuously revised it, has APC maintained copies of the policy that was first placed on the Internet in 2003?
A. No.
Q. Do you have copies of the travel policy that was on the Internet in 2003?
A. No.
Q. And when you drafted it, did you draft it on your computer?
A. Yes.
Q. And did you save it to your computer?
A. Yes.
Q. And then it's put on the Internet, I assume you still had a copy when you put it in the Internet in 2003 at that point, correct?
A. No, I revised the old -- it's a Word document that is continuously revised.
Q. But I am saying in 2003 when it was first put on the Internet, when you put it on the Internet you don't just delete it from your system I assume, correct?



A. Correct.
Q. You said it was put on in early 2003, correct, do you know when you first revised it after it was put on the Internet in 2003?
A. No.
Q. Was it in 2003 or 2004?
A. 2003, it's continuously revised.
Q. Well, I understand that. I am just wondering when you first revised it after it was on the Internet; do you recall?
A. No.
Q. Do you recall what revisions were made in 2003 to the policy?
A. Well, we negotiate car and air contracts once a year so if any airline contacts or car rental companies changed, it would have been in that year sometime.
Q. What would be in the policy with regard to an air contract or a car contract?
A. It would say APC employees are to use the preferred airlines which are whatever they are at the time, the same for car.
Q. And it specifically says in the policy



that APC employees are to use?
A. Yes.
Q. Does it say that they're required to use?
MR. KOSTAKOS: Objection.
A. I would have to go back to see exactly how it's worded.
Q. Well, what is the policy when you have a certain airline, car rental or hotel that you contract with for services, do you require APC employees to use those specific vendors or are they merely preferred vendors?
A. There are preferred vendors.
Q. So you don't require that they use those vendors?
A. Right.
Q. Other than the cardiac rental or the airline -- actually, strike that.
Are there also hotels listed in this travel policy?
A. Not in the policy.
Q. But there car agencies and airlines in the policy?
A. Correct.

Page 134

Q. But it went up a couple of dollars?
A. Yes.
Q. And that was because there had been such a drop in 2003 from these hotels rooms?
A. That was probably one of the reasons.
Q. Well, do you know the reasons why the costs went up?
A. No, I do not know.
Q. Could it have just been inflation and the cost of living and the hotel decided to increase the rate?
MR. KOSTAKOS: Objection.
A. Could have been.
Q. Did you ever inquire the reason as to why the price was going up?
A. No.
Q. How many hotels rooms were used in 2005 at the Johnson and Wales?
A. I have no idea. I cannot give you a number.
Q. Don't you review it on an annual basis?
A. Yes, but I don't recall numbers going back to 2005 for 25 hotels.
Q. But you recalled them for 2003 and 2004,

Page 135

correct?
A. I gave you approximate numbers.
Q. Can you give me an approximate number for 2005 how many hotel rooms were utilized by APC employees at Johnson and Wales?
A. Probably 750.
Q. Has there been a drop in trainings of APC employees between 2003 and 2005?
A. Yes.
Q. And why is that?
A. I can't tell you why.
Q. Do you know whether the use of hotel rooms at other hotels in the Providence area has increased for 2003 to 2005?
A. Yes.
Q. Which hotels has it increased at?
A. Comfort Suites.
Q. Any other hotels has it increased?
A. Crown Plaza.
Q. Any other hotels has it increased?
A. Sheridan Airport.
Q. Any others?
A. No.
Q. And how much does a room cost at the

Page 136

Comfort Suites?
A. $73.
Q. What about the Crown Plaza?
A. $109.
Q. And what about at the Sheridan Airport?
A. $89.
Q. And in 2003 and 2005 did you receive any points at the Comfort Suites?
A. No.
Q. I mean does APC receive any points?
A. No.
Q. Is there any program where APC receives points for hotel rooms that are booked at the Crown Plaza?
A. Yes.
Q. Do you recall about how many rooms were booked at the Crown Plaza in the 2005, approximately?
A. 250.
Q. Do you recall how many were booked approximately at the Comfort Suites in 2005?
A. Close to 3,000.
Q. And what about at the Sheridan Airport?

