IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

----------------------------x

SETH DANIELS,

Plaintiff,

v. Civil Action No: 05-00459-ML-LDA

AMERICAN POWER CONVERSION CORPORATION,

Defendant.

----------------------------x

Job No. 2713 Pages 1 - 307

DEPOSITION OF SETH DANIELS, a witness called by counsel for the Defendant, taken pursuant to the Federal Rules of Civil Procedure before Dena M. O'Brien, CSR, and Notary Public in and for the State of Rhode Island, at the law office Of Littler Mendelson, 10 Weybosset Street, Suite 404, Providence, Rhode Island, on September 14, 2006, commencing at 9:29 a.m.



Exhibit 21

hotel that I wanted to stay at because I was a manager, and I did not have to stay at the Johnson & Wales because he didn't feel it was an appropriate place, and he would not stay there.

He decided he wanted to stay at the Westin, and all of his managers could stay wherever they wanted, as long as the price was not outrageous, and it was during that conversation I said, John, I'm a Marriott rewards member. He said great, I'm a member of Starwood preferred guests. That's why I stay at the Westin. Have at it. Stay at the Marriott. I don't care. I use my credit card and I get 50,000 or 60,000 points a month by using my credit card, and I only use one credit card so that I get all of the points. There is no problem with receiving points.

Q. Okay. And that was in the context of a conversation you were having with him about your use of the hotel; is that correct, and his use of the Westin; is that correct?

A. No. What would be a correct characterization is I asked if I had a problem accumulating points as a member of any rewards program.



Q. Okay. Did you say to him at that point, John, do you have a problem with me accumulating points by putting other APC employees in the Marriott or words to that effect?

A. At that point in time, no. Subsequently.

Q. Subsequently you did?

A. Yes.

Q. And when was that?

A. After the manager's meeting where I presented the plan, reviewed the list of hotels, I reminded him that I was a rewards member, and I again got approval from John to use the hotels that were used.

Q. To use the Marriott?

A. Yes.

Q. Specifically?

A. Specifically approved by John, known by Paul Cavanaugh and Paul's manager. Everybody knew that we held training in East Providence and FSEs stay at the Marriott.

Q. Who's everyone?

A. Everyone in management and all field service engineers.

Q. But not everyone in travel; is that



correct?

MS. KISCH: Objection, foundation.

THE WITNESS: I don't know what travel knew.

(Defendant's Exhibit No. 11 was marked.)

BY MR. KOSTAKOS:

Q. Thanks. I'd ask that you take a look at this.

A. And to clarify my previous answer about everyone, Christine Hendrix of HR knew about field service engineers staying at the Marriott. She attended a breakfast, and she actually had my admin add new hires to the Marriott roster.

Q. And when was that?

A. After it was set up.

Q. And how many times was that?

A. I don't know. More than -- it was more than one, less than ten. I don't know.

Q. I'd ask you to take a look at the document that's been marked as Exhibit 11. Do you know what this is?

A. It's a copy of a proposed training agenda.

Q. Do you know when it is for, what date? Is there a way to identify the date on this?



A. This looks like part of the presentation that I provided to John Bonzani at a meeting in December where he approved the use of the Marriott hotel.

Q. In December. Okay.

A. November or December. I don't remember which one the meeting actually was.

Q. Did you consider any other hotels other than the Marriott?

A. Yes.

Q. Which ones?

A. We considered the Marriott; we considered the Johnson & Wales. Based upon my current recollection, the following hotels were all considered: The Marriott, the Johnson & Wales, the Courtyard, the Courtyard by the airport, the Fairfield Inn by the airport, the Radisson. There's a Westin downtown. Basically went through a list of hotels in the area that could meet the requirements that John set forth, which were -- had to be convenient to other activities, so on downtimes field service engineers when they're not working could go and get around easily. It had to have broadband access to the internet to support the