IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

----------------------------x

SETH DANIELS,

Plaintiff,

v. Civil Action No: 05-00459-ML-LDA

AMERICAN POWER CONVERSION CORPORATION,

Defendant.

----------------------------x

Job No. 2713 Pages 1 - 307

COPY

DEPOSITION OF SETH DANIELS, a witness called by counsel for the Defendant, taken pursuant to the Federal Rules of Civil Procedure before Dena M. O'Brien, CSR, and Notary Public in and for the State of Rhode Island, at the law office Of Littler Mendelson, 10 Weybosset Street, Suite 404, Providence, Rhode Island, on September 14, 2006, commencing at 9:29 a.m.



Exhibit 8

A. Yes.
Q. By whom?
A. I believe it was Christine Bollmann.
Q. And who is she?
A. The travel manager or travel -- I think her title was travel manager.
Q. And after she told you that, did you incur any expense after that that was directly billed?
MS. KISCH: Object to the form.
THE WITNESS: Can you repeat the question?
BY MR. KOSTAKOS:
Q. After Ms. Bollmann -- well, strike that. What did Ms. Bollmann tell you about direct billing?
A. That I could not -- she was not going to authorize a direct bill of the rental car.
Q. Did she reimburse -- strike that. When -- do you recall when she did this, when she told you that?
A. I don't remember the exact month or -- I don't remember the month that it occurred.
Q. What's your best recollection? How soon after you started did she tell you this?
A. Within 90 days I would estimate.
Q. Did you rent any cars after being told by

Ms. Bollmann that she wouldn't authorize that expense that was directly billed by the car rental agency or company to APC?

A. After I could no longer direct bill?

Q. After your conversation with Christine Bollmann?

A. I don't believe that I could direct bill any longer, and I believe that I had to use a credit card subsequent to that last time when she prevented me from --

Q. So your answer is no?

A. My answer is I don't remember exactly how many times I direct billed a car and when was the last time a car was direct billed.

Q. Is it your understanding that APC allows an employee to direct bill travel expenses to the company in exceptional circumstances only?

A. No.

Q. Okay.

A. Unless you consider undue hardship an exceptional circumstance or what is an exceptional circumstance?

Q. Is it your understanding that direct billing by an APC employee is acceptable only in

situations where the employee is not eligible for a corporate credit card or has an insufficient credit limit on that corporate credit card to cover the expense in question?

MS. KISCH: Object to form and to the extent it's been asked and answered and it mischaracterizes previous testimony.

MR. KOSTAKOS: Okay. You can answer.

THE WITNESS: Well, my understanding is that the direct bill is an option if the employee is unable to or if it creates an ongoing expense for the employee or if it creates an undue hardship.

BY MR. KOSTAKOS:

Q. Okay. In your view, would not being able to get a corporate credit card or qualify for one or not having sufficient credit on that corporate credit card available to cover an expense constitute that sort of undue hardship that you're referring to?

A. I think an undue hardship would be created on the individual if they were unable to perform their job because they did not have additional means to incur an expense for the company or if they did incur an expense for the company, would place an

undue financial burden on their family.

Q. Did you ever apply for a corporate credit card while an employee of APC?

A. No.

Q. Were you ever told to?

A. Told to apply?

Q. Was it ever suggested to you by anybody at APC that you should consider applying for a corporate credit card?

A. Yes.

Q. And who made that suggestion?

A. Christine Bollmann.

Q. And do you know why she made that suggestion?

A. To make me aware of it as an option.

Q. Okay. In what context? Was it in the context of discussing direct billing with her?

A. I don't think so. I don't know.

Q. Do you recall what context it came up in discussion?

A. It could have been doing one of the new hire sessions that I organized when I took new hire employees to Christine Bollmann to her office showing them where the travel office was, and during

one of those sessions, she could have had discussion about it. I don't know specifically when or in what context the discussion was with Christine Bollmann about the corporate credit card.

