IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

\- - - - - - - - - - - - - - - x

SETH DANIELS,

Plaintiff

Civil Action

vs. No. 05-00459-ML-LDA

AMERICAN POWER
CONVERSION CORPORATION,

Defendant

\- - - - - - - - - - - - - - - x

DEPOSITION of ARTHUR F. HAYEK, a witness called on behalf of the Plaintiff, pursuant to the Federal Rules of Civil Procedure, before Patricia A. Conant, a Registered Professional Reporter and Notary Public within and for the State of Rhode Island, at the offices of Stephen Robinson, 155 South Main Street, Fourth Floor, Providence, Rhode Island 02903, on Thursday, November 9, 2006, commencing at 5:19 p.m.

**Exhibit 7**

APPEARANCES:
LORI KISCH, ESQUIRE
Wiggins childs Quinn Pantazis, PC
7 Dupont Circle NW
Suite 200
Washington, DC 20036
For the Plaintiff;

GEORGE P. KOSTAKOS, ESQUIRE
Littler Mendelson, PC
10 Weybosset Street
Suite 404
Providence, Rhode Island 02903
For the Defendant.



I N D E X

| Deposition of: | Direct | Cross |
|---|---|---|
| ARTHUR F. HAYEK | | |
| BY MS. KISCH: | 4 | |

E X H I B I T S

| No. | Description | Page |
|---|---|---|
| 1 | Letter of 7/11/03 | 5 |



ARTHUR F. HAYEK,
having been satisfactorily identified by the production of his driver's license, and duly sworn by the notary public, was examined and testified as follows:
EXAMINATION
BY MS. KISCH:
Q. Good evening, Mr. Hayek. My name is Lori Kisch and I represent Mr. Seth Daniels who has filed a lawsuit against American Power Conversion, or APC, I might refer to them as?
A. Sure.
Q. And I'm here to take your deposition. Have you ever had your deposition taken?
A. No.
Q. It's going to be very quick.
MR. KOSTAKOS: Famous last words, Mr. Hayek.
BY MS. KISCH:
Q. And I'm here to find out really what information you may have with regard to the claims in the lawsuit?
A. Okay.
Q. Do you recall --



MS. KISCH: Can we go ahead and mark that.
(Hayek Exhibit 1, marked for identification.)
BY MS. KISCH:
Q. I show you what's been marked as Hayek Exhibit 1. Do you recognize this document?
A. If it's the same as -- yes, this is the subpoena.
Q. Right.
A. Sure.
Q. On the third page there is Attachment A which lists a bunch of documents that we had asked that you bring?
A. Right.
Q. Actually, before I continue, I don't believe I asked you to state your name for the record?
A. Arthur Hayek.
Q. What is your address?
A. 139 Ben Brown Avenue.
Q. Ben what?
A. Ben Brown.
Q. Okay.

Page 6

A. Hope, Rhode Island 02831.
Q. What's your home phone number?
A. 401-615-0061.
Q. Okay. Where are you currently employed?
A. Carlson Wagonlit Travel on site at APC.
Q. How long have you been employed with them?
A. Since October of 2002.
Q. Who were you employed by prior to that?
A. Actually, you could say H&R Block was the immediate job before that.
Q. Were you ever employed by Merit Travel?
A. Merit Travel is who hired me in October of 2002 and that later became Carlson, was bought out by Carlson. When I was hired it was Merit Travel. No, let me restate that. I was never employed by Merit. When I was hired by them, it was renamed TQ3 Travel which had been Merit.
Q. Okay.
A. That became Carlson.
Q. Okay. And during your entire tenure since October 2002, were you always on site at APC?

Page 7

A. Yes.
Q. And did your job responsibilities always involve providing travel related services for APC since that time?
A. Yes.
Q. Since you've been there since October 2002, have you ever received written directives, documentation, letters or memos or e-mails, anything at all with regard to any requirements for booking hotel reservations for APC related travel?
MR. KOSTAKOS: Objection. You can answer.
A. I think I need to hear the question once more.
Q. Since your employment in October 2002 in which you provided travel related services for APC employees, have you received any documentation at all from APC in relation to the requirement or restrictions for booking hotels for APC travel related?
A. Yes.
Q. Okay. And in with a form did you received such instructions?

