IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

- - - - - - - - - - - - - - - x

SETH DANIELS,

Plaintiff

Civil Action

vs. No. 05-00459-ML-LDA

AMERICAN POWER
CONVERSION CORPORATION,

Defendant

- - - - - - - - - - - - - - - x

DEPOSITION of LISA LAURENCE, a witness called on behalf of the Plaintiff, pursuant to the Federal Rules of Civil Procedure, before Patricia A. Conant, a Registered Professional Reporter and Notary Public within and for the State of Rhode Island, at the offices of Stephen Robinson, 155 south Main Street, Fourth Floor, Providence, Rhode Island 02903, on Thursday, November 9, 2006, commencing at 4:39 p.m.

**Exhibit 8**

APPEARANCES:
LORI KISCH, ESQUIRE
Wiggins childs Quinn Pantazis, PC
7 Dupont Circle NW
Suite 200
Washington, DC 20036
For the Plaintiff;

GEORGE P. KOSTAKOS, ESQUIRE
Littler Mendelson, PC
10 Weybosset Street
Suite 404
Providence, Rhode Island 02903
For the Defendant.



INDEX


| Deposition of: | Direct | Cross |
|---|---|---|
| LISA LAURENCE | | |
| By Ms. Kisch | 4 | |


EXHIBITS


| No. | Description | Page |
|---|---|---|
| 1 | Subpoena | 4 |




LISA LAURENCE,

having been satisfactorily identified by the production of her driver's license, and duly sworn by the notary public, was examined and testified as follows:

(Laurence Exhibit 1, marked for identification.)

EXAMINATION

BY MS. KISCH:

Q. Good morning, Miss Laurence. My name is Lori Kisch and I'm an attorney with Wiggins Childs Quinn & Pantazis in Washington, DC. I represent Seth Daniels who has filed a lawsuit against American Power Conversion Corporation. I may refer to it as APC.

We served a subpoena on you today to find out if you have any information related to his claim, and I just want to show you what's been marked as Laurence Exhibit 1, which is a copy of the subpoena that was served upon you and an attachment that lists some documents on the next page?

Do you recognize this document?

A. Yeah, I recognize it.



Q. Okay. And have you ever been deposed before?

A. Been to where?

Q. Been in a deposition before?

A. No.

Q. I'm going to just tell you I'm here to find out what facts and knowledge you have, and you need to testify and tell me about the facts and knowledge you have because you're under oath, and as you can see, a court reporter is transcribing it. This is not going to take long as at all. You may or may not have any information.

What is your current -- who are you currently employed with?

A. Carlson Wagonlit Travel.

Q. What's the second name?

A. Wagonlit; C-A-R-L-S-O-N, W-A-G-O-N-L-I-T, Travel.

Q. Could you just state your name for the record?

A. Lisa A. Laurence.

Q. What is your current home address?

A. 66 Cone, C-O-N-E, Drive, West Warwick.

Q. And what is your home phone number?
A. 401-714-1173.
Q. Do you have any plans of moving in the next year?
A. No.
Q. How long have you been employed by Carlson Wagonlit? Did I pronounce that correctly?
MR. KOSTAKOS: I think it's Wagonlit.
THE WITNESS: They say Wagonlit, but it's Wagonlit.
MR. KOSTAKOS: Off the record.
(Discussion off the record.)
BY MS. KISCH:
Q. How long have you been employed by Carlson Wagonlit?
A. I think two years.
Q. Okay.
A. But it was Merits prior to that.
Q. Okay. And when were employed by Merits how long were you employed for?
A. Been there almost 6 years, so go back.
Q. Have you always been located at the APC



location?
A. Yes.
Q. So where is your physical address of employment?
A. 132 Fairgrounds Road, West Kingston, Rhode Island.
Q. And has your job duties and responsibilities for Carlson Wagonlit and Merits been solely for travel accommodations for APC?
A. Yes.
Q. Did your job duties change at all when your employment changed from Merits to Carlson Wagonlit?
A. No.
Q. And describe for me just generally what your job duties and responsibilities are?
A. I service the APC travel account.
Q. Okay. And how do you do that?
A. Booking hotels, cars, airline tickets.
Q. Okay.
A. Anything travel-related.
Q. All right. And in booking hotels are you aware of any APC policies related to what



hotels APC employees are permitted to stay in?
A. They have negotiated rates with particular hotels.
Q. And are you aware of what those hotels are?
A. Yes.
Q. Do you have some sort of a list?
A. Yes.
Q. Okay. Have you ever been directed or told as to booking hotels from that list?
MR. KOSTAKOS: Objection. You can answer if I object.
A. I don't understand the question.
Q. Okay. If you don't understand something, let me know, because we certainly want you to understand the question.
Has APC ever given you any instructions as to what hotels could be booked for APC employees?
A. No.
Q. They haven't, okay. What is your understanding as to where APC employees can stay in hotels?
MR. KOSTAKOS: Objection.



