IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

- - - - - - - - - - - - - - - x

SETH DANIELS,

Plaintiff

Civil Action
vs. No. 05-00459-ML-LDA

AMERICAN POWER
CONVERSION CORPORATION,

Defendant

- - - - - - - - - - - - - - - x

DEPOSITION of BRUCE E. GOUGH, a witness called on behalf of the Plaintiff, pursuant to the Federal Rules of Civil Procedure, before Patricia A. Conant, a Registered Professional Reporter and Notary Public within and for the State of Rhode Island, at the offices of Stephen Robinson, 155 south Main Street, Fourth Floor, Providence, Rhode Island 02903, on Thursday, November 9, 2006, commencing at 9:33 a.m.

**Exhibit 10**

APPEARANCES:
LORI KISCH, ESQUIRE
Wiggins childs Quinn Pantazis, PC
7 Dupont Circle NW
Suite 200
Washington, DC 20036
For the Plaintiff;

GEORGE P. KOSTAKOS, ESQUIRE
Littler Mendelson, PC
10 Weybosset Street
Suite 404
Providence, Rhode Island 02903
For the Defendant.



INDEX

| Deposition of: | Direct | Cross |
|---|---|---|
| BRUCE E. GOUGH | | |
| By BY MS. KISCH: | 4 & 274 | |
| By Mr. Kostakos | 272 | |

EXHIBITS

| No. | Description | Page |
|---|---|---|
| 1 | Letter of 7/11/03 | 129 |
| 2 | Travel Policy | 210 |
| 3 | Ethics Policy | 210 |
| 4 | Corrective Discipline Policy | 248 |
| 5 | Answers to Interrogatories | 255 |
| 6 | Agenda of 3/9/04 | 264 |
| 7 | EEO Opportunity Policy | 266 |
| 8 | Complaint Resolution Procedure | 268 |
| 9 | Documents | 269 |



BRIAN GOUGH,
having been satisfactorily identified by the production of his driver's license, and duly sworn by the notary public, was examined and testified as follows:

EXAMINATION
BY MS. KISCH:
Q. Good morning. Would you go ahead and just state your name for the record?
A. Brian Gough, G-O-U-G-H.
Q. What is your current address?
A. 47 April Lane, Tiverton, Rhode Island.
Q. And what is your phone number?
A. 401-816-0470.
Q. Do you have any plans of living out of area in the next few months?
A. Yes, I do.
Q. Where to you plan on living?
MR. KOSTAKOS: She didn't expect that answer.
MS. KISCH: Well, in this case it's not unusual.
A. St. Louis.
Q. When are you planning on moving?



A. Undetermined at this point. Waiting on the sale of my home.
Q. Okay. Are you currently employed?
A. Yes, I am.
Q. By whom?
A. American Power Conversion.
Q. When you move will you still be employed by APC?
A. Yes, I will.
Q. My name is Lori Kisch and I represent Seth Daniels who worked at American Power Conversion Corporation. I may refer to it as APC rather than the full name so just so you understand I mean American Power Conversion when I say APC. Just understand I mean American Power Conversion when I say it.
I'm here to take your deposition today. Have you ever had your deposition taken before?
A. Yes, I have.
Q. When was the last time?
A. Approximately 6 years ago.
Q. What was that in relation to?
A. It was a noncompete issue.

internally with the company that the termination was not justified?
A. No, they did not.
Q. Are you sure about that?
A. Best of my knowledge there were no complaints.
Q. Would you, as the director overseeing and approving these terminations, would you expect to have knowledge of any complaints?
MR. KOSTAKOS: Objection.
A. Yes, I would.
Q. Okay. The individual who was the individual or individuals who were cheating on certification tests, was it one individual or more than one?
A. I remember a few circumstances over the years, one or two.
Q. Okay. Do you recall who those individuals were?
A. No.
Q. And do you recall how it came to your attention?
A. No.
Q. And do you recall -- was this while --



strike that.
Do you recall the manager that you spoke with regarding those terminations?
A. No.
Q. Do you recall the position of the employees that were terminated?
A. Inside sales reps or customer service engineers.
Q. Do you recall the race of those individuals?
A. No, I don't.
Q. Do you recall whether they had received any prior discipline prior to their terminations?
A. I don't recall.
Q. Do you know whether there are employee relations files on those individuals?
A. I don't know specifically whether there are or not.
Q. Okay. Do you recall what office they worked out of?
A. West Kingston.
Q. Do you recall whether those individuals complained that the termination was not



