IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| SETH DANIELS,<br>Plaintiff,<br>vs.<br>AMERICAN POWER CONVERSION CORPORATION,<br>Defendant. | Civil Action No. 05-00459-ML-LOA |

Deposition of BRIAN J. KELLY, taken pursuant to Fedeeral Rules of Civil Procedure, at the law offices of Stephen Robinson, 155 South Main Street, Providence, Rhode Island, before Sarah J. Miner, L.S.R., a Notary Public in and for the State of Connecticut, on October 19, 2006, at 9:00 a.m.

Exhibit 14

APPEARANCES:

For the Plaintiff:
WIGGINS, CHILDS, QUINN & PANTAZIS
7 Dupont Circle, NW
St. 200
Washington, D.C.
By: LORI KISCH, Esq.
For the Defendant:
LITTLER MENDELSON
10 Weybosset Street
Suite 404
Providence, Rhode Island 02903
By: GEORGE P. KOSTAKOS, Esq.

STIPULATIONS

It was stipulated by and between counsel for the parties that the requirements of notice of taking of the deposition have been complied with, that proof of the qualifications of the Notary Public before whom the deposition is taken are waived, and that objections, except as to the form, be reserved to the time of trial; and that the deponent shall read and sign his/her deposition transcript before a Notary Public within 30 days of its receipt. It is further stipulated and agreed that if the deposition remains unsigned thirty (30) days after delivery to counsel for the deponent, signature shall be deemed waived, and the deposition may be used as if signed.



BRIAN J. KELLY,

having first been duly sworn by the Notary Public to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MS. KISCH:

Q. Good morning, Mr. Kelly, my name is Lori Kisch, and I represent Mr. Seth Daniels in a lawsuit that he has filed against American Power Conversion Corporation, which I may at times refer to as APC. And I am here to take your deposition today. Go ahead, and just give your full name for the record?

A. Brian J. Kelly.

Q. Have you ever had your deposition taken before?

A. In this matter, no, previously on other issues, yes.

Q. Have you had your deposition taken with regard to your employment or your role at overseeing the finance department at APC?

A. Yes.

Q. How many times have you been deposed?

A. Once.

Q. When was that?



A. Two or three years ago.

Q. What was that in relation to, what was the issue?

A. It had to do with a tax suit that APC had filed against the State of Rhode Island.

Q. Let me just go over a couple of ground rules how we are going to proceed today since it has been a couple of years since you have had your deposition taken. As you can see there is a court reporter here that is going to transcribe some of the questions and answers, and maybe some of the objections Mr. Kostakos has. I am here to find out what you know about the facts related to the issues in this case. And I am entitled to whatever knowledge you have. If you have only partial knowledge of a question that I ask, then I am entitled to that knowledge. Let me give an example of what I mean. I ask if you attended a meeting and you recall that there were 10 people present at that meeting, and you recall the names of six of the individuals and you also remember there were four other individuals whose names you don't recall I would be entitled to the names of the six individuals you do know as well as the fact there are four individuals that were at the meeting whose



names you don't recall at this point. In addition if I ask you what was said at the meeting and you recall some the issues, as well as some of the topics, then I would be entitled to whatever information you recall about the conversations, as well as the fact there were other topics that were discussed, but you just don't remember what was said.

It is important to answer all the questions verbally since there is a court reporter here transcribing what we say rather than a shrug of the head. If I have mistakenly interrupted you, let me know, because you have a right to answer the questions fully, and I want you to answer the questions fully. I would also ask for the same courtesy, you wait until I ask the question even if you know where I am going with the question, because, again, I want to get the question down on the transcript. And it is difficult for the court reporter to transcribe two people speaking.

A. Understood.

Q. There may be times Mr. Kostakos has objections. Those are for the record. Unless he instructs you not to answer you need to go ahead and answer the questions despite the objections.

Daniels allegations against APC?
MR. KOSTAKOS: Objection.
THE WITNESS: Still answer.
MR. KOSTAKOS: The only time you can't answer a question over my objection if it indicates the attorney-client privilege.
THE WITNESS: Not that I recall.
BY MS. KISCH:
Q. Is that something that you think you would recall?
A. Well, in my nine years at APC I signed many documents for many different reasons. Do I always remember the details of what I sign? I certainly am cognizant of what I am signing at the time I am signing and why I am signing it. Whether I signed the document nine years ago, and being asked 10 years later time whether I signed the document, and what it pertained to, no, I have been gone from APC for a year. The case that you are referring to with Seth Daniels took place, I think, probably a year or two prior to that. So I am going on recollection from two or three years ago. So to the best of my knowledge, I have not signed a document relative to Seth's case against APC or allegations.



