**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| SETH DANIELS,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN POWER CONVERSION CORPORATION<br><br>Defendant. | CIVIL NO: 05-00459-ML-LDA<br>Judge Lisi |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Now comes the Plaintiff, through his undersigned counsel, and objects to Defendant's Motion for Summary Judgment. For the following reasons, Defendant's Motion for Summary Judgment should be denied.

## I. FACTS[1]

### A. APC'S STATED REASONS FOR TERMINATING DANIELS HAVE CHANGED OVER THE COURSE OF THE LITIGATION

Daniels was terminated on March 12, 2004, Ex. 1, APC 006, without any prior discipline or warnings regarding his conduct. Ex. 2, Daniels Aff., ¶ 2. Human Resources Director Brian Gough testified that he approved the termination because Daniels violated APC's ethics policy. Ex. 3, Gough Dep. at 164, 174. Daniels neither received a copy of the ethics policy, nor did he have any knowledge that an ethics policy existed. Ex. 4, Daniels Dep. at 357-67; Ex. 2, Daniels

[1] Daniels admits that the facts in the following paragraphs as articulated by APC in its Statement of Undisputed Facts are correct: ¶¶ 1-4, 6-10, 12, 20, 22, 24-25, 27, 29, 32, 35, 37-39, 42, 53-54, 59-60, 71, 77, 87-89, 102, 104. Daniels disputes the remaining facts as set forth in this Memorandum.

Aff. ¶ 3. There is no record evidence that APC distributed the ethics policy to Daniels or to any of its employees while Daniels was employed by APC. Rather, the only evidence APC provides regarding the distribution of the ethics policy is Gough statement that "Shortly after APC adopted the Code of Ethics, the company made it available to all employees on the company intranet." APC Mem. Ex. 5, Gough Aff. ¶ 10.

Gough testified that Daniels violated the ethics policy because he failed to forward his reward points to APC after receiving them from Marriott. Ex. 3, Gough Dep. at 214-15. He further testified that Daniels' receipt of reward points gave "the appearance of influencing his decision to do business that [*sic*] that particular vendor which is a direct violation of our ethics policy." *Id.* at 272-73.[2] Daniels is further accused of violating the ethics policy by taking actions that were not in APC's best interest. *Id*. at 166.

Gough further testified that Daniels was not terminated for violating any other policies. *Id*. at 165. APC had previously stated to the EEOC that it terminated Daniels for violating the company's travel policies[3] and for engaging in fraudulent behavior, but made no mention of violations of an ethics policy. Ex. 7, APC 450-53. It stated, "APC terminated Daniels when it learned that he had been flagrantly violating the Company's travel policies and engaging in self-dealing." Ex. 8, APC 474.

[2] Human Resources and APC's legal counsel are responsible for interpreting and enforcing the ethics policy. Ex. 3, Gough Dep. at 121. Gough testified that, under the ethics policy, *receipt* of cash or a cash equivalent is not a violation as long as that cash or cash equivalent is forwarded to the company. *Id*. at 215. No one ever asked Daniels to hand over the reward points to APC. *Id*. at 215-16. There also was no time limitation for handing over the cash or cash equivalent to the company. *Id*. Further, although Human Resources is responsible for interpreting the ethics policy, HR representative Christine Hendrix did not understand the policy. Ex. 6, Hendrix Dep. at 265-66. For example, she did not understand what was meant by the term "kickback," *Id*. at 265, nor did she understand what was meant by "has the appearance of being or could be construed to be in conflict with the interests of the company." *Id*. at 265-66.

[3] APC informed the EEOC that it did not retain copies of the APC "travel policy in effect during Daniels' employment, which has had several different iterations in the time since he left the employ of the Company." Ex. 7 APC 450.

Daniels was told that he was fired for receiving kickbacks and specifically that he received "points that should have gone to other field service engineers." Ex. 4, Daniels Dep. at 348-49. It was the diversion of the award points that was the cause for his termination. Ex. 3, Gough Dep. at 198. Travel Manager Christine Bollman, who made the initial accusations against Daniels and who was the only individual to provide any factual information upon which the termination was based, alleged that Daniels had arranged to "have the points for all of the rooms applied to his account. . . . to receive the points for all of the rooms for the employees who were staying there applied to his own account." Ex. 9, Kelly Dep. at 109-10; Ex. 3, Gough Dep. at 173. In response to a question whether Bollman told him that Daniels had instructed the Marriott to take the points from other APC employees who stayed at the Marriott and credit them to his personal account, Kelly testified:

> I don't know if it was 100 percent of it. I don't know how many of those employees had their own reward cards they would have insisted on using their own cards or if they just acquiesced to having Seth's card number used. I don't know the percentage, whether it is 100 percent, whether it is 50 percent, I don't know. All I know is there were points that were earned for other rooms other than where Seth was staying credited to his frequent stay account.

Ex. 9, Kelly Dep. at 111.

Although Gough testified that Marriott had a program that would have allowed APC to receive the reward points which Daniels received, Ex. 3, Gough Dep. at 199-201, Marriott in fact had no such program. Ex. 10, Colucci Dep. at 14. Gough conceded that the fact of whether or not the Marriott did have such a program was an important factor in Daniels' termination. Ex. 3, Gough Dep. at 200. Gough also testified that he did not know whether or not the award points actually influenced Daniels' decision to book the hotel at the Marriott, but that such a fact was also important. *Id.* at 274.

APC Human Resources representative Christine Hendrix, who worked for Brian Gough, represented to Daniels' direct supervisor, John Bonzani, that the reason for Daniels' termination was that Daniels took reward points from other employees. Ex. 11, Bonzani Dep. at 79. Bonzani would not have concurred with the decision to terminate Daniels had he known that Daniels did not take award points from other individuals. *Id*. at 83.[4] Daniels should have received only corrective action if, in fact, he had only received the points as an organizer rather than taking the points from other employees. *Id*. at 212.

Daniels is also accused of setting up a direct bill relationship to hide the hotel bookings made at the Marriott. Ex. 8, APC 475.[5] Specifically, APC alleges:

> APC learned that Daniels had arranged a direct-billing relationship between the Company and the Marriott – which Bollman repeatedly explained was not allowed – whereby the Marriott sent Daniels the bills directly at his office at APC in East Providence. In what appears to be an effort to hide his arrangement with the Marriott, in the two-plus month period of this arrangement, Daniels never submitted any of the bills from the Marriott to APC's Finance Department for payment.

Ex. 8, APC 475.

But the Finance Department was aware that the Marriott was being used and organized by Daniels department and was specifically asked to add the Marriott as a vendor into its system for direct billing. Ex. 12, APC 143. Further, Travel Manager Christine Bollman testified that the way in which the direct bill was set up was proper. Ex. 13, Bollman Dep. at 115-17. When hotel rooms are booked for a large group and a direct billing system is set up, the bill is generally sent by the hotel to the individual who is in charge of organizing the group hotel reservation, such as Daniels. *Id*. at 116-17. The organizer then enters the bill into APC's electronic

[4] Bonzani testified that, although he concurred with Daniels' termination based upon the facts that were presented to him, Daniels would have been terminated regardless of whether he concurred. Ex. 11, Bonzani Dep. at 160-63.

[5] Employees were not required to direct-bill their rooms and some employees who stayed at the Marriott did pay for their own rooms. Ex. 13, Bollman Dep. at 104-05; Ex.2, Daniels Aff ¶ 14.

accounting system for approval and payment. *Id*. at 115-117. There are other instances where the bill can be sent directly to the Finance Department. *Id*. at 115-117. Daniels did not have access to APC's electronic accounting system called, Oracle, in order to input the bill from the Marriott. Ex. 2, Daniels Aff. ¶ 20. Daniels understood that the bill should be sent directly to the Finance Department. *Id.* Upon learning that the bills were mistakenly sent to his department, he directed his staff to contact the Marriott to instruct it to send the bill directly to APC's Finance Department. *Id.*

### B. DANIELS FULFILLED HIS JOB DUTIES AS DIRECTED AND MET ALL COMPANY POLICY AND PRACTICE CONDITIONS

Daniels did arrange for the use of the Johnson & Wales Hotel and other hotels while he was employed by APC. Ex. 2, Daniels Aff. ¶11. From approximately September, 2003 through December, 2003, Field Service Engineers ("FSEs") stayed at the Johnson & Wales and at other hotels on APC's preferred hotel list. *Id*. However, it had become very expensive for the FSEs to stay in different locations because they had to rent cars, which was costing APC a lot of money. *Id.*

Daniels was directed by his supervisor, John Bonzani, to find a hotel for the trainees which had high speed internet access. Ex. 4, Daniels Dep. at 301-02; Ex. 11, Bonzani Dep. at 75. Internet access was a requirement because it was necessary for the Field Service Engineers ("FSEs") to perform the functions of their job. Ex. 11, Bonzani Dep. at 75-76. The other requirements included accommodating for the entire group so that they could spend time together. *Id*. Daniels was also instructed to keep down transportation costs, at 75-76, and to find a hotel that could accommodate meals for the FSEs. Ex. 2, Daniels Aff. ¶ 11. Daniels considered other hotels such as the Johnson & Wales, the Courtyard, the Fairfield Inn, and the Radisson. Ex. 4, Daniels Dep. at 301.

The Marriott was the only hotel that could meet all of Bonzani's requirements. Ex. 2, Daniels Aff. ¶ 12. Daniels negotiated and obtained a favorable room rate of $95.00, as well as a 20% discount on meals, at the Marriott. *Id.* According to his supervisor, Daniels did arrange for hotel rooms in accordance with his directives. Ex. 11, Bonzani Dep. at 78.[6] Bonzani and Cavanaugh were aware of, and approved, the use of the Marriott. Ex. 4, Daniels Dep. at 284-85, 299. Daniels followed the direction of his management by arranging for the hotel rooms at the Marriott. Ex. 4, Daniels Dep. at 285-87. Further, HR Representative Hendrix knew that the FSEs were staying at the Marriott, and she attended a breakfast there and even signed up additional FSEs to stay at the Marriott. Ex. 4, Daniels Dep. at 300, Ex. 14, APC 117. Bollman knew, as of February 6, 2004, that Daniels had arranged for the use of the Marriott. Ex. 15, APC 521. Bollman also knew that the Johnson & Wales Hotel was not being used and that there were several complaints about that hotel; she was working with the Johnson & Wales Hotel to see if it could arrange for high speed internet access. Ex. 16, APC 128.[7]

Numerous complaints had been made about the Johnson & Wales Hotel. Ex. 11, Bonzani Dep. at 71. Bollman herself was aware of five complaints, *Id*. at 142, Among them, that the rooms were old and creepy and hard to access. *Id*. at 71; Ex. 13, Bollman Dep. at 142. There were also complaints about its cleanliness and that the rooms smelled musty. *Id.*; Ex. 6, Hendrix Dep. at 225. On one occasion, the window glass shattered in an APC employee 's room. Ex. 17, APC 243. There were also complaints "about the heating systems in the rooms not working,

[6] Although there were complaints about Daniels with regard to being pushy, Daniels was acting as directed and trying to get the assigned job done. Ex. 11, Bonzani Dep. at 157. His work was satisfactory, and he was fairly good at getting his tasks done. *Id*. at 208-09.

