IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

\- - - - - - - - - - - - - - - x

SETH DANIELS,

ORIGINAL

Plaintiff

Civil Action

vs. No. 05-00459-ML-LDA

AMERICAN POWER
CONVERSION CORPORATION,

Defendant

\- - - - - - - - - - - - - - - x

DEPOSITION of BRUCE E. GOUGH, a witness called on behalf of the Plaintiff, pursuant to the Federal Rules of Civil Procedure, before Patricia A. Conant, a Registered Professional Reporter and Notary Public within and for the State of Rhode Island, at the offices of Stephen Robinson, 155 south Main Street, Fourth Floor, Providence, Rhode Island 02903, on Thursday, November 9, 2006, commencing at 9:33 a.m.

Exhibit 3

place.
Q. What if anything prompted that to be implemented in 2003?
A. The Sarbanes-Oxley Act was the impetus for the development of the formalized ethics policy.
Q. Is that one of the personnel policies that falls under HR, or is that somebody else's responsibility to implement?
A. That's the responsibility of human resources and our legal counsel.
Q. Any other individuals between 2002 and 2004 that you can recall were terminated for cause other than what you already testified about?
A. Not that I can recall.
Q. What about after 2004? Do you recall any?
A. Not that I recall because my job changed, and I was removed from the day-to-day operations aspect of it.
Q. What about prior to 2002 while you were director for HR, the subsection 2000 or 2002. Do you recall any individuals or circumstances

had with the general counsel relative to that.
Q. And do you have a specific recollection that that was in November of 2003, specifically?
A. No.
Q. Okay. So other than looking at the document itself to see whether there was any indication about the date in which it was created, you have no other knowledge as to when it was created or instituted, correct? Specific date?
A. Correct.
Q. Okay. Would the board have received a copy of the policy before voting on it?
A. That would be my understanding, yes.
Q. Okay. Well, do you know whether or not in fact they did receive a copy?
A. No, I did not know definitively.
Q. Did you receive any written communications with the board with regard to its approval of the ethics policy?
A. No, I did not.
Q. If the board did vote on it and did approve the ethics policy, would there be any

A. Based on the general counsel informing me of that.
Q. Okay. And then who's role is it to disseminate policies and to inform employees of new APC policies?
A. Personnel related policies would be the responsibility of the human resources area.
Q. Okay. The ethics policy, I believe you testified, was a personnel policy, correct?
A. That's correct.
Q. How did you disseminate the policy and inform employees of the policy's creation and existence?
A. It is my general recollection that we sent an e-mail out to the employee population with the ethics policy attached.
Q. And how soon after the board approval did you send out that e-mail?
A. I believe it would have been in the December or January time frame.
Q. So December 2003 or January 2004?
A. Yes.
Q. Why do you recall those dates?
A. It's related to Sarbanes-Oxley, again.

Q. Do you know an individual named Seth Daniels?
A. Yes, I do.
Q. Was he terminated from APC?
A. Yes, he was.
Q. Why was he?
A. He was terminated for a violation of the ethics policy.
Q. Anything else? Was there any other reason he was terminated other than a violation of the ethics policy?
A. That was the cause of the termination.
Q. Was there any other reason?
A. Yes.
Q. What specifically did he violate with regard to the ethics policy?
A. He diverted business from one approved hotel to another hotel in order for him to gain reward points through Marriott for his own personal use.
Q. Anything else? Any other ways in which he violated the ethics policy?
A. Reason he was terminated was for diverting the business from one hotel to

another which caused APC additional money, and he did so in order to gain Marriott reward points in his own personal account.

Q. Anything else? Any other reasons? Are there any other ways in which Mr. Daniels violated the ethics policy?

MR. KOSTAKOS: Objection. Asked and answered.

A. Not that I recall.

Q. Was he terminated for violating any other policies?

MR. KOSTAKOS: Objection.

A. No, he was not.

Q. Were there any other reasons, other than what you just said, which caused APC to terminate Mr. Daniels?

MR. KOSTAKOS: Objection.

A. There were no other reasons for his termination.

Q. What specifically was the violation of the ethics policy with regard to Mr. Daniel's diverting business from one hotel that was approved to another?

MR. KOSTAKOS: Objection.

