IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

-----------------------------x

SETH DANIELS,

Plaintiff,

v. Civil Action No: 05-00459-ML-LDA

AMERICAN POWER CONVERSION CORPORATION,

Defendant.

-----------------------------x

Job No. 2713 Pages 1 - 307

COPY

DEPOSITION OF SETH DANIELS, a witness called by counsel for the Defendant, taken pursuant to the Federal Rules of Civil Procedure before Dena M. O'Brien, CSR, and Notary Public in and for the State of Rhode Island, at the law office Of Littler Mendelson, 10 Weybosset Street, Suite 404, Providence, Rhode Island, on September 14, 2006, commencing at 9:29 a.m.



Exhibit 4

correct?

A. That is correct. I negotiated it.

Q. What was the terms of that relocation expense and timeline?

A. It was expressly understood that I would have to relocate Providence -- to the Rhode Island area. I had a year to do it because I accepted the position in September. I had three children that were -- three children of which two were in school at that time, and I'd have to relocate my family. So I could not do it in a short period of time. So they gave me a year, and during that period of time, Paul and John told me that I could commute back and forth at the company's expense.

Q. Who told you that?

A. John Bonzani and Paul Cavanaugh. Paul said he understood it because he had to commute for a period of time from Ireland as he was trying to get his family over here. So he had no problem with it. And John said hell, I live in Oregon, and I commute to and from Rhode Island. So I have no problem with it either.

Q. Did you get that -- well, okay. Any other terms that were part of the location expense aspect

negotiated based upon Paul Cavanaugh saying he had no problem with it. He had to do the same thing when he was moving from Ireland, and John Bonzani telling me hell, Seth, I commute to and from Oregon.

Q. Did you -- you also testified that they said you could commute. Were they willing or did you discuss with them who would bear the expense of your commute back and forth?

A. Yes.

Q. And what was the discussion around that issue?

A. I was told by John that they would put me up in a hotel, provide a rental car and pay for meals while I was here working for APC until I relocated, and that wouldn't happen for a year.

Q. How often were you expected to be in Providence?

A. Weekly.

Q. Five days a week?

A. Yes.

Q. Four nights a week?

A. Yes, on average I was expected to be here as a regular 9:00 to 5:00.

Q. Monday through Friday?

Services because of the nature of the work that was done by APC Global Services employees.

Q. Any policies in particular that you recall that didn't apply to the Global Services people?

A. Sure, the relocation policy.

Q. And why didn't that apply to Global Services people?

A. Because Global Services people typically would end up relocating from someplace else in the country, and to my knowledge, I am not the only employee that was relocated that did not have to do so within one month, and that employee happened to be in APC Global Services.

MR. KOSTAKOS: Read back that answer for me, please.

The previous answer was read by the reporter as follows:

("A. Because Global Services people typically would end up relocating from someplace else in the country, and to my knowledge, I am not the only employee that was relocated that did not have to do so within one month and that employee happened to be in APC Global Services.")

BY MR. KOSTAKOS:

Q. Who's that employee?

A. One employee was Paul Cavanaugh; another employee was John Bonzani.

Q. Were you responsible for training APC Global Services employees with respect to the company's travel and reimbursement policies?

A. No, not to my knowledge.

Q. What was your knowledge about how employees were supposed to pay for business-related expenses, such as business travel?

A. From my recollection, APC Global employees that were servicing a customer had to put the customer's situation -- factor the customer's situation in with respect to travel and expenses as it related to the task at hand. For example, I believe that there was an APC Global Services employee that had to charter a jet to fly from Europe to the United States or the United States to Europe. That's not in the travel policy, but that is something that had to be done expeditiously, and that's just another example of where the corporate policy was routinely different than what the needs of the business unit were.

were you supposed to do to -- how were you supposed to pay for those business-related expenses, such as business travel?

MS. KISCH: Object to the form.

THE WITNESS: I don't know that the $2,000 had to be exhausted before they could submit for expense reimbursement.

BY MR. KOSTAKOS:

Q. Okay. Let's talk about the $2,000. How were you to account for expenditures made with using that $2,000?

A. You would need receipts.

Q. Okay. And then you'd have to submit them to accounting or somebody in that department?

A. There was a process for submission of receipts.

Q. Were you handed a check for $2,000 when you started for your incidental expenses?

A. Yes.

Q. And you deposited that in the bank?

A. Yes.

Q. And you had to do some sort of an accounting after using the money or while you were using the money to provide to accounting at APC to

justify the expenditure?

A. Yes.

Q. Did you exhaust that $2,000 amount?

A. Yes.

Q. Okay. After you exhausted that amount, what was your understanding of what you were required to do and how you were supposed to pay for business-related expenses such as travel?

A. I had to pay for them out of my pocket.

Q. Okay. And then seek reimbursement?

A. Yes.

Q. Do you know what direct billing is or what that means at APC?

A. I do now, yes.

Q. What does that mean? What's your understanding of that?

A. That the companies billed directly.

Q. Did you ever engage in that sort of expenditure where you had direct billing done for your business-related expenses?

A. Yes.

Q. Okay. In what circumstances did you do that?

A. There were --

point in time, it's my understanding that direct bill was an option where the company would make a payment to a provider of the good or service directly as opposed to an employee incurring that expense if it would create an undue hardship on an employee or if it was an ongoing expense that would be incurred by the employee.

Q. Did your understanding of that, what circumstances that was allowed in, ever change during your tenure?

A. Yes.

Q. How did that change? How did your understanding change?

A. When I attempted to -- when I had exhausted all of my personal funds creating an undue hardship for myself and my family back in New Jersey, I was unable to rent a car. I was unable to rent a car at the car rental agency, and I asked that it be direct billed, and it was not.

Q. It was not direct billed?

A. No.

Q. Was any business expense that you incurred ever the subject of a direct billing relationship?

A. Yes.

A. That's all I can remember at this time.
Q. What was Julie Sapola's position?
A. I believe her title was training coordinator.
Q. What about Ed Malaguia?
A. He was an instructor.
Q. Full time?
A. Yes.
Q. And John, whose name you can't remember, what was his position?
A. Training coordinator.
Q. What's the difference between a training coordinator and an instructor?
A. A training coordinator has more administrative responsibilities to support the administrative areas of training, and an instructor is actually responsible for the subject matter aspect and delivery of the training.
Q. What about Steve LaPlant; what did he do?
A. He was an instructor.
Q. We talked about your salary and starting bonus that was set out in Exhibit 3. What other benefit did you receive, health insurance?
A. I believe health insurance was subsidized

A. That's correct.

Q. The second bullet relates then to the current tax year 2003?

A. I'm trying to answer your question honestly and fully, and at the time I did this, I believed that I had a right to a refund from the previous year, and I believed that I'd have a right to a refund of federal taxes in the current year because of my financial circumstances, and that's why I completed the form this way. I wasn't doing anything other than answering the questions.

