IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| SETH DANIELS, Plaintiff, | |
| vs. | Civil Action No. 05-00459-ML-LOA |
| AMERICAN POWER CONVERSION CORPORATION, Defendant. | |

COPY

Deposition of CHRISTINE B. HENDRIX, taken pursuant to Fedeeral Rules of Civil Procedure, at the law offices of Stephen Robinson, 155 South Main Street, Providence, Rhode Island, before Sarah J. Miner, L.S.R., a Notary Public in and for the State of Connecticut, on October 18, 2006, at 9:00 a.m.

Exhibit 6

said.

Q. Well, is it your understanding that she at the end of that 90 day period met the expectations of the 90 day performance improvement plan?

A. I don't recall. I believe it was towards the end of my employment. I don't recall whether I saw an end to that situation one way or another.

Q. Well, did her 90 days end prior to you leaving?

A. That is what I don't recall. That is why I am not sure.

Q. Well, while you were there, from your meetings with Mr. Kavanagh, and your meetings with Cathy Green, was it your understanding that it was looking like she was going to meet those expectations or not?

A. I believe it was looking like she was going to meet those expectations, yes.

Q. What other individuals do you recall?

A. There was a woman who reported directly to Cathy who we terminated her employment.

Q. What was her name, do you remember?

A. Julie, but I don't remember. I will think of it.

Q. What was her race?

A. Caucasian.
Q. Why was she terminated?
A. She traveled for business, and then -- she traveled for personal and claimed it was business, and charged it to the company.
Q. Who brought that to your attention?
A. Cathy.
Q. Do you know how Cathy learned about that?
A. I don't recall. I don't recall.
Q. Do you recall having any conversations with Christine Bollman about that incidents with regard to this issue?
A. I don't recall specifically having a conversation with her.
Q. Do you recall where she traveled personally?
A. No, not specifically.
Q. Do you recall how much it cost the company?
A. I don't.
Q. Was she disciplined prior to being terminated?
A. No, she was terminated.
Q. How soon after you learned of the situation was she terminated?
A. [TKWEUBG] [HRAE]. I would say within the

to you, and made a complaint about a leader you wouldn't necessarily go and speak to that leader about the issue. Do you remember that?

A. Yes.

Q. What would you do in the instance where an individual came to you, and complained about a leader when you use the term leader that is supervisor or manager?

A. Yes.

Q. What would you do in that instance?

A. It very much would depend on the situation. I may speak with that manager's director or I may speak with other pertinent parties. I mean, options are wide open depending on the nature of the concern.

Q. Are there instances in which someone made a complaint about a manager or supervisor in which you did not follow up in speaking to someone?

A. Yes.

Q. And what were those instances?

A. There was a, I don't remember specifically his title, there was an office manager who having sat next to me who people complained about fairly regularly. Just from a competency standpoint.

Q. And when individuals complain to you about

the office manager's competency, what if anything did you do?

A. His position was being eliminated, I would take notes of the -- I would talk to the person about how to handle the concern, knowing that there was this outcome anyway.

Q. Was this part of one of the layoffs?

A. I don't recall specifically.

Q. So you are saying you knew this individual was no longer with the company so you felt there was no need to address it; is that correct?

A. No, not specifically. I didn't -- I knew he wasn't able to fix the things that people were bringing to my attention, and I knew that his concern, he was leaving an appointment.

Q. When you say he wasn't able to fix the concerns, what were the concerns?

A. They are just related to his computer skills, and things like that.

Q. Other than the office manager, are there any other individuals who -- any others supervisors or managers who employees complained about you did not follow up and have a conversation with another individual?

A. I can't think of one.

Q. It would have been your general practice to follow-up with somebody about the complaint, correct?

A. Generally, yes.

Q. Do you recall receiving any complaints from anyone that they felt that a supervisor or manager was not treating them fairly?

A. Yes.

Q. Who do you recall those complaints coming from?

A. A field person in North Carolina. I don't know his name.

Q. Anybody else?

A. Yes. I received a complaint from Andy Cross about John Bonzani. I received numerous complaints about Seth.

Q. About Seth or from Seth?

A. About Seth. There were a number I received.

Q. Who else?

A. J. Guimond, Ron Templeton.

Q. You received complaints about J. Guimond or from J. Guimond?

A. About J. Guimond.

Q. You received complaints about Ron

Q. What about Michelle Hilaro what race is she?
A. Polynesian. I don't know what that is.
Q. Michelle Hilaro, you said she works for the help desk?
A. She is the manager of the help desk.
Q. In the IT department?
A. Yes.
Q. And what was the nature of her call to you or complaint to you?
A. It was very similar, who is this guy? Apparently Seth had called into the help desk, and she felt had been rude to her help desk support staff I don't remember specifically who on her staff.
Q. How was he rude? What did she tell you?
A. I don't recall. I just recall her saying he was rude. Again, it was who is this guy. It was not too far into his employment, because she didn't know who he was, and was frustrated.
Q. Do you know the nature of his inquiries to the support desk help staff that Mr. Daniels made?
A. I don't. Seth was responsible for new hire computers. So perhaps something around that.
Q. Did you inquire with her what the nature of

his call was about?

