LITTLER MENDELSON®
A PROFESSIONAL CORPORATION

ARIZONA
CALIFORNIA
COLORADO
DISTRICT OF COLUMBIA
FLORIDA
GEORGIA
ILLINOIS
MASSACHUSETTS
MINNESOTA
NEVADA
NEW JERSEY
NEW YORK
NORTH CAROLINA
OHIO
PENNSYLVANIA
TEXAS
WASHINGTON

April 6, 2005

Adam P. Forman
Direct: 617.378.6007
Direct Fax: 617.737.0052
aforman@littler.com

Ms. Edith Kessler, Investigator
Equal Employment Opportunity Commission
Boston Area Office
John F. Kennedy Federal Building
Government Center, Room 475
Boston, MA 02203

Re: ***Seth Daniels v. American Power Conversion Corp.***
***EEOC Charge No. 161-2005-00257***

Dear Ms. Kessler:

American Power Conversion Corporation ("APC" or "the Company") submits this supplemental statement in response to the above-referenced charge of discrimination brought by Seth Daniels. For the reasons set forth below and in APC's letter dated March 7, 2005, APC requests that the Commission issue a lack of probable cause finding. Daniels' claims of racial discrimination, retaliation and harassment are baseless. APC terminated Daniels' employment because (i) he engaged in conduct that violated the Company's previously communicated travel policies and (ii) he engaged in fraudulent behavior. Daniels was treated similarly to non-minority employees accused of self-dealing or fraudulent behavior. There is no legal or factual basis for finding that APC discriminated or retaliated against Daniels, and, therefore, the charge should be dismissed.

## I. Facts

### A. *The Company's Travel Policies*

Daniels violated APC's published travel policies when he advised the Field Service Engineers ("FSEs"), for whom he developed a training program, to stay at the Marriott in downtown Providence. APC's travel policies were repeatedly communicated to Daniels and were readily available to him (and to all APC employees) throughout his employment at the Company.

Daniels was hired in September 2003 as the training and development manager for APC's Global Services Group ("AGS"). Throughout his employment, APC's travel policy[1]

[1] APC has been unable to locate the exact version of the travel policy in effect during Daniels' employment, which has had several different iterations in the time since he left the employ of the Company.

was readily accessible to Daniels on the Company's intranet. Also included on the intranet was the list of APC-preferred hotels, which listed the Johnson and Wales hotel and did not include the Marriott in downtown Providence.

In late 2003 and early 2004, Christine Bollman, APC's travel manager, spoke to Daniels on numerous occasions about the Company's travel policies. In these discussions, Bollman specifically explained to Daniels that he should direct the FSEs coming to Rhode Island for training to stay at the Johnson and Wales hotel. Indeed, Bollman even went so far as to overrule Daniels when he questioned the Johnson and Wales' facilities, directing him to continue to use the hotel.

Thereafter, on February 6, 2004, after having been alerted by the Johnson and Wales hotel that patronage from APC had all but disappeared, Bollman confronted Daniels and asked whether he was conducting training at the Marriott hotel. Daniels misled Bollman and claimed that he was not using the Marriott. (See electronic mail exchange between Daniels and Bollman, dated February 6 and February 9, 2004, attached on the top of the first page of Exhibit G to APC's March 7, 2005 letter). Later, however, Bollman learned from the Marriott that FSEs had been staying there, and that training programs did take place at that hotel in the days immediately following Daniels' representation that this was not occurring. (See excerpts from an invoice for "Group Master Account for APC Training," received from the Marriott, indicating that "APC Training" occurred between February 8 and 13, 2004, attached as Exhibit E to APC's March 7, 2005 letter, and an electronic mail from the Marriott's Director of Sales and Marketing, stating that APC FSEs rented 180 rooms in February 2004, attached as Exhibit F to APC's March 7, 2005 letter).

