# FREEDOM COURT REPORTING



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

SETH DANIELS, Plaintiff,

vs. Civil Action No. 05-00459-ML-LOA

AMERICAN POWER CONVERSION CORPORATION, Defendant.

COPY

Deposition of BRIAN J. KELLY, taken pursuant to Fedeeral Rules of Civil Procedure, at the law offices of Stephen Robinson, 155 South Main Street, Providence, Rhode Island, before Sarah J. Miner, L.S.R., a Notary Public in and for the State of Connecticut, on October 19, 2006, at 9:00 a.m.

Exhibit 9

buy prizes. For me to venture out a guess electively what the.

Q. What was your practice with regard to reviewing the expense reports?

A. The expectation is that employees are expected to adhere to the travel policy. They are expected to have receipts for expenditures than they claim, with the exception of mileage, which are, you don't necessarily have, you wouldn't have receipts for. But there are -- there was a provision in the policy I believe that as an on going practice for an employee but on the occasion that an employee had a receipt that was missing I believe it was under $25 or $10 or whatever it was in, the policy, accounts payable would still process that expense with the -- provided that the expense report was approved by that employees manager. However, if that practice became the norm rather than the exception, then it is an issue that we could address further by kicking it back to the manager, and documenting, saying, this person is careless with their paperwork. And we may not consider that to be a legitimate expense, and therefore we are not going to reimburse them. And it is similar in a punitive way to when I put the

90 day policy in. There are people that kicked and screamed about that. A lot of people spent long weekends getting their expense reports caught up.

And there were people in the company who submitted expenses well after, that were well after the grace period I gave them for the 90 day grace period who submitted expense reports. I kicked them back. Those were thousands of dollars of expense reports. And certainly I don't know how much exposure you have had with different clients with regulations regarding Sarbanes-Oxley. Public companies are certainly required to have in-place controls. And following those controls. And on a quarterly basis, I was required to do an attestation making sure that those controls in my area were being adhered to. And that I didn't know of any material information that the company was aware of that wasn't being recognized and things like that.

So I think seriously any of the areas that were under me, and the policies that were in place, to making sure that they were adhered to regardless of who they were. This goes to the president CEO chairman of the board, went to the CFO. The policy is the policy unless there is provision in the

elevated to me than I felt was that was out of the realm of Mary to be able to address, and get a resolution, then I would take those expense reports, and if I felt that the situation warranted I would monitor that employee or those employees on a regular basis until I was comfortable that the issue no longer existed. I did not want to leave Mary in a position to have to document stuff that would become an HR issue. If the issue was serious enough or if I thought it was going to develop to something serious enough, given the nature of the discussions that had been taking place, I felt my role was to step in, one, support somebody who worked on my team, and, two, to make sure that the employee who was submitting the expense report knew that, recognized the seriousness of the issue, and that that person was going to have greater contact with me until the issue was resolved.

Q. And how many times in your role as director did you actually step in in that instance in which you are describing?

A. Only a handful of times.

Q. Less than five times or about five times?

A. I would say probably less than 10 times. I am not sure, certainly, it is not dozens of times.

But I am comfortable saying probably less than 10 times.

Q. Tell me the individuals who did you step in for in that role?

A. The only individual that I, name I can remember, is because of this deposition, is Seth.

Q. You don't remember any of the other individuals which you took over the rule to review the expense reports and took over Mary Tougas's role?

A. No.

Q. You don't remember any of the individuals other than the plaintiff in this case in which you took over a role which you ordinarily don't undertake?

MR. KOSTAKOS: Objection.

THE WITNESS: No, and I probably wouldn't have received Seth's name unless I had been served even before I received the letter from APC's attorney. When you leave a company, and you go to a new employer, at least myself, I dedicate myself to my new employer. I do have contacts with APC, certainly those people who used to work for me. Whether we go out socially, whatever. Do I make a great effort to retain at the expense of my current

MR. KOSTAKOS: Objection.

THE WITNESS: Yes, there would have been other instances where I got involved, where people put on expense reports items which would not be normally covered under APC's policy.

