IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

ORIGINAL

- - - - - - - - - - - - - - X

:

SETH DANIELS, :

:

Plaintiff, :

:

v. : Case No.: 1:05-cv-00459

:

AMERICAN POWER CONVERSION : Judge Mary M. Lisi

CORPORATION, : Magistrate Judge Lincoln D.

: Almond

:

Defendant. :

:

- - - - - - - - - - - - - - X

Thursday, October 5, 2006

Washington, D.C.

Exhibit 11

Deposition of:

JOHN J. BONZANI,

a witness was called for examination by Counsel for Plaintiff, Lori Kisch, attorney at law, pursuant to Notice at the offices of Wiggins, Childs, Quinn & Pantazis, 7 Dupont Circle, Northwest, Suite 200, Washington, D.C. 20036, commencing at 10:00 a.m., there being present on behalf of the respective parties:

A P P E A R A N C E S:

ON BEHALF OF PLAINTIFF:

WIGGINS, CHILDS, QUINN & PANTAZIS
BY: LORI KISCH, ATTORNEY-AT-LAW
7 Dupont Circle, N.W.
Suite 200
Washington, D.C. 20036
Telephone: 202.467.4123
Facsimile: 202.467.4489

Q. Did you discuss salary?
A. Vaguely, more the benefits and some of the exceptions to the normal hiring or normal employee. Essentially, it's a range that we needed to meet to hire him.
Q. What were those exceptions that you discussed?
A. That he would be allowed to stay where he lived now until his kids were out of school, travel back and forth, and we would take care of the expenses, that he would find a house and move in as soon as his kids completed school, move into the area.
Q. When you say "We would pay for expenses," you're referring to APC?
A. Correct.
Q. Which expenses would APC pay for?
A. His living expenses up in Rhode Island, travel expenses.
Q. Did you tell him that that's something that APC would do?
A. Correct.
Q. In that phone conversation?

A. More than once during that conversation was that agreed to.

Q. Okay. And did you ever communicate that to anyone else at APC?

A. HR was aware of it, Christine Hendrix.

Q. Do you recall when you told Christine Hendrix about that agreement?

A. I do.

Q. Is it your understanding that Christine Hendrix was aware of that at the beginning of Mr. Daniels' employment?

A. Correct.

Q. Okay. Prior to him actually starting?

A. Correct.

Q. Do you recall if that as anything that was communicated in writing versus verbally?

MR. KOSTAKOS: Objection.

A. BY THE WITNESS: I do not recall.

Q. Okay. Other than Christine Hendrix, did you communicate that aspect of Mr. Daniels' employment agreement with APC to anybody else?

A. Paul Kavanagh.

Q. Do you recall when you communicated that with Paul Kavanagh?

A. I do not.

Q. Was it prior to Mr. Daniels starting his employment with APC?

A. Yes.

Q. Do you recall whether Paul Kavanagh approved that as well?

A. Yes, he did.

Q. And do you recall whether any of that was in writing, or was it verbally?

A. Verbally.

MR. KOSTAKOS: Objection.

Q. BY MS. KISCH: Did you communicate that aspect of Mr. Daniels' employment agreement with APC with anyone else?

A. Not to my knowledge.

Q. Okay. And are you aware of whether or not Christine Hendrix or Paul Kavanagh communicated that aspect of Mr. Daniels' employment agreement with anybody?

A. I'm not.

the time.

Q. Did you ever stay at another hotel?

A. Twice during sales meetings, and I don't recall the name, one was in Newport and one was downtown I believe.

Q. The one that was downtown, do you recall the name of that one?

A. No, it was for a sales meeting. All of the arrangements were made companywide for all the sales people that came in.

Q. And when was that?

A. I don't recall the date. It would have been prior probably to Mr. McDaniels (sic).

Q. Mr. Daniels?

A. Mr. Daniels. I'm sorry.

Q. Do you recall if that was the Johnson & Wales?

A. It was not.

Q. Do you recall whether it was the Marriott?

A. I do not. It was an upscale sales meeting held there where all sales representatives for North America, U.S. and Canada, were brought in for

their sales meeting of the year, a two-day weekend type dog-and-pony show.

