IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

- - - - - - - - - - - - - - - - - - - - - - -

SETH DANIELS,

Plaintiff,

COPY

vs C.A. No. 05-00459-ML-LDA

AMERICAN POWER CONVERSION CORPORATION,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF CHRISTINE BOLLMAN, called as a witness by counsel for the Plaintiff, pursuant to the provisions of Rhode Island Rules of Civil Procedure, before Victoria S. Reade, Professional Court Reporter and Notary Public, in and for the State of Rhode Island, taken at Law Offices of Stephen Robinson, 155 South Main Street, Providence, Rhode Island, on Thursday, October 12, 2006, commencing at 1:00 p.m.

Exhibit 13

that APC employees are to use?
A. Yes.
Q. Does it say that they're required to use?
MR. KOSTAKOS: Objection.
A. I would have to go back to see exactly how it's worded.
Q. Well, what is the policy when you have a certain airline, car rental or hotel that you contract with for services, do you require APC employees to use those specific vendors or are they merely preferred vendors?
A. There are preferred vendors.
Q. So you don't require that they use those vendors?
A. Right.
Q. Other than the cardiac rental or the airline -- actually, strike that.
Are there also hotels listed in this travel policy?
A. Not in the policy.
Q. But there car agencies and airlines in the policy?
A. Correct.

Q. What did you mean when you said APC employees must use preferred APC hotel first and now you're say whenever possible that a designate agency has rates with, who are you referring to when you say designated agency?

A. Currently it's called Carlson Wagonlit Travel Agency.

Q. And is that Carson Wagonlit Travel Agency did you say?

A. Yes.

Q. Do they negotiate with hotels or does APC negotiate with hotels?

A. Both.

Q. So there may be some hotels that the travel agency has a contract or a relationship with is are not on the APC preferred list?

A. Correct.

Q. And do you receive some sort of a list from the travel agency as to what those hotels are?

A. There is a book.

Q. Is APC given a copy of that book?

A. The agents work off that book.
Q. Have you ever seen that book?
A. No.
Q. Do you know what hotels are on that book?
A. No.
Q. Do you know what hotels book in the Providence area?
A. No, I don't.
Q. And do you know if the hotels in that book has changed overtime?
A. I do not know that.
Q. If an individual is not able to make hotel reservations at either one of the hotels on the APC preferred hotel list or that is in the book that is maintained by the travel agency, what, if any approval, do they need to go outside those?
A. They don't need any.
Q. Are there any other policies, APC policies relating to booking hotels other than what you have just described?
A. No.
Q. Are there written policies at APC with regard to an employee's receipt of reward

FREEDOM COURT REPORTING



provides for an exception if there is a convention?
A. No.
Q. Is it the fact that in your mind when you say it doesn't violate the policy, is it the fact that there was a negotiation to get a good rate that makes it okay not to follow the APC policy?
A. Correct.
Q. Other than the conventions, have you ever stayed at a hotel that's not on the APC preferred list?
A. Yes.
Q. And when was that?
A. I don't recall the years, but the travel agencies usually put on their own, you can call it convention or town meetings on and you stay, again, in the hotel that they negotiated a rate for you.
Q. How often how many times would you do that?
A. Probably five times.
Q. And do you remember the last time you did that?

receipt of travel points; is that correct?
A. That's correct.
Q. Other than yourself, are you aware of any individuals who were not on APC prefer list?
A. Yes.
Q. Who?
A. APC travels all over the globe, so I cannot mention names, but we do not have preferred hotels in every city of the world.
Q. In those cities where APC does have preferred hotels, are you aware of individuals who stayed at non-preferred hotels?
A. No.
Q. Not at all?
A. I couldn't give you a name, no.
Q. Sitting here today you don't know of any individuals since you've been employed at APC that stayed in a city in which APC has preferred hotels and those individuals stayed at another hotel that was not on that list?

A. I am sure there are people, but I could not give you a name.
Q. None, no names?
A. No.
Q. Why are you sure there are people?
A. Because there are always people that go outside of the policy that you try and convince that they should stay with the policy. You try you, best so I am sure there is some leakage there.
Q. If somebody did stay in a city in which APC did have a hotel on their preferred list and that individual stayed at a different hotel other than one on the APC preferred list, would you have knowledge of that? Would you be informed of that in your role as travel manager?
MR. KOSTAKOS: Objection.
A. No, I would not.
Q. That's not part of your job?
A. No.
Q. Would anybody at APC be informed of that?
A. The manager who approves the expense report should have knowledge of it.