Page 137

A. A thousand.
Q. What about in 2004, approximately how many rooms were booked at the Comfort Suites in 2004?
A. Now, these are all approximate numbers.
Q. I understand that.
A. 2,500.
Q. And what about at the Crown Plaza?
A. 2004 you said?
Q. Yes.
A. I'd say 250.
Q. And what about the Sheridan Airport in 2004, approximately how many rooms were used?
A. 750.
Q. And 2003 approximately, how many rooms were used APC employees at Comfort Suites?
A. 1,500.
Q. And what about at the Crown Plaza?
A. 150.
Q. And what about at the Sheraton Airport?
A. 750.
Q. Do you recall what the rate was at the Comfort Suites for 2004?

Page 138

A. I think $69.
Q. And what about at the Crown Plaza?
A. $129.
Q. And what about at the Sheraton Airport?
A. Don't recall.
Q. Do you know if it was higher or lower than the $89 that you gave?
A. Probably lower.
Q. What about in 2003, do you remember what the hotel room rate was at the Comfort Suites?
A. I think it was $69 too.
Q. And what about at the Crown Plaza?
A. $129.
Q. Is the Crown Plaza on the APC preferred hotel list for the Providence area?
A. Yes.
Q. It is?
A. Yes.
Q. It is today?
A. It actually was taken off the preferred list.
Q. When was it taken off?
A. Recently, within the last two months.

Page 139

Q. Was the Crown Plaza on the APC preferred hotel list in 2005?
A. Yes.
Q. Was it on it in 2004?
A. Yes.
Q. What it on it in 2003?
A. Yes.
Q. Was the Comfort Suites, is it currently on the APC preferred hotel list?
A. Yes.
Q. Was it in 2005?
A. Yes.
Q. Was it in 2004?
A. Yes.
Q. Was it in 2003?
A. Yes.
Q. What about the Sheridan Airport, is it currently on the APC preferred hotel list?
A. Yes, it is.
Q. Was it in 2005?
A. Yes.
Q. Was it in 2004?
A. Yes.
Q. Was it in 2003?

Page 140

A. Yes.
Q. And where is the Crown Plaza located?
A. Holiday Inn at the Crossings like outside of the airport on 95.
Q. And did the Comfort Suites have high-speed Internet access in 2003?
A. I don't recall.
Q. What about 2004?
A. Well, in 2004, yes.
Q. Were there any problems with the high-speed Internet access at the Comfort Suites in 2004?
A. Not that I was aware of.
Q. Did all the rooms have high-speed Internet access at the Comfort Suites in 2004?
A. Yes.
Q. And at the Crown Plaza Hotel, did that have high-speed Internet access in 2003?
A. Do not know.
Q. What about 2004?
A. Yes.
Q. Did all the rooms in 2004 at the Crown Plaza have high-speed Internet access?
A. That's correct.

Page 141

Q. And the Sheraton at the airport in 2003, did it have high-speed Internet access?
A. I don't know.
Q. What about in 2004?
A. I believe they did.
Q. Do you know when in 2004 the Sheridan Hotel had high-speed Internet access?
A. No.
Q. Do you know when in 2004 the Crown Plaza got high-speed Internet access?
A. No, I don't.
Q. Do you know when in 2004 the Comfort Suites got high-speed Internet access?
A. No, I don't.
Q. Other than that one time that the Johnson and Wales called you to complain about the drop in rooms, have they called you at any other point to inquire or inquire about the drop in room reservations at their hotel?
A. No, they have not.
Q. Are you aware of any complaints about the hotel accommodations at the Johnson and Wales?

Page 154

always put greater control on the policy but never less, so if that manager approved an expense that was less than what this policy required or asked for, then in my opinion the employee violated the policy.
Q. Who actually determine whether or not the policy has been violated; who has the authority to make that decision?
A. Nobody really.
Q. There is nobody that can make that determination at APC?
A. Not in the context that we're talking about here.
Q. Well, I am asking you, APC has a policy who decides whether or not the APC has been violated; who has the authority to make that decision?
A. The individual manager who approves the expenses, I guess. I am not sure I know where you're going at with this.
Q. You don't understand the question?
A. No, I understand the question, but I am not sure I understand -- I don't really

Page 155

understand what you're picking at.
Q. Do you understand the question or not?
A. No, I understand the question.
Q. So the question is who at APC has the authority to determine whether or not the APC travel policy has been violated; is your answer the individual manager who is approving the expense?
MR. KOSTAKOS: Answer only if you know the answer to the question.
A. I don't know. I don't know.
Q. You don't know who at APC determines whether the travel policy has been violated?
MR. KOSTAKOS: Objection. Asked and answered.
Q. Who has the authority?
A. That's correct, I don't know.
Q. Do you have that authority?
A. No.
Q. Did you ever express to anyone that Mr. Daniels had violated the APC travel policy?
A. No.