Q. Did you ever have a discussion with Brian Kelly about applying for a corporate credit card?

A. Yes.

Q. And what did Brian suggest to you?

A. That APC had a corporate credit card that I could apply for if I chose to.

Q. And you didn't choose to do that, did you?

A. No.

Q. Why not?

A. I was preparing to relocate my family. I knew that I had to get a mortgage.

Q. Okay. Why didn't you apply for the credit card?

A. Because inquiries as you're applying for a mortgage process has never been recommended.

Q. I'm not sure I understand what you mean.

A. Everything I've read and everything I know highly suggests that you not have inquiries on your credit report when you're applying for the mortgage.

Q. Inquiries such as a credit card inquiry; is that what you're referring to?

A. Any inquiry on a credit report is not recommended when applying for or in a process of preparing to apply for a mortgage.

Q. Okay. How does that tie into your reason for not applying for a corporate credit card?

A. I was preparing to relocate within the one-year period of time that I was given.

Q. What does that have to do with applying for a corporate credit card? I'm not sure I understand the connection. Make it for me.

A. If you're going to be getting a mortgage, you don't want to go shopping for cars or anything that's going to require your credit to be pulled because it's counterproductive to the mortgage process. It will have an adverse impact on your credit score and could cause someone not to be approved for a mortgage.

Q. And where do you get that from? What source of information do you derive that from?

A. Every one that -- every piece of information I've seen suggests not applying for new credit when applying for a mortgage.

Q. Was your right -- strike that. Was your ability to direct bill business-related expenses ever suspended by the company, specifically suspended?
A. Can you repeat the question?
Q. Was your ability to direct bill business-related expenses at any time suspended by the company while you were employed?
A. My ability to direct bill a rental car was suspended by the company.
Q. Okay. Did you attempt after that to either -- did you attempt after that to direct bill any car rental expenses or any other travel expenses?
MS. KISCH: Object to form.
THE WITNESS: You said car rental or travel expenses?
MR. KOSTAKOS: Yes.
THE WITNESS: That's two questions.
BY MR. KOSTAKOS:
Q. Okay. I'll break it down for you. After your ability to direct bill business-related expenses was suspended by the company, did you attempt to direct bill any business-related expenses?
MS. KISCH: Object to the form. It

mischaracterizes his previous testimony.

MR. KOSTAKOS: I'm not trying to characterize his testimony.

MS. KISCH: He never testified that -- do you want me to explain my objection?

MR. KOSTAKOS: Yes. I'm curious about your objection because I'm asking -- I never asked him before a few seconds ago whether or not his license was suspended specifically, and I never asked him before whether or not he attempted to direct bill after his right to direct bill or his ability to direct bill was specifically suspended. So I don't understand where the objection comes from, but go ahead.

MS. KISCH: Okay. The objection is because Mr. Daniels testified that his right to directly bill rental cars was suspended, and in your question, you asked whether his right to directly bill business expenses was suspended, and that's the basis for my objection.

BY MR. KOSTAKOS:

Q. Okay. Was your right to otherwise bill

business expenses other than -- strike that. Was your right to directly bill other business expenses -- strike that -- travel expenses suspended in addition to your right or ability to direct bill car rental expenses?

A. My rights are God given and what rights are not God given are given to me in the Constitution. I do not believe that APC gave me any rights. However --

Q. Why don't I ask the question a different way. After APC suspended your ability to directly bill APC for rental car expenses, did you attempt to directly bill rental car expenses?

A. To the best of my recollection, when my ability to rent a car was last interrupted by Christine Bollmann, I do not remember at this point in time if I attempted to rent a car again. I do not believe that I did.

Q. Let me make sure I understand something you said. You said your ability to rent a car was interrupted. That's not what I asked. I asked about your ability to directly bill a rental car expense. My understanding is that after that you could continue to rent cars. It just had to be in a

different method than direct billing; is that correct?

A. To clarify my previous answer --

Q. Can you answer my question, please.

A. I was attempting to, but you interrupted me.

Q. No, you're attempting to clarify a previous question. What I'd like to know is -- and if you'd just listen to the question, that would be great. Did you make any effort after your -- let me start over. Who suspended your ability to directly bill rental car expenses?

A. It's my understanding it was Christine Bollmann or her superior.

Q. And who's that?

A. Brian Kelly.

Q. After those rental car -- after your ability to directly bill rental car expenses was suspended, did you attempt to directly bill a rental car expense to APC?