Page 8

A. I think generally e-mails.
Q. Okay. Anything else other than e-mails?
A. There's an APC policy that's on line, I think, but not commonly used or referred to, so any changes or updates and so forth have pretty much come by mail or I guess you could say verbally.
Q. Okay. And when such updates come verbally, who do they come from?
A. From Christine Bollman.
Q. Okay. And when they come in e-mail form, do you print out all such instructions that is come in e-mail form?
A. Not generally.
Q. Do you keep any of the e-mails you've received over the years?
A. I may keep them for a time and then delete them. Usually it's pretty straightforward stuff.
Q. Okay. Do you still have any e-mails at all that came from APC with regard to the requirements for booking hotels for APC related travel.
A. I don't think so, but I can't say for

Page 9

sure.
Q. Okay. I would just ask that you please go back and look?
A. Sure.
Q. And if you do, print them out and give them to Mr. Kostakos so he can produce them to me?
A. Okay.
Q. I would also look in any files you have for any directives, documentation that came from APC with regard to any considerations you are to take or any directives or any instructions, limitations or restrictions in booking hotels for APC employees, okay?
A. Okay.
Q. And to, if you find any, to copy them or give them to Mr. Kostakos and he'll copy them and produce them, okay.
A. Okay.
MR. KOSTAKOS: Subject to review and consideration.
MS. KISCH: Well, if there's an objection, you know, obviously you're going to raise it, but he was supposed to bring it to

the deposition.
MR. KOSTAKOS: The whole think could be privileged documentation. I don't know what it looks like.
MS. KISCH: Can't be privileged. He's a third-party. I can't do anything about reserving your right. But there's no privilege.
MR. KOSTAKOS: I'm just reserving my right.
BY MS. KISCH:
Q. Do you know of an employee named Seth Daniels?
A. I don't. I don't remember him.
Q. Okay. I would just ask for you to look to see in your e-mails or document if you have anything related to Mr. Daniels. Have you already conducted a search?
A. I haven't.
Q. You haven't conducted a search?
A. I haven't conducted a search of my e-mails for that, but I was given to understand that it was for individually.
Q. Okay.



A. But I can say I don't think I have anything going back as far as 2003.
Q. Or 2004?
A. I don't know, but I will check. I can't say definitively.
Q. Okay. Because he was employed in 2004, as well.
A. Okay.
Q. If you look back and have anything, produce it to Mr. Kostakos.
A. Sure.
Q. The policy that you -- you said there was a policy on line but it's not commonly used or referred to. Which policy was that you were referring to?
A. APC travel policy.
Q. Okay. When you say it's not commonly used or referred to, what do you mean by that?
A. By the travel counselors. It may be more relevant to the travelers.
Q. Okay. Are you aware of any negotiated rates by Carlson Wagonlit or TQ3 or Merits for hotels in the Providence area?
A. Yes.



Q. Okay. And is there any sort of listing of those hotels where negotiated rates exist?
A. Yes.
Q. Were are those listings?
A. In an e-mail and like an attachment.
Q. Okay. Are those hotels, hotels where APC has negotiated the rates, or are those hotels that one of the travel agencies you've worked for negotiated the rates?
A. APC negotiates the rates.
Q. Okay. Are you aware of any negotiated rates that were reached through Carlson Wagonlit or Merits or TQ3?
A. Carlson has negotiated rates world wide that are not specific to, you know, necessarily specific to individual hotels in Rhode Island or used by us commonly. They are like negotiated with chains. There are rates out there that will take advantage of when the best rate, but they are not the negotiated rates commonly used by us for people coming into Rhode Island.
Q. Do you know, for example, the Marriott is a pretty big chain, right?