BY MS. KISCH:
Q. Let me rephrase that.
What is your understanding with regard to restrictions, if any at all, with regard to APC employees staying in any particular hotel?
MR. KOSTAKOS: Again, objection, but go ahead.
A. Well, we're to book properties that we have negotiated rates with.
Q. Okay.
A. That in turn keeps the good relationship between the hotel so when they go in for negotiations we have, you know, we can get a better rate.
Q. Okay. And does Merits or Carlson Wagonlit have negotiated -- have negotiated rates with hotels that are separate from the APC negotiated rates?
A. Yes.
Q. Okay. And do you have some sort of a list of those hotels?
A. No. It's just through the system, Saber System that we have.

Q. Okay. And how do the -- who inputs that data into the system, do you know?
A. No.
Q. Is there any way to print out from the system --
A. No.
Q. -- what those hotels are?
A. No. Not to my knowledge.
Q. Okay.
A. I mean, we have -- Carlson is a very large company and we have -- say we have a contract with the Holiday Inn, so we might get a rate at the Holiday Inn throughout the United States.
Q. Okay.
A. So if we're looking at Atlanta and Holiday Inn comes in, we don't automatically offer that hotel, no.
Q. What do you mean?
A. We don't offer it. We don't say, "Oh, we have a Carlson rate." You know. Usually the travelers know where they want to stay outside of Rhode Island.
Q. For travel that occurs within Rhode



Island --
A. Uh-huh.
Q. -- do you have negotiated rates with hotels aside from the negotiated rates that APC has?
A. Not that I'm aware of.
Q. No?
A. No. APC usually has a better rate because they negotiated with the local hotels.
Q. Regardless of whether APC has a better rate, are you aware of whether or not Carlson Wagonlit or Merit Travel at any point had negotiated rates itself with any Providence area hotels?
MR. KOSTAKOS: Objection.
A. No.
MR. KOSTAKOS: You can answer.
A. No.
Q. You doesn't know one way or the other?
A. No.
Q. Is that a "No," you don't know, or "No," there are no such --
A. To my knowledge I do not think they are.
Q. Okay. And what is that knowledge based



upon?
A. When I book through the hotels, my system.
Q. Nothing comes up for Rhode Island?
A. I don't recall seeing any Carlson hotels in Rhode Island.
Q. What about any Merits?
A. Merit wasn't as large as Carlson, so I don't recall any Merits.
Q. Okay. Did you ever have a book that had the negotiated hotels that Merits and/or Carlson had negotiated with.
A. No.
Q. No?
Are you aware of any APC employees staying at the Providence Marriott?
MR. KOSTAKOS: Objection.
BY MS. KISCH:
Q. Let me rephrase that. Are you aware whether or not APC employees ever stayed at the Providence Marriott in Rhode Island?
A. Yes.
Q. Okay. And are you aware of whether APC employees have stayed at the Providence



Marriott within the last year?
A. Can I ask you a question?
MR. KOSTAKOS: I'm going to object. There's more than one Marriott in Providence.
THE WITNESS: Yeah.
BY MS. KISCH:
Q. Okay. How many Marriotts in Providence?
A. Are you talking about Providence, downtown.
Q. Yes.
A. There's the Courtyard by Marriott, the Marriott over here.
Q. Okay.
A. I'm aware of two downtown.
Q. Okay. Are you aware of whether any employees have stayed in either of those two hotels in Providence in the last year?
A. No.
Q. You're not aware?
A. No.
Q. Would you -- is it possible you wouldn't have knowledge of that? That perhaps one of the other travel agents booked those?

MR. KOSTAKOS: Objection. You can answer, if you can.
BY MS. KISCH:
Q. Let me rephrase the question. You're not the only travel agent at APC, correct?
A. Right, but I don't know how to answer that.
MR. KOSTAKOS: If you can't answer, you can't answer.
A. If a traveler was to come to me and say, "I need to book a Providence hotel."
Q. Yeah?
A. I would then turn around and if the rate was extremely high, higher than our negotiated rates, I would take it to the travel manager. I would need approval.
Q. And what would be an extremely high --
MR. KOSTAKOS: Objection.
A. Anything over our negotiated rates.
Q. Would $95 be extremely high?
MR. KOSTAKOS: Objection.
BY MS. KISCH:
Q. Based upon what the negotiated rates are in the Providence area?