justified?
A. I believe that they may have complained internally. No external complaints.
Q. Okay. And what investigation, if any, did APC conduct after those complaints were made?
A. To my recollection, none.
Q. Okay. And do you recall whether any of those individuals complained that their terminations were based on -- were actually a pretense for discrimination?
MR. KOSTAKOS: Objection.
A. Not to my recollection was that brought up as any concern.
Q. Okay. Are you aware of any other terminations other than those?
MR. KOSTAKOS: Objection.
A. We terminate hundreds of employees every year.
Q. But you don't remember any other individual circumstances?
MR. KOSTAKOS: Objection.
A. No.
Q. Okay.



BY MS. KISCH: Mark that, please.
(Gough Exhibit 1, marked for identification.)
BY MS. KISCH:
Q. I show you, Mr. Gough, what's been marked as Gough Exhibit 1?
A. Okay.
Q. Take a moment to look at the document. Let me just ask you a quick question. I'll give you a chance to read this fully, but does this refresh your recollection at all? Do you know Mr. Robert Graham.
A. Yes, I do.
Q. And were you involved at all in his termination from APC?
A. Yes, I was.
Q. Okay. I'm not going to ask you specific questions regarding this agreement, but wanted to refresh your recollection because you had said you didn't recall any terminations during the 2002, 2004 time frame. Now that your recollection has been refreshed, tell me what you can recall surrounding the issues of Robert Graham's termination?

MR. KOSTAKOS: What --
BY MS. KISCH: I'm not asking specifically about the document. I wanted to refresh his recollection about it.
A. Mr. Graham was responsible for managing our Latin American region. At the time of his termination, he had transferred to Europe and was in charge of the sales force for the European, Middle East and Africa region.
After that transfer it was brought to our attention that during his tenure in Latin America there was a gray marketing scheme that involved some of our distributors in Venezuela. An investigation was conducted by our general counsel and myself to determine to the best of our knowledge the facts of the case. It was our determination that the sales manager, Rainer Weigle, was, if not involved, complicit with the efforts of the distributor to purchase APC products in the Latin American region at a Latin American discount, and then forward those products back in to North America, realizing significant gains.
Mr. Weigle and Mr. Graham



benefited from this financially through their sales bonus program. Mr. Graham indicated he had no knowledge of the gray marketing scheme. Our investigation indicated that if he were not -- if he was not aware of it, he should have been as the leader of the organization, but the numbers were significant enough that he should have been given, have given it greater due diligence, and as a result, the company took action to terminate both Mr. Graham and Mr. Weigle.
Q. How do you spell Mr. Weigle?
A. Weigle?
Q. Yeah, Mr. Weigle.
A. Rainer, R-A-I-N-E-R; Weigle, W-E-I-G-L-E.
Q. And is Rainer, R-E-I-N-E-R?
A. R-A-I-N-E-R.
Q. Okay. How did you first learn about this issue?
A. The issue was brought to my attention by our general counsel.
Q. And when you first learned of this information, what documents do you have in your possession that you reviewed prior to



starting a full-scale investigation?
MR. KOSTAKOS: I'm going to object to the extent any of those documents are protected by attorney/client privilege or work product. I instruct the witness not to discuss those items.
A. My recollection is we had sales figures as well as documents from our distributors.
Q. And what kind of documents from distributors?
A. Those would include sales numbers.
Q. Okay.
A. Specific invoice data.
Q. Okay. And what, in your full-scale investigation that you undertook, who did you speak with?
A. We spoke with Rainer Weigle, and we spoke with his fiancee who was also an APC employee, Patricia -- I can't remember Patricia's last name. We spoke with Fernando Garcia who was the general manager of Latin America post Mr. Graham.
Q. I'm sorry. Can I just interrupt. What was his title prior to taking over as GM of