Q. When did you learn that Mr. Daniels filed a lawsuit against APC?
A. I knew about it before the subpoena, and before the letter to me from the attorney requesting a deposition. And I believe I had knowledge before I left, but I can't remember the time line.
Q. Was it soon before you left that you gained knowledge?
A. I can't tell you what the time line is.
Q. Do you recall whether it was in 2006?
A. Well, like I said, I thought it was when I was still there that somebody mentioned it to me. So if it was while I was still there it would not have been during 2006, because I hadn't been with APC during 2006.
Q. Okay. Do you believe it was in 2005 when you learned that Mr. Daniels had filed lawsuits against APC?
A. Could be. Again, I am not definite on the time line as to when I heard it.
Q. Who did you hear it from?
A. Don't recall.
Q. What was told to you?
A. Just simply that he had filed a claim I



believe with the, I don't know if it was at the Boston office of the EEOC or something of that nature.
Q. You actually learned that he had filed a charge with the EEOC?
A. That was my, that is my recollection.
Q. And what else did that person or persons tell you?
A. That was it.
Q. Did you ask any questions?
A. No.
Q. Were you finance manager during your entire tenure with APC?
A. No.
Q. What was your next position after finance manager?
A. I was corporate finance manager after that. And then the last position with the company was director of finance and administration for North America.
Q. When did you become corporate finance manager?
A. My guess is around 1998. I would say probably 1998.
Q. When did you become the Director of Finance



and Administration for North America?
A. That would have been around 2000, 2001.
Q. And you remained in that position until you left in July 2005; is that correct?
A. Correct.
Q. After you were, after that meeting with Mr. Dolan, and Mr. Thompson regarding your termination, did you speak with anybody else at any point regarding your termination?
A. I had a conversation with Pat Grandly who was the, I forget what her title was, I think she was a benefits manager. My conversation with her was relative to the benefits within the package, paperwork that needed to be done, finalizing exercising of my stock options, things like that. Strictly related to benefit questions.
I don't recall any other conversations with, I had a brief conversation with Steve Dolan when I dropped off my severance agreement, my conversation with him was, frankly, that I didn't agree with the decision to eliminate my position. But regardless what I said or did I felt, regardless whatever I said or did in that meeting with him and Rich wasn't going to change the decision on eliminating the position. So I told

Page 22

him that I decided to take the high road and I was going to move forward.
Q. And do you know whether, in fact, all of your job duties and functions were actually placed under the treasurer's responsibility?
A. As far as I know, yes.
Q. Do you know whether any other individuals that were hired to take over your job duties and responsibilities?
A. Believe me I kept a close eye, on that.
Q. And you are not aware of anyone?
A. No.
Q. What were your job duties and responsibilities as Director of Finance and Administration for North America?
A. I had global process ownership for accounts payable, for payroll, and for travel.
Q. Who did you report to?
A. I reported to Rich Thompson.
Q. His position was what?
A. CFO.
Q. And did you supervise any individuals?
A. Direct supervision?
Q. Correct.
A. Yes.

Page 23

Q. Who?
A. I had Reshma, R-E-S-H-M-A; last name Gada, G-A-D-A. She was my payroll accounts payable manager. And I had Christine Bollman, B-O-L-L-M-A-N, who was the travel manager.
Q. What role if any did you have in approving the travel policies that were implemented at APC?
A. The travel policy for the most part was already written in place and adopted in place at the time I assumed responsibility for travel. There may have been various sections of the travel policy that had to be updated for whatever reason, I am not, no particulars stick out in my mind, except for one particular policy change, which I had put in, which required employees to submit their expenses within 90 days of occurring expense, or they would not be reimbursed by the company at all. My main goal was to make sure that that policy was adhered to by employees.
Q. When you say that policy you are referring to the 90 policy?
A. 90 days, and the travel policy which is then inclusive of the 90 day rule.
Q. You said that the travel policy was already written at the time that you assumed responsibility