[7] While Bollman was aware that high speed internet access was a requirement for booking hotels, she knew that it was not easy to find a hotel with high speed internet access. Ex. 19, APC 111.

false fire alarms going off in the middle of the night, no internet access in the rooms, and a generally low level of hospitality service." Ex. 18, APC 133.

### C. DANIELS ACTED IN COMPLIANCE WITH APC TRAVEL POLICIES

Daniels did not receive a list of preferred hotels until February 9, 2004.[8] Ex. 15, APC 521. The hotels on the APC preferred hotel list are merely preferred vendors. Ex. 13, Bollman Dep. at 37. Bollman testified that the hotels on the APC-preferred list are merely preferred vendors, and employees are not required to use the vendors listed:

> Q. [W]hat is the policy when you have a certain airline, car rental or hotel that you contract with for services, do you require APC employees to use those specific vendors or are they merely preferred vendors?
> A. There are preferred vendors.
> Q. So you don't require that they use those vendors?
> A. Right.

*Id*.

Employees may also stay at a hotel where the travel agency has negotiated a rate. *Id*. at 44.[9] However, no approval is needed for an employee to stay at a hotel that is not on the preferred list and/or for which the travel agents do not have a negotiated rate. *Id*. at 45. If an employee stays at a hotel where there is a negotiated rate, there is no violation of policy. *Id*. at 56. Daniels negotiated a rate of $95.00 for the FSE trainees at the Marriott. Ex. 2, Daniels Aff. ¶ 12. As long as there is a negotiated rate with a hotel and, therefore, a contract regarding the rate

[8] Bonzani testified that neither he, nor anyone working for him, had ever seen the preferred hotel list and that employees stay in non-preferred hotels all the time. Ex. 11, Bonzani Dep. at 140-43. The following hotels in the Providence, yet were not on the preferred hotel list yet, were used by APC employees for work-related events: Comfort Inn Warwick Airport, Courtyard Providence Downtown, Courtyard Providence Warwick, Courtyard Providence-Lincoln, Crowne Plaza Warwick, Days Hotel At Providence, Express North Attleboro, Express Suites Conference Center Woonsocket, Hampton Inn Providence Warwick Airport, Hampton Inn Seekonk, Hilton Garden Inn Providence, Holiday Inn Express & Suites Warwick-Providence, Holiday Inn Providence-Downtown, Homewood Suites Providence, Mainstay Suites, Marriott Providence, Motel 6 Providence - Seekonk, Park Inn Seekonk, Providence Biltmore Hotel, Providence Warwick Airport Hotel, Residence Inn Providence, SpringHill Suites Warwick, and The Westin Providence. Ex. 33, APC 784. 797, 798.

[9] . Bollman is unaware the hotels with which the travel agents have negotiated rates. Ex. 13, Bollman Dep. at 45.

that will be applied to the group, that is consistent with the general practice. Ex. 3, Gough Dep. at 185.

APC looks at factors other than just the room rate in determining which hotel should be used. Ex. 9, Kelly Dep. at 130-31. The total cost for travel may be less even where an employee stays at a hotel with a higher rate. *Id.* at 131. A higher room rate may be offset by a location that eliminates rental car expenses or where individuals will eat meals at the facility rather than off site. *Id.* Daniels did arrange for a 20% discount at the Marriott for meals, and he arranged for a van to drive the trainees rather than having them incur rental car expenses. Ex. 2, Daniels Aff. ¶ 12.

Bollman never instructed Daniels to ensure that rooms were reserved at the Johnson & Wales Hotel. Ex. 13, Bollman Dep. at 157.[10] Bollman never told Daniels that he was not permitted to organize the use of hotel rooms at the Providence Marriott. *Id*. at 158.

> Q. Did you ever specifically direct Mr. Daniels and tell him that he must insure [*sic*] that rooms are reserved at the Johnson and Wales Hotel?
> A. No, I did not.
> Q. Did you ever direct[] him that he was not permitted to allow rooms to be booked at the Providence Marriott?
> A. No, I did not.

*Id*. at 157-58.

Further, Bollman did not expect that all hotel rooms organized by Daniels would be at the Johnson & Wales. *Id*. at 96-97. While she did expect that a portion of the rooms organized by Daniels would be at the Johnson & Wales, she did not quantify how many rooms she expected to be booked there. *Id*. at 97-98. Bollman testified that she had no knowledge of whether or not a portion of the rooms reserved by Daniels were in fact at the Johnson & Wales, nor did she ever

[10] APC misstated these facts to the EEOC when it represented that "Christine Bollman, expressly told [] [Daniels] that FSEs should stay at the Johnson and Wales hotel where the Company had a preferred rate." Ex. 8, APC 475. It further stated inaccurately that "Bollman even went so far as to overrule Daniels when he questioned the Johnson and Wales' facilities, directing him to continue to use the hotel." Ex. 7, APC 451.

inquire about that fact. *Id*. at 98-99. Daniels did arrange for some individuals to stay at the Johnson & Wales when internet access was not required. Ex. 2, Daniels Aff. ¶ 15. Further, Bollman knew that Daniels arranged for several employees to stay at the Comfort Suites, a hotel on the preferred list. Ex. 19, APC 111-13. There is no requirement that a group hotel booking be approved by Bollman, the Travel Manager. Rather, it is approved by the manager overseeing the meeting. *Id*. at 118-19.

Bollman was aware that high speed internet access was an issue with regard to hotel choice for the FSE trainees, and she had several conversations with Daniels regarding this requirement. *Id*. at 83-84, 86. In fact, she was even working with the Johnson & Wales, which, at the time of Daniels' employment, did not yet have high speed internet access, to make it available in the future. *Id*. at 93-94.

The transportation costs may have been higher had the FSEs stayed at the Johnson & Wales. Ex. 11, Bonzani Dep. at 171. The Johnson & Wales did not have the internet access required for the trainees at the time the hotel rooms were booked at the Marriott, and it would not have met the needs of the trainees even if the Johnson & Wales proposal to add the internet access to five rooms had been already implemented. *Id*.

### D. ARRANGEMENTS AT THE MARRIOTT DID NOT COST APC ANY MONEY

The preferred hotel list provided by APC identifies a number of other hotels in the Providence area in addition to the Johnson & Wales Hotel. Ex. 20, APC 139-140. The list includes the Radisson Airport Hotel, Sheraton Providence Airport Hotel, Fairfield Inn, and Extended Stay America. Ex. 20, APC 139-40. Several of the hotels used by APC employees had higher room rates than the Johnson & Wales,[11] and several hotels cost more than the rate

[11] The following hotels at which APC employees stayed had higher average room rates than the rate at the Johnson & Wales Hotel: Comfort Inn Warwick Airport ($108), Courtyard Providence Downtown ($225), Courtyard

obtained by Daniels at the Providence Marriott.[12] Travel Manager Bollman testified that the Crown Plaza Hotel in Providence was on the APC-preferred hotel list in 2003, 2004, and 2005, and that rooms at the Crown Plaza in 2003 cost $129 per night, $34 more per night than Daniels' negotiated rate of $95.00 per night at the Marriott. Ex. 13, Bollman Dep. at 138-39

### E. APC'S USE OF THE JOHNSON & WALES DRAMATICALLY DROPPED SINCE DANIELS' DEPARTURE AND THE USE OF MORE EXPENSIVE HOTELS INCREASED

The use of the Johnson & Wales Hotel consistently declined after Daniels' departure from APC, while the use of other hotels, including more expensive hotels, increased during the same time period. In 2003, APC booked approximately 1,000 to 2,000 rooms at the Johnson & Wales Hotel. Ex. 13, Bollman Dep. at 89-90. In both 2004 and 2005, the number of rooms at the Johnson & Wales used by APC employees dropped to 750 rooms each year. *Id.* at 134-35. Meanwhile, APC employees increased usage other hotels, such as the Crown Plaza, Sheraton Airport and Comfort Suites. *Id.* at 135 The number of rooms used at the Crown Place increased from 150 in 2003 to 250 in 2004 and 2005. *Id.* at 136-37. The rate at the Crown Plaza during those years was $129.00. *Id.* at 138. The number of rooms used by APC employees at the Sheraton increased from 750 rooms in 2003 to 1,000 in 2005. *Id.* at 136-37. The rate at the

---

Providence Warwick ($104), Courtyard Providence-Lincoln ($125, yr-2006), Crowne Plaza Warwick ($156.46), Days Hotel at Providence ($95.45, yr-2003, 2005, 2006 avg.), Hampton Inn Providence Warwick Airport ($118.41), Hampton Inn Seekonk ($97.81), Hilton Garden Inn Providence ($111.15, yr-2005, 2006 avg.), Holiday Inn Express & Suites Warwick-Providence ($104), Holiday Inn Providence-Downtown ($118.32), Homewood Suites Providence ($111.03, yr-2005, 2006 avg.), Mainstay Suites ($82.62), Marriott Providence ($189), Park Inn Seekonk ($75.99 - 2005), Providence Biltmore Hotel ($139), Providence Warwick Airport Hotel ($98.10), Residence Inn Providence, ($114.58, yr-2005-2006 avg.), SpringHill Suites Warwick ($102.14), and The Westin Providence ($126.19, yr-2003, 2005, 2006 avg.). Ex. 33, APC 784. 797, 798.

[12] The following hotels at which APC employees stayed had higher average room rates than the $95.00 rate obtained by Daniels at the Marriott: Comfort Inn Warwick Airport ($108), Courtyard Providence Downtown ($225), Courtyard Providence Warwick ($104), Courtyard Providence-Lincoln ($125, yr-2006), Crowne Plaza Warwick ($156.46), Days Hotel at Providence ($95.45-2003, 2005, 2006 avg), Hampton Inn Providence Warwick Airport ($118.41), Hampton Inn Seekonk( $97.81), Hilton Garden Inn Providence ($111.15, yr-2005, 2006 avg.), Holiday Inn Express & Suites Warwick-Providence ($104), Holiday Inn Providence-Downtown ($118.32), Homewood Suites Providence ($111.03, yr-2005, 2006 avg.), Marriott Providence ($189), Providence Biltmore Hotel ($139), Providence Warwick Airport Hotel ($98.10), Residence Inn Providence, ($114.58, yr-2005-2006 avg.), SpringHill Suites Warwick ($102.14), and The Westin Providence ($126.19, yr-2003, 2005, 2006 avg.). Ex. 33, APC 784. 797, 798.

Sheraton in 2005 was $89.00. *Id.* at 136. The number of rooms used by APC employees at the Comfort Suites increased from 1,500 to 2,500 in 2004 and 3,000 in 2005. *Id.* at 126-37.