A. Mr. Daniels took actions not in APC's best interest to change the hotels that APC employees and other partners were to use in order to gain credit with the other hotel, Marriott, for his own personal benefit.
Q. When you say he -- the use of the Marriott was not in the APC's best interest, on what facts do you make that statement?
A. APC had agreements with other local hotels at a more favorable rate, more favorable business conditions.
Q. What do you mean by business conditions?
A. We may have received other benefits for having utilized those hotels that weren't directly rate related. I don't know the specifics on the deal, but our travel manager had indicated there were other hotels that were better business deal for APC to be utilizing.
Q. Which hotels provided APC a better business deal?
A. I don't know the ones at the time. I know they were non-Marriott related.
Q. Did you know at the time?

A. I book my travel through APC travel.
Q. What do you mean by that?
A. We have travel agents that are connected and they book at hotels we are to stay at.
Q. So you've never requested a specific hotel when you were traveling?
A. No.
Q. Is it your understanding or did Miss Bollman tell you that she had told Mr. Daniels to book the hotel at the hotels on the APC hotel list?
MR. KOSTAKOS: Objection.
A. Repeat the question.
Q. Did Miss Bollman -- let me ask you this question. Is all of your knowledge relating to the issue of Mr. Daniel's termination and the reasons for his termination in terms of violating any policies, does all of your knowledge come from Miss Bollman?
A. Yes.
Q. Okay. Doesn't come from any other source?
A. No.
Q. Did Miss Bollman specifically tell you

that she told Mr. Daniels to book the hotel rooms at an APC preferred hotel?

MR. KOSTAKOS: Objection.

A. That is my understanding or general understanding. She had informed him that the meetings he was setting up should be set up at APC, or hotels that APC had an agreement with.

Q. And that was a requirement she imposed upon him?

A. That's my understanding.

Q. It wasn't optional?

A. That is my understanding.

Q. And it wasn't a suggestion?

MR. KOSTAKOS: Objection.

A. That is my understanding.

Q. And if you came to learn that that wasn't true, that she had never actually given him that directive, would that impact your decision as to whether or not Mr. Daniels should have been terminated?

MR. KOSTAKOS: Objection.

A. I don't know. I'd have to look at the full circumstances at that point.

Q. Uh-huh. Well, how did you determine --

negotiated rate with a hotel, and therefore, a contract regarding the rate that's going to be applied for the group, is that, therefore, in compliance with the general practice for making group reservation at a hotel?

MR. KOSTAKOS: Objection.

A. Yes, that is consistent with general practice.

Q. Okay. Miss Bollman tells us there was no prenegotiated rate for the reservations that were made at the direction of Mr. Daniels?

A. I believe her -- my recollection is she indicated that the rate that we were paying was greater than our approved rate at the other hotels.

Q. Okay. Did she, I'm going to ask my question again. Did Miss Bollman ever tell you that there was no negotiated rate prior to the hotel reservations being made at the Marriott?

MR. KOSTAKOS: Objection.

A. I don't recall her making that statement to me.

Q. Okay. Do you, in fact, have any

Q. You don't remember one way or the other?
A. I don't -- I don't have any information on it.
Q. Okay. Was the financial impact on APC, did that contribute to the decision to terminate Mr. Daniels or not?
A. The decision to terminate was based on his directing the Marriott award points to go to his personal account. The additional cost to APC clearly didn't help his case, but the actual issue for termination and cause was diverting those points.
Q. When you say diverting those points, what do you mean?
A. He accepted points for, essentially, as a group planner to go to his personal accounts.
Q. When you say diverted, did he divert them from someone else?
A. From APC.
Q. He diverted them from APC?
A. Yes.
Q. So APC would be entitled to receive those points had Mr. Daniels not received them?
A. That's my understanding.

Q. What is that understanding based on?
A. General business.
Q. What do you mean, general business?
A. That Marriott would reward the points to someone, if not an individual then the corporation. We have similar agreements with other hotels where we get their type of points towards certificates for stays at their hotels that we can raffle off, etc.
Q. Well, do you know, in fact, whether or not the Marriott actually had a program that would enable APC to receive travel points as a company?
A. I'm not familiar with all the programs, so I can't say specifically that they do, but it's my understanding that, yes, they have some type of program. That is through my conversation with Miss Bollman.
Q. So Miss Bollman told you the Marriott had some sort of program that would allow APC to receive the points instead of Mr. Daniels?
A. Again, I can't recall the specific conversation and how it went, but that's my recollection of it, yes, that she led me to

believe that Marriott has a program that would allow the points in some fashion to come back to us as a corporation.