Q. Okay. And did that belief change? Did your belief that you were filling it out correctly change at any point? In other words, did you change the W-4 form?

MS. KISCH: Object to form. Go ahead.

BY MR. KOSTAKOS:

Q. Did you subsequently fill out and sign a different W-4 form?

A. Yes, I subsequently signed a separate W-4 form at the direction -- I was forced to do so by Brian Kelly.

Q. What do you mean you were forced to? How so?

A. He said I had to. He forced me to do so. He did not give me an option not to.

Q. Did you read the instructions for filling out this form before completing it?

A. I completed it based upon my knowledge of the form, yes.

Q. I asked you if you read the instructions before completing the form?

A. Yes, I read the instructions.

Q. What led -- were there any discussions that led to Brian Kelly telling you that you had to change the form?

A. Yes.

Q. And what was the substance -- who were you speaking to about your completion of this form?

A. I believe it was someone in payroll. I don't know if -- I don't remember if her name was Bonnie or if it was someone else. When I got my check, I noticed that my check had federal taxes withheld, inconsistent with the way the form was completed. I subsequently asked her about that. She referred me to Brian Kelly, at which point, Brian Kelly told me that he was rejecting this W-4. He would not use it and forced me to complete

another W-4.

Q. Did you say anything in response to Brian Kelly?

A. I disagreed with him.

Q. What did you say to him?

A. From the best of my recollection at this time, I told him that it wasn't his obligation to tell me how to complete the form and that the form being completed, that I completed the form that represented accurately what I believed my tax situation should be.

Q. And then what did he say?

A. To the best of my recollection at this point in time, he said that he rejected my explanation, told me that he would reject my W-4, and he would withhold the taxes that he felt were appropriate, even if I did not complete another form, and he told me to do so.

Q. Was there any further conversation about your completion of this form between you and Brian Kelly?

A. He alleged that I was completing it incorrectly, at which point we launched into a discussion about how I was hired at APC and who

hired me and why I'm here.

Q. Can you tell me about that conversation and what was said?

A. I said I was hired by John Bonzani, and I'm here as a field -- as a training manager.

Q. And did he respond to that?

A. To the best of my recollection at this point in time, again, he was surprised that I was hired, and he questioned how I essentially got hired into the company.

Q. Well, how did he do that? Did he say I'm surprised you were hired? What was the substantive conversation?

A. He didn't remember approving an authorization for my position and questioned who had extended the offer.

Q. Did he question anything else?

A. He questioned how I was qualified and/or hired to get this position, to the best of my recollection at this point in time.

Q. And what did you say to him?

A. That I was qualified, that the offer was not approved by him, it was approved by John Bonzani, and he said that he's responsible for

that a person does not like you because of your race. His tone, his demeanor changed in a manner consistent with that, in my opinion, and it was not an isolated incident. It was not one incident that -- or one interaction with him that caused me to form this basis that he did not like black people. It was an ongoing manner in which he dealt with me.

And back to your question, if he's responsible for all the money, should he have the right to ask the question? Again, no.

BY MR. KOSTAKOS:

Q. Because you're black he can't ask the question why you're there; is that what you're saying?

MS. KISCH: Objection, argumentative.

BY MR. KOSTAKOS:

Q. If he asked the question of who hired you and why you were there, I don't understand how that leads simply -- if you don't like the question, that leads to that conclusion.

A. No. If you asked someone, hey, Tom, how

are you? It's the first time I've seen you. You're new with the company. Who hired you? Oh, well, that's great. That's a very conversational engaging welcome here. I'm sorry I didn't meet you sooner.
Q. Fair enough.
A. But I was interrogated, and I was left with the impression under no certain terms that he was disappointed that I was hired and that I was there, and how dare I question him about on how to complete my form or how dare -- how did this guy get in this company? Who are you?
Q. Is it possible that he was disappointed or upset with the fact that he did not approve your hire if he had that authority? Does that possibility exist?
A. No.
Q. No. Okay. Do you feel like his question -- is it your belief that his questions regarding your W-4 were -- he was asking you those questions because of your race, as well, I mean as part of that?
A. What other basis could there be?
Q. Have you ever employed people or had the responsibility for ensuring that people fill out W-4

Q. Do you remember whether or not -- I'm sorry. Do you remember whether or not or do you recall whether APC had a method for reporting claims of harassment for employees during your tenure?

A. I do not know -- I do not recall at this point in time what the procedure or policy was for an anti-harassment policy that APC may have had at this time. I don't remember.

Q. Did you ever make a claim of harassment while you were an employee of APC?

A. Yes.

Q. And how did you go about that?

A. I told Christine Hendrix, I told John Bonzani, and I told Brian Gough.

Q. What did you tell them?

A. That I was being harassed by Brian Kelly.

Q. What did you tell them specifically was the nature of the harassment?

A. That he was creating a hostile work environment for me.

Q. And how so?

A. By making it extremely difficult and constantly -- extremely difficult for me to do my job and creating a situation of financial hardship

for me.

Q. And how was he doing that?

A. By refusing to allow me to direct bill ongoing expenses that I had to incur to complete my job.

Q. Is that different than the suspension related to direct bill of rental cars that we talked about at length earlier, Brian Kelley's refusing to let you direct bill other business expenses?

A. Christine Bollmann reports to Brian Kelly.

Q. Okay.

A. With respect to the direct billing issue with the rental car, it's my understanding that John Bonzani talked to Brian Kelly, Brian Gough and tried to have them reverse the policy or reverse their decision.

Q. My understanding of the decision was that it related only to rental cars. That was your testimony earlier. If I understand your testimony correctly now, it extended beyond rental cars to other aspects of expenses you incurred. Is that a fair characterization of your testimony?

A. No. I said with respect to the rental car.

Q. Okay. But you just testified that Brian Kelly was making -- was harassing you by refusing to let you do your job or to enable you to do your job because he wasn't allowing you to direct bill your business-related expenses. Is that fair, or am I mischaracterizing your testimony? And if I am, please tell me how I am.

A. I think that you are. They're ultimately related. If I cannot direct bill a rental car, that means that when I'm in Providence for a week, it's $300 or $400 that --

Q. A week for a rental car? You said it was $50 a day, I think, earlier.

A. If I'm here for five days, and what I said earlier is if we use the number as $50 a day as an example is what I believe I said.

Q. Sorry.

A. So the point that I'm making is if the number -- and I'm approximating because I don't remember what the cost was, but if the number, using the previous example, is $50 a day for the rental car, that would be $250 for the week, if I was here from Monday to Friday. But if I got in on Sunday night, then that would create an extra day, plus the

knew all along what the situation was, and he made the call but knew that there would be no outcome.

Q. All right. But did Mr. Gough, other than as you've testified, by failing to do anything, did he in any way, shape, or form otherwise contribute to the hostile work environment that was created?