A. I don't recall if she told me, and I inquired. I don't recall.

Q. Do you know what the nature his call was about?

A. I don't.

Q. Do you know how she learned or on what basis she felt he was rude to the support desk help staff?

A. No.

Q. Do you know if any of his support staff help desk complained about the call to Mr. Daniels?

A. Yes.

Q. They did?

A. They told her about it and she called me. They are in a back room. She wouldn't have, her office is in a different area.

Q. Who went to her?

A. The help desk employees who took the incoming calls. They take the incoming calls for any computer related help issues.

Q. Was there more than one incident in which the support desk support staff went to Ms. Hilaro to complain about Mr. Daniels?

A. I understand there to be two.

taken out of your paycheck. I shuttled Seth's back to the corporate office. And Brian came down several days later time to talk about it. And said: You need to take this back, and he needs to refill out this form, because Seth had written exempt on his tax form. And Brian said that unless he filed, I don't remember all logistics, unless he had filed exempt the year before he wasn't exempt. Did he know he filed exempt the year before? And I said I didn't know. I didn't know he filed exempt. He set me up with a new tax form for Seth. At that time he said: I have never seen anyone try to do this. Frankly, he said, what is this guy trying to pull?

A. I said, again, I don't know. I will take the form up. I took the form up to Seth. I said: You need to fill this form out again. You can't be exempt. I said: I am not. I said: I am exempt. I said: I am not a payroll person. This is the information I have gotten. And monkey in the middle. And then started this whole thing where Brian Kelly and Seth were in a disagreement about his filing status. I quickly removed myself from that. I believe they spoke directly. I know Brian Gough also got involved. And Brian Kelly would

periodically come to me, and say: Lose this guy, he is so rude, what is he trying to pull? That kind of thing.

I remember specifically what situation where Brian Kelly was in my office with the door shut certainly after Seth began his employment, and was very loudly upset. He was screaming about what is this guy trying to pull. Who does he think he is?

Q. This is relating to the tax form or something else?

A. The tax form. This was like, I mean, really a week into his appointment, Seth's employment.

Q. At this point had he met with Seth to discuss it?

A. No. I don't know that they ever met face to face.

Q. I thought you said they did talk?

A. They talked on the phone. Seth was at the East Providence facility. And corporate was based out of West Kingston. So Brian was at West Kingston. Seth was in Providence. Hence I was shuttling the paperwork back and forth. I don't remember them having a face-to-face meeting.

Q. Do you know if Brian Gough and Brian Kelly spoke about the tax issue?

A. I believe that they spoke.

Q. Did either of them tell you they had spoken?

A. Yes.

Q. What did he tell you about the conversations?

A. I believe the information that came back was by Seth needed to fill out a new tax form and I believe I pushed back and said he is pretty angry, and I am not understanding the root of the anger. And he said, okay, and I believe he said, all right. Brian Kelly, and Seth, I believe from their -- I don't recall exactly what was said. After that I was out of the situation.

Q. Did you have any more conversations with anyone after that about the tax issue with Mr. Daniels?

A. Brian Kelly would periodically come down, and say, what is that guy up there doing? What else is he trying to pull?

Q. How soon after this incident would he then make these comments?

A. I am not sure. Periodically throughout

Q. Do you remember anything about Mr. Kelly expressions or comments about Mr. Daniels not living in Providence?

A. I just remember him asking me, didn't we offer this guy relocation, when the hell is he going to move up here?

Q. What did you say in response?

A. I said I didn't know.

Q. Did you inquire of Mr. Daniels?

A. No, I talked to John Bonzani about it. Again, I don't remember the outcome of our conversation. I wish I did.

Q. You don't recall Mr. Bonzani telling you prior to Mr. Daniels accepting employment at APC that, in fact, Mr. Daniels have to move to Providence, part of the agreement was he wouldn't have to move to Providence until after the school year ended?

A. I don't recall that.

Q. You said that there were questions about what was -- there was an issue with regard to Mr. Daniels what was reimbursable about the move did you say?

A. Yes.

Q. Tell me more specifically what that issue

Was it your understanding that that was the company's only reason for terminating Mr. Daniels?

A. I don't know.

Q. Was that the only reason he communicated to you, though?

A. Yes.

Q. You seem a bit hesitant with that.

A. No, I just want to be accurate.

MR. KOSTAKOS: Objection.