Finally, and ironically, as the AGS training and development manager, Daniels himself was responsible for developing a training program that included training in APC's travel policies. One document associated with the training program, entitled "AGS New Hire Process," was created by Kim Destefano, who reported directly to Daniels. (See AGS New Hire Process, attached hereto as Exhibit 1). On pages three and four of the document, under heading "5.2.1 Travel," the document specifically directs trainers, all of whom were supervised by Daniels, to "Highlight APC Travel Policy" as part of the first day of the orientation. (Id.). A chart entitled "AGS New Hire Procedures," which was last modified October 23, 2003 (during the time Daniels was training and development manager), also explains that in the AGS training programs, new hires were to review travel and expense policies as "homework." (The "AGS New Hire Procedures" chart is attached hereto as Exhibit 2). The second page of this document indicates that it was last modified on October 23, 2003). Further, the training materials given to FSEs during Daniels' tenure (in January 2004), explain plainly that the travel policy and list of APC's preferred vendors are located in the "Travel Web" section of APC's intranet. (See excerpts from the "Field Service Engineer Training Program" binder from January 2001, p. 4, attached hereto as Exhibit 3). Clicking on the "preferred vendors" link on the "Travel Web" led to APC's list of Preferred Hotels for

2004, which was attached as the final three pages of Exhibit G to APC's March 7, 2005 letter. This list includes the Johnson and Wales hotel and does not include the Marriott. Based upon these documents, and the other evidence in the record, it is plain that Daniels was well aware of APC's travel policies. Nevertheless, Daniels blatantly and willfully ignored these policies, constituting a lawful, independent basis for terminating his employment.

B. *APC Has Terminated Other Non-Minority Employees for Similar Unethical Conduct.*

APC does not hesitate to terminate any employee, irrespective of race, for engaging in what it perceives to be theft or self-dealing. While Daniels' termination is the only situation involving the misappropriation of travel points of which the Company is aware, APC has terminated non-minority employees who have engaged in similarly egregious behavior. Recently, APC terminated the employment of two well-regarded, high-level executives for engaging in self-dealing. These two executives, both of whom are white males, participated in a "gray marketing" scheme. The price for sale of APC products to distributors selling to end-users in Latin American countries is much lower than that for sales to end-users in the United States. In this scheme, the executives allowed a distributor of the Company's products to purchase huge quantities of APC products at the price reserved for sales to a particular Latin American country, and then resell the products to end-users in the United States at the higher price. The distributor made a huge profit in the scheme, and because of the volume of product purchased by the distributor in question, the executives received enormous commission bonuses from the sales. Although APC has no written policy prohibiting such conduct, when APC learned of the scheme, it terminated the executives' employment immediately because of the executives' fraudulent conduct and self-dealing.

APC also terminated a number of white males and females in their twenties, all of whom were members of the sales organization, for manipulating the phone system to inflate the number of calls they received or placed which, in turn, inflated their commission bonuses because these bonuses were tied to the volume of calls handled.

While APC does not have a written policy against stealing the travel points earned by other employees while on APC business, APC was completely justified when it terminated Daniels. Title VII does not require APC to create written policies. Fraudulent conduct, theft, self-dealing or unethical behavior do not become permissible simply because the Company has not reduced to writing the common sense proposition that such conduct is not tolerable.

Travel points earned by the FSEs attending APC training sessions did not belong to Daniels. Whether a written policy existed or not, Daniels simply cannot argue in good faith that these travel points belonged to him. The label attached to this conduct – theft, fraud, self-dealing, or unethical behavior – is not important. What is important is that the attempted

misappropriation of the travel points was serious misconduct that no employer is required by Title VII or any other law to tolerate.

When Daniels began requiring FSEs to stay at the Marriott, holding training sessions there, and taking for himself the travel points associated with the FSEs' stays, Daniels acted inappropriately and beyond acceptable boundaries. Though he was aware of and indeed was ultimately responsible for training FSEs on APC's travel policies, Daniels made a private arrangement with the Marriott (which was not APC-preferred) such that he would receive points in his personal account for rooms rented by the FSEs staying at the hotel for training events. He collected over 100,000 points in just two months as a result. (See the electronic mail from the Marriott's Director of Sales and Marketing, attached as Exhibit F to APC's March 7, 2005 letter, outlining same). Irrespective of whether APC had a specific written policy prohibiting such conduct, fraudulent behavior of this nature is simply not tolerable. For this reason, APC possessed a second independent basis for terminating Daniels.

## II. Conclusion

For the foregoing reasons and those stated in APC's March 7, 2005 position statement, APC requests that the Commission issue a finding of lack of probable cause. Please feel free to contact me should you have any questions.

Very truly yours,

Adam P. Forman

Boston:7361.2
3/30/05