BY MS. KISCH:

Q. Well, let me just stop you there. I am not talking about instances in which you answered questions or got involved. I am talking about instances in which you took over the review of the expense reports in the future.

MR. KOSTAKOS: Object.

THE WITNESS: None that I can think of.

BY MS. KISCH:

Q. Did you take over the role of reviewing Mr. Daniels expense reports, did you take that role away from Mary Tougas, and take that responsibility on for yourself?

A. Yes.

Q. What prompted that?

A. Because there was an issue surrounding Seth's expense reports, the completeness of the expense reports, and the past interaction with employees who worked for me in payroll, and Christine Bollman in travel. And when it came to

the expense reports I was not going to put Mary in that position, and my instructions to Mary was if expense reports came in for Seth until the issues were rectified, that those reports were to come to me.

Q. Was it the case that you reviewed all of his expense reports or only where an issue arrived?

A. From the point that an issue, that I became aware of an issue is at the point regardless of what the expense responsibility report was for I needed to see it because at the end of the day the checks that are issued or were issued at the time to reimburse expense reports had my signature on those checks, and I do not let anything go out under my signature unless I am comfortable in compliance with our policy. If I am made aware of a situation that is in violation of the company policy, which applied to everybody, then if it can be quickly rectified by Mary E mailing or saying Joe, they, this, and this. Yeah, just take it off my expense report. But when an issue gets escalated I owe it to the company, and the employee to exercise my prerogative and step in on that situation, and monitor it.

Q. You said there were three months to look

after.
Q. And what do you recall of your conversation with Ms. Hendrix's specifically whether you asked for her assistance in getting the W-4 form filled out?
A. Nothing specific, just it would have been a general conversation asking for her assistance in getting the form completed, the form is incomplete.
Q. Did you ever ask her to assist in speaking with Mr. Daniels, and telling Mr. Daniels that he could not claim that he was exempt from taxes?
A. No, I wouldn't have said that that to her. Because an employee can claim they are exempt from taxes if they attest on the form that they are exempt.
Q. Do you recall any other additional conversations with Ms. Hendrix's about this issue?
A. Not offhand.
Q. Did Ms. Hendrix's ever come to you, and report to you after you had sought her help with regard to Mr. Daniels filling out the W-4 form?
A. No conversations that stick out, I can't recall.
Q. Did you speak with anyone else other than the individuals you have already mentioned with

A. I am not sure if he was doing that. I think he may have been taking a train to someplace in Rhode Island, and renting a car. During his stay in Rhode Island he had the use of a rental car.

Q. When you said earlier that personally you don't think that somebody should be on the road who has no credit, if an individual is traveling on APC related travel, and they are unable to get a credit card, it is declined, what is your personal position with regard to that individual, should the company give them a corporate credit card?

A. No.

MR. KOSTAKOS: Objection.

BY MS. KISCH:

Q. Well, what is your personal position?

A. What the company does --

MR. KOSTAKOS: Objection. Go ahead.

THE WITNESS: The company policy at the time.

BY MS. KISCH:

Q. Let me clarify because I want to get through this deposition?

A. This is going to answer your deposition. The company policy at the time if somebody was on

the road, and continually on the road or going on a one time trip or whatever, to minimize their out of pocket expense, the company would either issue to an employee an ongoing travel advance or a short term travel advance so if you are a sales person, and you are on the road, and your expected monthly expenses are going to be $2,000, the company would -- the employee has the option of asking for a travel advance, an ongoing travel advance, which minimizes their out of pocket expense. Theoretically what would happen is they would be using company funds to pay for their expenses, submit an expense report timely, get reimbursed always replenishing that $2,000. Likewise, if somebody is going to go on a trip I have a great credit rating I have no problem getting credit. There would be times the company would give me a travel advance to cover out-of-pocket expenses when I return from that trip I submit my expenses and/or the balance of the funds that they had advanced me for the temporary trip. With the employees who have ongoing advance both sign a form stating what their obligation is for those funds. So the person with the ongoing advance at the time of separation from the company they have to either submit expense

reports or return the funds to the company. When you talk about people going on the road without credit, the way we address somebody not having credit is give them a temporary either on going travel advance or temporary travel advance.