Q. Okay. You don't know one way or the other whether it was the Marriott? Is that what you said?

A. Correct.

Q. Okay. Are you aware of any hotels that any other employee stayed at while traveling to Providence?

A. Yes.

Q. Okay. What hotels do you recall APC employees staying at while traveling to Providence?

A. Johnson & Wales. There were two that were down the street from East Providence that the employees had started staying at recently, but I do not recall the name of them.

Q. You said "recently." You're saying "recently" as in when?

A. Within the last year of my employment.

Q. Okay. Comfort Suites?

A. It does not ring a bell.

Q. Okay. So you think it was something other than Comfort Suites?

MR. KOSTAKOS: Objection.
A. BY THE WITNESS: I don't know.
Q. You don't know. But there were two other in East Providence you said?
A. No, they would have been in Massachusetts.
Q. Oh.
A. It would have been across the line. East Providence, the line is right there.
Q. Okay. Are you aware of any other hotels other than the Johnson & Wales in Providence that employees stayed in while traveling for APC Providence?
A. The Sheraton would have been the only other one.
Q. You're not aware of any other hotels that APC employees stayed in while traveling to Providence?
A. I believe there was some time that they were spending at a different hotel, and I don't know the name of it.
Q. Was it the Marriott?
A. It was right next to Bugaboo, and I do not know the name of it.

Q. Okay.

A. I do know that Seth, Mr. Daniels, stayed there and that some employees had stayed there.

THE WITNESS: Can we take a break as long as you're thinking?

MS. KISCH: Sure. Would you like a five-minute break?

THE WITNESS: Please.

MS. KISCH: Okay.

(Recess.)

Q. BY MS. KISCH: Are you aware of any policies, written policies, that APC had with regard to an employee of APC being allowed to keep travel points related to travel for APC?

MR. KOSTAKOS: Objection.

A. BY THE WITNESS: No.

MR. KOSTAKOS: I'm sorry. Did you say "written"?

MS. KISCH: Yes.

Q. BY MS. KISCH: And then the next question is: are you aware of any policies that weren't written but any policies that APC had with regard to an

heard of.

A. The availability of rooms and some of the rooms were old, creepy, and hard to access.

Q. Anything else?

A. Those were the major ones that I recall.

Q. Okay. How many complaints do you recall?

A. Hmm, at least a dozen over the years.

Q. Were these complaints that were made directly to you?

A. Yes.

Q. Okay. Are you aware of complaints made to other people about the Johnson & Wales, other than to you directly?

A. Complaints are a normal part of the job for field service people; so I imagine I heard a couple, yes.

Q. Would you have been apprised of all of the complaints made by employees with regard to the Johnson & Wales Hotel?

A. I don't understand.

Q. If there were, for example, another few dozen complaints made by APC employees about the

Q. Okay. Tell me what you recall, what conversations you had with Mr. Daniels.

A. The conversation revolved around the fact to get a hotel where we could get everybody in, that had Internet access, and that we could look at cutting down on transportation costs, getting the group together, spending more time together. Specifically, for the hotel was that it had Internet access.

Q. Were you aware at that time whether or not Johnson & Wales had Internet access?

A. Say that again, please.

Q. Were you aware around that time whether Johnson & Wales had Internet access?

A. At that time I probably was, but right now I do not recall whether it did nor not.

Q. Okay. Why was Internet access necessary?

A. For them to perform their functions, you know, and check on their jobs. APC is a company that you pretty much do everything on your computer, not a whole lot of paperwork to push around so --

Q. Was the requirement that there be Internet access was that something that was a recommendation,

or is that something that you expected, it was a requirement for reservations for hotel room reservations?

A. Say that again, please.

Q. You said that you communicated to Mr. Daniels that there must be Internet access at the hotel rooms that the APC employees were going to stay at. Was that just a suggestion you made to Mr. Daniels or was that a requirement that you felt was necessary for the actual whole training program?