Q. And are you talking about someone in finance or a manager within a particular division in which the employee works?
A. The division where the employee works.
Q. So is it policy at APC that managers are required to approve where the employees are staying at hotels, in which the employee is staying?
MR. KOSTAKOS: Objection.
A. They approve the expense report.
Q. And what does that approval mean?
A. They approve each charge on the expense report and there is approve button and it sends it to accounting.
Q. And if a manager does approve that expense report, then it's considered approved and the individual would be reimbursed for that expense?
A. Correct.
Q. What is the process for the approval -- strike that.
With rental cars is there any written policy with regard to any restrictions or requirements for renting

cars?

A. What sort of requirements?

Q. Well, I am wondering if there are any requirements. When an individual rents a car, are there any policies with regard to what type of car, what level car?

A. Yes.

Q. What are they?

A. Compact car.

Q. So APC employees are only permitted to rent compact cars; is that what you're saying?

A. Compact cars is the policy. There are always circumstances where an employees is extremely tall, an employee has customers that he has to transport or equipment and at that point you get a larger car.

Q. What does the policy specifically state with regard to renting cars?

A. That compact is the policy.

Q. Well, does it say that compact cars are preferred or you're required to rent a compact car unless there is an exception; what does it say?

A. I can't give you the exact wording of that.

Q. But what you're describing is that the general policy is the employees should rent a compact car unless there is a reason for renting a larger?

A. Correct.

Q. And if there is a reason for needing a larger car, is there any approval process that's required?

A. No.

Q. Does the manager have to sign off on the expense related to the rental car?

A. Correct.

Q. And, again, if that manager within the particular division signs off, then it's considered approved and the employee should be reimbursed?

A. Correct.

Q. Are there any exceptions to that?

A. No.

Q. Are there any reasons why if an individual rented a car and the manager signed off and approved why an individual would not

be reimbursed for that rental car?
A. I would think that if the manager sees that his employee rents a convertible every time or an SUV, I would hope they would say something or once in a while we see that at the time of booking and are made aware of it by an agent and we would take it from there.
Q. So if there seems to be a recurring pattern of an individual renting a larger car than a compact, then you might get involved?
A. Right.
Q. Other than a recurring problem, would there be any other reason why you would get involved?
A. No.
Q. Would anyone get involved other than yourself whether or not the individual, he or she rented a larger car other than a compact?
A. It could be that it's flagged at the time the expense reports are audited, each expense report is audited that somebody

flags it there.

Q. And why would someone flag it there?

A. Because they would see that it was maybe an extremely high expense or something out of the ordinary. That's what an process is for.

Q. What is the average cost of a rental car in Providence per day?

MR. KOSTAKOS: Objection.

A. $42.

Q. $42 a day?

A. Correct.

Q. Does that include tax and other charges?

A. No.

Q. And is there any policy with regard to whether or not they get collision insurance or any other type of insurance from the rental car agency?

A. That's included in the corporate rate which is the $42.

Q. And with tax do you know how much it is per day in Providence for renting a car?

A. No.

Q. Are you aware of any individuals who

rented a car larger than a compact car who were not reimbursed for the added expense?
A. No.
Q. Do you recall ever requiring in any individuals who rented a car larger than a compact car?
A. Yes.
Q. And who do you recall inquiring about?
A. Ed Machala.
Q. And when did you make that inquiry?
A. At the time I got a report from the rental car company showing me what kind of cars were rented.
Q. What year was that?
A. I don't know.
Q. Was it this year?
A. No.
Q. Was it last year?
A. I don't know.
Q. Was it after 2003?
A. Probably.
Q. And what kind of cars were being rented?
A. Convertible.
Q. How many times?

A. Just three times.
Q. Were you notified each time or were you notified the third time?
A. No, it was a compacted quarterly report.
Q. And what race is Mr. Machala?
A. White.
Q. And did you speak with him about the issue or somebody else?
A. No, I did not speak with him.
Q. Who did you speak with?
A. Well, he's VP of American Power Conversion so I would allow him, obviously, to rent that car or I would not speak up to him about that car.
Q. And why not?
A. Because he is a VP of the company.
Q. But you said you did inquire?
A. I inquired who rented those convertibles.
Q. So you saw that convertibles were rented, you just didn't know who and you asked and found out it was the vice president and you did nothing further?
A. That's correct.
Q. Is there an exception in the policy with

regard to the level of car an individual
to allowed to rent based upon a job title?
A. No.
Q. Is Mr. Machala a large man?
A. No.
Q. Did you inquire at all whether Mr. Machala
was escorting customers in the car?
A. No.
Q. Did you inquire with anybody else with
regard to the type or size of car that was
rented at all since you're the travel
manager?
A. No.
Q. Do you have any knowledge at all whether
or not there are any individuals at all
that have not been reimbursed for the
total cost for renting a car based upon
either the size or type of car?
A. I do not know.
Q. Do you know whether or not any inquires
were made with regard to any other
individual other than Mr. Machala with
regard to the size or type of car that was
rented?