Page 156

Q. Do you have an opinion as to whether or not Mr. Daniels, in fact, violated the APC travel policy?
MR. KOSTAKOS: Objection.
A. No.
Q. You don't have an opinion one way or the other.
MR. KOSTAKOS Objection.
A. No.
Q. Based upon your role of travel manager implementing the travel policy, is it your understanding that Mr. Daniels did or did not violate the APC travel policy?
MR. KOSTAKOS: Objection.
A. That would be for his manager to determine if he did or did not.
Q. That wasn't my question though.
A. That was my answer though.
Q. Based on your role as travel manager and in implementing the APC travel policy, is it your understanding that Mr. Daniels did or did not violate the APC travel policy?
MR. KOSTAKOS: Objection.
A. Again, I think it's for his manager to

Page 157

determine if he violated the policy or not, but it is my opinion that what he did was unethical.
Q. So you don't know one way or another whether Mr. Daniels violated the APC travel policy?
MR. KOSTAKOS: Objection, asked and answered twice.
A. I don't know.
Q. Did you ask Mr. Daniels' manager whether or not if Mr. Daniels' manager felt that Mr. Daniels violated the APC travel policy?
A. I did not.
Q. Did you ever inquire with anyone with regard to whether or not Mr. Daniels violated the APC travel policy?
A. Did not.
Q. Did you ever specifically direct Mr. Daniels and tell him that he must insure that rooms are reserved at the Johnson and Wales Hotel?
A. No, I did not.
Q. Did you ever directly him that he was not

permitted to allow rooms to be booked at the Providence Marriott?
A. No, I did not.
Q. Did you ever tell Mr. Daniels that he was not permitted to receive travel points as the organizer for the hotel rooms that were reserved at the Providence Marriott?
A. I did not.
Q. Was training held at the Providence Marriott?
A. Actual training?
Q. Yes, actual training sessions.
A. They were meeting rooms, I do not know if there was training in those meeting rooms.
Q. And how do you know that meeting rooms were booked?
A. Because I saw it on the invoices.
Q. Did you ever inquire with anyone whether or not actual training was conducted at the Providence Marriott?
A. No, I did not.
Q. Do you know whether anyone else ever inquired?
A. Do not know.



Q. Do you know whether or not anyone conducted an investigation other than yourself with regard to where hotel rooms were booked at the time that Mr. Daniels was overseeing the training or organizing the training?
A. I don't know.
Q. Whose role would that be, do you know?
A. Other than me, I don't see it to be anybody's role.
Q. You have no knowledge with regard to Mr. Daniel's job duties other that what you have told us, correct?
A. Correct.
Q. Do you have an opinion one way -- actually, strike that.
At the time the rooms were booked at the Providence Marriott, do you know how many rooms were available at the Johnson and Wales.
A. No, I don't.
Q. Did you ever inquire?
A. No.
Q. Did anyone else inquire from APC?



A. No.
Q. Do you know whether or not Mr. Daniels actually inquired?
A. I don't know.
Q. Did you ever ask Mr. Daniels if he had inquired?
A. No, I did not.
Q. What did you say the price was at the Johnson and Wales at the time in late 2003, early 2004, what was the rate?
A. I think it was $65 or $69.
Q. Was that for all rooms?
A. I think there was a higher tier. I usually book the lower, the $65. I don't remember what the cost was of the higher one.
Q. Is there just two tiers or three tiers or four tiers?
A. I think there was two.
Q. Are you pretty sure about that?
A. Not 100 percent.
Q. Was there ever an issues with APC employees who booked a higher rate room at the Johnson and Wales?



A. Could have been, yes.
Q. And for what reasons?
A. They stayed there a long period of time.
Q. Well, was there ever an occasion where an APC employee booked a room at the Johnson and Wales and they didn't stay there for a long time?
A. Could have been.
Q. Book a room at a higher rate then, the $65 or $69?
A. Right.
Q. And would that have been a violation of the travel policy?
A. Well, if the rooms were available, then it would have been preferred for them to use the lower rate.
Q. Okay, you said preferred to use the lower rate, were they required to use the lower rate?
A. Per policy?
Q. Correct.
A. Per policy, yes.
Q. They were required to use the lowest rate at Johnson and Wales?