A. I do not believe at this point in time that I did.

Q. Okay. Separate and apart from your ability to directly bill rental car expenses, was your

A. That's correct.

Q. The second bullet relates then to the current tax year 2003?

A. I'm trying to answer your question honestly and fully, and at the time I did this, I believed that I had a right to a refund from the previous year, and I believed that I'd have a right to a refund of federal taxes in the current year because of my financial circumstances, and that's why I completed the form this way. I wasn't doing anything other than answering the questions.

Q. Okay. And did that belief change? Did your belief that you were filling it out correctly change at any point? In other words, did you change the W-4 form?

MS. KISCH: Object to form. Go ahead.

BY MR. KOSTAKOS:

Q. Did you subsequently fill out and sign a different W-4 form?

A. Yes, I subsequently signed a separate W-4 form at the direction -- I was forced to do so by Brian Kelly.

Q. What do you mean you were forced to? How so?

A. He said I had to. He forced me to do so. He did not give me an option not to.

Q. Did you read the instructions for filling out this form before completing it?

A. I completed it based upon my knowledge of the form, yes.

Q. I asked you if you read the instructions before completing the form?

A. Yes, I read the instructions.

Q. What led -- were there any discussions that led to Brian Kelly telling you that you had to change the form?

A. Yes.

Q. And what was the substance -- who were you speaking to about your completion of this form?

A. I believe it was someone in payroll. I don't know if -- I don't remember if her name was Bonnie or if it was someone else. When I got my check, I noticed that my check had federal taxes withheld, inconsistent with the way the form was completed. I subsequently asked her about that. She referred me to Brian Kelly, at which point, Brian Kelly told me that he was rejecting this W-4. He would not use it and forced me to complete

another W-4.

Q. Did you say anything in response to Brian Kelly?

A. I disagreed with him.

Q. What did you say to him?

A. From the best of my recollection at this time, I told him that it wasn't his obligation to tell me how to complete the form and that the form being completed, that I completed the form that represented accurately what I believed my tax situation should be.

Q. And then what did he say?

A. To the best of my recollection at this point in time, he said that he rejected my explanation, told me that he would reject my W-4, and he would withhold the taxes that he felt were appropriate, even if I did not complete another form, and he told me to do so.

Q. Was there any further conversation about your completion of this form between you and Brian Kelly?

A. He alleged that I was completing it incorrectly, at which point we launched into a discussion about how I was hired at APC and who

of telling -- instead of Christine saying you're no longer going to direct bill, when John Bonzani called him, he could have reversed Christine's decision, since he was responsible for North America with respect to finances.

So that's what I mean, that he was creating a hostile work environment coupled with the interaction in the way that he treated me and responded to me any time there was something that I needed.

Q. And how many times was that?

A. How many times was what?

Q. That you interacted with him and that he provided a response to you that contributed to this hostile work environment that you claim existed?

A. There were a handful of times where I interacted with him directly in a face-to-face manner.

Q. One was the time we talked about with the W-4, correct?

A. Yes.

Q. How many other times? How spread out were they?

A. I don't remember an exact number: A

handful, a few.

Q. Do you remember any specifics from any of those conversations or interactions?

A. I remember a conversation that I had once telling John Bonzani about the conversation that I had with Brian Kelly, how --

Q. I'm talking about your interactions with Brian Kelly, not with John Bonzani. I want to know what subsequent interactions you had with him that support your contention that you were exposed or experienced a hostile work environment created by Brian Kelly. I'm talking about your interactions with Kelly that form the basis of that contention, again, subsequent to the W-4 form interaction.

A. I believe that one interaction, which we have talked about, was the direct bill situation on the rental car. Another interaction was when a rental car was broken into and items were stolen. He inferred -- he inferred that I participated and accused and blamed me for the theft of APC equipment.

Q. Any other times?

A. There was a time where he interrogated me about why I did not apply for the corporate credit

knew all along what the situation was, and he made the call but knew that there would be no outcome.

Q. All right. But did Mr. Gough, other than as you've testified, by failing to do anything, did he in any way, shape, or form otherwise contribute to the hostile work environment that was created?