A. Yes.
Q. Do you know whether Carlson Wagonlit, Merit, or TQ3 have a negotiated rate with the Marriott?
A. With a specific Marriott?
Q. Well, do they have negotiated rate with a specific hotel or do they have a negotiated rate with the hotel in general?
A. Generally, I think Carlson rates -- I mean, it's kind of hard for me to say it. As far as the Marriott goes, if I see a Carlson rate at a Marriott, I don't believe that it's been negotiated directly with that specific property. I generally think of it as being something negotiated with the Marriott chain.
Q. Okay. So in fact, is it true that there is a negotiated rate for the Marriott by Carlson Wagonlit?
A. Well, I can't say definitively because I'm not even sure I've really seen Carlson rates specifically at the Marriott or Marriott's generally. Basically, the computer will pull up rates, and we'll see rates that are available to Carlson Wagonlit that are a

little discounted off regular rates. That's what I see.
Q. Okay. Well, is there any way for you to look in your system or at any documentation at all that would show that there is a rate that's given for Carlson Wagonlit for Marriott Hotels in particular in Providence?
A. Yes, I could look in the system and see if there is a rate that would be valid for a Carlson agent booking it.
Q. Okay. Could you do that and if there is, print it out?
A. Uh-huh.
Q. Okay. If you did print out a document, because I don't have it in front of me, I don't know if it exists. I'm trying to understand what it means. That would mean that there is a particular rate that's given for Carlson Wagonlit travel agents that if I went to the Marriott, I wouldn't necessarily get?
A. No, it would have to be booked by Carlson. Not by the travel agent, but by Carlson. It's available for businesses,



volume of businesses we do, whatever.
Q. I misspoke. I didn't mean you as a travel agent could stay at that rate, but you in your role as a travel agent in booking hotels for employees could get that rate because it was negotiated by Carlson Wagonlit, am I correct?
A. The only thing I don't want to commit to, I guess, is I don't know the process that gets that rate in the system and whether negotiated is the right term for it. I would assume you could use that, but all I know as a user is when I check availability for hotels world wide, that I will periodically, for a portion of the hotels, see Carlson rates that I can take advantage of because they are specifically for Carlson for us to sell for whoever is requesting space. How it got there, I guess, would have to be considered a negotiation.
Q. Okay. When did Carlson Wagonlit take over?
A. Oh, gosh. I'm going to be speculating here but I'm thinking -- I'm thinking it was



May of 2004.
Q. Okay. And Merits, when you were employed by Merits or TQ3 --
A. Yes.
Q. -- were there similar types of rates that would come up that were available for you booking for APC employees because, you know, you were booking them as an employee of TQ3 or Merits?
A. To the best of my recollection, yes.
Q. Would you have any access to any of those?
A. That I wouldn't have because I would have access to right now what I could pull up in present availability.
Q. Okay. And you don't know whether they would be available back when it was a different company?
MR. KOSTAKOS: Objection.
A. If they were available back when we were TQ3?
Q. Right.
A. To the best of my recollection there were comparable rates like that. I would say, yes,



that TQ3 also had similar rates based on their agency booking them?
Q. Okay.
A. Not necessarily the same rates, but their own available through the system we would have a rate available at some hotels if it's based on us being the agency that's booking them.
Q. Do you have any idea one way or the other whether such rates did exist at the Marriott?
A. That I don't know.
Q. Okay. Are you aware of any policies relating to APC employees ability to directly bill travel related expenses?
A. Yes.
Q. Other than travel related, did you receive any e-mails, bills, memos, anything from APC related to direct billings?
A. I can't recall any.
Q. When you look through your e-mails can you look to see if there are any?
A. Yes, sure.
Q. Do you recall any conversations you had with Christine Bollman with regard to direct billing authority?