MR. KOSTAKOS: Objection.
A. Yeah.
MR. KOSTAKOS: Objection.
A. That would be high.
Q. That would be very high?
A. That would be very high.
Q. Are you aware of other hotels in the Providence area where the rates are actually higher than that?
A. Yes.
Q. Okay. And do you have to go get approval prior to booking those?
MR. KOSTAKOS: Objection. Are you talking about preferred, not preferred or any?
BY MS. KISCH:
Q. I'm sorry, are you aware of any hotels in the Providence area that are listed that are approved hotels for APC employees to stay in at a higher rate than $95?
A. Yes.
Q. Okay. And what hotels are those?
A. I have a problem when you say Providence.
Q. Providence area?



A. When you say Providence, you mean downtown, right?
Q. Not just downtown.
A. There are other hotels in the area within the airport that are higher.
Q. Okay. And do you know what those rates are?
A. $90, $91, $73. Depending on the season we get Newport hotels for $69.
Q. Are you aware of any rates over $100 that are on the APC approved hotel list?
A. Yes.
Q. Okay. Do you have to go and get pre approval prior to booking those?
MR. KOSTAKOS: Objection.
BY MS. KISCH:
Q. Go ahead.
A. Depending on the circumstances. We advise them that we can offer them a lower rate at a different property. At that time they are to make the decision whether they want to take what I offered them to what they decide to book.
Q. Okay. So if they decide not to take a



different property, you will go ahead and book that for him?
A. I will book that and note the reservation, or bring it to the traveler's attention.
Q. What hotels are over $100 that are on the APC approved list, do you recall, in the Providence area?
A. The Crown Plaza is the only one that I can recall.
Q. Okay. You have not been given any written directives as to how to book travel-related reservations for APC employees, is that correct?
A. Can you say that again.
Q. Have you been given any written directives or instructions from APC on the restrictions or requirements or policies for booking travel for APC-related travel?
A. In regard -- are you talking about hotels? Are you talking -- I don't understand the question.
Q. Let's talk about hotels?
A. We are to book the lowest available

hotel.
Q. I'm not asking you what to book. I'm asking have you ever received any documents either through an e-mail, a memo, an outline, a letter, any sort of written communication from APC as to the considerations that you are to undertake in booking hotels for APC-related travel and any restrictions on that booking?
A. We know the negotiated hotels.
Q. Do you receive any documentation at all from APC?
A. We get a list of hotels, yes.
Q. Other that getting a list of hotels, have you ever received anything else?
A. They have a travel policy.
Q. Did you receive that, too?
A. There's a travel policy.
Q. Okay. Anything other than travel policy and the list of hotels that you have received from APC with regard to making hotel reservations for APC employees? Any other documents at all?
A. No, no.
Q. Okay. Did you bring with you today the



travel policy and the list of hotels?
A. No.
Q. Okay. Can you turn to attachment A to Lawrence Exhibit 1. If you look at No. 3, it asks for "All APC Human Resources and/or travel-related policies and or directives from APC."
Do you see that?
A. That's in the computer. APC's policy is -- I didn't bring their travel policy.
Q. Okay.
A. I didn't even think --
Q. And you didn't bring the list of hotels?
A. No.
Q. I need you to give those to me, okay, because you were supposed to bring those today and you didn't. It's all right. It's okay that you haven't, but I need you to give it to me.
A. I didn't think that had anything to do with Carlson.
MR. KOSTAKOS: Is it in their possession or control? I don't know.
MS. KISCH: Well, she said it was



given to her.
THE WITNESS: It's APC's property, though.
MR. KOSTAKOS: Was it given to her to hold?
BY MS. KISCH:
Q. Let me ask you this: Do you have access to the policy that you said that they gave to you? The travel policy?
A. Yes.
Q. Do you have access?
A. Yes.
Q. Do you have access to the list of hotels?
A. Yes.
Q. Then I need you to produce those to me?
A. Okay.
Q. Can you give it to Mr. Kostakos and he can produce it to me. If I have to ask any more questions, I will, but hopefully I won't need to.
Do you have any other documents at all --
MR. KOSTAKOS: I'm going to object subject to the better understanding of



their access to them.
BY MS. KISCH:
Q. Do you use computers that are APC or are they -- the computers that you use, who actually provides those commuters for you? Is it APC or is it Merit Travel and/or Carlson?
A. Carlson.
Q. When you say it's in the computer, it's in the computer that was provided by Carlson?
A. It's an e-mail that was sent to us.
Q. Okay. So it's an e-mail form?
A. E-mail format.
Q. Is that both the list of hotels and the travel policy are both in the e-mail format?
A. Yes, they are.
Q. Okay. So I need you to print out both of those e-mails and give them to Mr. Kostakos and he'll produce them.
MR. KOSTAKOS: You don't have to do it right now.
BY MS. KISCH:
Q. All right. Have you received any other e-mails at all from APC?
A. In regards to?