Latin America?
A. Mr. Garcia?
Q. Yes.
A. Country manager of Spain.
Q. When you spoke to him at that point he was country manager, correct?
A. No, when we spoke to him he was general manager of Latin America. Mr. Graham had moved to Europe at that point.
Q. Okay, go ahead.
A. We spoke with the finance manager for Latin America, Aidan Mitchell, A-I-D-A-N.
Who else did we talk to? I may be missing one marketing person that we spoke with, but I can't recall. It's been a few years.
Q. Okay. Okay. And did you speak with Mr. Graham at all during your investigation?
A. At that point in the investigation, no, we did not.
Q. At some point in the investigation prior to his termination did you speak with Mr. Graham?
A. Yes. I believe that conversation was

held just by the general counsel. I don't recall I was involved in that conversation.
Q. Okay. Okay. And other than you and the general counsel, was there anybody else involved in the investigation, other than, obviously, the people you spoke to during the investigation that you just described?
A. One individual from our systems group was requested to come with us to Florida, and we took the hard drives off the computers of those individuals, and he wasn't aware of circumstances surrounding it. He was just instructed what to do.
Q. When you say the hard drives of the individuals, do you mean individuals you spoke with?
A. Specifically, Mr. Weigle and Patricia and Aidan, was three.
Q. Aidan, also?
A. Yes.
Q. Who was Aidan?
A. Aidan Mitchell, finance manager.
Q. Okay. Was he in any way implicated in the gray marketing schemes?



A. No.
Q. Did you think that he might be?
A. Going into the investigation we weren't certain whether he was involved or not. There was no evidence to indicate he was aware of what was taking place.
Q. Okay. Going into the investigation was it your understanding that both Mr. Graham and Mr. Weigle were involved in the gray marketing scheme?
A. Could you repeat that question?
Q. Going into the investigation was it your understanding that both Mr. Weigle and Mr. Graham were involved in the gray marketing scheme?
A. We knew that there was evidence of gray marketing. We did not know definitively who might be involved.
Q. Okay. And what prompted you then to speak to Mr. Graham's fiancee?
A. Wasn't Mr. Graham's, it was Mr. Weigle's.
Q. I'm sorry, Mr. Weigle's.
A. She was actually in charge of the marketing area and had specific interaction



with the distributors, so she had knowledge of the overall business in Latin America, so it was not specifically because they had a relationship that we were speaking with her.
Q. Okay. Did you speak with Mr. Graham before or after you had a belief that he was involved in the gray marketing scheme?
When I mean you spoke, or the general counsel. You said the general counsel, you believe, spoke?
A. I believe the general counsel spoke with him after our visit to Florida where we gathered additional data. Clearly, at that point we had, we had determined that there was significant evidence to show that the management in Latin America knew or should have known about the situation.
Q. Did you speak with Mr. Weigle before or after you had acquired evidence suggesting he either knew or should have known of the gray marketing scheme?
A. We spoke with him at the initial part of the investigation, so that day we didn't have significant data to form any opinion.



Q. Okay. And did you believe, though, at that point that he might have been involved?
A. There were indications, based on the numbers, that led us to be skeptical and have concern about his involvement.
Q. And were those the numbers that you initially reviewed, the data that you described, the sales figures and documents from the distributors and the invoice data?
A. Yes.
Q. Okay. Did those sales documents raise concerns that you believe Mr. Graham should have known about the gray marketing scheme?
A. We became aware of Mr. Graham's involvement with the distributor after our conversation with Mr. Weigle.
Q. Okay. And you did speak with Mr. Weigle prior to the general counsel's conversations with Mr. Graham, is that correct?
A. Yes.
Q. Okay. Did either Mr. -- well, was Mr. Weigle terminated or was he asked to resign?
A. I think both of those is the same, but I believe Mr. Weigle was terminated. However,

he was a German employee so there were other obstacles or hoops we needed to go through for the German contractor.
Q. Do you have any knowledge whether Mr. Graham was asked to resign versus actually terminating him?
A. We indicated that we were terminating his employment.
Q. So you are not aware that he was actually asked to resign?
A. No.
Q. You see on Gough Exhibit 1, the first line it states, "As you know, I represent the above named Robert Graham relative to your request for his resignation from American Power Conversion, Corp."
A. Yes.
Q. Does that refresh your recollection as to whether or not APC asked Mr. Graham to resign after conducting his investigation?
A. Yeah, that's not my recollection of the conversation. We met with Mr. Graham and indicated his employment with APC was ending. The subsequent negotiations on an agreement, I



see that those indicate that it was a resignation date.
Q. Okay.
A. I'm not familiar with how it became a resignation.
Q. Did you have any role in the negotiations with Mr. Graham's attorney?
A. No, I did not.
Q. Are you aware that APC paid him a significant amount of money associated with his resignation from APC?
MR. KOSTAKOS: Objection.
A. I'm not aware of the specifics. I see what's in here but --
Q. You had no knowledge, separate from reading this document, as to the significant amount of money that APC paid Mr. Graham to resign?
MR. KOSTAKOS: Objection.
A. I knew that we had settled. I did not know the amount.
Q. Does it surprise you that APC paid, I believe it was about $80,000, to Mr. Graham for his resignation?