Page 24

for travel. When did you assume responsibility for travel?
A. Probably around 2002, 2003.
Q. Who had responsibility over travel prior to you assuming responsibility?
A. Michael Ritchie.
Q. What was his position?
A. He was the corporate controller.
Q. He was the what?
A. Corporate controller.
Q. Did Christine Bollman report to Michael Ritchie prior to your assuming responsibility for travel?
A. Yes.
Q. Other than the 90 day expense requirement, did you institute any other changes to the travel policy while you were the director?
A. Only minor changes, certain parts of the policy had to be updated to keep up with like mileage rate reimbursements to be more in line with what the current gas prices were, and things like that. But overall, other than that, I can't recall any changes that I would have made to the policy.
Q. Did you have a physical copy of the policy while you were director of finance at APC?

Page 25

A. I would have had an electronic version, and I would have had a hard copy, yes.
Q. Where would you have kept the hard copy, where did you keep the hard copy when you were Director of Finance?
A. Would have kept in it the office.
Q. In a file somewhere or on your desk or where would it be?
A. Probably in a file. I tend to keep my office neat.
Q. Would you have kept that file in a filing cabinet or in your desk or somewhere else?
A. That probably would have been in a cabinet.
Q. When you left, APC, do you believe that that hard copy was still in that file cabinet?
A. Should have been. The only things I took with me were my personal possessions. Actually, I have to I had a to make another trip to pick up my stereo. That is the only thing.
Q. The hard copy in the file cabinet. Do you recall if you did not have a hard copy when you first assumed responsibility over travel in 2002 or 2003?
A. I am sure there was probably an updated version. That would have included reference to the

90 day rule.
Q. How soon after you became director did you institute day rule?
A. Well, becoming director, assuming responsibility for travel I believe are two different time lines.
Q. You assumed responsibility for travel in 2003 you had already been director for a year or two?
A. There about, yes. The question is, how soon after assuming responsibility for travel did I make the policy change? It would have been probably around 2003, 2004, because I recall that there was quite the number of people out in the field who were upset.
Q. When you instituted that change, was that put into the actual physical document? Did you implement that in writing when you made that change right away?
A. I believe it was, yes.
Q. It would have been added to the travel policy itself?
A. Yes.
Q. And you believe that you would have then had a physical copy of the travel policy that



included that 90 day requirement?
A. I believe so.
Q. And --
A. And I also would have communicated that policy change out via E mail to all employees.
Q. How would you have done that?
A. E mail.
Q. Do you have access to sending out E mails to all employees?
A. Well, that policy change dealt with north American employees, because different countries have different laws as to when, whether an employee can or cannot be reimbursed for expenses. Here in the US that is a policy change we could make. Yes, I had access to send out E mails to all North American employees.
Q. Did you personally send that out or did you instruct someone else to send out for you?
A. I believe a policy change like that I believe came from me.
Q. And you would have sent that out around the time of or at the time of the change, correct?
A. Correct.
Q. So in that file, would you have had the policy that existed at the time of the 90 day



change?
A. My practice would have been to have a current printed copy of the policy, and if my practice is consistent, it would have been a copy that had that change in it.
Q. If there were other changes made to the policy after that, such as mileage, would you have printed out a new travel policy for that?
A. Probably not.
Q. You would have expected under that file in your cabinet that contained the APC travel policy when you left in 2005 would have included the travel policy as it existed whether the 90 day change was made, correct?
A. Yes.
Q. Do you recall how long that document was?
A. APC had an extensive travel policy. It was probably, printed version was probably 30 to 40 pages perhaps, it was an extensive policy.
Q. Do you recall a time when the travel policy was changed from approximately 50 page document to a 25 page document, it was basically cut in half?
A. I don't believe that was done when I was there.
Q. No?