### F. DANIELS FULFILLED THE DUTIES OF HIS POSITION

Daniels met all of his "deliverables" set by his supervisor. Ex. 4, Daniels Dep. at 398. He made a "positive impact in APC in their service department not just nationally but globally." *Id.* He did a good job for his management and for the company, and he did a "good job for the customers of the company by training their people and getting them information that they needed in a timely manner, and differently than had been done before." *Id.* Daniels further explained that:

> I had taken a very disorganized process where field service engineers had been hired by the company and had been at training and gone back to their home office and did not have computer equipment or the tools to do their job for months after they had been employed by the company costing the company thousands of dollars for a non productive employee. I turned that around. Within the period of time that a person got hired while they were there in Rhode Island for training, they got their laptop, they got all of their tools, they got their $2,000 disbursement voucher, which they're able to cash, so they could be immediately productive. . . . At the same time, as a direct result of that, I was saving the company money, and I had a positive impact on the moral[e] of the field service engineers that was suffering.

*Id*. at 398-99, 402.

### G. DANIELS WAS SUBJECTED TO RACE DISCRIMINATION, RACIAL HARASSMENT, AND A HOSTILE WORK ENVIRONMENT AND HE MADE NUMEROUS COMPLAINTS REGARDING THE SAME

APC Director of Finance Brian Kelly created a hostile work environment for Daniels. Ex. 4, Daniels Dep. at 247. Kelly made it extremely difficult for Daniels to do his job and created a financial hardship for Daniels. *Id*. at 247-48, 250. Travel Manager Bollman treated Daniels differently than other employees. She was nasty to him, and her demeanor toward him was smug. *Id*. at 267-69. Bollman and Kelly refused to allow Daniels to direct-bill a rental car

despite the undue financial hardship it caused Daniels and his family.[13] Ex. 4, Daniels Dep. at 394-95.

Daniels regularly incurred approximately $2,000 in work-related expenses every week. Ex. 2, Daniels Aff. ¶ 8. It was a part of Daniels' job to take employees to lunch and to pay for the lunch himself. Ex. 11, Bonzani Dep. at 123. Although employees are permitted to receive ongoing travel advances to minimize out-of-pocket expenses, Daniels was not provided such advances.[14] Ex. 9, Kelly Dep. at 104-106. Ex. 2, Daniels Aff. ¶ 9. Fifty to Sixty employees were given ongoing advances to help defray the costs and minimize the financial burden of ongoing work related expenses. Ex. 9, Kelly Dep. at 193. The travel advance is supposed to be available for all employees. Ex. 9, Kelly Dep. at 106-08. The travel advance is "intended to minimize the amount of time that an employee [uses] [] their personal funds for company purposes." *Id*. at 107. Daniels had not been offered to receive ongoing travel advances. Ex. 2, Daniels Aff. ¶ 9.

Kelly personally took over review of Daniels' expenses, a task that he normally delegated to his assistant, Mary Tougas. Ex. 9, Kelly Dep. at 61-62. The Human Resources and Finance Departments combed Daniels' expenses to find evidence to discipline and/or terminate him. Ex. 22, APC 193. In an email regarding an issue relating to an expense for reimbursement for a lunch, Gough told Kelly and Hendrix,

> The issue of the lunch . . . is still an open issue, no resolution. From his perspective, worst case is that he made a mistake. From our perspective, worst

---

[13] Kelly and Bollman ended Daniels' ability to direct-bill rental cars because, they alleged, Daniels was disrespectful to an Avis representative after Daniels attempted to take the initiative to obtain reimbursement for items stolen from his car. Ex. 3, Gough Dep. at 239-41. Daniels was not disrespectful to the Avis representative, nor was Daniels aware that such an allegation had been made. Ex. 2, Daniels Aff. ¶ 10.

[14] Daniels was initially provided $2,000 for expenses against which he would submit receipts for reimbursement but was then required to pay for his expenses out-of-pocket after he exhausted the $2,000. Ex. 4, Daniels Dep. at 170-71.

> case is he tried to defraud the company. . . if this is the only issue we find in the reports, *we need to accept* that we can't come to any definitive conclusion therefore we take no negative action. . . . If no other issues are identified on the expense reports, no disciplinary action should be taken. . . . *So I need you to continue with this review of his expenses, and note to me any that are questionable*.

Ex. 22, APC 193.

Kelly responded to Gough and stated, "Regarding the expense reports, I am attempting to cross-reference the names of the employees on the reports to other [sic] expense reports as well as timecard information." Ex. 22, APC 193.

Kelly harassed and interrogated Daniels with regard to how he filled out his W-4 form. Ex. 4, Daniels Dep. at 273. Kelly refused to allow Daniels to fill out his W-4 form in a manner that Daniels felt was appropriate. On his W-4 form, Daniels claimed an exemption from withholding for 2003. Ex.21, APC 041. He filled out the form in accordance with what was requested on the form; specifically, he believed that, due to his financial circumstances, he had a right to a refund from the previous year and to a refund for the current year. Ex. 4, Daniels Dep. at 220. Kelly refused to accept the form as filled out by Daniels and asked Hendrix to instruct Daniels to fill out another form without the exemption claim. Ex. 4, Daniels Dep. at 220-21; Ex. 6, Hendrix Dep. at 145, 156.[15] Kelly told Daniels that he must complete a new form and that, even if Daniels did not do so, Kelly would withhold taxes anyway. Ex. 4, Daniels Dep. at 221-22.

Daniels was otherwise harassed by Brian Kelly. *Id.* at 335. The discrimination against Daniels was "in the form that I was treated, the way I was made to feel, the body language, the constant second guessing." *Id.* at 344.

---

[15] Kelly denies that he asked Hendrix to instruct Daniels that he "could not claim that he was exempt from taxes. . . . An employee can claim they are exempt from taxes if they attest on the form that they are exempt." Ex. 9, Kelly Dep. at 97.

> Brian Kelly in any interaction that I had with him always, it seems to me, wanted me to feel like I was under his feet based upon his tone, his demeanor and his response. . . . [His tone] was dismissive, angry, [he] spoke down to me, did not show common corporate courtesy in his interaction with me. . . . He constantly treated me differently. . . . [H]e constantly tried to intimidate and force me to submit to his will.

*Id*. at 255-56.

Kelly also questioned how and why Daniels was hired and questioned his qualifications. *Id*. at 223-23. He said he did not recall approving Daniels' hire and questioned who had offered Daniels the position. *Id*. at 223. Kelly often spoke negatively about Daniels. On more than one occasion, Kelly told Hendrix that she should "lose this guy." Ex. 6, Hendrix Dep. at 146. He also made comments like, "What is this guy up there doing? What is he trying to pull?" *Id*. at 159. Kelly's tone, mannerisms, and disrespect for Daniels made Daniels feel uncomfortable. *Id*. at 224. Daniels further explained how Kelly made him feel:

> Being an African American in this country, there are times where things are said, body language changes, where the only reason for that change in demeanor is that a person does not like you because of your race. His tone, his demeanor changed in a manner consistent with that, in my opinion, and it was not an isolated incident. It was not one incident that – or one interaction with him that caused me to form this basis that he did not like black people. It was an ongoing manner in which he dealt with me. . . . I was interrogated, and I was left with the impression under no [un]certain terms that he was disappointed that I was hired and that I was there, and how dare I question him about on how to complete my form or how dare – how did this guy get in this company?

*Id*. at 237-38.

Prior to his termination, several employees had commented about terminating Daniels and inquired with Hendrix why he had not yet been fired and why he was still working for the company. *Id*. at 211-213. Even the Payroll Administrator, who referred to Daniels as an "ass," *Id.* at 214, made Daniels her favorite topic to discuss with Hendrix, inquiring every time she saw Hendrix, "Is that guy still here[?]" Ex. 4, Daniels Dep. at 213. HR Representative Hendrix

recognized that people's feelings about Daniels were unusual. Ex. 6, Hendrix Dep. at 215. Hendrix testified that Daniels did not understand the "social boundaries" at APC. *Id*. at 217.

On one occasion, HR Representative Hendrix asked Daniels to accompany her to a train station because an individual who had been offered employment, and who was on his way to APC from out of town, had failed his drug test. *Id*. at 375-76. Hendrix told Daniels that she wanted him to accompany her because he "was big and black . . [and that he would] scare the shit out of the guy once she told him that he no longer had the job." *Id*. at 376.

Daniels complained to numerous individuals regarding the discrimination, harassment, and hostile work environment. Bonzani admits that Daniels complained to him about Kelly and Gough. Ex. 11, Bonzani Dep. at 91. Daniels also complained to Gough about Kelly on two separate occasions and specifically complained that Kelly was harassing him, Ex. 3, Gough Dep. at 226-27, and that Kelly was discriminating against him. Ex. 4, Daniels Dep. at 377, 394. Gough, who did not like Daniels, Ex. 11, Bonzani Dep. at 175, did nothing to address Daniels' complaints. Ex. 4, Daniels Dep. at 377, 394. Kelly also expressed that he did not like Daniels. Ex. 3, Gough Dep. at 254. Daniels also complained to Gough about Bollman. Ex. 4, Daniels Dep. at 396.

The manner in which Human Resources and the Finance Department treated Daniels was out of the ordinary. Ex. 11, Bonzani Dep. at 102, 126. Finance and HR treated Daniels differently from other employees. Ex. 11, Bonzani Dep. at 174. HR Representative Hendrix told Bonzani that someone needed to put Daniels in his place. Ex. 11, Bonzani Dep. at 154-55.

After Daniels' car was broken into and his company laptop stolen, Gough, Hendrix, and Bollman conducted their own investigation of the incident in an apparent attempt to discredit Daniels. Ex. 22, APC 193-94; Ex. 23, APC 213-15. After asking Daniels to obtain a police

report, Human Resources retrieved it, but instructed that Daniels should not be told that APC had already obtained a copy. *Id.*; Ex. 24, APC 297-99. Further, APC contacted Avis to double-check whether or not Daniels had lied about the car break-in. He had not. *Id.*

Daniels complained to Bonzani and Hendrix regarding the way in which Paul Cavanugh treated him. Ex. 4, Daniels Dep. at 387. Daniels complained to them after Cavanaugh said to him, "Seth, why can't you be a good Irish lad like everyone else?" "Why can't you be a good Irish lad and not get in trouble[?]" *Id*. at 387-88. Daniels responded to Cavanaugh, "because I'm black. I'm African American. That will never happen." *Id*. at 393. Cavanaugh also had slogans on his desk which said "if you were Irish, you could do no wrong, a little Irish boy can do no wrong." *Id*. at 387. After Daniels complained to Bonzani that he felt that such disparate treatment and harassment were due to his race, Bonzani merely responded by saying, "you know, Paul is Irish. He's new to the country." *Id*. at 390-91.

When Daniels complained to Hendrix about Cavanaugh and questioned whether the treatment was due to his race, Hendrix responded "that it was more of a process issue as opposed to an individual's dislike of black people." *Id*. at 392.

Instead of following up regarding Daniels' complaints about Kelly and Gough, Cavanaugh told Daniels that he needed "to stay away from Brian Kelly." *Id*. at 395-96. Daniels was told by Bonzani "that Brian Kelly has a long memory and was vindictive." *Id*. at 396.