Q. Did you, in fact, ask her whether or not there was such a program?

A. I can't recall if I asked that question or not.

Q. Okay. Is that an important fact?

MR. KOSTAKOS: Objection.

A. The fact that I ask her?

Q. No, the fact of whether or not Marriott had a program that would enable it, APC as a company, to receive points for the hotel reservations for APC employees?

A. Yeah, that would be an important fact.

Q. So if no such program existed and Mr. Daniels did receive points, would there have been a violation of the policy?

A. Again, that would be --

Q. An APC policy?

MR. KOSTAKOS: Objection.

A. It would depend on the full circumstances surrounding that issue.

Q. Did you ever look into that?

A. Through my conversation with Miss Bollman, as I indicated, she had informed me that Marriott had a program relative to that, so that's how I based my decision.

Q. You have a specific recollection that Miss Bollman told you that Marriott has a program which enables APC as a company to receive travel points?

A. Again, she led me to believe that. I don't know the specific words that she used.

Q. If Ms. Bollman testified she never told you that, would she be lying?

MR. KOSTAKOS: Objection.

A. I don't know that I can say that.

Q. Well, is it possible that you don't -- that your recollection is wrong right now, and, in fact, Miss Bollman never told you that?

A. I can tell you that as a recollection that it's what I believe occurred. That's the conversation I believe happened. Unless I'm told otherwise or given proof otherwise, then that's my recollection.

Q. Okay. If Miss Bollman told you she never

A. I can't speak definitively to it.
Q. Okay.
A. And I can't answer your question.
Q. You don't know if it was a violation of the ethics policy?
A. If you want to know if it was specifically a violation of the ethics policy, I can look specifically to that.
Q. Okay. Go ahead.
A. Okay. I'm ready to answer your question now to the best of my ability if you can restate it.
Q. Okay. If the Marriott Hotel was the only hotel that could accommodate the needs of the trainees coming into the Providence area, and the Marriott Hotel did not have a rewards program that would enable APC as a business company to receive travel points, and the organizer received travel points, would the receipt of those travel points be a violation of the ethics policy?
MR. KOSTAKOS: Objection.
A. Did the organizer maintain those points? Did he keep them?

Q. You mean after he received them?
A. Uh-huh.
Q. Correct.
A. Then, yes, it's a violation of policy.
Q. And why does it matter whether or not the -- whether the organizer keep them or not?
A. Under the policy receipt of cash or cash equivalent is not a violation as long as that cash or cash equivalent is forwarded over to the company.
Q. Okay. Did the company ever ask Mr. Daniels to forward over the receipt of any travel points pending determination?
A. It's the responsibility of the employee to notify us of receipt of those cash or cash equivalents.
Q. Is there a time limit in which the individual is supposed to hand over the receipt of something?
A. It's not noted in the policy.
Q. And is there any such time limitation?
A. Not that I'm aware of.
Q. Did APC ever ask Mr. Daniels to hand over the points or the equivalent value of the

point to the company?
A. No, we did not.
Q. And any other violations?
A. Huh?
Q. Any other violations of the ethics policy other than what you've just described?
A. On the face of what you've said, I would say I would have no other immediate findings relative to it. I would have a whole lot more questions that you're not answering as a condition of what you put forward in the question.
Q. Okay. Are there any other questions you asked of Miss Bollman other than what you already testified to?
A. Not that I can recall.
Q. Did you, in fact, ever ask Mr. Daniels questions at all with regard to the issues raised by Miss Bollman?
A. I was not involved in the questioning of Mr. Daniels.
Q. Who was?
A. Christine Hendricks and his manager, Paul Cavanaugh, or his higher level manager, Paul

MR. KOSTAKOS: You can fight me on it. It may have some significance whether or not he told him -- you're asking specifically about the substance of what was said between the general counsel and the witness, not whether or not he did.

BY MS. KISCH:

Q. All right. Do you have any knowledge at all that the general counsel spoke with Mr. Daniels about -- prior to his termination --

MR. KOSTAKOS: I'll object and say it was asked and answered, but go ahead.