A. By failing to act, I think it's --

Q. Other than that. I'm saying by failing to act in any other way. Did he say anything or otherwise do anything that caused you to --

A. Not that I can recall at this point in time.

Q. Okay. Did anybody else contribute to or engage in any behavior that contributed to the hostile environment?

A. Besides Christine Bollmann?

Q. What did she do?

A. She was --

Q. Is this stuff that we've talked about already?

A. Yes.

Q. Did she say anything that you haven't testified to that caused you to feel that she was creating a hostile environment?

A. Overall her demeanor.

Q. What about her demeanor?

A. It was just hostile. I mean it's consistent with what we've been talking about.

Q. Well, I want to know specifically about hers. We talked specifically about Mr. Kelly's demeanor. Is there anything about hers that created this environment?

A. Her demeanor was very smug. I control the travel. You're going to do what I do -- you're going to do what I tell you to do.

Q. Anything else?

A. That's all I can remember at this time.

Q. Is it your contention that she also treated you differently than she treated other employees?

A. Yes.

Q. How so?

A. She didn't -- my recollection of her interaction with other field service engineers and other people was, you know, that she was cordial with them.

Q. But she was not with you?

A. She was not with me, no.

Q. And how often or frequent was your

observation of her interaction with other employees?
A. More than Brian Kelly.
Q. Once a week, once a month, can you quantify it?
A. Yes, typically every training class there was that I did at corporate for the new hires, I'd stop by and introduce them to Christine Bollmann, if she were there.
Q. So how often was that?
A. I don't know, maybe once a month, twice a month, depending on the training classes.
Q. Anybody else besides Bollmann, Gough -- I'm sorry, Kelly that created a hostile environment or whose actions created or led to a hostile environment?
A. That's all I can remember at this time.
Q. Any witnesses to the actions by -- I think we talked about Mr. Gough. How about to the actions of Mr. Kelly?
A. Not that I can recall at this time.
Q. And to the actions by Ms. Bollmann, any witnesses?
A. It may have been on a conference call she was very nasty.

my personal effects, an iPAQ, electronic devices, things like that.

Q. Were the items ever recovered?

A. Not to my knowledge.

Q. And did you report it to APC, the theft?

A. Yes.

Q. And who did you report it to?

A. I reported it to John Bonzani, Christine Hendrix, Brian Kelly. I reported it to my management.

Q. What was the response? What was Bonzani's response?

A. I think his words were "shit happens. Where were you parked?"

Q. Any other response?

A. I think his question was what was on -- what work did you lose?

Q. Go back a second to your reporting of the harassment. You said reported it to Gough, Bonzani, and to Hendrix, correct?

A. Bonzani, Gough, Hendrix, and Gough.

Q. Right, three people. What did you say to Bonzani?

A. I told him about the problems I was having

with Brian Kelly. He suggested that I talk to Brian Gough.

Q. So that's why you went to Gough?

A. Yes.

Q. So the conversation with Bonzani was before Gough?

A. Yes, to the best of my recollection at this time.

Q. Did you say to Bonzani that it was harassment or a hostile work environment that Kelly was creating?

A. Words to that effect perhaps.

Q. Well, what did you say?

A. From the best of my recollection at this point in time, I told John about the problems I was having with Brian Kelly. I told him he was interrogating me and harassing me about my taxes, about why I didn't get a corporate credit card and things of that nature, and John said why the hell is he beating you up on stuff like that? That's none of his damn business how you fill out your taxes.

Q. Did you characterize Kelly's behavior to Bonzani as harassing from a racial perspective?

A. At that point in time I do not believe I

A. Absolutely.
Q. And how often did -- is this a one-time event, or did you have people stay there more frequently?
A. No. It was an ongoing -- referring back to a previous question with respect to John Bonzani and being focused, he wanted me to provide a scope of training for everybody in North America, and he gave me a list of criteria, and after providing him with options of additional hotels, I was told it was okay to use that hotel, and I was directed to do so.
Q. By John Bonzani?
A. Yes.
Q. Did anybody else direct you to do that?
A. No. And Paul Cavanaugh was aware of it, as well, and Paul's boss.
Q. Did you devise a direct billing relationship between the Marriott and APC related to those expenses that you contend Bonzani approved?
A. I did not create a direct billing relationship with the Marriott. A direct bill relationship existed prior to my hire, as I understand it.
Q. Did they ever send bills to you at your

APC at the Marriott Providence Hotel on Orms Street?

A. Yes.

Q. What expense did you incur?

A. For hotel room nights and food and beverage.

Q. For who?

A. For APC Global Services employees and myself.

Q. When did you incur those expenses?

A. At various times during my employment with APC.

Q. Okay. Was the Marriott that we're talking about a preferred provider to APC when they were providing those services that you just referred to?

A. They were not on the list. However, my management was aware that they were not on my list, and I was authorized and directed to hold a breakfast for FSEs, at the direction of my management at the hotel.

Q. A breakfast, who authorized you to do that?

A. John Bonzani.

Q. Did he authorize you to have them stay there?

Marriott where you were receiving 25,000 points per week from them?

MS. KISCH: Object to form.

THE WITNESS: I had -- per the Marriott program guidelines, I received a number of points based upon a calculation that they came up with and told me what I would receive. Also, prior to doing this, I had a conversation about receiving points with John Bonzani, to ensure that there would be no problem with receiving hotel or any other points.

BY MR. KOSTAKOS:

Q. Really. When was that conversation? This e-mail is dated January 29, 2004. Based on your testimony, you think this program of using the Marriott started sometime in November, maybe December. So maybe two months before; is that correct?

A. My conversation with John Bonzani was before this e-mail, before the program and, to the best of my recollection, occurred early in my employ with APC because I knew that I was a Marriott rewards member, and I was told I could stay at any

hotel that I wanted to stay at because I was a manager, and I did not have to stay at the Johnson & Wales because he didn't feel it was an appropriate place, and he would not stay there.

He decided he wanted to stay at the Westin, and all of his managers could stay wherever they wanted, as long as the price was not outrageous, and it was during that conversation I said, John, I'm a Marriott rewards member. He said great, I'm a member of Starwood preferred guests. That's why I stay at the Westin. Have at it. Stay at the Marriott. I don't care. I use my credit card and I get 50,000 or 60,000 points a month by using my credit card, and I only use one credit card so that I get all of the points. There is no problem with receiving points.

Q. Okay. And that was in the context of a conversation you were having with him about your use of the hotel; is that correct, and his use of the Westin; is that correct?

A. No. What would be a correct characterization is I asked if I had a problem accumulating points as a member of any rewards program.

Q. Okay. Did you say to him at that point, John, do you have a problem with me accumulating points by putting other APC employees in the Marriott or words to that effect?
A. At that point in time, no. Subsequently.
Q. Subsequently you did?
A. Yes.
Q. And when was that?
A. After the manager's meeting where I presented the plan, reviewed the list of hotels, I reminded him that I was a rewards member, and I again got approval from John to use the hotels that were used.
Q. To use the Marriott?
A. Yes.
Q. Specifically?
A. Specifically approved by John, known by Paul Cavanaugh and Paul's manager. Everybody knew that we held training in East Providence and FSEs stay at the Marriott.
Q. Who's everyone?
A. Everyone in management and all field service engineers.
Q. But not everyone in travel; is that

correct?