BY MS. KISCH:

Q. I just wasn't sure that there isn't something else that was communicated to you at some point.

A. That is what was communicated to me.

Q. Did anyone ever communicate to you at any other point that they were thinking about terminating Mr. Daniels?

A. Not in a serious conversation. There was jesting around, why haven't you termed him yet? Jesting is not the right word, but no one seriously said to me, we are considering terming Seth's employment next Tuesday, whatever. None of that.

Q. Well, the comments that were made about why haven't you termed him yet, who made those comments?

A. I believe I shared with you that Julie Sapola said: Why is he still here?
Q. I don't think you actually did. Can you tell me about that.
MR. KOSTAKOS: I think she did. I will object.
THE WITNESS: It was one of the follow-up conversations. I don't know how long I can put up with this, why is he still here, that type of thing.
BY MS. KISCH:
Q. Let me just ask you about that.
Did anyone ever communicate to her that Mr. Daniels would be terminated; do you know?
A. No. I don't know.
Q. Did you question her as to why she was saying, why is he still here? Did you ask why she had an expectation why he would be terminated?
A. No. Because I understood her reasoning from previous conversations.
Q. That she had expected that he would be based on her complaints?
A. Not necessarily based on her complaints, but based on his behavior.
Q. But you never communicated to her, gave her

the impression that he, in fact, would be terminated, correct?

Let me ask you a question, when Julie Sapola said to you, why is he still here, how did you respond?

A. I don't remember specifically my response. It would have been something around deflecting the question.

Q. Okay. And who else made comments to you about why haven't you termed Mr. Daniels yet?

A. I remember specifically Coyle, who is one of my generalists is that guy still here. And I recall the payroll administrator Bonnie. It was her favorite topic of conversation. So when I would walk by the payroll office she would, say: is that guy still here? I was like: Hi, Bonnie how are you, and I never really answered the question.

Q. Would she refer to Mr. Daniels or refer to him as that guy?

A. She referred to him as that guy.

Q. But you knew who she was referring to?

A. Right.

Q. Do you know why this was her favorite topic of conversation?

A. With me it was her favorite topic of conversation. It was one of the few issues we had in common that we worked on. I did not see her that frequently. She was the exempt, and exemptions conversation, because she had to file the W-4 so she knew about that.

Q. Do you know if she had knowledge about any other issues with regard to Mr. Daniels other than that one issue?

A. I know that Seth had been in communication Bonnie with several different times about payroll related issues. And she thought he was rude.

Q. Did she ever express in what way she thought he was rude?

A. She called him an ass, but I don't remember specifically. She just called him an ass.

Q. Did she call anyone else an ass?

A. I don't recall, again, our interaction was fairly limited, and every time I saw her for a period of time, that is what she talked about, so I don't recall her speaking about anyone else frankly her name was Bonnie Smith. I believe she is retired.

Q. You have mentioned throughout this deposition a lot of references to Mr. Daniels

as being an ass and a lot of profanity that was used in reference to him?

A. Yes.

Q. The use of profanity at APC something that is normal or something that regularly occurs?

MR. KOSTAKOS: Objection.

THE WITNESS: Is the use of profanity, I wouldn't say it was normal, it is not unusual, but it is not the norm. It is not shocking, let's me say that.

BY MS. KISCH:

Q. Is it unusual for so many individuals to be referring about an employee with the use of profanity?

MR. KOSTAKOS: Objection.

THE WITNESS: People's feelings about Seth were unusual I would say.

BY MS. KISCH:

Q. Did you have a sense of why there were such strong feelings against Seth at APC?

A. Do I have a sense of that?

Q. Yes.

A. I have my, you know, I can speak to what I know.

MR. KOSTAKOS: Object to the question. Go

ahead.

THE WITNESS: Seth was not a nice person. He frequently pushed too far. He frequently sort of ran over people. He wasn't a good listener. He was unable to take personal responsibility for situations that he was in, and therefore sort of behaved in a different way. He is a very difficult person to work with.

BY MR. KISCH:

Q. Is Mr. Kelly a nice person?

MR. KOSTAKOS: Objection.

THE WITNESS: I think Brian was nice to me. He was.

BY MS. KISCH:

Q. Do you think he was a nice person in general in the way he treats people?

MR. KOSTAKOS: Objection.

THE WITNESS: I think he has a soft side. I think he comes on strong and soft underneath. I don't think that about Seth. Brian would given the facts of the situation, and some time, respond rationally, and appropriately. I can not say the same thing about Seth.

BY MR. KISCH:

Q. In which situation did Seth not respond

# FREEDOM COURT REPORTING



rationally?

A. He just would not, he just didn't let things go. He just wouldn't give up. When people would say it was this way, he wouldn't accept it, and he would push and push and push. He didn't understand social boundaries, meaning social grace boundaries. He didn't understand that.