Q. Was Mr. Daniels ever offered that travel advance?

A. I don't know, that wouldn't have been for me to offer it to him.

Q. Was he entitled to it?

MR. KOSTAKOS: Objection.

THE WITNESS: Theoretically, any employee who would have been doing travel, whether ongoing or whether a one-time basis, theoretically would be eligible for a travel advance. There have been people who have been denied travel advances because of prior histories with travel advances.

BY MS. KISCH:

Q. But as far as you know, all employees are eligible for travel advances unless they have been denied for abusing the system?

MR. KOSTAKOS: Objection.

THE WITNESS: Given what the purpose of the advance is, we are not going to give someone a thousand dollar advance because they are going to

the Marriott for a conference for the day.

BY MS. KISCH:

Q. If an individual has a conference at the Marriott they are not eligible for travel advances?

A. If they are going from West Kingston from here to the market.

Q. I understand. If they live in the area?

A. Right. If they are flying or going someplace, and there is an out-of-pocket expense they are going to incur, yes, and even those people who had company credit cards, I had an American Express card that was paid for by the company, I still at times took travel advances to pay for some expenses. And, again, it is intended to minimize the amount of time that an employee is using their personal funds for company purposes.

Q. So the policy was many travel advances were eligible for all employees who were incurring expenses related to their employment?

MR. KOSTAKOS: Objection.

BY MS. KISCH:

Q. For APC?

MR. KOSTAKOS: Objection.

BY MS. KISCH:

Q. Other than someone who is taking, you know,

a local trip five miles down the road?

MR. KOSTAKOS: Object.

THE WITNESS: Yes.

BY MS. KISCH:

Q. Were there any other issues that you were aware of with regards to Ms. Bollman when you referred to issues, you referred to an issue with Ms. Bollman were you aware of any other issues other than what you just talked about?

A. I know Christine had an issue with Seth on-- when Seth's new hires were being trained or whatever in East Providence, and where Seth for some reason was putting them up in a hotel versus what the preferred location was, given our negotiations with local establishments.

Q. What was that issue, what do you know about that issue?

A. My issue was that he had employees staying at a location which was not a location where we had negotiated a rate, a discounted rate for when employees were in town and stayed. I don't know if, I think we had negotiated a rate with, I forget, Howard Johnson, I believe, is not Howard Johnson, Johnson & Wales, operates a hotel in East Providence Seeconk or whatever, which is in close

proximity to the East Providence facility. And I believe we negotiated a rate there. I can't recall where it was whether it was down at the Marriott or wherever that Seth was staying and putting people up. But it was contrary to where we had negotiated rates. Again, still providing housing doing it at the most efficient cost.

Q. Do you know whether a rate had been negotiated with the Marriott where individuals were staying?

A. I am not sure if there was.

Q. Did you ever inquire whether there was?

A. I don't know if I inquired. I don't recall whether I inquired or not.

Q. How did this whole issue come to your attention?

A. I think Christine Bollman raised it to me.

Q. Do you remember, was there anything more than she said to you other than what you just described?

A. I know Christine had conversations with managers at the establishment, and that she had determined that Seth provided his frequent stay account number to have the points for all of the rooms applied to his account as opposed to his

single room.

Q. How do you know that?

A. That was my conversation with Christine.

Q. Christine told you that Mr. Daniels had provided his frequent account number to the hotel, the Marriott, to receive the points for all of the rooms for the employees who were staying there applied to his own account?

A. Yes.

Q. And did you ask her for how she new that?

A. I am certain I must have asked how she new it, and it may have been in connection with the management at the establishment. She would have -- she has contacts with all the establishments throughout Rhode Island where people might be staying. So, and I am gathering that that information would have been determined based upon her conversation with the manager who would have had access to the records at the time. The establishment just would not have taken his number, and applied it to every single stay, you know, over the period of time that it was being done somebody doesn't just walk in off the street who is here for training who is a new hire, and then the establishment says, oh, we will apply -- we will

independently apply Seth's account number. The conversation was that Seth had the arrangements with the hotel that his frequent stay card number would be used to get benefit of the points.