A. It was necessary for AGS employees to have the internet access.

Q. Okay. Anything else that you recall communicating to Mr. Daniels at that time?

A. No, I do not.

Q. Okay. Do you recall having more than one conversation with Mr. Daniels about the need for Internet access for training programs?

MR. KOSTAKOS: Objection.

A. BY THE WITNESS: No.

Q. Okay.

A. There might have been two, but I do not

Q. Okay. When did you receive that? When did you become knowledgeable of that?
A. Mr. Daniels' last day of employment.
Q. Okay. What is your understanding with regard to that?
A. That he had received points or taken points from employees.
Q. Okay. Those are two different things. Is it your understanding that he received points as an organizer, or is it your understanding that he took points from employees that belonged to employees?
A. It was expressed to me that he had taken points from employees. That was in the sentence that was used to describe the situation.
Q. Okay. Who told you that?
A. Christine Hendrix and Paul Kavanagh was in the room. I believe it was Christine doing the talking.
Q. Do you remember what else she told you during that conversation with regard to Mr. Daniels?
A. No, I do not.
Q. Okay. Did Mr. Kavanagh say anything during

Mr. Daniels did not take points away from other employees and instead received points as an organizer, separate and apart from the employees points, would you concur that Mr. Daniels should have been terminated?

MR. KOSTAKOS: Objection.

A. BY THE WITNESS: Say that again, please.

Q. If, in fact, you learned that Mr. Daniels received points from the Marriott Hotel under a separate program, that he received points as being an organizer and did not in fact take any points away from employees who stayed at the hotel, that they could still get their own points, would you still concur that Mr. Daniels should have been terminated for receiving points from the Marriott as an organizer?

MR. KOSTAKOS: Objection.

A. BY THE WITNESS: My opinion?

Q. I'm asking you, yes.

A. No.

Q. Okay. And why should he not have been terminated if, in fact, it's true what I've just

Q. Okay. Were you aware whether or not Mr. Daniels had, in fact, negotiated a more favorable rate than one would normally get by just knowing and booking a room at this hotel?

MR. KOSTAKOS: Objection.

A. I believe I was, yes.

Q. Okay. After you became aware that this hotel was not on the preferred list, did any employee stay at this hotel after that point?

A. Yes.

Q. Okay. For how long a period of time after?

A. I don't know for sure.

Q. Okay. Did Christine Hendrix ever express to you that the hotel reservation should be changed for a different hotel?

A. No.

Q. Are you aware of whether employees ever stayed at this hotel after Mr. Daniels was terminated?

A. No.

Q. You don't know one way or the other?

A. I cannot be positive one way or the other, no.

that he felt that he was being discriminated against or harassed?

MR. KOSTAKOS: Objection.

A. BY THE WITNESS: Can you rephrase that, please?

Q. Did Mr. Daniels ever complain to you that he felt while working at APC that he had been harassed?

A. Yes.

MR. KOSTAKOS: Objection.

Q. BY MS. KISCH: What did he tell you?

A. He felt that he was being picked on by Finance and Human Resources.

Q. Did he tell you specifically who?

A. Yes.

Q. And who did he tell you he felt was picking on him?

A. Brian Gough and Brian Kelly.

Q. Anybody else?

A. No.

Q. Other than saying he was picked, did he ever say to you that he felt that they were harassing him?

MR. KOSTAKOS: Objection.

Mr. Daniels that the car had been broken into to check to see if what Mr. Daniels was telling them was the truth?

MR. KOSTAKOS: Objection.

A. BY THE WITNESS: Would I be surprised?

Q. Yes.

A. Yes.

Q. Okay. Why would you be surprised?

A. It's out of the norm.

Q. Okay. Is it also out of the norm to have a copy of a police report and then continue to insist that the employee get a copy and produce it?

MR. KOSTAKOS: Objection.

A. BY THE WITNESS: Yes. I've never been involved in something like that.

Q. Okay. Would it also be out of the norm to instruct employees not to tell Mr. Daniels that actually, because you already had a copy of the police report?