A. As for myself?

Q. Do you have any knowledge at all, could be that somebody else told you something, doesn't matter where your knowledge came from, do you have any knowledge at all?

A. Can you rephrase that.

Q. Do you have any knowledge of any inquires that were made at all with regard to an individual who rented a car based upon the type or size of the car?

A. No.

Q. Do you have any knowledge at all with regard to individuals not receiving full reimbursement because of either the size or type of car?

A. No.

MS. KIRSCH: Do you want to take a quick break?

MR. KOSTAKOS: Sure.

(THEREUPON, THERE WAS A SHORT RECESS.)

Q. Going back to the preferred, the APC preferred hotel list, you had said that in the APC travel policy there was no APC

preferred hotel list; is that correct?
A. That's correct.
Q. Did an APC preferred hotel list come into existence?
A. Say that again, sorry.
Q. Did an APC preferred hotel list come into existence at some point?
A. Yes, it did.
Q. When?
A. 2003.
Q. And who created that list?
A. I did.
Q. And in 2003 where was that list maintained?
A. On the APC Intranet.
Q. And when was it posted on the Internet?
A. Sometime early in 2003 when we actually had an Intranet for the first time.
Q. You thought that was in March perhaps?
A. Yes.
Q. So was the APC preferred hotel list put on the Internet at the same time that the APC travel policy was also posted?
A. About the same time.

Q. Did you inquire as to what the basis for his understanding that high-speed Internet access was not necessary?
A. No.
Q. Did you inquire of Julie Sakolla as to the basis of what her understanding was with regard to whether or not high-speed Internet access was necessary?
A. No.
Q. Other than the one e-mail from this individual who you didn't know and Julie Sakolla whose job title you didn't know, did you receive any other communications with regard to whether or not high-speed Internet access was available other than what we talked about with regard to Mr. Daniels?
A. I don't recall.
Q. Did you ever ask Mr. Daniels as to why high-speed Internet access was necessary?
A. Yes.
Q. And what did he tell you?
A. He told me that when the people attending the training, they had to go back to their

hotel after training and to do homework.
Q. And did you believe him?
A. At the time, yeah.
Q. And did that belief ever change?
A. Yes, when I got that e-mail.
Q. Anything that led you to change your belief in what Mr. Daniels was telling you was the truth with regard to why high-speed Internet access was necessary?
A. No.
Q. And did you inquire with anybody else?
A. I must have, but it was just speaking with people in conversations, daily conversations.
Q. Well, do you recall any inquires that you made other than what we've discussed?
A. No.
Q. Do you recall any other conversations that you had other than what you've just testified to?
A. No.
Q. Do you have any documentation with regard to the issue of whether or not high-speed Internet access was necessary for the

reserved for individuals that were not at
a hotel on the APC preferred list?
A. Was I aware at the time.
Q. Well, were you aware around the time?
A. No.
Q. When did you first become aware?
A. When I got a phone call from the general
manager at the Johnson and Wales
University Hotel.
Q. The conversation that you had with Mr.
Daniels with regard to the need for
high-speed Internet access, was that
before or after the phone call from
Johnson and Wales?
A. That was after.
Q. In what context did that conversation
occur with Mr. Daniels with regard to the
highspeed Internet access requirement?
A. It was really not in regards to the
high-speed Internet requirement, the
conversation that I originally had with
the GM.
Q. No, I am asking in what context did you
conversation with Mr. Daniels arise. Why

Q. Did you say anything in response to her?
A. No, I did not. I said I would try and check into it.
Q. Did she tell you what the actual drop was, how many rooms were normally used versus what was occurring at that point?
A. No.
Q. Did you inquire with her about that?
A. No.
Q. So you have no idea how far it dropped?
A. No.
Q. Did you ever look to see how many rooms were actually used in 2003 at the Johnson Wales Hotel?
A. We look at that on an annual basis.
Q. And do you recall how many rooms were rented at the Johnson and Wales Hotel in 2003?
A. No.
Q. Do you have any idea?
A. No.
Q. Do you have any idea whether it was more than ten?
A. Oh, yeah.