A. By failing to act, I think it's --

Q. Other than that. I'm saying by failing to act in any other way. Did he say anything or otherwise do anything that caused you to --

A. Not that I can recall at this point in time.

Q. Okay. Did anybody else contribute to or engage in any behavior that contributed to the hostile environment?

A. Besides Christine Bollmann?

Q. What did she do?

A. She was --

Q. Is this stuff that we've talked about already?

A. Yes.

Q. Did she say anything that you haven't testified to that caused you to feel that she was creating a hostile environment?

Q. Okay. Do you recall the substance of those conversations?

A. To the best of my recollection at this point in time, I recall letting her know that I had it. I believe she got a copy of it, and she acknowledged receipt, looked at it.

Q. Did she get a copy of it from you?

MR. KISCH: Object, to the extent it's been asked and answered.

MR. KOSTAKOS: You can answer.

THE WITNESS: To the best of my recollection, I gave her a copy.

BY MR. KOSTAKOS:

Q. Do you know -- why were you communicating with her about this issue?

A. Because it was -- to the best of my recollection, this is during the period of time where I was being harassed by Brian Kelly, and it's my understanding that Christine had a conversation with her boss, Brian Gough, that she was supposed to be the intermediary.

Q. You referred to your harassment by Brian Kelly, and we talked at some length about that in our last session. Is there anything other than what

that -- he said that I was taking kickbacks, and I said what do you mean by that? He said you were getting points that should have gone to other field service engineers and that you were stealing the points, and he had to terminate me for that.

He went on to say that how could you do such a thing or -- he -- his words were that that is what I had done. I attempted to explain that I had not done anything wrong. I told him that I was a Marriott member before joining the company. Everything had been approved with John, and I did nothing wrong.

Q. When you say everything was approved, did John approve your receipt of points from the Marriott for those stays?

A. John had prior knowledge that I was an awards member. He said it's not a problem. He's a member of hotel rewards, too. He collects points, and he used one credit card is what John told me. He puts everything on one card, so he can get the points, as well.

Q. Do you know whether he was referring to points he received for his own travel or points he was receiving from meeting organizer type points that

A. Other white employees.
Q. Can you name them?
A. People that I worked with.
Q. Can you name them specifically?
A. John Bonzani.
Q. And how were you treated differently than John Bonzani?
A. He got points. He didn't get fired.
Q. How else? Any other way?
A. Paul Cavanaugh, to my knowledge, got travel points. He didn't get fired. Other white employees that had the ability to direct bill rental cars.
Q. And who were they?
A. I don't know their names. I know that there was a practice of them being able to direct bill rental cars.
Q. Do you know what positions they held or any other specifics about them?
A. They were managers, to the best of my knowledge.
Q. Any other way to identify who they were specifically?
A. Yes, you could ask Christine Bollmann.

direct bill?

MR. KISCH: I'm going to object to the extent it's been asked and answered. Mr. Kostakos clearly asked this in a previous deposition.

MR. KOSTAKOS: I don't know that it was. Strike that.

BY MR. KOSTAKOS:

Q. How do you know that -- what sort of travel points are you aware that Paul Cavanaugh received?

A. He told me that he was a member of different travel reward programs and that he had an American Express and got points.

Q. Do you know whether he received travel points for organizing meetings or for organizing the travel of any other APC employees?

A. At this point in time, I do not know.

Q. Do you know whether he received travel points for his individual travel?

A. Based upon what I understood his travel program -- his travel rewards program and based upon my understanding of how an American Express program or other credit card reward programs work, it would be my understanding predicated upon those facts that

yes, he did get points for his travel, and if he paid for travel for another APC employee, if two APC employees were traveling together and he paid for that travel, then, yes, he would have gotten points for that other person.

Q. Do you know whether he ever did that, paid for the travel of any other APC employees?

A. I do know that he paid for entertainment expense.

Q. Okay. And are you certain that he received reward points for those instances?

A. It's my understanding that if he paid for that instance with a card that accumulated points, then he would have gotten points.