A. I can't recall specific conversation.
Q. Okay. Do you recall any conversation with Christine Bollman regarding booking of hotels for APC employees?
A. It's -- it's a travel department so we talk a lot about hotels.
Q. Okay. Do you remember any conversations with Christine Bollman specifically related to -- well, strike that.
A. I mean, I guess I should say, I talk to her about direct billing hotels all the time. We get her approval all the time.
Q. Do you have any sort of list of employees who have the ability to direct bill?
A. Not a list.
Q. How do you keep track?
A. In their profile.
Q. Is there any way to print out some sort of computer list of individuals who have direct billing authority?
A. Not that I'm aware of.
Q. Okay. And do you know the basis for individual's having direct billing authority?
MR. KOSTAKOS: Objection.



A. I do.
Q. And what is that?
A. Generally they don't have other means of paying.
Q. Okay. Do you have any knowledge whether or not individuals who have been given direct bill authority whether or not they have previously applied for an APC corporate credit card?
MR. KOSTAKOS: Objection.
A. I'm sorry.
Q. Do you have any knowledge one way or another whether the individuals who have district bill authority, and therefore, it would say so in their profile, whether all of those employees had previously applied for an APC credit card?
MR. KOSTAKOS: Objection.
A. I wouldn't know that specifically.
Q. Okay. Do you have any knowledge -- do you know whether or not in fact there are individuals who have direct bill authority who have not applied for an APC corporate credit card?



A. I don't know of any specific individual who has that scenario.
Q. Okay. Have you had any conversations with Christine Bollman regarding Mr. Seth Daniels?
A. Only when the subpoena came out, and then it was just to say, you know, basically agree not to talk about it. I didn't want to talk about it, and I'll be glad to answer any questions you have, but I didn't have any conversations beyond "do you remember anything"?
Q. I'm sorry. When you say, "I didn't want to talk about it," you didn't want to talk about it with Christine Bollman or somebody else?
A. With anybody.
Q. With anybody?
A. I felt it would be better to come in here just fresh and come in here and be glad to tell you anything I know rather than just -- see, I was new at APC at the time and everybody was new to me and I don't have a specific recollection of him. I didn't want



to come in here with preconceived notions based on other people telling me things and making me, you know, kind of like -- you know how it is from memory. If somebody tells you something you start to remember that the car was blue. I thought it would be a little more honest to come in here fresh.
MS. KISCH: All right. That's all I have.
MR. KOSTAKOS: That's it.
(Whereupon, at 5:37 p.m., the proceedings adjourned.)

ERRATA SHEET DISTRIBUTION INFORMATION
DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS.

ERRATA SHEET DISTRIBUTION INFORMATION

The original of the Errata Sheet has been delivered to Mr. Kostakos, Esquire.

When the Errata Sheet has been completed by the deponent and signed, a copy thereof should be delivered to each party of record and the ORIGINAL forwarded to MS. KISCH, Esquire.

INSTRUCTIONS TO DEPONENT

After reading this volume of your deposition, please indicate any corrections or changes to your testimony and the reasons therefore on the Errata Sheet supplied to you and sign it. DO NOT make marks or notations on the transcript volume itself. Add additional sheets if necessary. Please refer to the above instructions for errata sheet distribution information.



ATTACH TO THE DEPOSITION OF Brian E. Gough
CASE: Daniels V. APC DATE TAKEN: November 9, 2006

ERRATA SHEET

Please refer to page 22 for errata sheet instructions and distribution instructions.

I, the undersigned, ARTHUR F. HAYEK, do hereby certify that I have read the foregoing deposition, taken on Thursday, November 9, 2006, and that, to the best of my knowledge, said deposition is true and accurate (with the exception of the following corrections listed below):

Page Line Change Reason

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

_____________ Executed this ____ day of _____, 2006

________________________



C E R T I F I C A T E

State of Rhode Island
PLYMOUTH, SS.

I, Patricia A. Conant, a Registered Professional Reporter and Notary Public within and for the State of Rhode Island, do hereby certify:

That ARTHUR F. HAYEK, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the said witness.

IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal this 27th day of November, 2006.

Registered Professional Reporter
and Notary Public

My commission expires:
July 2, 2010