Q. In regards to anything with regards to your job?
A. I receive e-mails every day in regards to my job.
Q. Okay. Do you receive any e-mails at all that related to Mr. Daniels?
A. No.
Q. You never did?
A. Not that I can recall.
Q. How far back do your e-mails go in your computer?
A. I mean, I delete them every month.
Q. So they wouldn't go back a couple years?
A. No.
Q. Okay. Do any of the other e-mails, would they refer to any of the negotiated rates for hotels used by APC?
A. I'm sure in the past I've received an e-mail in regards to APC about hotels.
Q. Well, if there are any that talk about negotiated rates, I need you to print them out as well. If you didn't keep them and you don't have any --
A. I don't have any.



Q. -- we can't do anything about that, but if you have --
A. I don't have any.
Q. The e-mails with regard to the travel policy and the list of hotels, when did you receive that e-mail?
A. I have no idea.
Q. Okay.
A. I mean, the hotels get updated every year because contracts and negotiations change.
Q. Okay. So do you have old copies or you just have a more recent copy. How old is the e-mail copy that you have?
A. I have some old.
Q. That you kept?
A. Yeah.
Q. Okay. So any documents that reflect what hotels can be used by APC employees, any documents that reflect any travel policies, any documents that reflect negotiated rates for hotels, and the last question is about direct bill authority, any policies or documents that would refer to direct bill authority for APC employees. I need you to go



ahead and either print those or copy those and give those to Mr. Kostakos, okay?
A. Okay.
MS. KISCH: Okay. That's it.
MR. KOSTAKOS: Before we go, I'm going to reserve any objections subject to reviewing them that I may have to the production of those documents, not knowing what they are.
MS. KISCH: Okay. And if we need to reconvene the deposition because the documents were not provided today, we can do that, and hopefully we won't have to do that.
THE WITNESS: No, do you want me to have them faxed here?
MR. KOSTAKOS: No, because I'm going to need to review them.
THE WITNESS: All right.
BY MS. KISCH:
Q. Actually, I have one more question.
Did you have any conversations with Mr. Kostakos?
MR. KOSTAKOS: Objection, instruct you not to answer.



MS. KISCH: I didn't ask her what the conversations were.
BY MS. KISCH:
Q. Have you had any discussions with Mr. Kostakos prior to your coming here today.
You need to go ahead and answer that.
MR. KOSTAKOS: You can answer that.
A. No.
Q. You haven't? None at all?
A. Not that I recall. No. I met him in the lobby.
(Discussion off the record.)
MS. KISCH: Okay. That's all. Thank you.
(Whreupon, at 4:59 p.m., the proceedings adjourned.)

ERRATA SHEET DISTRIBUTION INFORMATION
DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS.

ERRATA SHEET DISTRIBUTION INFORMATION

The original of the Errata Sheet has been delivered to Mr. Kostakos, Esquire.

When the Errata Sheet has been completed by the deponent and signed, a copy thereof should be delivered to each party of record and the ORIGINAL forwarded to MS. KISCH, Esquire.

INSTRUCTIONS TO DEPONENT

After reading this volume of your deposition, please indicate any corrections or changes to your testimony and the reasons therefore on the Errata Sheet supplied to you and sign it. DO NOT make marks or notations on the transcript volume itself. Add additional sheets if necessary. Please refer to the above instructions for errata sheet distribution information.



ATTACH TO THE DEPOSITION OF LISA LAURENCE
CASE: Daniels V. APC DATE TAKEN: November 9, 2006

ERRATA SHEET

Please refer to page 26 for errata sheet instructions and distribution instructions.

I, the undersigned, LISA LAURENCE, do hereby certify that I have read the foregoing deposition, taken on Thursday, November 9, 2006, and that, to the best of my knowledge, said deposition is true and accurate (with the exception of the following corrections listed below):

Page Line Change Reason

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

_______________ Executed this ____ day of _____, 2006

______________________________



CERTIFICATE

State of Rhode Island
PLYMOUTH, SS.

I, Patricia A. Conant, a Registered Professional Reporter and Notary Public within and for the State of Rhode Island, do hereby certify:

That LISA LAURENCE, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the said witness.

IN WITNESS WHEREOF, I have hereunto set my hand and Notarial Seal this 27th day of November, 2006.

Registered Professional Reporter
and Notary Public

My commission expires:
July 2, 2010