MR. KOSTAKOS: Objection.
A. No, it does not surprise me.
Q. Why doesn't it surprise you?
A. Because I'm familiar with the legal system, and Mr. Graham had been with the organization for 12 or more years at that stage, and it was in the interests of the company to remove him from his role.
Q. Well, had the company actually removed him already?
A. We had indicated that his employment with APC was ending.
Q. Well, did you actually terminate him or did you tell him it would end?
A. My recollection of the events is I terminated his employment. I took his laptop and his badge.
Q. Okay. And was he told that he was no -- and did his job duties at that point end for APC?
A. Yes, they did.
Q. Was he allowed to come back to work after that point?
A. No, he was not.



Q. Okay. Did Mr. Graham ever file a lawsuit against APC?
A. No, he did not.
Q. Did he ever file a charge of discrimination against APC?
A. No, he did not.
Q. How much money did Mr. Graham make from the gray marketing scheme?
MR. KOSTAKOS: Objection.
A. I don't know that amount.
Q. Would it be indicated in any of the files relating to Mr. Graham?
A. My understanding it would be difficult to ascertain that, to determine exactly how much the gray market scheme was worth to him.
Q. Did you attempt to determine that during the investigation? Did you and/or anybody else attempt to determine the amount of money that Mr. Graham received from the gray marketing scheme?
A. I don't recall if we did an exact calculation on that.
Q. But did you try to calculate and come up with a general understanding of the amount of

Page 142

money he made from the gray marketing scheme?
A. I don't know if we did that or not.
Q. Do you have any understanding generally as to the amount of money that he made at all from the gray marketing scheme?
MR. KOSTAKOS: Objection.
A. I don't recall.
Q. Did you ever learn what his bonuses were during that time?
A. Again, I don't recall specifics. I'm assuming that we had the data on what his bonuses were.
Q. Okay. Was that the hundreds, the thousands, the ten thousands, or hundreds of thousands, or millions?
A. Based on my general knowledge, it would be in the tens of thousands.
Q. And do you recall whether it was low tens of thousands or high tens of thousands?
MR. KOSTAKOS: Objection.
A. I don't recall.
Q. How long did this gray marketing scheme go on for? What did your investigation reveal?

Page 143

A. I believe it was over the course of one year. It may be longer.
Q. And what about Mr. Weigle's bonuses? Were those also in the tense of thousands?
A. Yes.
Q. And were they more than the tens of thousands?
A. No.
Q. Did Mr. Weigle ever file a lawsuit against APC?
A. Not to my knowledge.
Q. Did Mr. Weigle ever file a charge of discrimination with the Rhode Island Commission or any other commission against APC?
A. Not to my knowledge.
Q. Did APC also pay Mr. Weigle a significant amount of money after he profited in the tens of thousands of dollars from the gray marketing scheme?
A. I'm not familiar with the final disposition of his German contract.
Q. Are you aware that APC paid him any amount of money in relation to his termination

Page 144

and/or resignation after he profited in the tens or thousands of dollars from the gray marketing scheme with APC?
A. I'm not familiar with the provision of his contract.
Q. You don't know whether APC paid him any money at all in relation to the termination or resignation?
A. I don't recall anything.
Q. Okay. Did the board of directors have to approve, do you know, the payment to Mr. Graham in relation to his resignation?
A. I can -- the only thing I can answer to that is if the board approved it there would have been an 8-K filed.
Q. A what filed?
A. 8-K.
Q. What's that?
A. That's a document that would have been filed with the Securities and Exchange Commission and it would detail an agreement made by the company with an officer of the company. I don't recall if Mr. Graham was considered an officer of the company at the