A. No.
Q. Is it possible that was done before you took over travel?
A. Possible. My answers are based upon the policy that was in place when I assumed responsibility, and when I left the company. So what the size of the policy was and number of pages before or after I have no knowledge.
Q. Had you ever seen the policy prior to assuming responsibility over travel?
A. I would have seen it as far as making myself knowledgeable of the policy given I was a traveler for the company. So it would be incumbent upon me as a traveler to know what my requirements are, and what my restrictions are on reimbursement rates or whatever. It wouldn't have been as a role of somebody over-seeing travel, but the requirement is people who travel are supposed to know travel policy. Me being a traveler would have known the travel policy I would have read the travel policy.
Q. Do you recall then ever seeing the policy twice as long at some point?
A. No, I didn't go through counting pages before I took over.
Q. What was the policy with regard to booking

MR. KOSTAKOS: Objection.
THE WITNESS: Yeah, and as I stated earlier, I believe we reimbursed him for those expenses.
BY MS. KISCH:
Q. What about the lunches, did you ever come to an understanding whether or not those lunches were to be reimbursed?
A. I can't recall what the resolution of that was. I know in here I make reference to my lunch expenses not being reimbursed by the company would come out of my pocket, and given that he was here and being housed here in a hotel, long term, that certainly that maybe the same situation.
Q. Did you live here in the Providence area?
A. I lived in Cumberland.
Q. You lived where?
A. Cumberland.
Q. How far away is that?
A. About an hour from West Kingston.
Q. And did your employment agreement include expenses for your travel back and forth between Cumberland, and Providence area?
A. No. As a matter of fact, I didn't have an employment agreement.



Q. Were you offered employment by APC?
A. Yes, but no employment agreement.
Q. Well, when you were given that offer -- when you were offered employment were you told either in writing or verbally what the conditions of that employment would be, and what the benefits would be?
A. Yes.
Q. Okay. And you accepted that?
A. Yes.
Q. Okay. Were you ever told either verbally or in writing that your travel related expenses would be paid for computing back and forth between Cumberland and the Providence area?
A. No. But his were.
Q. His were. Okay. Do you know whether or not Mr. Bonzani's expenses were reimbursed when he traveled to the Providence area?
A. Don't know whether they were.
Q. You don't know one-way or the other?
A. No.
Q. Did you ever ask Christine Bollman to inform Brian Gough regarding the issue related to Mr. Daniels at the travel and the travel points at the Marriott Hotel?



A. I can't recall whether she mentioned it to Brian or I mentioned it.
Q. Did you ever have any conversations or correspondence with Brian Gough regarding the theft of his laptop, Mr. Daniels' laptop?
A. I may have. I don't recall whether I did or not.
Q. You said there were other instances where other employees' laptops were stolen?
A. No.
Q. Do you know who those employees were?
A. No.
Q. Do you remember the race of those employees?
A. No.
Q. Do you remember when those employees laptops were stolen?
A. No.
Q. Do you remember what position you were in at the time?
A. No.
Q. Do you remember how many employees other than Mr. Daniels had their laptops stolen while working for APC?
A. No.



Q. Do you remember if there is more than one such employee?
A. Could have been, I don't know exactly how many.
Q. Did you get involved at all with regard to any issue surrounding the theft of those employees laptops?
A. Not that I can recall. But, again, different situations. If there was an employee who said their laptop was stolen, and their receipts were in there then I would have had involvement, because that would have because of extension would have required him or her to file expense reports that may have been missing receipts.
Q. Are you aware of any other individuals whose receipts were stolen or lost?
A. Yes.
Q. Did you become involved in all of those instances?
A. On occasion, don't know when, don't know who.
Q. Did you become involved in all of the instances in which other employees receipts were lost or stolen?
A. All of the instances, no.

Page 158

Q. Was there a requirement that employees submit original receipts in order to be reimbursed for expenses or could they attach copies of receipts?
A. The policy is that they submit the originals. And the reason we require them to submit the originals is so that somebody doesn't unintentionally or inadvertently resubmit the original thinking they had already submitted it.
Q. Is there any exception to an employee gaining reimbursement for an expense other than for providing an original receipt?
A. Yes, as if I said earlier this morning, if someone's expense reports was put in the mail, and lost, if the employee retains a copy of the report, and backup, then we would accept the copies as documentation for the report. But, again, that wouldn't be a pattern, that would be the exception.
BY MS. KISCH:
Q. Are there any other exceptions other than if an individual's expense reimbursement request was lost in the mail, are there any other exceptions where an employee is allowed to be reimbursed without supplying receipts?
A. No, policy in place for a reason.