### H. Kelly's Harassment Led to Daniels' Termination In Violation of An Employment Agreement

When it offered Daniels employment, APC, promised Daniels that he would be permitted to commute to Rhode Island from New Jersey until his children's school year had concluded and that APC would pay for his commuting expenses during that time, including travel, hotel while in Providence, and food. Ex. 11, Bonzani Dep. at 34. Paul Cavanaugh and John Bonzani told

Daniels that he could commute back and forth for a year at the company's expense. Ex. 4, Daniels Dep. at 143. The expenses included hotel, rental car, and meals while working for APC. *Id*. at 147. Bonzani informed both Hendrix and Paul Cavanuagh of the agreement prior to Daniels' employment with APC. Ex. 11, Bonzani Dep. at 35-36. Although Gough learned that this agreement had been made, Kelly gave Daniels a hard time about the expenses and told him that he should not be reimbursed for such expenses. Ex. 3, Gough Dep. at 232; Ex. 25, APC 225-26. Kelly made several comments about the fact that Daniels lived in New Jersey, including "When the hell is he going to move up here." Ex. 6, Hendrix Dep. at 169. Gough stated that, if the arrangement did not change, Daniels would be terminated. Ex. 3, Gough Dep. at 232.

## I. DANIELS WAS TREATED LESS FAVORABLY THAN WHITE EMPLOYEES

Other employees received substantial travel reward points and were not disciplined or terminated. Bonzani received approximately 100,000 points from hotel use. Ex. 11, Bonzani Dep. at 135-36. He has also received approximately 700,000 reward points from airline use. *Id*. at 136. Bonzani told Daniels that he is a "member of Starwood preferred guests." Ex. 4, Daniels Dep. at 297-98. Bonzani further stated that he uses only one credit card to aggregate his purchasing and to maximize the number of points he receives on one card. *Id*. at 298, 378. Bonzani arranged for meeting space and paid for it himself. *Id*. at 378-79. Some of the points that Bonzani received were from his credit card charges for meeting rooms. Ex. 11, Bonzani Dep. at 349-50.

Cavanaugh received travel points for travel expenses that were not his own. Ex. 4, Daniels Dep. at 368, 370-73. Cavanaugh told Daniels that he had an American Express card for which he received points. Ex. 4, Daniels Dep. at 372-73. Daniels saw Paul Cavanaugh use his American Express card to pay for meals for other employees, including Daniels. Ex. 2, Daniels

Aff. ¶ 5; Ex. 4, Daniels Dep. at 372-73. Cavanaugh received points when he used his credit card to pay for such meals. *Id.*

White employees who engaged in unethical conduct and who cost the company money were disciplined rather than terminated. For example, white employee [redacted] Ex. 26, APC 1770-71; Ex. 6, Hendrix Dep. at 85-86. [redacted] Ex. 26, APC 1770-71. [redacted] *Id.*

Additionally, although several employees have violated the travel policy, no individuals other than Daniels have been terminated or disciplined for their hotel room choices or for violating the travel policy. Ex. 13, Bollman Dep. at 149-50. APC did address other violations of the travel policy when, for example, the individuals were informed of the violation and were asked why they had not stayed at a preferred hotel. Ex. 9, Kelly Dep. at 141-44, 47-48.

## II. ARGUMENT

Summary judgment is inappropriate where the pleadings, depositions, answers to interrogatories, and affidavits demonstrate that there is a genuine issue of material fact and that the moving party is not entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). All reasonable inferences must be made in favor of the nonmoving party. *See, e.g., Ramirez Rodriguez v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 425 F.3d 67, 69 (1st Cir. 2005); *Gonzalez-Pina v. Rodriguez,* 407 F.3d 425, 431 (1st Cir. 2005).

In employment discrimination cases lacking direct evidence of discrimination, this Court applies the *McDonnell Douglas- Burdine- Hicks* burden-shifting analysis to the Title VII and Section 1981 claims. *See Conward v. Cambridge Sch. Comm.,* 171 F.3d 12, 19 (1st Cir. 1999). The plaintiff carries the initial burden to establish a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). This initial burden is not an onerous one. *Calero-Cerezo v. U.S. Dept. of Justice*, 355 F.3d 6, 25 -26 (1st Cir. 2004) (citing *Fennell v. First Step Designs, Ltd.,* 83 F.3d 526, 535-36 (1st Cir. 1996)).

After the plaintiff has made a *prima facie* case, the defendant must articulate a "legitimate, non-discriminatory reason" for its termination of the employee. *See, e.g., Feliciano de la Cruz v. El Conquistador Resort and Country Club*, 218 F.3d 1, 6 (1st Cir. 2000). The employee must then establish that "(1) the employer's articulated reason for laying off the plaintiff is a pretext; and (2) the true reason is discriminatory animus." *Id.* (citing *Thomas,* 183 F.3d at 56). This standard, however, "does not necessarily require the introduction of additional evidence beyond that required to show pretext." *Id.* (internal quotation marks and citations omitted). The same evidence used to show pretext can support a finding of discriminatory animus if it enables a factfinder "reasonably to infer that unlawful discrimination was a

determinative factor in the adverse employment action." *Id.* (internal quotation marks and citations omitted). See also *Dominguez-Cruz v. Suttle Caribe, Inc.,* 202 F.3d 424, 431 (1st Cir. 2000).

Although this burden-shifting analysis may guide the Court's review of summary judgment, "a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a question for a factfinder as to pretext and discriminatory animus." *Calero-Cerezo v. U.S. Dept. of Justice*, 355 F.3d 6, 26 (1st Cir. 2004) (citing *Fennell,* 83 F.3d at 535). To survive summary judgment, a plaintiff is not required to rely only on *uncontradicted* evidence. *Id.* (citing *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 9 n. 3 (1st Cir. 1990)) (emphasis in *Calero-Carezo*). "So long as the plaintiff's evidence is both cognizable and sufficiently strong to support a verdict in her favor, the factfinder must be allowed to determine which version of the facts is most compelling." *Id.* Finally, the Court must "exercise particular caution" before granting summary judgment for employers on such issues as pretext, motive, and intent. *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (2000) (citing *Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 167 (1st Cir. 1998)).

### A. DANIELS WAS SUBJECTED TO A HOSTILE WORK ENVIRONMENT BASED UPON HIS RACE

APC alleges that summary judgment should be granted because the conduct to which Daniels was subjected (1) was not race-based, (2) did not create a severely hostile environment, and (3) was not objectively or subjectively offensive. APC Mem. at 11-13. APC is wrong in all respects, and material issues of fact exist with regard to each factor. The First Circuit has repeatedly emphasized that the test of a hostile work environment claim is a "fact specific"

inquiry of "all the attendant circumstances," and therefore it is "often reserved for a fact finder." *Pomales*, 447 F.3d at 79.

**1. The Harassment of Daniels was Race-Based**

APC is incorrect when it misstates that the bulk of Daniels' claims surround only Kelly. In fact, Daniels alleges the harassment stemmed not only from Kelly, but also from Cavanaugh, Hendrix, Bollman, and Gough. Further, the harassment was based upon his race.

Cavanaugh and Hendrix made derogatory statements to Daniels specifically with regard to race. Cavanaugh directly questioned Daniels why he could not be a "good Irish lad." Ex. 4, Daniels Dep. at 387-88. Cavanaugh also had slogans on his desk stating, "if you were Irish, you could do no wrong, a little Irish boy can do no wrong." Ex. 4, Daniels Dep. at 387. Bonzani dismissed Daniels' complaints about this racial harassment stating, "you know, Paul is Irish. He's new to the country." Ex. 4, Daniels Dep. at 390-91. On one occasion, Hendrix asked Daniels to accompany him to the train station to inform a recent hire, who was on his way to APC, that he would not be employed expressly because Daniels "was big and black . . . [and that would] scare the shit out of the guy once she told him that he no longer had the job." Ex. 4, Daniels Dep. at 376. Hendrix also told Bonzani that Daniels needed to be put in his place. Ex. 11, Bonzani Dep. at 154-55. Further, Hendrix stated that Daniels did not understand the "social boundaries" at APC. *See supra* at 15.

Kelly's harassment of Daniels was severe. His tone and demeanor was consistent with an individual who does not like African-Americans. Ex. 4, Daniels Dep. at 237-38. Kelly interrogated Daniels, was dismissive of Daniels, was angry, spoke down to Daniels, and tried to intimidate him. *Id.* at 238-38, 255-56. Further, Kelly questioned why Daniels had been hired. *Id.* at 223. Although APC argues that Kelly was an "equal opportunity offender," (APC Mem. at

11, n.13), Kelly's treatment of Daniels was in fact different than his treatment of others. Ex. 11, Bonzani Dep. at 174.

APC cites *Morrison v. Carleton Woolen Mills, Inc.*, 108 F.3d 429, 441 (1st Cir. 1997), for the proposition that just because a supervisor is unsociable and hard to get along with does not mean there is discriminatory motive. See APC Mem. at 11. But Daniels' racial harassment and discrimination complaints went far beyond a difficult supervisor or employee. Daniels' own supervisor, Bonzani, testified that the way in which Daniels was treated by Human Resources and the Finance Department was "out of the ordinary" and different than how other employees were treated. Ex. 11, Bonzani Dep. at 102, 126, 174. All of this evidence creates genuine issues of material fact.

Further, "conduct that is not explicitly racial in nature may, in appropriate circumstances, be considered along with more overtly discriminatory conduct in assessing a Title VII harassment claim." *O'Rourke*, 235 F.3d at 729 (citing *Landrau-Romero v. Banco Popular De Puerto Rico*, 212 F.3d 607, 614 (1st Cir. 2000)). In *Landrau-Romero*, the court failed to consider all of the alleged mistreatment of the plaintiff, including, specifically, acts that were not overtly discriminatory, such as "verbal criticisms, the monitoring of his whereabouts, . . . [a] failure to accommodate [his] physical injury," and other acts "that were not imposed on white employees." 212 F.3d at 614. In reversing summary judgment, the First Circuit held that such conduct should have been considered along with those incidents that were more overtly racial in nature. *Id.* (citing *DeGrace v. Rumsfeld*, 614 F.2d 796, 800 (1st Cir. 1980) (evidence of equipment sabotage and co-workers' silent treatment considered along with racially explicit notes)).

In addition to the racial comments described above, there were numerous instances of hostility exhibited against Daniels. It was well known that neither Gough nor Kelly liked

Daniels. Ex. 11, Bonzani Dep. at 175; Ex. 3, Gough Dep. at 254. Daniels was referred to as an "ass." Ex. 6, Hendrix Dep. at 214. Several employees commented that Daniels should be terminated and inquired why he had not yet been fired. Ex. 6, Hendrix Dep. at 211-13. Further, Gough stated that Daniels would be terminated if he refused to agree to a change to a previously agreed condition of his employment – that APC would pay his commuting expenses while his family remained in New Jersey until the end of the school year. Ex. 3, Gough Dep. at 231-232.

Further, Daniels' actions were overly scrutinized by the Human Resources and Finance Departments. Kelly took on the unusual task of personally reviewing all of Daniels' expenses, a task normally delegated to his assistant. Ex. 9, Kelly Dep. at 54-55. The Human Resources and Finance Departments combed Daniels' expenses to find evidence to discipline and/or terminate him. Ex. 22, APC 193. In an email regarding a lunch expense reimbursement issue, Gough told Kelly and Hendrix:

> The issue of the lunch . . . is still an open issue, no resolution. From his perspective, worst case is that he made a mistake. From our perspective, worst case is he tried to defraud the company. . . if this is the only issue we find in the reports, *we need to accept* that we can't come to any definitive conclusion therefore we take no negative action. . . . If no other issues are identified on the expense reports, no disciplinary action should be taken. . . . *So I need you to continue with this review of his expenses, and note to me any that are questionable*.