BY MS. KISCH:

Q. -- in relation to his termination?

A. I have no knowledge of that.

Q. Okay. Are you aware of any complaints that Mr. Daniels made while he was employed with APC?

A. Yes, I am.

Q. What complaints are you aware of?

A. He complained regarding the treatment he received from the director of finance, Brian Kelly.

Q. Did he complain directly to you?

A. Yes, he did.
Q. What did he tell you?
A. He said that Brian was, in his words, harassing him about his expenses.
Q. And how many times did he come to you complaining about Mr. Kelly?
A. I would say twice. I don't think it was more than that.
Q. Okay. Did he complain to you about any other issues other than Mr. Kelly's harassment?
MR. KOSTAKOS: Objection.
A. Any of his complaints revolved around Mr. Kelly or Mr. Kelly's direct report. Christine Bollman reported to Mr. Kelly.
Q. So Mr. Daniels complained to you often about Miss Bollman?
A. I don't think it was about her. I think it was travel in general and not being able to direct bill his car.
Q. And who would be the individual who had the authority to allow him to direct bill his car? Was that Miss Bollman?
A. Christine Bollman.

relocation?
A. At that point I did discuss the situation with John Bonsoni and Christine and found that John had made that agreement to allow him to continue living in New Jersey for a period ever time until his children could be removed from school and then brought up into Rhode Island.
I indicated the period had gone further than it should based on good business practice and he needed to change the agreement with Mr. Daniels. It wasn't in our best interest to continue a long-term relationship with an employee who was living hours away from the site where the majority ever the work was occurring.
Q. So when you told Mr. Bonsoni he needed to change the agreement with Mr. Daniels, did you give him an instruction to make that change?
A. I believe I made it through Christine Hendricks to tell John it had to change.
Q. Okay. And if it didn't change, what was going to be the result?
MR. KOSTAKOS: Objection.

A. I didn't lay out results. I just said we need to change it.
Q. Okay. Did you have in your own mind what the result would be if it did not change?
A. My thought process at that point would be to go back to the offer letter and if he wasn't in compliance with the terms ever the compliance letter, than we'd have no choice but to terminate.
Q. So if it didn't change and Mr. Daniels didn't move to Rhode Island at that point when you raised this and the offer letter didn't specifically say in it that he was allowed to be in New Jersey, Mr. Daniels would have been terminated?
MR. KOSTAKOS: Objection.
A. Again --
Q. I'm just trying to understand that's what you're saying?
A. That was the intent. The position was located in Rhode Island. He needed to be here. We weren't going to pay his expenses. If he needed to live in a hotel here, then he needed to live in a hotel here but we weren't

Q. Okay. But it was your understanding at the time Mr. Daniels was terminated that APC was no longer paying his expenses for commuting from New Jersey to Rhode Island?

A. That would be my understanding.

Q. Do you have an understanding whether that was going on for a few days, a few weeks a few months?

MR. KOSTAKOS: Objection.

A. I don't know definitively how long.

Q. Was it your expectation that was going on for a couple of months? You said you expected that change to occur in the fall of 2003, so it was at least, you know, four, five, six months later he's still at APC?

A. I don't know how long we said we would continue paying anything. I would say would be a guess and I'm not willing to do that.

Q. But it was your expectation at the time he was terminated he was no longer paying for his expenses?

A. That was my recollection.

Q. Do you have a good memory?

MR. KOSTAKOS: Objection.

A. No, I do not.

MR. KOSTAKOS: Do you.

BY MS. KISCH: I'm not being deposed.

MR. KOSTAKOS: Pardon?

BY MS. KISCH: I'm not being deposed, but actually, I think I have a pretty good memory, yes.

BY MS. KISCH:

Q. Did you ever speak with Mr. Daniels about the issue of the tax forms?

A. We may have had a conversation on it. I cannot speak definitively about that.

Q. Okay. And do you have an opinion one way or another whether or not filling out the tax form to say he was exempt without providing the supporting documents is a violation of any law?

A. I have no opinion because I have no knowledge of the tax code.

Q. Okay.

MR. KOSTAKOS: And I'll object to it, to the question. Sorry, it's belated.

BY MS. KISCH:

interpretation.

MS. KISCH: All right. No speaking objections, please.

MR. KOSTAKOS: Making sure you knew.

MS. KISCH: I knew.

A. Other than conversations I had between myself and Mr. Kelly, or myself and Mr. Daniels, that's all the conversations I had.

Q. And you don't recall anything else about those conversations, correct?

A. No.

Q. What, if anything, did you do after Mr. Daniels complained about the direct billing situation for which Ms. Bollman refused to allow him to directly bill the car?