MS. KISCH: Objection, foundation.

THE WITNESS: I don't know what travel knew.

(Defendant's Exhibit No. 11 was marked.)

BY MR. KOSTAKOS:

Q. Thanks. I'd ask that you take a look at this.

A. And to clarify my previous answer about everyone, Christine Hendrix of HR knew about field service engineers staying at the Marriott. She attended a breakfast, and she actually had my admin add new hires to the Marriott roster.

Q. And when was that?

A. After it was set up.

Q. And how many times was that?

A. I don't know. More than -- it was more than one, less than ten. I don't know.

Q. I'd ask you to take a look at the document that's been marked as Exhibit 11. Do you know what this is?

A. It's a copy of a proposed training agenda.

Q. Do you know when it is for, what date? Is there a way to identify the date on this?

A. This looks like part of the presentation that I provided to John Bonzani at a meeting in December where he approved the use of the Marriott hotel.

Q. In December. Okay.

A. November or December. I don't remember which one the meeting actually was.

Q. Did you consider any other hotels other than the Marriott?

A. Yes.

Q. Which ones?

A. We considered the Marriott; we considered the Johnson & Wales. Based upon my current recollection, the following hotels were all considered: The Marriott, the Johnson & Wales, the Courtyard, the Courtyard by the airport, the Fairfield Inn by the airport, the Radisson. There's a Westin downtown. Basically went through a list of hotels in the area that could meet the requirements that John set forth, which were -- had to be convenient to other activities, so on downtimes field service engineers when they're not working could go and get around easily. It had to have broadband access to the internet to support the

Siebel training that field service engineers were struggling with, and there were other criteria that John added.

MS. KISCH: I've got to go in five minutes.

MR. KOSTAKOS: Why don't we just suspend now, if you're going to leave in five minutes. I'm not going to hold you from catching your plane. You can object to the suspension, but I'll suspend it, and I will reconvene at a convenient time.

MS. KISCH: I'm going to object to that.

MR. KOSTAKOS: I'm sure you are.

THE COURT REPORTER: Do you want a copy of this?

MS. KISCH: Yes.

MR. KOSTAKOS: I'm going to suspend the deposition at this point. I was advised before the deposition began at 9:25 that counsel had to attend -- had to catch a flight, and in part to accommodate plaintiff's schedule, I'm going to suspend now and seek to reopen the deposition at a convenient time.

MS. KISCH: And we're going to object to

Q. Okay. Do you recall the substance of those conversations?

A. To the best of my recollection at this point in time, I recall letting her know that I had it. I believe she got a copy of it, and she acknowledged receipt, looked at it.

Q. Did she get a copy of it from you?

MR. KISCH: Object, to the extent it's been asked and answered.

MR. KOSTAKOS: You can answer.

THE WITNESS: To the best of my recollection, I gave her a copy.

BY MR. KOSTAKOS:

Q. Do you know -- why were you communicating with her about this issue?

A. Because it was -- to the best of my recollection, this is during the period of time where I was being harassed by Brian Kelly, and it's my understanding that Christine had a conversation with her boss, Brian Gough, that she was supposed to be the intermediary.

Q. You referred to your harassment by Brian Kelly, and we talked at some length about that in our last session. Is there anything other than what

BY MR. KOSTAKOS:

Q. How were you otherwise discriminated against?

MR. KISCH: Same objection.

THE WITNESS: The discrimination was in the form that I was treated, the way I was made to feel, the body language, the tone, the questioning, the constant second guessing.

BY MR. KOSTAKOS:

Q. Again, I don't want to go over ground that we've covered. That goes to the environment that you experienced, the hostile environment that you contend you experienced; is that correct?

MR. KISCH: Object to the extent it calls for a legal conclusion, but go ahead.

THE WITNESS: Yes.

BY MR. KOSTAKOS:

Q. Okay. Outside of your claim that you experienced a hostile environment and harassment, do you have any other contention as to any other specific form of discrimination that you experienced?

MR. KISCH: Objection, to the extent it's been asked and answered.

MR. KOSTAKOS: I don't believe it has.

guessing.")

BY MR. KOSTAKOS:

Q. Do you contend that your termination was an act of discrimination?

A. Yes.

Q. How so?

A. I didn't do anything wrong. I did what I was told to do, and I was fired for doing what I was told to do.

Q. Why do you believe you were fired?

A. They discriminated against me.

Q. What was the reason? Did you meet with anybody -- strike that. When did you learn about your termination?

A. The day it happened.

Q. How did you learn about it?

A. When I was told.

Q. By who?

A. Paul Cavanaugh.

Q. Was there anybody else there at that meeting?

A. Christine Bollmann -- I'm sorry. Correct that, Christine Hendrix.

Q. What were you told? Were you called in to

Q. Yes.

A. I believe her words were "Paul needs to speak to you right now. Come with me."

Q. Was that the extent of what she said to you?

A. At my desk, to the best of my recollection at this point in time.

Q. And did you respond to that to her at that point?

A. I got up and followed her.

Q. Okay. And where did you go?

A. To Paul's office.

Q. And what happened next?

A. We went into the office, closed the door. Paul said "You're going to be fired."

Q. Did he say anything else?

A. I said "For what?"

Q. You said "For what?"

A. Yes, to the best of my recollection.

Q. And what did Paul say, if anything, at that point?

A. "For kickbacks."

Q. Did he say anything else?

A. He said that I was taking kickbacks and

that -- he said that I was taking kickbacks, and I said what do you mean by that? He said you were getting points that should have gone to other field service engineers and that you were stealing the points, and he had to terminate me for that.

He went on to say that how could you do such a thing or -- he -- his words were that that is what I had done. I attempted to explain that I had not done anything wrong. I told him that I was a Marriott member before joining the company. Everything had been approved with John, and I did nothing wrong.

Q. When you say everything was approved, did John approve your receipt of points from the Marriott for those stays?

A. John had prior knowledge that I was an awards member. He said it's not a problem. He's a member of hotel rewards, too. He collects points, and he used one credit card is what John told me. He puts everything on one card, so he can get the points, as well.

Q. Do you know whether he was referring to points he received for his own travel or points he was receiving from meeting organizer type points that

you were getting from the Marriott?

A. John received points for his own travel and travel with others when, to the best of my understanding, I attended a number of meetings where John was staying in a hotel, and John paid for the meeting rooms.

Q. Do you know whether or not he received points for paying for those meeting rooms?

A. It's my understanding that John got points on his credit card for any APC purchase that he made.

Q. Do you know specifically whether or not he was receiving points for those meeting rooms that he was using?

MR. KISCH: Objection, asked and answered.

THE WITNESS: It's my understanding that John got points for any -- by using his credit cards, he got points for any APC purchase, and he tried to aggregate it.