Q. Can you give me some specific examples of what he wouldn't let go where he pushed and pushed and pushed?

A. The payroll issue is one of them.

Q. What do you mean the payroll issue?

A. The exempt, nonexempt issue, Blackberrys issue, or the cell phone issue. From what I understand from the restaurant owner he pushed, from what Brian told me about the restaurant owner he pushed and pushed and pushed there so much so we had a complaint made.

Q. What did he tell you about how Mr. Daniels pushed, what do you know?

A. Just that he was rude, and, I don't remember, I just remember that he was rude, and wouldn't let things go.

Q. Do you know any specific facts or specific conversation between Mr. Daniels, and the

Q. Did you express any concerns to Chris Bollman about employees staying at the Johnson & Wales?
A. It was part of the conversation of the extended stay. And I just said. I don't remember that I expressed concerns but this was closer. And I believe there were kitchens, et cetera, in the extended stay. And that was for folks that were going to stay there for two weeks.
Q. Did you ever mentioned to her the reason John Bonzani wanted the extended stay to be added, one of the reasons being the lack of cleanliness at the Johnson & Wales?
A. I don't recall specifically, but I might have mentioned it.
Q. Okay. When you took your two trips do you know whether you stayed at hotels on the list on the APC list of recommended hotels?
A. I don't know.
Q. Are you aware of any individuals -- have you seen recommended list of hotels?
A. Have I ever seen a list, yes.
Yes, I have seen it.
Q. Is it available for employees to look at?
A. Yes. I believe so.

though.

Q. Okay. Did you ever E mail any policies to APC employees?

A. I very well may have.

Q. Let me ask you this --

A. Yes, I did.

Q. What policy did you distribute?

A. I E mailed the relocation policy to Seth Daniels.

Q. Other than that?

A. I would have E mailed the relocation policy to anyone that applied.

Q. Other than E mailing a new hire relocation policies or other policies related to their hiring, did you ever E mail generally to all employees or a number of employees any APC policies that were created after you were hired?

A. I don't recall that I had access to all employee E mailing. I wasn't able to do that as I recall.

Q. Who had access to all employee mailing?

A. It would have been senior management group, if I recall correctly.

Q. Do you recall getting any E mails that were distributed to all employees at APC with regard to

new APC policies that had been implemented?

A. With regard to new policies that had been implemented, I don't recall specific instance.

(Plaintiff's Exhibit No. 5 marked for identification.)

BY MS. KISCH:

Q. I am showing you what has been marked Deposition Exhibit 5. Take a moment to look over that. Show you what has been marked as Exhibit 5, which appears to be an E mail from you to Seth Daniels; do you recall that?

A. I see it.

Q. What do you recall from this incident?

A. There was a meeting to discuss this laptop and phone issue that I spoke about at the beginning of all of this, and a few people who I knew were in this meeting with Seth, and came to me after the meeting concerned because it was Danielle Vincent. She came to me, and said: Do you know you just got volunteered to do this, this and this during this meeting? And I said, no. And Danielle had been involved in this situation before where Seth had run over her, and so she came to talk to me about it.

Q. And so that is where this came from when

continues on apparently to the next page.

MS. KISCH: Yes, and onto the next page, that is correct.

THE WITNESS: I don't remember specifically these. I very well could have seen it.

BY MS. KISCH:

Q. In the first paragraph under fair dealing the last sentence says: Offer often giving or any form of bribe or kickback is strictly prohibited. What do you understand the term kickback to mean?

MR. KOSTAKOS: Objection.

BY MS. KISCH:

Q. If you have an understanding at all.

A. I don't have an understanding specifically of what kickback is.

Q. In the second paragraph, which is labeled Paragraph A, the third line down towards the end starts with: You should not. Do you see that?

A. Yes. You should not knowingly.

Q. It says you should not knowingly place yourself in a position that has the appearance of being or could be construed to be in conflict with the interests of the company. What does it mean when it says has the appearance of being. Do you know?

MR. KOSTAKOS: Objection.

BY MS. KISCH:

Q. Do you have an understanding what that means?

MR. KOSTAKOS: Same objection.

THE WITNESS: I don't. Has the appearance of being? Okay. No, I don't have an understanding of what that is.

BY MS. KISCH:

Q. On the paragraph which are is labeled paragraph one, the next paragraph it says cash or cash equivalent gifts may not be provided by an employee directly or indirectly to any person or enterprise. Do you know what a cash equivalent gift is?

MR. KOSTAKOS: Objection.

THE WITNESS: I don't know.

BY MS. KISCH:

Q. Do you know what it means that it cannot be provided by an employee directly or indirectly to any person or Enterprise?

MR. KOSTAKOS: Objection.

THE WITNESS: To be provided by an employee -- I mean, I guess it is what it says it is.