Q. So I just want to be clear. Christine Bollman told you that the points that would ordinarily be awarded to the individuals staying at the hotel, the Marriott Hotel, that those individuals who stayed at the hotel did not receive their reward points, and instead Mr. Daniels had instructed the Marriott to give him those reward points that would have otherwise gone to the individuals staying at the hotel; is that correct?

MR. KOSTAKOS: Objection.

THE WITNESS: I don't know if it was 100 percent of it. I don't know how many of those employees had their own reward cards they would have insisted on using their own or if they just acquiesced to having Seth's card number used. I don't know the percentage, whether it is 100 percent, whether it is 50 percent, I don't know. All I know is there were points that were earned for other rooms other than where Seth was staying credited to his frequent stay account.

Q. Okay. And your knowledge regarding from

A. Do I know specifically, no. Is it likely, yes. I don't know specific names, dates, whatever.
Q. Why do you believe it was likely?
A. Well, because.
MR. KOSTAKOS: Objection.
BY MS. KISCH:
Q. Let's me rephrase that. On what basis do you think it was likely?
A. There is possibility at times Johnson & Wales might not have had vacancies. There is always the opportunities that would have taken place. We have had people not only stay at the Marriott but also out of practicality we have had people stay at the Westin, because annually they would have a sales conventions where they bring the technology, and they bring the sales teams around the nation into Providence over here. So just from a practical standpoint, they would have them stay in the local hotels because it minimizes transportation cost down from West Kingston and here every day and back.
Q. Do you know what other hotels individuals stayed at other than the Marriott, and Westin in Providence?
A. Not off the top of my head, no.

MR. KOSTAKOS: Objection.

THE WITNESS: Not necessarily. I mean there are times where the stay might be a better rate than what APC negotiated. We have situations where people stay with relatives or friends at a location rather than rent a hotel, and we pay them, a customer would say, take your friend out to dinner in lieu of paying a hotel expense. So we try to be as practical as possible, but if we know that we are having employees who are in long term situations where they are going to be needing hotels on long a long term basis, then those are things that really stand out to ensure that over the long term we are not talking one night, somebody paying an extra $30 for a hotel. We are talking about somebody over five days, 10 days, five weeks, 10 weeks, staying at an establishment at a rate higher than what we negotiated, and having, directing other people to that establishment to stay there also costing the company more money than they would have incurred if the employee had stayed at an establishment where we had a negotiated rate.

BY MS. KISCH:

Q. How long were the sales meetings that you

mentioned, the sales convention, how long did that last?

A. The actual meeting lasted probably about four days. Usually there is day or so, depending on travel needs, on either side as to when they might need rooms. Again, when we sit down, and we look at the practicality. We had hundreds of people come into Providence, and it is not practical that we rent hundreds of cars to have people go back and forth to West Kingston. The feeling was that Providence offered enough, especially for the night life or whatever, that there were things for people to do. And minimize the cost to the company. So whether we paid more per night at a hotel here, that is offset by not incurring the expense, not incurring the expense of renting cars as well as not incurring the expense of individual meals that people would have off sites rather than group dinners at the facility.

Q. So there are other factors that APC looks at other than the hotel rate in determining whether or not an individuals stay at another hotel is appropriate, correct?

MR. KOSTAKOS: Object.

THE WITNESS: Yes.

Providence. We had people staying in Providence. Seth's job was in East Providence. The people that were coming in for training were being trained in East Providence. We had negotiated rate with Johnson & Wales in close proximity in East Providence. He chose to come to Providence. The cheaper rate was at Johnson & Wales. You can't make a unilateral decision to have the company incur additional expenses just because he wants to stay there, and that is where he has an account to get points, and he doesn't have an account at Johnson & Wales to get points.