MR. KOSTAKOS: Objection.

A. BY THE WITNESS: Yes. To talk to employees period about it, but, yes.

suggesting that Mr. Daniels should not be reimbursed for these lunches. Did you have an opinion one way or the other whether Mr. Daniels should be reimbursed for these lunches?

MR. KOSTAKOS: Objection.

A. BY THE WITNESS: In my opinion, they were reimbursable lunches. I don't know about the IRS rules. They were to take employees to lunch that were coming in, and part of his function was to pay for lunch.

Q. Okay. Then, therefore, he should have been reimbursed for those expenses by APC; is that correct?

MR. KOSTAKOS: Objection.

A. BY THE WITNESS: I'm sorry? I didn't --

Q. Then, is it correct that it was your view that Mr. Daniels should be reimbursed for those expenses relating to those lunches?

MR. KOSTAKOS: Objection.

A. BY THE WITNESS: Yes.

Q. Okay. In the paragraph here from Brian Kelly to Seth, Brian says, "As I've stated, you've chosen to commute to RI."

email from Christine Bollmann to Steven Grunin related to a rental car that Mr. Daniels rented from Avis. We were talking earlier about some of the actions that APC took with regard to Mr. Daniels being out of the ordinary. Would you agree this type of inquiry by Christine Bollmann was out of the ordinary?

MR. KOSTAKOS: Objection.

(The witness perused the document.)

A. BY THE WITNESS: Yes.

Q. Do you know one way or the other whether Ms. Bowman made such similar type of inquiries with regard to the break-in of Anthony Corideo?

A. Corideo.

Q. Corideo.

A. I have no knowledge of that.

Q. Okay. Have you had any discussions with anyone, other than what you've already told me about, with regard to Mr. Daniels' termination? You talked earlier about when you were notified that he would be terminated, that you were told by HR and by Paul Kavanagh. Other than that conversation, have you had conversations with anyone else regarding

circumstances for Ms. Hendrix departure?

A. I wasn't. I was just told that she was no longer with the company.

Q. Okay. You didn't know anything more than that?

A. I believe she accepted a position and left, but I'm not sure.

Q. So you think it was actually voluntary on her part?

A. I believe so, but I can't say for sure.

Q. Did Ms. Hendrix ever talk to you at all about any issues related to Mr. Daniels other than what we've already talked about?

A. Yes.

Q. What?

A. The overall appearance of him, using the word "brash" again; having to have somebody for him to look up to and, I don't know, put him in his place or keep him under control.

Q. You were told to put him in his place and keep him under control?

A. No. Help him be put in his place and keep

control. It was described to me as a "big dog theory," that the big dog in a playground only looks up to a bigger dog.

Q. And who told you that?

A. Christine.

Q. Did you say anything in response to that?

A. My response was that Seth he is what he is. And some of the people that get their feelings hurt, they are going to get them hurt, and that's kind of the way it is, not to be unexpected.

Q. What was your understanding of her comment in which she was referring to Mr. Daniels and said that, you know, "A dog only looks up to a bigger dog"?

A. Can you say that again, please?

Q. Can you actually just replay that?

THE REPORTER: Yes.

(The reporter played back the record.)

"QUESTION. What was your understanding of her comment in which she was referring to Mr. Daniels and said that, you know, `A dog only looks up to a bigger dog?'"

A. BY THE WITNESS: I'm still not quite

in?

A. I do not.

Q. How do you know that he stayed in a hotel that was not on the preferred hotel list?

A. Nobody had ever stayed in the hotel before and it was right down the street and he wanted to try it out and see what it was like.

Q. Okay. When you say "It was right down the street," right down the street where?

A. From East Providence.

Q. Okay. So it was in downtown Providence?

A. No, East Providence.

Q. Oh, in East Providence, okay. Do you recall how many nights he stayed there?

A. No, I do not.

Q. Do you know how much he paid to stay in the hotel?

A. No. Specifically, no.

Q. Was he disciplined for staying in that hotel?

A. No.

Q. Was he terminated for staying in that hotel?

A. No.

Q. Did he get reimbursed for his expenses for staying in that hotel by APC?

A. As far as I know.

Q. Do you know whether the Finance Department or the HR Department raised any issues with regard to him staying in that hotel that was not on the preferred hotel list?