Q. Was it more than 10?
A. It was probably a thousand, couple of thousand.
Q. What about in 2004?
A. At the beginning of 2004 or at the end of 2003 that was when that sudden drop came.
Q. For how long a period of time was there a drop, days, weeks, months?
A. Two months I would say.
Q. And that was either in late 2003 or early 2004?
A. Right.
Q. And how many rooms, when you say a couple thousand rooms were used in 2003 at Johnson and Wales, about how many rooms were used in 2004 at the Johnson and Wales Hotel?
A. I recall quite a bit less, I don't know exactly how many.
Q. Well, was it in the thousand range?
A. I would say less than that.
Q. Less than a thousand?
A. Yes.
Q. Was it more than 500?

A. Probably.
Q. More that 750?
A. Right around that I would think, yes.
Q. You believe that in 2004 that APC used about 750 rooms at the Johnson and Wales Hotel?
A. That's a guesstimate.
Q. Do you know how many rooms were used during -- strike that.
After you got off the phone with Miss Shibley what, if anything, did you do next with regard to the issue of the drop of rooms at the Johnson and Wales Hotel?
A. I believe I contacted Seth to inquire if they had anything to do with the shift of, at that time I didn't know shift, but with the sudden lack of room nights that we were giving to the Johnson and Wales.
Q. Was Mr. Daniels the only individual at APC who was in charge of organizing rooms in the Providence area at hotels?
A. No.
Q. Who else?
A. Kim Distafano I believe I recall that

that a verbal conversation or was that also e-mails?

A. No, I think she was copied on those same e-mails.

Q. Did she respond at all to you?

A. Nobody responded to me.

Q. Were you addressing it to her as well or were you just cc'ing her?

A. I probably cc'ed her.

Q. What, if anything else, did you do after the Johnson and Wales call with regard to your inquiries about the drop in the hotel reservations at Johnson and Wales?

A. Well, there was a period that Seth came in my office on a number of occasions and I can't recall exactly what the date was or where that falls in, but we had conversations about high-speed Internet and we came or I thought it would be a good solution because Johnson and Wales was getting onto high-speed Internet, they would do five rooms just for APC and hold them aside for APC business at first until they got the whole hotels up to speed and

if I remember right, he thought that was a good idea.
Q. Do you know when the Johnson and Wales were planning on having those five rooms ready for high-speed Internet access?
A. That was late 2003.
Q. They were going to have those five rooms available to you in late 2003 with high-speed Internet access; are you sure of that?
A. Yes.
Q. And that was late 2003?
A. Right.
Q. And how do know that, how do know that they were actually ready in late 2003, those five rooms?
A. Well, I don't know the dates, but I remember having conversations on a regular basis with Carol, you know, first we got two rooms going now, now we've got three and now we've got the five rooms going.
Q. So she actually told you that they were ready?
A. Right.

A. Marriott Providence.
Q. All ten?
A. Yes.
Q. Were you given copies of those expense reports, or did you look them at the finance department?
A. At the finance department.
Q. And you don't remember any of the individuals whose expense records you looked at?
A. No.
Q. Were those hotel rooms paid by the individuals staying at the hotel or was it a direct bill to APC?
A. Some were paid by the individual and then others had just other expenses, meals and such at the Marriott Providence.
Q. Did you have any knowledge one way or another whether all the individuals paid for their own hotel and then got reimbursed or whether or not anyone directly billed the hotel changes?
A. Well, after receiving all the unpaid invoices after Seth's departure it became

clear to me that they must have handled some individuals as a group and some were just responsible for their own charges.

Q. And do you have any knowledge about how many were paid -- when you some were handled by a group, what do you mean by that?

A. I am sorry?

Q. When you say some were handled as a group, what did you mean by that?

A. When you have a group you have usually ten or more people and you do a contract with the hotel and you say I need ten rooms, 20 rooms and you negotiate a contract.

Q. My question was were any of the hotel room expenses directly billed to APC?

A. Yes.

Q. Do you know how many?

A. Quite a substantial amount, I don't know exactly how many.

Q. Do you know if it was more than 50 percent or less than 50 percent?

A. I don't know.

Q. Did you ever inquire?

earned around to date over 100,000 points on his Marriott points for booking these groups and that these invoices are being sent to Jean in East Providence.