Q. Okay. And what do you base that understanding on?

A. My understanding on how in general credit card point programs work.

Q. Okay. How about in specific to the instances in which he paid for entertainment? Do you know whether specifically he received travel points or award points for that?

A. If he paid for a meal with a card that accumulated points and that bill was paid, if the

Q. Any other ways in which you were treated differently than other employees during your tenure at APC?

A. I was constantly second guessed.

Q. By whom?

A. By Christine Hendrix, Christine Bollmann, Brian Kelly. I complained to Brian Gough that I had been harassed. He didn't do anything.

Q. We talked about that in our last session. Do you know whether or not the individuals you listed ever second guessed any other employees?

A. I know they didn't take action on my issues.

Q. Do you know whether they ever second guessed any other employees, any white employees?

A. No.

Q. Is there anybody specific that you're aware of that they didn't second guess in the same manner that you were second guessed?

A. Not that I'm aware of at this time point in time or that I can recall.

Q. Other than John Bonzani and Paul Cavanaugh, are you aware of anyone else who received points for travel that was not terminated?

A. Yes.
Q. Who?
A. It's my understanding from Christine Bollmann that APC was a great company because they allowed employees to receive their travel points instead of forcing them to give them to the company.
Q. Okay. How about anybody else who received points for organizing meetings? Are you aware of whether there was anybody else at APC who did that and was not terminated?
A. John Bonzani organized meetings.
Q. And do you know whether he received points for those meetings, other than for his individual travel or stay?
A. Well, again, I refer back to the previous answer that I gave, which is that John Bonzani told me that he billed -- he tried to use one credit card to aggregate the purchasing through that one credit card whenever possible because he received points. He told me that he had his preferred -- personal preferred list of hotels, so, again, that he could aggregate points. And when he stayed in those hotels, he obviously got points, and there are times where he would hold meetings in the hotel that he

stayed in that he paid for the meeting room. So, again, as I understand it, he would get the points.

Q. And how did you obtain an understanding that he paid for the meeting? Is that something he told me?

A. That's my understanding, yes.

Q. How is it your understanding?

A. The meeting which I presented my training plan, John stayed in that hotel. I remember John getting the meeting space. I asked him if he wanted me to get it. He said no, I'm getting meeting space in the hotel where I'm staying.

Q. Do you know whether or not -- specifically do you have any firsthand knowledge whether he received points for that meeting space or are you just assuming he did because he stayed there?

A. John never showed me his travel points information.

Q. So you don't know that for certain; is that correct?

A. No, but as I understand that rewards program, he would get points.

Q. Are you aware of anybody else who received travel reward points for organizing meetings that was

MR. KISCH: I know, and I'm making the objection.

MR. KOSTAKOS: And I'm trying to resolve it.

THE WITNESS: Any other than what?

BY MR. KOSTAKOS:

Q. Than the conversation or the complaint that you made about Mr. Cavanaugh. Were there any other complaints that you made or action that you took as an employee of APC that you felt led to your termination?

MR. KISCH: And I'm going to again object to the extent it's been asked and answered, not just today but in his previous deposition. Go ahead.

MR. KOSTAKOS: I don't believe we ever talked about it in his previous deposition. If you want to show him, I'll be happy to look at it, but go ahead and answer.

THE WITNESS: I told Brian Gough that I was being discriminated against and harassed by Brian Kelly. He did nothing. I told him I didn't understand why Christine Bollmann would not allow me to direct bill a rental

car when it was creating an undue financial hardship on me and my family because of the expenses that I was incurring on a daily basis with the company. He did nothing.

BY MR. KOSTAKOS:

Q. Anything else?

A. I told everybody in my chain of command. I didn't have another -- I told the most senior person in HR of the discriminatory actions and hostile work environment that I was in, and he did nothing.

Q. And how do you connect that to the termination?

A. After my complaining, I got fired for something that I did not do.

Q. Okay. Is there anything specific that you base your claim that your complaint to Mr. Gough was connected to the decision to terminate you?

MR. KISCH: I'm going to object to the extent it calls for a legal conclusion.

MR. KOSTAKOS: I'm asking for any facts he's aware of that he can establish that his complaints to Mr. Gough about discrimination were in some way related or