Page 145

time and if it would have required board of director approval or not.
Q. Okay. Do you recall any other individuals who were terminated for an ethics violation? An APC ethics violation?
A. Yes. I can recall specifically one vice president of systems.
Q. Who was that?
A. Lisa Sipe.
Q. How do you spell her last name?
A. S-I-P-E.
Q. And when was she terminated?
A. Couple years ago.
Q. Okay. And what was the nature of the ethics violation?
A. She was manipulating the purchase system in order to get approval for purchases outside of the mandate set forth by the CEO at the time.
Q. Did she profit from this?
A. No.
Q. And did you approve her termination?
A. General counsel was involved in that investigation, and he and the CEO made that

determination.
Q. Who was the general counsel?
A. Jeffrey Giguere.
Q. How do you spell the last name?
A. G-I-G-U-E-R-E.
Q. Were you involved at all in the investigation of the issues surrounding this Sipe's termination?
A. Yes, I was.
Q. And describe for me the investigation that you undertook in her case?
A. I investigated the purchase orders and the approval of how it was done.
Q. How did you go about doing that?
A. Just working with the accounts payable group and getting a record of them, reviewing it.
Q. Did you speak with her at all?
A. No, I did not.
Q. Do you know whether the general counsel or the board spoke with her prior to her termination?
A. General counsel did.
Q. Was that prior to the decision to



terminate her?
A. Yes.
Q. Did you do anything else in the investigation?
A. Not that I can recall.
Q. Did you speak with any other individuals?
A. Not that I am aware.
Q. Do you know what general counsel did during the course of the investigation other than speaking with Miss Sipe, was it?
MR. KOSTAKOS: Again, to the extent it implicates any attorney/client work product or privileges, I instruct the witness not to reveal those communications or that information.
A. I am not aware of everything that he spoke to. I don't have any recollections as to the individuals that he spoke with on the case.
Q. Okay. Do you know whether she had ever been disciplined prior to her termination?
A. Not that I am aware of.
Q. What's her race?
A. White. Caucasian.



Q. Do you know if she filed any complaints, either in court or the EOC or a state agency regarding her termination?
A. Not that I am aware.
Q. Do you know whether APC paid her any money for her termination?
A. I believe we that we did settle with her for a final severance agreement.
Q. Do you recall how much she was paid?
A. No.
Q. Was it in the thousands of dollars? Tens of thousands of dollars?
A. Tens of thousands.
Q. Do you recall anybody else who was terminated for violating an ethics provision of APC policy?
A. Not that I can recall.
Q. Okay.
BY MS. KISCH: Want to take a break.
MR. KOSTAKOS: Sure.
(Lunch recess taken at 12:47 p.m.)
BY MS. KISCH:



Q. Prior to our break, Mr. Gough, we were talking about the gray marketing scheme by which Mr. Weigle and Mr. Graham departed from the company. They were terminated or resigned or the combination of the 2, and I just had one more question about that. That is, during your investigation did you look into the amount of money that that gray marketing scheme cost the company? Not how much money the company lost, not solely in the bonuses that they personally profited from, but the loss resulting from the fact that the products were sold at a lower price than they normally would have been?
MR. KOSTAKOS: Objection.
A. I don't recall that figure was calculated as part of the calculation or not. All I know is it was some dollar figure that -- there is cost associated with it.
Q. Okay. But did you and/or anyone else at APC come to an understanding of how significant that cost was?
A. I don't recall coming up with an exact figure on that.

Page 150

Q. Do you have a general understanding as to whether this was a few dollars, hundreds of dollars, thousands of dollars, tens of thousands, hundreds of thousands or millions?
A. My understanding it would have been in the hundreds of thousands of dollars.
Q. Okay. And would there be any documents reflecting that?
A. Not that I'm aware of.
Q. There might be but you just don't know?
A. There might be but I don't know. I'm not aware.
Q. Okay. Are you aware of any individuals who violated any ethics policies, APC ethics policies, that were not terminated?
A. I can't recall any ethics violations off the top of my head that did not result in termination.
Q. Are you aware of any other policies that were violated that did not result in termination? Any APC policies?
A. Over the course of the years, there were, there were a number of violations that take place in policies in any given year. Some of

Page 151

them result in termination, some of them don't. Depends on the severity.
Q. Do you recall any of the instances in which HR became involved where it was found an individual violated an APC policy in which that individual was not terminated?
A. Again, I know that there would have been cases where policy was violated but the individual wasn't terminated because the policy was minor, or could have been an insignificant issue and it was noted, or it was handled in a different fashion based on the severity: A warning, verbal warning, counseling, whatever it might have been.
Q. Do you recall any of those instances?
A. Off the top of my head, no.
Q. What would refresh your recollection about those?
A. A review of every personnel file that we've had or ever had.
Q. Would you need to go to the personnel files or employee relations files?
A. I would look at both of those.
Q. Would there be any individuals who