Page 159

Q. That was part of the written policy when you were at APC?
A. Yes.
Q. Was that the policy up until the time you left?
A. I didn't change the policy, so as far as I know it was.
Q. Okay. Well, if that policy had changed, could it have been changed by anyone other than yourself?
A. No.
Q. So when you left APC, that was the policy at the time, correct?
A. Right.
( Kelly Exhibit No. 3 marked for identification.)
BY MS. KISCH:
Q. Mr. Kelly, showing you what has been marked as Kelly Exhibit 3. Take a quick look at this.
This appears to be an E mail sent by you to Mr. Daniels, correct?
A. Correct.
Q. Why did you have this question?
A. Not having the report in front of me, the question may have been related to the period of

Page 160

time that the expense report covered in relation to when the break-in of the car took place. So without having the report in front of me, that may have been why the question was asked. And also there are employees who may have receipts that they carry with them, because they are incurring those expenses on the road, and have a file with them on the road. And there may be -- and they may have a file at home for receipts or expenses that they occur on their way home. There is always the possibility, just because what is on that report, and may be on or before the date of the break in, and the theft of the laptop bag, doesn't necessarily mean that the laptop bag contained all of the receipts that were on the report.
Q. Do you recall today what prompted you to send this E mail?
A. I believe because I was reviewing reports.
Q. Anything other than that, anything more specific?
A. No.
Q. When an individual submitted an expense report, is that expense report, request for reimbursement saved by APC?
A. Under the IRS guidelines, yes, it is

Page 161

retained for seven years.
Q. Is the 2003, 2004 time frame were those expense reimbursement requests submitted electronically, or in hard copy form?
A. Both.
Q. They would have been submitted both ways?
A. Well, -- people had access to the on line tool, which they were required to use the on-line tool to submit the expense report. Then they are required to send the printout, the sheet from the on line tool attached to the receipts, and send them in to AP. So the report routes electronically for approval. The hard copy comes in. Nothing in AP is processed electronically until we physically have a report in hand.
Q. Okay. And the physical hard copy of the copy of the electronic request, as well as the original receipts or what was submitted, that is all maintained for seven years per IRS regulations?
A. The hard copy?
Q. Yes.
A. Yes.
Q. Where would that be maintained, are there files set up for each individual employee or explain to me how the system works?

A. There were two systems in place because we did a process change as to how we do record retention.
Q. When was that process changed?
A. It was probably '94 or there about.
Q. Just talked about the second process then, from '94 up until the time you left, was there one process?
A. I believe so.
Q. Describe for me that process.
A. That the invoices or expense reports are processed for payment. They are prepared, and they are sent out to an outside service who scans them into an imaging system. And that is an accepted means of record retention by the IRS as long as the data can't be altered. And after a period of time, I think a month or two months, the vendor who was providing the scanning, the imaging service destroys the original documentation.
Q. Who retains a copy of the images, does APC or the vendor?
A. It is on a server that the vendor retains, APC has access to the images. So the agreement with the vendor is they house those images for seven years. When we stop doing business with them



or not, they are still obligated to maintain those images for seven years.
Q. But APC has access to view those images on line; is that correct?
A. Yes.
Q. What vendor was APC using in a 2003, and 2004?
A. 2003, 2004 was the old process.
Q. I thought you said it changed in 1994?
A. No, 2004.
Q. It changed in 2004?
A. 2004.
Q. So in 2004, who was the vendor?
A. 2004 was I believe the name of it was Source Corp, S-O-U-R-C-E C-O-R-P.
Q. Was that the same vendor up until the time you left the company?
A. Yes.
Q. So APC used Source Corp for this process that you just described from 2004 up until the time you left?
A. Correct.
Q. You have no knowledge whether or not they still use Source Corp, do you?
A. No.