Ex. 22, APC 193 (emphasis added).

Kelly responded to Gough that, "Regarding the expense reports, I am attempting to cross-reference the names of the employees on the reports to other [*sic*] expense reports as well as timecard information." Ex. 22, APC 193. Further, APC scrutinized the amount spent by Daniels on a rental car despite the fact that the amount spent was consistent with the average cost of a rental car as recognized by APC. Ex. 13, Bollman Dep. at 70. Although APC does not question rental car choice unless there is a recurring problem, APC scrutinized Daniels' expenditure even

though it was consistent with APC policy and, at most, cost the company an extra $2.00 a day. *Id.* at 64-74; Ex. 29. Additionally, Kelly singled out Daniels when he refused to allow Daniels to fill out his W-4 form in a manner consistent with what the form permits. Ex. 4, Daniels Dep. at 242, 316, 317, 373, 374; Ex. 21.

Collectively, the above incidents demonstrate that APC's treatment of Daniels was out of the ordinary, different from how other employees were treated, and was racially motivated. To the extent that APC disputes these facts, material issues of fact are in dispute and, therefore, summary judgment is improper.

### 2. The Hostile Environment Was Subjectively and Objectively Severe and Pervasive

Courts generally evaluate together two elements of a hostile work environment case, specifically, whether the harassing conduct is sufficiently severe or pervasive and whether it is sufficiently objectively and subjectively offensive, by reference to the non-exhaustive list of considerations in *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993). *See O'Rourke*, 235 F.3d at 728.

In *Harris*, the Supreme Court clarified that, in order to establish the subjective element of a hostile work environment, a plaintiff need not establish that the harassment "seriously affect[ed] plaintiff's psychological well-being or led her to suffe[r] injury." *Harris,* at 22. The Court noted:

> Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, *even without these tangible effects*, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality.

*Id.* (emphasis added). The Court concluded that the analysis must include a view of "all the circumstances," which "*may* include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance," but "no single factor is required." *Id.* at 23 (emphasis added).

Despite the Supreme Court's clear holding that no one single factor is required, APC argues just the opposite — that Daniels cannot establish that the harassment he endured amounted to a hostile work environment because he has not submitted evidence that his work performance suffered as a result of the harassment. *See* APC Mem. at 12.

Justice Scalia explained that "the test is not whether work has been impaired, but whether *working conditions* have been discriminatorily altered." *Id.* at 25 (Scalia, J., concurring) (emphasis added). Justice Ginsburg added that, to show

> interference [with work performance], the plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment. It suffices to prove that a reasonable person subjected to the discriminatory conduct would find . . . that the harassment so altered working conditions as to make it more difficult to do the job.

*Id.* (Ginsburg, J., concurring) (internal citations and quotations omitted). There is no requirement that Daniels prove that his productivity declined or his work performance suffered to establish that he endured a hostile work environment, because he has otherwise established that the harassment to which he was subjected made it significantly more difficult to do his job.

Even apart from the plain language of *Harris*, APC's misstatement of the law is contradicted by numerous rulings of the U.S. several Courts of Appeals, which have addressed this issue. In *Dey v. Colt Construction & Development Co*., 28 F.3d 1446, 1454 (7th Cir. 1994), the court recognized that "the mention in *Harris* of an unreasonable interference with work performance was not intended to penalize the employee who possesses the dedication and

fortitude to complete her assigned tasks," despite being subjected to unwelcome harassment. In *Dey*, the court held that, despite the fact that the plaintiff endured her supervisor's harassment for over two years without complaint and maintained a close relationship with him, her testimony that it upset and embarrassed her and made her feel uncomfortable was sufficient evidence of the plaintiff's subjective belief that the behavior was hostile and abusive. *Id.* The court rejected the defense that, because the plaintiff had testified that her supervisor's harassment did not prevent her from fulfilling her responsibilities, she could not establish a hostile work environment claim. *Id.* The court further held that a plaintiff "need not show that a campaign of harassment interfered with her work performance in order to establish a violation of Title VII," and urged that "[t]he absence of a noticeable decline in job productivity should therefore not be unduly emphasized where there is ample evidence showing that the campaign of harassment had an impact on its target and made it more difficult for her to do her job." *Id*. at 1456.

Similarly, in *Smith v. Northwest Financial Acceptance, Inc*., 129 F.3d 1408, 1413 (10th Cir. 1997), the court affirmed that a plaintiff "is not required to prove that her tangible productivity or work performance declined or that her ability to do her job was impaired" by the harassment. In that case, the plaintiff's claim "rested primarily on six statements [by her supervisor] directed at her and frequently made within earshot of her co-workers." *Id*. at 1412. The court rejected the Defendant's assertion that in order to establish a hostile work environment, she must establish a decline in her work performance, stating "it is sufficient" that the plaintiff found her supervisor's comments "were intolerable, publicly made, and caused humiliation and a loss of self-respect." *Id. See also, e.g., Schiano v. Quality Payroll Systems, Inc*., 445 F.3d 597, 607 (2d Cir. 2006) (even though the employer's harassment "might not have incapacitated" the plaintiff, "a reasonable juror could infer that it did have an effect on her

working conditions"; the "plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment"); *E.E.O.C. v. R&R Ventures,* 244 F.3d 334, 340 (4th Cir. 2001) ("the inquiry is not whether work has been impaired, but whether working conditions have been discriminatorily altered"); *Hathaway v. Runyon*, 132 F.3d 1214, 1223 (8th Cir. 1997) ("that [plaintiff] was still able to complete her assigned tasks does not undermine the jury's finding that a reasonable person subjected to th[e] conduct would find, as the plaintiff did, that the harassment so altered working conditions as to make it more difficult to do the job"); *Saxton v. American Telephone and Telegraph Co.,* 10 F.3d 526, 535 n.14 (7th Cir. 1993) ("Title VII, as interpreted by *Harris*, does not require proof that the harassment interfered with the plaintiff's work performance."); *Davis v. Monsanto Chemical Co.,* 858 F.2d 345, 349 (6th Cir. 1988) ("In establishing the requisite adverse effect on work performance, however, the plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment . . . [only that] the harassment made it more difficult to do the job") (all internal citations and quotations omitted).

Furthermore, the evidence is clear that the harassment and hostile work environment did affect Daniels' working conditions. APC's refusal to allow him to direct bill a rental car had a severe financial hardship on Daniels and made it difficult for him to get to work to perform his job. Ex. 2, Daniels Aff. ¶ 8; Ex. 4, Daniels Dep. at 174. APC's refusal to give Daniels a larger and/or ongoing advance for his expenses made it difficult for him to do his job, to get to work, and to perform such functions required of him, such as to pay for the meals of employees for whom he was responsible. Bollman's questioning of the need for high speed internet access also interfered with Daniels' job duties. The intimidation, interrogations, and general manner in which numerous APC managers — Kelly, Bollman, Gough, Hendrix, and Cavanaugh — dealt

with Daniels placed severe stress on Daniels and made it difficult for him to do his job. The fact that Daniels was instructed not to speak with the Director of Human Resources and Brian Kelly, who were constantly communicating with him and asking him to justify his actions, made Daniels' working conditions very difficult. Finally, APC's ultimate act of termination for arranging for the hotel booking at the Marriott — when it was the only hotel that could meet the requirements laid out by Daniels' manager, Bonzani — indisputably interfered with his ability to do his job.

APC's reliance on *Carmona-Rivera v. Puerto Rico*, 464 F.3d 14 (1st Cir. 2006), for the proposition that Daniels' failure to present evidence of a decline in his work performance dooms his hostile work environment claim is misplaced. The First Circuit in *Carmona-Rivera* made no such holding. Rather, the Court reiterated that to succeed on a hostile work environment claim, the plaintiff must demonstrate "that the complained-of conduct was so severe or pervasive that it altered the terms of her employment." *Id.* at 19 (citing *Pomales v. Celulares Telefonica, Inc.*, 447 F.3d 79, 83 (1st Cir. 2006)). The court further held:

> There is no mathematically precise test we can use to determine when this burden has been met, instead, we evaluate the allegations and all the circumstances, considering the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance.

*Id.* (internal citations and quotations omitted). The court then examined "all the circumstances" and determined that the employee's main allegation, that the employer was rude and indifferent to her, did not amount to behavior "that a reasonable person would find hostile or abusive." *Id.* (citing *Noviello v. City of Boston*, 398 F.3d 76, 92 (1st Cir. 2005)). The court did not discuss evidence (or the lack thereof) of the work environment's effect on the employee's performance.

As described above, the evidence in this case is much greater than mere rudeness or indifference. Contrary to APC's assertion, Daniels has presented sufficient evidence to establish that his work environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (referencing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993)). This factual determination must be considered in light of "the entire scope of a hostile work environment claim," *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002), bearing in mind that "the accumulated effect of incidents can amount to a hostile work environment over time." *Kosereis v. Rhode Island*, 331 F.3d 207, 216 (1st Cir. 2003) (quoting *O'Rourke v. City of Providence*, 235 F.3d 713, 729 (1st Cir. 2001)).

There should be no dispute that the harassment and hostile environment had a subjective effect on Daniels. Daniels testified to as much in his deposition. The harassment and discrimination against Daniels was "in the form that I was treated, the way I was made to feel, the body language, the constant second guessing." Ex. 4, Daniels Dep. at 344. Daniels further testified that, with regard to the racial harassment from Brian Kelly, "[I]t seems to be, [he] wanted me to feel like I was under his feet based upon his tone, his demeanor . . . . H constantly treated me differently . . . . [H]e constantly tried to intimidate me and force me to submit to his will. *Id.* at 255-56.

> Being an African American in this country, there are times where things are said, body language changes, where the only reason for that change in demeanor is that a person does not like you because of your race. His tone, his demeanor changed in a manner consisted with that, in my opinion, and it was not an isolated incident. It was not one incident that – or one interaction with him that caused me to form this basis that he did not like black people. It was an on-going manner in which he dealt with me. . . . I was interrogated, and I was left with the impression under no [un]certain terms that he was disappointed that I was hired and that I was there.

Ex. 4, Daniels Dep. at 237-38; Ex. 2, Daniels Aff. ¶ 21.

While ignoring this testimony, APC relies on a single passage in Daniels' deposition to argue that it proves that he did not perceive his working conditions to be "subjectively offensive on account of race." APC Mem. at 13. But APC misinterprets Daniels' testimony. Daniels did not state that he did not believe at the time the harassment occurred that it was not based on his race. Rather, he stated that he had not yet perceived a *pattern* of a racially hostile environment. Clearly, he perceived it as racially hostile given his testimony of the impact the harassment had upon him, the specific examples of racial comments, and, most pointedly, the fact that Daniels complained on numerous occasions to his supervisors and Human Resources of the race discrimination and racial harassment. *See* Ex. 4, Daniels Dep. at 377, 390, 392, 395 ("I told everybody in my chain of command . . . . I told the most senior person in HR of the discriminatory actions and hostile work environment that I was in, and he did nothing.").