A. Spoke with Miss Bollman and Mr. Kelly.

Q. And tell me about your conversation with -- who did you speak with first, Mr. Kelly or Miss Bollman, do you remember?

A. I don't remember.

Q. Tell me about your conversations with Miss Bollman?

A. Essentially, I asked her why he wasn't

being allowed to direct bill any longer. She informed me of a situation where his car had been broken into, it was a rental, and that there was some type of altercation with the Avis representative to the extent that Avis had filed a complaint with her regarding Mr. Daniels.

As a result she had discussed it with Mr. Kelly and they had determined that they would no longer allow him to direct bill any rental cars. Any of my conversations with Mr. Kelly, just confirming what Ms. Bollman had told me. He didn't had any additional information to it.

Q. Okay. So it was because his car had been broken into and the fact that there was this alleged alteration with the Avis representative that the direct billing that Miss Bollman and Mr. Kelly decided not to -- no longer allow him to direct bill, is that your understanding?

A. I would say they were concerned, but that wasn't the reason they stopped the direct bill.

Q. What was the reason?
A. The reason was the altercation with the Avis person and the disrespect shown.
Q. And do you recall the conversation you had with Miss Bollman when she told you the reason she wanted to stop the direct bill?
A. Recall the generalities, not specific language.
Q. But you're pretty sure that was the reason why the direct billing was stopped?
A. Yes, that was my understanding.
Q. What concerns did they raise with you about the break-in of the car?
A. Mr. Kelly was concerned about Mr. Daniels' care of APC property. There was a lap stop that was stolen as a result of the break-in. The laptop was in the back seat of the car, and Mr. Kelly thought that was inappropriate, that should be kept in the trunk which is the direction I've received over the years from the security department, if you're traveling some place, put it in the trunk as opposed to the back seat. And he was also concerned that Seth had not provided, as

Q. How did you know they didn't like each other?
A. Seth had indicated that he didn't really like Brian because he felt Brian was telling him he couldn't do some things.
Q. Well, is it just that he told him he couldn't do something or the way he treated him and --
A. I don't know.
Q. You don't know. You never inquired?
A. When he brought concerns forward, I would ask about the situation. I don't recall him saying that he was being treated poorly. He didn't like the decisions Brian was making.
Q. How do you know that Brian Kelly didn't like Seth Daniels?
A. Brian made it clear to me in the conversations, especially with regard to the W4, that he did not trust this individual.
Q. Anything else in the conversations that you can recall at this time?
A. Not that I can recall.
Q. Show you what's been marked as Gough Exhibit 4, which appears to be the Corrective

MS. KISCH: Okay. I think that's all I have.

MR. KOSTAKOS: I have one or two quick questions.

EXAMINATION

BY MR. KOSTAKOS:

Q. Mr. Gough, you testified earlier that you were aware that Mr. Daniels received -- you had some knowledge that Mr. Daniels received in the neighborhood of approximately one hundred thousand award points from the Marriott related to his arranging hotel space for APC employees, is that fair and correct?

A. Yes.

Q. Are you aware whether or not there was any arrangement between APC and the Marriott for APC to receive the points?

A. I'm not aware of any.

Q. Okay. And in terms of if, in fact, Mr. Daniels received those points for his own benefit, does it matter whether or not he diverted them from, possibly diverted them from APC as all this relates to his termination?

MS. KISCH: Objection.
BY MS. KISCH:
Q. You can answer. Let me rephrase it.
A. Yes.
Q. With respect to the decision to terminate Mr. Daniels, does it matter whether or not he diverted those points from APC?
MS. KISCH: Objection.
BY MS. KISCH:
Q. You can answer.
A. No, it doesn't.
Q. Why not?
A. The -- by accepting the points, it gives the appearance of influencing his decision to do business that that particular vendor which is a direct violation of our ethics policy.
Q. It's the ethics policy that's been marked as Exhibit 3, is that correct?
A. That's correct.
MR. KOSTAKOS: No further questions.
MS. KISCH: I have a further question.

EXAMINATION
BY MS. KISCH:
Q. What -- did the acceptance of the points actually influence Mr. Daniels' decision to book the hotel at the Marriott?
MR. KOSTAKOS: Objection.
A. I have no idea.
Q. Did you ever ask that question?
A. I did not.
Q. Is that an important fact?
A. Yes.
MR. KOSTAKOS: Objection.
BY MS. KISCH: No further questions. Okay. Thank you, Mr. Gough. I appreciate you coming in.
(Whereupon, at 4:33 p.m., the proceedings adjourned.)