BY MR. KOSTAKOS:

Q. Did Mr. Cavanaugh say anything else to you in that meeting that you can recall?

A. The gist of the meeting was what I told you. He asked for all APC assets and my ID tag, and



EXHIBIT

it was a typical, you know, good-bye. Sorry that -- I think he said sorry it didn't work out or something like that, just typical hasty departure type of discussion. He indicated that Paul made the decision. Since Paul was his boss, there was not much he could do because Paul made the decision.

Q. Did he indicate whether he had spoken to Mr. Cavanaugh?

A. As I said, he said he found out from Paul when I was finding out.

Q. I'm sorry. I didn't know that he said he found out from Paul. Did he say anything about his conversation with Mr. Cavanaugh?

A. I'm sorry?

MR. KOSTAKOS: Can you read the question back?

The pending question was read by the reporter as follows:

("Q. I didn't know that he said he found out from Paul. Did he say anything about his conversation with Mr. Cavanaugh?")

BY MR. KOSTAKOS:

Q. Anything else about his conversation with Mr. Cavanaugh?

A. He repeated to me what Paul had said that I had done.

Q. And what did Mr. Bonzani say to you that Paul had said?

A. That I was taking kickbacks.

Q. Did you say anything in response to Mr. Bonzani?

A. I said that I had not done anything wrong, only -- everything that I had done was in accordance to what she wanted me to do.

Q. Did Mr. Bonzani want you to receive over 100,000 points for organizing meetings at the Marriott?

MR. KISCH: Objection, foundation and form.

MR. KOSTAKOS: You can answer.

THE WITNESS: As I stated previously, Mr. Bonzani said and he told me when I asked him about points and staying at Marriotts, he said it was not an issue. He collected points. He had his credit card limit increased to $50,000 because that's how much he would spend, and he collected points, and it was no issue.

BY MR. KOSTAKOS:

Q. Are you familiar with APC's code of ethics or were you at the time of your employment?

A. Where would I have gotten this? To my knowledge, I had not received -- I'm at a loss on how to answer that question.

Q. It seems like a pretty straightforward question. Were you aware whether APC at the time of your employment, at any time during your employment, had a code of ethics?

A. I don't think I got training on code of ethics from APC.

Q. I'm not asking about training. I'm asking if you had any awareness that a policy or a code of ethics existed?

A. But if there was pol -- the only way I would have been aware of something is if I had been told or I received training on it.

Q. Do you know whether or not you were told about a code of ethics at APC?

A. We never received training.

Q. Okay. You said the only way you know about a policy is if you were told or if you were trained on it. So you never received training on the code of

ethics; is that correct?

A. To the best of my recollection at this time, there was never any training on code of ethics that I can recall.

Q. Were you otherwise told about a code of ethics during your employment?

A. No, I don't recall anyone telling me about a code of ethics.

Q. Were you aware of any prohibition at APC on receiving gifts from vendors?

A. I was aware that APC did not have a policy that prohibited employees from receiving or participating in awards programs.

Q. Okay. If you can answer my question. Are you aware of whether or not APC had a prohibition on employees receiving gifts from vendors?

A. To the best of my recollection at this point in time, I would have to say no.

Q. You weren't aware?

A. That there was prohibition on employees participating in a travel program?

Q. That's not my question. Were you aware of a prohibition on employees receiving gifts from vendors at APC?

A. To the best of my recollection, I do not recall -- I don't recall -- I don't recall at this point in time all of the policies and procedures.

Q. I'm not asking you to recall all of them. I'm simply asking whether you recall a specific prohibition against employees receiving gifts from vendors?

A. I don't recall.

MR. KOSTAKOS: Take one break. I've got to get a document.

(Recess.)

BY MR. KOSTAKOS:

Q. During your tenure at APC, were you aware of any policy or prohibition against receiving cash or cash equivalent gifts?

MR. KISCH: Objection to the extent it's been asked and answered.

MR. KOSTAKOS: I don't think we've ever asked this.

BY MR. KOSTAKOS:

Q. Do you recall any prohibition on accepting cash or cash equivalent gifts while you were at APC?

MR. KISCH: Objection to the extent it's

been ask and answered.
THE WITNESS: I refer back to my previous answer to that question.
BY MR. KOSTAKOS:
Q. I asked you about gifts. How about cash or cash equivalents?
A. Again, I don't recall all of the specific policies and procedures of APC at this point in time.
Q. Do you recall that specific policy or procedure?
MR. KISCH: Objection, foundation.
BY MR. KOSTAKOS:
Q. Do you?
A. I don't recall that specific policy and/or procedure at this point in time.
Q. Do you recall any company prohibition against gaining any advantage to the improper use of favors or other inducements?
MR. KISCH: Objection, foundation.
THE WITNESS: Again, go back to my previous answer --
BY MR. KOSTAKOS:
Q. This is a different question. I'd ask you

to think about the question I'm asking you, and answer that question.

Do you recall any prohibition on gaining any advantage to the improper use of favors or other inducements?

MR. KISCH: Same objection.

THE WITNESS: Again, I do not recall any company policy and/or procedure and/or training that I would have received or should have received to disseminate this information to me at this point in time.

BY MR. KOSTAKOS:

Q. Were you familiar with the fact that -- strike that. Were company policies available to you on company internet?

A. Based upon my recollection at this point in time, there may have been some company policies that were online, but I did not specifically know where or how to get to them, and by online, I mean within some company database.

Q. How were you aware of that?

A. The reason I'm aware of that is I remember that they talked about putting -- there was discussion about putting information online to make

it acceptable -- accessible, correction, to everyone in a more readable format, and I don't think that that project had been completed.

Q. What discussions were there about that? You referred to discussion about it.

A. Just trying to enable all content that was in paper form someplace electronically.

Q. Who was having those discussions that you're referring to?

A. It was a companywide initiative, from the best of my recollection. We had challenges finding out updated information on service bulletins and things of that nature. So because that was part of my job responsibility, disseminating relevant technical information to the field from time to time, I was hoping that there would be a more -- an easier way of accomplishing that instead of getting paper.

Q. But you did receive a copy of APC's corporate policies or a handbook after you became an employee of the company; is that correct?

A. I recall getting a fax of my contract.

Q. Okay. Do you recall receiving at any time after you became employed by APC a copy of their

employee handbook or their corporate policy?

A. I do not recall getting a copy of APC's entire corporate policy at some point after I became an employee.

Q. How about the handbook, employee handbook?

A. I don't recall if I got one at this point in time.

Q. Do you recall ever having received an employee handbook during your tenure?

A. I recall a new orientation meeting that all employees went through, and that was the training session for new employees with the company.

Q. Okay. Was there any discussion at those sessions about policies, human resource type, or employee policies or handbooks?

A. There was discussion about human resource type issues, yes.

Q. And how about other policies of APC that relate to employees? Were there any other discussion of those sorts of policies or corporate policies that were in place at that new hire training?

MR. KISCH: Object to form.