BY MS. KISCH:

Q. Read back my question.

(Requested portion of testimony read.)

THE WITNESS: His --

MR. KOSTAKOS: Objection.

THE WITNESS: His situation was different from the sales meeting. His was not -- his were not a group of people coming in for a period of a week. These were people who were constantly coming in and out of Providence for training, and going to East Providence. So there was increased costs being incurred by APC by a rental of car, by meals. They were not group, necessarily group meals that

had the economy of scales that were achieved by having a sales meeting here, and having gone to the Westin for meals. His situation is totally different from the sales arrangement, when it comes to, you know, getting the best rate for this hotel. If he had nobody come in on a particular week for training, does that mean he should still stay at the Marriott, when that is not where we negotiated the best rate for the situation that he is in. He is in for a long term stay.

BY MS. KISCH:

Q. I wasn't referring to Mr. Daniels' stay at the Marriott.

THE WITNESS: I don't think you can separate the two issues. I don't think that -- I think that personally if Seth did not have an account, a rewards card with Marriott that earned him points, that he would have had -- I don't think he would have insisted on staying there. I am not sure he would have directed all the other employees who were visiting to stay there. There was a personal gain to him of getting the points from all these individuals. I am sure if he had a point system or point card at Johnson & Wales he would have stayed there. But his decision in my opinion

was based upon what benefited him, not what was in the best interest of the company in controlling costs.

BY MS. KISCH:

Q. And on what basis do you assert that if Mr. Daniels had had a point system set up at the Johnson & Wales for him personally he would have directed employees to stay at the Johnson & Wales?

A. Because more than once reference had been made to the point issue. I know Chris mentioned that he had mentioned about, you know, getting the points at Marriott. And if there is a benefit, simply in my opinion, whether you agree with my opinion or not, is that if he did not have the reward card from Marriott, he would have stayed at Johnson & Wales or someplace else, maybe someplace else that did have a reward card. The fact is he stayed at Marriott where he had a reward card, and he was in the position of directing other people who were coming in for training where to stay. So when you do something like that, to the detriment of the company, there are policies above and beyond the travel policy. I mean, when you do things to the detriment of the company, it didn't have to be covered by the travel policy actionable by HR.

Q. Did you believe that Mr. Daniels violated the travel policy when he organized APC employees to stay at the Marriott Hotel for training?

A. Yes, because I don't believe that he stayed at the location where we had negotiated rate which could provide not only housing for him, but for the people that would save money for the company.

Q. What does the travel policy require regarding making the decisions as to where to book a hotel?

A. I don't recall what the requirements are.

Q. Which requirement did Mr. Daniels violate?

A. You are a asking me to answer a question based upon my remembrance of I know what my thoughts were at the time. If you are asking me to cite chapter and verse what he violated, I don't have it.

Q. I am not asking you to cite chapter and verse, I am just asking you what --

A. He did not stay at the most cost effective hotel.

Q. That is the basis for the violation, and?

A. And by the direction he was in he directed people to stay at the same establishment thereby causing the company to incur more costs. The

purpose of the policy is so that both employee, and employer understand the obligations and the requirements. The rights of the employee, the requirements, and the obligations of the company. And engrained in those policies is the intent to make sure that you have cost containment. If that is not the intent then there is no need to have a policy. Then you might as well let anybody stay wherever they want. Let me book first class flights wherever they want. The policy is intended to control those cost whether individual employees or like that I really don't care.

Q. Did Mr. Daniels ever book first class flights anywhere?

A. I don't know.

Q. Are you aware?

A. I don't know.

Q. You don't know whether you are aware or not?

A. I don't know if he did. I am not aware that he did.

Q. Did you ever express to anybody that you felt that Mr. Daniels violated the travel policy?

A. Can't recall a specific conversation on that with anybody. Don't recall a specific

and why he stayed there.

MR. KOSTAKOS: Objection, asked and answered.

THE WITNESS: I don't know.