MR. KOSTAKOS: Objection.

A. BY THE WITNESS: We stay in hotels that are not on that list any time. There's only a few of them that are around corporate headquarters or corporate facilities. We stay in hotels outside of that list on a fairly very regular basis.

Q. Why do you do that?

A. You can't negotiate with every town and every city in the U.S. where there is a UPS or a customer with a need to have an engineer stay the night.

Q. In those cities where there are hotels on the he preferred hotel list, do you know of any instances where individuals stayed in a hotel --

A. Yes.
Q. -- that was not on the preferred hotel list?
A. Yes. Jim, the gentleman we were just talking about.
Q. Okay. Any others?
A. I believe that I personally stayed in one that's not on that hotel list in Denmark.
Q. All right. And why did you stay at a different hotel other than the hotel that's on the preferred hotel list?
A. The hotel was full. I preferred the one downtown versus the one that they had on the list. I didn't even know there was a list until you showed it to me.
Q. Okay. But you said "The hotel was full." Did you actually first try to stay in the hotel that was on the preferred hotel list?
A. Well, the hotel that's on there is normally full. It's used by Americans and tourists, and one of the reasons I don't particularly care to stay there.
Q. But did you actually even inquire whether there was room at that hotel?

A. I seriously doubt it.

Q. Okay. Has that preferred hotel list ever been distributed to you?

A. No, not until today.

Q. Do you know whether that preferred hotel list is distributed to employees in general at APC?

A. I would believe nobody who worked for me had ever seen that list to my knowledge.

Q. Okay. Do you know if there was any preferred hotel list in 2003?

A. I didn't know there was one until today, so, no.

Q. Okay. Well, you don't know that there was on in 2003, do you? If you want to, take a look back at that exhibit again.

A. Well, the list I know of now but --

Q. Why don't you take a quick look at that, which is Exhibit 1, and I believe in the title it says "APC Preferred Hotels 2004." Are you aware of any APC preferred hotel list for 2003?

A. No, I did not know there was a list for 2003.

network. It would have resided on their network. Reviews are done in a formal program that resides on their server.

Q. Other than emails and this draft annual review, and you said you also gave over your account information for your mileage awards that you received?

A. Yes. I did not have hard copies.

Q. Is there anything else that you recall turning over?

A. Not to my knowledge. I believe that was it.

Q. Do you recall how many mileage awards you received while working for APC?

A. How many different accounts? How many total miles? Can you be a little more specific?

Q. Well, do you know how many total miles you've received?

A. No, I do not.

Q. When you say "miles," you're referring to airplane?

A. Airplane, hotel, car rental.

Q. Okay. Well, do you have any idea how many hotel reward points you received while working for

APC?
A. Whew. I have no idea, probably 75,000 to 100,000.
Q. Seventy-five hundred to how much?
A. Seventy-five thousand to a hundred thousand.
Q. Okay. Seventy-five thousand to a hundred thousand. Any estimate of how many airline miles you received?
A. Seven hundred thousand.
Q. Were there any other types of reward points that you received other than hotel and airline, or would that be it?
A. Rental cars were probably in there someplace. Most of them have some program or another.
Q. Okay. Were you ever required to give over any of your awards or miles or points to APC that you earned, actually that you earned through your employment with APC?
A. No.
Q. Do you know any employee who was required to hand over their personal reward points or travel miles that they had obtained through travel-related expenses

A. No.

Q. Do you know why Ms. Hendrix brought this up at that point?

A. Yeah, I believe so.

Q. Why?

A. I believe that he offended some people inside the IS Department trying to get us laptops in a timely manner when we had new hires.

Q. Do you know in what way he offended these people?

A. Specifically, no.

Q. Was it your understanding that he was doing his job in trying to get laptops, and he met resistance from the IS Department?