Q. And what's the problem with the invoices being sent to Jean?

A. Well, we generally don't just pay invoices there is an approval process.

Q. What kind of an approval process?

A. The invoice has to be put into iprocurement.

Q. What's that?

A. That's our accounting system that we have. I am not familiar exactly what it is.

Q. Okay.

A. It then goes through a certain level of approval process depending on how much approval, how much a manager can approve whether it's 10,000 or 30,000, whatever that invoice is goes to that manager who has that approval right and then it gets a purchase order number and it gets paid.

Q. So what is the problem with an invoice being sent to Jean?

A. There is no problem with an invoice being sent to Jean.

Q. And who puts the invoice into the Iprocurment system?

A. It's usually the person who incurred the cost.

Q. What if it's a direct billing situation, who puts it in?

A. The person who incurred the cost.

Q. Well, in the instance of someone who's organizing a training and -- let's say, for example -- let's say for example 50 rooms were booked at the Johnson and Wales and they were booked as a group?

A. Right.

Q. There would be direct billing for some of the individuals, correct?

A. Right, for the group.

Q. So who would that invoice be sent to?

A. Whoever is holding the group, whoever is in change of that group. That's usually one individual or one department.

Q. So the invoice would be sent by Johnson and Wales to whoever is organizing that

group hotel reservation?
A. Correct.
Q. So if Mr. Daniels had directed that the hotel rooms be reserved at the Johnson and Wales, Johnson and Wales would have sent Mr. Daniels an invoice for all of those for that group of rooms that were booked?
A. If it was booked as a group, yes.
Q. And what, if anything, would Mr. Daniels need to do with that?
A. He would receive this invoice and either himself or one of his assistants who put it into iProcurement and receive a purchase order number after approval and then it would get paid.
Q. Is there ever an instance where an invoice is sent directly to the finance department versus the manager who is organizing the hotel reservations?
A. Yes. When we do the hotel reservations for people that applicable for direct billing hotels. Our travel agents complete the form with the department coding the person's names, the hotel

information, they bring it to me, I sign it, it goes to the hotel, it gets faxed to the hotel and when the hotel sends out the invoice they attach this authorization to the invoices and it gets paid.

Q. Do you authorize all direct billing for hotels or are there some instances where you don't need to authorize it and the travel agents can send it directly to the hotel?

A. I authorize all individuals but not all groups.

Q. Does anyone at APC authorize the groups for direct billing?

A. No, usually that's what you use groups for meetings, it's not consolidated so each individual can arrange for a group if they chose to do so.

Q. And when you say individual, you're referring to whoever the manager is that's overseeing the meeting?

A. Right.

Q. So you wouldn't need to approve direct billing for that instance?

A. No, then it would get approved through the iProcurment process.

Q. After you expressed your suspicions to Mr. Kelly and what you found out after receiving the e-mail from Mr. Barger, did you say anything to Mr. Kelly with regard to this issue with Mr. Daniels?

A. Yes, I expressed my dissatisfaction that we would lose points at Johnson and Wales that we generally use for our Christmas party gifts to an individual who receive points pretty much can take a nice vacation.

Q. Did you say anything else?

A. No.

Q. Was the Johnson and Wales the only other hotel on the preferred list in the Providence area, the APC preferred list?

A. In East Providence or the entire Providence area.

Q. The Providence area.

A. No.

Q. There we other hotels?

A. Right.

preferred hotel list at the time?

A. Correct.

Q. Well, would you have learned about it soon after the time?

A. Well, I don't see their expense reports.

Q. Well, did you learn at any point that any individual stayed at hotels in the Providence area that were not on the APC preferred hotel list, other than those we have already right about?

A. No.

Q. You never became knowledgeable of that?

MR. KOSTAKOS: Objection.

A. No.

Q. Did you ever take any affirmative steps to learn the extent to which employees were staying at hotels in the Providence area that were not on the APC preferred hotel list?

A. Yes.

Q. And what's that other than with regard to what we talked about with regard to Mr. Daniels?

A. I was hoping that our expense reporting

tool would break out the different properties, car, hotel, air, but unfortunately at that time it could not.

Q. At what time?

A. 2003, 2002, really all the time that I have been there as the travel manager you always try to find ways of getting information, reporting.