Page 152

violated APC policy who received some sort of formal discipline and not termination who wouldn't have an employee relation file?
A. I don't know.
Q. Would you expect that the individuals who violated an APC policy and got some form of discipline less than termination would, in fact, have an employee relations file?
MR. KOSTAKOS: Objection.
A. My expectation would be that in many cases that would be the case. There may be exceptions.
Q. Okay. Does human resources keep some sort of log of discipline at all that's given out to employees?
A. No, we do not.
Q. Has human resources ever undertaken to compile information with regard to discipline given to APC employees?
A. I would say yes during times of reduction in force where disciplinary actions are noted as one of the issues to be reviewed in determining who would be terminated, that we would do a review of personnel files that were

Page 153

in existence at that point looking for any disciplinary actions.
Q. Okay. And when was the last reduction in force?
A. Reduction in force in September of 2006.
Q. And what about when was the one prior to that? Or was there one prior to that?
A. There was one prior to that. It was either 2001 -- I don't know -- excuse me, I don't know the exact date of that. It was a few years back.
Q. Okay. But you believe it was in 2000?
A. A few years prior to now. I don't know the exact year.
Q. I didn't mean 2000 but like 2000 or later?
A. Yes.
Q. Okay. And in those reviews of the discipline, would there be a review of all of the discipline that was given out for purposes of the reduction in force, or would you target only certain employees?
MR. KOSTAKOS: Objection.
A. It depends on the reduction in force

year. It wasn't this year or the year prior. It could have been any point after 2000.
Q. What is this 180-day rule that you're referring to?
A. Our e-mail system has a 180-day rule. Essentially, any e-mail older than 180 days are deleted.
Q. Is it deleted automatically by the system or are there individuals that go in and do that?
A. Automatically by the system.
Q. You don't think they are backed up anywhere?
A. I'm not aware of that.
Q. Is there a document retention policy at APC?
A. No, there's not.
Q. How does APC insure the documents are destroyed that are related to the complaints or EOC changes?
A. We manage that through our general counsel.
Q. How do you insure, in the HR department, that documents related to an individual's



claims filed in court and the EOC changes are not destroyed?
A. Documents requested by the general counsel are forwarded to them for management.
Q. That wasn't my question.
A. You asked how I insure. That's how I insure. I send them to the general counsel.
Q. How do you insure that documents are not destroyed that are related to claims made by an individual either through the filing of a complaint or filing a charge through the EOC or with a state agency?
MR. KOSTAKOS: Objection.
A. Requests made by the general counsel relative to any of those claims are forwarded to him to maintain those records.
Q. Well, do you always get -- other than a specific request for documents from the general counsel, do you take any other steps to insure that documents are preserved relating to claims made either in a lawsuit that have been filed with EOC or other state agency?
A. No, I do not.



Q. Do you know an individual named Seth Daniels?
A. Yes, I do.
Q. Was he terminated from APC?
A. Yes, he was.
Q. Why was he?
A. He was terminated for a violation of the ethics policy.
Q. Anything else? Was there any other reason he was terminated other than a violation of the ethics policy?
A. That was the cause of the termination.
Q. Was there any other reason?
A. Yes.
Q. What specifically did he violate with regard to the ethics policy?
A. He diverted business from one approved hotel to another hotel in order for him to gain reward points through Marriott for his own personal use.
Q. Anything else? Any other ways in which he violated the ethics policy?
A. Reason he was terminated was for diverting the business from one hotel to



another which caused APC additional money, and he did so in order to gain Marriott reward points in his own personal account.
Q. Anything else? Any other reasons? Are there any other ways in which Mr. Daniels violated the ethics policy?
MR. KOSTAKOS: Objection. Asked and answered.
A. Not that I recall.
Q. Was he terminated for violating any other policies?
MR. KOSTAKOS: Objection.
A. No, he was not.
Q. Were there any other reasons, other than what you just said, which caused APC to terminate Mr. Daniels?
MR. KOSTAKOS: Objection.
A. There were no other reasons for his termination.
Q. What specifically was the violation of the ethics policy with regard to Mr. Daniel's diverting business from one hotel that was approved to another?
MR. KOSTAKOS: Objection.