Q. Do you recall whether in 2004 this process was instituted?
A. No, I don't. Again I am saying 2004, but, you know, I don't -- 2004 is my best guess as to when it started.
Q. It may have been another year, in fact?
A. It may have been a few months earlier than that. I know we tried to do the process change to coincide to the beginning of the fiscal quarter or beginning of the fiscal year.
Q. When would that be, what months?
A. Again, it would be around 2004. I can't give you.
Q. Does the fiscal -- you think it changed -- strike that.
Prior to this change to using Source Corp, what was the process for retaining the reimbursement requests?
A. It is the same upfront, same upfront process. But the hard copies were retained in the file room on the premises of APC, and those were filed in individual files by whoever the check was payable to.
Q. So, for example, there would be a copy of a file with Seth Daniels name on it, and prior to the



change, in which you used Source Corp, all of the reimbursement requests that Mr. Daniels made relating to his APC employment would have been saved in this one file under his name, correct?
A. Correct.
Q. When the change was made to Source Corp were those hard copy files sent to Source Corp for imaging or did APC continue to maintain those hard copy files which were from reimbursement requests prior to the change?
A. The files prior to the change.
Q. Let me ask that again.
MR. KOSTAKOS: I think the point is made.
BY MS. KISCH:
Q. Prior to the change to the use of Source Corp, there were a whole bunch of files maintained by APC, hard copy files of all the reimbursement requests. When the change was made, and APC started using Source Corp, did APC continue to maintain the hard copy files that were already in existence, or did they send those hard copy files that they had been maintaining in the file to Source Corp for imaging?
A. We didn't do anything we had on hand that we had already paid prior to the conversion and

send it out. We made that part of our permanent physical record retention.
Q. When you left, those documents were still maintained in APC?
A. In APC or Capital Records, which is an off-site storage facility here in Providence.
Q. What is the record retention policy say with regard to sending documents to Capital Records, if anything?
A. One, that we comply with the seven year rule of the IRS, two, it is based on the physical space availability within the department to keep documents on-site. I had been trying to keep two years on-site, but given the space limitations it may be in the beginning or early part of the third year to pack up the oldest year, and send that to Capital Records.
Q. All right. Was there actually a written document retention policy?
A. No.
Q. What else did the document retention policy require that you followed? Let me back up. Was there an unwritten document retention policy? You were just citing certain policies. It was in your head?



A. It was in my head. I knew what we had to retain I knew space limitations. I contracted with the service. We have a report. They have a physical report of an inventory of the boxes. We put a destroy date on the boxes. Capital Records is authorized to destroy those boxes and the contents when it reaches the date that is beyond the seven years.
Q. Do you recall when Mr. Daniels was hired?
A. No.
Q. Would it surprise you if it was in 2003?
Assuming he was hired in 2003, is it your understanding that based on the policy that you followed while you were at APC, that all of his reimbursement requests should still exist if he maintained either at APC's own location, Source Corp or at Capital Records.
A. Yes it should be.
Q. Did you communicate the documents retention policy that was in your head to anybody else?
A. Well, let's see, my AP payroll manager new about the retention policy but she left APC two weeks after my exit. I am not sure. I know that the controller, Mike Ritchie would have had knowledge of the retention requirements. And



certainly Jeff, who was the general counsel for APC would have knowledge of record retention.
Q. Was that the end of your answer?
A. Yes.
Q. The document retention policy in your own mind, was that only related to the finance departments or deposit also, did you also have a policy related to other documents, as well?
A. I had a policy for the functional areas that fell under me. I knew what the requirements were to retain records. Now, if there were, if there was any indication from the company that we are going to keep records for 10 years, rather than the seven required by the IRS, they never communicated to me. I knew what the requirements are from the IRS I wasn't going to retain those records any less than seven years.
Q. You only had knowledge of document retention as it pertains to IRS regulations; is that correct?
MR. KOSTAKOS: Object.
THE WITNESS: That is the one I followed.
BY MS. KISCH:
Q. Well, do you have any knowledge of any other document retention obligations other than IRS



requirements?
A. Not that I believe pertains to any area that was under me.
Q. Well, do you have any knowledge at all while you were employed by APC do you have any knowledge at all of any other documents retention responsibilities other than the document requirements?
A. Again, other than my areas --
Q. While you were employed by APC did you have any knowledge of any documents retention responsibilities other than the IRS requirements?
A. No.
Q. Do you have any knowledge of individuals who were terminated for allegedly participating in a gray marketing scheme?
A. No, I don't have any firsthand knowledge.
Q. Do you have any knowledge at all?
A. I know that APC had an issue out in Asia on bootleg products or black-market products. I don't have specifics on employees or who was involved, what actions were taken.
Q. You have no more knowledge other than what you just said?
A. Correct.