Further, even if Daniels had not understood that the acts of harassment, as they occurred, were based upon his race, such fact would not render his hostile work environment claim any less actionable. In *Kosereis*, a case on which APC relies, APC Br. at 13, the court held that "the accumulated effect of incidents can amount to a hostile work environment over time," and that the collective effect of these incidents, not the employee's immediate reaction and perception, is most important. 331 F.3d 207, 216. Similarly, in *Crowley*, the court rejected an employer's argument that "since [the employee] did not believe that [her supervisor] was sexually harassing her until June 23, 1998…[she] did not subjectively believe that she was being subjected to a hostile work environment during the statutory period." 303 F.3d at 397. Rather, the court held that "although the victim must subjectively perceive the harasser's conduct to be hostile or abusive, the victim need not subjectively believe that the conduct met the legal definition of

unlawful sexual harassment." *Id*. There is no dispute that Daniels perceived the acts taken against him and the manner in which he was treated by the Gough, Cavanaugh, Bollman, Kelly, and Hendrix as hostile. That is sufficient to meet the test.

Courts in this circuit have denied summary judgment on hostile work environment claims on weaker facts than those presented by Daniels. For example, in *MacDougal v. Potter*, 431 F. Supp. 2d at 130, the plaintiff's hostile work environment claim stemmed from a co-worker expressing his romantic feelings for the plaintiff on a couple of occasions over the course of a few years.[16] Even on this scant evidence, the court found that "reasonable jurors could find the alleged offensive conduct by [the co-worker] towards [the plaintiff] to have been objectively severe and pervasive." *Id*. The court reiterated that the question of whether conduct is objectively abusive is ideally reserved for the fact finder. "It is for a jury of [the plaintiff's] peers to determine whether the facts in this case give rise to a claim under Title VII, not this Court. Thus, summary judgment will be denied on this ground." *Id.* The charges Daniels raises in this case, supported amply by admissible evidence, are far more serious than the ones presented in *MacDougall*. The harassment came from APC's Director of Finance, its Human Resources Director, its Human Resources representative, Daniels' ultimate manager, Paul Cavanaugh, as well as several individuals in APC who expressed on many occasions that they wanted Daniels fired.

Furthermore, in *Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7 (1st Cir. 2002), the First Circuit reaffirmed that a jury, not a court, should determine when a work environment becomes objectively hostile. "Subject to some policing at the outer bounds, it is for the jury to weigh

[16] Courts will apply the same analysis to both race and sex discrimination cases under Title VII. *Faragher*, 524 U.S. at 787 ("Although racial and sexual harassment will often take different forms, and standards may not be entirely interchangeable, we think there is good sense in seeking generally to harmonize the standards of what amounts to actionable harassment.").

those factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment." *Id.* at 19. In that case, the evidence of a hostile work environment included "humiliating sexual remarks and innuendos," which consisted of comments such as "are you sweet to men?" and the defendant's brushing past the plaintiff and rubbing her with his body in a narrow hallway, and was sufficient evidence for a jury to infer a hostile work environment. *Id.* at 19. The court rejected the employer's assertion that the comments were not objectively hostile or abusive, simply "inappropriate" and too "mild to create an objectively hostile work environment," and confirmed that the evidence was sufficient to sustain a finding that the plaintiff was subjected to a hostile work environment. *Id.* at 18.

The evidence of the hostile work environment to which Daniels was subjected is far from the "outer bounds" of such claims, as the above -cited cases demonstrate. Therefore summary judgment would be improper.

## B. Summary Judgment on Daniels' Termination Claim Is Not Appropriate

### 1. Daniels' Has Met His Prima Facie Burden

APC argues that Daniels cannot meet his prima facie burden because he cannot establish that "he was performing his job duties at a level that rules out the possibility that he was fired for job performance. APC Mem. at 14. Material issues of fact as to whether Daniels had fulfilled all his job duties are in hot dispute. Daniels has presented evidence that his own supervisor, Bonzani, testified that Daniels had satisfied his job duties, that he was fairly good at getting his tasks done, and that he arranged for hotel rooms for the FSEs in accordance with Bonzani's directives. Ex. 11, Bonzani Dep. at 78, 157, 208-09. Further, APC itself admitted in its "Statement of Undisputed Facts" that at "the time of his termination, he was 'meeting all of [his]

deliverables from [his] supervisor' and 'making a positive impact in APC in their service department not just nationally but globally." APC Statement of Undisputed Facts, ¶ 102.

APC's argument that Daniels did not perform his job duties because APC terminated him for allegedly receiving kickbacks, violating the ethics policy, and costing APC additional money is a circular argument. It bootstraps the articulated business reason (*i.e.*, the employer's burden of production) into an absolute defense. The reason for Daniels' termination is the very issue before this Court and cannot be used as a defense to prove that he did not perform his job. If APC's circular reasoning were adopted, then no plaintiff could ever win a discrimination case where the challenged action was termination.

Furthermore, each of APC's arguments as to the reasons for his termination are factually inaccurate. There is no record evidence that APC had implemented and/or distributed the ethics policy during the time Daniels was employed. Daniels never received the ethics policy nor was he aware that such a policy existed while employed by APC. Ex. 4, Daniels Dep. at 357-67.

Further, even if the ethics policy had been in place while Daniels was employed, Human Resources Director Brian Gough testified that the mere receipt of reward points was not a violation of the policy and that, had Daniels turned over the "cash equivalent gift" to APC, there would have been no violation. Ex. 3, Gough Dep. at 215-16. Gough admitted that APC never asked Daniels to turn over the reward points, that there was no time limitation by which he was required to turn over the points, and that Daniels himself stated that he would have turned over the points had he been asked to do so. *Id.*, Ex. 2, Daniels Aff. ¶ 16. Further, the only other possible violation of the ethics policy that Gough could cite was that the receipt of reward points gave "the appearance of influencing his decision to do business that [sic] that particular vendor which is a direct violation of our ethics policy." Ex. 3, Gough Dep. at 272-73. Yet Human

Resources representative Christine Hendrix testified that she did not understand what was mean by "the appearance of being or could be construed to be in conflict with the interests of the company," the same clause upon which Gough was apparently relying. Ex. 6, Hendrix Dep. at 265-66. Equally important is Gough's testimony that, had the receipt of the reward points not influenced Daniels' decision for arranging the hotel bookings at the Marriott, such a factor would impact his conclusions about any possible violations. Ex. 3, Gough Dep. at 274.

APC argues that Daniels' booking of rooms at the Marriott instead of the Johnson & Wales Hotel demonstrates his focus on self-interest. APC Mem. at 14-15. But Daniels did book rooms at the Johnson & Wales as well as several other hotels on APC's preferred hotel list. Ex. 2, Daniels Aff. ¶ 11, 15; Ex. 19, APC 111-13. Further, Daniels booked rooms at the Marriott because his supervisor directed that he find a hotel that could meet several conditions including that it have high-speed internet access, that it be centrally located with a restaurant, and that it be near entertainment. Ex. 2, Daniels Aff. ¶¶ 11, 12; Ex. 11, Bonzani Dep. at 75-76; Ex. 4, Daniels Dep. at 301-02. After receiving these instructions from Bonzani, Daniels checked several hotels, and the Marriott was the only hotel that met the criteria. Ex. 2, Daniels Aff. ¶ 12. Bonzani and Cavanaugh both knew of, and approved, the use of the Marriott. Ex. 4, Daniels Dep. at 284-85, 299. Human Resources and the travel manager also knew that Daniels had arranged for the FSEs to stay at the Marriott. Ex. 4, Daniels Dep. at 300; Ex. 14, APC 117; Ex. 15, APC 521; Ex. 16, APC 128.

APC also argues that, by booking the hotel rooms at the Marriott, Daniels cost the company $8,000. APC Mem. at 15. APC's Finance Director, Kelly, admitted that the cost of the hotel is not based solely upon the room rate; rather, a higher room rate can be offset by a location that eliminates rental car expenses or meals. Ex. 9, Kelly Dep. at 130-31. But APC's arguments

make little sense given that the Travel Manager testified that she did not tell Daniels that he could not use the Marriott and because several other hotels on APC's preferred hotel list actually cost more than the rate Daniels was able to negotiate. Ex. 13, Bollman Dep. at 96-99; *id.* at 138-39. For example, the Crown Plaza Hotel which was on APC's preferred hotel list, cost $129 a night, $34.00 more a night than the $95.00 rate obtained by Daniels at the Marriott. Ex. 13, Bollman Dep. at 138-39. Further, APC's argument that the hotel rooms should have been booked at the Johnson & Wales makes little sense because APC continued to use other hotels, rather than the Johnson & Wales, at an increasingly higher rate, even after Daniels was terminated. Ex. 13, Bollman Dep. at 126-38.

APC alleges that Daniels "lied" to Bollman about the *use* of the Providence Marriott. APC Mem. at 15. APC's false accusation against Daniels is remarkable because the evidence clearly shows that Daniels *never lied* to Bollman or anyone else at APC. Although APC alleges that Daniels denied "using the Providence Marriott," in APC's own statement of facts, it admits that Daniels made no such denial. Rather, when asked whether or not Daniels was holding training at the Marriott, Daniels simply responded "we are not doing training at the Marriott." Ex. 34, APC 137-38. Bollman never asked Daniels whether hotel rooms were being booked at the Marriott. Bollman's failure to articulate clearly what she now says was meant to be an inquiry into whether or not hotel rooms had been reserved at the Marriott cannot be imputed to Daniels to prove an improper motive by Daniels. Further, Daniels never attempted to hide the fact that rooms were being used at the Marriott Hotel for employees traveling to Providence for training. In fact, Daniels notified Human Resources and his management prior to the time in which the employees actually stayed at the Marriott. Ex. 4, Daniels Dep. at 298-301. Further, as

previously stated, Bonzani, Cavanaugh, Bollman, and Hendrix all knew that Daniels was using the Marriott, so there would be no reason to try to hide that fact.

**2. APC's Reason For Terminating Daniels Is Pretext for Discrimination**

A plaintiff can establish that the employer's proffered non-discriminatory reason for his dismissal is a pretext for discrimination in several ways. In assessing pretext, a court must look at the total "package of proof" offered by the plaintiff. S*antiago-Ramos v. Centennial P.R. Wireless Corp*., 217 F.3d 46, 55 (1st Cir. 2000); *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 824 (1st Cir. 1991).