THE WITNESS: Yes.

BY MR. KOSTAKOS:

Q. What sort of discussion do you recall?

A. I recall discussions about -- about safety and OSHA and HR, what to do if you got hurt, reminding us that the products that they made typically used high voltage and very general things about that.

Q. Anything else you can recall?

A. I recall them telling us that -- talking about the frequency of pay and direct deposit.

Q. Did anybody -- who conducted that training; do you recall?

A. I don't recall at this point.

Q. Do you recall the position or the type of job that the person who provided the training was in? Was it an HR person or some other kind?

A. It was my first day of employment with the company.

Q. So does that mean you don't recall?

A. It means that I wouldn't know. I recall a person doing the training. I don't know what department they were from.

Q. And you don't recall their names; is that correct?

A. No, I don't, not at this point in time.
Q. Do you recall at that training session or sessions whether or not anybody ever directed the attendees or advised them about where they could find employee policies?
A. I don't -- I don't recall that they said go to this book or go to this website or go to this database. I don't recall at this point in time.
Q. Do you recall anybody after training or those training sessions, anybody ever directing you or advising you of the existence of employee policies or telling you where you could find them, if needed?
A. I recall going to several meetings, content and knowledge management, content managing, e-training initiative meetings, where they talked about taking relevant information from different elements of the company and enabling it to create a centralized repository for relevant and important information.
MR. KOSTAKOS: Mark this as No. 13.
(Defendant's Exhibit No. 13 was marked.)
BY MR. KOSTAKOS:
Q. I'm going to ask you to take a look at what has been marked as Exhibit 13, and as you're looking

at it, I want to ask you if you're familiar with or have ever seen this code of ethics and business conduct document before or the substance -- well, whether or not you're familiar with the code of ethics and business conduct?

MR. KISCH: Object to form.

BY MR. KOSTAKOS:

Q. Do you recognize that document?

A. I'm reviewing it.

Q. Have you ever -- just in looking at the first page, have you ever seen it before?

A. I don't recall seeing this document at some point prior to this day, to the best of my recollection at this point in time.

Q. And does this document in any way refresh your recollection whether you were aware of whether APC had a code of ethics during your tenure there?

MR. KISCH: Objection to the extent it's been asked and answered. Go ahead.

THE WITNESS: I don't recall receiving any training on this document that you provided me at some point in time prior to today.

BY MR. KOSTAKOS:

Q. Okay. Again, I didn't ask about whether

you received training. I'm just asking whether or not it refreshes your recollection as to whether you were aware of a code of ethics policy during your tenure with APC?

MR. KISCH: Same objection.

THE WITNESS: This document did not refresh my recollection as to whether or not I had received this at some point prior to today --

MR. KOSTAKOS: Thank you.

THE WITNESS: -- at this point in time.

BY MR. KOSTAKOS:

Q. In your complaint in this case, you contend you were treated differently than other APC employees. How were you treated differently?

A. As I mentioned before, the tone, the second guessing, body language, the way I was treated, access to information, access to tools to make -- to give me the ability to do my job were denied to me by intentionally creating an unfair financial burden on myself, my family, harassing me, discriminating against me.

Q. And who was it that you were treated differently than?

A. Other white employees.
Q. Can you name them?
A. People that I worked with.
Q. Can you name them specifically?
A. John Bonzani.
Q. And how were you treated differently than John Bonzani?
A. He got points. He didn't get fired.
Q. How else? Any other way?
A. Paul Cavanaugh, to my knowledge, got travel points. He didn't get fired. Other white employees that had the ability to direct bill rental cars.
Q. And who were they?
A. I don't know their names. I know that there was a practice of them being able to direct bill rental cars.
Q. Do you know what positions they held or any other specifics about them?
A. They were managers, to the best of my knowledge.
Q. Any other way to identify who they were specifically?
A. Yes, you could ask Christine Bollmann.

Q. Well, I'm asking you.
A. You asked me any other ways to specifically identify them?
Q. Yes, and you said I could ask Christine Bollmann, but I'm asking you whether you can identify them any other way?
A. No, not that I'm aware of at this point in time.
Q. Were they in your department?
A. They were not in the training department, no.
Q. And how were you aware that they were being treated differently?
A. There was a point in time where Christine Bollmann told me that other people had the ability to direct bill rental cars and direct bill travel, but I could not.
Q. And when did she say that?
A. During my tenure at APC when I needed to direct bill a rental car because I had no more money, and I got off the train, and it was at that point that I found that I could not rent a car.
Q. Did she ever tell you that you needed to apply for an American Express card before you could

direct bill?

MR. KISCH: I'm going to object to the extent it's been asked and answered. Mr. Kostakos clearly asked this in a previous deposition.

MR. KOSTAKOS: I don't know that it was. Strike that.

BY MR. KOSTAKOS:

Q. How do you know that -- what sort of travel points are you aware that Paul Cavanaugh received?

A. He told me that he was a member of different travel reward programs and that he had an American Express and got points.

Q. Do you know whether he received travel points for organizing meetings or for organizing the travel of any other APC employees?

A. At this point in time, I do not know.

Q. Do you know whether he received travel points for his individual travel?

A. Based upon what I understood his travel program -- his travel rewards program and based upon my understanding of how an American Express program or other credit card reward programs work, it would be my understanding predicated upon those facts that

yes, he did get points for his travel, and if he paid for travel for another APC employee, if two APC employees were traveling together and he paid for that travel, then, yes, he would have gotten points for that other person.

Q. Do you know whether he ever did that, paid for the travel of any other APC employees?

A. I do know that he paid for entertainment expense.

Q. Okay. And are you certain that he received reward points for those instances?

A. It's my understanding that if he paid for that instance with a card that accumulated points, then he would have gotten points.

Q. Okay. And what do you base that understanding on?

A. My understanding on how in general credit card point programs work.

Q. Okay. How about in specific to the instances in which he paid for entertainment? Do you know whether specifically he received travel points or award points for that?

A. If he paid for a meal with a card that accumulated points and that bill was paid, if the

card accumulated points, I think it would be logical to surmise that he --

Q. I'm not asking you to surmise. I'm asking if you know. Do you know if he received travel or reward points for buying meals or other entertainment for other APC employees?

A. Other than what I've said to you, no.

Q. But you don't have any specific knowledge that he received points for those purposes?

MR. KISCH: Objection, to the extent it's been asked and answered, and it mischaracterizes his prior testimony.

BY MR. KOSTAKOS:

Q. Do you have any specific knowledge whether he received points for paying for entertainment for other -- other than your general knowledge of how the point systems work for various credit cards, do you have any specific knowledge that he received points for paying for entertainment or otherwise for travel for other APC employees?

MR. KISCH: Objection, to the extent it's been asked and answered.