BY MS. KISCH:

Q. If Mr. Daniels had stayed at the Marriott at times totally unrelated to organizing training events where either employees traveled to Providence for APC training if in fact Mr. Daniels did stay at Marriott's at other times would that have been a violation of APC policy?

MR. KOSTAKOS: Objection.

THE WITNESS: Given that it was a place that we didn't have a negotiated rates, I would say, yes. But I will qualify that yes by saying that APC had hundreds if not, hundreds and hundreds of people who were traveling. And probably a thousand expense reports a week that come through. So is somebody going to be able to look at an expense report, look at a hotel receipt, and on a particular night, and, say, you know, and put all the effort, that is a violation of the company on the travel policy? I mean there are situations that stand out when you multiply the number of nights that you stay there. Not only one stay, but

over a period of weeks or months. So would an individual night trigger somebody saying that is a violation of travel policy, and following up, and getting HR involved, no. But when it is a situation when it is a significant number of nights involving a significant number of people over a significant period of time, yes, it, would be.

Q. It would be what?

A. It would be a violation, because he is staying at a place that doesn't have the rate that is negotiated the best rate.

Q. There are two different issues whether or not it is a policy and the second is whether or not APC is going to enforce that policy.

My first question asked, if Mr. Daniels stayed at a Marriott unrelated to organizing events for others people, would that be a violation of policy. And I believe you said it was, is that correct, is that individual one night stay is a violation of the policy, yes or no?

A. It would be, yes.

Q. If APC learned that he, in fact, did stay at the Marriott, whether it is Christine Bollman, HR, yourself, what would be the practice, if any, of following up with regard to that violation of

policy?
A. Well, first, if it was a single night situation, we wouldn't expend, necessarily expend the energy to follow it up. Because my time is money, Christine's time is money, HR's time is money. But if it were a situation that warranted the attention a contact would be made with the employee to say: Why are you staying here when you are in this city, we have a negotiated rate over here?
Q. Well, what situation would warrant that?
A. When a situation stands out. If a situation is brought to my attention or if it happens to be apparent on an expense report, somebody is looking at an expense report, and why are they staying at Marriott in Providence, and we know that the employee works in East Providence, and we know we have a rate in East Providence with Johnson & Wales.
Q. Well, my question was, at first, what if anything would you do to follow up if you, in fact, had knowledge that he was staying at a non-preferred APC hotel? And you said it wouldn't be worth the time to follow up. You said under certain circumstances you would. Under what

circumstances would you follow up?

MR. KOSTAKOS: Objection.

THE WITNESS: I answered the question. I will answer it a second time. I said if it was an isolated it wouldn't necessarily be worth my time, Christine's time, HR's time, to follow up on a single violation. But if it was a situation that we found that existed that was clearly not a one-night situation then we are going to follow up with the employee, and say: Why are you staying here, and why are you not staying over here?

BY MS. KISCH:

Q. Is there any exceptions -- are there any exceptions to the policy for any employees at APC?

A. Exceptions related to.

Q. What hotel he wishes to stay at when he travels?

A. I am not aware of exceptions. If people are going to -- we don't -- with people traveling through 50 states, you know, we can't compare every single one night against the policy. You review the expense reports in this relation to the policy, but there are always going to be stays that get through on the expense reports, one, because it is a timing issue, and you want to make sure that all

MR. KOSTAKOS: Objection.

THE WITNESS: I can't remember. It came down to also money. So even if there wasn't a written policy that said you had to stay at Hotel A, versus Hotel B, it would still be in place guidelines as to what the reasonable cost is per night for a hotel room.

BY MS. KISCH:

Q. So you do remember that there was some monetary limit for or guideline as to what hotel rooms should cost in the Providence area?

A. I am not saying the Providence area. I don't recall specifically what was in the policy related to Providence.

Q. So you don't recall what the policy was with regard to booking hotel rooms in the Providence area, correct?

MR. KOSTAKOS: Objection.

THE WITNESS: Correct.

BY MS. KISCH:

Q. Do you know of any individuals had other than, and I am not -- others than Mr. Daniels, do you now of any individuals who APC determined violated the travel policy in any way?