A. He was acting as directed and trying to get the task done the best that he could.

Q. Okay. Were any of the individuals that he was working with in trying to get the laptops from minorities?

A. Probably. I can't say one way or another, but half the department is a minority of some kind.

Q. Half of the department, you said?

discipline should be given?
A. Yes.
Q. Okay. Did they actually make the decision of what level of discipline to give or did you?
A. I did.
Q. Okay. So they just gave you guidance?
A. They helped fill out the forms and helped discuss which ones would be the better opportunities, but the final decision was mine as the manager.
Q. Okay. Whose final decision was it to terminate Mr. Daniels?
MR. KOSTAKOS: Objection.
A. Final decision? I'm not sure I can say who. I know kind of where it came from directionalwise. But final decision? No, maybe I am. Because I said, "If he did that, then, yes, he has to go." I agreed with it, and I was the last one to say something.
Q. Okay.
A. But where it came from and how it was presented? It was, you know, given to me by those two individuals. Where they got it from? I have no clue.
Q. Well, did you understand that you were

making a final decision with regard to his termination?

A. Yes.

Q. You did understand that?

A. Yes.

Q. Do you normally make final decisions with regard to final termination without any knowledge about where the information came from?

MR. KOSTAKOS: Objection.

A. BY THE WITNESS: When it was presented to me by my boss and Human Resources, I agreed. I would have agreed in any case.

Q. What do you mean by that? You would have agreed in any case?

A. It doesn't matter who the individual was, if somebody came to me and presented it the way they presented what was done, yes, they have to go. There is no place in the company for somebody like that.

Q. Okay. But you don't find it necessary to corroborate any of the information that's coming to you? For example, let's say, Laurie Gaspar came to you and said, "Mr. Daniels punched me in the parking

lot" and there was no physical evidence, would you based on that one statement go and terminate Mr. Daniels, or would you first speak with Mr. Daniels?

MR. KOSTAKOS: Objection.

A. BY THE WITNESS: No. No, you don't make decisions like that. If now you turn it around and present it the way it was, but you're trying to present it in a different light.

The fact is that my boss and HR came to me and said "This happened, and we are letting him go," and I agreed to say yes, you know.

And, if those two individuals came to me and said, "You know, somebody hit me in the parking lot, and he's got to go," or "She's got to go," then, yes, I would agree in that same circumstance.

Q. Okay. So Mr. Kavanagh and Ms. Hendrix came to you and said that they had already made a decision to terminate Mr. Daniels; is that correct?

A. Correct.

Q. Okay. If you had disagreed, do you think that Mr. Daniels would not have been terminated?

MR. KOSTAKOS: Objection.

A. BY THE WITNESS: No. I mean, it's a hard question to answer. If I would have fought real hard, maybe I could have stalled it for some time. But I don't believe that my saying yes or no to do with it. They were there to walk him out.

Q. Okay. He would have been terminated regardless of your response?

MR. KOSTAKOS: Objection.

A. BY THE WITNESS: I believe so.

MS. KISCH: Could you mark this, please?

(The document was marked Bonzani's Deposition Exhibit No. 6 for identification.)

Q. BY MS. KISCH: Mr. Bonzani, I'll show you what has been marked as Bonzani's Exhibit 6. If you could, just take a moment to look at that.

(The witness perused the document.)

A. BY THE WITNESS: Mr. Bonzani, I just want to direct your attention to the last item. This appears to be a bill from Providence Marriott and the last entry is dated March 24th and it says "APC Training."

increased if the APC employees had stayed at the Johnson & Wales?

A. Say that again. I didn't --

Q. Would transportation costs have been more if the APC employees stayed at the Johnson & Wales versus the Marriott which is right downtown?

MR. KOSTAKOS: Objection.

A. BY THE WITNESS: Not necessarily.

Q. Okay. When you say "not necessarily," potentially it could be?

A. Yes.

Q. Okay. If the Johnson & Wales had equipped five rooms with high-speed Internet access, would that have been sufficient for housing the APC employees in rooms for this type of training event?