Q. Did you inquire with someone about this possible expense reporting tool?

A. At that time it was my boss yes.

Q. And who was your boss at that time?

A. Mike Richie.

Q. Did you inquire with anyone else?

A. No.

Q. Other than inquiring of Mike Richie in either 2002 or 2003 whether or not the expense reporting tool would identify what hotels were being used, did you make any other affirmative efforts to determine whether APC employees who stay in the Providence area are staying at hotels which are not on the APC preferred hotel list?

A. No.
Q. At the time that you went and took it upon yourself to look at individual expense reports of employees who were attending training sessions for which Mr. Daniels was organizing, did you inquire with anyone whether or not any of the individuals stayed at the Marriott received points from staying at the Marriott?
A. No.
Q. Did you ever ask Marriott that question?
A. No.
Q. And do you have any knowledge today whether or not any APC employees who stayed at the Marriott for the training session for which Mr. Daniels organized, whether or not any of those employees received points for their stay at the Marriott?
A. I don't know.
Q. Do you know whether anyone else from APC inquired?
A. No, I don't know.

Q. How many points would APC have obtained from the Johnson Wales had Mr. Daniels booked all of those rooms that were booked at the Marriott at the Johnson and Wales?
A. I couldn't tell that.
Q. Do you know how many points are generally received from the Johnson and Wales for a hotel stay?
A. You know what, I can't say exactly. I think it was one point per night.
Q. One point per night?
A. Yes.
Q. And how many points did you need in order to get a gift?
A. Well, the smallest one was $50 to Home Depot, Lowes.
Q. And how many points would you need in order to get a $50 -- was it a gift certificate?
A. Yes.
Q. How many points would you need in order to get a $50 gift certificate to Home Depot?
A. Fifty points.
Q. So points translated, it was $1 per point?

A. Yeah, I guess, yes, that would be correct.
Q. Is it your testimony that after you sent that e-mail to HR that you had no further discussions with anyone with regard to Mr. Daniels at all?
MR. KOSTAKOS: Objection.
A. Correct.
Q. How did you become aware that Mr. Daniels was terminated?
A. As the corporate card administrator I am cc'ed on hold terms.
Q. Did you ever make any recommendations that you thought that Mr. Daniels should be terminated?
A. No.
Q. Did you ever whether or not it was an official recommendation or not, did you ever express at all that you thought Mr. Daniels should be terminated?
A. I did not.
Q. Did you ever express to anyone that you thought what Mr. Daniels did was unethical?
A. Yes.

Q. Who did you express that to?
A. Brian Kelly and HR.
Q. And was this in writing or verbally?
A. I believe that was in that one e-mail.
Q. That one e-mail that you said Brian Kelly suggested that you write?
A. Right.
Q. And why did you think that what Mr. Daniels did was unethical?
A. I would have to go back to common sense that if we are not allowing employees to keep gifts whether it's, like I said, a purse, a leather purse or 100,000 points and taking those points away from other employees for the Christmas party that's just -- I guess you could argue whether it's unethical, but in my eyes it's unethical.
Q. If an individual is not booked at -- strike that.
Did you ever express to anyone that what Mr. Daniels did was fraud?
A. No.
Q. Did you give any other opinions as to what

you thought about the actions taken by
Mr. Daniels?
A. No.
Q. If there are hotels in the book that
travel agents have that are not on the APC
preferred hotels list, will APC receive
any points for stays at those hotels?
A. No.
Q. Did APC receive points for the stays at
the Fairfield?
A. No.
Q. Is Comfort Suites on the APC preferred
hotel list?
A. It must have been on the preferred list,
yes.
Q. And did APC receive points for hotels
rooms that were book up there?
A. No.
Q. Mr. Daniels could have booked hotel rooms
at the Comfort Suites, correct, that would
have been one of the APC preferred hotels?
A. Yes.
Q. And APC wouldn't have received points for
their Christmas party for that?

A. That's correct.
Q. And would booking hotel rooms at the Comfort Suites be unethical?
A. In my eyes?
Q. Yes.
A. No.
Q. Other than the loss of possible Christmas party points that could have been accrued if the hotel rooms were booked at the Johnson and Wales, is there anything else that you felt was unethical about what Mr. Daniels did?
A. Yes. No. 1, we paid more for the hotel rooms than we needed. No. 2, anytime room nights give you negotiation power for the next year, so anything that you lose potentially the rate can go up for the next year so there was an increased cost in the short term and in the long term in my opinion.
Q. Did the rate actually go up for the Johnson and Wales in 2004?
A. I think I was able to keep it at a couple of dollars only, not too bad?