A. Mr. Daniels took actions not in APC's best interest to change the hotels that APC employees and other partners were to use in order to gain credit with the other hotel, Marriott, for his own personal benefit.
Q. When you say he -- the use of the Marriott was not in the APC's best interest, on what facts do you make that statement?
A. APC had agreements with other local hotels at a more favorable rate, more favorable business conditions.
Q. What do you mean by business conditions?
A. We may have received other benefits for having utilized those hotels that weren't directly rate related. I don't know the specifics on the deal, but our travel manager had indicated there were other hotels that were better business deal for APC to be utilizing.
Q. Which hotels provided APC a better business deal?
A. I don't know the ones at the time. I know they were non-Marriott related.
Q. Did you know at the time?



A. No, because I don't stay in the hotels. I live here.
Q. Did you inquire of the travel manager as to which hotels provided a better business condition?
A. I don't recall if -- I do recall something about a Johnson & Wales Hotel.
Q. Do you recall whether there were any others?
A. There may have been. I don't recall.
Q. Do you know what capacity hotel rooms, or for what purpose hotel rooms were reserved at Marriott?
A. My recollection of it was that they were for field service engineers coming in for training or what we would term high power partners, third-party individuals who were coming in for training as well.
Q. And do you know, in fact, if Johnson & Wales could accommodate the needs of those trainees?
A. I have no idea.
Q. Do you know whether any hotel other than Marriott at that time could have accommodated



all of the needs and requirement for individuals in need of hotel rooms?
A. I do not know that.
Q. Did you know that then?
A. I did not know that then.
Q. Did you ever ask Miss Bollman, the travel manager, whether or not any other hotel could provide all the necessary requirements for the trainees and individuals who needed hotel rooms?
A. I was assured that the hotels that we were under agreement with were satisfactory for our business needs.
Q. But for the particular hotel reservations that were made at the Marriott for those trainings, did you ever ask Miss Bollman whether the hotels for which she said Mr. Daniels should have booked at could accommodate all the needs of the individuals who needed hotel rooms?
MR. KOSTAKOS: Objection.
A. Again, I was assured by our travel manager that the hotels we had an agreement with met our business needs. If there were



other business needs related to this, I was not aware of it.
Q. Are the business needs of individuals always the same for all trips and all travel and all occasions in which hotels are booked, or do the business needs at times vary?
A. Again, it's a fairly broad question, but I would answer it in a broad manner. Yes, there could be specific needs for individual cases, but for central programs, training programs where the activity occurs on a regular basis, it should remain fairly consistent.
Q. Did you ever learn, in fact, there was no other hotel that could accommodate the needs of the individuals that were being trained at that time and that was the reason why Mr. Daniels had booked the Marriott?
MR. KOSTAKOS: Objection.
A. That's not my understanding of the situation based on the information as provided by the travel manager.
Q. If, in fact, there was no other hotel that could accommodate the needs, would you

knowledge whether or not there was such a negotiated rate at the Marriott?
MR. KOSTAKOS: Objection.
A. I do not have direct knowledge of that.
Q. And did you at the time?
A. I don't recall at the time if I did or did not.
Q. Okay. Is that an important fact?
MR. KOSTAKOS: Objection.
A. No.
Q. It's not?
A. It is not.
Q. Okay. Are all the hotels in the Providence area, are the rates at all the hotels the same?
A. No.
Q. Were there any hotels in the Providence area that had equal or greater room rates than the Marriott at that time?
A. I'm not aware of the rates in any of the locations at that time.
Q. Would that be an important fact to know?
MR. KOSTAKOS: Objection.
A. No.



Q. Would it be an important fact to know whether or not any other hotel could accommodate the training needs of the individuals who had booked hotels at the Marriott?
A. No.
Q. It would not? Do you know whether any individuals who stayed at the Marriott Hotel, in fact, received reward or travel points from the Marriott at that time?
A. I'm not aware of that.
Q. You don't know one way or the other?
A. I don't know definitively one way or the other.
Q. Did you know at that time?
A. My understanding was that the points associated with the reservations went to Seth Daniels.
Q. Did you inquire whether or not any individuals also received reward points for their stay at the Marriott?
A. No, I did not at that time.
Q. Okay. And is that an important fact to know?