***a. Daniels Was Treated More Harshly Than Similarly Situated White Employees***

A plaintiff can establish pretext by showing that a "similarly situated employee was treated differently." *Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 173 -74 (1st Cir. 2003). "Reasonableness is the touchstone: while the plaintiff's case and the comparison cases that [s]he advances need not be perfect replicas, they must closely resemble one another in respect to relevant facts and circumstances." *Perkins v. Brigham & Women's Hosp.,* 78 F.3d 747, 751 (1st Cir. 1996). The treatment need only be "roughly equivalent." *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989). "Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples." *Id.* This disparate treatment need not be specific to the ultimate decision to terminate the employee -- "[c]ompetent proof that the plaintiff was denied privileges and opportunities available to similarly situated employees may constitute probative evidence that an adverse employment action was motivated by discriminatory animus." *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 39 (1st Cir. 2001). To be found similarly situated, Daniels need only show that the comparators are similar in "all relevant respects." *Rathbun v,. Autozone, Inc.*, 361 F.3d 62, 76 (1st Cir. 2004).

Daniels was treated differently than similarly situated white employees. For example, both Bonzani and Cavanaugh received reward points when they paid for travel expenses for other individuals. Ex. 11, Bonzani Dep. at 135-36, 349-50; Ex. 4, Daniels Dep. at 297-98, 368, 370-73, 378-79; Ex. 2, Daniels Aff. ¶ 5. Neither Cavanaugh nor Bonzani were disciplined or terminated for accepting such reward points for travel-related expenses that were not their own. Bonzani and Cavanaugh are similarly situated to Daniels because the acceptance of reward points by Bonzani and Cavanaugh for travel-related expenses that were not their own meets the test that such relevant facts and circumstances resemble the facts and circumstances for which Daniels was terminated in all relevant respects. *Kosereis v. Rhode Island*, 331 F.3d 207, 214 (1st Cir. 2003). Further, Bonzani and Cavanaugh "engaged in the same conduct [as Daniels] without [] differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Perkins v. Brigham & Women's Hospital*, 78 F.3d 747, 751 (1st Cir. 1996). APC's stated reason for terminating Daniels is that he received the reward points, for the travel-related expenses of others. Bonzani and Cavanaugh's actions were no different.

White employees who committed more egregious actions than Daniels were treated more favorably by APC. For example, white employee [redacted] Ex. 26, APC 1770-71. [redacted]

[redacted], like Daniels, she was accused of unethical behavior by looking after her own self-interest, costing the company money and attempting to deceive the company.

Additionally, several employees violated the travel policy, but no individuals other than Daniels were terminated or disciplined for their hotel choices or for violating the travel policy. Ex. 13, Bollman Dep. at 19-50; Ex. 9, Kelly Dep. at 141-44, 47-48.

**b. *APC's Articulated Reasons For Terminating Daniels Are Implausible, Inconsistent, Incoherent, and Contradictory***

Pretext may also be shown from the "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" that will enable a factfinder to "infer that the employer did not act for the asserted non-discriminatory reasons." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir. 2000) (quoting *Hodgens v. General Dynamics Corp*., 144 F.3d 151, 168 (1st Cir. 1998)) (internal quotations and citations omitted). In *Santiago-Ramos*, the First Circuit specifically found that because of "weaknesses" in the proffered justifications for the plaintiff's termination, "the jury could find that the reasons were pretextual." *Santiago-Ramos,* 217 F.3d at 56. For example, one of the stated reasons for the plaintiff's discharge was that she failed to complete an assigned task, which resulted in the assessment of fees against the company. *Id.* The court found this reason wanting because the plaintiff presented evidence that she was never assigned this duty. *Id.* Furthermore, the court found it compelling that no one had reprimanded the plaintiff for failing

to complete this task during her tenure. *Id.* The employer cited another reason for her termination, but the court found that this reason too was lacking. The plaintiff had made an error in performing one of her duties. However, testimony by a decisionmaker stating that the mistake was "minor" established that this reason was insufficient to support the termination, and therefore could be considered pretextual by a jury.

APC's proffered reasons for terminating Daniels are inconsistent, implausible, and full of contradictions. Gough testified that he made the decision to terminate Daniels based upon the information he received from Bollman and Bollman alone. Ex. 3, Gough Dep., at 173. Although Gough fired Daniels for booking the hotel rooms at the Marriott rather than the Johnson & Wales, Bollman testified that she had not instructed Daniels to book the rooms at the Johnson & Wales, that she never told him that he couldn't use the Marriott, and that she never expected that all the rooms would be booked at the Johnson & Wales. Ex. 13, Bollman Dep. at 37, 44, 56, 96-98, 157-58. Further, Bollman testified that she did not know whether or not a portion of the rooms reserved by Daniels were, in fact, at the Johnson & Wales. *Id.* at 98-99. But Bollman did know that Daniels had arranged for hotels on APC's preferred list to be used, such as the Comfort Suites Hotel. Ex. 19, APC 111-113. In fact, Daniels did arrange for hotel rooms to be booked at the Johnson & Wales. Ex. 2, Daniels Aff. ¶¶ 11, 15. Further, Bollman, Cavanaugh, Bonzani, Hendrix, and the Finance Department all knew that Daniels had booked rooms at the Marriott. Ex. 4, Daniels Dep. at 284-85, 299, 300; Ex. 14, APC 117, Ex. 15, APC 521, Ex. 12, APC 143.

The accusation that Daniels set up a direct-billing scheme to hide the fact that he was using the Marriott is also implausible and contrary to the facts. First, because Cavanaugh, Bonzani, Hendrix, and Bollman all knew that the Marriott was being used, such an argument is

implausible. Second, the direct-billing was set up in accordance with APC policy and, when the Marriott mistakenly sent the direct-bill to Daniels' department, it was Daniels who directed his assistant to contact the Marriott to have the bills sent directly to the Finance Department. Ex. 12, APC 143; Ex. 13, Bollman Dep. at 115-17; Ex. 2, Daniels Aff. ¶ 18. Further, as described above, APC's allegations that Daniels' actions violated the ethics policy is inconsistent with Gough's testimony that, given the facts of this case, no such violation occurred. Ex. 3, Gough Dep. at 185, 199-201, 215-16, 274; Ex. 10, Colucci Dep. at 14. Further, the evidence is undisputed that Daniels never received a copy of the ethics policy or even knew of its existence. Ex. 4, Daniels Dep. at 357-67; Ex. 2, Daniels Aff. ¶ 3.

APC's allegation that Daniels' was terminated for taking the reward points for himself when they belonged either to APC or the individuals who stayed at the Marriott is also inconsistent with the facts. The Marriott did not have a program that would have allowed APC to receive the reward points. Ex. 10, Colucci Dep. at 14. Further, Daniels did not take any reward points from any other individuals. Rather, Daniels encouraged other employees to sign up for the rewards program and benefit from the program, and it is undisputed that other individuals did in fact take advantage and receive such reward points. Ex. 2, Daniels Aff. ¶ 14. Even Daniels' own supervisor, Bonzani, testified that, if Daniels did not take points from other individuals and instead only received the rewards points as a meeting organizer, then he should not have been terminated and should only have been disciplined. Ex. 11, Bonzani Dep. at 83.

Next, APC's allegations that the hotel booking at the Marriott cost APC $8,000 is also contradicted by the facts. As previously discussed, the cost of a hotel is determined not only by the hotel rate, but also by other considerations, such as meals and transportation costs, both of which Daniels had taken into consideration. Daniels obtained a 20% discount on meals and

arranged for a van to drive all the trainees to and from training rather than incurring expenses from numerous rental cars. Ex. 2, Daniels Aff. ¶ 11. Further, the cost of the Marriott was less than the room rates at hotels that were on the APC preferred list, such as the Crown Plaza which cost $34 more a night than the Marriott. Ex. 13, Bollman Dep. at 138-39; Ex. 33, Kisch Aff. and attached Exhibits.

Tellingly, APC's argument that it was important to APC to continue to use the Johnson & Wales and to reserve a similar number of rooms at the Johnson & Wales as it had previously, is contrary to the facts. APC booked 750 rooms at the Johnson & Wales in 2004 and 2005 (each year), down from 1,000 to 2,000 rooms in 2003. Ex. 13, Bollman Dep. at 88-90, 134-35. Additionally, APC's use of other hotels, including the more expensive Crown Plaza Hotel increased significantly in 2004 and 2005. Ex. 13, Bollman Dep. at 126-37. The increase in the use of the more expensive hotels in 2004 and 2005, with a concomitant drop in the use of the Johnson & Wales, convincingly undercuts APC's rationale for terminating Daniels in March 2004. Ex. 1, APC 006.

Further, pretext is established where an employee has followed the direction of his employer and acted in accordance with corporate policy and or practice. *See, e.g., Ames v. Cartier, Inc.*, 193 F. Supp. 2d 762 (S.D.N.Y. 2002). In *Ames*, a sales associated was terminated by a jewelry store for allegedly failing to display a showcase properly and within a reasonable period of time. The court denied summary judgment because the plaintiff contended that he had adhered to the company polices and practice in setting up the display, but that the task took him longer than others because he followed the policy while others did not. Likewise, in *Pereira v. Schlage Electronics*, 902 F. Supp. 1095 (N.D. Cal. 1995), the court denied summary judgment where an employee was terminated for acts of misconduct, including stealing her co-worker's

tools and misappropriating other employees' work. The court found that, because the employee alleged that she was following the instructions of her supervisor, material issues of fact were in dispute and summary judgment was inappropriate.

Daniels' use of the Marriott Hotel was in compliance with APC's travel polices and practices and Daniels' supervisor, Bonzani, testified that, by arranging for use of the Marriott Hotel, Daniels had fulfilled the directives Bonzani had given to him. Ex. 11, Bonzani Dep. at 78, 14-43; Ex. 4, Daniels Dep. at 284-85, 299; Ex. 13, Bollman Dep. at 37, 44, 56, 96-98, 157-58, 118-19; Ex. 3, Gough Dep. at 185.

**c. *APC's Articulated Reason for Terminating Daniels Has Changed Over the Course of the Litigation***

"A company may have several legitimate reasons to dismiss an employee. But when a company, at different times, gives different and arguably inconsistent explanations, a jury may infer that the articulated reasons are pretextual." *Dominguez-Cruz v. Suttle Caribe, Inc*., 202 F.3d 424, 432 (1st Cir. 2000).

In *Dominguez-Cruz*, the employee was told at the time of his termination that his position was being eliminated as part of restructuring plan, and internal documents from that time corroborated this explanation. *Id.* at 431. The employee was told a week or so later that there had been some complaints about his performance, but they were "not important." *Id.* However, in the answer to the employee's complaint, the company claimed that the employee was terminated for his repeated failure to abide by company policies and his inability work as part of a team. *Id*. at 431-32. The court held that, even though a jury could, at trial, accept the employer's explanation that it initially chose not to discuss the employee's performance issues publicly in order to avoid embarrassing him, the jury could also believe that the company's "inability to settle on an explanation for [the employee's] dismissal" was indicative of pretext.

*Id*. at 432 (reversing summary judgment). *See also Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext."), opinion amended by 97 F.3d 833 (6th Cir. 1996); *Kobrin v. University of Minnesota*, 34 F.3d 698, 703 (8th Cir. 1994) ("Substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext."); *Castleman v. Acme Boot Co.,* 959 F.2d 1417, 1422 (7th Cir. 1992) ("A jury's conclusion that an employer's reasons were pretextual can be supported by inconsistencies in or the unconvincing nature of the decisionmaker's testimony."); *Alvarado v. Board of Trustees*, 928 F.2d 118, 122-23 (4th Cir. 1991); *Schmitz v. St. Regis Paper Co*., 811 F.2d 131, 132-33 (2d Cir. 1987), *all cited in Dominguez-Cruz*, 202 F.3d at 432.