THE WITNESS: I have specifically been out to dinner with Paul Cavanaugh and other APC

employees where he has paid for the meal.
BY MR. KOSTAKOS:
Q. Are you familiar with all of his credit card arrangements with various credit card companies?
A. No.
Q. Thanks. Anybody else other than John Bonzani, Paul Cavanaugh? Any other white employees who got to direct bill rental cars that you were treated differently from?
A. Yes.
Q. Who?
A. I was treated differently than other white employees with respect to my W-4.
Q. How so?
A. To my knowledge, based upon my understanding from Brian Kelly, he refused to accept my form as submitted.
Q. Who was -- are you aware of any specific white employees whose W-4's he accepted in the form that you submitted yours?
MR. KISCH: Object to form.
BY MR. KOSTAKOS:
Q. Let me rephrase it. Who is it specifically? Who are the other white employees that

MR. KISCH: And I'm just going to object to the extent it's been asked and answered.
MR. KOSTAKOS: You can answer.
THE WITNESS: Yes.
BY MR. KOSTAKOS:
Q. How so?
A. By being forced to go to a train station with Christine Hendrix to scare the shit out of some person that failed the drug test because I was a big, black guy.
Q. What train station was it?
A. Providence.
Q. Downtown Providence?
A. Yes.
Q. What did you do when you got there?
A. Didn't have to go. I was told I had to go or asked by Christine Hendrix because she failed to communicate -- she felt that she had failed to communicate to the individual before him boarding the train in Philadelphia, I believe it was, that he could not be an employee because he failed the drug test.
Q. When did she say this to you?
A. During --

Q. Strike that. Did she come specifically to you and say -- what did she say?
A. She said -- she came to me in a panic saying she didn't know what to do. She has to go and meet this individual who failed the drug test, and she was afraid to do that, and she wanted to take me with her because I was big and black, and I'd scare the shit out of the guy once she told him that he no longer had the job.
Q. And was there anybody else present when she came to you?
A. As I recall at this point in time, when she initially told me about it, I was in her office.
Q. Was there anybody else there?
A. I don't recall at this point in time. I don't think so, no.
Q. You don't know or you don't think so?
A. When she initially told me, no, I don't believe -- I believe it was just she and I, and she hung up the phone, and she then was in a panic.
Q. Do you recall -- do you know of any other instances where she had to confront an employee and tell them they had failed a drug test?
A. No.

Q. Any other ways in which you were treated differently than other employees during your tenure at APC?
A. I was constantly second guessed.
Q. By whom?
A. By Christine Hendrix, Christine Bollmann, Brian Kelly. I complained to Brian Gough that I had been harassed. He didn't do anything.
Q. We talked about that in our last session. Do you know whether or not the individuals you listed ever second guessed any other employees?
A. I know they didn't take action on my issues.
Q. Do you know whether they ever second guessed any other employees, any white employees?
A. No.
Q. Is there anybody specific that you're aware of that they didn't second guess in the same manner that you were second guessed?
A. Not that I'm aware of at this time point in time or that I can recall.
Q. Other than John Bonzani and Paul Cavanaugh, are you aware of anyone else who received points for travel that was not terminated?

A. Yes.
Q. Who?
A. It's my understanding from Christine Bollmann that APC was a great company because they allowed employees to receive their travel points instead of forcing them to give them to the company.
Q. Okay. How about anybody else who received points for organizing meetings? Are you aware of whether there was anybody else at APC who did that and was not terminated?
A. John Bonzani organized meetings.
Q. And do you know whether he received points for those meetings, other than for his individual travel or stay?
A. Well, again, I refer back to the previous answer that I gave, which is that John Bonzani told me that he billed -- he tried to use one credit card to aggregate the purchasing through that one credit card whenever possible because he received points. He told me that he had his preferred -- personal preferred list of hotels, so, again, that he could aggregate points. And when he stayed in those hotels, he obviously got points, and there are times where he would hold meetings in the hotel that he

stayed in that he paid for the meeting room. So, again, as I understand it, he would get the points.

Q. And how did you obtain an understanding that he paid for the meeting? Is that something he told me?

A. That's my understanding, yes.

Q. How is it your understanding?

A. The meeting which I presented my training plan, John stayed in that hotel. I remember John getting the meeting space. I asked him if he wanted me to get it. He said no, I'm getting meeting space in the hotel where I'm staying.

Q. Do you know whether or not -- specifically do you have any firsthand knowledge whether he received points for that meeting space or are you just assuming he did because he stayed there?

A. John never showed me his travel points information.

Q. So you don't know that for certain; is that correct?

A. No, but as I understand that rewards program, he would get points.

Q. Are you aware of anybody else who received travel reward points for organizing meetings that was

With respect to this, these complaints that you made, is it your contention or your view that Mr. Cavanaugh treated you in the manner you described or differently than other employees were in a discriminatory manner?

MR. KISCH: Object to form. Go ahead.

THE WITNESS: Yes, and actually, I had mentioned to John and to Christine that Paul Cavanaugh said to me "Seth, why can't you be a good Irish lad like everyone else?" Paul was from Ireland, and he had logos or slogans on his desk that may have been acceptable in Ireland, but I found them to be not acceptable.

BY MR. KOSTAKOS:

Q. And what were those?

A. It was to the extent if you were Irish, you could do no wrong, a little Irish boy can do no wrong or something to that extent.

Q. So, in your view, was he discriminating against you because of your race?

A. Yes.

Q. How so?

A. Well, if we look on what his slogan said,

if I had been Irish, it would have been fine. He made reference to the fact on more than one occasion that, you know, being Irish was a positive thing. It appeared to me from the department that when he hired, he gave a preference to people with Irish ancestry, and he also said to me, as I said before, "Why can't you just be a good Irish lad and not get in trouble?"

Q. Do you think he didn't fight harder on the direct billing issue because you're African American?

A. Yes.

Q. Why?

A. Because I wasn't being a good Irish lad.

Q. Okay. Do you know if he fought harder for direct billing rights or the ability to direct bill for anybody else?

A. I know he authorized the commandeering -- that's probably not the proper term. I know he offered the charter flight of a plane to fly equipment from the United States to Germany when it needed to be done.

Q. How does that reflect that he treated others differently than you?

Mr. Cavanaugh to Mr. Bonzani?

A. Prior to the termination.

Q. How long prior?

A. I don't remember specifically.

Q. Was it a day prior?

A. No.

Q. Was it a week?

A. A few weeks.

Q. A month?

A. A few.

Q. A few months?

A. It was within a couple of months' span of time.

Q. Okay. Between when you made the complaint about Mr. Cavanaugh and when you were terminated?

A. I made -- all of these complaints did not happen at the same time. So over the course of making the complaints was a few months.

Q. And did you tell Mr. Bonzani that you thought it was because of your race that Mr. Cavanaugh was treating you that way?