A. I can't tell you who it was and why it was

I know there were violations that were addressed.

Q. Do you know of any individuals other than Mr. Daniels who were terminated for violating the travel policy?

A. Don't know.

Q. Do you know if any of those individuals were white?

MR. KOSTAKOS: Objection.

THE WITNESS: Don't know whether they were white, don't know, whether they were male or female, don't know whether they were Asian, don't know whether they were Mexican.

BY MS. KISCH:

Q. Do you know of any individuals who were disciplined by APC for violating the travel policy?

A. Do I know firsthand, no, do I know that there were violations, yes. And those would be subject to whatever discipline. I was not involved -- once you identify an issue, and hand it off to HR, HR determines the outcome of what discipline, what action is taken to the employee.

Q. Did you ever inform APC of any violations of the travel policy by APC employees?

A. I am sure I did in this particular situation, Christine and I are very diligent in

the file room for retention.

Q. Do you recall having any conversation with anyone after Mr. Daniels was terminated regarding whether or not he should ben reimbursed for all of his outstanding expenses?

A. No.

Q. What was your role, if any, in notifying individuals than Mr. Daniels had been terminated by the company?

A. That wasn't my role.

Q. That was not your role?

A. HR has a mechanism, E mail notification whenever anybody leaves the company notifying when the last day worked, so that different people in IT, payroll, whatever, have knowledge that somebody has left the company, so that they can take actions, whether it is a stop payroll, shut off system access, whatever, so that notification wouldn't come from me, it would come from HR.

Q. Is it your testimony that you do not as a regular practice notify employees when an employee is terminated; is that correct?

A. That would be my practice, yes.

Q. You would notify people or you would not?

A. That would be my practice not to notify

because HR has their own mechanism.

Q. Do you recall ever notifying any individuals, current employees of APC, regarding the termination of an employee?

A. Not specifically, there may have been situations where some people hide visible people were let go, the former CFO, when you work for somebody, and they are let go, and somebody else didn't have knowledge of it, yeah, you would certainly want to let them know because they would have had interaction with that person. There would have been times when I would have mentioned to people who needed to know that somebody was no longer with APC ahead of an E mail coming out just because of the necessity of letting them know.

Q. But you don't recall ever notifying any individuals with regard to Seth's termination?

A. Not that I recall.

Q. Would there have been any reason to do that?

A. No, because the, people in my functional area are already included on that E mail from HR, they would have already had notification.

Q. All right. Other than what we have already talked about today do you recall any other

incur?
A. Yes.
Q. How so?
A. If you are going to be out in the field as part of your job incurring expenses on an everyday basis, again, we didn't want our employees working with their cash on the part of APC. If somebody is going into Providence for the day it is not worthy of anything.
Q. Do you know how many people had that sort of arrangements in with APC?
A. In North America we probably had I would say about 50, 60 people who probably had on going advances in place.
Q. And can you characterize, and only if you can, the types of positions those 50 or 60 people had or are they varied?
A. They were predominantly sales, sales related type of employees, because they are the ones who are out there.
Q. Who would be responsible for approval of those?
A. Again, the manager, the manager signs the forms, and then we do a sanity check on it as to whether it really is warranted.

Q. When you say we?

A. Mary Gougas and me.

Q. I like the phrase sanity check, can you tell me what that means?

A. Just as if our normal practice is to give an employee in a position X a $2,000 advance that is normally the monthly expenses they incur. If another employee comes in position X we are not going to give them a $7,000 advance.

Q. Is it because 2000 is more?

A. 2000 is more appropriate.

Q. Do you know whether or not Seth Daniels was given that sort of approval?

A. Finance doesn't initiate out to the employees pushing advances on them. So it would have been he or his supervisor, I believe his supervisor certainly would be aware of the on going advance mechanism. So it would be the employee and/or supervisor who would initiate an on going advance.

Q. And so to make sure I understand, is it your testimony that it wasn't something, a mechanism, to use your word, that you would inform the employee about, but rather the more likely that the employees manager would inform them of the