MR. KOSTAKOS: Objection.

A. BY THE WITNESS: I seriously doubt it, no.

Q. Okay. Well, when these types of training events were going on, how many employees were involved?

A. Hmm, anywhere from six to ten, if only one class is going on. If there's more than one class, it

these types of instances, got themselves involved when it came to Mr. Daniels?

MR. KOSTAKOS: Objection.

A. BY THE WITNESS: Well, in my opinion, I think Brian Kelly got involved because of the amount of money. Some of this people were upset, and he didn't like that. Brian Gough, in my opinion, I don't think he liked Seth.

Q. Why don't you think he liked him?

A. Brash and outgoing, Brian Gough doesn't like people like that, myself included.

Q. What race is Brian Gough?

A. Pardon?

Q. What race is Brian Gough?

A. White.

Q. Do you think that Mr. Daniels' race in any way affected the way in which he was treated by HR and the Finance Departments?

A. I would like to think not.

Q. We would all like to think not. But my question is: do you think it in any way did?

A. No.

and was off the list of issues.

Q. Who gave you that understanding?

A. Christine.

Q. Hendrix or Bollmann?

A. No, Christine Hendrix. And judging from the other email, I would say the same thing.

Q. The training that Mr. Daniels was responsible for scheduling, I guess it was not delivering but scheduling?

A. Correct.

Q. Did he deliver training at the orientation sessions?

A. He had knowledge of the Internet IS type environments. I believe he helped or could have the ability to deliver some of the computer training, but he was specifically tasked as a manager.

Q. A coordinator?

A. Well, not even a coordinator, as a manager.

Q. Okay.

A. There was a coordinator that did exist.

Q. Were those training sessions, were any of the training sessions that he was the manager for,

are numbers, yes, and no.

Q. Did you ever see anybody at APC harass or discriminate against Mr. Daniels because of his race?

A. No.

Q. Did you ever see Mr. Gough or Mr. Kelly discriminate or harass anybody because of their race?

A. No.

Q. What was Mr. Daniels' performance like?

A. Average, needed improvement.

Q. I think you talked about his ability to act with others. Was that a problem for him in terms of performing his job, his brashness?

A. I wouldn't term it as a problem, but some saw it as a problem, yes.

Q. You didn't determine or see it as a problem because it was helping him to get his job done; is that correct?

A. It was helping me, yes.

Q. Helping you to get your job done. But was it fair to say that he was offending people in the workplace because of his demeanor or attitude?

A. Yes.

Q. How about his ability to prioritize and get his tasks done? What was that like?

A. Prioritizing, he had issues with. Getting his tasks done, he was fairly good at it, if you kept him focused and moving on it.

MR. KOSTAKOS: Mr. Bonzani, I don't have any more questions.

MS. KISCH: I have a few more.

THE WITNESS: Surprise, surprise.

FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MS. KISCH:

Q. I think I'll work backwards here. You just mentioned that Mr. Daniels did offend some people. How did he offend people? In what ways?

A. His personality is outgoing, a brash kind of thing. Some people do not take well to that and are just naturally offended by that type of a person.

Q. Okay.

A. It's not like he went out looking to do it.

Q. But, just by the very nature of who he was, he offended people?

A. Correct.

consider that stealing and it would be unethical, and they should be dismissed from the company.

Q. BY MS. KISCH: Okay. But, if, in fact, Mr. Daniels received reward points as an organizer but it in no way affected whether or not other employees received their reward points, I believe you testified earlier that you believe he should not have been terminated; correct?

A. Correct.

Q. Okay.

A. It should have been corrective action and discuss the why not to do those kinds of things and how it looks to other people.

Q. Okay. You were talking earlier that certain training was held at an APC facility while some training is conducted offsite. If some of the training that Mr. Daniels organized, in fact, was held offsite at a hotel at the Marriott or some other offsite location, would that have been a violation of APC policy?

A. No, there could have been reasons why it was done.