Q. But it went up a couple of dollars?
A. Yes.
Q. And that was because there had been such a drop in 2003 from these hotels rooms?
A. That was probably one of the reasons.
Q. Well, do you know the reasons why the costs went up?
A. No, I do not know.
Q. Could it have just been inflation and the cost of living and the hotel decided to increase the rate?
MR. KOSTAKOS: Objection.
A. Could have been.
Q. Did you ever inquire the reason as to why the price was going up?
A. No.
Q. How many hotels rooms were used in 2005 at the Johnson and Wales?
A. I have no idea. I cannot give you a number.
Q. Don't you review it on an annual basis?
A. Yes, but I don't recall numbers going back to 2005 for 25 hotels.
Q. But you recalled them for 2003 and 2004,

correct?

A. I gave you approximate numbers.

Q. Can you give me an approximate number for 2005 how many hotel rooms were utilized by APC employees at Johnson and Wales?

A. Probably 750.

Q. Has there been a drop in trainings of APC employees between 2003 and 2005?

A. Yes.

Q. And why is that?

A. I can't tell you why.

Q. Do you know whether the use of hotel rooms at other hotels in the Providence area has increased for 2003 to 2005?

A. Yes.

Q. Which hotels has it increased at?

A. Comfort Suites.

Q. Any other hotels has it increased?

A. Crown Plaza.

Q. Any other hotels has it increased?

A. Sheridan Airport.

Q. Any others?

A. No.

Q. And how much does a room cost at the

Comfort Suites?

A. $73.

Q. What about the Crown Plaza?

A. $109.

Q. And what about at the Sheridan Airport?

A. $89.

Q. And in 2003 and 2005 did you receive any points at the Comfort Suites?

A. No.

Q. I mean does APC receive any points?

A. No.

Q. Is there any program where APC receives points for hotel rooms that are booked at the Crown Plaza?

A. Yes.

Q. Do you recall about how many rooms were booked at the Crown Plaza in the 2005, approximately?

A. 250.

Q. Do you recall how many were booked approximately at the Comfort Suites in 2005?

A. Close to 3,000.

Q. And what about at the Sheridan Airport?

A. A thousand.
Q. What about in 2004, approximately how many rooms were booked at the Comfort Suites in 2004?
A. Now, these are all approximate numbers.
Q. I understand that.
A. 2,500.
Q. And what about at the Crown Plaza?
A. 2004 you said?
Q. Yes.
A. I'd say 250.
Q. And what about the Sheridan Airport in 2004, approximately how many rooms were used?
A. 750.
Q. And 2003 approximately, how many rooms were used APC employees at Comfort Suites?
A. 1,500.
Q. And what about at the Crown Plaza?
A. 150.
Q. And what about at the Sheraton Airport?
A. 750.
Q. Do you recall what the rate was at the Comfort Suites for 2004?

A. I think $69.
Q. And what about at the Crown Plaza?
A. $129.
Q. And what about at the Sheraton Airport?
A. Don't recall.
Q. Do you know if it was higher or lower than the $89 that you gave?
A. Probably lower.
Q. What about in 2003, do you remember what the hotel room rate was at the Comfort Suites?
A. I think it was $69 too.
Q. And what about at the Crown Plaza?
A. $129.
Q. Is the Crown Plaza on the APC preferred hotel list for the Providence area?
A. Yes.
Q. It is?
A. Yes.
Q. It is today?
A. It actually was taken off the preferred list.
Q. When was it taken off?
A. Recently, within the last two months.

Q. Was the Crown Plaza on the APC preferred
hotel list in 2005?
A. Yes.
Q. Was it on it in 2004?
A. Yes.
Q. What it on it in 2003?
A. Yes.
Q. Was the Comfort Suites, is it currently on
the APC preferred hotel list?
A. Yes.
Q. Was it in 2005?
A. Yes.
Q. Was it in 2004?
A. Yes.
Q. Was it in 2003?
A. Yes.
Q. What about the Sheridan Airport, is it
currently on the APC preferred hotel list?
A. Yes, it is.
Q. Was it in 2005?
A. Yes.
Q. Was it in 2004?
A. Yes.
Q. Was it in 2003?