A. The fact that they received Marriott point rewards for the stay? No, I do not see that as relevant.
Q. Did Mr. Daniels, in fact, ever inquire -- let me ask you this: You already testified you didn't speak with anyone with regard to these issues other than Miss Bollman, is that correct?
A. That's correct.
Q. Okay. Other than speaking with Miss Bollman, did you look at any documents?
A. Not that I recall.
Q. Okay. Did you conduct any investigation at all?
A. Yes, I did.
Q. What did you do?
A. I discussed the issue fully with Miss Bollman.
Q. What else did you do?
A. That's the extent of my investigation.
Q. Did Mr. Daniels get approval to book the hotel rooms at the Marriott from anybody?
MR. KOSTAKOS: Objection.
A. My only knowledge is that Miss Bollman



did not approve that, but there was no contract in place with the Marriott.
Q. Did Mr. Daniels receive approval from anyone with regard to booking the hotel at the Marriott?
MR. KOSTAKOS: Objection. Asked and answered.
A. I don't have direct knowledge of that.
Q. Did you ever inquire at the time?
A. I don't recall.
Q. Okay. Is that an important fact?
MR. KOSTAKOS: Objection.
A. Yes.
Q. If Mr. Daniels had received approval to book the hotel rooms at the Marriott from someone, is it your understanding that Mr. Daniels should have been fired?
MR. KOSTAKOS: Objection.
A. I don't know the first circumstances. Again, the speculation there, I can't speculate as to full circumstances in that regard.
Q. So it may or may not --
MR. KOSTAKOS: Objection.

BY MS. KISCH:
Q. -- change your decision?
MR. KOSTAKOS: Objection.
A. I can't say whether it would change my decision or not.
Q. What did Ms. Bollman tell you -- did she tell you how many points Mr. Daniels received specifically for those training sessions at the Marriott in which FSE employees booked hotels at the Marriott?
A. If I recall it was around a hundred thousand or more points.
Q. And how did that relate in terms of dollars?
A. I don't know how that relates to dollars.
Q. Did you ever inquire?
A. No, I did not.
Q. Is that an important fact?
MR. KOSTAKOS: Objection.
A. The fact that the points are valuable to people is important.
Q. Well, is the amount, the monetary amount or the value of the points that Mr. Daniels received, is the value of that important? Is



that an important fact to know --
MR. KOSTAKOS: Objection.
BY MS. KISCH:
Q. -- or not?
A. On the face of it, no.
Q. Is doesn't impact whether or not he's violated a policy at APC, the value of the points that he received?
A. No.
Q. Did APC lose any money through the profits Mr. Daniels received in travel points for this instance in which hotel rooms were booked at the Marriott?
MR. KOSTAKOS: Objection.
A. I don't know the answer to that question.
Q. Is that an important fact?
MR. KOSTAKOS: Objection.
A. No.
Q. Did you know at the time?
A. No, I did not.
Q. Do you know whether or not, in fact, Mr. Daniels attempted to reserve rooms at the Johnson & Wales prior to having rooms booked at the Marriott?



A. I'm not aware.
Q. Did you know at the time?
A. No, I did not.
Q. Is that an important fact?
A. No.
MR. KOSTAKOS: Objection.
BY MS. KISCH:
Q. Did you ask Miss Bollman that question?
A. No, I did not.
Q. Do you know whether or not, in fact, the Johnson & Wales had enough room to accommodate the employees that were booked in hotel rooms at the Marriott?
A. My understanding was the agreement we had in place was sufficient for our business needs.
Q. Did you know at that particular time whether or not the Johnson & Wales had enough rooms for all the individuals at the training session?
MR. KOSTAKOS: Objection. Asked and answered.
A. I'm not aware, specifically, whether or not they had the number of rooms necessary on



each and every day.
Q. And I'm talking specifically for the time at which Mr. Daniels was terminated for booking at the Marriott; do you understand that?
A. Yes.
Q. Same answer?
A. Same answer.
Q. Did you know that fact then at the time Mr. Daniels was terminated?
A. No, I did not.
Q. Did you ask Miss Bollman?
A. No, I did not.
Q. Is that an important fact?
A. No, it is not.
MR. KOSTAKOS: Objection to that.
THE WITNESS: Could we take a break?
MS. KISCH: We can take a break as long as you're not going to talk about the line of questioning.
(Recess taken.)
BY MS. KISCH:
Q. Mr. Gough, did you ask any questions of