Similarly, if an explanation for an employee's termination arises in anticipation of or in reaction to litigation, pretext is inferable. For example, in *Santiago-Ramos v. Centennial P.R. Wireless, Corp., et. al*, 217 F.3d 46, 56 (1st Cir. 2000), the employee was not told on the date of her dismissal why she was being terminated. A memorandum dated that same day identified several reasons for the decision, but testimony indicated that the memorandum was prepared several weeks after her termination, and after it was clear that the employee was initiating legal action against the employer. *Id.* The court reversed summary judgment on this issue and held that a jury could infer from the timing of the memorandum that the employer's "stated reasons for firing [the employee] were merely pretextual post hoc justifications because they were only provided in anticipation of litigation." *Id.* (citing *Mariani Giron v. Acevedo Ruiz*, 834 F.2d 238, 239 (1st Cir. 1987); Lex K. Larson, 1 Employment Discrimination § 8.04 at 8-76 (2d ed. 2000)).

APC's articulated reason for terminating Daniels has changed over the course of this litigation. Originally, APC's articulated reason for terminating Daniels was that he stole reward

points from other employees and that he violated the travel policy. Ex. 7, APC 450-53, Ex. 8, APC 474; Ex. 36, APC 512, 514. APC alleged that, "[t]hese points belonged to the APC employees who stayed at the Marriott at Daniels' direction." Ex. 35, APC 501. APC further alleged that Daniels "devised a scheme to divert the Marriott Rewards Points that should have been credited to the FSEs staying at the Marriott to his own personal account." Ex. 35, APC 501. It further stated that APC "allows employees who travel on Company business to collect travel points for their own personal travel. Thus, if Daniels had followed Company practice, each individual renting a room at the Marriott would have collected travel points." *Id.*, Ex. 8, APC 475, n.5.

APC's changed position that Daniels did not violate the travel policy, and that he was not terminated for stealing reward points from other employees is clear evidence of pretext, and summary judgment should be denied. To the extent that APC argues that it has not changed its position with regard to the reasons for Daniels' termination, such an argument would create a material issue of fact in dispute, equally supporting a denial of summary judgment.

**d. *Remarks by Supervisors Are Relevant to Determine Pretext***

Finally, where discriminatory comments are made by key decisionmakers or those in a position to influence the decisionmakers, such comments are relevant to prove pretext. *Santiago-Ramos*, 217 F.3d at 55 (citing *Mulero-Rodríguez v. Ponte, Inc.,* 98 F.3d 670, 675-76 (1st Cir. 1996)). "Stray remarks" may be material to the pretext inquiry and, even if they are not proof of discrimination against the plaintiff, they "add 'color' to the decision-making process at [Defendant's organization] and to the reasons given for [the employee's dismissal]." *Santiago-Ramos*, 217 F.3d at 55 (quoting *Sweeney,* 604 F.2d at 113). A jury could reasonably rely upon

these comments, together with other evidence, in concluding that a defendant's explanations are pretextual. *Id.*

To the extent that Cavanaugh participated in the decision to terminate Daniels, his comments to Daniels about not being "a good Irish lad" are evidence of pretext as are Hendrix's statements regarding her request that Daniels accompany her to the train station — because he is black — to scare a new hire who had failed a drug test, and her statement that Daniels did not understand the "social boundaries" at APC.

## C. DANIELS HAS ESTABLISHED A PRIMA FACIE CASE OF RETALIATION AND MATERIAL ISSUES OF FACT ARE IN DISPUTE REGARDING THE RETALIATION ALLEGATIONS

To establish a prima facie case of retaliation, a plaintiff must show that he was engaged in protected conduct, that he was subjected to an adverse employment action, and that there was a causal connection between the adverse employment action and the protected conduct. *See Wright v. CompUSA, Inc.,* 352 F.3d 472, 478 (1st Cir. 2003); *see also Burlington Northern and Santa Fe Railway Company v. White*, 126 S. Ct. 2405, 2006 WL 1698953 (June 22, 2006).

With regard to the protected activity prong, Title VII prohibits retaliation because the employee "has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. §§ 2000e-3(a). The First Circuit has recognized repeatedly that complaints of harassment to management constitute protected activity under Title VII. *Benoit v. Technical Mfg. Corp*., 331 F.3d 166, 175 (1st Cir. 2003); *Hoeppner v. Crotched Mountain Rehab. Center*, 31 F.3d 9, 13-14 (1st Cir. 1994) (finding that the employee had engaged in protected activity when she complained to her employer about sexual harassment).

Daniels engaged in protected activity by complaining to his supervisors about racial harassment and discrimination. *See* Ex. 2, Daniels Aff. ¶¶ 6, 7; Ex. 4, Daniels Dep. at 377, 392, 394. APC asserts that Plaintiff did not engage in protected activity because he made "[g]eneral complaints of unfair treatment." However, APC ignores that Daniels made multiple complaints specifically about race discrimination and harassment. *See* Ex. 2, Daniels Aff. ¶¶ 6, 7; Ex. 4, Daniels Dep. at 377 ("I complained to Brian Gough that I had been harassed."); *id.* at 390 ("Q. And did you tell Mr. Bonzani that you though it was because of your race that Mr. Cavanaugh was treating you that way? A. Yes."); *id.* at 392 ("I told [Ms. Hendrix] I didn't understand why these things were happening . . . is it because I'm black?"); *id.* at 395 ("I told everybody in my chain of command . . . . I told the most senior person in HR of the discriminatory actions and hostile work environment that I was in, and he did nothing."). Reporting harassment directly to the employer falls squarely within the Title VII anti-retaliation provision's definition of "protected activity." 42 U.S.C. §§ 2000e-3(a) (prohibiting retaliation when an employee has "opposed any practice made an unlawful employment practice by [Title VII]"); *see also* *Hoeppner*, 31 F.3d at 13-14. Therefore, Daniels can establish that he engaged in protected activity.

APC argues erroneously that, even if Daniels engaged in protected activity, the adverse actions about which he complained do not constitute actionable discrimination or harassment. APC misstates the law. "As a matter of law, [the plaintiff's] retaliation claim may be viable even if the underlying discrimination claim is not." *Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 174 (1st Cir. 2003). "Moreover, the employment activity or practice that [the employee] opposed need not be a Title VII violation so long as [the employee] had a reasonable belief that it was, and he communicated that belief to his employer in good faith." *Benoit*, 331 F.3d at 175

(citing *Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d 252, 261-62 (1st Cir. 1999)). Therefore, whether or not Daniels can establish a claim of discrimination is immaterial to his retaliation claim. The simple fact is that Daniels complained about race discrimination and harassment by his managers, both of which are prohibited by Title VII. Thus, his complaints are protected activity under Title VII.

It is undisputed that termination of employment is sufficiently adverse to constitute an adverse employment action for purposes of a Title VII retaliation claim. *Wright*, 352 F.3d at 478. Thus, Daniels has satisfied this prong of the retaliation *prima facie* case.

There are numerous ways to meet the burden of showing causation between the protected activity and the adverse employment action. "Temporal proximity is but one method of proving retaliation." *Che v. Mass. Bay Transp. Authority*, 342 F.3d 31, 38 (1st Cir. 2003) (citing *Wyatt v. City of Boston*, 35 F.3d 13, 16 (1st Cir. 1994) (*per curiam*); *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 828 (1st Cir. 1991)); *see also Calero-Cerezo v. U.S. Dept. of Justice*, 355 F.3d 6, 25-26 (1st Cir. 2004). "[W]here direct evidence of causation is missing temporal proximity may provide the necessary nexus to meet the third element of the plaintiff's case." *Russell v. Enterprise Rent-A-Car Co. of Rhode Island*, 160 F.Supp.2d 239 (D.R.I. 2001). Additionally, "[e]vidence of discriminatory or disparate treatment in the time period between the protected activity and the adverse employment action can be sufficient to show a causal connection." *Che*, 342 F.3d at 38 (citations omitted).

Daniels can meet his burden through both of these indirect methods. Record evidence establishes that Daniels complained about discrimination and harassment as recently as *two weeks* before his termination, not "a few months," as APC suggests. *See* Ex. 2, Daniels Aff. ¶ 6; APC MSJ at 20. Moreover, the harassment and discrimination continued after Daniels' earlier

complaints of discrimination. Ex. 11, Bonzani Dep. at 91; Ex. 3, Gough Dep. at 226-27; Ex. 2, Daniels Dep. at 377, 387-88, 390-92, 394, 396. Instead of following up with Daniels' complaints, he was told to stay away from Kelly and not to contact Gough in Human Resources. Ex. 2, Daniels Dep. at 395-96; Ex. 2, Daniels Aff.¶ 7. Each of these facts, *i.e.* temporal proximity and continued discrimination, if considered alone, would be sufficient to permit an inference of causation. When considered together they firmly establish the causation prong of the retaliation *prima facie* case. Moreover, causation can also be established directly by the record evidence of Kelly, who was one of the managers about whom Daniels complained had racially harassed him, repeatedly demanded of Human Resources to fire Daniels. Ex. 6, Hendrix Dep. at 146 (on more than one occasion, Kelly told Hendrix that she should "lose this guy").

APC cites case law stating that mere proof of protected activity added to an adverse action does not establish causation. APC Mem. at 20. APC fails to acknowledge that Daniels has gone beyond this and shown not only temporal proximity, but additional disparate treatment after his early complaints about discrimination and harassment.

APC goes on to proffer a legitimate non-discriminatory reason for firing Daniels and to argue that Daniels cannot establish that the proffered reason was a pretext for retaliation. As noted *supra,* Daniels has shown that APC's proffered reason for his termination was a mere pretext. At the very least, Daniels has established that a reasonable jury could disbelieve that APC's proffered reason actually motivated Daniels' discharge. Therefore, this Court should deny APC's Motion for Summary Judgment regarding Daniels' retaliation claim.

Dated: March 30, 2007

Respectfully submitted,

/s/ Noelle Clapham______________
Noelle K. Clapham (R.I. Bar #5338)
Law Office of Noelle Clapham
24 Salt Pond Road
Suite A-8
South Kingston, RI 02879
claphamlaw@verizon.net
(401) 783-3600

Lori B. Kisch (MD Fed Bar # 25781)
Wiggins, Childs, Quinn & Pantazis, PLLC
2031 Florida Ave., NW, Suite 300
Washington, DC 20009
lkisch@wcqp.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of April, 2007, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

Further, a true and correct copy of Plaintiff's Motion to File Under Seal, a Portion of His Memorandum in Support of His Objection to Defendant's Motion for Summary Judgment, and Ex. 26 were hand-delivered this 6th day of April, 2007 on the following:

George P. Kostakos, Esq.
LITTLER MENDELSON, P.C.
10 Weybosset Street, Suite 404
Providence, Rhode Island 02903

*Attorney for APC*

/s/ Noelle Clapham________________
*Attorney for Plaintiff*