A. Yes.

Q. And what was Mr. Bonzani's response to that?

A. He defended Paul by indicating that, you know, Paul is Irish. He's new to the country.
Q. And what specifically did you say to Mr. Bonzani that indicated to him -- or that you meant to indicate to him that it was because of your race?
A. I think I said John, "Is it that they just" -- "is it because I'm black?"
Q. And what did -- was there anything else?
A. I articulated the issues that I was having, did not understand why, and John couldn't explain why it was happening. He felt that it was inconsistent with what should happen, and I voiced the same concern to Christine Hendrix.
Q. Do you know whether Mr. Bonzani ever elevated your concerns to Mr. Cavanaugh?
A. John had a number of closed door meetings with Paul.
Q. Do you know whether he ever elevated those concerns to Mr. Cavanaugh, your concerns that you've articulated?
A. No.
Q. And the discussions that you said were substantially similar with Ms. Hendrix to those you

had with Mr. Bonzani about Mr. Cavanaugh, do you know whether Ms. Hendrix ever elevated your concerns to Mr. Cavanaugh?

A. No.

Q. And did you advise Ms. Hendrix that you thought Mr. Cavanaugh was treating you differently because of your race?

A. Yes.

Q. And what did you say to her?

A. I told her I didn't understand why these things were happening. It doesn't make sense, and is it because I'm black? Why is -- why am I being treating in this manner?

Q. And do you recall her response?

A. She tried to defend the company, and said well -- she tried to -- she tried to indicate that it was more of a process issue as opposed to an individual's dislike of black people.

Q. Did you ever elevate these concerns to Mr. Cavanaugh yourself?

A. Yes, to a certain extent.

Q. How so?

A. I told him that that I wanted to do -- that I could do and fix the problems that he was

having, but he had to give me the tools to do it, and he had to help me.

Q. And what was his response?

A. His response was keep your nose clean and just keep your nose to the grindstone and just keep pushing forward. He didn't offer anything more than that.

Q. Did you ever indicate to him or say to him that you thought he was treating you differently because of your race or that he was discriminating against you?

A. When he said well, why can't you be a good Irish boy or Irish lad, I say because I'm black. I'm African American. That will never happen.

Q. Did you say to him that you felt he was treating you differently because of your race or discriminating against you?

A. I didn't use those words.

Q. Are there any other complaints that you made or any other activity that you engaged in that you felt led to your termination?

MS. KISCH: Object to the extent it's been asked and answered.

MR. KOSTAKOS: I'm asking for any other.

MR. KISCH: I know, and I'm making the objection.

MR. KOSTAKOS: And I'm trying to resolve it.

THE WITNESS: Any other than what?

BY MR. KOSTAKOS:

Q. Than the conversation or the complaint that you made about Mr. Cavanaugh. Were there any other complaints that you made or action that you took as an employee of APC that you felt led to your termination?

MR. KISCH: And I'm going to again object to the extent it's been asked and answered, not just today but in his previous deposition. Go ahead.

MR. KOSTAKOS: I don't believe we ever talked about it in his previous deposition. If you want to show him, I'll be happy to look at it, but go ahead and answer.

THE WITNESS: I told Brian Gough that I was being discriminated against and harassed by Brian Kelly. He did nothing. I told him I didn't understand why Christine Bollmann would not allow me to direct bill a rental

car when it was creating an undue financial hardship on me and my family because of the expenses that I was incurring on a daily basis with the company. He did nothing.

BY MR. KOSTAKOS:

Q. Anything else?

A. I told everybody in my chain of command. I didn't have another -- I told the most senior person in HR of the discriminatory actions and hostile work environment that I was in, and he did nothing.

Q. And how do you connect that to the termination?

A. After my complaining, I got fired for something that I did not do.

Q. Okay. Is there anything specific that you base your claim that your complaint to Mr. Gough was connected to the decision to terminate you?

MR. KISCH: I'm going to object to the extent it calls for a legal conclusion.

MR. KOSTAKOS: I'm asking for any facts he's aware of that he can establish that his complaints to Mr. Gough about discrimination were in some way related or

connected to the decision to terminate?

MR. KISCH: Same objection.

THE WITNESS: I was told by Mr. Gough and by Paul Cavanaugh to stay away from Brian Kelly. I was told by John Bonzani that Brian Kelly has a long memory and was vindictive.

BY MR. KOSTAKOS:

Q. By whom were you told that?

A. John Bonzani.

Q. Any other evidence to connect your complaints to Mr. Gough to a decision to terminate you?

A. I complained to Brian Gough about Christine Bollmann, about Brian Kelly, about the ongoing situations that I've had, and I complained to his direct subordinate.

Q. Okay. Other than the mere fact that you complained, do you have any additional evidence other than what you've told me or any additional bases to contend that your complaints to Mr. Gough about all of the people that you talked about or to anybody else were in some way connected to the decision to terminate you?

A. John Bonzani wasn't made aware of it, but he knew that I had complained to him about the treatment of his subordinate and other senior members in the company, and it seems to me that they got together and got back at me for my complaints.

Q. Why does that seem to you that they got back at you? That's what I'm driving at. What is it -- other than your conclusion from what happened, why does it seem to you that they got back at you?

A. I was meeting all of my deliverables from my supervisor. I was making a positive impact in APC in their service department not just nationally but globally. I was doing a good job, and there was not a performance issue, there was not a deliverable issue. I had no issues as I'm aware. I was doing a good job for my boss, and I was doing a good job for the company, and I was doing a good job for the customers of the company by training their people and getting them information that they needed in a timely manner, and differently than had been done before.

I had taken a very disorganized process where field service engineers had been hired by the company and had been at training and gone back to

their home office and did not have computer equipment or the tools to do their job for months after they had been employed by the company costing the company thousands of dollars for a nonproductive employee. I turned that around. Within the period of time that a person got hired while they were there in Rhode Island for training, they got their laptop, they got all of their tools, they got their $2,000 disbursement voucher, which they're able to cash, so they could be immediately productive.

So I made a very positive impact to the company, but the reason that I was terminated had nothing to do with that in my mind, and I haven't -- no one complained about what I was doing. It was all because I complained about my superiors and the other white managers in corporate that did not like the fact that I complained about them, and then the manager that had direct responsibility for me that knew that I was doing a good job wasn't included in the loop, and they cut him out and I was terminated. How else can it be interpreted? That's the fact.

Q. And do you have any evidence to support that fact other than your own conclusions?

MR. KISCH: Object to the extent it's been

engineer left Providence with a laptop that was typically issued within two days, if not the same day that they started. The same day that they started. Where it used to take them weeks to get their $2,000 advance voucher, they were getting it the same day that they came in.

I was training all field service engineers. I was training the APC partners in a very effective manner. So I was meeting the deliverable there. Training people faster, better, and allowing people to go back out into the field prepared to do their job.

At the same time, as a direct result of that, I was saving the company money, and I had a positive impact on the moral of the field service engineers that was suffering. In addition to that, I was meeting the deliverables that Paul Cavanaugh had where he was getting heat because field service engineers were not able to do Siebel, which was the software that he was catching a lot of flack for that we talked about before.

So I was meeting his deliverable, which was ultimately John's deliverable, and then apart from that, saving the company money. There was no