A. There have been occasional complaints.
Q. How many complaints are you aware of?
A. Maybe a handful.
Q. What's a handful?
A. Maybe about five.
Q. Were those complaints made directly to you?
A. Some of them.
Q. How many were made directly to you?
A. Maybe two.
Q. Who made those complaints, do you recall the names of the individuals?
A. No.
Q. Do you remember the circumstances?
A. No.
Q. No?
A. No.
Q. Do you remember anything about those complaints?
A. One was that the rooms were old, one was that the rooms were musty smelling, those two I recall.
Q. The other complaints, they didn't come directly to you, how did you learn about

lawsuit?
A. No.
Q. Other than the attorneys?
A. Correct.
Q. Have you ever had any conversations with any of your friends about that fact?
A. My husband.
Q. Anybody else in your family other than your husband?
A. No.
Q. And what did you tell your husband?
MR. KOSTAKOS: Objection. I instruct the witness not to answer.
MS. KIRSCH: What's the basis.
MR. KOSTAKOS: Marital privilege.
Q. Are you going to answer the question, or are you going to --
A. No, I am not.
Q. Are you aware of any other individual other than Mr. Daniels being terminated on the basis of where hotel rooms be reserved?
MR. KOSTAKOS: Objection.

A. No, I am not.
Q. Are you aware of any APC employees being disciplined for their choice of locations for reserving hotel rooms?
MR. KOSTAKOS: Objection.
A. I am not.
Q. Are you aware of any employees who were terminated for violating any part of the travel policy?
A. I am not.
Q. Are you aware of any individuals who were disciplined for violating the travel policy?
A. No, I am not.
Q. Are you aware of any individuals who violated the travel policy?
A. Yes.
Q. And who?
A. I can't give you names.
Q. Why not?
A. Because I don't recall.
Q. How many individuals have violated the travel policy?
MR. KOSTAKOS: Can you be more

understand what you're picking at.
Q. Do you understand the question or not?
A. No, I understand the question.
Q. So the question is who at APC has the authority to determine whether or not the APC travel policy has been violated; is your answer the individual manager who is approving the expense?
MR. KOSTAKOS: Answer only if you know the answer to the question.
A. I don't know. I don't know.
Q. You don't know who at APC determines whether the travel policy has been violated?
MR. KOSTAKOS: Objection. Asked and answered.
Q. Who has the authority?
A. That's correct, I don't know.
Q. Do you have that authority?
A. No.
Q. Did you ever express to anyone that Mr. Daniels had violated the APC travel policy?
A. No.

Q. Do you have an opinion as to whether or not Mr. Daniels, in fact, violated the APC travel policy?

MR. KOSTAKOS: Objection.

A. No.

Q. You don't have an opinion one way or the other.

MR. KOSTAKOS Objection.

A. No.

Q. Based upon your role of travel manager implementing the travel policy, is it your understanding that Mr. Daniels did or did not violate the APC travel policy?

MR. KOSTAKOS: Objection.

A. That would be for his manager to determine if he did or did not.

Q. That wasn't my question though.

A. That was my answer though.

Q. Based on your role as travel manager and in implementing the APC travel policy, is it your understanding that Mr. Daniels did or did not violate the APC travel policy?

MR. KOSTAKOS: Objection.

A. Again, I think it's for his manager to

determine if he violated the policy or not, but it is my opinion that what he did was unethical.

Q. So you don't know one way or another whether Mr. Daniels violated the APC travel policy?

MR. KOSTAKOS: Objection, asked and answered twice.

A. I don't know.

Q. Did you ask Mr. Daniels' manager whether or not if Mr. Daniels' manager felt that Mr. Daniels violated the APC travel policy?

A. I did not.

Q. Did you ever inquire with anyone with regard to whether or not Mr. Daniels violated the APC travel policy?

A. Did not.

Q. Did you ever specifically direct Mr. Daniels and tell him that he must insure that rooms are reserved at the Johnson and Wales Hotel?

A. No, I did not.

Q. Did you ever directly him that he was not

permitted to allow rooms to be booked at the Providence Marriott?

A. No, I did not.

Q. Did you ever tell Mr. Daniels that he was not permitted to receive travel points as the organizer for the hotel rooms that were reserved at the Providence Marriott?

A. I did not.

Q. Was training held at the Providence Marriott?

A. Actual training?

Q. Yes, actual training sessions.

A. They were meeting rooms, I do not know if there was training in those meeting rooms.

Q. And how do you know that meeting rooms were booked?

A. Because I saw it on the invoices.

Q. Did you ever inquire with anyone whether or not actual training was conducted at the Providence Marriott?

A. No, I did not.

Q. Do you know whether anyone else ever inquired?

A. Do not know.